## Exhibit H

**Monex Amparo**

**Certified Translation (English)**



**<u>CERTIFICATION</u>**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the original document entitled "*Monex Constitutional Appeal_Amparo,*" which was written in Spanish.

City of Buenos Aires, August 18, 2022.

THE TR COMPANY TRANSLATION SERVICES



_____

Ms Cynthia Farber

Certified Sworn Translator

License recorded on Page 226:Book XV.

Registered with the Translators Bar Association

City of Buenos Aires

C.T.P.C.B.A. No.5402

Manuel Ugarte 2187 1º (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com

# CORRESPONDENCE OFFICE (OCC) OF DISTRICT COURTS IN CIVIL MATTERS IN AND FOR MEXICO CITY

| | |
|---|---|
| Indirect *amparo* proceeding | **OCC Registration No.:** 20220811033508977 |
| Formal | **Electronic File No.:** 3760569 |
| Civil matters | **Type of Submission:** Online Services Portal (PSL) |
| | **Referring User:** jmgarciab |

| | |
|---|---|
| **Submission Date/Filing Date:** 07/19/2022 | **Submission Time/Filing Time:** 12:49 p.m. |
| **Appointment Date:** 07/19/2022 | **Appointment Time:** 1:10 p.m. |

**Referred to:** EIGHTH DISTRICT COURT IN CIVIL MATTERS IN AND FOR MEXICO CITY

**No. of Copies:** 0 **No. of Exhibits:** 0

**Appellant/Plaintiff:** *

**Petitioner:** BANCO MONEX, S.A. I.B.M. MONEX GRUPO FINANCIERO

**Authorized Representative:** JACOBO GUADALUPE MARTINEZ FLORES

**Third Party in Interest:** CREDITO REAL, S.A.B. DE C.V.

**Challenged Actions:** ALL THE MEASURES UNDER CASE FILE 691/22

**Authority in Charge:** 52nd COURT. WRITTEN CIVIL PROCEEDING. CDMX.

**Authority has Signature:** YES **Page of Art. 41:** *

**Record of Authority in Charge:** *

**Original File:** 691/22

[Illegible]: 52ND COURT. WRITTEN CIVIL PROCEEDING. CDMX.

**Comments:** *

| **Notifying Correspondence Office** | | **Party authorized by the court to process petitions** | |
|---|---|---|---|
| Public Officer who serves the notice: | José Manuel García Barrera | Public Officer who receives the notice: | |
| Signature: | | Associated Office: | |
| Date: | Time: | Signature: | Time: |
| | | Date: | |

[Handwritten:] 783/2022-III. FILE 12859.

PETITIONER: BANCO MONEX, S.A.

**INSTITUCIÓN DE BANCA MÚLTIPLE,**

**MONEX GRUPO FINANCIERO**

**INDIRECT *AMPARO* PROCEEDING**

<u>**INITIAL COMPLAINT**</u>

[Seal:] EIGHTH DISTRICT COURT IN CIVIL MATTERS. JULY 20, 2022 AT 9:00 AM. MEXICO CITY. 12859. [Handwritten:] Four exhibits. [Signature]

**TO THE JUDGE OF THE DISTRICT COURT IN CIVIL MATTERS IN AND FOR MEXICO CITY ON DUTY.**

I, **JACOBO GUADALUPE MARTINEZ FLORES**, in my capacity as counsel for Banco Monex, S.A., Institución de Banca Múltiple, Monex Grupo Financiero —as duly evidenced by public instrument No. 45,619 attached hereto as "<u>**Exhibit 1**</u>", which is declared, under penalty of perjury, to be a true and accurate copy of its original in accordance with Section 3(IV) of General Agreement No. 12/2020 of the Mexican Judicial Council sitting *en banc*—, establish the registered office of my client for any matters concerned with the proceeding at Blvd. Manuel Ávila Camacho 24, piso 21, Colonia Lomas de Chapultepec, Alcaldía Miguel Hidalgo, zip code 11000, Mexico City. Moreover, I hereby authorize lawyers Daniel Alejandro Diaz Álvarez (professional license No. 4048429), Octavio Lorenzo Hernandez Negretti (professional license No. 5559352), Estefanía Sierra Ulibarri (professional license No. 8074726), Adrián Roberto Villagómez Alemán (professional license No. 7259714), Daniel Pardo Fuentes (professional license No. 11036633), Gabriel Nájera Mandujano (professional license No. 11547664), Miguel Ángel García Ávila (professional license No. 12367247), and Yoare Heredia González (professional license No. 8651856) to jointly or individually perform the broad acts set forth in Section 12 of the *Amparo* Act; and further expressly authorize Santiago Hernández Gutiérrez, Citlali Anahí Nava Marín, Luis Eduardo García Mora, Diego Enrique Lazcano González, Sebastián García-Lascuráin Barrantes, Cristóbal Sales Cruz, Regina Cabrera Suárez, Sandra Paola Herrera Ortiz and Raymundo Guerra Lea, either jointly or separately, to receive notices, take pictures of documents attached to the case file, scan and receive documents, and access the case file. Also, by virtue of circulars No. 12/2020, 13/2020 and 14/2020 issued by the Mexican Judicial Council on June 8, 2020, I request permission to access the electronic file created in this proceeding. To facilitate the review of the electronic file and protect both the Court's personnel and the parties to the proceeding, I expressly authorize users "DanielDiazA" (Daniel Alejandro Díaz Álvarez), "esierra" (Estefanía Sierra Ulibarri), "egarciamora" (Eduardo García Mora), "yheredia" (Yoare Heredia González), and "mgarciaavila" (Miguel Ángel García Ávila) to send any type of notices, including personal notices, through the Mexican Judicial Council's Online Service Portal. I hereby respectfully appear and declare as follows:

Pursuant to Articles 103 and 107 of the Political Constitution of the United Mexican States; Sections 1, 107(V) and 107(VI), 108 and related provisions of the *Amparo* Act, I hereby file this **INDIRECT *AMPARO* PETITION** with respect to the acts performed by the authority in charge.

The following information is provided to comply with Section 108 of the *Amparo* Act:

## I.    PETITIONER'S NAME AND ADDRESS

**a.**  Banco Monex, S.A., Institución de Banca Múltiple, Monex Grupo Financiero, with registered offices for any matters concerned with this proceeding at Blvd. Manuel Ávila Camacho 24, piso 21, Colonia Lomas de Chapultepec, zip code 11000, Delegación Miguel Hidalgo, Mexico City, Mexico.

## II.    NAME AND ADDRESS OF THIRD PARTIES IN INTEREST

**a.**  **CRÉDITO REAL S.A.B. DE C.V., SOFOM, E.N.R.**, with offices at Insurgentes Sur 730, Col. Del Valle Alcaldía, Benito Juárez, 03103, Mexico City, Mexico City.

**b.**  **ÁNGEL FRANCISCO ROMANOS BERRÓNDO**, whose address I declare, under penalty of perjury, to ignore. Such address shall be provided as soon as I am authorized to access case file 691/2022, filed with the Fifty-second Court in Civil Matters of the Superior Court of Justice in and for Mexico City.

## III.    AUTHORITIES IN CHARGE

**a.**  Fifty-second Court in Civil Matters of the Superior Court of Justice in and for Mexico City ("**Court in Charge**", "**Fifty-second Civil Court**" or "**Ordinary Court Predetermined by Law**").

**b.**  Assistant Clerks to the Fifty-second Court in Civil Matters of the Superior Court of Justice in and for Mexico City.

**c.**  National Banking and Securities Commission.

**d.**  Public Registry of Property and Commerce of Mexico City.

## IV.    CHALLENGED ACTIONS

a.   The Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City is hereby challenged with respect to any and all acts, agreements, orders, official letters, injunctions, interlocutory decrees and final judgments issued in case 691/2022; in particular, the order dated June 30, 2022 (and any subsequent and directly related orders, if applicable), which sought to execute various precautionary measures on the property, rights and assets of the third party in interest, thus affecting my client's rights against such party.

b.   The Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City is hereby challenged with respect to any and all measures, rulings, agreements, orders, subpoenas, injunctions, official letters, decrees and letters rogatory issued and to be issued in the original proceeding, and seeking to finalize, formalize and/or execute the different precautionary measures imposed on the property, rights and assets of Crédito Real.

c.   The Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City is hereby challenged with respect to the final judgment allegedly issued on July 13, 2022 and published on July 14 of the same year in case file 691/2022. Under penalty of perjury, it is stated that as of the date this petition was filed, the content of such judgment was unknown. Notwithstanding the foregoing, such judgment is also challenged; the reasons for the challenge will be elaborated on, as convenient for the petitioner, once authorization to access the judgment is granted.

d.   Assistant Clerks to the Fifty-second Court in Civil Matters of the Superior Court of Justice in and for Mexico City, as Enforcement Authorities in Charge, are hereby challenged with respect to any actions purporting to enforce any order, agreement, injunction, ruling, decree, judgment and notice derived from or issued in case 691/2022, in particular those related to any precautionary measures ordered under the original proceeding and imposed on the property, rights and assets of Crédito Real; specifically, the intended execution of the order of June 30, 2022 and the final judgment of July 14, 2022 (and any subsequent and directly related orders, if applicable).

e.   The National Banking and Securities Commission, as Enforcement Authority in Charge, is challenged with respect to any actions purporting to enforce any order, agreement, injunction, ruling, decree, judgment and notice derived from or issued in case 691/2022, in particular those related to any precautionary measures ordered in the original proceeding and imposed on the property, rights and assets of Crédito Real; specifically, the intended execution of the order of June 30, 2022 and the final judgment of July 13, 2022.

f.   The Public Registry of Property and Commerce of Mexico City, as Enforcement Authority in Charge, is challenged with respect to any actions purporting to enforce any order, agreement, injunction, ruling, decree, judgment and notice derived from or issued in case 691/2022, in particular those related to precautionary measures and/or discharge of attachments,

registration of dissolution and liquidation proceedings, registration of liquidators, or any other measures set forth in the General Business Organizations Law, ordered in the original proceeding and imposed on the property, rights and assets of Crédito Real; specifically, the intended execution of the order of June 30, 2022 and the final judgment of July 13, 2022.

V.    **BACKGROUND**

**Under penalty of perjury**, it is hereby stated that the background events to the challenged actions known by the Petitioner are as follows:

a.  **CRÉDITO REAL S.A.B. DE C.V., SOFOM, E.N.R.**, ("Crédito Real", "SOFOM", or "Respondent") is a financial institution organized as a *Sociedad Anónima Bursátil de Capital Variable, Sociedad Financiera de Objeto Múltiple, Entidad No Regulada* (Variable Stock Corporation, Multiple-purpose Financial Corporation, Non-Regulated Entity). The company has been mainly devoted to the grant of loans for durable goods and consumables and has branches in the United States, Costa Rica, Panama, Nicaragua and Honduras. The loans are granted through diversified lines of business, mostly including payroll deduction loans, SMEs loans, group loans, used car loans and, through Instacredit, consumer loans. Crédito Real's stock is listed on the Mexican Stock Exchange under the "CREAL" ticker.

b.  According to public records, in 2007 it partnered with Nexxus Capital Private Equity and began conducting group loan operations. Thus, in year 2012, it registered with the Mexican Stock Exchange and had its Initial Public Offering (IPO).

c.  As per publicly available information, in 2014 the company began to place international bonds for USD 425,000,000.00 (four hundred and twenty-five million dollars, legal tender of the United States of America), 7.5% with maturity date in 2019. In 2015, the company issued stock-exchange certificates for CHF 1,000,000,000.00 (one billion Swiss francs). In 2016, it placed another international bond for USD 625,000,000.00 (six hundred and twenty-five million dollars, legal tender of the United States of America) with maturity date in 2023.

d.  According to public sources, in 2018 the company issued a Swiss Bond with maturity date in 2022 for CHF 170,000,000.00 (one hundred and seventy million Swiss francs), and there was a second issuance for CHF 615,000,000.00 (six hundred and fifteen million Swiss francs) under the Securitization Program. In 2019, unsecured notes were offered for USD 400,000,000.00 (four hundred million dollars, legal tender of the United States of America) with maturity in 2026; moreover, Senior Notes were offered for EUR 350,000,000.00 (three hundred and fifty million Euros) with maturity in 2027, and bonds for MXN 750 (seven hundred and fifty million Mexican pesos) were issued under the loan portfolio securitization program.

e.  On February 19, 2020, a syndicated line of credit for USD 110,000,000.00 (one hundred million dollars, legal tender of the United States of America) was extended with a three-year maturity; and a medium-term bond issuance program ("**MTN Program**") for up to USD 1,500,000,000.00 (one billion, five hundred million dollars, legal tender of the United States of America) was launched. Several creditors took part in that program, including my client, which participated for USD 13,000,000.00 (thirteen million dollars, legal tender of the United States of America). The foregoing is evidenced by the document attached hereto as "**Exhibit 2**", which also proves my client's cause of action in these *amparo* proceedings.

f.  In May, June and July 2022, various press articles were published noting that Crédito Real was in financial trouble and working on a restructuring plan. On June 1, 2022, the BMV suspended the listing of Crédito Real's stock.

g.  Furthermore, it was announced that Crédito Real was filing for a reorganization proceeding in the United States, also known as "Chapter 11" bankruptcy, after failing to make payments to the holders with respect to a bond for an amount of CHF 170,000,000.00 (one hundred and seventy million Swiss francs).

However, since the petition was not filed voluntarily in the United States, various creditors — including my client— filed an involuntary bankruptcy proceeding under Chapter 11 of the New York Bankruptcy Act, which is currently pending resolution.

h.  On July 14, 2022, Crédito Real submitted several statements to a United States court and attached various documents of the proceeding conducted in Mexico, including an admission order issued by the Ordinary Court Predetermined by Law on July 1, 2022. It follows from those documents that different precautionary measures challenged herein were granted. It was stated that such proceeding was not a Business Reorganization Proceeding but an act that constitutes the challenged action and which allegedly involves the corporate/judicial dissolution and liquidation of Crédito Real, which is unconstitutional for violating fundamental rights of the petitioner and of several creditors, a matter analyzed in depth in this *amparo* proceeding.

i.  Also, on July 14, 2022, the Mexican Stock Exchange announced the publication of a court decision which declared the dissolution and liquidation of Crédito Real. Furthermore, it was informed that a trustee had already been appointed by the court as a result of the legal action filed by "one of the shareholders". This information may be consulted at https://www.bmv.com.mx/docs-pub/visor/visorXbrl.html?docins=../eventemi/eventemi_1205293_1.zip#/visorXbrl, and is a publicly known fact to this Court since it became public knowledge.[1]

---

[1] "*ELECTRONIC OR WEB PAGES. THEIR CONTENT IS PUBLICLY KNOWN AND MAY BE SUBJECT TO VALUATION BY A JUDICIAL DECISION.*"

**j.**  In addition, on July 15, 2022, "El Financiero" newspaper published an article claiming that a Mexican court had ordered the liquidation of Crédito Real.

**k.**  As a result of the search conducted with the data provided by Crédito Real before the New York Court, my client learned that there is a special commercial proceeding involving Romanos Berróndo Ángel Francisco, shareholder of SOFOM Crédito Real, as plaintiff, and Crédito Real, S.A.B. de C.V. *Sociedad Financiera de Objeto Multiple, Entidad No Regulada*, as defendant. This also constitutes a publicly known fact which may be verified at this link: https://consultabpj.poderjudicialcdmx.gob.mx:2096/externo/2242.

**l.**  It follows from the referred link that on July 5, 8 and 12, 2022, certain agreements were reached in case 691/2022, a proceeding filed with the Fifty-second Court. In such proceeding, Crédito Real is the defendant. In the earlier agreements dated July 1, 5 and 8, 2022, the proceeding is published as "Confidential", which is normally the case where the execution of a precautionary measure or attachment is ordered. This is a publicly known fact to this Court because this information was published on an official page of the Judiciary.

The fact that the publication is publicly known is confirmed based on the following judicial arguments: *"ELECTRONIC OR WEB PAGES. THEIR CONTENT IS PUBLICLY KNOWN AND MAY BE SUBJECT TO VALUATION BY A JUDICIAL DECISION", AND "PUBLICLY KNOWN FACT. IT CONSISTS IN DATA APPEARING ON OFFICIAL WEBSITES THAT GOVERNMENT AGENCIES USE TO MAKE AVAILABLE TO THE PUBLIC, AMONG OTHERS: DESCRIPTIONS OF JOB POSITIONS, PAYROLLS, OR THE STATUS OF CASE FILES. FOR THAT REASON, SUCH INFORMATION MAY BE INVOKED* SUA SPONTE *FOR ANY PARTICULAR MATTER."*

**m.**  As of this date, the petitioner has not been summoned or notified of the original case, and it therefore has the status of a person who is not a party to the proceeding. As a result, it does not have formal or accurate knowledge of the proceedings, measures, orders, injunctions, attachments or any other act within the referred proceeding, and is absolutely defenseless because the proceeding in question is a special commercial proceeding which aims at dissolving the company —as per the information obtained and described in this background section— and does not include the creditors of Crédito Real as is the case of my client or the rest of the shareholders, except for the plaintiff of the case.

**n.**  Along this line of thought, as was previously noted, my client is a creditor of SOFOM Crédito Real. The fact that the dissolution and liquidation was ordered legally affects my client because the claims enforceable against the company were left in a state of defenselessness and legal uncertainty. Since nothing is known about the proceeding commenced, no assumptions may be made; also, the proceeding conducted is not appropriate to liquidate a company that is in a

state of insolvency, as we will explain below. The speediness with which the judgment was allegedly entered and the liquidation was ordered is also worth noting, as it affected third parties, among which my client is also included.

The fact that the petitioner is a person who is not a party to the proceeding is confirmed because my client is adversely affected by the admission of the petition, the agreements, precautionary measures and the judgment allegedly entered in case 691/2022. My client sustains harm for being a creditor of Crédito Real, as we will see in greater detail in the appropriate section of this document.

## VI.    DATE ON WHICH THE CHALLENGED ACTIONS BECAME KNOWN

Under penalty of perjury, I state that my client learned about the challenged actions on July 14, 2022, since on that date Crédito Real entered an appearance in the Chapter 11 bankruptcy case filed by several creditors —including my client— and informed about the precautionary measures ordered by the Fifty-second Court.

As a result, my client conducted a search on the website of the Judicial Gazette of Mexico City and found out that a special commercial proceeding involving Romanos Berróndo Ángel Francisco, shareholder of the defendant, as plaintiff, and Crédito Real, S.A.B. de C.V., *Sociedad Financiera de Objeto Múltiple, Entidad No Regulada*, as defendant, had been filed with the Fifty-second Court (case file 691/2022). The proceeding included the following phrase: "COMMERCIAL PROCEEDING. 5 AGREEMENTS", which is a publicly known fact that may be consulted in the following link: https://consultabpj.poderjudicialcdmx.gob.mx:2096/externo/2242.

As the referred link shows, the agreements dated July 1, 5 and 8, 2022 were published as "Confidential", which is normally the case where the execution of a precautionary measure and/or attachment has been ordered.

It is thus clear that the *amparo* petition is filed within the legal term granted.

## VII.    CONSTITUTIONAL PRINCIPLES VIOLATED

Articles 1, 14, 16, 17, 25, 40, 41, 103, 104, 115, 122 and 124 of the Political Constitution of the United Mexican States, as well as Articles 8 and 25 and further consecutive and applicable provisions of the American Convention on Human Rights.

**ADMISSIBILITY CHAPTER**

Pursuant to Articles 103 and 107(I), 107(III)(c) and 107(VII) of the Political Constitution of the United Mexican States, as well as Section 107(VI) of the *Amparo* Act, *amparo* proceedings are admissible as a defense against acts affecting persons who are not parties to the proceeding in question (*i.e.,* unrelated to the dispute), whether within or outside a case.

## POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES

*"**Article 107.** The disputes referred to in Article 103 of this Constitution, except for those related to electoral matters, shall be subject to the proceedings set forth in the regulations, as per the following criteria:*

*__I.__ Amparo proceedings shall be heard at the request of the aggrieved party, such party being whoever claims to be the holder of a right or an individual or group legitimate interest, provided it alleges that the challenged action violates the rights embodied in this Constitution and thus affects its legal rights, either directly or by virtue of a special situation with respect to the legal system.*

*[…] __III.__ Where acts from judicial, administrative or labor courts are challenged, the* amparo *petition shall only apply in the following cases:*

*[…] __c)__ Against acts affecting persons who are not parties to the proceeding;*

*__VII.__ Amparo petitions against acts or omissions within, outside or after a proceeding which may affect persons who are not parties to the proceeding, or against general rules or actions or omissions by an administrative authority, shall be filed with the District Court of the jurisdiction in which the challenged action was performed or attempted to be performed. The proceeding shall only consist in submitting a report to the authority and holding a hearing called through the same ruling ordering the issuance of the report. During the same hearing, the parties in interest may offer evidence, the parties shall hear the allegations, and the judgment shall be entered; [...]."*

**AMPARO ACT**

*"Section 107. Indirect* amparo *proceedings are admissible:*

*[…] **VI.** Against acts within or outside of the proceeding which affect persons who are not parties to the proceeding."*

The Judiciary of the Federation defines a person who is not a party to the proceeding as follows:

"Any individual or legal entity which did not participate in the proceeding as a material party to it, *but which sustains harm from it or from the execution of its rulings* without having the opportunity of being heard or defeated for completely ignoring the related proceedings."

In this vein, a person who is not a party to the proceeding *per se* is a person, *i.e.,* an individual or legal entity, other than the parties to the dispute being heard. Therefore, the "person who is not a party to the proceeding" is the opposite to the procedural "party". As a result, an indirect *amparo* is admissible where the actions performed, whether within or outside of the proceeding, cause harm to such person without giving them the opportunity of being heard and defeated in trial, in violation of the guarantee of a hearing.

Indeed, a person who is aware of a certain proceeding in which issues having an impact on their legal interests are being resolved is not obliged to exhaust all the ordinary remedies. Since such person is not a party to the proceeding, they have the possibility of filing the *amparo* petition in an effort to have their rights restored.

This is an exception to the requirement that a final judgment exists that is applicable to the *amparo* proceeding. The following criterion supports this:

*Digital docket No.: 172933*

*Instance: Circuit Courts*

*Ninth Series*

*Matter(s): Ordinary*

*Opinion: VI.2o.C. J/282*

*Source: Court Journal and Gazette of the Federation*

*Volume XXV, March 2007, page 1557*

*Type: Case law*

**A PERSON WHO IS NOT A PARTY TO THE PROCEEDING HAS NO OBLIGATION TO EXHAUST ORDINARY REMEDIES.**

*Section 73(XIII) of the* Amparo *Act provides that the* amparo *proceeding is inadmissible against judicial rulings issued by administrative or labor courts with respect to which the law grants remedies or defenses, as part of the proceeding, to modify, revoke or annul such decisions, even if the aggrieved party fails to timely enforce them, except for what Article 107(VII) of the Constitution provides for the persons who are not parties to the proceeding. Thus, the first subsection refers to the ordinary defenses established by the law in favor of the parties, which they must exhaust or enforce before filing an* amparo *proceeding in order to meet the requirement that a final judgment exists, and the second subsection provides that this principle does not apply to persons who are not parties to the proceeding. That is so because if they are not parties to the original proceeding, they cannot use those remedies or defenses either.*

Moreover, it should be noted that, in the hypothetical case that my client was a party to the Original Proceedings and a decision was issued to order the dissolution of the company, as was apparently the case, the ordinary defense to be exhausted would be the appeal. Such remedy, however, is not effective to safeguard the petitioner's rights, since it does not envisage the stay of the act and would therefore not prevent its uncurable occurrence. The following criterion supports this argument:

*Digital docket No.: 2024044*

*Instance: Circuit Courts*

*Eleventh Series*

*Matter(s): Ordinary*

*Opinion: I.11o.C.J/6 K (11a.)*

*Source: Court Journal and Gazette of the Federation. Book 9, January 2022, Volume IV; page 2866*

*Type: Case law*

**THE INDIRECT** **AMPARO** **PROCEEDING MAY BE FILED WITHOUT EXHAUSTING THE REQUIREMENT THAT A FINAL JUDGMENT EXISTS IF A REMEDY OR ORDINARY DEFENSE IS SUITABLE TO REVOKE, MODIFY OR ANNUL THE CHALLENGED ACTION BUT IS NOT EFFECTIVE TO SAFEGUARD THE PETITIONER'S RIGHTS.**

*Facts: The District Court dismissed the indirect* amparo *petition because it concluded that the petitioner failed to exhaust the requirement that a final judgment exists, for which reason a motion for appeal was filed.*

*Legal grounds: This Circuit Court rules that where a remedy or ordinary defense is appropriate to revoke, modify or annul a challenged action but is not effective to safeguard the petitioner's rights due to its own nature, the manner in which the proceeding is regulated or the special*

*circumstances of the case at hand, the private party may immediately file an indirect* amparo *petition without exhausting the requirement that a final judgment exists.*

*Justification: The requirement that a final judgment exists derives from Article 107(III) of the Political Constitution of the United Mexican States; it is one of the main guiding principles of the admissibility of the* amparo *proceeding and ratifies its nature as an extraordinary defense mechanism to be used, in principle, only in the event the harm caused by the authority's action is final and incurable by other means. This principle is regulated, as a ground for inadmissibility of the constitutional action, in Section 61(XVIII), paragraph one, of the* Amparo *Act, a regulatory hypothesis that only applies to judicial proceedings but not administrative acts, which are specifically governed by Section 61(XX). To satisfy effective judicial protection fundamental rights and have a simple and swift judicial remedy at hand, the obligation or procedural duty to exhaust the requirement that a final judgment exists set forth in Article 17, paragraph two of the Political Constitution of the United Mexican States and Article 25 of the American Convention on Human Rights before an* amparo *petition is filed rests in the logic that the remedy or ordinary defense admissible against the authority's act deemed harmful should meet the following conditions: I. Appropriateness. It should be able to modify, revoke or annul the challenged action; and II. Effectiveness. Depending on the nature of the act to be challenged, it must: i. allow the person to fully exercise its right to defense; and, ii. regulate a procedure preventing the irreparable impact of the effects caused by the authority's act on the rights of the party subject to administrative authority. Thus, if the remedy or ordinary defense envisaged in the procedural legislation fails to meet any of the above conditions, there is no obligation on the part of the petitioner to file it before resorting to the* amparo *petition.*

Therefore, this *amparo* petition is grounded on Article 107(I), 107(III)(c) and 107(VII) of the Constitution, and on Section 107(VI) of the *Amparo* Act referred to above, since the execution of the challenged actions derives in a clear and direct impact on the substantive rights of the petitioner —a person that is not a party to the Original Proceeding because the authority in charge has issued various rules which directly affect my client's legal interests, as it was not given the opportunity of defending itself and was left in a state of complete uncertainty.

This consists in the dissolution and liquidation of Crédito Real, a proceeding in which several precautionary measures were granted by inadmissible means and by an authority lacking jurisdiction (which encroached on the jurisdiction of the district courts). Undoubtedly, this is an irreparable act within the proceeding, since it materially affects substantive rights, in particular the right to property, the right to due process of law and the right to effective judicial protection.

Article 103 of the Political Constitution of the United Mexican States and Section 1 of the Amparo Act establish the grounds for admissibility of the *amparo* proceeding, which provide that its

purpose is to solve any dispute arising from general rules, actions or omissions by the authority of federative entities which encroach on the jurisdiction of the federal authority, provided there is also a violation of the human rights and guarantees granted for their protection and embodied in the Political Constitution of the United Mexican States.

This means that if an authority from a federative entity should encroach upon the jurisdiction of a federal authority, the party subject to administrative authority that is aggrieved by the act resulting from that encroachment may file an *amparo* petition and request the protection of the Union's Judiciary. This seeks to maintain the principle of division of jurisdiction and respect for federalism. It should be noted that in this case, the harmed party subject to administrative authority should resort to the *amparo* petition, in accordance with the principle of request by the aggrieved party and admissibility of *amparo*.

That is, if an authority from a federative entity should encroach upon the jurisdiction of a federal authority, it would be clearly affecting the jurisdiction system between the federal and local authorities and the human rights of the parties subject to administrative authority.

The admissibility of the *amparo* petition against the restriction of sovereignty is fundamental to safeguard Mexican federalism, as it consists in a constitutional defense available to the party subject to administrative authority. The following arguments from our highest courts support this view:

> *Series: Fifth Series*
>
> *Docket: 389842*
>
> *Instance: En banc*
>
> *Type of opinion: Case law*
>
> *Source: Appendix of 1995*
>
> *Volume I, Part HO*
>
> *Matter(s): Constitutional*
>
> *Opinion: 389*
>
> *Page: 362*

**AMPARO** *PETITION AGAINST THE ENCROACHMENT OF JURISDICTION BY THE* *FEDERATION WITH RESPECT TO THE STATES AND VICE VERSA.*

*The* Amparo *petition was embodied in Article 103 of the Constitution, not to safeguard the entire Constitution but to protect individual guarantees. Articles 103(II) and 103(III) should be construed as entitling the petitioner to* ***solely claim the application of a federal law during*** ***the*** amparo ***proceeding where the jurisdiction of the States is encroached upon or***

*restricted, or if the federal authority jurisdiction is encroached upon, where there is a* *private petitioner* claiming the violation of individual guarantees in a specific execution case *or as a result of such encroachments or sovereignty restrictions. If the constituent assembly had been willing to grant the power to file an* Amparo *petition to protect any violation of the Constitution, even those not causing harm to private interests, it would have had to clearly do so, which was not the case. Through the Constitutions of 1857 and 1917, and the constitutional drafts and reform documents anteceding them, it follows that the constituents, aware of the different control systems that may be implemented to remediate the violations of the Constitution, did not want to give the Judiciary of the Federation full powers to challenge all unconstitutional orders through the* Amparo *proceeding, and set this mechanism up, instead, for the protection and enjoyment of individual guarantees."*

*Series: Fifth Series*

*Docket: 339130*

*Instance: Third Division*

*Type of Opinion: Guiding opinion*

*Source: Court Journal of the Federation*

*Volume CXXX*

*Matters(s): Ordinary*

*Opinion:*

*Page: 765*

**ONLY PRIVATE PARTIES MAY FILE AN** Amparo **PETITION AGAINST THE ENCROACHMENT OF JURISDICTION.**

**The** Amparo **action by virtue of which encroachment upon jurisdiction is challenged must be filed by the private party whose constitutional guarantees are affected by the encroachment.** *Article 103 of the Federal Constitution reads as follows: "The Federation Courts shall resolve any disputes arising from: I. Laws or acts of the authority which violate individual guarantees; II. Federal authority's laws or acts which violate or restrict the sovereignty of the states, and III. Laws and actions by the authorities of the states which encroach on the federal authority's jurisdiction". In the case of laws or acts by authorities which violate individual guarantees there is no problem, since the* amparo *petition may be requested by a private person, i.e., an individual, or legal entity concerning its property rights. But who would request an* amparo *under the two latter sections? One might think that the* amparo *could be filed by the Federation or the State, since the matter in question is the encroachment of jurisdiction. However, a final principle in terms of the* amparo *petition is the fact that the constitutional proceeding must always be filed by a private party, by a person sustaining harm from the action*

*in question. In some cases, the Federation or the State may file an* amparo, *provided they are legal entities under civil law. The Federation and the States, as authorities, may not request an* amparo *alleging the encroachment of their respective jurisdictions. This argument clearly follows from the first part of Article 107 of the Federal Constitution, which reads as follows: "All the disputes referred to in Article 103 shall be heard at the request of the aggrieved party through legal procedures and forms to be determined by a law in line of the following conditions: 1. The judgment shall always refer to private individuals, and shall protect and safeguard them with regard to the challenged action, without a general statement on the law or act giving rise to it." Thus, for the action to be challenged through a constitutional proceeding, it must adversely affect an individual or civil law legal entity, since they are the only parties that may resort to the* amparo *proceeding. The Judiciary of the Federation may not serve as an instrument of another State branch because the only one that may file this petition is the aggrieved private party, and the basis of the request should be a specific harm to its assets or person. The control function refers, therefore, to a private and particular interest and not to the interest of a political party or group, or a State's agency.*

Added to this, it is clear that the *amparo* proceeding is the only means of defense available for petitioners to resolve any controversies arising from the encroachment of jurisdiction between federal and local authorities affecting its legal rights, particularly human rights, considering that the admissibility of this proceeding is regulated both in the Constitution and under the implementing law. In addition, it follows from the analysis of the laws that there is no ordinary means of defense which may be exhausted prior to the filing of the *amparo* proceeding, given that an encroachment of jurisdiction is at issue and my principal is not a party to the original controversy, although it is indeed affected by the precautionary measures granted therein; therefore, the indirect *amparo* proceeding is admissible with no need to exhaust any remedies or actions as prescribed under local legislation with regard to the potential to be subject to objections, on the grounds that the controversy is related to an encroachment of jurisdiction between federal and local authorities. In support of the foregoing, the following precedent laid down by our highest courts may be noted:

*Series: Tenth Series*

*Docket No.: 2017422*

*Instance: Circuit Courts*

*Type of Opinion: Case law*

*Source: Court Journal and Gazette of the Federation*

*Book 56, July 2018, Vol. II*

*Matter(s): Ordinary*

*Opinion: XVIII.2o.P.A. J/l (10a.)*

*Page: 1379*

*RIGHT TO STREET LIGHTING IN THE STATE OF MORELOS. IF <u>THE **AMPARO** PETITION FILED</u> AGAINST THE COLLECTION OF SERVICE RATES <u>WAS SUBMITTED AS A PETITION AGAINST THE RESTRICTION OF SOVEREIGNTY OR AN ENCROACHMENT OF JURISDICTION, THE PETITIONER SHALL NOT BE REQUIRED TO SATISFY THE PRINCIPLE THAT A FINAL JUDGMENT EXISTS.</u>*

*<u>If the</u>amparo <u>petition was filed against the restriction of sovereignty or an encroachment of jurisdiction, pursuant to Article 103(III) of the Political Constitution of the United Mexican States, and Section 1(III) of the</u> Amparo Act, on the grounds that the petitioner objects to the collection of street lighting service rates, which charges are grounded on general laws, namely: the Law on Public Revenue of the Cuernavaca Municipality (Morelos), for fiscal year 2015, and the General Law on Municipal Revenue for the State of Morelos, which allegedly encroach upon the sphere of competent jurisdiction of the Federation, set forth under Article 73(XXIX)(5)(a) of the Political Constitution; <u>such circumstances release the petitioner from the requirement that a final judgment exists</u>, as laid down under Section 61(XX) of the Amparo Act. This stems from the fact that, on the one hand, the Administrative Tribunal in the State of Morelos <u>lacks competent jurisdiction to hear claims regarding an encroachment of competencies, as this case is not included among those listed in Section 36 of the Law on State Administrative Tribunals, in force at the time the petitioner became aware of the occurrence of the act being challenged and, on the other hand, competent jurisdiction to hear these matters is in fact expressly and exclusively regulated as belonging to federal courts, pursuant to Article 103(II) and (III)</u> of the Mexican Constitution, which is consistent with the provisions of Article 104(V) of the Constitution, given that the Administrative Tribunal in the State of Morelos is merely a local agency, which cannot be vested with competent jurisdiction to decide conflicts between local and federal rules. <u>Hence, an indirect</u> amparo <u>petition will be admissible with no need for the petitioner to exhaust any remedies or actions as prescribed under local legislation with regard to the potential to be subject to objections against street lighting service rates, provided always that the claim is derived from the encroachment of jurisdiction</u>.*

Based on the foregoing, it is clear that the *amparo* petition is admissible, considering that my principal is not a party to the Original Proceedings, and is thus prevented from filing any ordinary means of defense; additionally, the means of defense available against a judgment that orders winding-up should be an appeal, and this would be ineffective in the case at hand, because it does not provide for the suspension of the act, which may become irrevocably confirmed. Finally, an *amparo* proceeding is the only means of defense available for petitioners to solve any controversies arising from the encroachment of jurisdiction between federal and local authorities, as is the case with precautionary measures, and even in the event a judgment seems to be rendered in violation of property rights and without affording the right to a hearing and by competent authorities.

**ALLEGED BREACHES**

**FIRST.** The acts being challenged breach the provisions contained in Articles 1, 14,16 and 104(II) and applicable similar related provisions of the Political Constitution of the United Mexican States, in connection with Sections 215, 216, 217 *et seq.* of the *Amparo* Act, applicable case law and precedents identified as "***RIGHT TO A HEARING, HOW THIS GUARANTEE IS FULFILLED***", and, "***RIGHT TO A HEARING, A GUARANTEE TO BE OBSERVED EVEN THOUGH THE LAW ON WHICH THE RESOLUTION IS GROUNDED DOES NOT PROVIDE FOR ANY PROCEDURE TO THIS EFFECT***", among other sections, considering that the provisions have not been applied and have been manifestly violated.

Article 14 of the Political Constitution of the United Mexican States enshrines the right to a hearing afforded to all individuals, while the second paragraph provides as follows:

> "***Article 14.****- [...]*

> No one shall be deprived of their freedom, properties, possessions or rights without a fair trial before previously established courts, according to the essential formalities of the proceedings and laws issued beforehand.

The Article above lays down the well-known guarantee of a hearing, according to which each person has the possibility to be heard by a court formed beforehand, prior to being affected by a deprivation and following a procedure established in advance, with due regard for the due process, and granting legal protection to the life, freedom, properties, possessions and rights of such person. Therefore, the person is allowed to go against arbitrary actions performed by the authorities, or against the violation of this guarantee even through the issuance of mandatory general rules, thus limiting the consistency between the allegations and the decision, in addition to setting constraints to the obligations of the authorities to act in accordance with the Constitution.

In this vein, all authorities acting either in judicial, executive or legislative capacities, should anticipate and uphold, before performing any act that might cause a deprivation, the conduct of legal proceedings in full compliance with the essential formalities of due process, granting petitioners sufficient opportunities to defend from any acts the authorities intend to enforce against them, in the understanding that compliance with this guarantee should be maintained at all times.

This is because, in denying prior proceedings, remedies or objections, procedural formalities are lost and the parties are left defenseless and so, at the core of the guarantee is the right to defend in court

by resort to the constitutional due process, thus requiring a mandatory behavior from the authorities with regard to the application of the law through a forced procedure. Thus, the petitioner is afforded the certainty that the law will be applied fairly, thus guaranteeing consistency in the acts of the authorities.

Moreover, the American Convention on Human Rights provides as follows, in Article 8(1):

> "**Article 8**. Judicial Guarantees
>
> 1. Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the determination of his rights and obligations of a civil, labor, fiscal or any other nature."

In this regard, judicial guarantees are a requirement for access to justice in a legal, effective manner, and they must be observed to refer to the regulated protection of rights under the law, with respect to any acts performed by competent authorities which confer rights and impose obligations upon all persons, and which require the State to ensure that procedures are conducted protecting persons against any acts potentially in violation of such persons' rights.

This guarantee is breached by the acts being challenged, since they allegedly seek to commit fraud against a law –in particular, the Bankruptcy Law ("**LCM**," for its acronym in Spanish) and, naturally, affect my principal in its capacity as creditor of Crédito Real, but they also place the whole of society at risk. The foregoing is in direct breach of Article 104(II) of the Constitution, and impairs material rights afforded to the petitioner, which rights this Court should protect.

Under these circumstances, it is unquestionable that a process is lawful if it guarantees, protects, assures and enforces an interest or the exercise of a right to defense and to access to justice, and the parties have an opportunity to present their cases before an impartial court, to produce evidence and to object to the counterparty's submissions with all due guarantees under a due process filed to adjudicate certain event impartially and impose penalties on those found liable.

Thus, the right to a hearing comprises various elements, as explained in case law decisions from our highest courts, as transcribed below:

> Series: Ninth Series
>
> Docket No.: 169143
>
> Instance: Circuit Courts
>
> Type of Opinion: Case law

*Source: Court Journal of the Federation and Gazette*

*Volume XXVIII, August 2008*

*Matter(s): Ordinary*

*Opinion: I.7o.A. J/41*

*Page: 799*

### RIGHT TO A HEARING, HOW THIS GUARANTEE IS FULFILLED.

*Among the various guarantees for legal certainty contained in Article 14(2) of the Political Constitution of the United Mexican States, the right to a previous hearing is worthy of note, on account of its primary relevance. This superior mandate, which essentially translates into a guarantee for legal certainty afforded to all persons, imposes an inexcusable obligation on the authorities to satisfy, before performing any act that involves a deprivation, a number of essential formalities, as necessary to hear the defense of those who are affected. Such formalities and their observance, in addition to compliance with those in connection with the legality principle enshrined under Article 16(I) of the Constitution, are key elements that prove useful to show to those affected by any act of the authorities that the resolution considered harmful is not arbitrary and lawless, but rather the result of a strict adherence to the legal framework governing such resolution. Thus, in accordance with such mandates, any procedure or action should be subject to the unavoidable observance, in its conduct, of the various steps informing the formal guarantee of a hearing afforded to the petitioners, namely, that the party affected should become aware of the filing of the proceeding, and of the matter to be decided, along with the consequences that might be derived from the proceeding; that the party should be given an opportunity to defend its case through the production of evidence organized so that anyone making a contention should be afforded an opportunity to demonstrate it, while anyone holding a contrary position should be in turn afforded the right to substantiate any defenses raised; that once the trial stage is completed, an opportunity is granted to the party to deliver the relevant closing arguments and, finally, that the proceedings should be concluded by the rendering of a decision on the matters contested, which decision should clearly determine the time and manner for compliance."*

On these terms, it is undisputed that the guarantee of a hearing as such comprises various fundamental elements which are useful to show to those affected by any act of the authorities that the resolution considered harmful is not arbitrary and lawless, or even the consequence of a fraud against the law, but rather the result of a strict adherence to the legal framework governing such resolution; therefore, any proceeding must be composed of different stages **which inform the formal guarantee to the benefit of all persons, namely**: *(i)* that the party affected should be made aware of the filing of the proceeding, and of the matter to be decided, along with the consequences that might be derived from the proceeding; *(ii)* that the party should be given an opportunity to defend its case through the production of evidence organized so that **anyone making a contention should be afforded an**

**opportunity to demonstrate it**, while anyone holding a contrary position should be in turn afforded the right to substantiate any defenses raised; *(iii)* that once the trial stage is completed, an opportunity is granted to the party to **deliver the relevant closing arguments**; and, finally, *(iv)* that the proceedings should be **concluded by the rendering of a decision** on the matters contested, which decision should clearly determine the time and manner for compliance.

On this basis, Article 14(2) of the Constitution provides that, prior to any deprivation of a person's freedom, estate, possessions or rights, **a trial should be heard** by pre-established courts. It has been noted that the reference to a trial "heard" as contained in this article means that, before any act implying a deprivation, the trial must be concluded; at the same time, it should be understood to mean that the reference to a trial involves the existence of a person with authority to render an impartial decision.

Furthermore, Article 8 of the American Convention on Human Rights provides that every person has the right to be heard, with due guarantees, by a competent, independent, and impartial court. The concept of a court cannot legally exist unless the notion implies an impartial adjudicator, because the person commissioned with the responsibility to resolve a controversy can under no circumstance have any interest in any of the parties. This notion is the very foundation upon which other legal concepts rest, such as impediments, excuses and disqualification.

This said, Article 14(2) of the Constitution has been traditionally interpreted as enshrining the so-called "guarantee to a hearing," which basically consists **in the right afforded to all persons to be heard prior to the issuance of any act implying a deprivation, with all due regard for the essential formalities of a process**. To this end, the Supreme Court of Justice has found that the essential formalities of a process comprise four basic guarantees, namely: *(i)* notice of the commencement of a proceeding, *(ii)* the right to offer evidence, *(iii)* the right to deliver closing arguments; and *(iv)* the rendering of a decision adjudicating the matters contested. The following case law opinion can be quoted in support of this:

"*Series: Ninth Series*

*Docket No.: 200234*

*Instance:* En banc *session*

*Type of Opinion: Case law*

*Source: Court Journal and Gazette of the Federation*

*Volume II, December 1995*

*Matter(s): Constitutional, Ordinary*

*Opinion: P./J. 47/95*

*Page: 133*

***ESSENTIAL FORMALITIES OF A PROCESS. THESE GUARANTEE AN ADEQUATE AND TIMELY DEFENSE PRIOR TO AN ACT OF DEPRIVATION.***

*The guarantee of a hearing as laid down in Article 14 of the Constitution consists in affording all persons the opportunity to defend prior to the issuance of an act entailing a deprivation of life, freedom, properties, possessions or rights, and observance of this guarantee imposes on the authorities, among others, the obligation to conduct the proceedings "with due regard for the rules of due process." These rules are necessary to guarantee an adequate defense prior to the act of deprivation and, in general terms, translate into the following requirements: <u>1) Notice of the commencement of the proceeding and its effects; 2) An opportunity to offer and produce all evidence relied upon for the defense; 3) An opportunity to deliver closing arguments; and 4) The rendering of a decision adjudicating the matters the matters contested</u>. If these requirements are not met, the purpose of the guarantee of a hearing, that is, to prevent persons from being left defenseless, is thwarted.*

Then, the described essential formalities of a process imply due notice of the commencement or completion of each stage of the process, so that the person has the possibility to exercise its rights within specific time frames and in a timely manner, so that such rights can be validly enforced and therefore become effective. That is, in order for the referred essential formalities to be realized, it is necessary that all persons are afforded the possibility to enforce the guarantee by means of a timely notice and the terms granted to that end under the specific applicable laws. Therefore, to actually contend that a person was afforded the essential guarantees of due process, such person must have been served prior notice that the possibility was available and of the time periods granted to enforce these guarantees, the relevant authority also being under a duty to consider any arguments raised by any of the parties to the proceeding or by the petitioner itself; this is because such authority cannot be alien to events or developments which necessarily call for the appearance of a third party whose rights might be violated by the acts of the adjudicator. Based on a cursory knowledge, at this point, of the act being challenged, the guarantee of a hearing, as claimed by the Petitioner and by multiple creditors, has not been observed.

Indeed, one of the key elements of the guarantee of a hearing is the requirement of notice of the proceeding, so that the person can then offer evidence, deliver arguments and file any remedies as deemed convenient. Therefore, this time, and based on the cursory knowledge of the case at hand, it may be assumed, while reserving the right to expand on the alleged breaches once access to the case file is obtained, that the petitioner's guarantee of a hearing has been breached, thus violating the Constitution outright.

The foregoing may be contended considering that the Petitioner only just became aware that a proceeding exists where its rights as a creditor are at stake, upon giving a statement before the New

York Bankruptcy Court, although the precise procedural status is unknown. Nevertheless, the striking promptness of such proceeding suggests that it is an act fabricated by the merchant itself and one of its shareholders, who is also part of the management of the defendant-merchant, to the detriment of its creditors, my principal included. This likewise implies a clear act of fraud against the law, given that these parties seek to escape a bankruptcy proceeding in Mexico and/or the insolvency proceeding being followed in New York, United States of America.

Moreover, it follows from a reading of the decree granting the precautionary measures as ordered by the Court in Charge, the admissibility and legality of which is, of course, denied, that a clear impairment to material property rights of the Petitioner has taken place, and that Petitioner has not been given an opportunity to defend, added to the fact that Petitioner has been left in a state of legal uncertainty.

In this line of reasoning, and taking into account that the Petitioner had no formal knowledge of the proceeding where a judgment was rendered ordering the liquidation of Crédito Real, the Petitioner is unable to assert any ordinary means whereby it might seek review of the agreements and potential rulings issued against it or, where appropriate, object to the validity of the acts performed by the original court.

At this point, I hereby state that the Petitioner has not been served notice, afforded any time period or been required to appear in any proceeding filed by Mr. ÁNGEL FRANCISCO ROMANOS BERRONDO, pending before the Fifty-second Civil Court and, **therefore, it is not a party to any action or enforcement proceeding giving rise to the precautionary measures thus issued, and, what is even worse, that an attempt is presumably being made to commit fraud against the rights of my principal in its capacity as a creditor of Crédito Real, failing to comply with the essential formalities of the process and the specific procedure established by the lawmaker for insolvency situations, such as bankruptcy**.

In this vein, this Court should grant the *amparo* protection to and serve the Justice of the Union upon the Petitioner and, for all effects, hold ineffective all procedural measures adopted by the Fifty-second Civil Court, in particular, the precautionary measures and resolutions declaring an alleged dissolution and liquidation and, where applicable, summon the Petitioner to appear and be given an opportunity to exercise its rights, by objecting to the illegal and fraudulent winding-up, as claimed by the Third Party in Interest.

**SECOND.** The acts being challenged violate the provisions of Articles 14, 16, 40, 41, 104, 115, 122 and 124 of the Political Constitution of the United Mexican States, in connection with Sections 2, 50 of the Organic Law of the Superior Court of Justice in and for Mexico City, with respect to Section 59(II) of the Organic Law of the Judiciary of the Federation.

In the United Mexican States, Article 40 of the Federal Constitution provides for two subordinate systems under the scope of the Constitution, namely, the Federation and the States. There is no subordination between them, for each system comprises a decision-making authority within its scope of competence. Each of the States freely draft their own Constitution, to organize their government structure, provided that it does not conflict with the Federal Constitution.

There are two concurrent regimes in Mexico, the Federal and the State systems. Each such system has its own scope of competence, which has been organized under the principle that any powers not vested in the Federation shall be reserved to the States, as provided for under Article 124 of the Constitution.

On the one hand, the supreme power of the Federation is divided, to be exercised by the Legislative, Executive and Judiciary Branches. The Judiciary of the Federation rests with the Supreme Court of Justice, an Electoral Tribunal, Circuit Courts and Unitary Court, and District Courts.

On the other hand, each State, and Mexico City, adopted, for their internal organization, a republican, representative, democratic, secular and popular form of government. Moreover, the government of the States shall be divided, to be exercised by the Executive, Legislative and Judiciary Branches. In the case of Mexico City, the Judiciary rests with the Superior Court of Justice, the Judicial Council and the courts and tribunals as provided under the local Constitution.

It follows from the foregoing that there are two judiciaries, that is to say, the Federal system and the State system. That said, in this case we should ascertain the relationship between a Federal Court, in particular, a District Court, and a local Court in Mexico City, with regard to a commercial matter, specifically, an insolvency matter.

First, it should be determined who is competent to hear commercial matters. Article 104 of the Constitution provides for a concurrence of jurisdiction with respect to **commercial matters to the extent only private interests are concerned**, that is, both the federal courts and tribunals and local courts may hear such cases on ordinary controversies, at the discretion of the plaintiff. For the sake of clarity, the referred article is transcribed below:

> *Article 104. Federal Courts shall resolve:*
>
> *I. Proceedings related to federal crimes;*
>
> *II. Any civil or commercial disputes arising from the observance and enforcement of federal laws or international treaties executed by the Mexican State. Plaintiff may choose, if the disputes relate only to private interests, to file actions before ordinary courts and tribunals.*

> *Lower court judgments may be appealed before the higher appellate court hearing the relevant matter at the first instance stage."*

We may then conclude that local courts, such as the Court in and for Mexico City, do have competent jurisdiction to hear controversies concerning commercial matters, provided that they solely and exclusively affect private interests. This has been widely recognized by the Supreme Court of Justice of the Federation, as noted in the following precedent:

> *Series: Ninth Series*
>
> *Docket No.: 164576*
>
> *Instance: First Division*
>
> *Type of Opinion: Case law*
>
> *Source: Court Journal and Gazette of the Federation*
>
> *Volume XXXI, May 2010*
>
> *Matter(s): Civil*
>
> *Opinion: 1a./J. 17/2010*
>
> *Page: 536*

> ***CONCURRENT JURISDICTION. WHERE UNDER A COMMERCIAL CONTRACT THE PARTIES HAVE MADE NO SPECIFIC PROVISION AS TO THE TYPE OF COURTS WHOSE COMPETENT JURISDICTION THEY SUBMIT TO, THE RIGHT OF THE PARTIES SHALL BE RESERVED FOR THEM TO RESORT TO EITHER FEDERAL OR LOCAL COURTS AS THEY CHOOSE.***

> ***It follows from Article 104(I) of the Political Constitution of the United Mexican States that any controversies concerning commercial matters and arising from the observance and enforcement of federal laws shall be subject to concurrent jurisdiction, where such controversies relate only to private interests***; *therefore, both the federal courts and tribunals and local ordinary courts may hear such cases, at the discretion of the plaintiff. Furthermore, it can be derived from Sections 1092 and 1093 of the Commercial Code that the courts with competent jurisdiction to resolve commercial matters shall be those to which the litigating parties have expressly or implicitly submitted (express submission clause) and submission is express where the interested parties clearly and irrevocably waive the jurisdiction prescribed by law. This said, if a clause under a commercial contract provides that the parties agree to submit to the jurisdiction of the courts in the city where the contract was executed, but fail to specify the type of courts, under such circumstance reference is made to a matter of territorial jurisdiction which does not constrain the type of jurisdiction of the courts, even  if only an ordinary court has seat in the venue where the agreement was executed; this is so because,*

> *where no specification was made regarding the type of court to which the parties submit, both the federal and the local courts are likewise competent, given that either of them have jurisdiction over the territory. Therefore, if a commercial contract only provides that the parties submit to the courts of certain venue without specifying the type of courts, the right of the plaintiff to choose whether to resort to the federal or to the local courts shall be reserved.*

The jurisdiction of the Courts in and for Mexico City to hear the commercial dispute is also recognized under local laws, namely, the Organic Law of the Superior Court of Justice in and for Mexico City, given that it provides that Civil Courts shall resolve matters subject to concurrent jurisdiction; to this effect, the relevant section is transcribed below:

> *Section 50. Civil Courts shall resolve:*
>
> *III. Any other disputes concerning contested, ordinary and concurrent matters dealing with personal rights whose main amount is equal to or higher than the amount required under Section 691 of the Code of Civil Procedure for the Federal District and Section 1340 of the Commercial Code for a proceeding to be appealable, which amount shall be updated as provided for under the foregoing subsection; the amount shall be published in the court gazette.*

On this basis, we may confirm that **the Courts in and for Mexico City have competent jurisdiction to hear commercial matters provided always that only private interests are affected**. In the case at hand, the Court in Charge intends to order the dissolution and conduct the winding-up of Crédito Real, which implies that multiple creditors are affected, with no certainty whatsoever as to the circumstances regarding time, place and manner of such winding-up; that is, a sort of special *ad hoc* proceeding is followed, without the creditors being afforded any guarantee to a hearing or legal certainty of any kind.

The Court in Charge intends, in an overly fraudulent and unconstitutional manner, to carry out a liquidation proceeding to wind-up a merchant, thereby affecting not only multiple creditors and shareholders, but also the employees, tax authorities and society in general, through a proceeding where no guarantees whatsoever are afforded. This reveals that we are, in actual fact, faced with a proceeding where not only are private interests affected, but there are also clear considerations of public policy at stake.

In taking over a liquidation proceeding of such size, relevance and impact on the Mexican financial system, the Court in Charge actually intends to absorb powers which are exclusively conferred upon the Federal Courts, for these courts have competent jurisdiction to hear the proceeding set forth under the Bankruptcy Law, as provided under Section 59(II) of the Organic Law of the Judiciary of the Federation.

*Section 59. Federal district courts in commercial matters shall resolve:*

*[...]*

*II. Any controversy concerning bankruptcy issues.*

The courts, which pursuant to the Constitution, have competent jurisdiction to resolve any liquidation proceeding with respect to Crédito Real, as asserted by the authority in charge are the Federal Courts, as confirmed in the section above, in Section 17 of the Bankruptcy Law, and also in General Agreement No. 4/2022 issued by the Mexican Judicial Council sitting *en banc*, published in the Official Gazette of the Federation on March 4, 2022, regarding the establishment, designation and taking of office by the First and Second District Courts in Commercial Bankruptcy Matters, which hold their seat in Mexico City and have jurisdiction over Mexico.

This said, the question to be ascertained is whether a local court may hear and resolve a liquidation proceeding where the groups of creditors, shareholders, employees, authorities and society in general might be affected by the rulings issued thereunder, particularly when there is not even a guarantee of a hearing or other creditor protection mechanisms, considering that the entity involved is a listed company which trades on the Stock Exchange. **The answer is no, because this proceeding concerns public policy and exceeds private interests.**

**Besides, under the terms of the Law, the Federal Courts are the only courts with competent jurisdiction to guarantee an adequate protection of creditors' rights under such proceeding.**

The above follows clearly from the Bankruptcy Law, which specifies, in its Section 1, that bankruptcy is a public policy proceeding; said Section 1 reads as follows:

*Section 1. This Law is a public interest law whose purpose is to govern bankruptcy proceedings. It serves the public interest to preserve companies and to prevent the generalized non-performance of payment obligations from placing the viability of said companies and of those with which they maintain business relationships at risk. In order to guarantee the proper protection of creditors against the impairment of the assets of the companies undergoing bankruptcy proceedings, the actions of the court and the other persons involved in the proceedings governed by this Law shall be guided, at all times, by the principles of materiality, procedural economy, speedy proceedings, publicity, and good faith.*

This gains more strength if we review the explanatory statement of the Bankruptcy Law, which stressed the importance of bankruptcy proceedings, and the interest the State has in them:

*Bankruptcy laws and regulations also have a strategic role. Their purpose is to organize companies' restructuring processes, seeking, on the one hand, to benefit from the experience and knowledge of the businessperson undergoing bankruptcy and, on the other hand, to ensure that trade or financial creditors can also continue operating. When an instance cannot conclude successfully, the State can assume a central role and coordinate efforts, providing a forum where information flows and which viable companies can use to restructure, continue operating, and maintain jobs. In addition, when companies are no longer viable, the State has a fundamental role in reassigning productive factors, so that workers can find new sources of productive, well-paid employment, whereas goods are used by other, more productive companies. In this process, creditors and merchants obtain the higher value from the company or the assets that comprise it, and can, in due time, resume other businesses and activities that contribute to the general well-being of society […]*

*As first set forth in the explanatory statement of the Bankruptcy and Debt Moratorium Law, the Committee acknowledged that bankruptcy is an economic phenomenon that is not only of interest to its parties, but it is an economic and legal manifestation **in which the State has a dominant and fundamental interest, and therefore it suggested, in line with Article 104(I) of the Constitution, that Federal Courts should hear bankruptcy cases**.*

In addition to the above, the public policy that frames liquidation proceedings has been widely acknowledged by our federal courts, which reveals that the Court in Charge lacks jurisdiction under the Constitution to hear the proceeding being challenged; such caselaw criteria are the following:

*Digital docket No.: 179439*

*Instance: First Division*

*Ninth Series*

*Matter/s: Civil*

*Opinion: 1a./J. 69/2004*

*Source: Court Journal and Gazette of the Federation. Volume XXI, January 2005, page 379.*

*Type: Case law*

***STAY. INADMISSIBLE AGAINST THE APPOINTMENT AND INTERVENTION OF A REPRESENTATIVE FROM THE FEDERAL INSTITUTE OF BANKRUPTCY SPECIALISTS, AS GRANTING IT WOULD PARALYZE THE PROCEEDING, WHICH WOULD AFFECT SOCIAL INTEREST AND VIOLATE PUBLIC POLICY.***

*This Supreme Court of Justice has upheld the criteria that legal proceedings are of public policy and social interest, as society has an interest in its prosecution and conclusion. In this regard, the stay, within the* amparo *proceedings, against the appointment and intervention of a representative from the Federal Institute of Bankruptcy Specialists to decide whether a*

*merchant committed the violations specified in Section 10 of the applicable law is inadmissible. If such measure were to be admitted, the bankruptcy proceedings would be paralyzed, as the Court having jurisdiction would be unable to continue with the following stages pursuant to the law, thus violating Section 124(II) of the* Amparo *Law, as social interest would be prejudiced and public policy provisions would be violated. This First Division is not unaware of the fact that, if the stay of the actions being challenged were not granted, some of its consequences,* i.e.*, the secrecy of the accounts of the respondent merchant, would irreparably arise, leaving the* amparo *proceedings without a subject matter, as the above-mentioned representative would necessarily have to conduct the visit specified in Sections 29 to 41 of the Bankruptcy Law and submit a report to the District Court, reporting the financial and accounting situation of the merchant, given that, in the case of conflict between such interests, the collective interest must prevail over the individual interest; otherwise, the public interest of the Bankruptcy Law, which consists in preserving companies and preventing the generalized non-performance of payment obligations, would become null. This would place the feasibility of companies subject to bankruptcy and of those with which they maintain business relationships at risk, especially considering that Section 18 of that same law expressly sets forth that neither the procedural defenses nor the filing and transaction of any kind of motion may stay the bankruptcy proceedings.*

*Digital docket No. 2023200*

*Instance: Circuit Courts*

*Eleventh Series*

*Matter/s: Constitutional, Civil*

*Opinion: 1.80.C.91 C (10a.)*

*Source: Gazette of the Court Journal of the Federation. Book 2, June 2021, Volume V, page 5054*

*Type: Guiding*


**BANKRUPTCY. AN ORDER TO A LOCAL COURT IN CRIMINAL MATTERS TO REFRAIN FROM WITHHOLDING, AS PART OF AN INVESTIGATION, THE AMOUNTS OF MONEY NEEDED FOR THE VIABILITY OF A COMPANY NOT TO BE AFFECTED DOES NOT IMPLY AN INVASION OF SPHERES OF JURISDICTION RESERVED TO THE STATES.**

*Bankruptcy proceedings are a matter of public policy, whose ultimate purpose is to preserve companies in order to respond to the acknowledged creditors, and it is the Court who guides the proceedings; they are of public interest due to the economic and financial implications that affect not only the debtor in the proceedings, but also all the companies or persons with whom the former maintains business relationships. In this regard, not only the individual interests of the company are present, which faces the problem of the generalized non-performance of its*

*obligations, but also the interests of the creditor individuals and companies, the social interests of its workers, as well as the public interest to prevent a company from closing, with all the harmful consequences this causes; therefore, it is sought that all these interests should converge at the purpose of maintaining the viability of the company, as set forth by Section 1 of the Bankruptcy Law, providing the Court with the power to order the precautionary measures that allow the viability of the merchant. Thus, the most relevant effect of a declaration of bankruptcy is the order of the Court for the company to suspend the payment of the debts contracted before the date on which the relevant bankruptcy decision becomes effective, except for those that are essential to its daily operations. For that purpose, the Court may order measures such as ordering the authority in criminal matters to refrain from withholding, as part of an investigation, amounts of money that prevent the regular operation of the debtor company (in the understanding that compliance with its labor and tax obligations is a priority.) Therefore, if the bankruptcy proceeding is universal and the Bankruptcy Law gives the Court the authority to order the stay of any proceedings against the company, it is clear that ordering a local Court in criminal matters to refrain from withholding, as part of an investigation, amounts of money needed not to affect the viability of the company does not imply an invasion of spheres of jurisdiction, given that, as the one that guides the bankruptcy proceedings, in issuing that order, the bankruptcy Court is not exercising authorities reserved by the Constitution to the States and does not invade the scope of authority that the General Constitution establishes or reserves in favor of the States, as the Court in criminal matters is not forced to make a decision regarding the admissibility or inadmissibility of the criminal action that is brought; rather, the purpose of the order is the preservation of the debtor company. In other words, the crimes committed by the merchant during a bankruptcy proceeding can be prosecuted without waiting for the conclusion or continuation of the bankruptcy proceeding, and any decisions entered by the bankruptcy Court shall not bind the criminal court to decide with regard to the admissibility or inadmissibility of the criminal action; rather, observing the autonomy of both proceedings, the rules of each one must be followed, particularly in connection with the social interest of the Bankruptcy Law, as well as the importance of the preservation of the company undergoing bankruptcy.*

*Digital docket No. 2009906*

*Instance: Circuit Courts*

*Tenth Series*

*Matter/s: Common, Civil*

*Opinion: III.1o.C.25 C (10a.)*

*Source: Gazette of the Court Journal of the Federation. Book 22, September 2015, Volume III*

*Type: Guiding*

***DECISION IN BANKRUPTCY PROCEEDINGS. A STAY IN CONNECTION WITH ITS PUBLICATION IS NOT ALLOWED, AS THE SOCIAL INTEREST THAT PREVAILS AGAINST THAT OF THE MERCHANT UNDERGOING BANKRUPTCY WOULD BE AFFECTED***

*Section 128 of the* Amparo *Law (1) sets forth the requirements that must be met for a stay to be granted, including the requirement not to affect social interest and for public policy provisions not to be breached. In that context, this measure regarding the publication of the bankruptcy decision may not be granted given that, if we weigh the social interest of disclosing its existence to all the persons that may have an interest in appearing in this special and universal proceeding to enforce their rights against the interest of the merchant undergoing bankruptcy of not having its assets affected by spending the publication expenses, the former must prevail, as granting the stay would result in the stagnation of the bankruptcy proceeding, which is one of public interest, pursuant to Sections 1 and 2 of the Bankruptcy Law. (2)*

In addition, it is clear that the reason why bankruptcies were regulated is to guarantee not only the right of creditors to be heard, but also an orderly payment mechanism, with defined rules, which procedure is governed solely by the Bankruptcy Law, and over which the Bankruptcy District Courts have exclusive jurisdiction.

The Court in Charge does not have jurisdiction under the constitution to process and continue performing the actions being challenged, *i.e.*, it has no jurisdiction to hear a commercial dispute in which public policy interests are affected, and not only particular interests (those of partners or shareholders, as it intends to make believe), given that there are creditors, including my client, that have the right to the payment of our claims with the proceeds from the bankruptcy estate; therefore, as there are special laws and regulations, and specialized court bodies, there is a violation of jurisdictions of the federal system.

Indeed, the Court in Charge forgets that ours is a federal system, in which the bodies of the different levels of government have reserved and express powers, and the drafters of the Constitution reserved the jurisdiction to the Federal Courts to hear any dispute in commercial matters where public order is affected, especially in connection with insolvency proceedings, when there are multiple creditors and participants, precisely as set forth by the Bankruptcy Law.

It is a direct violation of the Constitution, as it blatantly violates the federal pact, which, in turn, is a breach of my client's fundamental right to legal certainty and due process, since it implies that a Local Court can ignore the Constitution and the Bankruptcy Law, leaving my client without any legal certainty as regards its legal situation. This is a clear violation of the rule of law, as it attempts to ignore the form of government of Mexico, in pursuit of an alleged interest of Crédito Real.

In other words, the Court in Charge deems it more important to commence an *ad hoc* winding-up procedure, without any judicial guarantees, without observing the essential formalities of the proceeding, clearly favoring Crédito Real, in order to establish a mechanism to defraud creditors, instead of maintaining the form of government of Mexico, which reveals how absurd the entire procedure being challenged is, since it is the federal system that provides functionality to the entire form

of government and the legal system; it is not without reason that it has been said that it is a fundamental political and legal decision. By analogy, the following case law criteria becomes relevant:

> *Docket No. 180648*
>
> *Instance: En banc*
>
> *Type of Opinion: Case law*
>
> *Source: Court Journal and Gazette of the Federation. Volume XX, September 2004*
>
> *Matter/s: Constitutional*
>
> *Opinion: P./J. 80/2004*
>
> *Page: 1122*

> ***SEPARATION OF POWERS. TO AVOID THE VIOLATION OF THIS PRINCIPLE, THERE ARE IMPLICIT PROHIBITIONS IN PLACE REGARDING THE NON-INTERFERENCE, NON-DEPENDENCY AND NON-SUBORDINATION BETWEEN THE PUBLIC POWERS OF FEDERAL ENTITIES.***
>
> *Article 116 of the Political Constitution of the United Mexican States implicitly sets forth three prohibitions for the public powers of federal entities, so that they observe the principle of separation of powers: a) non-interference, b) non-dependency, and c) non-subordination of any of the powers with regard to any of the others. Interference is the least serious degree of violation of the principle of separation of powers, as it occurs when one of the powers meddles or interferes in a matter that is under the purview of a different power, and this does not result in a decisive impact on decision making and does not generate submission. Dependency is the next level of violation of said principle, and represents a higher degree of breach, as it implies that a power illegally prevents another from making decisions or acting autonomously. Subordination translates into the most serious degree of violation of the principle of separation of powers, since it implies not only that one of the powers is unable to make autonomous decisions, but it must also submit to the will of the subordinating power; the difference with dependency lies in that, whereas in the case of dependency, the dependent power can choose to avoid the imposition of the other power, in the case of subordination, the subordinating power does not allow the subordinate power any course of action other than that which is imposed. In this regard, these concepts are different degrees of the same violation, and thus the most serious of them implicitly carries the previous one.*

Indeed, the Court in Charge invaded the sphere of jurisdiction of the Judiciary of the Federation when it heard a dissolution and winding-up proceeding, as it assumed a jurisdiction that belongs to the federal courts, violating the federal pact; this, in turn, implied a violation of my client's fundamental right to legal certainty and judicial protection.

It is astonishing that the Court in Charge could ignore the observance of and non-interference with the jurisdiction of federal authorities. What kind of legal certainty can there be in a State where local judicial authorities intend to hear proceedings with secrecy, expeditiously, and without any respect, when there are special laws and regulations, as well as specialized courts, to hear such proceedings? The blatant lack of legal certainty brought about by the action being challenged is demonstrated as follows: my client has no knowledge whatsoever of the rules that will be applied during such "special" and *ad hoc* proceeding, which clearly reveals the violation of the constitutional order and the rule of law.

Under these conditions, and taking into consideration the premises of this pleading, I hereby request that the *amparo* and protection of justice by the Union be granted to my client.

**THIRD**. The actions being challenged, undertaken by the Authorities in Charge, violate Articles 1, 14, 16, 17 and 133 of the Political Constitution of the United Mexican States, and Articles 1, 21, 25 and 29 of the American Convention on Human Rights, incurring violations of legal certainty as a human right, the human rights in connection with the property of other persons, and the human right to private property.

Article 14 of the Political Constitution of the United Mexican States sets forth, in its second paragraph, that no one may be deprived of their freedom or their property, possessions and rights without a trial before previously created Courts, complying with the most essential procedural formalities in accordance with the laws issued before the fact being tried took place.

Article 16 of the Political Constitution of the United Mexican States, in turn, provides that no one may be disturbed in their private affairs, their family, address, documents or possessions without a written order issued by an authority with jurisdiction, which order must justify the legal cause of the proceeding.

It is recognized and well-established in the legal practice that Article 14 of the Political Constitution of the United Mexican States prohibits privative actions, whereas Article 16 prohibits actions of disturbance.

Privative actions are those that result in the decrease, impairment or permanent suppression of a citizen's right, and are only allowed if certain requirements specified in Article 14 of the Political Constitution of the United Mexican States are complied with, such as the existence of a trial before a previously created court that meets the essential procedural formalities and in which the laws issued before the fact being tried took place are applied.

In turn, actions of disturbance, which, in spite of affecting the legal sphere of the citizen, do not cause the same effect as privative actions, since they only temporarily or provisionally restrict a right in order to protect certain legal rights, are authorized under the Political Constitution of the United Mexican States in accordance with its Article 16, **provided that there is a written order issued by an authority with the legal jurisdiction to do so**, which must justify, based on applicable laws in force, the legal cause of the proceeding.

In this regard, the following case law, decided by the Supreme Court of Justice sitting *en banc*, is relevant:

*Instance: En banc*

*Source: Court Journal and Gazette of the Federation*

*Ninth Series*

*Volume IV, July 1996*

*Page 5*

*Case law opinion*

### PRIVATIVE ACTIONS AND ACTIONS OF DISTURBANCE. ORIGIN AND EFFECTS OF THE DIFFERENTIATION.

*Article 14 of the Constitution sets forth, in its second paragraph, that no one may be deprived of their life, freedom, property, possessions or rights without a trial before previously established courts that complies with the essential procedural formalities and is conducted in accordance with laws issued before the fact being tried took place; in turn, Article 16 of the Constitution sets forth, in its first paragraph, that no one may be disturbed in their private affairs, their family, address, documents or possessions without a written order issued by an authority with jurisdiction, which order must justify the legal cause of the proceeding. Therefore, the Constitution differentiates between privative actions and actions of disturbance, and regulates them differently; it authorizes the former, which are those that result in the decrease, impairment or permanent suppression of a citizen's right, only if certain requirements specified in Article 14 are complied with, such as the existence of a trial before a previously established court that meets the essential procedural formalities and in which the laws issued before the fact being tried took place are applied. In turn, actions of disturbance, which, in spite of affecting the legal sphere of the citizen, do not cause the same effect as privative actions, since they only temporarily or provisionally restrict a right in order to protect certain legal rights, are authorized under Article 16, provided that there is a written order issued by an authority with the legal jurisdiction to do so, which must justify the legal cause of the proceeding. In order to ascertain the constitutionality or unconstitutionality of an action by an authority, challenged for being a privative action, it is necessary to determine if it truly is one and, therefore, if it needs to comply with the formalities specified in Article 14, or if it is an action of disturbance and, therefore, if compliance of the requirements specified in Article 16 suffices. To make this differentiation, the purpose sought by the action must be determined,* i.e*., if the deprivation of a material or immaterial good is the innate goal of the action of the authority or if, by its own nature, it is merely a provisional restriction.*

Furthermore, the Political Constitution of the United Mexican States sets forth, in Articles 14, 16 and in particular in Article 27, the fundamental right to private property, which is also recognized by Article 21 of the American Convention on Human Rights. These provisions specify that all persons have

the right to the use and enjoyment of their property, and that no one may be deprived of them except upon payment of just compensation, for reasons of public utility or social interest, and in the cases and according to the forms established by law.

The Supreme Court of Justice has established that the right to property must be understood as the right that people have to be the owners and to dispose of their own rights to property, which is an aspect of legal capacity and of the capacity to act that is directly related to the class of civil rights, and the concrete right to property over such or such good.

Therefore, the right to property brings together, for its holder, all the legal powers to the use, enjoyment and disposal of a thing, *i.e.*, the regulatory possibility of performing acts of dominion and administration over the thing, which exercise entails a legal usage for the holder and possibly, albeit not necessarily, may generate an economic benefit. The right to property is an absolute, exclusive and perpetual right in itself, which is governed by the basic principle of absolute freedom, and which can only exceptionally be affected by a restriction, limitation or termination, by the law or by the will of its holder, exercising the regulatory authority granted by their right.

In other words, as a general rule, ownership of a movable or immovable asset is an absolute right *in rem*, where the free will of the owner prevails to exercise the powers of use, enjoyment and disposal of the asset, which powers allow the owner to transfer the right or to encumber it by fragmenting or restricting any of its powers in favor of a third party, whether by an *inter vivos* transfer, by operation of the owner's death, or by causes specified by law; **only exceptionally may the owner be deprived of their right.**

Property is also considered an absolute right *in rem* because it grants its holder the legal authority to demand *erga omnes* –from all people– (universal and indeterminate passive subject) the non-disturbance of its exercise; it should be noted that such indeterminate passive subject must be necessarily identified as the legal community that is permanently or temporarily near the thing, as that is the only way in which the risk that one or more third parties could disturb the exercise of the owner's rights could arise.

The right to property, as any other right *in rem*, grants its holder a claim over the thing against anyone who disturbs the exercise of the powers that are intrinsic to that right (use, enjoyment and/or disposal) and a preferential right over the thing against third parties. Presumably, with the actions being challenged, this right has been violated, as my client is a creditor of Crédito Real.

As regards the human right to property, in connection with the deprivation of this right, since rights of other individuals are also necessarily contested here, the state protection must also be provided through the guarantees of lawfulness, legal certainty and due process, established by Articles 14 and 16 of the Constitution, in relation to the resolution of conflicts between parties, so that the person is not deprived of their property without a trial before previously created courts, complying with the most essential procedural formalities in accordance with the laws issued before the fact being tried.

However, certain guidelines must be followed in order to limit any human right, as the impact or limitation must not be absolute or arbitrary, and must follow, in all cases, the principles of proportionality and adequacy. The following opinion of our highest courts supports this claim:

Series: Tenth series

Docket No. 160267

Instance: First division

Type of Opinion: Case law

Source: Court Journal and Gazette of the Federation

Book V, February 2012, Volume 1

Matter/s: Constitutional

Opinion: 1a./J. 2/2012 (9a.)

Page: 533

### RESTRICTIONS TO FUNDAMENTAL RIGHTS. ELEMENTS THAT THE CONSTITUTIONAL COURT MUST TAKE INTO CONSIDERATION TO DEEM THEM VALID.

*No fundamental right is absolute and, therefore, all of them can be restricted. However, regulating such restrictions cannot be arbitrary. In order for the measures issued by the common legislator with the aim of restricting fundamental rights to be valid, they must meet, at least, the following requirements: a) they must be admissible within the constitutional scope, i.e., the common legislator may only restrict or suspend the exercise of individual guarantees with goals that can be considered within the provisions of the Constitution; b) __they must be necessary to ensure the achievement of the goals that warrant the constitutional restriction__, i.e., it is not enough for the restriction to be generally useful to achieve those goals, but it must be adequate for their fulfilment, which means that the end sought by the legislator cannot be reasonably achieved by other means that are less restrictive of fundamental rights; and c) __they must be proportional__, i.e., __the legislative measure must observe certain correspondence between the importance of the purpose sought by the law and the harmful effects it has on other constitutional rights and interests, in the understanding that a constitutional objective may not be pursued by unnecessarily or excessively affecting other constitutionally protected rights and assets.__ Thus, the courts must determine, in each case, firstly, if the legislative restriction of a fundamental right is admissible in view of the constitutional provisions; secondly, if it is the means necessary to protect such constitutionally protected ends or interests, provided there are no other less restrictive options that allow to achieve them; and thirdly, if the legislative differentiation falls within the options that can be considered proportionate. Similarly, the restrictions must be in accordance with the law, including international rules of human rights, must be compatible with the nature of the rights protected by the Constitution, in the interest of achieving the legitimate goals that are sought, and must be strictly necessary to promote general well-being in a democratic society.*

Now, the case at hand involves an act of authority that gave rise to several disproportionate precautionary measures and sought the dissolution and winding-up of a company, depriving the creditors of their right to collect and appear before court, without the relevant formalities or a judgment

entered by a court of competent jurisdiction. This affected the property right of my client and multiple creditors, which implies a limitation to the human right to property. In this regard, if a limitation to the property right is ordered and enforced, it is essential that such limitation meet minimum requirements to be constitutionally valid, which were not satisfied in the case at hand. It is clear, then, that the human rights enshrined in Articles 1, 14, 16 and 27 of the Mexican Constitution and Article 21 of the American Convention on Human Rights have been violated by the authority in charge.

Paragraph 2 of Article 1 of the Mexican Constitution provides as follows:

"**_All authorities_**, _within the scope of their authority,_ **_shall promote, respect, protect and guarantee human rights in accordance with the principles of universality, interdependence, indivisibility and progressive realization_**. _Accordingly, the State shall prevent, investigate, punish and remedy any human rights violations, to the extent prescribed by law._"

In view of the above, it follows that each and every one of the federal, state and municipal authorities are strictly required and compelled to respect the human rights of the parties –_protected under the Constitution and/or treaties–,_ and therefore they **shall refrain from carrying out any act that violates such human rights**. In the case at hand, such obligation has been breached by the authorities in charge, specifically the Fifty-second Civil Judge, by issuing, entering and enforcing decisions that violated the Petitioner's legal rights. The Petitioner was not given notice of the original proceedings, its essential rights were not respected, and the authority in charge lacked jurisdiction to hear such proceedings, apart from all the other violations explained above. This clearly shows a blatant violation of human rights protected under various constitutional provisions.

Therefore, the claim of violation alleged herein is clearly grounded, and this Court should grant the Federal Justice Protection and _Amparo_ Petition to the Petitioner.

**4**. The challenged action, involving certain measures ordered on June 30, 2022, are contrary to Articles 14, 16 and 17 of the Mexican Constitution, aligned with Sections 1077, 1168, 1170, 1176, 1777 and other applicable sections of the Mexican Commercial Code, Sections 383 and 384 of the Mexican Code of Civil Procedure, Sections 37 and 38 of the Bankruptcy Law, Sections 229-233 of the General Business Organizations Law, and Articles 8 and 10 of the Universal Declaration of Human Rights, Articles 2 and 14 of the International Covenant on Civil and Political Rights, Articles 8 and 25 of the American Convention on Human Rights in connection with a court decision entitled "**_EFFECTIVE JUDICIAL PROTECTION AND DUE PROCESS. QUALITIES OF JUDGES IN ACCORDANCE WITH SUCH FUNDAMENTAL RIGHTS_**," which the authority in charge failed to follow, together with my client's rights of due process and legal certainty, since the precautionary measures prejudged the merits of the case and took effect _ex nunc_, contrary to the essential characteristics of any precautionary measure, and they were ordered in violation of the guarantee of a hearing.

The fundamental right to effective judicial protection has an impact on precautionary measures, which constitute an essential element to guarantee the right to justice. This is so because the granting of a precautionary measure allows the relevant proceeding to be conducted while preserving the subject-matter of the dispute, for the benefit of the party affected by the challenged decision and in

preservation of its rights, including but not limited to the access to justice and the guarantee of a hearing. In this regard, such fundamental right, just like any other, is not absolute and is qualified depending on each case.

Consequently, precautionary measures are instruments that help to improve access to justice and the effective judicial protection and are characterized as instrumental, especially because they are used to preserve a current factual situation, seeking to ensure the outcome of a judgment to be entered in due course.

Given their instrumental nature, precautionary measures are not an end in themselves, but a tool available to the parties to protect or preserve factual situations. Precisely, when a precautionary measure is ordered, it is not intended to decide on the merits of the case or create new rights.

Thus, the adoption of precautionary measures is not automatic – a court is not necessarily required to grant a precautionary measure just because it has been sought by a party. As a general rule, for a precautionary measure to be granted, certain requirements need to be satisfied, including:

*(a)* A presumed right. The party requesting a precautionary measure shall prove, even on a presumptive basis, that it is entitled to assert a certain right against the other party and that such right should be protected by the precautionary measure being sought. Such requirement has not been satisfied in the case at hand.

*(b)* Actual or imminent harm. The facts supporting the relevant request shall show that, if the precautionary measure being sought is not granted, irreparable harm or harm difficult to repair shall be caused, leading to the violation of the filing party's legally protected rights. Such requirement has not been satisfied in the case at hand.

*(c)* Urgency of the measure. It is necessary to prove that the substantial right asserted or to be asserted by the filing party cannot be immediately protected in any other way; otherwise, it would be unreasonable to adopt an exceptional measure. Such requirement has not been satisfied in the case at hand.

*(d)* Formal request. The relevant request shall be filed in proper legal form with the court of competent jurisdiction. In certain events expressly specified by law, for a precautionary measure to be granted, the filing party shall post a bond as determined by the court.

Thus, precautionary measures are essential instruments intended to safeguard the fundamental right of access to justice and ensure full and effective justice. The effective judicial protection is a fundamental right of any person in court, namely, to obtain a legally grounded decision, typically on the merits of the case brought to court in the exercise of the person's rights and legitimate interests.

In this context, precautionary measures may be deemed not only a tool to render the rights of due process effective and efficient, but also a means to ensure the effectiveness of remedies and full enforcement and protection of the parties' rights. Thus, given their purpose, precautionary measures are considered **tools to ensure that the subject-matter of the dispute is preserved and that a judgment or decision disposing of the dispute or proceeding becomes effective or that such**

**precautionary measures prevent, during the main action or the respective proceeding, serious harm from being caused to one of the parties or social interests**.

In the case at issue, it is presumed that the analysis by the Court in Charge failed to comply with the requirements described in paragraphs *(a)*, *(b)* and *(c)* above, especially because no evidence was provided to prove a presumed legally protected right of the plaintiff – not the defendant, Crédito Real – or to show that harm difficult to repair could be caused. This is so because, upon a quick examination of the measures, the authority in charge would have noticed that there was no legal basis for the third parties in interest to obtain the measures provided for by the Bankruptcy Law and not by the General Business Organizations Law, which do not exist thereunder but affect my client as a creditor of Crédito Real, to such an extent that my client was not held liable for any event whatsoever but was certainly affected by the measures as a creditor. Additionally, there is no legal basis for granting such measures.

Precautionary measures are based on the risk that a judicial protection order may be enforced too late. This means that a party claiming to have a violated or unexercised right may allege such risk or limit the harmful consequences resulting therefrom, before or without a final court decision, by seeking the relevant precautionary measures, which shall be limited to being instrumental in nature, not precisely an end.

These are mechanisms used to prevent acts that may render the course and outcome of a proceeding futile. This means that they are intended to ensure, provisionally in advance, the effectiveness of both the proceeding and the favorable decision that may be entered in it. Such requirement has not been satisfied in the case at hand with respect to the precautionary measures being sought, since the minimum constitutional and legal requirements for granting such measures and restricting the rights of my client and other creditors and shareholders of Crédito Real have not been fulfilled. This clearly implies a blatantly disproportionate negative impact on their legal rights. In addition, the granting of such measures violated the due process of law, the principle of legal certainty and, as a result, the effective judicial protection, since the authority in charge, without completing the proceedings, granted unnecessary and disproportionate measures which are contrary to the concept of precautionary measure, and such measures are not available for a judicial or corporate winding-up under company law.

The authority in charge failed to analyze whether the necessary requirements for granting the precautionary measure had been satisfied, namely, the likelihood to succeed on the merits, the suitability of the measure and the risk inherent in delay. Furthermore, the decision ordering the measures was ungrounded and unreasoned, since the authority merely cited a few sections of the Mexican Commercial Code and the Mexican Code of Civil Procedure and trivially stated that the decision was intended to avoid the depletion of assets and ensure the protection of the company, without explaining why such measures applied to the case at issue or why there was an evident risk if the measure was not granted.

As a result, the Petitioner was clearly rendered defenseless, since disproportionate precautionary measures were granted, in serious violation of its legal rights and in a blatantly inadmissible way.

In this regard, a precautionary measure is intended to ensure that the general purposes of jurisdiction are successfully achieved. It entails a prerogative to seek relief from a court of competent jurisdiction and proper venue on the merits of a legal dispute with other persons or authorities in order to have a favorable judgment issued, entered or granted and, where appropriate, enforced.

Thus, such instruments are inherent to the right of jurisdiction, as they are intended to render court decisions effective, pursuant to paragraph 7 of Article 17 of the Mexican Constitution: "*federal and local laws shall set forth the necessary means to guarantee the independence of courts and the full enforcement of their decisions.*" Such limitation, then, runs counter to the right under analysis. The challenged judgment violates such right to the detriment of the Petitioner and is therefore unconstitutional.

In this respect, the legal concept of precautionary measures is intended to guarantee the parties' right of access to justice and the protection of any rights at issue; accordingly, it is indisputable that, in granting the precautionary measures, the Court in Charge was required to examine such measures for admissibility and proportionality but failed to do so – the Court in Charge simply ordered several measures under the Bankruptcy Law that are not applicable to a judicial dissolution and winding-up, without an adequate analysis. Such analysis would have led the Court in Charge to find that none of the facts alleged in the complaint were attributed to my client.

Therefore, the challenged decision was not duly grounded or reasoned and should be revoked, since it blatantly violated the *non ultra petita* and completeness principles that apply to any court decision.

In view of the above, it follows that the authority in charge, in clear violation of the fundamental rights of my client – specifically, the right to effective precautionary protection – erroneously granted the precautionary measures.

In this regard, the parties' guarantee of a hearing is enshrined in paragraph 2 of Article 14 of the Political Constitution of the United Mexican States:

"***Article 14. (…)***

*A person may be deprived of his or her liberty or property, belongings or rights only through a court proceeding heard by previously established courts, subject to essential formalities of procedure and in accordance with the laws enacted before the facts of the case.*"

Article 14 sets forth the well-established guarantee of a hearing, whereby each person is entitled to be heard by a previously established court before any act of deprivation, following a procedure with all essential formalities and affording legal protection to the person's life, liberty, property, belongings and rights; this allows the person to challenge any arbitrary action by the authorities or the violation of such guarantee even when general mandatory rules are adopted, thereby limiting the scope of court decisions to what has been requested and contextualizing the authorities' duties to abide by the Constitution.

In this regard, all authorities with judicial, executive and legislative functions shall foresee and respect, before any act of deprivation, the existence of a proceeding subject to the essential formalities of procedure to offer the person an adequate opportunity to defend from the decisions that the authority wishes to enforce against the person. Such guarantee shall be observed at all times.

Denying a prior proceeding, remedy or defense would run counter to the formal elements of procedure and the parties would be rendered defenseless. Therefore, the essential content of such right is the guarantee to defend in a proceeding by relying upon the formalities under the Constitution. This means that all authorities are required to act properly in applying the law through a forced procedure, so that any person is guaranteed a fair application of the law and a regular course of actions by the authorities.

Furthermore, paragraph 1 of Article 8 of the American Convention on Human Rights provides as follows:

"***Article 8***. *Right to a Fair Trial*

*1. Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature.*"

In this regard, the right to a fair trial is a requirement to access the administration of justice in a legal and effective manner and shall be observed in furtherance of a regulated protection of rights under the law, with respect to any act by the competent authorities determining rights and obligations of persons. Such right requires the State to guarantee a proceeding intended to protect persons against any act that may violate their rights.

Thus, it is indisputable that a court proceeding guarantees, protects, ensures and asserts the existence or exercise of a right to defense and access to justice. This means that the parties are allowed to produce evidence before an impartial judge and defend their case against the counterparty with due guarantees in the relevant proceeding so that the case is impartially resolved and judgment is entered against the liable parties.

The guarantee of a hearing, then, includes several elements, as explained in the case law adopted by the highest courts of the land:

"*Series: Ninth Series*

*Docket No.: 169143*

*Instance: Circuit Courts*

*Type of Opinion: Case law*

*Source: Court Journal and Gazette of the Federation*

*Volume XXVIII, August 2008*

*Matter(s): State Law*

*Opinion: I.7o.A. J/41*

*Page: 799*

**HEARING. ELEMENTS OF THIS GUARANTEE.**

*Among the various guarantees of legal certainty contained in paragraph 2 of Article 14 of the Political Constitution of the United Mexican States, the guarantee of a prior hearing stands out for its key role. Such constitutional mandate, which essentially involves a guarantee of legal certainty for persons, imposes an unavoidable obligation on the authorities to observe a series of essential formalities required to hear the defense of the affected parties before any act of deprivation. Such formalities and the observance thereof, together with the formalities related to the guarantee of legality under paragraph 1 of Article 16 of the Constitution, are fundamental elements that help to show the persons affected by an act of authority that the decision entered against them was not adopted in an arbitrary and anarchic way but, quite the contrary, in strict observance of the legal framework applicable to it. Thus, under such mandates, the course of any proceeding or dispute shall be subject to the unavoidable completion of different stages associated with the parties' formal guarantee of a hearing. This means that the affected party shall be aware of the commencement of the proceeding, as well as the case to be heard and the consequences resulting from such proceeding, and it shall be given the possibility of defending the case in a system of proof that allows a party to prove its allegations and the counterparty to raise objections; when the discovery stage is closed, the affected party shall also be allowed to submit arguments and, finally, the proceeding shall be disposed of by means of a decision on the case heard, clearly establishing the time and manner of enforcement.*

*SEVENTH COURT IN ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT.*

*Direct Amparo Proceeding No. 3077/2001. Special Agrarian Committee for an ejido community to be called, if created, "Miguel de la Madrid Hurtado," in the Municipality of Tamiahua, State of Veracruz, through its President, Secretary and one of its members. October 10, 2001. Unanimous vote. Reporting Judge: Alberto Pérez Dayán. Court Clerk: Amelia Vega Carrillo.*

*Direct Amparo Proceeding No. 131/2005. Huizar Cleaner de México, S.A. de C.V. May 11, 2005. Unanimous Vote. Reporting Judge: Alberto Pérez Dayán. Court Clerk: Elizabeth Arrañaga Pichardo.*

*Amparo Proceeding for Review No. 47/2005. Eleazar Loa Loza. October 5, 2005. Unanimous vote. Reporting Judge: Alberto Pérez Dayán. Court Clerk: Amelia Vega Carrillo.*

*Direct Amparo Proceeding No. 107/2006. Armando Huerta Muñiz. April 26, 2006. Unanimous Vote. Reporting Judge: Alberto Pérez Dayán. Court Clerk: Amelia Vega Carrillo.*

*Direct Amparo Proceeding No. 160/2008. President, Secretary and Treasurer of the Ejido Community Commissioner's Office of the New Ejido Community Center called "Coyamitos y anexos" in the Municipality of Chihuahua, State of Chihuahua. June 25, 2008. Unanimous vote. Reporting Judge: Adela Domínguez Salazar. Court Clerk: Luis Huerta Martínez.*"

In view of the above, it is indisputable that the guarantee of a hearing in itself includes various key elements that help to show the persons affected by an act of authority that the decision entered against them was not adopted in an arbitrary and anarchic way but, quite the contrary, in strict observance of the legal framework applicable to it; therefore, any proceeding shall consist of different stages **associated with the parties' formal guarantee of a hearing**: *(i)* the affected party shall be aware of the commencement of the proceeding, as well as the case to be heard and the consequences resulting from the proceeding; *(ii)* the affected party shall be given the possibility of defending the case in a system of proof that allows **a party to prove its allegations** and the counterparty to raise objections; *(iii)* when the discovery stage is closed, the affected party shall be allowed to **submit arguments**; and finally, *(iv)* the proceeding shall be **disposed of by means of a decision** on the case heard, clearly establishing the time and manner of enforcement.

As show above, paragraph 2 of Article 14 of the Constitution provides that, before a person is deprived of his or her liberty, property, belongings or rights, **a proceeding shall be heard** by the previously established courts. It has been pointed out that the word "through" contained in Article 14 implies that, before an act of deprivation, a proceeding needs to be concluded; at the same time, it follows that the reference to a proceeding pertains to a person with authority to issue a decision impartially.

Article 8 of the American Convention on Human Rights provides that every person has the right to a hearing with due guarantees by a competent, independent, and impartial judge; it contains an instance of pleonasm (albeit not in a superfluous way) by referring to an impartial judge. Legally speaking, the idea of a judge cannot exist if the judge is not impartial – a person mandated to hear a dispute may not have any interest whatsoever with respect to any of the parties. The foregoing idea supports other legal concepts, such as impediments, excusal and recusal.

Now, paragraph 2 of Article 14 of the Mexican Constitution has been traditionally interpreted as containing what is called (or used to be called) "guarantee of a hearing," which essentially refers to **the right of each party to be heard before an act of deprivation, subject to all essential formalities of procedure**. In this regard, the Supreme Court of Justice has determined that the essential formalities of procedure include four essential guarantees, namely: *(i)* notice of the commencement of the proceeding, *(ii)* the right to produce evidence, *(iii)* the right to plead, and *(iv)* the delivery of a judgment disposing of the dispute. This is supported by the following case law opinions:

"*Series: Ninth Series*

*Docket No.: 200234*

*Instance: Plenary Session*

*Type of Opinion: Case Law*

*Source: Court Journal and Gazette of the Federation*

*Volume II, December 1995*

*Matter(s): Constitutional, State Law*

*Opinion: P./J. 47/95*

*Page: 133*

**ESSENTIAL FORMALITIES OF PROCEDURE. FORMALITIES GUARANTEE A PROPER AND TIMELY DEFENSE BEFORE AN ACT OF DEPRIVATION.**

*The guarantee of a hearing under Article 14 of the Mexican Constitution is intended to offer parties the opportunity to defend before being deprived of their life, liberty, property, belongings or rights, and the due respect of such guarantee imposes obligations on the authorities, including but not limited to an obligation to ensure that the relevant proceeding is conducted "subject to the essential formalities of procedure." Such formalities are necessary to guarantee a proper defense before an act of deprivation and, in a generic way, give rise to the following requirements: (1) notice of the commencement of the proceeding and its consequences; (2) opportunity to produce and present evidence in support of the defense; (3) opportunity to plead; and (4) delivery of a decision disposing of the dispute. If the foregoing requirements are not satisfied, the purpose of the guarantee of a hearing – namely, to ensure that the affected party is not in a defenseless state – would not be achieved.*

*Direct amparo proceeding under review 2961/90. Opticas Devlyn del Norte, S.A. March 12, 1992. Nineteen unanimous votes. Reporting judge: Mariano Azuela Güitrón. Court clerk: Ma. Estela Ferrer Mac Gregor Poisot.*

*Direct amparo proceeding under review 1080/91. Guillermo Cota López. March 4, 1993. Sixteen unanimous votes. Reporting judge: Juan Díaz Romero. Court clerk: Adriana Campuzano de Ortiz.*

*Direct amparo proceeding under review 5113/90. Héctor Salgado Aguilera. September 8, 1994. Seventeen unanimous votes. Reporting judge: Juan Díaz Romero. Court clerk: Raúl Alberto Pérez Castillo.*

*Direct amparo proceeding under review 933/94. Blit, S.A. March 20, 1995. Nine-vote majority. Reporting judge: Mariano Azuela Güitrón. Court clerk: Ma. Estela Ferrer Mac Gregor Poisot.*

*Direct amparo proceeding under review 1694/94. María Eugenia Espinosa Mora. April 10, 1995. Nine unanimous votes. Reporting judge: Mariano Azuela Güitrón. Court clerk: Ma. Estela Ferrer Mac Gregor Poisot.*

*The Supreme Court sitting en banc in a private session held on the twenty-third of November of this year, by eleven unanimous votes of the Justices: Chief Justice José Vicente Aguinaco Alemán, Sergio Salvador Aguirre Anguiano, Mariano Azuela Güitrón, Juventino V. Castro y Castro, Juan Díaz Romero, Genaro David Góngora Pimentel, José de Jesús Gudiño Pelayo, Guillermo I. Ortiz Mayagoitia, Humberto Román Palacios, Olga María Sánchez Cordero and Juan N. Silva Meza; approved, under number 47/1995 (9th), the above-mentioned case law opinion, and found that the votes of the above-mentioned Justices are in line with such case law opinion. Mexico, Federal District, on the twenty-third of November, nineteen ninety-five."*

However, the above-mentioned formal requirements that are key to the proceeding entail due notice of the beginning or completion of each of the stages of the proceeding, in order for the party to be able to exercise their rights within the established time period and to have the procedural opportunity to enforce such rights in an effective manner. That is, in order for the above-mentioned key formal requirements of the proceeding to materialize, it is necessary that the party be granted the possibility to make use of them, giving them notice of the time periods to that effect under the terms of the specific applicable law. Thus, in order to effectively protect the party's fundamental procedural rights, they must be given prior notice of such rights and of the deadlines to exercise them, being the appropriate authority responsible for taking into consideration the statements made to that effect by any party to the proceeding or by the petitioner itself, because such authority may not ignore the facts or events that necessarily require the appearance of a third party whose rights may be affected by the acts of the court.

In effect, one of the key elements of the right to a hearing is notice of the proceeding, so that the party can have the possibility to offer evidence, make claims and file any appropriate appeal. Therefore, in the case at hand, given that a series of acts have clearly infringed the substantive rights of the undersigned since the Ordinary Court Predetermined by Law is allegedly ordering the adoption of precautionary measures, complying with the request made in that sense by Petitioners, without even allowing my client to raise any defense, let alone analyze and prove the likelihood to succeed on the merits that may exist in favor of the party requesting such measures and against my client, and which it is claimed that does not exist with respect to Petitioners and my client in the original proceeding.

Accordingly, through the challenged action, the Court intends to limit and restrict the rights of my client, which constitutes a violation of its human rights, and it does not even allow my client to raise any defense, which is undoubtedly unconstitutional. Consequently, it is indisputable that my client should have been given the opportunity to exercise its rights.

In this sense, I request that Your Honor grant my client the *amparo* and protection of the Federal Judiciary in order to annul the precautionary measures granted on June 30, 2022 by the Ordinary Court Predetermined by Law.


**<u>STAY OF THE CHALLENGED ACTION</u>**

It is hereby requested that the Court grant the provisional and potential final stay of the actions challenged under Article 107(X) of the Political Constitution of the United Mexican States, and Section 128 of the *Amparo* Act, which read as follows:

> **"Article 107.** *Any dispute covered by Article 103 of this Constitution, except for electoral disputes, shall be subject to the procedures established by the regulatory act, in accordance with the following principles:*
>
> *[…]*
>
> **X.** *Challenged actions may be subject to stay in the cases and under the conditions and guarantees established by the regulatory act. For such purpose, the amparo court, where*

*deemed appropriate based on the nature of the act, must perform an analysis taking into account the likelihood to succeed on the merits and social interest. Such stay must be granted in final criminal judgments at the time of notifying the filing of the amparo, and in civil, commercial, and administrative matters, through the posting of a bond by the petitioner to cover any damages that may be caused to the third party in interest due to such stay. The stay must be annulled if the third party in interest posts bond to guarantee that the state of affairs will remain as it was if the amparo were granted and to pay any resulting damages; …"*

*"**Section 128.** Except in the cases where it is granted sua sponte, the stay must always be issued on all matters, except on the matters stated in the last paragraph of this section, provided the following requirements are met:*

*I. The stay is requested by the petitioner; and*

*II. Social interest is not damaged, and public policy laws are not infringed. […]."*

In this sense, the following conclusions can be drawn from the contents of Article 107(X) of the Political Constitution of the United Mexican States and Section 128 of the *Amparo* Act:

*a)*        The stay of the challenged action is an order (similar to a precautionary measure) that arises as a collateral action to the indirect *amparo* proceeding. This action follows a separate path, and it becomes an order aimed at protecting compliance and enforcement of the protective judgment that may be issued in the proceeding for protection of fundamental rights.

*b)*        The purpose of the stay of the challenged action is to maintain the subject matter of the *amparo* proceeding.

*c)*        The effects of the stay, the purpose of which is to maintain the state of affairs as it is at the time of issuance of the order, temporarily lifting the measures aimed at enforcing such order. Therefore, the subject matter of the stay in the original proceeding is such enforcement and not the act in itself. The stay may also have effects of restitution where necessary for due protection of the fundamental rights allegedly infringed.

With regard to the requirements to grant the stay, the intention of the federal lawmaker is that, through the stay, the state of affairs remain as it is or that the rights of the petitioner be provisionally granted back, in order for the challenged action, its enforcement or consequences not to destroy the subject matter of the *amparo* (or that they cause damages to the petitioner that are difficult or impossible to repair), as long as permitted by the nature of the act. This means that the granting of the stay of the challenged action shall be analyzed taking into account the following requirements: *(i)* if the challenged actions are true or not (premise), *(ii)* if the nature of such actions allow for their suspension; *(iii)* if the conditions required by Section 128 of the *Amparo* Act are met (that the stay is requested by the petitioner and that social interest is not damaged and public policy laws are not infringed); and *(iv)* if, when there are third parties in interest, it is necessary to demand the posting of a bond.

In view of the foregoing, and based on Article 127 of the Constitution and Section 128 of the *Amparo* Act, the undersigned requests that Your Honor grant the stay of the challenged actions **for the following purposes: *(i)* that the Court in Charge allow the petitioner, through its authorized**

**representatives, to have access to all acts performed in the proceeding 691/2022, filed with the Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City; *(ii)* that any enforcement act within the proceeding 691/2022, filed with the Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City, be stayed; *(iii)* that the Court immediately order the lift of any precautionary measure affecting goods, rights and assets of the petitioner; *(iv)* that the enforcement of any provisional or final ruling issued by the Court in Charge be stayed; *(v)* that the provisional or final liquidator be ordered to refrain from performing any action aimed at enforcing any order or action issued in the context of the original proceeding; and *(vi)* that all authorities, agencies and private persons be ordered to refrain from participating in, enforcing, attempting to enforce or carrying out any act stemming from proceeding 691/2022, filed with the Fifty-second Civil Court of the Superior Court of Justice in and for Mexico City, including, without limitation, the registration of any judgment with the Public Registry of Property and Commerce, and, since this is a publicly traded company, the stay of any order cancelling registration on the list**, given that the requirements established by the above-mentioned law are met since *(i)* the stay is requested by the petitioner; and *(ii)* social interest is not damaged and no public policy law is infringed. On the contrary, they are being defended, as it will be explained below.

Grammatically, stay means "*action and effect of staying*". Staying, in turn, means "*stopping or delaying for some time an action or work.*" The Mexican Supreme Court of Justice defines stay by stating that "*the purpose of the stay is to stop, paralyze or maintain the state of affairs in order to avoid that the challenged action, its enforcement, or consequences destroy the subject matter of the amparo, or cause serious damage that is difficult or impossible to repair to the petitioner or any other injured third party[2].*"

Furthermore, as determined by our Supreme Court sitting *en banc* and acting through the Second Division, it is possible to grant the stay of the enforcement of an action just by proving the likelihood to succeed on the merits of the petitioner, so that it is possible to foresee that in the *amparo* judgment, the challenged action will be declared unconstitutional. This decision must be weighed against the damage that may be caused to social interest or public policy by granting the measure. In this case, neither social interest nor public policy is affected, and the following conflicting case law is applicable:

*"Ninth Series*

*Docket: 200136*

*Instance: En banc*

*Case law*

*Source: Court Journal and Gazette of the Federation*

---

[2] ***"STAY DUE TO SUPERVENING ACT. THE REVOCATION OR MODIFICATION ESTABLISHED IN SECTION 140 OF THE AMPARO ACT APPLIES BOTH IN PROVISIONAL AND FINAL STAY."*** *P.J. 31/2001*

*III, April, 1996*

*Matter/s: Common*

*Opinion: P./J. 15/96*

*Page: 16*

**STAY. IN ORDER TO MAKE A DECISION ON THE STAY, IT IS POSSIBLE, WITHOUT OVERLOOKING THE REQUIREMENTS IN SECTION 124 OF THE AMPARO ACT, TO MAKE A PROVISIONAL ANALYSIS OF THE UNCONSTITUTIONALITY OF THE CHALLENGED ACTION.**

*The stay of the challenged actions is part of the nature of a precautionary measure, the requirements of which are the likelihood to succeed on the merits and the risk inherent in delay. The former is based on the superficial knowledge aimed at reaching a decision of mere probability regarding the existence of the right being disputed in the proceeding. Such requirement, applied to the stay of the challenged actions, implies that, in order for the measure to be granted, without overlooking the requirements in Section 124 of the Amparo Act, it is enough that the likelihood to succeed on the merits by the petitioner be proved, so that, on the balance of probabilities, the court can foresee that the challenged action will be declared unconstitutional in the amparo judgment. This analysis is also based on Article 107(X) of the Constitution, which establishes that, in order to grant the stay, the nature of the alleged violation, among other factors, must be taken into consideration, which means that the right that has been allegedly infringed must be considered. That is, the analysis of the nature of the alleged violation does not only involve the concept of violation alleged by the petitioner, but also the fact or action that causes the violation, considering its features and importance. In any case, such analysis must be performed without making any assumption regarding the certainty of the right, i.e., the constitutionality or unconstitutionality of the challenged actions, because this fact can only be determined in the amparo judgment, based on a larger proceeding with additional information. This is due to the fact that the decision taken with regard to the stay must not influence the judgment on the merits, given that the former is only provisional and is based on mere hypotheses, and not on the conviction that the claims exist, on the understanding that this element must be weighed against the other required elements to grant the stay, because if the damage to social interest or public policy overcomes the potential damage suffered by the petitioner that would be difficult to repair, the requested stay must be denied, due to the fact that protection of public policy or social interest is above the particular interest of the aggrieved party. In so doing, an excess in the analysis made by the court is prevented, which must always be subject to the rules that govern stay matters.*

*"Ninth Series*

*Docket: 165659*

*Instance: Second Division*

*Case law*

*Source: Court Journal and Gazette of the Federation*

*XXX, December, 2009*

*Matter/s: Common*

*Opinion: 2nd/J. 204/2009*

*Page: 315*

**STAY. IN ORDER TO DECIDE ON THE GRANTING OF THE STAY, THE COURT MUST WEIGH THE LIKELIHOOD TO SUCCEED ON THE MERITS AGAINST THE DAMAGE TO SOCIAL INTEREST OR PUBLIC POLICY.**

*The Mexican Supreme Court sitting en banc, in case law P./J. 15/96, in the proceeding "STAY. IN ORDER TO MAKE A DECISION ON THE STAY, IT IS POSSIBLE, WITHOUT OVERLOOKING THE REQUIREMENTS IN SECTION 124 OF THE AMPARO ACT, TO MAKE A PROVISIONAL ANALYSIS OF THE UNCONSTITUTIONALITY OF THE CHALLENGED ACTION," held that in order to grant a stay, without overlooking the requirements in Section 124 of the Amparo Act, it is enough that the likelihood to succeed on the merits by the petitioner be proved, so that the court can foresee that the challenged action will be declared unconstitutional in the amparo judgment, which must be weighed against the damage that may be caused to social interest or public policy by granting the measure; that is, if the damage to social interest or public policy overcomes the potential damage suffered by the petitioner that would be difficult to repair. In view of the foregoing, the court must simultaneously analyze the likelihood to succeed on the merits and the risk inherent in delay and the potential damage that may be caused to public policy or social interest by granting the stay of the challenged action. This hypothetical case is covered by the above-mentioned Section 124(II). The analysis must be made simultaneously because it is not possible to consider in isolation that an action is unconstitutional without making an immediate comparison with public policy that may be affected by the stay of such action. In addition, the other legal requirements necessary to grant that measure must have been previously met.*

*"Tenth Series*

*Docket: 2006857*

*Instance: Circuit Courts*

*Type of Opinion: Guiding Opinion*

*Source: Court Journal of the Federation*

*Date of Publication: Friday, June 27, 2014, 09:30 a.m.*

*Matter/s: (Common)*

*Opinion: IV.2o. A.70 K (10th)*

**STAY IN INDIRECT AMPARO PROCEEDINGS. THE ACT ON THE MATTER, IN FORCE SINCE APRIL 3, 2013, ESTABLISHES A NEW BALANCED SYSTEM, GOVERNED BY**

**MORE PROCEDURAL AND SUBSTANTIVE LEGAL ELEMENTS, BOTH GENERAL AND SPECIFIC, FOR THE ISSUANCE OF DECISIONS IN THAT REGARD.**

*As a result of the constitutional reform regarding amparo proceedings of June 6, 2011, and the subsequent adoption of the act on the matter, in force since April 3, 2013, a new balanced system was created—with regard to the stay of challenged actions in indirect amparo proceedings—to make the precautionary measure more effective in the protection of affected rights and amparo proceedings and, at the same time, providing it with more elements of control in order to prevent abuse and the issuance of decisions that may damage social sensibility by harming legally relevant collective interests, and to allow for the correction of those effects through means provided for in such act. Furthermore, with regard to the purpose of making the precautionary measure more effective, in the new stay system, <u>**Courts are given broader discretionary powers to gather more elements to issue more informed decisions, and it is provided that the court must decide by considering the likelihood to succeed on the merits, which implies a superficial and provisional analysis of the merits of the case that allows the court to confirm, even if it is a provisional confirmation, that the petitioner is the holder of the right that was allegedly infringed and to establish the manner in which such infringement occurred**</u>. Based on that, the court can establish the extent of the stay so that it is more effective in stopping the infringement and preventing such infringement from becoming too difficult to repair and, at the same time, preventing loss of the subject matter of the amparo proceeding, since the risk inherent in delay is analyzed simultaneously to the likelihood to succeed on the merits. On the other hand, a new element to be considered when granting the stay is introduced, which is social interest. This means that, when deciding on the measure, the court must take into account the legally relevant collective interests, principles or values, the protection of which is entrusted to the Court in the exercise of its discretionary powers. These interests are represented through the challenged action or are involved in the context in which the consequences of the stay or enforcement of the measure will materialize. Therefore, the decision is more likely to have an effective result with regard to the protection of the petitioner's rights, the matter of the amparo proceeding and to prevent the issuance of a decision based on a claim that is superficially grounded, frivolous, or reckless and that hurts social sensibility. In addition, as part of the new balanced system, with regard to the stay at the request of the petitioner, a set of expressions was included that constitute regulatory, formal and substantive elements of the above-mentioned weighting process and, in general, of the decisions on the stay of the challenged action, and specific expressions were established that regulate or reinforce the weighting between the likelihood to succeed on the merits and social interest, granting more importance to the latter, as provided for in the last paragraph of Section 129, which states that the measure may only be exceptionally granted to protect social interest, even if the actions concerned are such as those established in the different subsections. Furthermore, Section 131 establishes that in order for the measure to be granted when the stay is requested claiming a legitimate interest, not only will it be necessary to ensure that social*

*interest is not affected, but it will also be necessary to prove that it is social interest which justifies granting the measure, and not only the private interest of the petitioner; or alternatively, when in order for the petitioner to be granted back provisional exercise of the infringed right, as provided for in the second paragraph of Section 147, it is necessary to prove that it is legally and materially possible to give such effect to the measure. These elements show that each of those expressions govern the formal and substantive aspects of the decisions on the stay of the challenged action, but they are also elements that can be verified and that facilitate the control that needs to be exerted by courts through appropriate means. They also show that there are general and specific or reinforced expressions depending on the different provisions of the Amparo Act that inform the above-mentioned weighting process between the likelihood to succeed on the merits and social interest; and, based on the latter, they show that the new system for the stay of the challenged action includes more requirements in order to grant the measure in comparison to the repealed act.*

Moreover, in order to decide whether to grant the provisional stay or not, district courts must consider the representations made under oath by the petitioner in their complaints regarding the imminent risk in the event that the challenged action be performed, because, as a general rule, these are the only elements that the court can make use of in order to decide on the request to grant the precautionary measure. It is not appropriate to speculate about the unlikely performance of the actions that the petitioner alleges that a third party is intending to perform against them, because in order to decide on the provisional stay, the court must make the assumption, whether proved or not, that all challenged actions are certain[3].

In this sense, from a weighted analysis, Your Honor will observe that, on the one hand, as stated when addressing the concepts of violation, there is a high probability that the challenged actions be declared unconstitutional, due to the fact that the violation of the right to a hearing of the petitioner and several creditors is blatant, besides the fact that it is evident that the Authority in Charge lacks jurisdiction to hear this winding-up proceeding because there are creditors, and, therefore, an obligation to guarantee public interest, respecting the procedures established by the Legislature for the cases of insolvency, protecting the workers, the tax authority, other creditors and hundreds of Mexican families that have done business with that institution.

That is, from a weighted analysis between the likelihood to succeed on the merits and the risk inherent in delay, we can see that the conditions necessary to grant the stay are met, because the petitioner is the holder of the fundamental right to due process and legal certainty, and the public interest to protect the companies' viability and the viability of those that do business with such companies is also present, and, on the other hand, the challenged actions are clearly unconstitutional. These appear to be actions defrauding creditors and contrary to the law, especially considering that if the stay were

---

[3] ***"PROVISIONAL STAY. IN ORDER TO DECIDE WHETHER TO GRANT THE STAY OR NOT, THE REPRESENTATIONS OF THE PETITIONER REGARDING THE CERTAINTY OF THE CHALLENGED ACTION MUST BE TAKEN INTO CONSIDERATION"*** Conflicting opinion. Various 34/91.

granted, no damage would be caused to social interest. On the contrary, if the stay were not granted, this *amparo* proceeding would be lacking subject matter, which would cause significant violations to the legal rights of the petitioner, multiple creditors, workers and even the tax authorities. These damages would be impossible to repair, and if this court allowed the enforcement of any action or order stemming from the original proceeding to continue, it would jeopardize not only the interest of my client, but also the interest of the society at large.

Consequently, it is undisputable that all requirements necessary to grant the stay are met, i.e.: *(i)* the measure is expressly requested by the petitioner; *(ii)* there is certainty regarding both the substantive right of the petitioner and the challenged action given that this is a jurisdictional proceeding; *(iii)* the actions are subject to stay because, presumably, the actions of enforcement of the measures and the rest of the orders, rulings, or decisions of any kind issued during the proceeding are positive actions; *(iv)* neither public interest nor public policy provisions are infringed; on the contrary, the purpose is to protect them; and *(vi)* there are fundamental rights at stake, such as due process, legal certainty, the right to jurisdiction in connection with the public interest that entails preservation of the companies' viability, in addition to the evident unconstitutionality of the challenged actions.

The following case supports this claim:

> *Series: Ninth Series*
>
> *Docket No.: 2011614*
>
> *Authority: Second Court Division*
>
> *Type of Opinion: Guiding Opinion*
>
> *Source: Court Journal and Gazette of the Federation*
>
> *Book 30, May 2016, Volume II*
>
> *Matter(s): Ordinary*
>
> *Opinion: 2a./XXIII/2016*
>
> *Page: 1376*

> ***FINAL STAY IN AN AMPARO PROCEEDING. REQUIREMENTS FOR GRANTING A STAY.***
>
> *It can be noted from* <u>Article 107(X) of the Political Constitution of the United Mexican States</u>*, as well as from* <u>Sections 128 and 138 of the</u> Amparo <u>Act</u>*, that, in order for a final stay to be granted in an* amparo *proceeding, it is required that:* ***<u>i. Such stay be expressly requested by the petitioner; ii. Certainty exist regarding the existence of the actions whose stay is being requested; iii. The challenged actions be likely to be stayed; iv. No harm be caused to the social interest, and no public policy provisions be violated, as provided in Section 129 of the</u> Amparo <u>Act;  and v. A weighted analysis of the likelihood to succeed on the merits be conducted for the specific case under review</u>***. *Thus, only if all of the above requirements are met may a court grant a final stay, subject, where appropriate, to the posting of a bond, as provided in Section* <u>132</u> *of the* Amparo *Act.*

As the petitioner is a third party that is not a party to the core proceeding, there is no doubt that a stay should be granted in order to maintain the *status quo*; otherwise, further violations of the petitioner's fundamental rights will continue to occur.

The risk inherent in delay consists in the fact that, by not being able to collect on the loans granted to Crédito Real, the petitioner may be harmed even to the point of being rendered insolvent, in addition to the fact that the *per condictio creditorum* principle will be violated to the petitioner's detriment. And, if the stay of the challenged action is not granted, the petitioner will never be in a position to become aware from the outset of the entire case record kept for the proceedings, and, therefore, assert any rights to which the petitioner may be entitled. Therefore, the principle of due process of law, the guarantee of a hearing and of legal certainty would continue to be violated, in addition to the petitioner being deprived of its property by an authority lacking jurisdiction.

The request made herein is appropriate under Section 139 of the *Amparo* Act, according to which, **if there is imminent risk that the challenged action will be or will continue to be carried out WITH LOSSES TO THE PETITIONER FOR WHICH IT IS DIFFICULT TO GRANT APPROPRIATE RELIEF**—as in this case, where the possibility has been notably compromised of collecting on a loan or having access to appropriate and applicable remedies in insolvency cases, such as the one involving Crédito Real, and where attempts are being made to thwart such possibility by means of tricks—a court should order that the *status quo* be maintained, pending notification of the decision to be rendered regarding the stay to the authority in charge, while adopting all such measures as the court sees fit to prevent losses to the interested parties.

## **RESERVATION OF RIGHTS**

Since the petitioner is unaware of the content of the decisions issued by the **Fifty-Second Court in Civil Matters of the Superior Court of Justice in and for Mexico City** in Case No. 691/2022, the petitioner reserves as of now the right to assert any defense, action, and/or right against such decisions, in accordance with the applicable procedural terms and rules. Such reservation shall remain effective until the petitioner has become fully aware of the entire content of such decisions. Therefore, the petitioner also reserves the right to amend the *amparo* petition once the petitioner has become fully aware of the relevant proceedings.

For the above reasons,

I hereby request that **YOUR HONOR**:

**ONE.** Consider the capacity in which I am acting to have been duly established, and further consider this submission to have been duly filed, wherein I am requesting an *Amparo* and Protection from the Judiciary against the actions that are being challenged, carried out by the authorities designated as authorities in charge.

**TWO.** Admit this *amparo* petition for hearing, requesting that a reasoned report be provided by the authorities designated as authorities in charge, and further setting the day and time for a constitutional hearing in these proceedings.

**THREE.** Grant the provisional and, where appropriate, final stay requested herein, requesting that the authorities in charge provide their preliminary reports, and further setting the day and time for the relevant collateral case hearing.

**FOUR.** In due course, and following all appropriate legal steps, dispose of and grant the *amparo* and protection requested herein from the Judiciary.

**RESPECTFULLY SUBMITTED**

In Mexico City, Mexico, on this date.

_____

**JACOBO GUADALUPE MARTINEZ FLORES**

Legal Counsel

**Banco Monex, S.A., Institución de
Banca Múltiple, Monex Grupo
Financiero**



## JUDICIARY OF THE FEDERATION

**CRYPTOGRAPHIC EVIDENCE - TRANSACTION**

Signed Filed: 0811001000000000000017588408.p7m

Certifying Authority: CERTIFYING AUTHORITY

Signing Party/Parties: 1

| SIGNING PARTY | | | | |
|---|---|---|---|---|
| **Name:** | JACOBO GUADALUPE MARTÍNEZ FLORES | **Validity:** | OK | Valid |
| SIGNATURE | | | | |
| **Serial No.:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | **Revocation:** | OK | Not revoked |
| **Date: (UTC / CDMX)** | 07/19/22 5:48:25 PM - 07/19/22 12:48:25 PM | **Status:** | OK | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 44 bc 61 ce a9 3d 5b d0 c4 c6 45 9b 94 57 42 2f 7a 28 c2 fa 0b 01 65 2c a3 80 e2 50 2b 86 cc 1d 35 6a 9a 42 2c d9 68 1a 9f 32 d7 eb e8 f3 47 b2 33 3e 82 f7 f0 25 6b e7 62 99 2c b1 23 54 5c 66 72 f4 5b 8f 5a a3 1d e6 dc 65 90 5e 56 99 89 38 e9 db 41 74 0d 5b 57 e0 be 7d 40 d9 34 8a a1 9a 79 ee 8f c5 01 67 a0 b8 b4 a4 b6 38 a1 fa 50 47 09 f1 3b cf 1d 0c e7 54 60 61 f3 24 72 e9 44 89 76 29 3f 1c be 45 cb d4 60 94 38 c5 32 ca 9d 48 50 51 8d 85 18 07 c6 be b6 e9 6f 70 95 e5 ec 69 c5 b7 98 60 6e a7 83 43 09 bc 07 25 72 ad 0b 54 58 ff f2 1c f6 61 92 89 f0 d6 43 77 d0 37 70 1c c1 62 c3 68 1b b1 46 76 5e 61 a6 f1 b0 ad 7d 20 ec 47 53 9f 2b 89 8d 6e b2 67 93 2a fb 6e 37 18 49 a2 80 42 17 5a d1 15 3c 48 9c 4b b5 75 77 83 fa fc 8e 79 44 56 6c 10 74 0c 2f 5d b7 2b f7 7d | | | |
| OCSP | | | | |
| Date: (UTC / CDMX) | 07/19/22 5:48:22 PM - 07/19/22 12:48:22 PM | | | |
| Responder name: | OCSP SAT Service | | | |
| Responder issuer: | CERTIFYING AUTHORITY | | | |
| Serial number: | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | |
| TSP | | | | |
| Date: (UTC / CDMX) | 07/19/22 5:48:26 PM - 07/19/22 12:48:26 PM | | | |
| Name of TSP response issuer: | Timestamping Authority of the Mexican Judicial Council | | | |
| TSP certificate issuer: | Intermediary Certifying Authority of the Mexican Judicial Council | | | |
| TSP response ID: | 126099507 | | | |
| Time-stamped data: | K5xNTmcnVMIVoYlviH0+H3Ss4nQ= | | | |

**ALBERTO T. SÁNCHEZ COLÍN**

Notary Public No. 83. Mexico City

COPY OF THE **PARTIAL NOTARIZATION** OF THE INSTRUMENT **GRANTING POWERS OF ATTORNEY** FROM "**BANCO MONEX**," **SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO** TO **MR. JACOBO GUADALUPE MARTÍNEZ FLORES.**

**NOTARIALLY RECORDED INSTRUMENT NO. 45619.**

**BOOK NO. 1240.**

**YEAR 2021.**

Av. Paseo de las Palmas No. 555-902

Col. Lomas de Chapultepec

1 1 0 0 0, Mexico City

5540-6644 Fax 5540-7307

atsclex@prodigy.net.mx

BOOK NO. 1240. ASC*MLG*IMJ. 45619. -------------------------------------------------------------------------

MEXICO CITY, July 14, 2021. -------------------------------------------------------------------------------

**ALBERTO T. SÁNCHEZ COLÍN, Notary Public No. 83 in and for Mexico City,** do hereby record: ---------------------------------------------------------------------------------------------

**THE GRANTING OF POWERS OF ATTORNEY FROM "BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** TO **MR. JACOBO GUADALUPE MARTÍNEZ FLORES**, resulting from the **partial notarization** of the minutes of the relevant Board of Directors Meeting, made at the request of Mr. Jacobo Guadalupe Martínez Flores, based on the following background information, representations, and provisions:

----------------------------------------------------------------------------------------------------------------

**BACKGROUND INFORMATION:** -------------------------------------------------------------------------

**I.** <u>**INCORPORATION.**</u> **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** a company with address in Mexico, Federal District, with an indefinite duration and a minimum fixed capital stock of one hundred and fifty million pesos, was incorporated **by means of notarially recorded instrument No. 50993, dated April 2, 1997, signed before Mr. Miguel Alessio Robles, Notary Public No. 19 in and for the Federal District,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book. --------------------------------------------------------

**II.** <u>**AMENDMENT TO ARTICLES 7, 10, 11, 15, 25, 38, 39, 40, 41, AND 42 OF THE BYLAWS, AND AUTHENTICATION THEREOF.**</u> **Notarially recorded instrument No. 56512, dated August 27, 1999, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE**, held on April 30, 1999, where it was resolved, among other business, to amend Articles 7, 10, 11, 15, 25, 38, 39, 40, 41, and 42 of the Bylaws, and to have the Bylaws authenticated, so that they would contain the name **"COMERICA BANCA MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANK MÚLTIPLE,** a company with an indefinite duration, address in this city, and a capital stock of one hundred and fifty million pesos. ------------------------------------

**III.** <u>**INCREASE IN CAPITAL STOCK AND AMENDMENT TO ARTICLE 6 OF THE BYLAWS.**</u> **Notarially recorded instrument No. 57042, dated November 22, 1999, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE**, held on October 29, 1999, where it was resolved to increase the Company's capital stock by the amount of nine million one hundred and sixty-seven thousand pesos, so that, added to the previous capital stock of one hundred and fifty million pesos, the new capital stock would amount to one hundred and fifty-nine million one hundred and sixty-seven thousand pesos; and to amend Article 6 of the Bylaws. -----

**IV. <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO ARTICLE 6 OF THE BYLAWS.</u> Notarially recorded instrument No. 59955, dated January 5, 2001, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on December 28, 2000, where it was resolved to increase the Company's capital stock by the amount of twenty-five million nine hundred and forty-six thousand pesos, so that the new capital stock would amount to one hundred and eighty-five million one hundred and thirteen thousand pesos; and to amend Article 6 of the Bylaws accordingly. -------------------------------------------------------------------------------------

**V. <u>COMPREHENSIVE AMENDMENT TO THE BYLAWS.</u> Notarially recorded instrument No. 62748, dated February 19, 2002, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on December 19, 2001, where it was resolved to amend the Bylaws in their entirety, so that they would reflect the Company's name, its indefinite duration, its address in Mexico City, Federal District, and its capital stock of one hundred and eighty-five million one hundred and thirteen thousand pesos.------------------------------------------------

**VI. <u>INCREASE IN THE MINIMUM FIXED CAPITAL STOCK AND AMENDMENT TO ARTICLE 6 OF THE BYLAWS.</u> Notarially recorded instrument No. 68474, dated March 16, 2004, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on December 31, 2003, where it was resolved, among other business, to increase the Company's minimum fixed capital stock by the amount of five million pesos, so that the new capital stock would amount to one hundred and ninety million one hundred and thirteen thousand pesos; and to amend Article 6 of the Bylaws accordingly.------------------------------------------------

**VII. <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO ARTICLE 6 OF THE BYLAWS.</u> Notarially recorded instrument No. 70637, dated November 29, 2004, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on September 7, 2004, where it was resolved to increase the Company's capital stock by the amount of twenty-eight million six hundred and twenty-five thousand pesos, so that the new capital stock would amount to two hundred and eighteen million seven hundred and thirty-eight thousand Mexican pesos; and to amend Article 6 of the Bylaws accordingly.------------------------------------------------

**VIII. <u>ADDITION OF CHAPTER 9 TO THE BYLAWS</u>. Notarially recorded instrument No. 70788, dated December 20, 2004, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on December 8, 2004, where it was resolved to add Chapter 9 to its Bylaws. --------------------------------------------------------------------------------------------------------

**IX. <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO ARTICLE 6 OF THE BYLAWS</u>. Notarially recorded instrument No. 74538, dated December 22, 2005, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on December 20, 2005, where it was resolved, among other business, to increase the Company's capital stock by the amount of thirty-one million two hundred and sixty-two thousand pesos, so that the new capital stock would amount to TWO HUNDRED AND FIFTY MILLION PESOS, represented by 248,576 Series "F" registered shares of common stock, and 1,424 Series "B" registered shares of common stock; and to amend Article 6 of the Bylaws. -------------------------------------------------------

**X. <u>COMPREHENSIVE AMENDMENT TO THE BYLAWS</u>. Notarially recorded instrument No. 76350, dated August 15, 2006, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on August 15, 2006, where it was resolved to amend the Bylaws in their entirety, so that they would reflect the Company's name, its indefinite duration, its address in Mexico City, Federal District, and its capital stock of TWO HUNDRED AND FIFTY MILLION PESOS, represented by 250,000 Series "O" registered shares of common stock, with a par value of ONE THOUSAND PESOS each.------------------------------------------------------------------

**XI. <u>CHANGE OF COMPANY NAME AND AMENDMENT TO SECTIONS 1, 2, AND 3 OF THE BYLAWS</u>. Notarially recorded instrument No. 76351, dated August 15, 2006, signed before the above-mentioned notary public,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"COMERICA BANK MÉXICO," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** held on August 15, 2006, where it was resolved, among other business, **to change the Company's name to "BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**; to incorporate the Company into **"MONEX GRUPO FINANCIERO," SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**; and, subject to the approval of the Office of the Secretary of Finance and Public Credit, to amend Sections 1, 2, and 3 of the Bylaws.---------

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


**XII.- <u>SOLE RESPONSIBILITY AGREEMENT</u>.- Notarially recorded instrument No. 30849, dated August 23, 2006, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the Amendment to the Sole Responsibility Agreement, executed by and between **"MONEX GRUPO FINANCIERO", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, on the one part, and **"MONEX CASA DE BOLSA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, MONEX GRUPO FINANCIERO, "MONEX DIVISAS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, CASA DE CAMBIO, MONEX GRUPO FINANCIERO, "MONEX OPERADORA DE FONDOS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, MONEX GRUPO FINANCIERO, "MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO, MONEX GRUPO FINANCIERO,** and **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** on the other part, in order to comply with Section 28 of the Law on Financial Associations Regulations and Section 19 of the "General Rules on the Creation and Operation of Financial Groups", for the purposes of **including "BANCO MONEX, SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO as a Financial Entity of the referred group**. ------

**XIII.- <u>APPROVAL OF THE AMENDMENT TO SECTIONS 1, 2, AND 3 OF THE BYLAWS</u>.-** Official Letter No. UBA/DGABM/1217/2006, issued by the Office of the Undersecretary of Finance and Public Credit, Banking and Savings Division, Multiple Banking Office, on August 30, 2006, in accordance with Section 9 of the Credit Institutions Law, approved the amendment to Sections 1, 2, and 3 of the Bylaws, which was notarized in the notarially recorded instrument referred to in whereas clause XI hereof. --------------------------------------------------------------------------------------------

**XIV.- <u>INCREASE IN CAPITAL STOCK, AMENDMENT TO SECTION 8 OF THE BYLAWS; AMENDMENT TO SECTIONS 8, 14 AND 38, AND TO THE TITLE OF CHAPTER VI; DELETION OF SECTIONS 15, 35 AND 36; ADDITION OF SECTIONS 28 AND 35, AND OF CHAPTERS VIII AND IX, TO BE ENTITLED "CONDITIONAL OPERATION SYSTEM" AND "FINANCIAL RESTRUCTURING THROUGH DEBT", RESPECTIVELY, ADDING SECTIONS 39 TO 51 AND CHANGING THE NUMBERING OF THE CHAPTERS AND SECTIONS OF THE BYLAWS</u>.- Notarially recorded instrument No. 31172, dated February 13, 2007, signed before me**, the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on December 5, 2006, where it was resolved, among other business, to increase its capital stock by the amount of TWENTY-ONE MILLION MEXICAN PESOS, in local currency, so that, added to the previous

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

capital stock of TWO HUNDRED AND FIFTY MILLION MEXICAN PESOS, in local currency, the new capital stock would amount to TWO HUNDRED AND SEVENTY-ONE MILLION MEXICAN PESOS, in local currency; to increase its capital stock by the amount of FORTY-FIVE MILLION EIGHT HUNDRED THOUSAND MEXICAN PESOS, in local currency, so that, added to the previous capital stock of TWO HUNDRED AND SEVENTY-ONE MILLION MEXICAN PESOS, in local currency, the new capital stock would amount to THREE HUNDRED AND SIXTEEN MILLION EIGHT HUNDRED THOUSAND MEXICAN PESOS, in local currency; to amend Section 8 of the Bylaws; to amend Sections 8, 14 and 38, and the title of Chapter VI; to delete Sections 15, 35 and 36; to add Sections 28 and 35, and Chapters VIII and IX, to be entitled "Conditional Operation System" and "Financial Restructuring Through Debt", respectively, adding Sections 39 to 51 and changing the numbering of the chapters and sections of the Bylaws.-----------------------

**XV.- <u>MERGER, INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- Notarially recorded instrument No. 31781, dated December 11, 2007, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meetings of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO** and **"MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO, MONEX GRUPO FINANCIERO**, held on December 4, 2007, where it was resolved to merge **"MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO, MONEX GRUPO FINANCIERO**, the acquired company, with **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, the surviving company; and, as a result thereof, to increase its capital stock by the amount of FORTY-TWO MILLION EIGHT HUNDRED AND FORTY-FOUR THOUSAND MEXICAN PESOS, in local currency, so that, added to the previous capital stock of THREE HUNDRED AND SIXTEEN MILLION EIGHT HUNDRED THOUSAND MEXICAN PESOS, in local currency, the new capital stock would amount to THREE HUNDRED AND FIFTY-NINE MILLION SIX HUNDRED AND FORTY-FOUR THOUSAND MEXICAN PESOS, in local currency; and to amend the first paragraph of Section 8 of the Bylaws. --------------------------------------------------------

**XVI.- <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- Notarially recorded instrument No. 31816, dated December 28, 2007, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meeting of **"BANCO MONEX",**

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


**SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MULTIPLE, MONEX GRUPO FINANCIERO**, held on December 21, 2007, where it was resolved to increase its capital stock by the amount of NINETY MILLION THREE HUNDRED AND FIFTY-SIX THOUSAND MEXICAN PESOS, in local currency, so that, added to the previous capital stock of THREE HUNDRED AND FIFTY-NINE MILLION SIX HUNDRED AND FORTY-FOUR THOUSAND MEXICAN PESOS, in local currency, the new capital stock would amount to FOUR HUNDRED AND FIFTY MILLION MEXICAN PESOS, in local currency; and to amend the first paragraph of Section 8 of the Bylaws. -----------

**XVII.- AMENDMENT TO SECTIONS 3, 7, 10, 13, 33, 34, 38 AND 39 OF THE BYLAWS.- Notarially recorded instrument No. 32209, dated July 25, 2008, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on May 29, 2008, where it was resolved, among other business, to amend Sections 3, 7, 10, 13, 33, 34, 38 and 39 of the Bylaws. -------------------------------------------------------------------------------------------------------

**XVIII.- AUTHENTICATION OF THE BYLAWS.- Notarially recorded instrument No. 32220, dated July 31, 2008, signed before me,** recorded the authentication of the Bylaws of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.** -----------------------------------------------------------------------------------------

**XIX.- MERGER, INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS.- Notarially recorded instrument No. 33017, dated December 9, 2009, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the General and Special Shareholders' Meetings of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO** and **"ACTIMONEX", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, both held on November 26, 2009, where it was resolved to merge **"ACTIMONEX", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, the acquired company, with **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, the surviving company, and, as a result thereof, to increase its capital stock by the amount of THREE HUNDRED AND EIGHTY-THREE MILLION FIVE HUNDRED AND TEN THOUSAND MEXICAN PESOS, in local currency, so that, added to the previous capital stock of FOUR HUNDRED AND FIFTY MILLION MEXICAN PESOS, in local currency, the new capital stock would amount to EIGHT HUNDRED AND THIRTY-THREE MILLION FIVE HUNDRED AND TEN

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

THOUSAND MEXICAN PESOS, in local currency; and to amend the first paragraph of Section 8 of the Bylaws.----------------------------------------------------------------------------------------------------------------

**XX.- <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- Notarially recorded instrument No. 33849, dated April 5, 2011, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on December 21, 2010, where it was resolved, among other business, to increase its capital stock by the amount of ONE HUNDRED AND ONE MILLION SIXTY-THREE THOUSAND MEXICAN PESOS, in local currency, so that, added to the previous capital stock of EIGHT HUNDRED AND THIRTY-THREE MILLION FIVE HUNDRED AND TEN THOUSAND MEXICAN PESOS, in local currency, the new capital stock would amount to NINE HUNDRED AND THIRTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency; and to amend the first paragraph of Section 8 of the Bylaws. ------------------------------------------------------

**XXI.- <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- Notarially recorded instrument No. 34850, dated August 17, 2012, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on June 29, 2012, where it was resolved, among other business, to increase its capital stock by the amount of FIVE HUNDRED AND NINETY MILLION MEXICAN PESOS, in local currency, so that, added to the previous capital stock of NINE HUNDRED AND THIRTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency, **the new capital stock would amount to ONE THOUSAND FIVE HUNDRED AND TWENTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency**; and to amend the first paragraph of Section 8 of the Bylaws. --------------------------------

**XXII.- <u>AUTHENTICATION OF THE BYLAWS</u>.- Notarially recorded instrument No. 34907, dated September 12, 2012, signed before me,** recorded the authentication of the Bylaws of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**. ----------------------------------------------------------------------------------------------

**XXIII.- <u>AMENDMENT TO THE BYLAWS AND AUTHENTICATION OF THE BYLAWS</u>.- Notarially recorded instrument No. 36897, dated June 2, 2014, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


221912 of the Book, recorded the notarization of the Minutes of the Special Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** held on March 7, 2014, where it was resolved to amend the Bylaws and to record their authentication.-------------------------------------------------------------------------------

XXIV.- <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- **Notarially recorded instrument No. 38762, dated August 26, 2015, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meetings of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** held on December 31, 2014, and March 18, 2015, where it was resolved to increase its capital stock by the amount of **SIX HUNDRED MILLION MEXICAN PESOS**, in local currency, so that, added to the previous capital stock of ONE THOUSAND FIVE HUNDRED AND TWENTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency, **the new capital stock would amount to TWO THOUSAND ONE HUNDRED AND TWENTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency**; and to amend the first paragraph of Section 8 of the Bylaws. --------------------------------

XXV.- <u>INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF SECTION 8 OF THE BYLAWS</u>.- **Notarially recorded instrument No. 39424, dated March 1, 2016, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meetings of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** held on June 30 and September 29, 2015, where it was resolved, among other business, to increase its capital stock by the amount of **SIX HUNDRED AND FIFTEEN MILLION NINE HUNDRED THOUSAND MEXICAN PESOS**, in local currency, so that, added to the previous capital stock of TWO THOUSAND ONE HUNDRED AND TWENTY-FOUR MILLION FIVE HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency, **the new capital stock would amount to TWO THOUSAND SEVEN HUNDRED AND FORTY MILLION FOUR HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency**; and to amend the first paragraph of Section 8 of the Bylaws. --------------------------------------------------------

XXVI.- <u>AUTHENTICATION OF THE BYLAWS</u>.- **Notarially recorded instrument No. 40138, dated December 1, 2016, signed before me,** recorded the authentication of the Bylaws of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**. ----------------------------------------------------------------------------------------

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

**XXVII.-** <u>**INCREASE IN CAPITAL STOCK AND AMENDMENT TO THE FIRST PARAGRAPH OF**</u> <u>**SECTION 8 OF THE BYLAWS**</u>**.- Notarially recorded instrument No. 41700, dated February 15, 2018, signed before me,** the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the notarization of the Minutes of the Special Shareholders' Meetings of **"BANCO MONEX" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on June 29 and October 31, 2017, where it was resolved, among other business, to increase its capital stock by the amount of **FIVE HUNDRED MILLION MEXICAN PESOS**, in local currency, so that, added to the previous capital stock of TWO THOUSAND SEVEN HUNDRED AND FORTY MILLION FOUR HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency, **the new capital stock would amount to THREE THOUSAND TWO HUNDRED AND FORTY MILLION FOUR HUNDRED AND SEVENTY-THREE THOUSAND MEXICAN PESOS, in local currency**, represented by three million two hundred and forty thousand four hundred and seventy-three Series "O" registered shares of common stock, each carrying a nominal value of ONE THOUSAND MEXICAN PESOS, and to amend the first paragraph of Section 8 of the Bylaws. -------------------------------------------------------------------------------------------

**XXVIII.-** <u>**AUTHENTICATION OF THE BYLAWS**</u>**.- Notarially recorded instrument No. 41722, dated February 22, 2018, signed before me,** recorded the authentication of the Bylaws of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, the relevant section of which reads as follows:---------------------------------

"<u>**CHAPTER I**</u> (…) -----------------------------------------------------------------------------------------------

(…) <u>**CORPORATE PURPOSE**</u> (…) -------------------------------------------------------------------------

(…) **SECTION 3.- The Company shall engage in the provision of banking and credit services, in accordance with the Credit Institutions Law**, and shall thus be able to conduct the operations identified in Section 46 of the Credit Institutions Law, being entitled to:--------------

    I.   Receive bank deposits of money with the following characteristics:

        a.  Demand deposits,

        b.  Deposits that may be withdrawn on specified dates,

        c.  Savings deposits, and

        d.  Term deposits or deposits at notice;

    II.  Accept loans;

    III.  Issue bank bonds;

    IV.  Issue subordinated debt;

    V.  Make deposits in credit and financial institutions abroad;

    VI.  Make discounts and grant loans;

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


VII.  Issue credit cards based on agreements granting credit in current accounts;

VIII. Assume obligations on behalf of third parties, based on credit granted, through acceptances, by endorsing or providing security for negotiable instruments, as well as by the issuance of letters of credit;

IX.  Carry out transactions with securities, under the Credit Institutions Law and the Securities Exchange Law;

X.   Promote the organization and transformation of all types of business organizations or companies, and subscribe and keep shares or an interest therein, under the Credit Institutions Law;

XI.   Operate with commercial documents on its own behalf;

XII.  Carry out, by itself or on behalf of third parties, transactions involving gold, silver and foreign currency, including reports on the latter;

XIII.  Provide safety deposit box services;

XIV. Issue letters of credit upon receipt of their amount; enforce loans and make payment on behalf of customers;

XV.  Perform the trust operations referred to in the General Securities and Credit Operations Law, and act as an agent and on behalf of third parties.

The company shall be entitled to enter into transactions with itself in furtherance of trusts, agency agreements or on behalf of third parties, when so authorized by the Bank of Mexico through general provisions setting forth the requirements, terms and conditions for the operations referred to above to be performed in line with the market conditions prevailing at the time the operations are conducted, and avoiding conflicts of interest.

XVI. Receive deposits for their management or custody, or as guarantee on behalf of third parties for negotiable instruments or securities and, in general, for commercial documents.

XVII. Act as the common representative of negotiable instrument holders;

XVIII. Conduct cash operations and provide treasury services in relation to negotiable instruments on behalf of the issuers.

XIX. Keep accounting records and minutes and registration books for companies and businesses;

XX.  Act as trustee;

XXI. Act as receiver, or carry out the court or out-of-court settlement of negotiations, organizations, bankruptcy proceedings or inheritances;

XXII. Make valuations with the same probative value given by law to valuations made by public brokers or experts;

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


XXIII.  Purchase personal or real property as may be necessary to achieve its purpose and dispose of them when appropriate;

XXIV.  Enter into financial lease agreements and purchase assets under those agreements;

XXV.  Conduct derivate transactions, subject to the technical and operational provisions issued by the Bank of Mexico, setting out the characteristics of such transactions, such as types, terms, counterparties, underlying assets, guarantees and liquidation;

XXVI.  Make financial factoring operations;

XXVII. Issue and make effective any method of payment, as determined by the Bank of Mexico, subject to the technical and operational provisions the latter may set forth, setting out the characteristics related to their use, amount and effectiveness, among others, in order to promote the use of different methods of payment;

XXVIII.  Take place in insurance agreements, for which purpose the company shall comply with the General Insurance Institutions and Mutual Companies Law and the general provisions arising in connection with such law, and

XXIX.  Conduct any similar or related transactions, as authorized by the Office of the Secretary of Finance and Public Credit, upon the opinion of Bank of Mexico and of the National Banking and Securities Commission.


In furtherance of its corporate purpose, the Company shall comply with the provisions of the Credit Institutions Law and any other applicable provisions. Moreover, subject to the Law on Financial Associations Regulations, the Company may act before third parties jointly with other financial entities within the Financial Group of which the Company is a member, and provide supplementary services and hold itself out as a member of the relevant Financial Group.


### CHAPTER III

### ADMINISTRATION AND SUPERVISION

**SIXTEEN.** The Company shall be managed by a Board of Directors and a General Director within their respective purviews.

**SEVENTEEN.** The Board of Directors of the Company shall be comprised of a minimum of five and a maximum of fifteen Directors, at least twenty-five percent of whom shall be independent. An alternate director shall be appointed for each Director, in the understanding that the alternate Directors of independent Directors shall also be independent.

An independent Director shall be a person not in any way related to the administration of the Company, who meets the requirements and conditions that the National Banking and Securities Commission may determine through general provisions, which shall also provide for the events

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

in which a Director shall cease to be independent. In no event may independent Directors fall under the events preventing them from taking office, in accordance with the Credit Institutions Law.

The members of the Board of Directors shall be appointed at the General Meeting by the Shareholders, who shall also determine their fees, where applicable. Moreover, Shareholders representing at least ten percent of the common paid-in capital of the Company shall be entitled to appoint one Director.

The appointment of minority Directors may only be revoked if the appointment of all others is also revoked.

The Directors appointed must be honorable people, with technical skills and a satisfactory credit history, as well as broad knowledge and experience in financial, legal or administrative matters. In no event may a person falling under the events preventing directors from taking office be a Director of the Company, in accordance with the Credit Institutions Law.

The majority of Directors shall be Mexican or foreigners residing in the national territory. The members of the Board of Directors may be Shareholders or not. They shall remain in office for one year, and shall continue in office until their successors take office.

Directors and, where applicable, the respective alternate directors, shall keep themselves mutually informed on the matters addressed at the Board of Directors' meetings they attend.

The National Banking and Securities Commission may at any time order the removal or suspension of the members of the Board of Directors, the General Director and any officers holding positions in the two immediately lower levels of the General Director's hierarchy.

**EIGHTEEN.** The Chairperson shall be appointed by the Shareholders at the General' Meeting among the Directors and, absent such appointment, the Board of Directors itself shall appoint the Chairperson.

The Chairperson shall preside over the Shareholders' Meetings and the Board of Directors' meetings, and shall have the power to comply with the resolutions adopted at both, without any special resolution being required.

The Shareholders at the General Meeting shall appoint a Secretary, who may not be a Director, as well as an Alternate Secretary, to replace the secretary when absent.

**NINETEEN.** The Board of Directors shall meet at least on a quarterly basis and, extraordinarily, when called by the Chairperson, by at least twenty-five percent of Directors, by any Company Auditor or by the Secretary, upon the request of the Chairperson.

Board of Directors' meetings shall be called in writing, through a notice sent to its members by fax, email or to their address at least one calendar day prior to the date of the meeting, stating

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

date, time and place of the meeting, as well as the matters that shall be addressed. No call shall be necessary when all the members of the Board of Directors, alternate or otherwise, are present.

In order to hold the general and special Board of Directors' meetings, at least fifty-one percent of the Directors must be present, and at least one of them must be an independent Director. Decisions shall be adopted by majority vote, and the Chairperson shall have the casting vote in the event of a tie.

Directors shall refrain from participating in the discussion and vote of any matter entailing a conflict of interest. In addition, they shall maintain strict confidentiality of all acts, facts or events relating to the Company, as well as any discussions by the Board, notwithstanding the duty of the Company to provide any information that may be required under the Credit Institutions Law.

Resolutions adopted unanimously outside a Board of Directors' meeting shall be, for all legal purposes, as valid as if they had been adopted at a Board of Directors' meeting, provided however that they shall be confirmed in writing.

**TWENTY.** The Board of Directors shall have the broadest powers to achieve the corporate purpose and to conduct and manage the Company, including, without limitation, the following powers:

a)     **General power of attorney for litigation and collection purposes**, with all the general powers, and even the special powers that may legally require a power of attorney or special clause, under Article 2554, paragraph 1, of the Mexican Civil Code, the Federal District Civil Code, and the respective codes in the remaining federal entities.

Without limitation, the Board shall have the following powers:

I.    To bring and withdraw any kind of proceedings, including *amparo* proceedings;

II.    To settle;

III.    To refer to arbitration;

IV.    To ask and answer interrogatories;

V.    To disqualify judges;

VI.    To assign assets;

VII.    To receive payment;

VIII.    To bring criminal complaints and claims and to withdraw them when permitted by Law.

The powers listed in this item may be exercised before private parties and any kind of administrative or judicial authority, including federal or local authorities, and before the Conciliation and Arbitration Boards, whether Local or Federal, and Labor Authorities.

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


b)     Under Section 11 of the Federal Labor Law, **special power of attorney for labor-related administrative purposes** for the purposes described in the Federal Labor Law and before the Mexican Social Security Institute and the National Workers' Housing Fund Institute.

c)     **General power of attorney for administrative purposes** under Article 2554, paragraph 2 of the Mexican Civil Code, the Federal District Civil Code, and the respective codes in the remaining federal entities.

d)     **General power of attorney for the transfer of property** under Article 2554, paragraph 3 of the Mexican Civil Code, the Federal District Civil Code, and the respective codes in the remaining federal entities.

e)     **Power of attorney to grant and execute securities** under Section 9 of the General Securities and Credit Operations Law.

f)     **Power to grant general or special powers of attorney and to revoke both**, including the possibility to delegate the powers included in this item.

g)     In general, power to perform any act or operation necessary or convenient to achieve the purposes of the Company.

**TWENTY-ONE.** In addition to the Board of Directors, the Company may have intermediate Administration bodies, which shall be referred to as Committees.

The Company may have any committees as the Board of Directors may deem necessary in accordance with the Company's administration interests. Moreover, the Company shall have any committees provided for in the Credit Institutions Law and any applicable general provisions, including, but not limited to, the following: (i) audit committee, (ii) risk management committee, (iii) remunerations committee, and (iv) communication and control committee (in terms of money laundering and terrorism financing prevention).

Committees' minimum functions, as well as regulations related to their formation, frequency of meetings, and timeliness and sufficiency of the information that they should consider, shall be subject to the applicable provisions, as well as any operational rules that the Board of Directors may determine.

**TWENTY-TWO.** The members of the Committees shall be appointed through a resolution of the Board of Directors.

Committees shall invariably work collectively, and shall be comprised of at least three members. Their operation shall be valid upon attendance of the majority of their members, and their resolutions shall be made upon the vote of the majority. The Chairperson of the Committee shall have the casting vote.

The Board of Directors shall appoint the Chairperson of the Committee among the Committees' members, to preside over the Committees.

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

Committees, by means of their Chairperson, shall keep the Board of Directors informed of their activities, at the frequency that the Board of Directors itself may determine, or upon the occurrence of situations or acts relevant to the Company warranting, at the discretion of the Board of Directors or the Chairperson of the Committee, such information.

Committees' meetings shall be called by the relevant Committee's Chairperson or by its Secretary, upon the request of the former.

Committees shall be tasked with solving issues in order to maintain the agile performance, the safety and the supervision of the activities of the Company, pursuant to the guidelines that the Board of Directors may provide, which shall, in no event, include the powers reserved by law or the Bylaws to another body of the Company (…)".

**TWENTY-THREE.** The Company shall be supervised by an Auditor appointed by the Shareholders holding Series "O" shares and, in turn, an Auditor appointed by the Shareholders holding Series "L" shares, as well as by their respective alternate auditors, and they shall be appointed by the majority vote of the Shareholders at the General Meeting, for Series "O", and at the Special Shareholders' Meeting for Series "L". They shall remain in office for one year, and until the successor(s) take office. Special Shareholders' Meetings held for this purpose shall be subject, where applicable, to the provisions for General Shareholders' Meetings under the General Business Organizations Law.

The Auditor or Auditors shall have the powers and obligations determined by the General Business Organizations Law (…)"

**XXIX.- RESIGNATION, APPOINTMENT AND RATIFICATION OF AUDITOR AND ALTERNATE AUDITOR. -** Notarially recorded instrument No. 44411, dated December 13, 2019, signed before me, recorded the notarization of the Minutes of the General Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on October 23, 2019, where it was resolved, among other business, to appoint Karen Jazmín Pérez Olvera and to ratify Ernesto Pineda Fresán as Auditor and Alternate Auditor of the company, respectively.

**XXX.- APPOINTMENT AND RATIFICATION OF THE MEMBERS OF THE BOARD OF DIRECTORS, AUDITOR AND ALTERNATE AUDITOR, SECRETARY AND ALTERNATE SECRETARY.** Notarially recorded instrument No. 44699, dated June 16, 2020, signed before me, the first copy of which was registered with the Public Registry of Commerce of this Capital City on Page 221912 of the Commercial Book, recorded the partial notarization of the Minutes of the General Shareholders' Meeting of **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, held on April 30,

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


2020, where it was resolved, among other business, to **appoint and ratify** the people mentioned below **as members of the Board of Directors, Auditor and Alternate Auditor, and Secretary and Alternate Secretary:**


## DIRECTORS

Héctor Pío Lagos Dondé - **Chairman**

Georgina Teresita Lagos Dondé

Mauricio Naranjo González

Moisés Tiktin Nickin

## ALTERNATE DIRECTORS

Jorge Hierro Molina

Patricia García Gutiérrez

## INDEPENDENT DIRECTORS

David Aarón Margolín Schabes

Jorge Jesús Galicia Romero

## ALTERNATE INDEPENDENT DIRECTORS

Hernando Carlos Luis Sabau García

## AUDITOR

Karen Jazmín Pérez Olvera

## ALTERNATE AUDITOR

Ernesto PIneda Fresán

## SECRETARY

Jacobo Guadalupe Martínez Flores

## DEPUTY SECRETARY

Erik Alberto García Tapia

The latter two do not serve on the Board of Directors.

**XXXI. The members of the Board of Directors of "BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, held a meeting, the minutes of which, in pertinent part, are transcribed verbatim below:**

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


"Minutes of the meeting held by the Board of Directors of **BANCO MONEX S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** on January 27, 2021, at 6.30 p.m. at the company's registered office.

**Attendance:** The meeting was attended by Héctor Pío Lagos Dondé, Georgina T. Lagos Dondé, Mauricio Naranjo González, Moisés Tiktin Nickin, David Aarón Margolín Schabes, and Jorge Jesús Galicia Romero in their capacity as Directors; Jorge Hierro Molina, Patricia García Gutiérrez, and Hernando Carlos Luis Sabau García in their capacity as Alternate Directors; Jacobo G. Martínez Flores and Karen Jazmín Pérez Olvera, in their capacity as Secretary and Auditor of the Company, respectively; and Javier Alvarado Chapa, Antonio Nava Tamez, and Ignacio Odriozola Garín as guests.

**Chairman and Secretary**: The meeting was presided over by Héctor P. Lagos Dondé in his capacity as Chairman of the Board of Directors and Jacobo G. Martínez Flores acted as Secretary.

**Quorum**: The meeting was duly notified to the members of the Board and was attended by all of them. The Chairman therefore declared it duly convened and proposed that business be transacted as follows:

<div align="center">

**AGENDA**

</div>

…**XXI.** Proposal, discussion, and approval, if appropriate, regarding the grant of powers of attorney by the Company. Adoption of a resolution in this respect.

The above item on the agenda having been unanimously approved, the matter was addressed as follows:

**…XXI. Proposal, discussion, and approval, if appropriate, regarding the grant of powers of attorney by the Company. Adoption of a resolution in this respect.**

In addressing the last item on the agenda, Héctor P. Lagos Dondé told the Directors that it was advisable for the Company to grant several powers of attorney to Jacobo Guadalupe Martínez Flores.

Having discussed the issue, the Directors, by unanimous vote,

<div align="center">

**RESOLVED**

</div>

**XXI.1.** To grant Jacobo Guadalupe Martínez Flores the following powers of attorney:

a) **General power of attorney for litigation and collection purposes**, including all general powers and the special powers which, by law, shall be granted under a special clause or power of attorney, pursuant to the first paragraph of Section 2554 of the Federal Civil Code, the Civil

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


Code for the Federal District applicable in Mexico City, and the related sections of the Civil Codes of the States of the Mexican Republic, except for the power to assign property.

Such powers include, but are not limited to, the powers to:

I. Pursue and abandon all kinds of actions and proceedings, including *amparo* actions.

II. Settle.

III. Submit matters to arbitration.

IV. Ask and answer interrogatories.

V. Move for recusals.

VI. Receive payment.

VII. Report crimes and file criminal complaints and abandon such proceedings when permitted by law.

**b) General power of attorney for labor-related administrative purposes**, which encompasses the powers established in Sections 11, 684-E, 692, 873-F, and 873-H of the Federal Labor Law, including the power to act on behalf of the Company before labor unions; to attend all kinds of meetings and hearings, whether in court or before other authorities, and whether for settlement or termination purposes; to ask and answer interrogatories; to file or abandon *amparo* actions; to report crimes and file criminal complaints; to forgive violations; to act in furtherance of a no-strike environment and engage in economic disputes; to act as an employer with the broadest powers of representation, without limitations, including the power to attend conciliation meetings, pretrial hearings, and trial hearings, as provided in Sections 684-E, 873-F, and 873-H and any other related sections of the Federal Labor Law, acting at all times in such capacity, especially with regard to the instances referred to in Sections 684-E, 873-F, and 873-H of such law.

The attorney-in-fact may further appear before the Conciliation and Arbitration Boards for conciliation purposes and file complaints, raise defenses, and offer and have evidence admitted as provided in Sections 875, 876 and 878 of the Federal Labor Law, pursuant to the terms of Transitory Provision No. 8 of the Executive Order amending, supplementing, and repealing several provisions of the Federal Labor Law, the Organic Law of the Judiciary of the Federation, the Federal Public Defense Law, the Law of the National Workers' Housing Fund Institute, and the Social Security Law in matters of Labor Justice, Labor Union Freedom, and Collective Bargaining, published in the Federation's Official Gazette on May 1, 2019.

**c) General power of attorney for administrative purposes**, pursuant to the second paragraph of Section 2554 of the Federal Civil Code, the Civil Code for the Federal District applicable to Mexico City, and related sections of the Civil Codes of the States of the Mexican Republic.

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

**d) Special power of attorney for acts of ownership** only with regard to personal property owned by the Company, pursuant to the third paragraph of Section 2554 of the Federal Civil Code, the Civil Code for the Federal District applicable to Mexico City, and related sections of the Civil Codes of the States of the Mexican Republic.

**e) Power of attorney to issue and execute negotiable instruments,** as well as to endorse and protest such instruments as provided in Section 9 of the General Law on Negotiable Instruments and Credit Transactions.

**f) Special power of attorney to open and cancel bank accounts and issue checks** on behalf of the Company, and to authorize third parties to manage such accounts.

**g) Special power of attorney to execute brokerage agreements** and securities purchase and repurchase agreements, and to authorize third parties to provide instructions thereunder.

**h) Power to grant general and special powers of attorney,** including the power to grant new powers of attorney, as well as to delegate powers while reserving the right thereto and the right to revoke any powers so conferred or delegated.

**i) Power** to confer such special powers of attorney as may be required under the Stock Market Law and the Investment Funds Law upon individuals duly authorized by the National Banking and Securities Commission to carry out transactions with investors.

**j) Power to revoke all general and special powers of attorney** conferred or delegated by the Company's Shareholders, Board of Directors, Delegates or Attorneys-in-Fact.

**k) Power to revoke** any appointment of officers or Delegates made by the Company's Shareholders, Board of Directors, Delegates or Attorneys-in-Fact.

**LIMITATION:** The attorney-in-fact shall exercise the powers set forth in paragraphs (d), (e) and (f) above, jointly with any other attorneys-in-fact vested with such powers.

There being no further business to transact, the meeting was concluded at 7.00 p.m. on the date of the meeting. Signed in proof thereof by: Signatures."

The minutes partially transcribed above are recorded from page 106 overleaf to page 117 front of the Company's Board of Directors' Meeting Minutes Book.

A photostatic copy of the Attendance Record of the Meeting held by the Board of Directors of "**BANCO MONEX,**" **SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, is hereby added to the Appendix to this notarial instrument identified with letter "**A**".

**STATEMENTS:**

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

The appearing party, in his capacity as delegate of the Meeting of the Board of Directors, the minutes of which have been partially transcribed above, expressly states under oath as follows:

a) The text and signatures on the minutes partially transcribed above are authentic.

b) The Company's bylaws produced before me are in full force and effect.

c) The members of the Company's Board of Directors who attended the meeting were present during such meeting and upon adopting the resolutions.

### NO FOREIGN INVESTMENT STATEMENT

The appearing party further states that "**BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** has received no foreign investment for the purposes of Section 34 of the Foreign Investment Law.

In light of the foregoing, the appearing party executes the following

CLAUSES:

**ONE.** The minutes of the meeting held by the Board of Directors of "**BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** on January 27, 2021, which have been partially transcribed in **Recital XXXI** of this notarial instrument, are partially entered into this notarial book for all legal purposes.

**TWO. Jacobo Guadalupe Martínez Flores** is hereby vested with the powers set forth in the minutes partially transcribed in **Recital XXXI** of this notarial instrument, subject to the limitation established in such minutes.

**I, THE UNDERSIGNED NOTARY PUBLIC, CERTIFY AS FOLLOWS**:

**I.** I provided sufficient proof of my capacity as Notary Public to the appearing party, to whom I explained the penalties imposed for false statements.

**II.** The appearing party is personally known to me and is, in my opinion, legally competent to execute this instrument.

**III.** I have no reason to believe that the minutes partially recorded in this notarial instrument are false.

**IV. PRIVACY NOTICE.** Subject to the terms of the Federal Law on the Protection of Personal Data Held by Individuals, the appearing party states that he knows that the privacy notice referred to therein is the one provided on this Notarial Office's website at www.notaria83df.com.mx and at the offices of the undersigned Notary Public, and it is available upon request at all times. By executing this instrument, the appearing party expressly consents to the treatment of his personal data.

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.

**V.** In answer to the general questions required by law, the appearing party expressly states under oath as follows:

He is Mexican, born in Ciudad Victoria, State of Tamaulipas, on December 22, 1962, married and a lawyer, with address at Avenida Paseo de la Reforma No. 284, 14th floor, Colonia Juárez, Cuauhtémoc, zip code 06600, Mexico City.

**VI.** I have had the documents cited in this notarial instrument before me.

**VII.** I have explained to the appearing party that he has the right to read this notarial instrument, and he did not read it personally.

**VIII.** Once this notarial instrument was read to the appearing party, who was explained the value, consequences and legal effects of its content, he stated that he fully understood and consented to such instrument, to which he affixed his signature on July 14, 2021. I hereby certify that I notarially recorded this instrument on the aforementioned date.

Signature by Jacobo Guadalupe Martínez Flores.

Sánchez Colín. Signature.

Notarial seal.

In compliance with the provisions of Section 2554 of the Civil Code in force for the Federal District (currently Mexico City) and the Federal Civil Code, such section is transcribed below:

"**SECTION 2554.** "In order for a general power of attorney conferred for litigation and collection purposes to be deemed granted without limitations, it will suffice to state that it encompasses all general powers and the special powers which, by law, are to be granted under a special clause.

Where a general power of attorney is conferred for the administration of property, it will suffice to state that it is granted for the attorney-in-fact to exercise all kinds of administrative powers.

In order to perform acts of ownership under a general power of attorney, it will suffice to state that it is granted for the attorney-in-fact to exercise all the rights inherent in ownership, both with regard to the property and to any acts required to protect it.

Should a principal wish to limit the powers conferred in any of the three cases above, the relevant limitations shall be stated, or a special power of attorney shall be granted.

Notaries public shall include this section in the copies of any powers of attorney that may be granted."

I HEREBY ISSUE THIS HOLOGRAM-SECURED, TWENTY-FIVE PAGE, **FIRST COPY**, **FIRST IN ORDER**, OF THE DOCUMENT RECORDED IN THE NOTARIAL BOOK UNDER MY CHARGE, TO **"BANCO MONEX," SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, AS **PROOF OF RECORD**.

**ALBERTO T. SÁNCHEZ COLÍN**

**Notary Public No. 83**

**Mexico City**

[Seal:] Alberto T. Sanchez Colin.

United Mexican States.

Notarial Office No. 83. Federal District, Mexico.


MEXICO CITY, JULY 14, 2021

AMENDED. CERTIFIED

IMJ/mlg*


[Signature] [Seal:] Alberto T. Sanchez Colin. United Mexican States. Notarial Office No. 83. Federal District, Mexico.


[QR code]

[Logo:] MEXICO CITY [illegible]          Office of the Secretary of Economy (SE) [Logo]

PUBLIC REGISTRY OF PROPERTY AND COMMERCE OF THE FEDERAL DISTRICT

## PROOF OF REGISTRATION

THE ACTS SET FORTH IN THIS DOCUMENT HAVE BEEN RECORDED UNDER ELECTRONIC COMMERCIAL FILE (FME) No. 221912  -1

NAME / CORPORATE NAME

BANCO MONEX, S.A., INSTITUCION DE BANCA MULTIPLE, MONEX GRUPO FINANCIERO.

Address: MEXICO D.F.

PROCEDURE INFORMATION

| Control No. | Date received | Time |
|---|---|---|
| 536202 | 08/24/2021 | 11:26:31 |

NOTARY PUBLIC / AUTHORITY INFORMATION

| 109017083 | ALBERTO T. SANCHEZ COLIN |
|---|---|
| Address | FEDERAL DISTRICT |

DOCUMENT No. 45619

ACTS RECORDED

| Code | FME | Standard Form | | Registration Date |
|---|---|---|---|---|
| M1 | 221912 | MINUTES OF THE BOARD OF DIRECTORS' MEETING | | 09/14/2021 |

GRANT OF POWER OF ATTORNEY

Signature authenticity code: 41f301310521af7a98f5846ca98ab74ed888   Series No. 2073517

REGISTRATION FEE

| AMOUNT | PAYMENT DATE | PROOF OF PAYMENT |
|---|---|---|

[Signature] I HEREBY CERTIFY THAT THIS INFORMATION HAS BEEN RECORDED IN THE NOTARIAL BOOK.

$2,881.00                    07/27/2021                  93900107616609R5H26U

$2,881.00

OFFICIAL IN CHARGE: NANCY ALATRISTE CID

The electronic signature authenticity code provided in each act is the electronic seal authorized by the Office of the Secretary of Economy, pursuant to sections 21 Bis(II)(c) and (d), and 30 Bis of the Commercial Code, and section 15 of the Public Registry of Commerce Regulations.

[Logo]                                        [Logo]

Legal Affairs and Services                   PUBLIC REGISTRY OF
Office (CEJUR)                               PROPERTY AND
                                            COMMERCE

                                            MEXICO CITY

**BANCO MONEX, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE,**

**MONEX GRUPO FINANCIERO**

**BOARD OF DIRECTORS' MEETING**

**DATE: JANUARY 27, 2021**

**<u>ATTENDANCE RECORD</u>**

**"A"**

### <u>DIRECTORS</u>

| | |
|---|---|
| Héctor Pío Lagos Dondé | [Signature] |
| Georgina T. Lagos Dondé | [Signature] |
| Mauricio Naranjo González | [Signature] |
| Moisés Tiktin Nickin | [Signature] |
| David Aarón Margolín Schabes | [Signature] |
| Jorge Jesús Galicia Romero | [Signature] |

### <u>AUDITOR</u>

Karen Jazmín Pérez Olvera          [Signature]

### <u>SECRETARY</u>

Jacobo G. Martínez Flores          [Signature]

**BANCO MONEX, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE,**

**MONEX GRUPO FINANCIERO**

**BOARD OF DIRECTORS' MEETING**

**DATE: JANUARY 27, 2021**

**ATTENDANCE RECORD**

**ALTERNATE DIRECTORS**

| | |
|---|---|
| Jorge Hierro Molina | [Signature] |
| Patricia García Gutiérrez | [Signature] |
| Hernando Carlos Luis Sabau García | [Signature] |

**INVITEES**

| | |
|---|---|
| Ana Isabel Lagos Vogt | [Blank] |
| Julia Inés Lagos Vogt | [Blank] |
| Javier Alvarado Chapa | [Signature] |
| Antonio Nava Tamez | [Signature] |
| Ignacio Odriozola Garín | [Signature] |

[Coat of Arms:] UNITED MEXICAN STATES

# JUDICIARY OF THE FEDERATION

**CRYPTOGRAPHIC PROOF - TRANSACTION**

**Signed File:**

**0811001000000000017588409.p7m**

**Certifying Authority:**

**CERTIFYING AUTHORITY**

**Signatories: 1**

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | JACOBO GUADALUPE MARTINEZ FLORES | **Validity:** | OK | Effective |
| SIGNATURE | | | | |
| **Series No.:** | 30.30.30.30.31.30.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | **Revocation:** | OK | Unrevoked |
| **Date: (UTC/CDMX)** | 07/19/22 05:48:23 PM - 07/19/22 12:48:23 PM | **Status:** | OK | Valid |
| **Algorithm:** | RSA – SHA256 | | | |
| **Signature Chain:** | 5a 9c 2b ce 9b 17 52 fb 64 73 9a e8 9f c3 9f 70 00 11 43 fe db d2 d3 82 43 8b 4d 82 fa 79 b9 27 7c 55 d1 84 a2 ad 18 87 24 63 52 db 67 ab 82 26 2c 13 f7 20 32 09 b9 f0 0e 6d d6 05 31 e1 72 db f1 bb 05 de b3 91 ff e6 a2 aa c9 10 2d 40 d1 c0 2d f6 ad 73 76 c0 58 71 04 ce c7 5d 07 9f 14 6c a9 79 07 7e af 95 f0 e5 e2 0d 59 b7 81 78 6c 34 da a2 67 60 76 05 84 cf e1 13 7e 10 cb 88 a0 79 82 0f 68 e3 2a df 4e be b4 ff b8 73 20 dd 84 c0 06 a1 39 87 25 68 9e 9d 5a 88 b3 2e f5 bc 03 72 1d e3 c9 5e 7c ec bd c0 1e 33 02 09 3a 3b cd 93 69 5f 6d a4 89 60 4f 56 c9 99 a8 8a 31 01 ce 79 bd e5 b3 e8 db cd 9e 30 1e 84 7a 23 88 44 ab 77 41 9c d4 8b 2d c3 b5 62 b3 bf 7b 88 1a 86 b6 5a 8a 86 9c 74 44 22 bc 96 9b 71 4f fe d6 e3 7d 85 ca e5 8f fd b4 84 14 55 87 bb 33 91 e1 a1 16 3d | | | |
| OCSP | | | | |
| **Date: (UTC / CDMX)** | 07/19/22 05:48:23 PM - 07/19/22 12:48:22 PM | | | |
| **Responder Name:** | OCSP SAT Service | | | |
| **Responder Issuer:** | CERTIFYING AUTHORITY | | | |
| **Series No.:** | 30.30.30.30.31.30.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | |
| TSP | | | | |
| **Date: (UTC / CDMX)** | 07/19/22 05:48:27 PM - 07/19/22 12:48:27 PM | | | |
| **Name of TSP Response Issuer:** | Timestamping Authority of the Mexican Judicial Council | | | |
| **TSP Certificate Issuer:** | Intermediary Certifying Authority of the Mexican Judicial Council | | | |
| **TSP Response Identifier:** | 126099520 | | | |
| **Stamped Data:** | jZqo690AkPuPrpbHiyo3qRlfVMs= | | | |

[Coat of Arms:] UNITED MEXICAN STATES

# JUDICIARY OF THE FEDERATION

**CRYPTOGRAPHIC PROOF - TRANSACTION**

**Signed File:**

**0811001000000000017588412.p7m**

**Certifying Authority:**

**CERTIFYING AUTHORITY**

**Signatories: 1**

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | JACOBO GUADALUPE MARTINEZ FLORES | **Validity:** | OK | Effective |
| **SIGNATURE** | | | | |
| **Series No.:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | **Revocation:** | OK | Unrevoked |
| **Date: (UTC/CDMX)** | 07/19/22 05:48:23 PM - 07/19/22 12:48:23 PM | **Status:** | OK | Valid |
| **Algorithm:** | RSA – SHA256 | | | |
| **Signature Chain:** | 8a c6 67 79 ee e5 9e d0 62 3d af 33 5c 3c 77 c7 25 90 ec 3b f5 b5 4a fd bd ee f9 60 9a 50 22 5b b2 b2 a9 58 6f cb 5d af d2 d7 9b e8 e7 4d 17 06 c6 0b 3c 44 8f 4b e8 92 38 20 e0 db 55 3a 47 98 23 12 08 fa 1f 63 4d d8 fe c2 74 e3 f7 8c af 6c de a0 27 1a 9c e7 61 8e 42 a3 49 e0 4d 29 de bf af 4f a6 f1 ec 37 bf 35 3b fe 79 4c 90 e9 35 3a 68 69 2b 9b 63 90 77 bc 99 0d f6 dd 87 23 99 02 53 8b 55 b9 c5 11 36 72 42 05 da 90 c0 55 75 9f 60 2b af 26 ed 66 fb 42 64 70 2b dc d5 e9 28 b8 6a 73 e4 26 0d 7c f2 6c eb dd c7 f9 7c 6e d8 ca 58 92 e8 06 9e 33 69 d0 7e 34 d7 7f 57 65 a0 71 79 da 5a 88 39 24 53 9f 11 f0 60 2c bd a5 3c be b1 28 1c 87 31 5d 6d 12 a1 51 19 bf f4 a3 5a 4c 75 f4 3a 97 34 41 be 0c 77 eb ae fe de d8 61 04 d0 f7 a4 a9 d1 13 dd 84 c0 49 c0 86 26 71 cd f0 | | | |
| **OCSP** | | | | |
| **Date: (UTC / CDMX)** | 07/19/22 05:48:20 PM - 07/19/22 12:48:20 PM | | | |
| **Responder Name:** | OCSP SAT Service | | | |
| **Responder Issuer:** | CERTIFYING AUTHORITY | | | |
| **Series No.:** | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | |
| **TSP** | | | | |
| **Date: (UTC / CDMX)** | 07/19/22 05:48:23 PM - 07/19/22 12:48:23 PM | | | |
| **Name of TSP Response Issuer:** | Timestamping Authority of the Mexican Judicial Council | | | |
| **TSP Certificate Issuer:** | Intermediary Certifying Authority of the Mexican Judicial Council | | | |
| **TSP Response Identifier:** | 126099495 | | | |
| **Stamped Data:** | v9txAGJ8Tj6man+TWXVWv4yv9JE= | | | |

[Note on the left margin:] JACOBO GUADALUPE MARTINEZ FLORES. 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 13/08/24 20:01:41

**Original (Spanish)**

OCC DE JUZGADOS DE DISTRITO EN MATERIA CIVIL EN LA CIUDAD DE MÉXICO

mparo Indirecto
ormal
ivil - Sin submateria

No. de registro OCC: 20220811033508977
Folio electrónico: 3760569
Tipo de ingreso: PSL
Usuario que Turnó: jmgarciab

echa de presentación/Fecha de depósito: 19/07/2022
echa de turno: 19/07/2022
urnado al: JUZGADO OCTAVO DE DISTRITO EN MATERIA CIVIL EN LA CIUDAD DE MÉXICO

Hora de presentación/Hora de depósito: 12:49 Hrs.
Hora de turno: 13:10 Hrs.

o. de copias: 0

No. de anexos: 0

ecurrente/ Promovente: *
uejoso(a): BANCO MONEX, S.A. I.B.M. MONEX GRUPO
INANCIERO
epresentante/ Autorizado: JACOBO GUADALUPE MARTINEZ
LORES
ersona tercero interesada: CREDITO REAL, S.A.B. DE C.V.
cto reclamado: TODO LO ACTUADO EN EL EXP. 691/22
utoridad responsable: JUEZ 52 CIV.PROCESO ESCRITO CDMX
uenta con firma: Si
xpediente de autoridad responsable: *
xpediente de origen: 691/22
iverso: JUEZ 52 CIV.PROCESO ESCRITO CDMX
bservaciones: *

Folio de Art. 41: *

**Oficina de Correspondencia Común que presta servicio**

Servidor Público que entrega:   José Manuel García Barrera

Firma:

Fecha:                              Hora:

**Autorizado por el órgano jurisdiccional para recoger asuntos**

Servidor Público que recibe:

Órgano de Adscripción:

Firma:

Fecha:                              Hora:

783/2022-III

FOLIO - 12859



QUEJOSO: BANCO MONEX, S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.

AMPARO INDIRECTO

<u>ESCRITO INICIAL DE DEMANDA</u>

C. JUEZ DE DISTRITO EN MATERIA CIVIL EN LA CIUDAD DE MÉXICO, EN TURNO.

JACOBO GUADALUPE MARTINEZ FLORES en mi carácter de apoderado de Banco Monex, S.A., Institución de Banca Múltiple, Monex Grupo Financiero personalidad que se acredita en términos del instrumento público número 45,619 que se agrega al presente como "**Anexo** 1", mismo que se manifiesta bajo protesta de decir verdad que es copia íntegra e inalterada de sus originales, conforme lo dispuesto por el artículo 3 fracción IV del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, señalo como domicilio para oír y recibir notificaciones, por todo lo que al procedimiento que nos ocupa corresponda, el ubicado en Blvd. Manuel Ávila Camacho 24, piso 21, colonia Lomas de Chapultepec, alcaldía Miguel Hidalgo, código postal 11000, Ciudad de México. Asimismo, autorizo en términos amplios del artículo 12 de la Ley de Amparo, conjunta o individualmente, indistintamente, a los licenciados en Derecho Daniel Alejandro Díaz Álvarez, con cédula profesional 4048429, Octavio Lorenzo Hernandez Negretti, con cédula profesional 5559352, Estefanía Sierra Ulibarri, con cédula profesional 8074726, Adrián Roberto Villagómez Alemán, con cédula profesional número 7259714, Daniel Pardo Fuentes, con cédula profesional 11036633, Gabriel Nájera Mandujano, con cédula profesional 11547664, Miguel Ángel García Ávila, con cedula profesional 12367247 y Yoare Heredia González, con cédula profesional 8651856, también conjunta o separadamente, indistintamente, pero únicamente para oír y recibir notificaciones, tomar fotografías de constancias de autos, escanear y recibir documentos y para imponerse en autos, firmando lo necesario a Santiago Hernández Gutiérrez, Citlali Anahí Nava Marín, Luis Eduardo García Mora, Diego Enrique Lazcano González, Sebastián García-Lascuráin Barrantes, Cristóbal Sales Cruz, Regina Cabrera Suárez, Sandra Paola Herrera Ortiz y Raymundo Guerra Lea. Asimismo, en términos de lo dispuesto por las circulares 12/2020, 13/2020 y 14/2020, emitidas por el Consejo de la Judicatura Federal el 8 de junio del 2020, solicito sea permitido, el acceso al expediente electrónico formado con motivo del presente juicio, autorizando expresamente la práctica de todo tipo de notificaciones incluso las de carácter personal, para lo cual proporciono los usuarios "DanielDiazA", "esierra", "egarciamora" "yheredia", y "mgarciaavila", que corresponden a Daniel Alejandro Díaz Álvarez, Estefania Sierra Ulibarri, Eduardo García Mora, Yoare Heredia González y Miguel Ángel García Ávila autorizados que utilizan dentro del Portal de Servicios en Línea del Consejo de la Judicatura Federal. Lo anterior para permitir la revisión del expediente electrónico y fomentar el cuidado tanto del personal del Tribunal como de los litigantes, ante Usted, comparezco para exponer:

Con fundamento en los artículos 103 y 107 de la Constitución Política de los Estados Unidos Mexicanos, 1°, 107, fracción V y VI, 108 y demás relativos y aplicables de la Ley de Amparo, promuevo **DEMANDA DE AMPARO INDIRECTO**, en contra de los actos que se reclaman de la autoridad señalada como responsable.

A efecto de dar cumplimiento a lo dispuesto por el artículo 108 de la Ley de Amparo, se expresa lo siguiente:

## I.    NOMBRE Y DOMICILIO DEL QUEJOSO

a)    Banco Monex, S.A., Institución de Banca Múltiple, Monex Grupo Financiero, con domicilio para oír y recibir notificaciones únicamente por lo que a este asunto corresponde en Boulevard Manuel Ávila Camacho 24, piso 21, colonia Lomas de Chapultepec, Código Postal 11000, delegación Miguel Hidalgo, Ciudad de México, México.

## II.    NOMBRE Y DOMICILIO DEL TERCERO INTERESADO

a.    **CRÉDITO REAL S.A.B DE C.V., SOFOM, E.N.R.,** con domicilio en Insurgentes Sur 730 Col. Del Valle Alcaldía, Benito Juárez, 03103 Ciudad de México, Ciudad de México.

b.    **ÁNGEL FRANCISCO ROMANOS BERRONDO,** cuyo domicilio manifiesto bajo protesta de decir verdad que desconozco, sin embargo el mismo será proporcionado en el momento en el que se tenga acceso al expediente 691/2022, radicado en el Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México.

## III.    AUTORIDADES RESPONSABLES

a.    C. Juez Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México.  (en adelante referido como "**Juez Responsable**" "**Juez Quincuagésimo Segundo Civil**"o "**Juez Natural**")

b.    C. Actuarios adscritos al Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México.

c.    Comisión Nacional Bancaria y de Valores.

d.    Registro Público de la Propiedad y de Comercio de la Ciudad de México.

## IV.    ACTOS RECLAMADOS

a.    Se reclama del C. Juez Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, todos y cada uno de los actos,

acuerdos, órdenes, oficios, mandamientos, sentencias interlocutorias y definitivas, decretos y medidas precautorias que se hayan dictado en el expediente 691/2022, en particular el auto del 30 de junio del 2022 y, en su caso, subsecuentes directamente relacionados, mediante el cual pretendidamente se ordenó la ejecución de diversas providencias precautorias sobre la generalidad de los bienes, derechos y activos del tercero interesado afectando los derechos que tiene mi representada en contra de este.

**b.**    Se reclama del C. Juez Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, todas y cada una de las actuaciones, resoluciones, acuerdos, diligencias, apercibimientos, mandamientos, oficios, decretos y exhortos, dictados y que se lleguen a dictar en los autos del Juicio de origen tendientes a perfeccionar, formalizar y/o ejecutar las diversas providencias precautorias decretadas sobre la generalidad de bienes, derechos y activos de Crédito Real.

**c.**    Se reclama del C. Juez Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, la sentencia definitiva presuntivamente dictada el 13 de julio del 2022, supuestamente publicada el 14 del mismo mes y año, en el expediente 691/2022. Manifestando bajo protesta de decir verdad, que a la fecha de presentación de la demanda se desconoce el contenido de dicha sentencia, no obstante se señala como acto reclamado y una vez que se tenga acceso a la misma se ampliaran los conceptos de violación, conforme al quejoso convenga.

**d.**    Se reclama de los CC. Actuarios adscritos al Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, como Autoridades Responsable Ejecutoras, cualquier diligencia por la que pretendan dar cumplimiento a cualquier orden, acuerdo, mandamiento, resolución, decreto, sentencia y notificación que se hayan derivado o emitido dentro del expediente 691/2022, en particular la relativa a cualquier providencia precautoria que se haya ordenado en autos del juicio natural, sobre la generalidad de bienes, derechos y activos de Crédito Real; en específico, la ejecución que pretendan efectuar respecto del auto del 30 de junio del 2022 y sentencia definitiva de 14 de julio de 2022, y en su caso, los subsecuentes que estén relacionados.

**e.**    Se reclama de la Comisión Nacional Bancaria y de Valores, como Autoridad Responsable Ejecutora cualquier diligencia por la que pretendan dar cumplimiento a cualquier orden, acuerdo, mandamiento, resolución, decreto, sentencia y notificación que se hayan derivado o emitido dentro del expediente 691/2022, en particular la relativa a cualquier providencia precautoria que se haya ordenado en autos del juicio natural, sobre la generalidad de bienes, derechos y activos de Crédito Real; en específico, la ejecución que pretendan efectuar respecto el auto del 30 de junio del 2022 y sentencia definitiva de 13 de julio de 2022.

f. Se reclama del Registro Público de la Propiedad y de Comercio de la Ciudad de México, como Autoridad Responsable Ejecutora, cualquier diligencia por la que pretendan dar cumplimiento a cualquier orden, acuerdo, mandamiento, resolución,

decreto, sentencia y notificación que se hayan derivado o emitido dentro del expediente 691/2022, en particular la relativa a cualquier providencia precautoria y/o levantamiento de embargo, inscripción de disolución y liquidación, inscripción de liquidador, o cualquiera de las que establece la Ley General de Sociedades Mercantiles que se haya ordenado en autos del juicio natural, sobre la generalidad de bienes, derechos y activos de Crédito Real; en específico, la ejecución que pretendan efectuar respecto el auto del 30 de junio del 2022 y sentencia definitiva de 13 de julio de 2022.

## V.    **ANTECEDENTES**

Se manifiesta **bajo protesta de decir verdad** que los hechos que constituyen los antecedentes de los actos reclamados, del conocimiento de Quejoso, son los siguientes:

a. **CRÉDITO REAL S.A.B DE C.V., SOFOM, E.N.R.,** (en adelante "Crédito Real, "SOFOM", o "Demandada" indistintamente) es una institución financiera constituida como como Sociedad Anónima Bursátil de Capital Variable Sociedad Financiera de Objeto Múltiple, Entidad No Regulada, su objeto se ha desarrollado principalmente otorgando créditos para bienes duraderos y de consumo, con presencia en Estados Unidos, Costa Rica, Panamá, Nicaragua y Honduras, enfocada al otorgamiento de créditos con una plataforma diversificada de negocios, que comprende principalmente: créditos con descuento vía nómina, créditos para PYMES, créditos grupales, créditos para autos usados y a través de Instacredit, créditos de consumo. Las acciones de Crédito Real se encuentran listadas en la Bolsa Mexicana de Valores bajo la clave de pizarra "CREAL".

b. Según fuentes públicas, en el 2007 se asoció con Nexxus Capital Private Equity e inició operaciones de créditos grupales. Así pues, en el año 2012 se registró en la Bolsa Mexicana de Valores y lanzo Oferta Pública Inicial (OPI) en la Bolsa Mexicana de Valores.

c. Según fuentes públicas, en el 2014 comenzaron a colocar bonos internacionales por US$ 425,000,000.00 (cuatrocientos veinticinco millones de dólares moneda del curso legal en los Estados Unidos de América), 7.5% con vencimiento en el año 2019, durante el 2015 emitieron certificados bursátiles por $1,000,000,000.00 (mil millones de francos suizos), en 2016 colocaron otro bono internacional por US $625,000,000.00 (seiscientos veinticinco millones de dólares moneda del curso legal en los Estados Unidos de América) con vencimiento en 2023.

d. Según fuentes públicas, en el año 2018 emitieron un Bono Suizo con vencimiento al 2022 por $170,000,000.00 (ciento setenta millones de francos suizos) y hubo una segunda emisión por $615,000,0000.00 (seiscientos quince millones de francos suizos) del programa de Bursatilización; en el 2019 se ofertaron notas no garantizadas por US $400,000,000.00 (cuatrocientos millones de dólares moneda del curso legal en los Estados Unidos) con

JACOBO GUADALUPE MARTINEZ FLORES
38.30.30.30.31.30.30.30.30.30.34.37.35.32.34.31.38
13.0622.2903141

vencimiento en 2026, asimismo se ofertaron Senior Notes por EUR€ 350,000,000.00 (trescientos cincuenta millones de Euros), con vencimiento en 2027, y emitieron MXN$750 (setecientos cincuenta millones de pesos moneda nacional) de su programa de bursatilización de cartera de crédito.

e. El 19 de febrero de 2020 formalizaron una línea de crédito sindicada de US$110,000,000.00 (cien millones de dólares moneda del curso legal en los Estados Unidos de América) con un vencimiento a 3 años, realizaron el lanzamiento de un programa de emisión de bonos a mediano plazo ("**Programa MTN**") por un monto de hasta US $1,500,000,000.00 (mil quinientos millones de dólares moneda del curso legal en los Estados Unidos de América), en el que participaron diversos acreedores, entre ellos mi representada por la cantidad de US $13,000,000.00 (trece millones de dólares moneda de curso legal en los Estados Unidos de América), lo anterior se acredita con el documento que se anexa al presente como "**Anexo 2**" y acredita el interés que tiene mi representada en el presente juicio de amparo.

f. En los meses de mayo, junio y julio del 2022 se empezaron a difundir diversas notas periodísticas en las cuales se destacaba que Crédito Real se encontraba en problemas financieros, por lo cual se estaba trabajando en un plan de reestructuración y el 1 de junio de 2022 la BMV suspendió la cotización de las acciones de Crédito Real.

g. Asimismo, se anunció que Crédito Real preparaba la declaración de concurso mercantil en Estados Unidos o mejor conocido como *"Chapter 11"*, después de entrar en diversos supuestos de incumplimiento de pago a los tenedores de un bono de $170,000,000.00 (ciento setenta millones de francos suizos).

Sin embargo, la declaración de Bancarrota en Estados Unidos no se presentó de manera voluntaria, por lo que diversos acreedores, como lo es mi representada, presentaron una solicitud involuntaria de quiebra (*"involuntary bankruptcy proceeding"*) bajo el procedimiento del Capítulo 11 de la Ley de Bancarrotas de Nueva York (*"Chapter 11"*), mismo que se encuentra pendiente de resolución.

h. El 14 de julio de 2022, Crédito Real realizó diversas manifestaciones ante la Corte de Estados Unidos, exhibiendo diversos documentos del procedimiento llevado a cabo en México, entre los cuales exhibió un auto admisorio dictado por el Juez Natural el 1 de julio de 2022, de los cuales se desprende que se concedieron diversas medidas precautorias que aquí se señalan como acto reclamado. Se precisa que dicho procedimiento no se trata de un Concurso Mercantil, sino del juicio que constituye el acto reclamado y que presuntivamente versa sobre la disolución y liquidación corporativa/judicial de Crédito Real, cuya inconstitucionalidad emana principalmente de ser un mecanismo violatorio de derechos fundamentales del quejoso y de diversos acreedores, cuestión en la que se ahonda en el presente amparo.

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,30,34,37,33,32,34,31,31,38
13,06/24 28091414

i. También el 14 de julio de 2022 la Bolsa Mexicana y de Valores anunció que se publicó una sentencia dictada por la autoridad judicial por la que se declaró la disolución y se puso en liquidación a Crédito Real, asimismo se informó que ya se había designado liquidador judicial derivado de la acción legal ejercida por "uno de sus accionistas". Información puede ser consultada en la siguiente página de internet https://www.bmv.com.mx/docs-pub/visor/visorXbrl.html?docins=../eventemi/eventemi_1205293_1.zip#/visorXbrl , y que constituye un hecho notorio para su Señoría en virtud de que fue una noticia pública.[1]

j. Asimismo, el 15 de julio de 2022, fue publicado en el periódico "El Financiero" una nota que afirmó que un tribunal mexicano ordenó la liquidación de Crédito Real.

k. Derivado de la búsqueda realizada con los datos aportados por Crédito Real ante el Juez de Nueva York, mi representada se percató de que existe un juicio especial mercantil cuyas partes son Romanos Berróndo Ángel Francisco, quien es accionista de la SOFOM Crédito Real, como parte actora y Crédito Real, S.A. B. de C.V. Sociedad Financiera de Objeto Múltiple, Entidad No Regulada como parte demanda, , lo cual constituye un hecho notorio e incluso es consultable en el siguiente link: https://consultabpj.poderjudicialcdmx.gob.mx:2096/externo/2242

l. En el link referido se advierte que el 1, 5, 8 y 12 de julio del 2022, se dictaron ciertos acuerdos dentro del procedimiento seguido ante el Juzgado Quincuagésimo Segundo, dentro del expediente 691/2022, en el cual Crédito Real figura como parte demandada y sin embargo en los primeros acuerdos de fechas 1, 5 y 8 de julio de 2022 fue publicado como "Secreto", lo que acontece normalmente en aquellos casos en que se ha ordenado la ejecución de alguna providencia precautoria o embargo. Lo anterior constituye un hecho notorio para su Señoría al haber sido publicado en una página oficial del Poder Judicial.

La característica de hecho notorio de dicha publicación se confirma en términos de los criterios jurisdiccionales cuyos rubros son: *"PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL."*, y *"HECHO NOTORIO. LO CONSTITUYEN LOS DATOS QUE APARECEN EN LAS PÁGINAS ELECTRÓNICAS OFICIALES QUE LOS ÓRGANOS DE GOBIERNO UTILIZAN PARA PONER A DISPOSICIÓN DEL PÚBLICO, ENTRE OTROS SERVICIOS, LA DESCRIPCIÓN DE SUS PLAZAS, EL DIRECTORIO DE SUS EMPLEADOS O EL ESTADO QUE GUARDAN SUS EXPEDIENTES Y, POR ELLO, ES VÁLIDO QUE SE INVOQUEN DE OFICIO PARA RESOLVER UN ASUNTO EN PARTICULAR."*

---

[1] *"PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL."*,

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,31,30,30,30,30,30,30,35,30,34,37,35,32,34,31,38
13,00/24,200/141

m.  A la fecha, el quejoso no ha sido emplazado ni notificado del procedimiento de origen, de forma tal que le asiste el carácter de tercero extraño a juicio, toda vez que no tiene conocimiento formal y exacto de las actuaciones, actos, ordenes, mandamientos, embargo y cualquier otro acto dentro del procedimiento referido, encontrándose en un estado de absoluta indefensión, siendo que se trata de un procedimiento especial mercantil, que tiene como finalidad la disolución de la sociedad, según la información obtenida según se narra en los antecedentes, donde no participan ni los acreedores de Crédito Real como lo es mi representada ni el resto de su accionariado, salvo el actor del juicio.

n.  En ese tenor, y como se narró anteriormente, mi representada es acreedora de la SOFOM Crédito Real, por lo que al haber sido disuelta y ordenada la liquidación de esta, le causa perjuicio en su esfera jurídica ya que deja en total estado de indefensión y en inseguridad jurídica los derechos que se tienen contra la misma, al haber iniciado un procedimiento del cual no se tiene conocimiento, únicamente se presupone sobre los hechos con la información conocida, y que además, no es el procedimiento que debe llevarse para liquidar a una empresa que enfrenta una situación de insolvencia como se explicará más adelante, además, es sorprendente la celeridad con la que aparentemente se dictó la sentencia y se ordenó la liquidación afectando a terceros, dentro de los que se encuentra mi representada.

El carácter del quejoso como tercero extraño, se confirma en virtud de que mi representada se duele de la admisión de la demanda, de los acuerdos, providencias precautorias y de la sentencia presuntivamente dictada en el juicio 691/2022, al pararle perjuicio por ser acreedora de Crédito Real, en lo que se ahondará en el capítulo de procedencia correspondiente.

## VI.  FECHA EN QUE SE TUVO CONOCIMIENTO DEL ACTO RECLAMADO

Se manifiesta bajo protesta de decir verdad, que mi representada tuvo conocimiento de los actos reclamados, el 14 de julio del 2022, ya que fue en dicha fecha en la cual Crédito Real compareció al Chapter 11 presentado por diversos acreedores, entre ellos mi representada e informó de las medidas cautelares decretadas por el Juzgado Quincuagésimo Segundo.

Como consecuencia de lo anterior, mi representada realizó búsqueda en el Boletín Judicial del Poder Judicial de la Ciudad de México, y se percató que, existe un juicio especial mercantil cuyas partes son Romanos Berróndo Ángel Francisco, accionista de la demandada, como parte actora y Crédito Real, S.A. B. de C.V. Sociedad Financiera de Objeto Múltiple, Entidad No Regulada, como parte demanda, radicado en el Juzgado Quincuagésimo Segundo con el expediente 691/2022 en el cual se advierte lo siguiente: "MERCANTIL 5 ACDOS.", lo cual constituye un hecho notorio e incluso es consultable en el siguiente link: https://consultabpj.poderjudicialcdmx.gob.mx:2096/externo/2242

Como se puede observar en el link referido, los acuerdos de fechas 1, 5 y 8 de julio de 2022 fueron publicados como *"Secreto"*, lo que acontece normalmente en aquellos casos en que se ha ordenado la ejecución de alguna providencia precautoria y/o embargo.

En ese tenor es claro que el amparo se presenta dentro del plazo legal concedido.

## VII.    **PRECEPTOS CONSTITUCIONALES VIOLADOS**

Los artículos 1, 14, 16, 17, 25, 40, 41, 103, 104, 115, 122 y 124 de la Constitución Política de los Estados Unidos Mexicanos. Así como los artículos 8, 25 y demás correlativos y aplicables de la Convención Americana de Derechos Humanos.

## CAPÍTULO DE PROCEDENCIA

Los artículos 103 y 107, fracciones I, III, inciso c) y VII de la Constitución Política de los Estados Unidos Mexicano, así como el artículo 107, fracción VI, de la Ley de Amparo, prevén que el juicio de amparo será procedente como medio de defensa en contra de los actos que afecten a terceros extraños (ajenos a la controversia) ya sea que estos se den fuera o dentro de un juicio.

*CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS*

*"Artículo 107. Las controversias de que habla el artículo 103 de esta Constitución, con excepción de aquellas en materia electoral, se sujetarán a los procedimientos que determine la ley reglamentaria, de acuerdo con las bases siguientes:*

*I. El juicio de amparo se seguirá siempre a instancia de parte agraviada, teniendo tal carácter quien aduce ser titular de un derecho o de un interés legítimo individual o colectivo, siempre que alegue que el acto reclamado viola los derechos reconocidos por esta Constitución y con ello se afecte su esfera jurídica, ya sea de manera directa o en virtud de su especial situación frente al orden jurídico.*

*[...]III. Cuando se reclamen actos de tribunales judiciales, administrativos o del trabajo, el amparo sólo procederá en los casos siguientes:*

*[...]c) Contra actos que afecten a personas extrañas al juicio;*

*VII. El amparo contra actos u omisiones en juicio, fuera de juicio o después de concluido, o que afecten a personas extrañas al juicio, contra normas generales o contra actos u omisiones de autoridad administrativa, se interpondrá ante el Juez de Distrito bajo cuya jurisdicción se encuentre el lugar en que el acto reclamado se ejecute o trate de ejecutarse, y su tramitación se limitará al informe de la autoridad, a una audiencia para la que se citará en el mismo auto en el que se mande pedir el informe y se recibirán las pruebas que las partes interesadas ofrezcan y oirán los alegatos, pronunciándose en la misma audiencia la sentencia;[...]"*

*LEY DE AMPARO*
*"Artículo 107. El amparo indirecto procede:*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.10.31.30.30.30.30.30.35.30.34.17.35.32.34.11.38
13.00/24 20.00:41

*[...] VI. Contra actos dentro o fuera de juicio que afecten a personas extrañas."*

El Poder Judicial de la Federación define al tercero extraño a juicio como:

"Aquella persona física o moral que no ha figurado en el juicio o en el procedimiento como parte en sentido material, *pero que sufre un perjuicio dentro del mismo o en la ejecución de las resoluciones*, sin haber tenido la oportunidad de ser oído o vencido por desconocer totalmente las actuaciones relativas".

En ese tenor, la persona extraña a juicio, propiamente dicha, es aquella persona, moral o física, distinta de los sujetos de la controversia que en él se ventila, por lo que la "persona extraña" es opuesta a la de "parte" procesal; de ahí que, el amparo indirecto sea procedente cuando se realizan actos, ya sea fuera o dentro de juicio, que causen un perjuicio sin tener oportunidad de ser oído y vencido en juicio, violentando la garantía de audiencia.

En efecto, aquella persona que tenga conocimiento de determinado procedimiento en el que se está deduciendo cuestiones que impactan en su esfera jurídica, no se encuentra obligado a agotar los recursos ordinarios, sino que, al ser ajeno al juicio se encuentra en posibilidad de accionar el juicio de amparo en el afán de que le sea restituido sus derechos.

Se trata de una excepción al principio de definitividad que opera en el juicio de amparo. Sirve de sustento a lo anterior el siguiente criterio:

*Registro digital: 172933*
*Instancia: Tribunales Colegiados de Circuito*
*Novena Época*
*Materias(s): Común*
*Tesis: VI.2o.C. J/282*
*Fuente: Semanario Judicial de la Federación y su Gaceta.*
*Tomo XXV, Marzo de 2007, página 1557*
*Tipo: Jurisprudencia*

**RECURSOS ORDINARIOS. EL TERCERO EXTRAÑO NO ESTÁ OBLIGADO A AGOTARLOS.**
*El artículo 73, fracción XIII de la Ley de Amparo establece que el juicio de garantías es improcedente contra las resoluciones judiciales de tribunales administrativos o del trabajo respecto de las cuales concede la ley algún recurso o medio de defensa, dentro del procedimiento, por virtud del cual pueden ser modificadas, revocadas o nulificadas, aun cuando la parte agraviada no lo hubiese hecho valer oportunamente salvo lo que la fracción VII del artículo 107 constitucional dispone para los terceros extraños, o sea que el primer numeral se refiere a los medios ordinarios de defensa establecidos por la ley en favor de las partes, y que deben agotar o hacer valer antes de intentar el juicio constitucional para cumplir con el principio de definitividad, y el segundo precepto establece que para los terceros extraños no opera ese principio, porque no siendo partes en el procedimiento de origen es evidente que tampoco pueden hacer uso de aquellos recursos o medios de defensa para lograr su intervención en dicho procedimiento.*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13/08/24 20:01:41

Adicionalmente, es necesario señalar que, suponiendo sin conceder, mi representada fuese parte en el Juicio Natural y se llegara a dictar una sentencia ordenando la disolución de la sociedad, como aparentemente sucedió, el medio ordinario de defensa a agotar sería el recurso de apelación, el cual no resulta eficaz para salvaguardar los derechos del quejoso, pues dicho recurso al no prever suspensión del acto no impediría la consumación irreparable del acto, por lo que resultaría ineficaz. Sirve de apoyo el criterio siguiente:

*Registro digital: 2024044*
*Instancia: Tribunales Colegiados de Circuito*
*Undécima Época*
*Materias(s): Común*
*Tesis: I.11o.C. J/6 K (11a.)*
*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 9, Enero de 2022, Tomo IV, página 2866*
*Tipo: Jurisprudencia*

*PRINCIPIO DE DEFINITIVIDAD. PUEDE PROMOVERSE EL JUICIO DE AMPARO INDIRECTO SIN NECESIDAD DE AGOTARLO, SI UN RECURSO O MEDIO ORDINARIO DE DEFENSA ES IDÓNEO PARA REVOCAR, MODIFICAR O NULIFICAR EL ACTO RECLAMADO, PERO NO RESULTA EFICAZ PARA SALVAGUARDAR LOS DERECHOS DEL QUEJOSO.*

*Hechos: El Juez de Distrito desechó la demanda de amparo indirecto porque estimó que la quejosa no agotó el principio de definitividad, motivo por el cual interpuso el recurso de queja.*

*Criterio jurídico: Este Tribunal Colegiado de Circuito determina que cuando un recurso o medio ordinario de defensa, aunque sea idóneo para revocar, modificar o nulificar el acto reclamado no resulte eficaz para salvaguardar los derechos del quejoso, por su propia naturaleza, por la forma en que se regule su sustanciación o por las circunstancias especiales que se presenten en determinado caso concreto, el particular podrá promover de inmediato el juicio de amparo indirecto, sin necesidad de agotar el principio de definitividad.*

*Justificación: Lo anterior, porque el principio de definitividad deriva de lo previsto en el artículo 107, fracción III, de la Constitución Política de los Estados Unidos Mexicanos; es uno de los principales ejes rectores de la procedencia del juicio de amparo y que ratifican su naturaleza como medio extraordinario de defensa, al cual debe acudirse, en principio, sólo en el caso de que la lesión causada por el acto de autoridad sea definitiva y no pueda ser solucionada por otros medios. Este principio se encuentra regulado, como causa de improcedencia de la acción constitucional, en el artículo 61, fracción XVIII, primer párrafo, de la Ley de Amparo; hipótesis normativa que sólo resulta aplicable a los procedimientos jurisdiccionales y no para los actos propiamente administrativos, pues respecto de éstos se regula en forma específica en la fracción XX del mismo precepto. Para satisfacer los derechos fundamentales de tutela judicial efectiva y a contar con un recurso judicial sencillo y rápido, consagrados en los artículos 17, segundo párrafo, de la Constitución Política de los Estados Unidos Mexicanos y 25 de la Convención Americana sobre Derechos Humanos, la obligación o carga procesal de agotar el principio de definitividad, previamente a la promoción del juicio de amparo, lleva inmersa la lógica de que el recurso o medio ordinario de defensa que proceda contra el acto de autoridad que el gobernado estima lesivo de sus derechos, debe satisfacer los*

JACOBO GUADALUPE MARTINEZ FLORES
30.30,32,33,31,36,30,30,30,30,30,35,30,34,33,33,32,34,31,38
13.0629,20.01-41

*siguientes requisitos: I. Idoneidad. Debe ser capaz de modificar, revocar o nulificar el acto reclamado; y, II. Eficacia. Dependiendo de la naturaleza del acto que se pretende impugnar, debe: i. Permitir al particular el despliegue pleno de su derecho de defensa; y, ii. Regularse un procedimiento que impida la consumación irreparable en los derechos del gobernado, de los efectos que produce el acto de autoridad. Por lo que si el recurso o medio ordinario de defensa previsto en la legislación procesal no satisface cualquiera de los anteriores requisitos, no existirá obligación de la quejosa de interponerlo antes de acudir al amparo.*

Así las cosas, el presente amparo tiene como fundamento lo dispuesto por los artículos 107, fracciones I, III, inciso c) y VII constitucional, y 107, fracción VI, de la Ley de Amparo previamente citados, ya que la ejecución de los actos reclamados deriva en una clara y directa afectación a los derechos sustantivos del quejoso, quien es tercero extraño al Juicio Natural, dado que la autoridad responsable ha dictado diversas resoluciones que afectan directamente la esfera de jurídica de mi representada sin que se le haya dado oportunidad de defenderse dejándola en total incertidumbre.

Nos encontramos ante una disolución y liquidación de Crédito Real en donde se otorgaron diversas providencias precautorias en una vía improcedente y por una autoridad incompetente al estar invadiendo la esfera competencia de los jueces de distrito, lo cual sin duda alguna constituye un acto dentro de juicio de imposible reparación, ya que se están afectando materialmente derechos sustantivos, particularmente el derecho de propiedad, al debido proceso, y a la tutela jurisdiccional efectiva.

Así es, la Constitución Política de los Estados Unidos Mexicanos establece en el artículo 103 constitucional, así como en el artículo 1 de la Ley de Amparo los supuestos de procedencia para el juicio de amparo, los cuales establecen que el juicio de amparo tiene por objeto resolver toda controversia que se suscite por normas generales, actos u omisiones de la autoridad de las entidades federativas que invadan la esfera de competencia de la autoridad federal, siempre y cuando se violen los derechos humanos reconocidos y las garantías otorgadas para su protección por la Constitución Política de los Estados Unidos Mexicanos.

Lo anterior implica que si una autoridad de una entidad federativa invade el ámbito de competencia de una autoridad federal, el gobernado agraviado por el acto que emana de esa invasión competencial podrá inconformarse demandando el amparo y la protección de la Justicia de la Unión, con lo que se pretende mantener vivo el principio de división de competencias y el respeto al federalismo. Es importante destacar que en ese supuesto es el gobernado lesionado, de conformidad con el principio de instancia de parte agraviada y de procedencia del amparo quien debe recurrir al amparo.

Es decir, en caso de que un acto de una autoridad de una entidad federativa invada la esfera de competencia de una autoridad federal, claramente se está afectando el sistema de competencias entre las autoridades federales y locales afectado los derechos humanos de los gobernados.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.00.30.00.15.30.34.37.35.32.34.31.38
13/08/24 20:01:41

La procedencia respecto el amparo soberanía, es fundamental para salvaguardar el federalismo mexicano, ya que consiste en un medio de defensa constitucional para el gobernado. Sirven de sustento las siguientes tesis de nuestros más altos tribunales:

*Época: Quinta Época*
*Registro: 389842*
*Instancia: Pleno*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Apéndice de 1995*
*Tomo I, Parte HO*
*Materia(s): Constitucional*
*Tesis: 389*
*Página: 362*

**INVASION DE ESFERAS DE LA FEDERACION A LOS ESTADOS Y VICEVERSA, AMPARO POR.**

*El juicio de amparo fue establecido por el artículo 103 constitucional, no para resguardar todo el cuerpo de la propia Constitución, sino para proteger las garantías individuales, y las fracciones II y III del precepto mencionado, deben entenderse en el sentido de que* <u>*sólo puede reclamarse en el juicio de garantías una ley federal, cuando invada o restrinja la soberanía de los Estados, o de éstos, si invade la esfera de la autoridad federal, cuando existe un particular quejoso,*</u> *que reclame violación de garantías individuales, en un caso concreto de ejecución o con motivo de tales invasiones o restricciones de soberanía. Si el legislador constituyente hubiese querido conceder la facultad de pedir amparo para proteger cualquiera violación a la Constitución, aunque no se tradujese en una lesión al interés particular, lo hubiese establecido de una manera clara, pero no fue así, pues al través de las Constituciones de 1857 y 1917, y de los proyectos constitucionales y actas de reforma que las precedieron, se advierte que los legisladores, conociendo ya los diversos sistemas de control que pueden ponerse en juego para remediar las violaciones a la Constitución, no quisieron dotar al Poder Judicial Federal de facultades omnímodas, para oponerse a todas las providencias inconstitucionales, por medio del juicio de amparo, sino que quisieron establecer éste, tan sólo para la protección y goce de las garantías individuales."*

*Época: Quinta Época*
*Registro: 339130*
*Instancia: Tercera Sala*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación*
*Tomo CXXX*
*Materia(s): Común*
*Tesis:*
*Página: 765*

<u>**AMPARO POR INVASION DE JURISDICCION. SOLO LOS PARTICULARES PUEDEN PROMOVERLO.**</u>

<u>*El amparo a virtud del cual se reclama la invasión de jurisdicción debe ser promovido por el particular afectado en sus garantías constitucionales con motivo de la invasión.*</u> *El artículo 103 de la Constitución Federal Establece: "Los Tribunales de la Federación resolverán toda controversia que se suscite: I. Por leyes o actos de la autoridad que violen las garantías individuales; II. Por leyes o actos de la autoridad federal que vulneren o restrinjan la soberanía de los estados; y III. Por leyes o actos de las autoridades de éstos que invadan la esfera de la autoridad federal". En el caso de leyes o actos de autoridades que violen las garantías individuales no existe problema, porque puede pedir amparo lo mismo un particular, persona física, que una persona moral en lo que se refiere a sus derechos patrimoniales. Pero, ¿quién va a pedir el amparo en el caso de las dos últimas fracciones? Podría pensarse que el amparo debería ser*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.33.34.37.35.32.34.33.38
13.08/24.20:01:41

*interpuesto o bien por la Federación o bien por el Estado, puesto que se trata de invasión de jurisdicciones. Sin embargo, es un principio definitivamente fijado en materia de amparo el de que el juicio constitucional siempre debe promoverse por un particular, por aquel que resulte perjudicado con motivo del acto de que se trata. Existirá en algunos casos la posibilidad de que la Federación o los Estados puedan pedir amparo, pero siempre en el concepto de personas morales de derecho civil. La Federación y los Estados como autoridades nunca pueden pedir amparo alegando invasión de sus respectivas jurisdicciones. Esta tesis se desprende claramente de la primera parte del artículo 107 de la Constitución Federal que declara: "Todas las controversias de que habla el artículo 103, se seguirán a instancia de la parte agraviada por medio de procedimientos y formas de orden jurídico que determinará una ley que se ajustará a las bases siguientes: I. La sentencia será siempre tal, que sólo se ocupe de individuos particulares, limitándose a ampararlos y protegerlos en el caso especial sobre el que verse la queja, sin hacer una declaración general respecto de la ley o acto que la motivare". Es necesario, pues, para que el acto pueda impugnarse mediante un juicio constitucional, que redunde en perjuicio de una persona física o moral de derecho civil, únicas que podrán acudir al juicio de amparo. El Poder Judicial Federal no podrá de esta suerte constituirse en instrumento de otro de los poderes del Estado, porque el único que puede provocar su intervención es el particular agraviado, y la base de la solicitud tiene que ser un agravio concreto en su patrimonio o en su persona. La función controladora se refiere, pues a un interés privado, particular y no a un interés de un partido o facción política o de un órgano del Estado.*

Aunado a lo anterior, es evidente que el juicio de amparo es el único medio de defensa con el que cuenta el gobernado para resolver las controversias que se susciten debido a la invasión de esfera de competencias entre poderes federales y locales que afecten su esfera jurídica, particularmente sus derechos humanos, tan es así que su procedencia se encuentra regulada tanto constitucional como a nivel de ley reglamentaria. Aunado a lo anterior, de un análisis de las leyes se desprende que no existe un medio ordinario de defensa que pueda agotarse previamente la promoción del juicio de amparo al tratarse de una invasión competencial y al no ser parte de la controversia natural mi representada pero si es afectada por las medidas precautorias dictadas, por lo que de ahí que el juicio de amparo indirecto es procedente sin necesidad de agotar cualquier recurso o juicio previsto en la legislación local en torno a la posible impugnabilidad ya que la controversia radica sobra la invasión de esferas de competencia entre las autoridades locales y federales. Sirve de sustento a lo anterior la siguiente tesis de nuestros más altos tribunales:

*Época: Décima Época*
*Registro: 2017422*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Gaceta del Semanario Judicial de la Federación*
*Libro 56, Julio de 2018, Tomo II*
*Materia(s): Común*
*Tesis: XVIII.2o.P.A. J/1 (10a.)*
*Página: 1379*

*DERECHO DE ALUMBRADO PÚBLICO EN EL ESTADO DE MORELOS. SI LA DEMANDA DE AMPARO PROMOVIDA CONTRA SU COBRO FUE PLANTEADA COMO AMPARO SOBERANÍA O POR INVASIÓN DE ESFERAS, NO LE ES EXIGIBLE AL QUEJOSO CUMPLIR CON EL PRINCIPIO DE DEFINITIVIDAD.*

*Si la demanda de amparo fue planteada como amparo soberanía o por invasión de esferas, de conformidad con la hipótesis prevista en los artículos 103, fracción III, de la Constitución Política de los Estados Unidos Mexicanos y 1o.,*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.51.30.30.30.30.30.35.30.34.37.35.32.34.31.38
130624.200314J

*fracción III, de la Ley de Amparo, pues el quejoso impugna el cobro del derecho de alumbrado público, el cual se funda en normas generales –Ley de Ingresos del Municipio de Cuernavaca, Morelos, para el ejercicio fiscal del año dos mil quince y Ley General de Hacienda Municipal del Estado de Morelos– que invaden la esfera de competencia de la Federación, establecida en el artículo 73, fracción XXIX, numeral 5o., inciso a), de la Constitución Federal; dicha circunstancia genera que no le sea exigible al quejoso cumplir con el principio de definitividad, previsto en el artículo 61, fracción XX, de la Ley de Amparo. Lo anterior, en virtud de que, por un lado, el Tribunal de Justicia Administrativa del Estado de Morelos carece de competencia para conocer de planteamientos de invasión de esferas, pues tal hipótesis no está prevista en el artículo 36 de la Ley de Justicia Administrativa del Estado, vigente al momento en que el quejoso se hizo conocedor del acto reclamado y, por otro, es que la competencia para conocer de ese tipo de asuntos sí se encuentra regulada expresa y exclusivamente para los tribunales federales, de conformidad con el artículo 103, fracciones II y III, de la Constitución Federal, lo cual guarda congruencia con el diverso artículo 104, fracción V, constitucional, puesto que el Tribunal de Justicia Administrativa del Estado de Morelos es un órgano de carácter meramente local que no puede gozar de competencia para decidir conflictos que se planteen entre normas de índole local con normas federales; de ahí que el juicio de amparo indirecto sea procedente sin necesidad de agotar los recursos o juicios previstos en la legislación local en torno a la posible impugnabilidad de los derechos de alumbrado público, siempre que el planteamiento radique sobre la invasión de esferas.*

Por lo anterior, resulta evidente la procedencia del amparo, mi representa no es parte en el Juicio Natural, lo que la imposibilitaba a presentar un medio ordinario de defensa, adicionalmente, el medio de defensa previsto en contra de una sentencia que ordena una disolución es el recurso de apelación, el cual resultaría ineficaz en el caso concreto al no prever éste la suspensión del acto, pudiendo quedar irremediablemente consumado y finalmente, el juicio de amparo es el único medio de defensa con el que cuenta el gobernado para resolver las controversias que se susciten debido a la invasión de esfera de competencias entre poderes federales y locales que afecten su esfera jurídica como en el caso al ordenarse providencias precautorias e incluso, aparentemente una sentencia que viola el derecho de propiedad y haber sido dictadas sin otorgar garantía de audiencia y por una autoridad incompetente.

## CONCEPTOS DE VIOLACIÓN

**PRIMERO.** Los actos reclamados violan lo establecido por los artículos 1, 14, 16 y 104, fracción, II y demás relativos y aplicables de la Constitución Política de los Estados Unidos Mexicanos, en relación con lo dispuesto por los artículos 215, 216, 217 y siguientes de la Ley de Amparo, las jurisprudencias y criterios jurisdiccionales cuyos rubros son *"AUDIENCIA, CÓMO SE INTEGRA ESTA GARANTÍA."*, y, *"AUDIENCIA, GARANTIA DE. DEBE RESPETARSE, AUNQUE LA LEY EN QUE SE FUNDE LA RESOLUCION NO PREVEA EL PROCEDIMIENTO PARA TAL EFECTO."*, entre otras, por su falta de aplicación y eminente violación.

El artículo 14 de la Constitución Política de los Estados Unidos Mexicanos prevé la garantía de audiencia de asiste a los gobernados, mismo que en su segundo párrafo dispone lo siguiente:

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.30.35.30.37.35.37.34.31.38
130624.70903-41

*"Artículo 14.- [...]*

*Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho."*

El artículo transcrito establece la conocida garantía de audiencia, conforme a la cual todo gobernado tiene la posibilidad de ser escuchado por un tribunal previamente establecido, de manera previa a sufrir un acto privativo y mediante un procedimiento que cumpla con la totalidad de sus formalidades esenciales, otorgando protección jurídica al gobernado en su vida, libertad, propiedades, posesiones y derechos; por ende, permite al gobernado ejercer oposición en contra de la acción arbitraria por parte de las autoridades, o bien la violación a ésta garantía incluso en la expedición de normas generales de observancia obligatoria, condicionando la existencia de congruencia entre lo que se alega y lo que se resuelve, además de contextualizar obligaciones de autoridades para proceder constitucionalmente.

En ese tenor, todas las autoridades en sus funciones judiciales, ejecutivas así como legislativas deben prever y respetar, antes de generar cualquier acto que pueda tener efectos privativos, la existencia de un juicio que cumpla con las formalidades esenciales del procedimiento, en el que se otorgue al gobernado la suficiente oportunidad de defenderse de aquellos actos que la autoridad pretende hacer valer en su contra, siendo que el cumplimiento de ésta garantía debe estar presente en todo momento.

Lo anterior, toda vez que al negar la existencia de un juicio, recurso u oposiciones correspondientes previo se ven perdidos los atributos de la formalidad del procedimiento y se deja en estado de indefensión a las partes y por ende el contenido esencial del derecho es la garantía de defenderse de un procedimiento mediante las formalidades establecidas en la constitución, obligando así un debido actuar a las autoridades respecto a la aplicación de la ley mediante un procedimiento forzoso, por lo que el gobernado tiene la seguridad de recibir la justa aplicación de la ley y así garantizar la regularidad de la actuación de las autoridades.

Asimismo, la Convención Americana Sobre Derechos Humanos, en su artículo octavo primer párrafo, establece lo siguiente:

*"Artículo 8.- Garantías Judiciales*
*1. Toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter."*

En este sentido, las garantías judiciales son un requisito de acceso de la administración de la justicia de manera legal y efectiva que se deben observar para hacer referencia a la regulada protección de derechos mediante la ley, sobre

cualquier acto ejecutado por autoridades competentes que determinen derechos y obligaciones de las personas, y que exigen al Estado garantice la tramitación de un proceso que ampare a las personas contra actos que pudieran resultar violatorios de sus derechos.

Dicha garantía se transgrede con los actos reclamados, pues presumiblemente se pretende ejecutar un fraude a la ley -en específico a la Ley de Concursos Mercantiles ("**LCM**"), lo que desde luego genera una afectación a mi representada en su calidad de acreedor de Crédito Real, pero pone en riesgo a toda la sociedad. Lo anterior transgrede de manera directa lo dispuesto por el artículo 104, fracción II, de la Constitución y genera una afectación a derechos sustantivos de la quejosa, que deben ser protegidos por su Señoría.

Así las cosas, resulta indiscutible que un proceso legal garantiza, protege, asegura y hace valer la titularidad o ejercicio de un derecho de defensa y acceso a la justicia, donde las partes tienen la posibilidad de presentar ante un juez imparcial pruebas y objetar a la contraparte con las debidas garantías en un respectivo proceso para esclarecer el hecho de un modo imparcial y sancionar a los responsables.

Así, la garantía de audiencia está compuesta de diversos elementos, según se explica en la Jurisprudencia emitida por nuestros más importantes tribunales, que sigue:

> *"Época: Novena Época*
> *Registro: 169143*
> *Instancia: Tribunales Colegiados de Circuito*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo XXVIII, Agosto de 2008*
> *Materia(s): Común*
> *Tesis: I.7o.A. J/41*
> *Página: 799*
>
> *AUDIENCIA, CÓMO SE INTEGRA ESTA GARANTÍA.*
>
> *De entre las diversas garantías de seguridad jurídica que contiene el segundo párrafo del artículo 14 de la Constitución Política de los Estados Unidos Mexicanos, destaca por su primordial importancia, la de audiencia previa. Este mandamiento superior, cuya esencia se traduce en una garantía de seguridad jurídica para los gobernados, impone la ineludible obligación a cargo de las autoridades para que, de manera previa al dictado de un acto de privación, cumplan con una serie de formalidades esenciales, necesarias para oír en defensa a los afectados. Dichas formalidades y su observancia, a las que se unen, además, las relativas a la garantía de legalidad contenida en el texto del primer párrafo del artículo 16 constitucional, se constituyen como elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario y anárquico sino, por el contrario, en estricta observancia del marco jurídico que la rige. Así, con arreglo en tales imperativos, todo procedimiento o juicio ha de estar supeditado a que en su desarrollo se observen, ineludiblemente, distintas etapas que configuran la garantía formal de audiencia en favor de los gobernados, a saber, que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite, que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.35.33.34.37.35.32.34.31.38
13.08/24 20:03:41

*comprobación tal, que quien sostenga una cosa tenga oportunidad de demostrarla, y quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; que cuando se agote dicha etapa probatoria se le dé oportunidad de formular las alegaciones correspondientes y, finalmente, que el procedimiento iniciado concluya con una resolución que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas."*

En términos de lo anterior, resulta indiscutible que la garantía de audiencia como tal se constituye de diversos elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario, anárquico o incluso como consecuencia de un fraude a la ley sino, por el contrario, en estricta observancia del marco jurídico que la rige; por lo tanto, todo procedimiento debe estar compuesto por distintas etapas **que configuran la garantía formal de audiencia en favor de los gobernados**, a saber: *(i)* que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite; *(ii)* que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de comprobación tal, **que quien sostenga una cosa tenga oportunidad de demostrarla**, y quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; *(iii)* que cuando se agote dicha etapa probatoria se le dé oportunidad de **formular las alegaciones correspondientes**; y, finalmente, *(iv)* que el procedimiento iniciado **concluya con una resolución** que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas.

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.30.30.34.35.35.34.37.35.32.34.11.38
130624 26:01-i-1

En dichos términos, el segundo párrafo del artículo 14 constitucional dispone que previamente a la privación de la libertad, propiedades, posesiones o derechos de cualquier persona **debe mediar juicio** seguido ante los tribunales previamente establecidos. Se ha destacado que la palabra "mediante" contenida en el citado artículo implica que previo al acto de privación debe haber concluido un juicio; y al mismo tiempo debe colegirse que al mencionar juicio se alude a una persona con autoridad que emita una resolución de manera imparcial.

Por su parte, el artículo 8 de la Convención Americana sobre Derechos Humanos dispone que toda persona tiene derecho a ser oída con las debidas garantías por un juez competente, independiente e imparcial. La idea de un juez no puede existir jurídicamente hablando si no se trata de una persona imparcial, puesto que, en un litigio, quien tiene encomendada la tarea de resolverlo nunca puede tener un interés por alguna de las partes. La idea anterior es la base sobre la que descansan otras figuras jurídicas como los impedimentos, las excusas y la recusación.

Ahora bien, tradicionalmente se ha interpretado el segundo párrafo del artículo 14 de la carta magna como el continente de lo que se denomina "garantía de audiencia" que consiste, esencialmente, **en el derecho de todo gobernado a ser escuchado de manera previa al dictado de un acto de privación respetando las formalidades esenciales del procedimiento**. Al efecto, la Suprema Corte de Justicia ha definido que las formalidades esenciales del procedimiento se componen de cuatro garantías esenciales, a saber: *(i)* la notificación del inicio del procedimiento, *(ii)* la facultad de ofrecer pruebas, *(iii)* la facultad de alegar; y, *(iv)* el dictado de una

resolución que dirima las cuestiones objeto de la controversia. Sirven de sustento de lo anterior las siguientes tesis de jurisprudencia:

> *"Época: Novena Época*
> *Registro: 200234*
> *Instancia: Pleno*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo II, Diciembre de 1995*
> *Materia(s): Constitucional, Común*
> *Tesis: P./J. 47/95*
> *Página: 133*
>
> **FORMALIDADES ESENCIALES DEL PROCEDIMIENTO. SON LAS QUE GARANTIZAN UNA ADECUADA Y OPORTUNA DEFENSA PREVIA AL ACTO PRIVATIVO.**
>
> *La garantía de audiencia establecida por el artículo 14 constitucional consiste en otorgar al gobernado la oportunidad de defensa previamente al acto privativo de la vida, libertad, propiedad, posesiones o derechos, y su debido respeto impone a las autoridades, entre otras obligaciones, la de que en el juicio que se siga "se cumplan las formalidades esenciales del procedimiento". Estas son las que resultan necesarias para garantizar la defensa adecuada antes del acto de privación y que, de manera genérica, se traducen en los siguientes requisitos: 1) La notificación del inicio del procedimiento y sus consecuencias; 2) La oportunidad de ofrecer y desahogar las pruebas en que se finque la defensa; 3) La oportunidad de alegar; y 4) El dictado de una resolución que dirima las cuestiones debatidas. De no respetarse estos requisitos, se dejaría de cumplir con el fin de la garantía de audiencia, que es evitar la indefensión del afectado.*

Ahora bien, las descritas formalidades esenciales del procedimiento presuponen la debida notificación del inicio o realización de cada una de las etapas de este, a efecto de estar en la posibilidad de ejercer dichos derechos en plazos determinados y con una oportunidad procesal suficiente para que los mismos puedan hacerse válidos y en tal medida resulten eficaces. Esto es, para que las referidas formalidades esenciales del procedimiento se materialicen es necesario que se dé al gobernado la posibilidad de hacerlas valer, mediante la oportuna notificación y los términos con los que cuenta al efecto en los términos de la legislación específica que esté siendo aplicable. Así, para poder hablar efectivamente de que a un gobernado se le han respetado las garantías esenciales del procedimiento se le debió haber notificado previamente que estaba en esa posibilidad y los momentos para hacerlas valer, quedando obligada la autoridad correspondiente además a tomar en consideración aquellas manifestaciones que al efecto señale alguna de las partes en el proceso o el propio quejoso, pues no puede ser omisa a los hechos o acontecimientos que necesariamente implican llamar o requerir la comparecencia de un tercero cuyos derechos pueden ser vulnerados por las actuaciones del juzgador. Con base en el conocimiento superficial que se tiene en este momento del acto reclamado, la garantía de audiencia de la Quejosa y de múltiples acreedores no ha sido respetada.

En efecto, uno de los componentes esenciales de la garantía de audiencia es la notificación del procedimiento, para que así el gobernado se encuentre en la posibilidad de ofrecer pruebas, alegar e interponer los recursos que estime oportunos, por lo que en el caso en concreto, se presume, con base en el conocimiento

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13.08/24.20.01/41

superficial y a reserva de ampliar los conceptos de violación una vez que se tenga acceso al expediente, que se violenta la garantía de audiencia de la quejosa, violando directamente la constitución.

Lo anterior, tomando en consideración que la única forma en la que el Quejoso, tuvo conocimiento de que existía un procedimiento en donde sus derechos como acreedor están en juego, fue hasta que realizó las manifestaciones en la Corte de Bancarrotas del Estado de Nueva York, que se tuvo conocimiento de la existencia del procedimiento, cuyo estado procesal exacto se desconoce, pero la extraña inmediates con la que se ha desarrollado, aparenta ser un acto orquestado por la propia comerciante y uno de sus accionistas que también es parte de la administración de la misma comerciante demandada, en perjuicio de sus acreedores, entre los que se encuentra mi representada y también en claro fraude a la ley, pues se estima pretenden evitar un procedimiento concursal en México y/o el proceso de insolvencia seguido en Nueva York, Estados Unidos de América.

Por otra parte, de la lectura de las medidas cautelares otorgadas por el Juez Responsable, cuya procedencia y legalidad desde luego se niega, se desprende la clara afectación a derechos patrimoniales y sustantivos de la quejosa, frente a las cuales no se ha dado la oportunidad de defenderse, aunado a que se le coloca en un estado de inseguridad jurídica.

Bajo esa línea de pensamiento, siendo que no tuvo formal conocimiento del juicio en el que se obtuvo sentencia para liquidar a Crédito Real, el quejoso no se encuentra en aptitud de hacer valer algún medio o recurso ordinario en el cual someta a revisión los acuerdos y posibles providencias dictados en su contra o en su caso cuestionar la validez de las actuaciones del juzgador de origen.

Siendo que se manifiesta desde este momento que el quejoso no ha sido notificado, emplazado o requerido en algún procedimiento iniciado por ÁNGEL FRANCISCO ROMANOS BERRONDO, tramitado ante el Juzgado Quincuagésimo Segundo Civil, **por lo que no es parte de juicio o proceso de ejecución alguno que haya dado lugar a las providencias precautorias decretadas , pero lo aún más grave es que presumiblemente se intenta defraudar los derechos de mi representada como acreedor de Crédito Real, sin respetar las formalidades esenciales del procedimiento y el propio procedimiento creado por el legislador para situaciones de insolvencia como lo es el concurso mercantil.**

En este tenor, su Señoría deberá otorgar al quejoso el amparo y protección de la Justicia de la Unión para los efectos de dejen insubsistentes todos los actos procesales dictados por el Juez Quincuagésimo Segundo Civil, en específico las providencias precautorias y resoluciones por las cuales se declara la supuesta disolución y liquidación y en su caso sea debidamente citado para estar en posibilidades de ejercer los derechos correspondientes, oponiéndose a la ilegal y fraudulenta disolución que se demanda por el Tercero Interesado.

**SEGUNDO.** Los actos reclamados violan lo dispuesto por el artículo 14, 16, 40, 41, 104, 115, 122 y 124 de la Constitución Política de los Estados Unidos

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.11.30.30.30.30.30.45.35.34.37.35.32.34.31.38
13.08.074 20.01.41

Mexicanos, en relación con los artículos 2, 50 de la Ley Orgánica del Tribunal Superior de Justicia de la Ciudad de México, en relación con el artículo 59, fracción II, de la Ley Orgánica del Poder Judicial de la Federación.

En los Estados Unidos Mexicanos, la Constitución Federal prevé en su artículo 40, el establecimiento de dos órdenes subordinados a ella; la Federación y los Estados. Entre ellos no existe subordinación, ya que cada uno es instancia decisoria dentro de su competencia. Las entidades federativas se dan libremente su propia Constitución, en la que establecen su estructura de gobierno, pero sin contravenir el pacto federal inscrito en la Carta Magna.

En México, existen dos órdenes coincidentes, el Federal y el Estatal. Cada uno de esos ordenes tiene un ámbito competencial, el cual se ha enunciado bajo el principio que todo lo que no corresponde a la federación se encuentra reservado a las entidades federativas, mismo que se encuentra previsto en el artículo 124 de la Constitución.

Por un lado, tenemos que el supremo poder de la Federación se divide para su ejercicio en Legislativo, Ejecutivo y Judicial. El Poder Judicial de la Federación se deposita en la Suprema Corte de Justicia, en un Tribunal Electoral, en Tribunales Coligados y Unitario de Circuito y en Juzgados de Distrito.

Por otro lado, tenemos que cada entidad federativa, así como la Ciudad de México, adoptaran para su régimen interior, la forma de gobierno republicano, representativo, democrático, laico y popular. Asimismo, el poder público de las entidades federativas se dividirá, para su ejercicio, en Ejecutivo, Legislativo y Judicial. En el caso de la Ciudad de México, tenemos que el poder judicial se deposita en el Tribunal Superior de Justicia, el Consejo de la Judicatura y los juzgados y tribunales que prevea la Constitución local.

De lo anterior podemos vislumbrar la existencia de dos poderes judiciales, a saber el Federal y el de las Entidades Federativas. Ahora bien, en el caso que nos ocupa, es necesario determinar cuál es la relación que existe entre un Tribunal Federal, en específico un Juzgado de Distrito, y un Juzgado local de la Ciudad de México, en un asunto de materia mercantil, específicamente en materia de insolvencia.

Primero es necesario determinar a quién compete conocer los asuntos de materia mercantil. El artículo 104 constitucional prevé una jurisdicción concurrente en las controversias del orden **mercantil cuando sólo se afecten intereses particulares**, esto es, en aquellos casos podrá conocer del juicio tanto los juzgados y tribunales federales como los locales del orden común, a elección del actor. Para efectos de brindar claridad se transcribe el artículo en comento:

*Artículo 104. Los Tribunales de la Federación conocerán:*
*I.     De los procedimientos relacionados con delitos del orden federal;*
*II.    De todas las controversias del orden civil o mercantil que se susciten sobre el cumplimiento y aplicación de leyes federales o de los tratados internacionales celebrados por el Estado Mexicano. A elección del actor y cuando sólo se afecten*

*intereses particulares, podrán conocer de ellas, los jueces y tribunales del orden común. Las sentencias de primera instancia podrán ser apelables ante el superior inmediato del juez que conozca del asunto en primer grado;*

De lo anterior podemos concluir que los Tribunales locales, como lo es el Tribunal de la Ciudad de México tiene competencia para conocer de una controversia de orden mercantil, única y exclusivamente cuando se afecten intereses particulares. Lo anterior ha sido ampliamente reconocido por la Suprema Corte de Justicia de la Unión, tal como se advierte del siguiente criterio jurisprudencial:

*Época: Novena Época*
*Registro: 164576*
*Instancia: Primera Sala*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo XXXI, Mayo de 2010*
*Materia(s): Civil*
*Tesis: 1a./J. 17/2010*
*Página: 536*

*JURISDICCIÓN CONCURRENTE. SI EN EL CONTRATO MERCANTIL LAS PARTES NO ESPECIFICAN EL FUERO DEL TRIBUNAL A CUYA COMPETENCIA SE SOMETEN, DEBE QUEDAR A SALVO SU DERECHO PARA ACUDIR A LA POTESTAD JURISDICCIONAL DEL TRIBUNAL FEDERAL O LOCAL DE SU ELECCIÓN.*

<u>*Del artículo 104, fracción I, de la Constitución Política de los Estados Unidos Mexicanos, deriva que las controversias del orden mercantil suscitadas sobre el cumplimiento y aplicación de leyes federales en las que sólo se afecten intereses particulares, la jurisdicción es concurrente*</u> *y, por tanto, pueden conocer del juicio tanto los juzgados y tribunales federales como los locales del orden común, a elección del actor. Por otra parte, de los artículos 1092 y 1093, del Código de Comercio, se advierte que en los asuntos de carácter mercantil será competente el juez a quien los litigantes se hubieren sometido expresa o tácitamente (cláusula de sumisión expresa) y que hay sumisión expresa cuando los interesados renuncian clara y terminantemente al fuero que la ley les concede. Ahora bien, cuando en un contrato mercantil se establece que las partes pactan someterse a la competencia de los tribunales de la ciudad en la que se celebró, pero omiten señalar el fuero de dichos tribunales, en tal caso se alude a una cuestión de competencia territorial que no delimita el carácter de la jurisdicción de los órganos jurisdiccionales, aun cuando en el lugar donde se celebró el acuerdo de voluntades sólo resida el juez del orden común, ya que si no se señaló el fuero del tribunal a cuya competencia se someten resultan igualmente competentes los del fuero federal que los del local, pues ambos tienen jurisdicción en ese territorio. Por tanto, si en un contrato mercantil sólo se dice que las partes se someten a la jurisdicción del juez de determinado lugar sin especificar su fuero, debe quedar a salvo el derecho del actor para acudir al tribunal federal o local de su elección.*

La competencia de los Juzgados de la Ciudad de México para conocer de controversia del orden mercantil también se encuentra reflejado en la legislación local, a saber, la Ley Orgánica del Tribunal Superior de Justicia de la Ciudad de México, pues dispone que los Juzgados de lo Civil conocerán de los juicios de jurisdicción concurrente; al efecto, se transcribe el artículo en comento:

*Artículo 50. Los Juzgados de lo Civil conocerán:*
*III. De los demás negocios de jurisdicción contenciosa, común y concurrente que versen sobre derechos personales cuya suerte principal sea igual o mayor a la cantidad que los artículos 691 del Código de Procedimientos Civiles para el Distrito Federal y 1340 del Código de*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.32.34.01.38
13.08.02.29.01.41

*Comercio establecen para que un juicio sea apelable, misma que se actualizará en términos de la fracción anterior; dicho valor se dará a conocer en el boletín judicial.*

Una vez sentado lo anterior, podemos afirmar que **los Juzgados de la Ciudad de México tiene la competencia para conocer de controversias mercantiles siempre y cuando sólo se afecten intereses particulares**. En el caso que nos ocupa, el Juez Responsable pretende declarar una disolución y ejecutar una liquidación de Crédito Real, lo que implica la afectación de una multitud de acreedores, sin que se tenga certeza alguna respecto las circunstancias de tiempo, lugar y modo respecta a dicha liquidación, esto es, se trata de en una especie de procedimiento *ad hoc*, sin que los acreedores tengan garantía de audiencia ni certeza jurídica alguna.

El Juez Responsable de manera por demás fraudulente e inconstitucional, pretende ejercer un procedimiento de liquidación de una comerciante, afectando no sólo a los múltiples acreedores, accionistas, sino a los trabajadores, autoridades tributarias y a la sociedad en general, mediante un procedimiento en el cual no existen garantía alguna, lo que revela que realmente estamos ante un procedimiento que no sólo se afectan intereses particulares, sino que hay evidentemente consideraciones de orden público.

El Juez Responsable al tratar de arrojarse un procedimiento de liquidación de dicha magnitud, relevancia e impacto en el sistema financiero mexicano, lo que realmente pretende, es atribuirse una facultad que corresponde exclusivamente a los Tribunales Federales, ya que son dichos órganos jurisdiccionales los competentes para conocer del procedimiento previsto en la Ley de Concursos Mercantiles, pues así lo dispone el artículo 59 fracción II de la Ley Orgánica de Poder Judicial de la Federación.

> *Artículo 59. Las y los jueces de distrito mercantiles federales conocerán:*
>
> *[...]*
>
> *II. De todas las controversias en materia concursal*

El órgano jurisdiccional constitucionalmente competente para dirimir cualquier procedimiento de liquidación, tal como fue planteada en la autoridad responsable, respecto de Crédito Real son los Tribunales Federales, tal y como se confirma del artículo transcrito, del artículo 17 de la Ley de Concursos Mercantiles, e incluso el 4 de marzo del 2022 se publicó en el Diario Oficial de la Federación el Acuerdo General 4/2022 del Pleno del Consejo de la Judicatura Federal relativo a la creación, denominación e inicio de funciones de los Juzgados Primero y Segundo de Distrito en Materia de Concursos Mercantiles, mismos que están ubicados en la Ciudad de México y tendrán jurisdicción en todo México.

Ahora bien, la *litis* radica en determinar si un Juzgado Local, puede tramitar y dilucidar un procedimiento de liquidación en el cual hay un universo de acreedores, accionistas, trabajadores, autoridades y la sociedad en general que se pudieran ver afectadas por las resoluciones ahí dictadas, máxime que ni siquiera existe garantía de audiencia ni mecanismos de protección a los acreedores y se trata

de una sociedad listada en la Bolsa de Mercado de Valores. **La respuesta es no, pues se trata de un procedimiento de orden público, que supera los intereses particulares.**

**Y en términos de la Ley, son los Juzgados Federales los únicos competentes para garantizar la adecuada protección de los acreedores en dicho procedimiento.**

Lo anterior se desprende claramente del texto de la Ley de Concursos Mercantiles, pues en su artículo 1 que el concurso mercantil es un procedimiento de orden público; dicho artículo es del tenor literal siguiente:

> *Artículo 1o.- La presente Ley es de interés público y tiene por objeto regular el concurso mercantil. Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios. Con el fin de garantizar una adecuada protección a los acreedores frente al detrimento del patrimonio de las empresas en concurso, el juez y los demás sujetos del proceso regulado en esta Ley deberán regir sus actuaciones, en todo momento, bajo los principios de trascendencia, economía procesal, celeridad, publicidad y buena fe.*

Lo anterior incluso se refuerza si acudimos a la exposición de motivos de la Ley de Concursos Mercantiles, en la cual se resaltó la importancia de dicho procedimiento, y el interés del Estado en dichos procedimientos:

> *La legislación concursal también desempeña un papel estratégico. Su propósito es el de ordenar los procesos de reestructuración de empresas, buscando en primer término aprovechar la experiencia y conocimientos del empresario falimentario y, por otra parte, procurar que los acreedores, ya sea comerciales o financieros, también puedan continuar operando. Cuando una instancia no puede concluir exitosamente, el Estado puede desempeñar una función central coordinando los esfuerzos, proveyendo un foro donde la información fluya y que las empresas viables puedan aprovechar para reestructurarse, seguir operando y mantener el empleo. Por otra parte cuando es el caso que las empresas han dejado de ser viables, el Estado desempeña un papel fundamental en la reasignación de factores productivos, de modo que los trabajadores puedan encontrar nuevas fuentes de empleo productivo y bien remunerado en tanto que los bienes sean aprovechados por otras empresas más productivas. En este proceso, los acreedores y los comerciantes obtienen el mayor valor de la empresa o de los bienes que la integran y con oportunidad pueden retomar otros negocios y actividades que contribuyan al bienestar general de la sociedad[...]*

> *Tal y como se establecía desde la exposición de motivos de la Ley de Quiebras y de Suspensión de Pagos, la Comisión reconoció que el concurso mercantil es un fenómeno económico que no sólo interesa a los particulares que en él intervienen sino que se trata de una manifestación económico jurídica en la que el Estado tiene un interés preponderante y fundamental por lo que en consecuencia propuso, en congruencia con lo que establece la fracción I del artículo 104 constitucional que fuera competencia de los tribunales federales conocer del concurso mercantil de los comerciantes*

Aunado a lo anterior, el orden público que envuelve un procedimiento de liquidación ha sido ampliamente reconocido por nuestros tribunales federales, lo que revela que el Juez Responsable carece de competencia constitucional para tramitar el procedimiento reclamado; dichos criterios jurisprudenciales son los siguientes:

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.38.31.30.30.30.30.30.35.30.34.57.33.32.34.31.38
13.08.24  20:01:41

*Registro digital: 179439*
*Instancia: Primera Sala*
*Novena Época*
*Materias(s): Civil*
*Tesis: 1a./J. 69/2004*
*Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXI, Enero de 2005,*
*página 379*
*Tipo: Jurisprudencia*

*SUSPENSIÓN. ES IMPROCEDENTE CONTRA LA DESIGNACIÓN Y LA ACTUACIÓN DE UN VISITADOR DEL INSTITUTO FEDERAL DE ESPECIALISTAS DE CONCURSOS MERCANTILES, PORQUE DE CONCEDERSE SE PARALIZARÍA EL PROCEDIMIENTO RELATIVO Y, POR ENDE, SE AFECTARÍA EL INTERÉS SOCIAL Y SE CONTRAVENDRÍAN DISPOSICIONES DE ORDEN PÚBLICO.*

*Esta Suprema Corte de Justicia de la Nación ha sustentado el criterio de que el procedimiento judicial es de orden público e interés social, ya que la sociedad está interesada en su prosecución y conclusión. En ese sentido, es improcedente la suspensión en el juicio de amparo contra la designación y actuación de un visitador del Instituto Federal de Especialistas de Concursos Mercantiles para que dictamine si un comerciante incurrió en los supuestos previstos en el artículo 10 de la ley de la materia, pues de concederse tal medida se paralizaría el procedimiento de concurso mercantil, ya que el Juez competente no podría continuar con las siguientes etapas que señala la ley, infringiéndose con ello el artículo 124, fracción II, de la Ley de Amparo, puesto que se seguiría perjuicio al interés social y se contravendrían disposiciones de orden público. No pasa inadvertido para esta Primera Sala el hecho de que de no concederse la suspensión de los actos reclamados en la hipótesis apuntada, algunas de sus consecuencias, a saber, la secrecía de la contabilidad del comerciante demandado, podrían consumarse irreparablemente, dejando sin materia el juicio de amparo, ya que el citado visitador necesariamente tendría que practicar la visita ordenada por los artículos 29 a 41 de la Ley de Concursos Mercantiles y rendir su informe al Juez de Distrito, divulgándose la situación financiera y contable del comerciante, toda vez que ante el conflicto de tales principios debe prevalecer el interés colectivo sobre el particular, pues de lo contrario se haría nugatorio el interés público de la Ley de Concursos Mercantiles consistente en conservar las empresas y evitar el incumplimiento generalizado de las obligaciones de pago, lo que pondría en riesgo la viabilidad de los negocios sujetos a concurso mercantil y de los demás con los que mantenga una relación comercial, máxime que el artículo 18 de la propia ley expresamente establece que ni las excepciones de naturaleza procesal, ni la interposición y trámite de recurso alguno suspenderán el procedimiento de declaración de concurso mercantil.*

*Registro digital: 2023200*
*Instancia: Tribunales Colegiados de Circuito*
*Undécima Época*
*Materias(s): Constitucional, Civil*
*Tesis: I.8o.C.91 C (10a.)*
*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 2, Junio de 2021, Tomo V, página 5054*
*Tipo: Aislada*

*CONCURSO MERCANTIL. LA ORDEN A UN JUEZ PENAL LOCAL PARA QUE SE ABSTENGA DE RETENER, CON MOTIVO DE UNA INVESTIGACIÓN, LAS SUMAS DE DINERO NECESARIAS PARA QUE NO SE AFECTE LA VIABILIDAD DE LA COMERCIANTE, NO IMPLICA UNA INVASIÓN DE ESFERAS COMPETENCIALES RESERVADAS A LOS ESTADOS.*

*El procedimiento de concurso mercantil es una cuestión de orden público, cuya finalidad esencial es la conservación de la empresa a efecto de responder a los acreedores reconocidos siendo el Juez el rector del procedimiento; y es de interés*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.51.30.30.30.90.93.30.34.37.35.32.34.31.38
13.082.2. 20:01:41

*público por las implicaciones económicas y financieras que no sólo afectan a la concursada, sino que trascienden a todas aquellas empresas o personas físicas con quienes mantiene una relación comercial. En ese sentido, en el procedimiento concursal concurren los intereses particulares no sólo del comerciante, que enfrenta problemas de incumplimiento generalizado de sus obligaciones, sino también de las personas físicas y jurídicas acreedoras, los sociales de los trabajadores, así como el interés público para que no se llegue al cierre de una empresa, con todas las consecuencias nocivas que genera, por lo que se procura que todos estos intereses converjan en la finalidad de que se conserve la viabilidad de la empresa, tal como lo prevé el artículo 1o. de la Ley de Concursos Mercantiles, dando la facultad al Juez para dictar las medidas precautorias que permitan la viabilidad del comerciante. Así, el efecto más relevante de la declaración de concurso mercantil es la orden del Juez para que la empresa suspenda el pago de los adeudos contraídos con anterioridad a la fecha en que surta efectos la sentencia de concurso respectiva, salvo los que sean indispensables para su operación ordinaria. Para ello, puede dictar medidas como ordenar a la autoridad penal que se abstenga de retener con motivo de una investigación cantidades de dinero que impidan el funcionamiento ordinario de la concursada (entiéndase como prioridad el cumplimiento de sus obligaciones laborales y fiscales). De ahí que si el procedimiento concursal es universal y la Ley de Concursos Mercantiles faculta al Juez para ordenar la suspensión de cualquier procedimiento en contra del comerciante, es claro que al ordenar a un Juez penal local que se abstenga de retener, con motivo de una investigación, las sumas de dinero necesarias para que no se afecte la viabilidad de la comerciante, esto no implica una invasión de esferas competenciales, porque como rector del concurso mercantil al emitir esa orden no ejerce facultades constitucionalmente reservadas a los Estados, con las cuales penetre el ámbito de atribuciones que la Constitución General establece o reserva en favor de éstos, ya que no se obliga al Juez penal a tomar cierta determinación respecto de la procedencia o no de la acción penal ejercitada, sino que lo que se busca con aquélla es la conservación de la empresa concursada. Esto es, los delitos en situación de concurso mercantil cometidos por el comerciante, pueden seguirse sin esperar a la conclusión del concurso o la continuación de éste, y las decisiones que tome el Juez del concurso no vinculan a la jurisdicción penal para decidir respecto a la procedencia o no de la acción penal de que se trate, sino que observando la autonomía de ambos procesos, se respeten las normas de cada uno, en específico, respecto del interés social de la Ley de Concursos Mercantiles, así como la importancia de la conservación de la empresa concursada.*

*Registro digital: 2009906*
*Instancia: Tribunales Colegiados de Circuito*
*Décima Época*
*Materias(s): Común, Civil*
*Tesis: III.1o.C.25 C (10a.)*
*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 22, Septiembre de 2015, Tomo III*
*, página 2209*
*Tipo: Aislada*

**SENTENCIA DE CONCURSO MERCANTIL. NO PROCEDE OTORGAR LA SUSPENSIÓN, RESPECTO DE SU PUBLICACIÓN, YA QUE SE AFECTARÍA AL INTERÉS SOCIAL QUE PREVALECE FRENTE AL DEL COMERCIANTE CONCURSADO.**

*El artículo 128 de la Ley de Amparo,(1) establece los requisitos que habrán de cumplirse para el otorgamiento de la suspensión del acto reclamado, entre los que se encuentran que no se perjudique al interés social, ni se contravengan disposiciones de orden público. En ese contexto, no puede otorgarse esta medida respecto de la publicación de la sentencia de concurso mercantil, ya que la ponderación entre el interés social de dar a conocer su existencia a todas las personas que pudiesen estar interesadas en acudir a ese proceso especial y universal para hacer valer sus derechos, indica que, frente al interés del comerciante concursado de no ver afectado su patrimonio por la erogación de los gastos de publicación, debe prevalecer aquél, porque el otorgamiento de la suspensión tendría como efecto la paralización del*

JACOBO GUZMÁN LUPE MARTÍNEZ FLORES
29.30.31.51.1.34.1.40.39.36.30.35.36.35.38.14.37.33.32.34.31.38
13.08.24 26.01.41

*concurso mercantil, que es de interés público, en términos de los artículos 1o. y 2o. de la Ley de Concursos Mercantiles.(2)*

Además, resulta evidente que la razón por la que se reguló el concurso mercantil es para garantizar no solo el derecho de audiencia de los acreedores, sino un mecanismo de pago ordenado, con reglas determinadas, procedimiento que está regulado únicamente en la Ley de Concursos Mercantiles, cuya competencia es exclusiva de los Juzgados de Distrito en Materia Concursal.

El Juzgado Responsable no tiene competencia constitucional para dar trámite y continuar ejecutando los actos reclamados, esto es, no es competente para conocer de una controversia en materia mercantil en la que se afecten intereses de orden público y no solo de particulares (socios o accionistas, como se pretende hacer creer) pues existen acreedores, entre ellos mi representada que tenemos derecho al pago de nuestros créditos con lo que se liquide de la masa concursal, por lo que, al existir una legislación especial y órganos jurisdiccionales especializados, existe una violación de competencias al sistema federal.

En efecto, el Juez Responsable olvida que es un sistema federal, en el cual los órganos de poderes de los diversos órdenes de gobierno tienen facultades reservadas y expresas, siendo precisamente que el Constituyente reservó la competencia a los Tribunales Federales para dirimir cualquier controversia en materia mercantil cuando se afecte el orden público, y más aún, tratándose de procedimientos de insolvencia, cuando existen un universo de acreedores y jugadores, tal y como lo prevé la Ley de Concursos Mercantiles.

Se trata de una violación directa al texto constitucional, pues viola flagrantemente el pacto federal, lo que a su vez redunda en una lesión al derecho fundamental de seguridad jurídica y debido proceso de mi representada, pues implica que un Juez Local puede inobservar la Constitución y la Ley de Concursos Mercantiles, lo que implica que mi representada no tenga certeza jurídica de su situación jurídica. La realidad es que se trata de un evidente atropello al estado de derecho, pues se pretende pasar por alto la forma de gobierno del Estado Mexicano en aras de un supuesto interés a Crédito Real.

Es decir, a juicio del Juez Responsable parece más importante iniciar un procedimiento *ad hoc* de liquidación, sin garantías judicial alguna, sin respeto a las formalidades esenciales del procedimiento, en evidente interés de Crédito Real, a efecto de instaurar un mecanismo de defraudación de acreedores, que mantener la forma de gobierno del Estado Mexicano, lo que revela lo absurdo de todo el procedimiento reclamado, pues el sistema federal es el que da operatividad a toda la forma de gobierno y al sistema jurídico, no por algo se ha dicho que se trata de una decisión política jurídica fundamental. Cobra aplicación, por analogía, el siguiente criterio jurisprudencial:

*Registro: 180648*
*Instancia: Pleno*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Semanario Judicial de la Federación y su Gaceta*

*Tomo XX, Septiembre de 2004*
*Materia(s): Constitucional*
*Tesis: P./J. 80/2004*
*Página: 1122*

*DIVISIÓN DE PODERES. PARA EVITAR LA VULNERACIÓN A ESTE PRINCIPIO EXISTEN PROHIBICIONES IMPLÍCITAS REFERIDAS A LA NO INTROMISIÓN, A LA NO DEPENDENCIA Y A LA NO SUBORDINACIÓN ENTRE LOS PODERES PÚBLICOS DE LAS ENTIDADES FEDERATIVAS.*

*El artículo 116 de la Constitución Política de los Estados Unidos Mexicanos prescribe implícitamente tres mandatos prohibitivos dirigidos a los poderes públicos de las entidades federativas, para que respeten el principio de división de poderes, a saber: a) a la no intromisión, b) a la no dependencia y c) a la no subordinación de cualquiera de los poderes con respecto a los otros. La intromisión es el grado más leve de violación al principio de división de poderes, pues se actualiza cuando uno de los poderes se inmiscuye o interfiere en una cuestión propia de otro, sin que de ello resulte una afectación determinante en la toma de decisiones o que genere sumisión. La dependencia conforma el siguiente nivel de violación al citado principio, y representa un grado mayor de vulneración, puesto que implica que un poder impida a otro, de forma antijurídica, que tome decisiones o actúe de manera autónoma. La subordinación se traduce en el más grave nivel de violación al principio de división de poderes, ya que no sólo implica que un poder no pueda tomar autónomamente sus decisiones, sino que además debe someterse a la voluntad del poder subordinante; la diferencia con la dependencia es que mientras en ésta el poder dependiente puede optar por evitar la imposición por parte de otro poder, en la subordinación el poder subordinante no permite al subordinado un curso de acción distinto al que le prescribe. En ese sentido, estos conceptos son grados de la misma violación, por lo que la más grave lleva implícita la anterior.*

En efecto, el Juez Responsable invadió la esfera competencial del poder judicial de la Federación, al tramitar un procedimiento de disolución y liquidación, pues se arrojó competencia que le corresponde a los tribunales federales violando el pacto federal, lo que, a su vez, implicó una transgresión al derecho fundamental de seguridad jurídica y tutela judicial efectiva de mi representada.

Es increíble que el Juez Responsable haya pasado por alto el respeto y la no intromisión a la competencia de las autoridades federativas, pues qué seguridad jurídica puede existir en un Estado en el cual las autoridades judiciales locales pretenden tramitar procedimientos con secrecía, expeditos y sin respeto alguno, cuando existe una legislación especial y tribunales especializados para la tramitación de dichos procedimientos. La patente inseguridad jurídica que genera el acto reclamado se ejemplifica de la siguiente manera, mi quejosa no tiene conocimiento alguno, ni circunstancia alguna de las reglas que se seguirán en dicho procedimiento "especial" y *ad hoc*, lo que evidentemente revela la violación al orden constitucional y al estado de derecho.

En esas condiciones se solicita que derivado de las consideraciones vertidas en el cuerpo del presente escrito se otorgue el amparo y protección de la justicia de la Unión a mi representada.

**TERCERO.-** Los actos que se reclaman de las Autoridades Responsables violan lo establecido por los artículos 1, 14, 16, 17 y 133 de la Constitución Política de los Estados Unidos Mexicanos y 1, 21, 25, 29 de la Convención Americana de Derechos Humanos, actualizándose violaciones a la seguridad jurídica como

derecho humano, a los derechos humanos relativos al patrimonio de otras personas, al derecho humano a la propiedad privada.

El artículo 14 de la Constitución Política de los Estados Unidos Mexicanos, establece, en su párrafo segundo, que nadie podrá ser privado de la libertad o de sus bienes, posesiones y derechos sino mediante juicio seguido ante los Tribunales previamente establecidos en el que se observen las formas más esenciales del procedimiento conforme a las leyes expedidas con anterioridad al hecho.

El artículo 16 de la Constitución Política de los Estados Unidos Mexicanos, por su parte establece que nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de autoridad competente, que funde y motive la causa legal del procedimiento.

Es de sabido y explorado derecho que el artículo 14 de la Constitución Política de los Estados Unidos Mexicanos prohíbe los actos privativos, mientras que el artículo 16 del mismo ordenamiento legal, prohíbe los actos de molestia.

Los actos privativos son aquellos que producen como efecto la disminución, menoscabo o supresión definitiva de un derecho del gobernado, y que están permitidos solamente a través del cumplimiento de determinados requisitos precisados en el artículo 14 de la Constitución Política de los Estados Unidos Mexicanos, como son, la existencia de un juicio seguido ante un tribunal previamente establecido que cumpla con las formalidades esenciales del procedimiento y en el que se apliquen las leyes expedidas con anterioridad al hecho juzgado.

En cambio, a los actos de molestia que, pese a constituir afectación a la esfera jurídica del gobernado, no producen los mismos efectos que los actos privativos pues sólo restringen de manera provisional o preventiva un derecho con el objeto de proteger determinados bienes jurídicos, la Constitución Política de los Estados Unidos Mexicanos los autoriza según lo dispuesto por su artículo 16, **siempre y cuando proceda mandamiento escrito girado por una autoridad con competencia legal para ello**, en donde ésta funde y motive, en leyes vigentes y aplicables, la causa legal del procedimiento.

Al respecto, tiene aplicación la siguiente jurisprudencia dictada por el Pleno de la Suprema Corte de Justicia de la Nación:

> "*Instancia: Pleno.*
> *Fuente: Semanario Judicial de la Federación y su Gaceta,*
> *Novena Época.*
> *Tomo IV, Julio de 1996.*
> *Pág. 5.*
> *Tesis de Jurisprudencia.*
>
> *ACTOS PRIVATIVOS Y ACTOS DE MOLESTIA. ORIGEN Y EFECTOS DE LA DISTINCION.*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.33.30.34.27.35.52.34.31.38
13.80.74.29.60.41

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.03.03.30.36.30.30.36.35.35.32.34.31.38
13/08/24 20:01:41

*El artículo 14 constitucional establece, en su segundo párrafo, que nadie podrá ser privado de la vida, de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las leyes expedidas con anterioridad al hecho; en tanto, el artículo 16 de ese mismo Ordenamiento Supremo determina, en su primer párrafo, que nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de la autoridad competente, que funde y motive la causa legal del procedimiento. Por consiguiente, la Constitución Federal distingue y regula de manera diferente los actos privativos respecto de los actos de molestia, pues a los primeros, que son aquellos que producen como efecto la disminución, menoscabo o supresión definitiva de un derecho del gobernado, los autoriza solamente a través del cumplimiento de determinados requisitos precisados en el artículo 14, como son, la existencia de un juicio seguido ante un tribunal previamente establecido, que cumpla con las formalidades esenciales del procedimiento y en el que se apliquen las leyes expedidas con anterioridad al hecho juzgado. En cambio, a los actos de molestia que, pese a constituir afectación a la esfera jurídica del gobernado, no producen los mismos efectos que los actos privativos, pues sólo restringen de manera provisional o preventiva un derecho con el objeto de proteger determinados bienes jurídicos, los autoriza, según lo dispuesto por el artículo 16, siempre y cuando preceda mandamiento escrito girado por una autoridad con competencia legal para ello, en donde ésta funde y motive la causa legal del procedimiento. Ahora bien, para dilucidar la constitucionalidad o inconstitucionalidad de un acto de autoridad impugnado como privativo, es necesario precisar si verdaderamente lo es y, por ende, requiere del cumplimiento de las formalidades establecidas por el primero de aquellos numerales, o si es un acto de molestia y por ello es suficiente el cumplimiento de los requisitos que el segundo de ellos exige. Para efectuar esa distinción debe advertirse la finalidad que con el acto se persigue, esto es, si la privación de un bien material o inmaterial es la finalidad connatural perseguida por el acto de autoridad, o bien, si por su propia índole tiende sólo a una restricción provisional.*

Así las cosas, la Constitución Política de los Estados Unidos Mexicanos establece en sus artículos 14, 16 y 27, principalmente éste último, el derecho fundamental de la propiedad privada, el cual también está reconocido en el artículo 21 de la Convención Americana Sobre Derechos Humanos. Dichos preceptos señalan que toda persona tiene derecho al uso y goce de sus bienes y que ninguna persona puede ser privada de ellos excepto mediante el pago de indemnización justa, por razones de utilidad pública o de interés social y en los casos y según las formas establecidas por la ley.

La Suprema Corte de Justicia de la Nación ha establecido que el derecho de propiedad debe ser entendido como el derecho que tienen las persona a ser propietarias y a disponer de los propios derechos de propiedad, que es un aspecto de la capacidad jurídica y de la capacidad de obrar reconducible sin más a la clase de los derechos civiles, y el concreto derecho de propiedad sobre este o aquel bien.

De manera que en el derecho de propiedad concurren para su titular, en forma total, las facultades jurídicas de uso, goce o disfrute y disposición de la cosa, es decir, la posibilidad normativa de ejecución de actos de dominio y de administración sobre ella, cuyo ejercicio, se reitera, siempre entraña un aprovechamiento jurídico para el propietario y, eventual, aunque no

necesariamente, le puede reportar un provecho económico. Se reconocen en la propiedad los caracteres de ser un derecho absoluto, exclusivo y perpetuo en sí mismo, en el que rige el principio básico de absoluta libertad, y que sólo por excepción, puede ser afectado mediante su restricción, limitación o extinción, por disposición de la ley o por la voluntad del propietario en ejercicio de las facultades normativas que le confiere su derecho.

Es decir, por regla general, la propiedad sobre una cosa mueble o inmueble es un derecho real absoluto, donde impera la libre voluntad del propietario para ejercer las facultades de uso, goce, disfrute y disposición sobre su bien, que le permiten transmitir su derecho o afectarlo mediante el desmembramiento o la restricción de alguna de sus facultades en favor de tercero, ya sea por acto entre vivos, por virtud de su muerte, o por causas reconocidas en la ley; **siendo excepcional que el propietario pueda ser privado de su derecho.**

La propiedad también se considera un derecho real absoluto, porque normativamente otorga a su titular, la facultad de exigir *erga omnes* -frente a todas las personas- (sujeto pasivo universal e indeterminado), la no perturbación de su ejercicio; con la nota de que, ese sujeto pasivo indeterminado, ha de identificarse necesariamente como la comunidad jurídica que de manera permanente o transitoria se coloca en proximidad material con la cosa, pues sólo de ese modo podría actualizarse el riesgo de que uno o más terceros pueden perturbar el ejercicio de las facultades del propietario.

El derecho de propiedad, como todo derecho real, confiere a su titular, acción para perseguir la cosa de cualquiera que perturbe el ejercicio de las facultades inherentes a ese derecho (uso, goce, disfrute y/o disposición), y un derecho de preferencia respecto de ella frente a terceros. Presumiblemente con los actos reclamados dicho derecho se ve transgredido, al ser mi representada acreedora de Crédito Real.

El derecho humano a la propiedad, en relación con la privación de ese derecho, en tanto que aquí necesariamente entran en disputa derechos de otros particulares, la protección estatal tendrá que darse también a través de las garantías de legalidad, seguridad jurídica, y debido proceso, establecidas en los artículos 14 y 16 constitucional, en la solución de conflictos entre partes, a efecto de que la persona no sea privada de sus propiedades, sino es mediante un juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las leyes expedidas con anterioridad al hecho.

Ahora bien, para limitar cualquier derecho humano se tienen que seguir ciertas directrices, ya que la afectación o limitación no puede ser absoluta, ni arbitraria y siempre tiene que seguir los principios de proporcionalidad e idoneidad. Sirve de sustento la siguiente tesis de nuestros más altos tribunales:

*Época: Décima Época*
*Registro: 160267*

*Instancia: Primera Sala*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Libro V, Febrero de 2012, Tomo 1*
*Materia(s): Constitucional*
*Tesis: 1a./J. 2/2012 (9a.)*
*Página: 533*

**RESTRICCIONES A LOS DERECHOS FUNDAMENTALES. ELEMENTOS QUE EL JUEZ CONSTITUCIONAL DEBE TOMAR EN CUENTA PARA CONSIDERARLAS VÁLIDAS.**

*Ningún derecho fundamental es absoluto y en esa medida todos admiten restricciones. Sin embargo, la regulación de dichas restricciones no puede ser arbitraria. Para que las medidas emitidas por el legislador ordinario con el propósito de restringir los derechos fundamentales sean válidas, deben satisfacer al menos los siguientes requisitos: a) ser admisibles dentro del ámbito constitucional, esto es, el legislador ordinario sólo puede restringir o suspender el ejercicio de las garantías individuales con objetivos que puedan enmarcarse dentro de las previsiones de la Carta Magna; b) ser necesarias para asegurar la obtención de los fines que fundamentan la restricción constitucional, es decir, no basta que la restricción sea en términos amplios útil para la obtención de esos objetivos, sino que debe ser la idónea para su realización, lo que significa que el fin buscado por el legislador no se pueda alcanzar razonablemente por otros medios menos restrictivos de derechos fundamentales; y, c) ser proporcional, esto es, la medida legislativa debe respetar una correspondencia entre la importancia del fin buscado por la ley, y los efectos perjudiciales que produce en otros derechos e intereses constitucionales, en el entendido de que la persecución de un objetivo constitucional no puede hacerse a costa de una afectación innecesaria o desmedida a otros bienes y derechos constitucionalmente protegidos. Así, el juzgador debe determinar en cada caso si la restricción legislativa a un derecho fundamental es, en primer lugar, admisible dadas las previsiones constitucionales, en segundo lugar, si es el medio necesario para proteger esos fines o intereses constitucionalmente amparados, al no existir opciones menos restrictivas que permitan alcanzarlos; y en tercer lugar, si la distinción legislativa se encuentra dentro de las opciones de tratamiento que pueden considerarse proporcionales. De igual manera, las restricciones deberán estar en consonancia con la ley, incluidas las normas internacionales de derechos humanos, y ser compatibles con la naturaleza de los derechos amparados por la Constitución, en aras de la consecución de los objetivos legítimos perseguidos, y ser estrictamente necesarias para promover el bienestar general en una sociedad democrática.*

Ahora bien, atendiendo al caso en concreto, estamos ante un acto de autoridad mediante el cual se dictaron diversas medidas cautelares desproporcionales y se está pretendiendo disolver y liquidar una sociedad privando a los acreedores de su derecho de cobro sin permitirles comparecer a juicio, sin que existan formalidades, o una sentencia dictada por un tribunal competente, afectando el derecho de propiedad de mi representada y de un sin número de acreedores lo cual implica una limitación al derecho humano de propiedad. En ese tenor, en el supuesto de que se ordene y ejecute una limitación al derecho a la propiedad, es indispensable que esa limitación cumpla con los requisitos mínimos para que sea constitucionalmente válida, lo cual no sucedió. En ese sentido resulta evidente que

los derechos humanos consagrados en el artículo 1, 14, 16 y 27 Constitucional, así como en el 21 de la Convención Americana sobre Derechos Humanos ha sido violado por la autoridad responsable.

El artículo 1° Constitucional en su segundo párrafo establece lo siguiente:

> "*Todas las autoridades*, *en el ámbito de sus competencias, **tienen la obligación de promover, respetar, proteger y garantizar los derechos humanos de conformidad con los principios de universalidad, interdependencia, indivisibilidad y progresividad**. En consecuencia, el Estado deberá prevenir, investigar, sancionar y reparar las violaciones a los derechos humanos, en los términos que establezca la ley."*

De lo anterior se colige que todas y cada una de las autoridades federales, estatales y municipales se encuentran indefectiblemente obligadas y constreñidas a respetar los derechos humanos de los gobernados -*reconocidos a nivel constitucional y/o convencional*-, y por tanto **deben abstenerse de realizar cualquier acto que vulnere tales derechos humanos**, obligación que las hoy señaladas autoridades responsables, en específico el Juez Quincuagésimo Segundo Civil han incumplido en el caso que nos ocupa, ello al dictar, ordenar y ejecutar los actos afectan la esfera jurídica del quejoso, sin que fuera notificado en el procedimiento de origen, sin que se respetaran los derechos mínimos de mi representada y sin ser la autoridad responsable competente para tramitar dicho procedimiento y todas las demás violaciones que han quedado expuestas, lo cual, a todas luces se traduce en una franca violación a los derechos humanos consagrados en diversas disposiciones Constitucionales.

Es por lo anterior que el presente concepto de violación resulta a todas luces fundado, por lo que su Señoría deberá conceder el Amparo y Protección de la Justicia Federal al quejoso.

**CUARTO.** El acto reclamado consistente en las medidas otorgadas el 30 de junio del 2022, transgreden lo dispuesto por los artículos 14, 16 y 17 Constitucionales, en concordancia con lo dispuesto por los artículos 1077, 1168, 1170, 1176, 1777 y demás aplicables del Código de Comercio, 383 y 384 del Código Federal de Procedimientos Civiles, artículos 37 y 38 de la Ley de Concursos Mercantiles, artículos 229 a 233 de la Ley General de Sociedades Mercantiles, así como lo que prevén los artículos 8 y 10 de la Declaración Universal de los Derechos Humanos, 2 y 14 del Pacto Internacional de Derechos Civiles y Políticos, 8 y 25 de la Convención Americana de los Derechos Humanos en relación con la jurisprudencia de rubro "*TUTELA JURISDICCIONAL EFECTIVA Y DEBIDO PROCESO. CUALIDADES DE LOS JUECES CONFORME A ESOS DERECHOS FUNDAMENTALES*" que dejó de aplicar la responsable; en conjunto con los derechos de debido proceso y seguridad jurídica que asisten a mi representada, en virtud de que el otorgamiento de las medidas cautelares prejuzgó sobre el fondo del asunto y tiene efectos constitutivos, contrarios a las características esenciales de cualquier medida cautelar, aunado a que se dictó sin respetar mi garantía de audiencia.

ACCIÓN GUADALUPE MARTÍNEZ FLORES
30,30.30,30.31,30,30.30,30,30.35,30,34.37,35,32,34,31,38
13,08/29.20-01.41

El derecho fundamental a la tutela judicial efectiva impacta en las medidas cautelares, las cuales constituyen un elemento esencial para garantizar el derecho a la justicia; lo anterior toda vez que, a través del otorgamiento de las mismas, se logra que se lleve a cabo el procedimiento asegurando la conservación de la materia de la litis, en beneficio del afectado con el acto que se impugne y en preservación de sus derechos tales como acceso a la justicia, garantía de audiencia, entre otros, en ese tenor como cualquier derecho fundamental, no es absoluto y se encuentra matizado según el caso concreto.

Conforme lo anterior, las medidas cautelares son instrumentos que ayudan al perfeccionamiento del acceso a la justicia y la tutela judicial efectiva y se caracterizan por ser instrumentales y principalmente por que sirven para mantener una situación de hecho actual, buscando asegurar así el resultado del fallo que en su momento llegue a dictarse.

La instrumentalidad de las medidas cautelares implica que no son un fin en sí mismas, sino una herramienta con la que los justiciables cuentan a efecto de proteger o mantener situaciones de hecho que acontecen, pero que implican precisamente, no resolver sobre el fondo del asunto al momento de otorgarlas ni constituir derechos novedosos.

De esa forma, la aplicación de las medidas cautelares no es automática, esto es, no basta que alguien las solicite para que la autoridad judicial necesariamente deba otorgarlas. Por regla general, para poder concederlas se requiere de la concurrencia de determinados presupuestos, entre los que se encuentran:

*a)* Un presumible derecho. Quien la solicita debe acreditar, aun presuntivamente, que tiene facultad de exigir de la otra parte algún derecho que se pretende asegurar con la medida cautelar; -cuestión que en el caso concreto no se acreditó-.

*b)* Peligro actual o inminente. Dados los hechos en que se sustenta la petición, se advierta que en caso de no obsequiarse la medida cautelar se causará un daño irreparable o de difícil reparación, que torne nugatorios los derechos subjetivos del promovente; -cuestión que en el caso concreto no se acreditó-.

*c)* Urgencia de la medida. Es necesario que el derecho sustancial deducido o a deducir por el solicitante no pueda ser protegido inmediatamente de otra manera, pues de ser así no se justificaría tomar una medida de excepción; y, -cuestión que en el caso concreto no se acreditó-.

*d)* Solicitud formal. La petición se debe hacer de acuerdo con las formalidades previstas en la ley respectiva, ante el órgano jurisdiccional competente. En algunos casos previstos expresamente en la ley, el otorgamiento de la medida cautelar implicará la obligación del solicitante, para exhibir la garantía que le fije la autoridad judicial.

De esa forma, las medidas cautelares son instrumentos esenciales que salvaguardan el derecho fundamental de acceso a la justicia, a fin de que ésta sea plena y efectiva. La tutela judicial efectiva es el derecho fundamental que toda persona tiene a la prestación jurisdiccional; esto es, a obtener una resolución fundada

jurídicamente, normalmente sobre el fondo de la cuestión que, en el ejercicio de sus derechos e intereses legítimos, haya planteado ante los órganos jurisdiccionales.

En ese contexto, las medidas cautelares pueden considerarse no sólo una herramienta que hace efectivos y eficientes los derechos que consagran el debido proceso, sino también un medio que asegura la eficacia de los recursos y la ejecución plena y salvaguarda de los derechos de los particulares. De esa forma, se entiende que las medidas cautelares, dada su finalidad, **constituyen herramientas que van a permitir que la materia del litigio se conserve y pueda ser efectiva una sentencia o resolución que resuelva la controversia o el procedimiento, o bien, que a través de tales providencias precautorias se evite, mientras dura el juicio en lo principal o el procedimiento respectivo, que se cause un grave daño a una de las partes o al interés social.**

En el caso concreto, se presume que el análisis realizado por el Juez Responsable, no cumple con los incisos previstos en los incisos *a)*, *b)* y *c)*, principalmente porque no se acreditó un presumible derecho subjetivo en favor del actor, no del demandado Crédito Real y tampoco se acreditó que se pudieran ocasionar daños de difícil reparación, lo anterior se sostiene porque de un análisis superfluo de las medidas, la autoridad responsable se hubiera percatado que no existe ningún fundamento jurídico para que las aquí tercero interesadas pudieran obtener las medidas que están previstas en la Ley de Concurso Mercantiles y no así en la Ley General de Sociedades Mercantiles, las cuales no existen en dicha ley, pero que afectan a mi representada como acreedora de Crédito Real, a tal grado que ni un solo hecho le fue atribuido a mi representada pero que sin duda le afectan las medidas como acreedora, mucho menos existe un fundamento jurídico que justifique el otorgamiento de las medidas.

Las medidas cautelares se explican por el peligro de que las providencias de tutela jurisdiccional lleguen a aplicación demasiado tarde, de manera que quien pretenda tener un derecho transgredido o insatisfecho, puede alegar de sí, o limitar, las consecuencias dañosas que de ello derivan, antes o sin haber obtenido al respecto, una declaración de certeza judicial definitiva en virtud de las medidas cautelares, pero siempre se encuentran limitadas a ser instrumentales y no precisamente un fin.

Se trata de los mecanismos utilizados para impedir la realización de actos que pudieran hacer irrisorio el desenvolvimiento de un procedimiento y de su resultado, de manera que su objeto es asegurar, con anticipación provisoria la eficacia del procedimiento y de la decisión favorable que pudiera dictarse en él. La cuestión anteriormente mencionada, no se actualiza en el caso concreto, en virtud de que las medidas cautelares cuyo otorgamiento se reclama, pues no se cumplieron los requisitos constitucionales y legales mínimos para justificar su otorgamiento y la restricción de los derechos de mi representada y demás acreedores y accionistas de édito Real, lo cual claramente implica una afectación en su esfera jurídica notoriamente desproporcionada. Además, con su otorgamiento se transgredió el debido proceso legal, el principio de seguridad jurídica y por lo tanto la tutela judicial efectiva, pues sin agotar el procedimiento, la autoridad responsable, otorgó medidas sin que fueran necesarias y desproporcionadas, mismos que son contrarios a la institución de la medida cautelar, medida que además no están previstas para una liquidación judicial o corporativa en la ley societaria.

La autoridad responsable omitió analizar si se cumplían con los elementos necesarios para el otorgamiento de la medida cautelar, consistentes en la apariencia del buen derecho, idoneidad de la medida y el peligro en la demora. Incluso, en el

JACOBO GUADALUPE MARTINEZ FLORES
30.10,30.30,13.30,30.30,30.30,35.30,34.57,15.32,34.31,38
198002-200041

auto que se ordenó el otorgamiento de las medidas, la fundamentación y motivación es inexistente, en virtud de que la autoridad, se limitó a citar un par de artículos del Código de Comercio y del código adjetivo federal, manifestó banalmente que se otorgaba para evitar la dilapidación de bienes y protección de la empresa, pero sin desarrollar el por qué son aplicables al caso concreto, o el por qué efectivamente se está en un evidente peligro si no se otorga la medida.

Lo anterior coloca al quejoso en un claro estado de indefensión, porque se otorgaron medidas cautelares desproporcionales, que afectan gravemente la esfera jurídica de mi representada que es a todas luces improcedente.

En este sentido, la actividad cautelar se dirige a asegurar el desenvolvimiento eficaz de los fines generales de la jurisdicción, consiste en la prerrogativa de exigir a los tribunales, con jurisdicción y competencia, la solución de fondo de los conflictos con trascendencia jurídica que se tengan con otras personas o con las autoridades, con el objeto de declarar, constituir o establecer una condena, y en su caso, ejecutarla.

Así, al ser este tipo de instrumentos inherentes al derecho de jurisdicción, pues tienen la finalidad de hacer eficaces las sentencias de los Jueces, tal como está previsto en el artículo 17 constitucional, el cual dispone en el párrafo séptimo que: *"las leyes federales y locales establecerán los medios necesarios para que se garantice la independencia de los tribunales y la plena ejecución de sus resoluciones"*, su limitación conculca el derecho analizado. La sentencia reclamada excede dicho derecho en perjuicio de la quejosa y por lo tanto es inconstitucional.

Así las cosas, la figura jurídica consistente en las medidas cautelares y/o providencias precautorias tiene su razón en garantizar el derecho de acceso a la justicia de las partes y la tutela de aquellos derechos que se están controvirtiendo en juicio; consecuentemente, es indiscutible que para que el otorgamiento de las medidas cautelares el Juez Responsable, debió llevar a cabo un escrutinio para determinar la procedencia y proporcionalidad en el otorgamiento de estas y no lo llevó a cabo, porque sencillamente se limitó a ordenar diversas medidas previstas en la Ley de Concurso Mercantiles que no son aplicables a una disolución y liquidación judicial, sin realizar un análisis suficiente que le permitiera considerar que ninguno de los hechos en los cuales se basa la demanda fueron atribuidos a mi representada.

Luego entonces, el acto reclamado constituye una resolución que no se encuentra debidamente fundada y motivada por lo que el acto reclamado deberá ser revocado al violar notoriamente los principios de congruencia y exhaustividad que deben regir toda resolución judicial.

De lo anterior se desprende que, <u>la responsable en una clara violación a los derechos fundamentales de mi representada, específicamente el derecho a la tutela cautelar efectiva -contrario sensu- resolvió el otorgamiento de estas.</u>

Al respecto, el artículo 14 de la Constitución Política de los Estados Unidos Mexicanos prevé la garantía de audiencia que asiste a los gobernados, mismo que en su segundo párrafo dispone lo siguiente:

*" Artículo 14.- [... ]*
*Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos,*

*sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho."*

El artículo transcrito establece la conocida garantía de audiencia, conforme a la cual todo gobernado tiene la posibilidad de ser escuchado por un tribunal previamente establecido, de manera previa a sufrir un acto privativo y mediante un procedimiento que cumpla con la totalidad de sus formalidades esenciales, otorgando protección jurídica al gobernado en su vida, libertad, propiedades, posesiones y derechos; por ende, permite al gobernado ejercer oposición en contra de la acción arbitraria por parte de las autoridades, o bien la violación a ésta garantía incluso en la expedición de normas generales de observancia obligatoria, condicionando la existencia de congruencia entre lo que se alega y lo que se resuelve, además de contextualizar obligaciones de autoridades para proceder constitucionalmente.

En ese tenor, todas las autoridades en sus funciones judiciales, ejecutivas así como legislativas deben prever y respetar, antes de generar cualquier acto que pueda tener efectos privativos, la existencia de un juicio que cumpla con las formalidades esenciales del procedimiento, en el que se otorgue al gobernado la suficiente oportunidad de defenderse de aquellos actos que la autoridad pretende hacer valer en su contra, siendo que el cumplimiento de ésta garantía debe estar presente en todo momento.

Lo anterior, toda vez que al negar la existencia de un juicio, recurso u oposiciones correspondientes previo se ven perdidos los atributos de la formalidad del procedimiento y se deja en estado de indefensión a las partes y por ende el contenido esencial del derecho es la garantía de defenderse de un procedimiento mediante las formalidades establecidas en la constitución, obligando así un debido actuar a las autoridades respecto a la aplicación de la ley mediante un procedimiento forzoso, por lo que el gobernado tiene la seguridad de recibir la justa aplicación de la ley y así garantizar la regularidad de la actuación de las autoridades.

Asimismo, la Convención Americana Sobre Derechos Humanos, en su artículo octavo primer párrafo, establece lo siguiente:

*" Artículo 8.- Garantías Judiciales*

*1. Toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter."*

En este sentido, las garantías judiciales son un requisito de acceso de la administración de la justicia de manera legal y efectiva que se deben observar para hacer referencia a la regulada protección de derechos mediante la ley, sobre cualquier acto ejecutado por autoridades competentes que determinen derechos y obligaciones de las personas, y que exigen al Estado garantice la tramitación de un

proceso que ampare a las personas contra actos que pudieran resultar violatorios de sus derechos.

Así las cosas, resulta indiscutible que un proceso legal garantiza, protege, asegura y hace valer la titularidad o ejercicio de un derecho de defensa y acceso a la justicia, donde las partes tienen la posibilidad de presentar ante un juez imparcial pruebas y objetar a la contraparte con las debidas garantías en un respectivo proceso para esclarecer el hecho de un modo imparcial y sancionar a los responsables.

Así, la garantía de audiencia está compuesta de diversos elementos, según se explica en la Jurisprudencia emitida por nuestros más importantes tribunales, que sigue:

" *Época: Novena Época*
*Registro: 169143*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo XXVIII, Agosto de 2008*
*Materia(s): Común*
*Tesis: I.7o.A. J/41*
*Página: 799*
*AUDIENCIA, CÓMO SE INTEGRA ESTA GARANTÍA.*
*De entre las diversas garantías de seguridad jurídica que contiene el segundo párrafo del artículo 14 de la Constitución Política de los Estados Unidos Mexicanos, destaca por su primordial importancia, la de audiencia previa. Este mandamiento superior, cuya esencia se traduce en una garantía de seguridad jurídica para los gobernados, impone la ineludible obligación a cargo de las autoridades para que, de manera previa al dictado de un acto de privación, cumplan con una serie de formalidades esenciales, necesarias para oír en defensa a los afectados. Dichas formalidades y su observancia, a las que se unen, además, las relativas a la garantía de legalidad contenida en el texto del primer párrafo del artículo 16 constitucional, se constituyen como elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario y anárquico sino, por el contrario, en estricta observancia del marco jurídico que la rige. Así, con arreglo en tales imperativos, todo procedimiento o juicio ha de estar supeditado a que en su desarrollo se observen, ineludiblemente, distintas etapas que configuran la garantía formal de audiencia en favor de los gobernados, a saber, que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite, que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de comprobación tal, que quien sostenga una cosa tenga oportunidad de demostrarla, y quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; que cuando se agote dicha etapa probatoria se le dé oportunidad de formular las alegaciones correspondientes y, finalmente, que el procedimiento iniciado concluya con una resolución que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas.*
*SÉPTIMO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.*

*Amparo directo 3077/2001. Comité Particular Agrario del núcleo de población ejidal que de constituirse se denominaría "Miguel de la Madrid Hurtado", del Municipio de Tamiahua, Estado de Veracruz, por conducto de su Presidente, Secretario y Vocal. 10 de octubre de 2001. Unanimidad de votos. Ponente: Alberto Pérez Dayán. Secretaria: Amelia Vega Carrillo.*
*Amparo directo 131/2005. Huizar Cleaner de México, S.A. de C.V. 11 de mayo de 2005. Unanimidad de votos. Ponente: Alberto Pérez Dayán. Secretaria: Elizabeth Arrañaga Pichardo.*
*Amparo en revisión 47/2005. Eleazar Loa Loza. 5 de octubre de 2005. Unanimidad de votos. Ponente: Alberto Pérez Dayán. Secretaria: Amelia Vega Carrillo.*
*Amparo directo 107/2006. Armando Huerta Muñiz. 26 de abril de 2006. Unanimidad de votos. Ponente: Alberto Pérez Dayán. Secretaria: Amelia Vega Carrillo.*
*Amparo directo 160/2008. Presidente, Secretario y Tesorero del Comisariado Ejidal del Nuevo Centro de Población Ejidal "Coyamitos y anexos", Municipio de Chihuahua del Estado de Chihuahua. 25 de junio de 2008. Unanimidad de votos. Ponente: Adela Domínguez Salazar. Secretario: Luis Huerta Martínez."*

En términos de lo anterior, resulta indiscutible que la garantía de audiencia como tal se constituye de diversos elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario y anárquico sino, por el contrario, en estricta observancia del marco jurídico que la rige; por lo tanto, todo procedimiento debe estar compuesto por distintas etapas **que configuran la garantía formal de audiencia en favor de los gobernados**, a saber: *(i)* que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite; *(ii)* que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de comprobación tal, **que quien sostenga una cosa tenga oportunidad de demostrarla**, y quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; *(iii)* que cuando se agote dicha etapa probatoria se le dé oportunidad de **formular las alegaciones correspondientes**; y, finalmente, *(iv)* que el procedimiento iniciado **concluya con una resolución** que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas.

En dichos términos, el segundo párrafo del artículo 14 constitucional dispone que previamente a la privación de la libertad, propiedades, posesiones o derechos de cualquier persona **debe mediar juicio** seguido ante los tribunales previamente establecidos. Se ha destacado que la palabra "mediante" contenida en el citado artículo implica que previo al acto de privación debe haber concluido un juicio; y al mismo tiempo debe colegirse que al mencionar juicio se alude a una persona con autoridad que emita una resolución de manera imparcial.

Por su parte, el artículo 8 de la Convención Americana sobre Derechos Humanos dispone que toda persona tiene derecho a ser oída con las debidas garantías por un juez competente, independiente e imparcial; siendo que este artículo incurre en un pleonasmo (aunque no innecesario) al decir juez imparcial. La idea de un juez no puede existir jurídicamente hablando si no se trata de una persona imparcial, puesto que en un litigio, quien tiene encomendada la tarea de resolverlo nunca puede tener un interés por alguna de las partes. La idea anterior es la base

sobre la que descansan otras figuras jurídicas como los impedimentos, las excusas y la recusación.

Ahora bien, tradicionalmente se ha interpretado el segundo párrafo del artículo 14 de la carta magna como el continente de lo que se denomina (o denominaba) " garantía de audiencia" que consiste, esencialmente, **en el derecho de todo gobernado a ser escuchado de manera previa al dictado de un acto de privación respetando las formalidades esenciales del procedimiento**. Al efecto, la Suprema Corte de Justicia ha definido que las formalidades esenciales del procedimiento se componen de cuatro garantías esenciales, a saber: *(i)* la notificación del inicio del procedimiento, *(ii)* la facultad de ofrecer pruebas, *(iii)* la facultad de alegar; y, *(iv)* el dictado de una resolución que dirima las cuestiones objeto de la controversia. Sirven de sustento de lo anterior las siguientes tesis de jurisprudencia:

> " *Época: Novena Época*
> *Registro: 200234*
> *Instancia: Pleno*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo II, Diciembre de 1995*
> *Materia(s): Constitucional, Común*
> *Tesis: P./J. 47/95*
> *Página: 133*
> *FORMALIDADES ESENCIALES DEL PROCEDIMIENTO. SON LAS QUE GARANTIZAN UNA ADECUADA Y OPORTUNA DEFENSA PREVIA AL ACTO PRIVATIVO.*
> *La garantía de audiencia establecida por el artículo 14 constitucional consiste en otorgar al gobernado la oportunidad de defensa previamente al acto privativo de la vida, libertad, propiedad, posesiones o derechos, y su debido respeto impone a las autoridades, entre otras obligaciones, la de que en el juicio que se siga "se cumplan las formalidades esenciales del procedimiento". Estas son las que resultan necesarias para garantizar la defensa adecuada antes del acto de privación y que, de manera genérica, se traducen en los siguientes requisitos: 1) La notificación del inicio del procedimiento y sus consecuencias; 2) La oportunidad de ofrecer y desahogar las pruebas en que se finque la defensa; 3) La oportunidad de alegar; y 4) El dictado de una resolución que dirima las cuestiones debatidas. De no respetarse estos requisitos, se dejaría de cumplir con el fin de la garantía de audiencia, que es evitar la indefensión del afectado.*
> *Amparo directo en revisión 2961/90. Opticas Devlyn del Norte, S.A. 12 de marzo de 1992. Unanimidad de diecinueve votos. Ponente: Mariano Azuela Güitrón. Secretaria: Ma. Estela Ferrer Mac Gregor Poisot.*
> *Amparo directo en revisión 1080/91. Guillermo Cota López. 4 de marzo de 1993. Unanimidad de dieciséis votos. Ponente: Juan Díaz Romero. Secretaria: Adriana Campuzano de Ortiz.*
> *Amparo directo en revisión 5113/90. Héctor Salgado Aguilera. 8 de septiembre de 1994. Unanimidad de diecisiete votos. Ponente: Juan Díaz Romero. Secretario: Raúl Alberto Pérez Castillo.*
> *Amparo directo en revisión 933/94. Blit, S.A. 20 de marzo de 1995. Mayoría de nueve votos. Ponente: Mariano Azuela Güitrón. Secretaria: Ma. Estela Ferrer Mac Gregor Poisot.*
> *Amparo directo en revisión 1694/94. María Eugenia Espinosa Mora. 10 de abril de 1995. Unanimidad de nueve votos. Ponente: Mariano Azuela Güitrón. Secretaria:*

JA ICELO GUADALUPE MARTINEZ FLORES
30.34.34.30.31.30.30.30.30.34.30.33.30.34.37.33.32.34.31.38
13068/24 26011-41

*Ma. Estela Ferrer Mac Gregor Poisot.*
*El Tribunal Pleno en su sesión privada celebrada el veintitrés de noviembre en curso,*
*por unanimidad de once votos de los ministros: presidente José Vicente Aguinaco*
*Alemán, Sergio Salvador Aguirre Anguiano, Mariano Azuela Güitrón, Juventino*
*V. Castro y Castro, Juan Díaz Romero, Genaro David Góngora Pimentel, José de*
*Jesús Gudiño Pelayo, Guillermo I. Ortiz Mayagoitia, Humberto Román Palacios,*
*Olga María Sánchez Cordero y Juan N. Silva Meza; aprobó, con el número 47/1995*
*(9a.) la tesis de jurisprudencia que antecede; y determinó que las votaciones de los*
*precedentes son idóneas para integrarla. México, Distrito Federal, a veintitrés de*
*noviembre de mil novecientos noventa y cinco."*

Ahora bien, las descritas formalidades esenciales del procedimiento presuponen la debida notificación del inicio o realización de cada una de las etapas de este, a efecto de estar en la posibilidad de ejercer dichos derechos en plazos determinados y con una oportunidad procesal suficiente para que los mismos puedan hacerse válidos y en tal medida resulten eficaces. Esto es, para que las referidas formalidades esenciales del procedimiento se materialicen es necesario que se dé al gobernado la posibilidad de hacerlas valer, mediante la oportuna notificación y los términos con los que cuenta al efecto en los términos de la legislación específica que esté siendo aplicable. Así, para poder hablar efectivamente de que a un gobernado se le han respetado las garantías esenciales del procedimiento se le debió haber notificado previamente que estaba en esa posibilidad y los momentos para hacerlas valer, quedando obligada la autoridad correspondiente además a tomar en consideración aquellas manifestaciones que al efecto señale alguna de las partes en el proceso o el propio quejoso, pues no puede ser omisa a los hechos o acontecimientos que necesariamente implican llamar o requerir la comparecencia de un tercero cuyos derechos pueden ser vulnerados por las actuaciones del juzgador.

En efecto, uno de los componentes esenciales de la garantía de audiencia es la notificación del procedimiento, para que así el gobernado se encuentre en la posibilidad de ofrecer pruebas, alegar e interponer los recursos que estime oportunos, por lo que en el caso en concreto, al existir una serie de actuaciones que claramente contravienen los derechos sustantivos del suscrito, toda vez que presumiblemente el Juez de origen está ordenando la práctica de providencias precautorias, conformándose con atender la solicitud en tal sentido formulada por los actores sin siquiera permitir a mi representada la más mínima defensa, ni mucho menos, analizar y tener por acreditada la apariencia del buen derecho de la que en su caso goce la ejecutante en perjuicio de mi representada-misma que en el caso concreto, se afirma, no existe respecto los actores en el juicio de origen y mi representada.

Consecuentemente, a través del acto reclamado se pretende limitar y restringir los derechos de mi representada, actos que constituyen una violación de sus derechos humanos y sin siquiera permitirle posibilidad de defensa alguna, lo que resulta notoriamente inconstitucional. Consecuentemente, es indiscutible que debió haberse dado a mi representada la oportunidad de hacer valer sus derechos.

En este tenor, su Señoría deberá otorgar a mi representada el amparo y protección de la Justicia de la Unión para los efectos de que se dejen sin efectos las medidas precautorias otorgadas en auto del 30 de junio del 2022 por el Juez Natural.

## SUSPENSIÓN DEL ACTO RECLAMADO

Se solicita la suspensión provisional y en su momento definitiva de los actos reclamados con fundamento en lo dispuesto por los artículos 107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos y 128 de la Ley de Amparo, cuyo tenor es el siguiente:

> *"**Artículo 107**. Todas las controversias de que habla el artículo 103 de esta Constitución, con excepción de aquéllas en materia electoral, se sujetarán a los procedimientos que determine la ley reglamentaria, de acuerdo con las bases siguientes:*
>
> *[...]*
>
> *X. Los actos reclamados podrán ser objeto de suspensión en los casos y mediante las condiciones y garantías que determine la ley reglamentaria, para lo cual el órgano jurisdiccional de amparo, cuando la naturaleza del acto lo permita, deberá realizar un análisis ponderando de la apariencia del buen derecho y del interés social. Dicha suspensión deberá otorgarse respecto de las sentencias definitivas en materia penal al comunicarse la promoción del amparo, y en las materias civil, mercantil y administrativa, mediante garantía que dé el quejoso para responder de los daños y perjuicios que tal suspensión pudiere ocasionar al tercero interesado. La suspensión quedará sin efecto si éste último da contragarantía para asegurar la reposición de las cosas al estado que guardaban si se concediese el amparo y a pagar los daños y perjuicios consiguientes; ...".*
>
> *"**Artículo 128**. Con excepción de los casos en que proceda de oficio, la suspensión se decretará, en todas las materias salvo las señaladas en el último párrafo de este artículo, siempre que concurran los requisitos siguientes:*
> *I. Que la solicite el quejoso; y*
> *II. Que no se siga perjuicio al interés social ni se contravengan disposiciones de orden público. [... ]".*

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.9.30.31.30.30.30.30.5.33.34.35.34.33.35.36
13.08.024 26.01.14

En este sentido, del contenido de los artículos 107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos y 128 de la Ley de Amparo, se concluye lo siguiente:

*a)*     La suspensión del acto reclamado es una providencia (similar a una cautelar) que surge como un incidente en el procedimiento relativo al juicio de amparo indirecto, se lleva por cuerda separada y se traduce en un mandato que tiende a preservar el cumplimiento y ejecución de la sentencia protectora que pudiere llegar a dictarse en el juicio de protección de derechos fundamentales.

*b)*     La suspensión del acto reclamado tiene por objeto conservar la materia del juicio de amparo.

*c)*     Los efectos de la suspensión, consistente en mantener las cosas en el estado en que se encuentran al otorgarse la providencia, haciendo cesar temporalmente las medidas tendientes a ponerlo en ejecución y que, por tanto, la materia de la suspensión en el juicio propiamente la constituye esa ejecución y no el acto en sí mismo considerado. Asimismo, puede tener efectos restitutorios cuando

sea necesario para la debida protección de los derechos fundamentales que se estiman violados.

En relación con los requisitos de procedencia, la intención del legislador federal es que, a través de la suspensión se detenga, paralice, mantengan las cosas en el estado que guardan o se restituya provisionalmente al quejoso en sus derechos, a fin de evitar que el acto reclamado, su ejecución o consecuencias, se consumen destruyendo la materia del amparo (o bien, produzcan perjuicios de difícil o imposible reparación al quejoso), siempre que la naturaleza del acto lo permita, lo que implica que la procedencia de la suspensión del acto reclamado, debe estudiarse a partir de los requisitos siguientes: *(i)* Si son ciertos o no los actos reclamados (premisa); *(ii)* Si la naturaleza de esos actos permite su paralización; *(iii)* Si se satisfacen las condiciones exigidas por el artículo 128 de la Ley de Amparo (que lo solicite el quejoso y no se siga en perjuicio al interés social, ni contravenga disposiciones de orden público); y, *(iv)* Si ante la existencia de terceros interesados, es necesario exigir alguna garantía.

En atención a lo anterior, y con fundamento en los artículos 107 constitucional y 128 de la Ley de Amparo, el suscrito solicita a su Señoría decrete la suspensión de los actos reclamados <u>para el efecto de que: *(i)* el Juez Responsable, permita al quejoso a través de sus autorizados tener acceso a todo lo actuado en el juicio 691/2022 radicado en el Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, *(ii)* se suspenda cualquier acto de ejecución dentro del juicio 691/2022 radicado en el Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, *(iii)* se ordene el levantamiento inmediato de cualquier medida cautelar y/o providencias precautorias en contra de bienes, derechos y activos del quejoso, *(iv)* así como que se suspenda la ejecución de cualquier resolución provisional o definitiva dictada por el Juez Responsable, *(v)* se ordene al liquidador provisional o definitivo, se abstenga de realizar cualquier acto tendiente a la ejecución de cualquier orden, mandamiento o acto, que emane el juicio del que todo lo actuado se reclama y *(vi)* se ordene a cualquier autoridad, dependencia o particular, se abstenga de participar, ejecutar, pretender ejecutar o dar cumplimiento a cualquier acto que derive del juicio 691/2022 radicado en el Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México, incluyendo, sin limitar,la inscripción de cualquier sentencia en el Registro Público de la Propiedad y el Comercio y al tratarse de una empresa que cotiza en bolsa, la suspensión de cualquier orden de cancelación en el listado</u> , toda vez que se cumple con los requisitos que establece el mencionado precepto legal ya que *(i)* es solicitada por el quejoso; y, *(ii)* no se sigue perjuicio al interés social, ni se contravienen disposiciones de orden público, sino que incluso se defienden éste, tal como se explicará en párrafos subsecuentes.

Gramaticalmente suspensión significa *"Acción y efecto de suspender"* por otro lado, suspender implica *"detener o diferir por algún tiempo una acción u obra"*. La Suprema Corte de Justicia de la Nación define a la suspensión diciendo que *"la finalidad que persigue la figura de la suspensión que es la de detener, paralizar o mantener las cosas en el estado que guarden para evitar que el acto reclamado, su ejecución o consecuencias, se consumen destruyendo la materia del amparo, o bien, produzcan notorios*

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30,30.30.31.30.30,30.30,30.35,30.35.34,31.35.32.34.31.38
130062-E 2020141

*perjuicios de difícil o imposible reparación al quejoso o, en su caso, el de los terceros perjudicados[2]"*

Por otra parte, tal y como lo ha establecido nuestro más alto Tribunal Constitucional, actuando en Pleno y actuando a través de su Segunda Sala, es factible otorgar la suspensión de la ejecución de un acto, bastando la comprobación de la apariencia del buen derecho invocado por el quejoso, de modo que sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado, lo que deberá sopesarse con el perjuicio que pueda ocasionarse al interés social o al orden público con la concesión de la medida, siendo que, en el presente caso, no existe afectación al interés social y al orden público, resultando aplicables las siguientes jurisprudencias por contradicción de tesis:

> *"Novena Época*
> *Registro: 200136*
> *Instancia: Pleno*
> *Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *III, Abril de 1996*
> *Materia(s): Común*
> *Tesis: P./J. 15/96*
> *Página:   16*

> *SUSPENSION. PARA RESOLVER SOBRE ELLA ES FACTIBLE, SIN DEJAR DE OBSERVAR LOS REQUISITOS CONTENIDOS EN EL ARTICULO 124 DE LA LEY DE AMPARO, HACER UNA APRECIACION DE CARACTER PROVISIONAL DE LA INCONSTITUCIONALIDAD DEL ACTO RECLAMADO.*

> *La suspensión de los actos reclamados participa de la naturaleza de una medida cautelar, cuyos presupuestos son la apariencia del buen derecho y el peligro en la demora. El primero de ellos se basa en un conocimiento superficial dirigido a lograr una decisión de mera probabilidad respecto de la existencia del derecho discutido en el proceso. Dicho requisito aplicado a la suspensión de los actos reclamados, implica que, para la concesión de la medida, sin dejar de observar los requisitos contenidos en el artículo 124 de la Ley de Amparo, basta la comprobación de la apariencia del derecho invocado por el quejoso, de modo tal que, según un cálculo de probabilidades, sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado. Ese examen encuentra además fundamento en el artículo 107, fracción X, constitucional, en cuanto establece que para el otorgamiento de la medida suspensional deberá tomarse en cuenta, entre otros factores, la naturaleza de la violación alegada, lo que implica que debe atenderse al derecho que se dice violado. Esto es, el examen de la naturaleza de la violación alegada no sólo comprende el concepto de violación aducido por el quejoso sino que implica también el hecho o acto que entraña la violación, considerando sus características y su trascendencia. En todo caso dicho análisis debe realizarse, sin prejuzgar sobre la certeza del derecho, es decir, sobre la constitucionalidad o inconstitucionalidad de los actos reclamados, ya que esto*

---

[2] *"SUSPENSION POR HECHO SUPERVENIENTE. LA REVOCACION O MODIFICACION ESTABLECIDA EN EL ARTICULO 140 DE LA LEY DE AMPARO PROCEDE TANTO EN LA PROVISIONAL COMO EN LA DEFINITIVA" P./J. 31/2001*

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,30,30,30,35.30,34.07.15.32,34,31,38
13/08/24 20:01:41

*sólo puede determinarse en la sentencia de amparo con base en un procedimiento más amplio y con mayor información, teniendo en cuenta siempre que la determinación tomada en relación con la suspensión no debe influir en la sentencia de fondo, toda vez que aquélla sólo tiene el carácter de provisional y se funda en meras hipótesis, y no en la certeza de la existencia de las pretensiones, en el entendido de que deberá sopesarse con los otros elementos requeridos para la suspensión, porque si el perjuicio al interés social o al orden público es mayor a los daños y perjuicios de difícil reparación que pueda sufrir el quejoso, deberá negarse la suspensión solicitada, ya que la preservación del orden público o del interés de la sociedad están por encima del interés particular afectado. Con este proceder, se evita el exceso en el examen que realice el juzgador, el cual siempre quedará sujeto a las reglas que rigen en materia de suspensión.*

*"Novena Época*
*Registro: 165659*
*Instancia: Segunda Sala*
*Jurisprudencia*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*XXX, Diciembre de 2009*
*Materia(s): Común*
*Tesis: 2a./J. 204/2009*
*Página: 315*

*SUSPENSIÓN. PARA DECIDIR SOBRE SU OTORGAMIENTO EL JUZGADOR DEBE PONDERAR SIMULTÁNEAMENTE LA APARIENCIA DEL BUEN DERECHO CON EL PERJUICIO AL INTERÉS SOCIAL O AL ORDEN PÚBLICO.*

*El Tribunal en Pleno de la Suprema Corte de Justicia de la Nación, en la jurisprudencia P./J. 15/96, de rubro: "SUSPENSIÓN. PARA RESOLVER SOBRE ELLA ES FACTIBLE, SIN DEJAR DE OBSERVAR LOS REQUISITOS CONTENIDOS EN EL ARTÍCULO 124 DE LA LEY DE AMPARO, HACER UNA APRECIACIÓN DE CARÁCTER PROVISIONAL DE LA INCONSTITUCIONALIDAD DEL ACTO RECLAMADO.", sostuvo que para el otorgamiento de la suspensión, sin dejar de observar los requisitos exigidos por el artículo 124 de la Ley de Amparo, basta la comprobación de la apariencia del buen derecho invocado por el quejoso, de modo que sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado, lo que deberá sopesarse con el perjuicio que pueda ocasionarse al interés social o al orden público con la concesión de la medida, esto es, si el perjuicio al interés social o al orden público es mayor a los daños y perjuicios de difícil reparación que pueda sufrir el quejoso. Conforme a lo anterior, el juzgador debe realizar un estudio simultáneo de la apariencia del buen derecho y el peligro en la demora con la posible afectación que pueda ocasionarse al orden público o al interés social con la suspensión del acto reclamado, supuesto contemplado en la fracción II del referido artículo 124, estudio que debe ser concomitante al no ser posible considerar aisladamente que un acto pudiera tener un vicio de inconstitucionalidad sin compararlo de manera inmediata con el orden público que pueda verse afectado con su paralización, y sin haberse satisfecho previamente los demás requisitos legales para el otorgamiento de la medida.*

*"Décima Época*
*Registro: 2006857*
*Instancia: Tribunales Colegiados de Circuito*

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13.08.07.26/05141

*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación*
*Publicación: viernes 27 de junio de 2014 09:30 h*
*Materia(s): (Común)*
*Tesis: IV.2o.A.70 K (10a.)*

*SUSPENSIÓN EN EL AMPARO INDIRECTO. LA LEY DE LA MATERIA, VIGENTE DESDE EL 3 DE ABRIL DE 2013, ESTABLECE UN NUEVO SISTEMA EQUILIBRADO, REGIDO POR MAYORES ELEMENTOS NORMATIVOS FORMALES Y SUSTANTIVOS, GENERALES Y ESPECÍFICOS, PARA EL DICTADO DE LAS RESOLUCIONES AL RESPECTO.*

*Como resultado de la reforma constitucional en materia de amparo del 6 de junio de 2011 y la posterior expedición de la ley de la materia, vigente desde el 3 de abril de 2013, se generó -en cuanto a la suspensión del acto reclamado en el amparo indirecto-, un nuevo sistema equilibrado con el propósito de dotar a la precautoria de mayor eficacia para la preservación de los derechos vulnerados y la materia del amparo y, a la vez, de mayores elementos de control que permitan evitar el abuso y el dictado de resoluciones que lastimen la sensibilidad social, por la contravención a intereses colectivos jurídicamente relevantes, e igualmente, permitan corregir esos efectos a través de los recursos previstos en la propia ley. Luego, en cuanto al propósito de dotar a la medida de mayor eficacia, en el nuevo sistema de suspensión, <u>se amplía la discrecionalidad de los Jueces y sus facultades para allegarse de mayores elementos para dictar resoluciones más informadas y se prevé que se resuelva con base en una ponderación entre la apariencia del buen derecho, que presupone un asomo superficial y provisional al fondo del asunto, que, por un lado, permite corroborar, así sea provisionalmente, que asista al quejoso el derecho que estima vulnerado y la manera en que la violación se suscita</u> para, en función de ello, conocer qué alcance dar a la suspensión para que resulte más eficaz para contener la violación y evitar que se torne difícilmente reparable y a la vez se evite la pérdida de la materia del amparo, esto por cuanto en forma concomitante a la apariencia del buen derecho, se valora el peligro en la demora; mientras que por otro, se introduce como elemento a dicha ponderación, el interés social, lo que lleva a que al decidir sobre la medida se tomen en cuenta los intereses, principios o valores colectivos jurídicamente relevantes cuya preservación se confía al Juez en uso de su discrecionalidad, representados a través del acto reclamado o involucrados en el contexto en que se materializarán las consecuencias de la suspensión del acto o de su ejecución, con lo que se encamina la decisión a tener un resultado eficaz en cuanto a la preservación de los derechos del quejoso, la materia del amparo y a evitar el dictado de una resolución que tenga como punto de partida una pretensión que no sea ni superficialmente fundada, frívola o temeraria y que lastime la sensibilidad social. Además, como parte del nuevo sistema equilibrado, en relación con la suspensión a petición de parte, el legislador estableció un conjunto de expresiones que constituyen elementos normativos, formales y sustantivos del aludido juicio de ponderación y, en general, de las resoluciones sobre la suspensión del acto reclamado, y estableció expresiones específicas que modulan o refuerzan la ponderación entre la apariencia del buen derecho y el interés social, enfatizando la prevalencia de éste, como acontece en el último párrafo del artículo 129, en que se prevé que sólo en función de preservar un interés social, podrá excepcionalmente otorgarse la medida, aun tratándose de actos como los previstos en sus diferentes fracciones; además, en su artículo 131, al disponer que para otorgar la medida cuando se pida la suspensión aduciéndose*

JACOBO GUADALUPE MARTINEZ FLORES
30.30,30.30,31,30.30,30.30,30,35,33,34,37,35,33,34,31,38
13/08/24 20:01:41

*un interés legítimo, no sólo será necesario asegurar la no afectación al interés social, sino que deberá justificarse que es un interés de esa índole y no meramente el deducido por el quejoso, el que justifique su otorgamiento, o bien, cuando a fin de disponer restablecer provisionalmente a éste en el goce de la garantía violada, como lo prevé el segundo párrafo del artículo 147, se requiere acreditar que dotar a la medida de ese efecto, es jurídica y materialmente posible, aspectos que ilustran que cada una de esas expresiones, norman en lo formal y sobre todo sustantivamente, las decisiones sobre suspensión del acto reclamado, pero también constituyen elementos susceptibles de ser verificados y facilitadores del control que corresponde ejercer a los tribunales a través de los recursos procedentes de que conozcan; igualmente, evidencian que el aludido juicio de ponderación entre la apariencia del buen derecho y el interés social, adquiere expresiones generales y específicas o reforzadas en función de las diversas previsiones de la Ley de Amparo; y, en función de esto último, revelan que el nuevo sistema establecido para la suspensión del acto reclamado, está dotado de mayores requisitos para su otorgamiento en comparación con la ley abrogada.*

Asimismo, para decidir sobre la procedencia o no de la suspensión provisional, los jueces de distrito deben atender a las manifestaciones del quejoso hechas en su demanda bajo protesta de decir verdad, cuando se duele de que existe peligro inminente de que se ejecute, en su perjuicio, el acto reclamado, ya que, por regla general, son los únicos elementos con que cuenta para resolver sobre la solicitud de concesión de la medida cautelar; sin que proceda hacer conjeturas sobre la improbable realización de los actos que el quejoso da por hecho pretenden ejecutar en su contra, pues para resolver sobre la suspensión provisional, el juez debe partir del supuesto, comprobado o no, de que la totalidad de los actos reclamados son ciertos[3].

En este sentido, de un análisis ponderado que realice su Señoría advertirá por un lado, que tal como se argumentó en los conceptos de violación, existe una gran probabilidad de declarar la inconstitucionalidad de los actos reclamados, en razón de que es flagrante la violación a la garantía de audiencia del quejoso y de múltiples acreedores, además de que resulta evidente que la Autoridad Responsable no es competente para conocer de este procedimiento de liquidación al existir acreedores y por lo tanto una obligación de garantizar el interés público respetando los procedimientos que el legislador previó en caso de encontrarse en insolvencia protegiendo a trabajadores, al fisco, otros acreedores y a cientos de familias mexicanas que contrataron con dicha institución.

Esto es, de un análisis ponderado entre la apariencia del buen derecho y el peligro en la demora se observa que se dan los presupuestos para la concesión de la medida suspensional, pues tenemos que el quejoso es titular del derecho fundamental de debido proceso, seguridad jurídica y certeza jurídica, así como el interés público para velar por la viabilidad de las empresas y de aquellas con las que éstas mantienen una relación de negocios, y por el otro lado, la evidente inconstitucionalidad de los actos reclamados; que tienen apariencia de tratarse de un acto en fraude de acreedores y en fraude a la ley, máxime que de otorgarse la medida suspensional no se causaría perjuicio al interés social, sino que al contrario,

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,10,31,30,30,30,30,30,35,50,34,77,35,33,34,31,38
13/08/24 20:04:41

---

[3] *"SUSPENSION PROVISIONAL. PARA DECIDIR SOBRE SU PROCEDENCIA, DEBE ATENDERSE A LAS MANIFESTACIONES DEL QUEJOSO RESPECTO DE LA CERTIDUMBRE DEL ACTO RECLAMADO"* Contradicción de tesis. Varios 34/91.

de no otorgarse la medida suspensional se quedaría sin materia el presente juicio de amparo, acarreando violaciones trascendentales a la esfera jurídica del quejoso, de múltiples acreedores, de trabajadores e inclusive de la Hacienda Pública, las afectaciones que se causarían serían de imposible reparación, y de permitir la continuación de ejecución cualquier acto, orden, mandamiento, emanado del procedimiento natural, pondría en riesgo no solo el interés de mi representada, sino el de la colectividad.

Por lo tanto, es inconcuso que en la especie se satisfacen todo los requisitos para la concesión para la medida suspensional, a saber: *(i)* la medida suspensional es solicitada expresamente por el quejoso; *(ii)* existe certeza tanto del derecho sustantivo del quejoso como del acto reclamado al tratarse de un procedimiento jurisdiccional; *(iii)* los actos son susceptibles de suspenderse en razón de que se trata presumiblemente de un acto positivo, que lo son los actos de ejecución de las medidas y el resto de órdenes, decretos, autos o resoluciones de cualquier tipo que se dicten en el juicio, ; *(iv)* no se contraviene el interés público ni disposiciones de orden público sino que busca protegerlas; y, *(vi)* existen derechos fundamentales en juego tales como el debido proceso, seguridad, certeza jurídica, el derecho de competencia aunado al interés público que implica la conservación de la viabilidad de las empresas, sumado a la evidente inconstitucionalidad de los actos reclamados. Sirve de sustento el siguiente criterio:

> *"Época: Novena Época*
> *Registro: 2011614*
> *Instancia: Segunda Sala*
> *Tipo de Tesis: Tesis Aislada*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Libro 30, Mayo de 2016, Tomo II*
> *Materia(s): Común*
> *Tesis: 2a./XXIII/2016*
> *Página:1376*

> *SUSPENSIÓN DEFINITIVA EN EL JUICIO DE AMPARO. REQUISITOS PARA CONCEDERLA. De los artículos <u>107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos, así como 128 y 138 de la Ley de Amparo,</u> se advierte que para conceder la suspensión definitiva en el juicio de amparo se requiere que: <u>i. Expresamente la solicite el quejoso; ii. Haya certidumbre sobre la existencia de los actos cuya suspensión se solicita; iii. Los actos reclamados sean susceptibles de suspensión; iv. No se siga perjuicio al interés social ni se contravengan disposiciones de orden público, según lo dispuesto en el artículo 129 de la citada Ley y; v. Deba llevarse a cabo un análisis ponderado del caso concreto bajo la apariencia del buen derecho.</u> Así, sólo de cumplirse todos los requisitos que anteceden, el órgano jurisdiccional podrá conceder la suspensión definitiva sujetándola, en su caso, al otorgamiento de la garantía prevista en el artículo <u>132</u> de la propia Ley.*

Al tratarse el quejoso de un tercero extraño al procedimiento de mérito es indudable que debe otorgarse la medida suspensional para mantener las cosas en el estado en que se encuentren, pues de lo contrario se irán consumando mayores violaciones a sus derechos fundamentales.

El peligro en la demora consiste en que al no poder hacer efectivos los créditos otorgados a Crédito Real, el quejoso puede llegar a verse afectado inclusive en su propia solvencia, aunado a que se transgrede en su perjuicio el principio per condictio creditorum y de no concederse la suspensión del acto reclamado, de entrada no estará nunca en condiciones de conocer la totalidad de las constancias del juicio y por lo tanto de hacer valer cualquier derecho, por lo que se continuaría violando el debido proceso, la garantía de audiencia y seguridad jurídica, además de ser privado de sus bienes por una autoridad incompetente.

La solicitud que por esta vía se formula es procedente, de conformidad con lo dispuesto por el artículo 139 de la Ley de Amparo, conforme al cual **si hubiere peligro inminente de que se ejecute o continúe ejecutando el acto reclamado CON PERJUICIOS DE DIFÍCIL REPARACIÓN PARA EL QUEJOSO** -como acontece en el caso concreto, al comprometerse notablemente la posibilidad de cobrar un crédito o de acceder a los mecanismos adecuados y aplicables en casos de insolvencia, como el que acontece con Crédito Real y que con artimañas pretenden evitar, el órgano jurisdiccional deberá ordenar que las cosas se mantengan en el estado que guarden hasta que se notifique a la autoridad responsable la resolución que se dicte sobre la suspensión, tomando las medidas que estime convenientes para que se eviten perjuicios a los interesados.

### RESERVA DE DERECHOS

Toda vez que el quejoso desconoce el contenido de las resoluciones dictadas por el <u>Juzgado Quincuagésimo Segundo de lo Civil del Tribunal Superior de Justicia de la Ciudad de México</u>, en los autos del expediente 691/2022; desde este momento se reserva su derecho para hacer valer cualquier defensa, acción y/o derecho en contra de las mismas, conforme los plazos y reglas procesales aplicables, misma reserva que deberá surtir efectos en tanto se conozca el contenido íntegro y cabal de dichas resoluciones, por lo que también se reserva el derecho de ampliar la demanda de amparo una vez que se tenga conocimiento cierto y total de lo actuado en el juicio.

Por lo expuesto y fundado,

**A USTED C. JUEZ**, atentamente pido se sirva:

**PRIMERO.** Tener por acreditada la personalidad con la que me ostento y tener por presentado en los términos del presente escrito, solicitando el Amparo y Protección de la Justicia de la Unión en contra de los actos que se reclaman de las autoridades señaladas como responsables.

**SEGUNDO.** Admitir a trámite la presente demanda de amparo, debiéndose de solicitar el informe justificado de las autoridades señaladas como responsables, debiéndose de señalar día y hora para la celebración de la audiencia constitucional en el presente juicio.

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.33.1.30.30.30.30.30.33.30.34.37.35.12.34.31.38
150624.20.01.41

**TERCERO.** Conceder la suspensión provisional y en su caso la definitiva en los términos del presente escrito, debiéndose de solicitar a las autoridades responsables sus informes previos, señalándose día y hora para la celebración de la audiencia incidental.

**CUARTO.** En su oportunidad, previos los trámites de Ley, resolver y conceder el amparo y protección de la Justicia de la Unión que se solicita.

<div align="center">

**PROTESTO LO NECESARIO.**

Ciudad de México, México, a la fecha de presentación

_____

**JACOBO GUADALUPE MARTINEZ FLORES**
Apoderado legal
**Banco Monex, S.A., Institución de Banca Múltiple, Monex Grupo Financiero**

</div>

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.31.30.34.37.35.32.34.31.38
13/08/24 20:01:41



## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
0811001000000000000017588408.p7m
Autoridad Certificadora:
AUTORIDAD CERTIFICADORA
Firmante(s): 1

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | JACOBO GUADALUPE MARTINEZ FLORES | **Validez:** | BIEN | Vigente |
| FIRMA | | | | |
| **No. serie:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | **Revocación:** | Bien | No revocado |
| **Fecha:** (UTC/ CDMX) | 19/07/22 17:48:25 - 19/07/22 12:48:25 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA - SHA256 | | | |
| **Cadena de firma:** | 44 bc 61 ce a9 3d 5b d0 c4 c6 45 9b 94 57 42 2f 7a 28 c2 fa 0b 01 65 2c a3 80 e2 50 2b 86 cc 1d 35 6a 3a 42 2c d9 68 1a 9f 32 d7 eb e8 f3 47 b2 33 3e 82 f7 f0 25 6b e7 62 99 2c b1 23 54 5c 86 72 f4 5b 8f 5a a3 1d e6 dc 65 90 5e 56 99 89 38 e8 db 41 74 0d 5b 57 e0 be 7d 40 d9 34 8a a1 9a 79 ee 8f c5 01 67 a0 b8 b4 a4 b8 38 a1 fa 50 47 09 f1 3b cf 1d 0c e7 54 60 61 f3 24 72 e9 44 89 76 29 3f 1c be 45 cb d4 60 94 38 c5 32 ca 9d 48 50 51 8d 85 16 07 c6 be b6 e9 6f 70 93 e5 ec 69 c5 b7 98 60 6e a7 83 43 09 bc 07 25 72 ad 0b 54 58 ff f2 1c f6 61 92 89 f0 d6 43 77 d0 37 70 1c c1 62 c3 68 1b b1 46 76 5e 61 a6 f1 b0 ad 7d 20 ec 47 53 9f 2b 89 8d 6e b2 67 93 2a fb 9e 37 18 49 a2 80 42 17 5a d1 15 3c 48 9c 4b b5 75 77 83 fa fc 8e 79 44 56 8c 10 74 0c 2f 5d b7 2b f7 7d | | | |
| OCSP | | | | |
| **Fecha: (UTC / CDMX)** | 19/07/22 17:48:22 - 19/07/22 12:48:22 | | | |
| **Nombre del respondedor:** | Servicio OCSP SAT | | | |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA | | | |
| **Número de serie:** | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | |
| TSP | | | | |
| **Fecha : (UTC / CDMX)** | 19/07/22 17:48:26 - 19/07/22 12:48:26 | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| **Identificador de la respuesta TSP:** | 126099507 | | | |
| **Datos estampillados:** | K5xNTmcnVMfVoYlviH0+H3Ss4nQ= | | | |

**ALBERTO T. SÁNCHEZ COLÍN**
notario 83 Ciudad de México

TESTIMONIO DE LA **PROTOCOLIZACIÓN PARCIAL** DEL ACTA DEL OTORGAMIENTO PODERES DE "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO A FAVOR DE **DON JACOBO GUADALUPE MARTÍNEZ FLORES.-**

ESCRITURA  45,619.-
LIBRO         1,240.-
AÑO           2,021.-

Av. Paseo de las Palmas No. 555-902
Col. Lomas de Chapultepec
1 1 0 0 0,  Ciudad de México
5540-6644    Fax 5540-7307
atsclex@prodigy.net.mx

**ALBERTO T. SÁNCHEZ COLÍN**

**Notario No. 83**
Ciudad de México



LIBRO MIL DOSCIENTOS CUARENTA.----------------------------------ASC*MLG*IMJ

CUARENTA Y CINCO MIL SEISCIENTOS DIECINUEVE.--------------------------

------CIUDAD DE MÉXICO, a catorce de julio del año dos mil veintiuno.---------------

**ALBERTO T. SÁNCHEZ COLÍN, Notario Número Ochenta y Tres de la Ciudad**

**de México**, hago constar: --------------------------------------------------------------

**EL OTORGAMIENTO DE PODERES DE "BANCO MONEX", SOCIEDAD**

**ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO**

**FINANCIERO, A FAVOR DE DON JACOBO GUADALUPE MARTÍNEZ FLORES,**

que resulta de la **protocolización parcial** del acta de la Junta del Consejo de

Administración, que realizo a solicitud de don Jacobo Guadalupe Martínez Flores, al

tenor de los siguientes antecedentes, declaraciones y cláusulas:-------------------------

-------------------------------**A N T E C E D E N T E S :**------------------------------------

**I.- CONSTITUCIÓN.- Por escritura número cincuenta mil novecientos noventa**

**y tres, de fecha dos de abril de mil novecientos noventa y siete, ante el**

**Licenciado Miguel Alessio Robles**, Notario Número Diecinueve del Distrito

Federal, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio

de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos

doce, se constituyó **"COMERICA BANK MÉXICO", SOCIEDAD ANÓNIMA,**

**INSTITUCIÓN DE BANCA MÚLTIPLE**, con domicilio en México, Distrito Federal,

duración indefinida y capital social mínimo fijo de ciento cincuenta millones de

pesos.--------------------------------------------------------------------------------------------

**II.- REFORMA DE LOS ARTÍCULOS SÉPTIMO, DÉCIMO, DÉCIMO PRIMERO,**

**DÉCIMO QUINTO, VIGÉSIMO QUINTO, TRIGÉSIMO OCTAVO, TRIGÉSIMO**

**NOVENO, CUADRAGÉSIMO, CUADRAGÉSIMO PRIMERO Y CUADRAGÉSIMO**

**SEGUNDO DE LOS ESTATUTOS SOCIALES, ASÍ COMO LA COMPULSA DE**

**LOS MISMOS.- Por escritura número cincuenta y seis mil quinientos doce, de**

**fecha veintisiete de agosto de mil novecientos noventa y nueve, ante el mismo**

**notario que la anterior**, cuyo primer testimonio quedó inscrito en el Registro

Público de Comercio de esta Capital, en el Folio Mercantil número doscientos

veintiún mil novecientos doce, se protocolizó el acta de la asamblea ordinaria y

extraordinaria que los accionistas de **"COMERICA BANK MÉXICO", SOCIEDAD**

**ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE**, celebraron el día treinta de abril

de mil novecientos noventa y nueve, en la que, entre otros acuerdos, se tomó el

reformar los artículos séptimo, décimo, décimo primero, décimo quinto, vigésimo

quinto, trigésimo octavo, trigésimo noveno, cuadragésimo, cuadragésimo primero y

cuadragésimo segundo de los estatutos sociales, así como el de compulsar los

mismos a fin de quedar con la citada denominación de **"COMERICA BANK**

**MÉXICO", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,**





JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.11.30.30.30.30.33.30.34.37.35.33.31.31.38
13/08/24 22:01:41



- 2 -                                    45,619

duración indefinida, domicilio en esta ciudad y capital social de ciento cincuenta millones de pesos.----------------------------------------------------------------------------------------------

III.- <u>AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL ARTÍCULO SEXTO DE LOS ESTATUTOS SOCIALES</u>.- **Por escritura número cincuenta y siete mil cuarenta y dos, de fecha veintidós de noviembre de mil novecientos noventa y nueve, ante el mismo notario que las anteriores,** cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se protocolizó el acta de la asamblea extraordinaria que los accionistas de **"COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** celebraron el veintinueve de octubre de mil novecientos noventa y nueve, en la que se tomó el acuerdo de aumentar el capital social en la suma de nueve millones ciento sesenta y siete mil pesos, que sumados a los ciento cincuenta millones de pesos con que contaba la sociedad, el capital social quedó en la suma de ciento cincuenta y nueve millones ciento sesenta y siete mil pesos, reformándose el artículo sexto de los estatutos sociales.----------------------------------------------------------------------------------------------

IV.- <u>AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL ARTÍCULO SEXTO DE LOS ESTATUTOS SOCIALES</u>.- **Por escritura número cincuenta y nueve mil novecientos cincuenta y cinco, de fecha cinco de enero del año dos mil uno, ante el mismo notario que las anteriores,** cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se protocolizó el acta de la asamblea extraordinaria que los accionistas de **"COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** celebraron el veintiocho de diciembre de dos mil, en la que se tomaron los acuerdos de aumentar el capital de la sociedad, en la cantidad de veinticinco millones novecientos cuarenta y seis mil pesos, para quedar en la suma de ciento ochenta y cinco millones ciento trece mil pesos, reformando como consecuencia el artículo sexto de los estatutos sociales.---

V.- <u>REFORMA INTEGRAL DE LOS ESTATUTOS SOCIALES</u>.- **Por escritura número sesenta y dos mil setecientos cuarenta y ocho, de fecha diecinueve de febrero del año dos mil dos, ante el mismo notario que las anteriores,** cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se protocolizó el acta de la asamblea general ordinaria y extraordinaria que los accionistas de **"COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** celebraron el diecinueve de diciembre de dos mil uno, en la que se tomó el acuerdo de reformar íntegramente los estatutos sociales, a fin de quedar con la misma denominación, duración indefinida, domicilio

ALBERTO T. SÁNCHEZ COLÍN

**Notario No. 83**
Ciudad de México

- 3 -                    45,619

en esta ciudad de México, Distrito Federal, capital social de ciento ochenta y cinco
millones ciento trece mil pesos.--------------------------------------------------------------

VI.- <u>AUMENTO DE CAPITAL SOCIAL EN LA PARTE MÍNIMA FIJA Y REFORMA</u>
<u>DE LA CLÁUSULA SEXTA DE LOS ESTATUTOS SOCIALES</u>.- **Por escritura**
**número sesenta y ocho mil cuatrocientos setenta y cuatro, de fecha dieciséis**
**de marzo del año dos mil cuatro, ante el mismo notario que las anteriores,**
cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta
Capital en el Folio Mercantil número doscientos veintiún mil novecientos doce, se
protocolizó el acta de la asamblea general ordinaria y extraordinaria que los
accionistas de **"COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA,**
**INSTITUCIÓN DE BANCA MÚLTIPLE,** celebraron el treinta y uno de diciembre de
dos mil tres, en la que, entre otros, se tomó el acuerdo de aumentar el capital social
en su parte mínima fija en la suma de cinco millones de pesos, a fin de quedar
fijado en la suma de ciento noventa millones ciento trece mil pesos, reformándose
en consecuencia la cláusula sexta de sus estatutos sociales.------------------------------

VII.- <u>AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL ARTÍCULO SEXTO DE</u>
<u>LOS ESTATUTOS SOCIALES</u>.- **Por escritura número setenta mil seiscientos**
**treinta y siete, de fecha veintinueve de noviembre del año dos mil cuatro, ante**
**el mismo notario que las anteriores,** cuyo primer testimonio quedó inscrito en el
Registro Público de Comercio de esta Capital, en el Folio Mercantil número
doscientos veintiún mil novecientos doce, se protocolizó el acta de la asamblea
general extraordinaria que los accionistas de **"COMERICA BANK MÉXICO"**
**SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** celebraron el siete
de septiembre de dos mil cuatro, en la que se tomó el acuerdo de aumentar el
capital en la cantidad de veintiocho millones seiscientos veinticinco mil pesos, para
quedar en la suma de doscientos dieciocho millones setecientos treinta y ocho mil
pesos, moneda nacional, reformándose en consecuencia el artículo sexto de sus
estatutos sociales.--------------------------------------------------------------------------------

VIII.- <u>ADICIÓN DEL CAPÍTULO NOVENO DE LOS ESTATUTOS SOCIALES</u>.- **Por**
**escritura número setenta mil setecientos ochenta y ocho, de fecha veinte de**
**diciembre del año dos mil cuatro, ante el mismo notario que las anteriores,**
cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta
Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se
protocolizó el acta de la asamblea general extraordinaria que los accionistas de
**"COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA**
**MÚLTIPLE,** celebraron el ocho de diciembre de dos mil cuatro, en la que se tomó el
acuerdo de adicionar el capítulo noveno a sus estatutos sociales.----------------------






- 4 -                              45,619

IX.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL ARTÍCULO SEXTO DE LOS ESTATUTOS SOCIALES.- Por escritura número setenta y cuatro mil quinientos treinta y ocho, de fecha veintidós de diciembre del año dos mil cinco, ante el mismo notario que las anteriores, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se protocolizó el acta de la asamblea general extraordinaria que los accionistas de "COMERICA BANK MÉXICO" SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, celebraron el veinte de diciembre de dos mil cinco, en la que, entre otros acuerdos, se tomó el de aumentar el capital social, en la suma de treinta y un millones doscientos sesenta y dos mil pesos, a fin de quedar en la suma de DOSCIENTOS CINCUENTA MILLONES DE PESOS, representado por doscientas cuarenta y ocho mil quinientas setenta y seis acciones ordinarias, nominativas, serie "F" y mil cuatrocientas veinticuatro acciones ordinarias, nominativas, serie "B", reformándose al efecto el artículo sexto de los estatutos sociales.----------------------------------

X.- REFORMA TOTAL DE LOS ESTATUTOS SOCIALES.- Por escritura número setenta y seis mil trescientos cincuenta, de fecha quince de agosto del año dos mil seis, ante el mismo notario que las anteriores, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Ordinaria y Extraordinaria de accionistas de "COMERICA BANK MÉXICO", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, de fecha quince de agosto del año dos mil seis, en la que se tomó el acuerdo de reformar totalmente sus estatutos sociales, a fin de quedar con la misma denominación, duración indefinida, domicilio en esta ciudad de México, Distrito Federal, capital social de DOSCIENTOS CINCUENTA MILLONES DE PESOS, representado por doscientos cincuenta mil acciones, serie "O", ordinarias y nominativas, con valor nominal de UN MIL PESOS cada una.----------

XI.- CAMBIO DE DENOMINACIÓN Y MODIFICACIÓN DE LAS CLÁUSULAS PRIMERA, SEGUNDA Y TERCERA DE LOS ESTATUTOS SOCIALES.- Por escritura número setenta y seis mil trescientos cincuenta y uno, de fecha quince de agosto del año dos mil seis, ante el mismo notario que la anterior, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Ordinaria y Extraordinaria de accionistas de "COMERICA BANK MÉXICO", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, de fecha quince de agosto del año dos mil seis, en la que, entre otros, se tomaron los acuerdos de cambiar la

**ALBERTO T. SÁNCHEZ COLÍN**
Notario No. 83
Ciudad de México

- 5 -                    45,619

denominación de la sociedad a "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, la incorporación de la sociedad a "MONEX GRUPO FINANCIERO", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE y, sujeto a la aprobación de la Secretaría de Hacienda y Crédito Público, modificar las cláusulas primera, segunda y tercera de sus estatutos sociales.------------------------------------------------------------------

XII.- <u>CONVENIO ÚNICO DE RESPONSABILIDADES</u>.- **Por escritura número treinta mil ochocientos cuarenta y nueve, de fecha veintitrés de agosto del año dos mil seis, ante mí,** cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar el Convenio Modificatorio al Convenio Único de Responsabilidades, que celebraron por una parte **"MONEX GRUPO FINANCIERO", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** y por otra **"MONEX CASA DE BOLSA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** MONEX GRUPO FINANCIERO, **"MONEX DIVISAS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, CASA DE CAMBIO,** MONEX GRUPO FINANCIERO, **"MONEX OPERADORA DE FONDOS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** MONEX GRUPO FINANCIERO, **"MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO,** MONEX GRUPO FINANCIERO y **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** MONEX GRUPO FINANCIERO, para dar cumplimiento a lo dispuesto por el artículo veintiocho de la Ley para Regular las Agrupaciones Financieras y la décima novena de las "Reglas Generales para la Constitución y Funcionamiento de Grupos Financieros", a efecto de **incluir como Entidad Financiera del mencionado grupo a "BANCO MONEX, SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE,** MONEX GRUPO **FINANCIERO.**-------------------------------------------------------------------

XIII.- <u>APROBACIÓN DE LA MODIFICACIÓN A LAS CLÁUSULAS PRIMERA, SEGUNDA Y TERCERA DE LOS ESTATUTOS SOCIALES</u>.- Por oficio número UBA diagonal DGABM diagonal mil doscientos diecisiete diagonal dos mil seis, expedido por la Subsecretaría de Hacienda y Crédito Público, Unidad de Banca y Ahorro, Dirección General Adjunta de Banca Múltiple, el día treinta de agosto del año dos mil seis, en cumplimiento de lo establecido por el artículo Noveno de la Ley de Instituciones de Crédito, se aprobó la modificación a las cláusulas Primera, Segunda y Tercera de los Estatutos Sociales, que quedó formalizada en la escritura relacionada en el antecedente décimo primero de este instrumento.----------------------

XIV.- <u>AUMENTO DE CAPITAL SOCIAL, REFORMA A LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES; MODIFICACIÓN DE LAS CLÁUSULAS</u>






OCTAVA, DÉCIMA CUARTA Y TRIGÉSIMA OCTAVA, ASÍ COMO EL TÍTULO DEL CAPÍTULO SEIS ROMANO; ELIMINACIÓN DE LAS CLÁUSULAS DÉCIMA QUINTA, TRIGÉSIMA QUINTA Y TRIGÉSIMA SEXTA; ADICIÓN DE LAS CLÁUSULAS VIGÉSIMA OCTAVA, TRIGÉSIMA QUINTA, ASÍ COMO LOS CAPÍTULOS OCHO Y NUEVE ROMANO A DENOMINARSE "RÉGIMEN DE OPERACIÓN CONDICIONADA" Y "SANEAMIENTO FINANCIERO MEDIANTE CRÉDITOS", RESPECTIVAMENTE, EN VIRTUD DE LOS CUALES SE ADICIONARON LAS CLÁUSULAS TRIGÉSIMA NOVENA A QUINCUAGÉSIMA PRIMERA Y LA MODIFICACIÓN A LA NUMERACIÓN DE LOS CAPÍTULOS Y CLÁUSULAS DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y un mil ciento setenta y dos, de fecha trece de febrero del año dos mil siete, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Ordinaria y Extraordinaria de Accionistas de **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, de fecha cinco de diciembre del año dos mil seis, en la que entre otros, se tomaron los acuerdos de aumentar el capital social en la cantidad de VEINTIÚN MILLONES DE PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de DOSCIENTOS CINCUENTA MILLONES DE PESOS, Moneda Nacional, quedara establecido en DOSCIENTOS SETENTA Y UN MILLONES DE PESOS, Moneda Nacional; aumentar el capital social en la cantidad de CUARENTA Y CINCO MILLONES OCHOCIENTOS MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de DOSCIENTOS SETENTA Y UN MILLONES DE PESOS, Moneda Nacional, quedara establecido en TRESCIENTOS DIECISÉIS MILLONES OCHOCIENTOS MIL PESOS, Moneda Nacional; reformar la cláusula octava de los Estatutos Sociales; modificar las cláusulas octava, décima cuarta y trigésima octava, así como el título del capítulo seis romano; eliminar las cláusulas décima quinta, trigésima quinta y trigésima sexta; adicionar las cláusulas vigésima octava, trigésima quinta, así como los capítulos ocho y nueve romano a denominarse "Régimen de Operación Condicionada" y "Saneamiento Financiero Mediante Créditos", respectivamente, en virtud de los cuales se adicionaron las cláusulas trigésima novena a quincuagésima primera, y la modificación a la numeración de los capítulos y cláusulas de los estatutos sociales.------------------------
XV.- FUSIÓN, AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- **Por escritura número treinta y un mil setecientos ochenta y uno, de fecha once de diciembre del año dos mil siete, ante mí,** cuyo primer testimonio quedó inscrito en

**ALBERTO T. SÁNCHEZ COLÍN**
Notario No. 83
Ciudad de México

- 7 -                    45,619

el Registro Público de Comercio de está Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización de las actas de las Asambleas Generales Ordinarias y Extraordinarias de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO y de "MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO, MONEX GRUPO FINANCIERO, de fecha cuatro de diciembre del año dos mil siete, en la que, se tomaron los acuerdos de fusionar "MONEX FINANCIERA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO LIMITADO, MONEX GRUPO FINANCIERO, como fusionada con "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, subsistiendo esta última como fusionante; como consecuencia aumentar su capital social en la cantidad de CUARENTA Y DOS MILLONES OCHOCIENTOS CUARENTA Y CUATRO MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de TRESCIENTOS DIECISÉIS MILLONES OCHOCIENTOS MIL PESOS, Moneda Nacional, quedara establecido en TRESCIENTOS CINCUENTA Y NUEVE MILLONES SEISCIENTOS CUARENTA Y CUATRO MIL PESOS, Moneda Nacional; y reformar el primer párrafo de la cláusula octava de los Estatutos Sociales.--------------------------------------------------------------------------------------------
XVI.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y un mil ochocientos dieciséis, de fecha veintiocho de diciembre del año dos mil siete, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Ordinaria y Extraordinaria de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MULTIPLE, MONEX GRUPO FINANCIERO, de fecha veintiuno de diciembre del año dos mil siete, en la que, se tomaron los acuerdos de aumentar el capital social en la cantidad de NOVENTA MILLONES TRESCIENTOS CINCUENTA Y SEIS MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de TRESCIENTOS CINCUENTA Y NUEVE MILLONES SEISCIENTOS CUARENTA Y CUATRO MIL PESOS, Moneda Nacional, quedara establecido en CUATROCIENTOS CINCUENTA MILLONES DE PESOS, Moneda Nacional; y reformar el primer párrafo de la cláusula octava de los Estatutos Sociales.----------------------------------
XVII.- MODIFICACIÓN DE LAS CLÁUSULAS TERCERA, SÉPTIMA, DÉCIMA, DÉCIMA TERCERA, TRIGÉSIMA TERCERA, TRIGÉSIMA CUARTA, TRIGÉSIMA






JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.33.30.34.37.35.32.24.31.38
1.3.0024 20:01:41

- 8 -                                    45,619

OCTAVA Y TRIGÉSIMA NOVENA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y dos mil doscientos nueve, de fecha veinticinco de julio del año dos mil ocho, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Extraordinaria de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de fecha veintinueve de mayo del año dos mil ocho, en la que entre otros, se tomaron los acuerdos de modificar las cláusulas tercera, séptima, décima, décima tercera, trigésima tercera, trigésima cuarta, trigésima octava y trigésima novena de los estatutos sociales.----------------------------------------------

XVIII.- COMPULSA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y dos mil doscientos veinte, de fecha treinta y uno de julio del año dos mil ocho, ante mí, se hizo constar la compulsa de los estatutos sociales de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.---------------------------------------

XIX.- FUSIÓN, AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y tres mil diecisiete, de fecha nueve de diciembre del año dos mil nueve, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización de las actas de las Asambleas Generales Ordinarias y Extraordinarias de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO y de "ACTIMONEX", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, ambas de fecha veintiséis de noviembre del año dos mil nueve, en las que, se tomaron los acuerdos de fusionar "ACTIMONEX", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, como fusionada con "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, subsistiendo esta última como fusionante; como consecuencia aumentó su capital social en la cantidad de TRESCIENTOS OCHENTA Y TRES MILLONES QUINIENTOS DIEZ MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de CUATROCIENTOS CINCUENTA MILLONES DE PESOS, Moneda Nacional, quedara establecido en OCHOCIENTOS TREINTA Y TRES MILLONES QUINIENTOS DIEZ MIL PESOS, Moneda Nacional; y reformar el primer párrafo de la cláusula octava de los Estatutos Sociales.-------------------------

XX.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura

**ALBERTO T. SÁNCHEZ COLÍN**

**Notario No. 83**
Ciudad de México

- 9 -                                        45,619

número treinta y tres mil ochocientos cuarenta y nueve, de fecha cinco de abril del año dos mil once, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Extraordinaria de Accionistas de **"BANCO MONEX"**, **SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** de fecha veintiuno de diciembre del año dos mil diez, en la que, entre otros, se tomó el acuerdo de aumentar el capital social en la cantidad de CIENTO UN MILLONES SESENTA Y TRES MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de OCHOCIENTOS TREINTA Y TRES MILLONES QUINIENTOS DIEZ MIL PESOS, Moneda Nacional, quedara establecido en NOVECIENTOS TREINTA Y CUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional; y reformar el primer párrafo de la cláusula octava de los estatutos sociales.------------------

XXI.- <u>AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES</u>.- Por escritura número treinta y cuatro mil ochocientos cincuenta, de fecha diecisiete de agosto del año dos mil doce, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Extraordinaria de accionistas de **"BANCO MONEX"**, **SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** de fecha veintinueve de junio del año dos mil doce, en la que entre otros, se tomaron los acuerdos de aumentar el capital social en la cantidad de QUINIENTOS NOVENTA MILLONES DE PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de NOVECIENTOS TREINTA Y CUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional, **quedara establecido en MIL QUINIENTOS VEINTICUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional;** y reformar el primer párrafo de la cláusula octava de los Estatutos Sociales.------------------

XXII.- <u>COMPULSA DE LOS ESTATUTOS SOCIALES</u>.-**Por escritura número treinta y cuatro mil novecientos siete, de fecha doce de septiembre del año dos mil doce, ante mí,** se hizo constar la compulsa de los estatutos sociales de **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.**------------------

XXIII.- <u>MODIFICACIÓN DE LOS ESTATUTOS SOCIALES Y COMPULSA DE LOS ESTATUTOS SOCIALES</u>.- Por escritura número treinta y seis mil ochocientos noventa y siete, de fecha dos de junio del año dos mil catorce, ante mí, cuyo






- 10 -                    45,619

primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio doscientos veintiún mil novecientos doce, se hizo constar la protocolización del acta de la Asamblea General Extraordinaria de accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de fecha siete de marzo del año dos mil catorce, en la que, se tomaron los acuerdos de modificar los estatutos sociales; así mismo se hizo constar la compulsa de los estatutos sociales.————————————

XXIV.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y ocho mil setecientos sesenta y dos, de fecha veintiséis de agosto del año dos mil quince, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización de las actas de las Asambleas Generales Extraordinarias de accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de fechas treinta y uno de diciembre del año dos mil catorce y dieciocho de marzo del año dos mil quince, en las que, se tomaron los acuerdos de aumentar el capital social en la cantidad de SEISCIENTOS MILLONES DE PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de MIL QUINIENTOS VEINTICUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional, **quedara establecido en DOS MIL CIENTO VEINTICUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional**; y reformar el primer párrafo de la cláusula octava de los estatutos sociales.————————————————————————

XXV.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura número treinta y nueve mil cuatrocientos veinticuatro, de fecha primero de marzo del año dos mil dieciséis, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital, en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización de las actas de las Asambleas Generales Extraordinarias de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de fecha treinta de junio y veintinueve de septiembre del año dos mil quince, en las que, entre otros, se tomaron los acuerdos de aumentar el capital social en la suma total de SEISCIENTOS QUINCE MILLONES NOVECIENTOS MIL PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de DOS MIL CIENTO VEINTICUATRO MILLONES QUINIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional, **quedara**

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.10.01.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13.08.24.20.01/41

## ALBERTO T. SÁNCHEZ COLÍN
**Notario No. 83**
Ciudad de México

- 11 -                    45,619

establecido en DOS MIL SETECIENTOS CUARENTA MILLONES CUATROCIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional; y reformar el primer párrafo de la Cláusula Octava de los estatutos sociales.------------------

XXVI.- COMPULSA DE LOS ESTATUTOS SOCIALES.- Por escritura número cuarenta mil ciento treinta y ocho, de fecha primero de diciembre del año dos mil dieciséis, ante mí, se hizo constar la compulsa de los estatutos sociales de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.------------------------------

XXVII.- AUMENTO DE CAPITAL SOCIAL Y REFORMA DEL PRIMER PÁRRAFO DE LA CLÁUSULA OCTAVA DE LOS ESTATUTOS SOCIALES.- Por escritura número cuarenta y un mil setecientos, de fecha quince de febrero del año dos mil dieciocho, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de Comercio de esta Capital en el Folio Mercantil número doscientos veintiún mil novecientos doce, se hizo constar la protocolización de las actas de las Asambleas Generales Extraordinarias de Accionistas de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de fechas veintinueve de junio y treinta y uno de octubre del año dos mil diecisiete, en las que, entre otros, se tomaron los acuerdos de aumentar el capital social en la suma total de QUINIENTOS MILLONES DE PESOS, Moneda Nacional, para que sumado al que anteriormente tenía de DOS MIL SETECIENTOS CUARENTA MILLONES CUATROCIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional, quedara establecido en TRES MIL DOSCIENTOS CUARENTA MILLONES CUATROCIENTOS SETENTA Y TRES MIL PESOS, Moneda Nacional, representado por tres millones doscientas cuarenta mil cuatrocientas setenta y tres acciones Serie "O", ordinarias y nominativas, con valor nominal de MIL PESOS cada una y reformar el primer párrafo de la Cláusula Octava de los estatutos sociales.------------------

XXVIII.- COMPULSA DE LOS ESTATUTOS SOCIALES.- Por escritura número cuarenta y un mil setecientos veintidós, de fecha veintidós de febrero del año dos mil dieciocho, ante mí, se hizo constar la compulsa de los estatutos sociales de "BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO, de la que copio en su parte conducente lo que es del tenor literal siguiente:------------------

"-------------------------CAPÍTULO I...------------------------------

------------------------..OBJETO SOCIAL...------------------------

...CLÁUSULA TERCERA.- El objeto de la Sociedad es la prestación del servicio de banca y crédito, en los términos de la Ley de Instituciones de Crédito, por lo que podrá llevar a cabo todas las operaciones señaladas en el

- 12 -                              45,619

artículo cuarenta y seis de la Ley de Instituciones de Crédito y que se enuncian a continuación: -------------------------------------------------------------------------------------------

I. Recibir depósitos bancarios en dinero:-------------------------------------------------------

a) A la vista;------------------------------------------------------------------------------------------

b) Retirables en días preestablecidos;--------------------------------------------------------

c) De ahorro, y--------------------------------------------------------------------------------------

d) A plazo o con previo aviso;-------------------------------------------------------------------

II. Aceptar préstamos o créditos;---------------------------------------------------------------

III. Emitir bonos bancarios;-----------------------------------------------------------------------

IV. Emitir obligaciones subordinadas;----------------------------------------------------------

V. Constituir depósitos en  instituciones de crédito y entidades financieras del exterior;-----------------------------------------------------------------------------------------------

VI. Efectuar descuentos y otorgar préstamos o créditos;-------------------------------

VII. Expedir tarjetas de crédito con base en contratos de apertura de crédito en cuenta corriente;------------------------------------------------------------------------------------

VIII. Asumir obligaciones por cuenta de terceros, con base en créditos concedidos, a través del otorgamiento de aceptaciones, endoso o aval de títulos de crédito, así como de la expedición de cartas de crédito;-------------------------------------------------

IX. Operar con valores en los términos de las disposiciones de la Ley de Instituciones de Crédito y de la Ley del Mercado de Valores;--------------------------

X. Promover la organización y transformación de toda clase de empresas o sociedades mercantiles y suscribir y conservar acciones o partes de interés en las mismas, en los términos de la Ley de Instituciones de Crédito;--------------------------

XI. Operar con documentos mercantiles por cuenta propia.-----------------------------

XII. Llevar a cabo por cuenta propia o de terceros operaciones con oro, plata y divisas, incluyendo reporto sobre estas últimas;-------------------------------------------

XIII. Prestar servicio de cajas de seguridad;------------------------------------------------

XIV. Expedir cartas de crédito  previa  recepción de su importe, hacer efectivos créditos y realizar pagos por cuenta de clientes;------------------------------------------

XV. Practicar las operaciones de fideicomiso a que se refiere la Ley General de Títulos y Operaciones de Crédito, y llevar a cabo mandatos y comisiones;------------

Podrá celebrar operaciones consigo misma en el cumplimiento de fideicomisos, mandatos o comisiones, cuando el Banco de México lo autorice mediante disposiciones de carácter general, en las que se establezcan requisitos, términos y condiciones que promuevan que las operaciones de referencia se realicen en congruencia con las condiciones de mercado al tiempo de su celebración, así como que se eviten conflictos de interés;----------------------------------------------------------

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.30.30.30.35.30.14.13.32.14.31.38
13.080.21.2061-01



## ALBERTO T. SÁNCHEZ COLÍN
**Notario No. 83**
Ciudad de México

- 13 -                    45,619

XVI. Recibir depósitos en administración o custodia, o en garantía por cuenta de terceros, de títulos o valores y en general de documentos mercantiles;---------------

XVII. Actuar como representante común de los tenedores de títulos de crédito;--------

XVIII. Hacer servicio de caja y tesorería relativo a títulos de crédito, por cuenta de las emisoras;-----------------------------------------------------------------------

XIX. Llevar la contabilidad y los libros de actas y de registro de sociedades y empresas;-----------------------------------------------------------------------------

XX. Desempeñar el cargo de albacea;-------------------------------------------------

XXI. Desempeñar la sindicatura o encargarse de la liquidación judicial o extrajudicial de negociaciones, establecimientos, concursos o herencias;--------------------------

XXII. Encargarse de hacer avalúos que tendrán la misma fuerza probatoria que las leyes asignan a los hechos por corredor público o perito;-------------------------------

XXIII. Adquirir los bienes muebles e inmuebles necesarios para la realización de su objeto y enajenarlos cuando corresponda;--------------------------------------------

XXIV. Celebrar contratos de arrendamiento financiero y adquirir los bienes que sean objeto de tales contratos;----------------------------------------------------------------

XXV. Realizar operaciones derivadas, sujetándose a las disposiciones técnicas y operativas que expida el Banco de México, en las cuales se establezcan las características de dichas operaciones, tales como tipos, plazos, contrapartes, subyacentes, garantías y formas de liquidación;----------------------------------------

XXVI. Efectuar operaciones de factoraje financiero;----------------------------------

XXVII. Emitir y poner en circulación cualquier medio de pago que determine el Banco de México, sujetándose a las disposiciones técnicas y operativas que éste expida, en las cuales se establezcan entre otras características, las relativas a su uso, monto y vigencia, a fin de propiciar el uso de diversos medios de pago;----------

XXVIII. Intervenir en la contratación de seguros para lo cual deberá cumplir con lo establecido en la Ley General de Instituciones y Sociedades Mutualistas de Seguros y en las disposiciones de carácter general que de la misma emanen, y------

XXIX. Las análogas o conexas que autorice la Secretaría de Hacienda y Crédito Público, oyendo la opinión del Banco de México y de la Comisión Nacional Bancaria y de Valores.--------------------------------------------------------------------------

Para la realización de su objeto social, la Sociedad deberá ajustarse a lo previsto en la Ley de Instituciones de Crédito y demás disposiciones que en su caso resulten aplicables; asimismo podrá, con apego a lo dispuesto por la Ley para Regular las Agrupaciones Financieras, actuar de manera conjunta frente al público con las demás entidades financieras que formen parte del Grupo Financiero al que pertenezca la Sociedad, así como ofrecer servicios complementarios y ostentarse como parte del Grupo Financiero de que se trate...--------------------------------------

- 14 -                    45,619

## CAPÍTULO III

## ADMINISTRACIÓN Y VIGILANCIA

**CLÁUSULA DÉCIMA SEXTA.-** La Administración de la Sociedad estará encomendada a un Consejo de Administración y a un Director General, en sus respectivas esferas de competencia.

**CLÁUSULA DÉCIMA SÉPTIMA.-** El Consejo de Administración de la Sociedad estará integrado por un mínimo de cinco y un máximo de quince Consejeros propietarios, de los cuales cuando menos el veinticinco por ciento deberán ser independientes. Por cada Consejero propietario se designará a su respectivo suplente, en el entendido de que los Consejeros suplentes de los Consejeros independientes, deberán tener ese mismo carácter.

Por Consejero independiente, deberá entenderse a la persona que sea ajena a la administración de la Sociedad y que reúna los requisitos y condiciones que determine la Comisión Nacional Bancaria y de Valores mediante disposiciones de carácter general, en las que igualmente se establecerán los supuestos bajo los cuales se considerará que un Consejero deja de ser independiente. Los Consejeros independientes en ningún caso deberán ubicarse en los supuestos de impedimento para ocupar el cargo, de conformidad con lo establecido por la Ley de Instituciones de Crédito.

Los miembros del Consejo de Administración serán designados por la Asamblea General Ordinaria de Accionistas, la cual, en su caso, determinará sus emolumentos; asimismo, los Accionistas que representen cuando menos un diez por ciento del capital pagado ordinario de la Sociedad tendrán derecho a designar un Consejero.

Sólo podrá revocarse el nombramiento de los Consejeros de minoría, cuando se revoque el de todos los demás.

Los nombramientos de Consejeros de la Sociedad deberán recaer en personas que cuenten con calidad técnica, honorabilidad e historial crediticio satisfactorio, así como con amplios conocimientos y experiencia en materia financiera, legal o administrativa. En ningún caso podrán ser Consejeros de la Sociedad las personas que se ubiquen en los supuestos de impedimento para ocupar el cargo, de conformidad con lo establecido por la Ley de Instituciones de Crédito.

La mayoría de los Consejeros deberán ser mexicanos o extranjeros residentes en el territorio nacional. Los miembros del Consejo de Administración podrán ser o no Accionistas, durando en sus funciones un año y deberán continuar en el ejercicio de su cargo en tanto sus sucesores no hayan tomado posesión en el mismo.

JACOBO GUADALUPE MARTINEZ FLORES
20,30,30,30,30,31,30,30,30,30,30,33,30,34,37,35,32,34,31,38
13308'24 26:01-41

# ALBERTO T. SÁNCHEZ COLÍN

**Notario No. 83**
Ciudad de México





- 15 -                45,619

Los Consejeros propietarios y, en su caso, los respectivos suplentes deberán mantenerse mutuamente informados acerca de los asuntos tratados en las sesiones del Consejo de Administración a las que asistan.----------------------------------

La Comisión Nacional Bancaria y de Valores podrá en todo tiempo determinar la remoción o suspensión de los miembros del Consejo de Administración, Director General y funcionarios que ocupen cargos con las dos jerarquías inmediatas inferiores a la de éste.--------------------------------------------------------------------

**CLÁUSULA DECIMA OCTAVA.-** El Presidente del Consejo será elegido por la Asamblea General Ordinaria de Accionistas de entre los Consejeros propietarios y, a falta de tal designación, el propio Consejo de Administración lo elegirá.-------------

El Presidente del Consejo presidirá las Asambleas de Accionistas y las sesiones del Consejo de Administración y estará facultado para cumplir con los acuerdos adoptados en ambas, sin necesidad de resolución especial alguna.-------------------

La Asamblea General Ordinaria de Accionistas nombrará a un Secretario, el cual podrá no ser Consejero, así como a un Prosecretario que lo supla en sus ausencias.------------------------------------------------------------------------------------

**CLÁUSULA DÉCIMA NOVENA.-** El Consejo de Administración deberá reunirse por lo menos trimestralmente y, en forma extraordinaria, cuando sea convocado por su Presidente, por al menos el veinticinco por ciento de los Consejeros, por cualquiera de los Comisarios de la Sociedad o por el Secretario a petición del Presidente del Consejo.-------------------------------------------------------------------------------------------

Las convocatorias a las sesiones del Consejo de Administración se harán por escrito enviando a sus miembros vía fax, correo electrónico o a su domicilio, con cuando menos un día natural de anticipación a la celebración de la misma, especificando la hora, fecha y lugar de la sesión, así como los asuntos que serán tratados en ella. La convocatoria no será necesaria cuando todos los miembros del Consejo de Administración, propietarios o suplentes, se encuentren presentes.------

Para la celebración de las sesiones ordinarias y extraordinarias del Consejo de Administración se deberá contar con la asistencia de cuando menos el cincuenta y uno por ciento de los Consejeros, de los cuales por lo menos uno deberá ser Consejero independiente, y se tomarán las resoluciones por mayoría de votos, teniendo el Presidente voto de calidad en caso de empate.-----------------------------

Los Consejeros estarán obligados a abstenerse expresamente de participar en la deliberación y votación de cualquier asunto que implique para ellos un conflicto de interés. Asimismo, deberán mantener absoluta confidencialidad respecto de todos aquellos actos, hechos o acontecimientos relativos a la Sociedad, así como de toda deliberación que se lleve a cabo en el Consejo, sin perjuicio de la obligación que





- 16 -                    45,619.

tendrá la Sociedad de proporcionar toda la información que les sea solicitada al amparo de la Ley de Instituciones de Crédito.----------------------------------------

Las resoluciones tomadas fuera de sesión de Consejo por unanimidad de sus miembros tendrán, para todos los efectos legales, la misma validez que si hubiesen sido adoptadas en sesión de Consejo, siempre que se confirmen por escrito.---------

**CLÁUSULA VIGÉSIMA.-** El Consejo de Administración tendrá las más amplias facultades para realizar el objeto social y para dirigir y administrar a la Sociedad.-----

De manera enunciativa y no limitativa, contará con los siguientes poderes y facultades:----------------------------------------------------------------

**a) Poder general para pleitos y cobranzas**, con todas las facultades generales y aún las especiales, que de acuerdo con la Ley requieran poder o cláusula especial, en los términos del párrafo primero del artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal y sus correlativos en las demás entidades federativas.----------------------------------------------

De manera enunciativa y no limitativa, se mencionan entre otras las facultades siguientes:-----------------------------------------------------------------

I.- Para intentar y desistirse de toda clase de procedimientos, inclusive amparo.------

II.- Para transigir.---------------------------------------------------------------

III.- Para comprometer en árbitros.-----------------------------------------------

IV.- Para absolver y articular posiciones.-----------------------------------------

V.- Para recusar.-----------------------------------------------------------------

VI.- Para hacer cesión de bienes.-------------------------------------------------

VII.- Para recibir pagos.----------------------------------------------------------

VIII.- Para presentar denuncias y querellas en materia penal y para desistirse de ellas cuando lo permita la Ley.--------------------------------------------------

Las facultades contenidas en este inciso podrán ser ejercidas ante particulares y ante toda clase de autoridades administrativas o judiciales, inclusive las de carácter federal o local y ante las Juntas de Conciliación y Arbitraje, Locales o Federales y Autoridades del Trabajo.------------------------------------------------------

b) En los términos del artículo once de la Ley Federal del Trabajo, **poder especial para actos de administración laboral** para los efectos contenidos en la Ley Federal del Trabajo y ante el Instituto Mexicano del Seguro Social y el Instituto del Fondo Nacional de la Vivienda para los Trabajadores.-------------------------------

c) **Poder general para actos de administración** en los términos del párrafo segundo del artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal y sus correlativos en las demás entidades federativas.-------------------------------------------------------------------

# ALBERTO T. SÁNCHEZ COLÍN

**Notario No. 83**
Ciudad de México



- 17 -                    45,619

d) **Poder general para actos de dominio** de acuerdo con el párrafo tercero del mismo artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal y sus correlativos en las demás entidades federativas.----------------------------------------------------------------------------------------

e) **Poder para otorgar y suscribir títulos de crédito** en los términos del artículo noveno de la Ley General de Títulos y Operaciones de Crédito.------------------------------

g) **Facultad para otorgar poderes generales o especiales y revocar unos y otros**; incluyendo la posibilidad de delegar las facultades contenidas en el presente inciso.----------------------------------------------------------------------------------------------

h) En general, facultad para llevar a cabo cualquier acto u operación que sean necesarios o convenientes para la consecución de los fines de la Sociedad.------------

**CLÁUSULA VIGÉSIMA PRIMERA.-** Además del Consejo de Administración, la Sociedad podrá contar con órganos intermedios de Administración, a los cuales se les denominará Comités.-------------------------------------------------------------------------

La Sociedad podrá contar con los comités que el Consejo de Administración estime necesarios de conformidad con los intereses de administración de la Sociedad. Asimismo, la Sociedad deberá contar con los comités que establezcan la Ley de Instituciones de Crédito y las disposiciones de carácter general que resulten aplicables, entre los cuales se encuentran, de manera enunciativa, más no limitativa, los siguientes: (i) comité de auditoría, (ii) comité de administración de riesgos, (iii) comité de remuneraciones, y (iv) comité de comunicación y control (en materia de prevención y combate de lavado de dinero y financiamiento al terrorismo).------------------------------------------------------------------------------------------

Las funciones mínimas de los comités, así como las normas relativas a su integración, periodicidad de sus sesiones y la oportunidad y suficiencia de la información que deban considerar, se sujetarán a las disposiciones que les resulten aplicables, así como a las reglas de operación que determine el Consejo de Administración.---------------------------------------------------------------------------------------

**CLÁUSULA VIGÉSIMA SEGUNDA.-** La designación de los integrantes de los Comités se hará por resolución del Consejo de Administración.-----------------------------

Los Comités funcionarán invariablemente como órganos colegiados y estarán compuestos por un mínimo de tres integrantes. Funcionarán válidamente con la asistencia de la mayoría de sus miembros, tomándose sus acuerdos por mayoría de votos, teniendo el Presidente de los Comités voto de calidad.---------------------------

El Consejo de Administración elegirá de entre los miembros que integren los Comités, a quien los presida, quien recibirá la designación de Presidente del Comité.-------------------------------------------------------------------------------------------------

- 18 -                          45,619

Los Comités, por conducto de su Presidente, informarán de sus actividades al Consejo de Administración con la periodicidad que el propio Consejo de Administración determine o cuando se susciten hechos o actos de trascendencia para la Sociedad que a juicio del propio Consejo de Administración o del Presidente de los Comités ameriten dicho informe.----------------------------------------------------------

Las convocatorias para las reuniones de los Comités las efectuará el Presidente del Comité respectivo o el Secretario del mismo a solicitud del primero.----------------

La función de los Comités deberá ser la de resolver asuntos que mantengan el ágil desarrollo, la seguridad y la vigilancia de las actividades de la Sociedad, de conformidad con los lineamientos que establezca el Consejo de Administración, los cuales en ningún caso comprenderán las facultades reservadas por la ley o los Estatutos a otro órgano de la Sociedad...".--------------------------------------------------

**CLÁUSULA VIGÉSIMA TERCERA.-** La vigilancia de la Sociedad queda encomendada a un Comisario designado por los Accionistas titulares de acciones Serie "O" y, en su caso, un Comisario designado por los Accionistas titulares de acciones Serie "L", así como sus respectivos suplentes, debiendo ser designados por mayoría de votos de los Accionistas en Asamblea Ordinaria en el caso de la Serie "O" y, en su caso, en Asamblea Especial para la Serie "L", durando en funciones un año y hasta en tanto el o los sucesores no hayan tomado posesión de sus cargos, continuarán en ejercicio del mismo. A las Asambleas Especiales que se reúnan con este fin, les serán aplicables, en lo conducente, las disposiciones para las Asambleas Generales Ordinarias de Accionistas previstas en la Ley General de Sociedades Mercantiles.-------------------------------------------------------------------

El Comisario o Comisarios tendrán las facultades y obligaciones que determina la Ley General de Sociedades Mercantiles...".------------------------------------------------

**XXIX.- RENUNCIA, DESIGNACIÓN Y RATIFICACIÓN DE COMISARIOS PROPIETARIO Y SUPLENTE.- Por escritura número cuarenta y cuatro mil cuatrocientos once, de fecha trece de diciembre del año dos mil diecinueve, ante mí,** se hizo constar la protocolización del acta de la Asamblea General Ordinaria de accionistas de **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** de fecha veintitrés de octubre del año dos mil diecinueve, en la que entre otros, se tomaron los acuerdos de designar a doña Karen Jazmín Pérez Olvera y ratificar a don Ernesto Pineda Fresán, como Comisarios Propietario y Suplente de la Sociedad, respectivamente.---------------------------------------------------------------------------

**XXX.- NOMBRAMIENTO Y RATIFICACIÓN DE LOS MIEMBROS DEL CONSEJO DE ADMINISTRACIÓN, COMISARIOS PROPIETARIO Y SUPLENTE, SECRETARIO Y PROSECRETARIO.- Por escritura número cuarenta y cuatro**

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.35.30.34.37.35.37.34.31.38
13.08.24.39.08.41

**ALBERTO T. SÁNCHEZ COLÍN**

**Notario No. 83**
**Ciudad de México**

- 19 -                          45,619

mil seiscientos noventa y nueve, de fecha dieciséis de junio del año dos mil
veinte, ante mí, cuyo primer testimonio quedó inscrito en el Registro Público de
Comercio de esta Capital en el Folio Mercantil número doscientos veintiún mil
novecientos doce, se hizo constar la protocolización parcial del acta de la Asamblea
General Anual Ordinaria Anual de accionistas de **"BANCO MONEX", SOCIEDAD
ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO
FINANCIERO,** de fecha treinta de abril del año dos mil veinte, en la que, entre
otros, se tomaron los acuerdos de **nombrar y ratificar como miembros del
Consejo de Administración, Comisarios Propietario y Suplente, Secretario y
Prosecretario,** a las personas que a continuación se indican:------------------------

**PROPIETARIOS**----------------------------------**SUPLENTES**----------------------------

Don Héctor Pío Lagos Dondé-------------**Presidente**----------------------------------

Doña Georgina Teresita Lagos Dondé------------------------------------------------------

Don Mauricio Naranjo González---------------------------Don Jorge Hierro Molina----

Don Moisés Tiktin Nickin--------------------------------Doña Patricia García----------

----------------------------------------------------------------Gutiérrez----------------

**INDEPENDIENTES PROPIETARIOS**----------**INDEPENDIENTE SUPLENTES**----

Don David Aarón Margolín Schabes----------------Don Hernando Carlos Luis Sabau-

------------------------------------------------García----------------------------------

Don Jorge Jesús Galicia Romero-----------------------------------------------------------

**COMISARIO PROPIETARIO**------------------**COMISARIO SUPLENTE**-----------

Doña Karen Jazmín Pérez Olvera ---------------Don Ernesto Pineda Fresán---------

**SECRETARIO**----------------------------------**PROSECRETARIO**------------------

Don Jacobo Guadalupe Martínez Flores------------Don Erik Alberto García Tapia------

Estos dos últimos sin ser miembros del Consejo de Administración.------------------

**XXXI.- Que los miembros del Consejo de Administración de "BANCO MONEX",
SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO
FINANCIERO, celebraron Junta, de la que se levantó el acta que en su parte
conducente es del tenor literal siguiente:**------------------------------------------------

"Acta de la junta del Consejo de Administración de **BANCO MONEX, S.A.,
INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO,** celebrada el
27 de enero de 2021 a las 18:30 horas en el domicilio Social.------------------------

**Asistencia:** Se reunieron los señores Héctor Pío Lagos Dondé, Georgina T. Lagos
Dondé, Mauricio Naranjo González, Moisés Tiktin Nickin, David Aarón Margolín
Schabes y Jorge Jesús Galicia Romero, como miembros Propietarios del Consejo de
Administración y los señores Jorge Hierro Molina, Patricia García Gutiérrez y
Hernando Carlos Luis Sabau García, como miembros Suplentes del Consejo de
Administración, así como los señores Jacobo G. Martínez Flores y Karen Jazmín



- 20 -                    45,619

Pérez Olvera, en su carácter de Secretario y Comisario de la Sociedad, respectivamente; los señores Javier Alvarado Chapa, Antonio Nava Tamez e Ignacio Odriozola Garín, como invitados.————————————————————————

**Presidencia y Secretaría:** Presidió la junta el señor Héctor P. Lagos Dondé, en su carácter de Presidente del Consejo de Administración y actuó como Secretario el señor Jacobo G. Martínez Flores.————————————————————————

**Quórum:** Tomando en consideración que los señores Consejeros fueron debidamente convocados y en virtud de encontrarse presentes la totalidad de los mismos, el Presidente declaró debidamente instalada la junta proponiendo el siguiente:————————
————————————————O R D E N   D E L   D Í A...————————————————

...XXI. Propuesta, discusión y, en su caso, aprobación respecto del otorgamiento de poderes de la Sociedad.  Resoluciones al respecto.————————————————————

Aprobado por unanimidad el Orden del Día que antecede, se procedió a su desahogo en los siguientes términos:...——————————————————————

...**XXI. Propuesta, discusión y, en su caso, aprobación respecto del otorgamiento de poderes de la Sociedad.  Resoluciones al respecto.**————————

Por lo que se refiere al desahogo del último punto del Orden del Día, el señor Héctor P. Lagos Dondé indicó a los miembros Consejeros la conveniencia de que la Sociedad otorgue diversos poderes a favor del señor Jacobo Guadalupe Martínez Flores.————————————————————————

Después de comentar lo anterior, los miembros Consejeros, por unanimidad de votos, adoptaron los siguientes:————————————————————————
————————————————A C U E R D O S————————————————————

XXI.1 Se otorga a favor del señor Jacobo Guadalupe Martínez Flores los siguientes poderes:————————————————————————————————

**a) Poder general para pleitos y cobranzas,** con todas las facultades generales y aún las especiales que de acuerdo con la Ley requieran poder o cláusula especial, en los términos del párrafo primero del artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal aplicable a la Ciudad de México y sus artículos correlativos de los Códigos Civiles de los Estados de la República Mexicana, excepto hacer cesión de bienes.————————————————

De manera enunciativa y no limitativa, se mencionan entre otras las facultades siguientes:————————————————————————————————

I. Para intentar y desistirse de toda clase de procedimientos inclusive el juicio de Amparo.————————————————————————————————

II. Para transigir.————————————————————————————————

III. Para comprometer en árbitros.————————————————————————

IV. Para absolver y articular posiciones.————————————————————————

# ALBERTO T. SÁNCHEZ COLÍN
**Notario No. 83**
**Ciudad de México**



- 21 -                    45,619

V. Para recusar.----------------------------------------------------------

VI. Para recibir pagos.----------------------------------------------------

VII. Para presentar denuncias y querellas en materia penal y para desistirse de ellas cuando lo permita la Ley.--------------------------------------------------

**b) Poder general para actos de administración en materia laboral,** por lo que gozará de las facultades establecidas en los artículos once, seiscientos ochenta y cuatro "E", seiscientos noventa y dos, ochocientos setenta y tres "F" y ochocientos setenta y tres "H", de la Ley Federal del Trabajo, pudiendo representar a la poderdante ante toda clase de sindicatos, concurrir a toda clase de audiencias, citatorios, requerimientos, avenencias, transacciones, arreglos, finiquitos, articular o absolver posiciones, promover o desistirse del juicio de amparo, presentar denuncias y querellas penales, otorgar el perdón, promover inexistencias de huelgas, promover conflictos de orden económico, ostentarse en calidad de patrón frente a los trabajadores con las más amplias facultades de representación, sin limitación alguna y sin impedimentos de ninguna especie, pudiendo inclusive comparecer a la audiencia de conciliación, a la audiencia preliminar y a la audiencia de juicio a que se refieren los artículos seiscientos ochenta y cuatro "E", ochocientos setenta y tres "F", ochocientos setenta y tres "H", y demás relativos de la Ley Federal del Trabajo, actuando siempre con la calidad de Patrón principalmente en el caso de audiencias a que se refieren los artículos seiscientos ochenta y cuatro "E", ochocientos setenta y tres "F" y ochocientos setenta y tres "H", de la Ley Federal del Trabajo.--------------------------------------------------

Asimismo, podrá comparecer ante las Juntas de Conciliación y Arbitraje a las audiencias de conciliación, demanda y excepciones, ofrecimiento y admisión de pruebas a que se refieren los artículos ochocientos setenta y cinco, ochocientos setenta y seis y ochocientos setenta y ocho de la Ley Federal del Trabajo, de conformidad con lo previsto por el Transitorio Octavo del Decreto por el que se reforman, adicionan y derogan diversas disposiciones de la Ley Federal del Trabajo, de la Ley Orgánica del Poder Judicial de la Federación, de la Ley Federal de la Defensoría Pública, de la Ley del Instituto del Fondo Nacional de la Vivienda para los Trabajadores y de la Ley del Seguro Social, en materia de Justicia Laboral, Libertad Sindical y Negociación Colectiva, publicado en el Diario Oficial de la Federación el día primero de mayo de dos mil diecinueve.--------------------------

**c) Poder general para actos de administración,** en los términos del segundo párrafo del artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal aplicable a la Ciudad de México y sus artículos correlativos de los Códigos Civiles de los Estados de la República Mexicana.----------

**d) Poder especial para actos de dominio** únicamente en cuanto a bienes muebles





JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.10.31.00.30.30.30.35.36.34.37.35.32.34.31.38
13.06.24 20.01.41



- 22 -                    45,619

se refiere propiedad de la Sociedad, de conformidad con lo dispuesto en el tercer párrafo del artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal, Código Civil para el Distrito Federal aplicable a la Ciudad de México y sus artículos correlativos de los Códigos Civiles de los Estados de la República Mexicana.----------

**e) Poder para otorgar y suscribir títulos de crédito**, así como endosarlos y protestarlos, en términos de lo dispuesto por el artículo noveno de la Ley General de Títulos y Operaciones de Crédito.----------------------------------------------------

**f) Poder especial para abrir y cancelar cuentas bancarias y librar cheques** a nombre de la Sociedad, así como para autorizar a personas para el manejo de las mismas.----------------------------------------------------------------------------------------------

**g) Poder especial para celebrar Contratos de Intermediación Bursátil** y Contratos de Compraventa de Valores y Reporto, así como para autorizar a personas que puedan girar instrucciones en dichos contratos.----------------------------

**h) Facultad para otorgar poderes generales y especiales**, en los que se podrá otorgar la facultad de sustitución, así como sustituir o delegar sus poderes, reservándose siempre el derecho de los mismos y para revocar cualquier poder que se hubiere otorgado, sustituido o delegado.----------------------------------------------

**i) Facultad** para otorgar a favor de las personas físicas debidamente autorizadas por la Comisión Nacional Bancaria y de Valores para celebrar operaciones con el público inversionista, los poderes especiales que correspondan de conformidad con la Ley del Mercado de Valores y con la Ley de Fondos de Inversión.------------------

**j) Facultad para revocar todos los poderes generales o especiales** otorgados, delegados o sustituidos por la Asamblea de Accionistas, por el Consejo de Administración, por Delegados o por Apoderados de la Sociedad.---------------------

**k) Facultad para revocar** cualquier designación de funcionarios o Delegados, efectuada por la Asamblea de Accionistas, el Consejo de Administración, Delegados o Apoderados de la Sociedad.----------------------------------------------------

**LIMITACIÓN:** El apoderado deberá ejercer las facultades contenidas en los incisos d), e) y f) anteriores, conjuntamente con cualquier otro apoderado que tenga dichas facultades.------------------------------------------------------------------------------------

No habiendo más asuntos que tratar, se dio por concluida la presente junta a las 19:00 horas del día de su fecha, firmando para constancia las siguientes personas.- Siguen firmas.".----------------------------------------------------------------------------------

El acta antes transcrita parcialmente obra consignada a páginas de ciento seis vuelta a la ciento diecisiete frente del libro de actas de Sesiones del Consejo de Administración de la sociedad.------------------------------------------------------------------

Con la letra **"A"** agrego al apéndice de esta escritura en copia fotostática Lista de Asistencia de la Junta del Consejo de Administración de **"BANCO MONEX"**,

ALBERTO T. SÁNCHEZ COLÍN

**Notario No. 83**
Ciudad de México





- 23 -                     45,619

SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO.------------------------------------------------------------------------

----------------------------D E C L A R A C I O N E S:----------------------------

Declara el compareciente, en su carácter de delegado de la Junta del Consejo de Administración antes transcrita parcialmente, de manera expresa y bajo protesta de decir verdad, lo siguiente:----------------------------------------------------------------

a) Que el texto y firmas que aparecen en el acta antes transcrita parcialmente son auténticos.------------------------------------------------------------------------------

b) Que los estatutos de la Sociedad que me han sido exhibidos son los vigentes.----

c) Que los miembros del consejo de Administración de la Sociedad que asistieron a la Junta estuvieron presentes en el desarrollo y al tomarse los acuerdos de la misma.------------------------------------------------------------------------------------

----------------DECLARACIÓN DE NO INVERSIÓN EXTRANJERA----------------

Declara el compareciente que **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, no tiene participación alguna de inversión extranjera para los efectos que establece el artículo treinta y cuatro de la Ley de Inversión Extranjera.----------------------------

Expuesto lo anterior, el compareciente otorga las siguientes:------------------------

----------------------------C L Á U S U L A S:----------------------------



PRIMERA.- Queda protocolizada parcialmente el acta de la Junta del Consejo de Administración de **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, MONEX GRUPO FINANCIERO**, de fecha veintisiete de enero del año dos mil veintiuno, que ha quedado transcrita parcialmente en el **antecedente trigésimo primero** de esta escritura, para que surta todos sus efectos legales.---------------------------------------------------------------------------------------

SEGUNDA.- Quedan otorgados a **don Jacobo Guadalupe Martínez Flores**, los poderes y facultades, y con la limitación que se indica en el acta transcrita parcialmente en el **antecedente trigésimo primero** de esta escritura.----------------

YO EL NOTARIO CERTIFICO:----------------------------------------------------------

I.- Que me identifiqué plenamente como Notario ante el compareciente, a quien enteré de las penas en que incurre quien declara con falsedad.--------------------------

II.- Que conozco personalmente al compareciente y a mi juicio tiene capacidad legal para la celebración de este acto.-------------------------------------------------------------

III.- Que no tengo indicio alguno de falsedad del acta que en esta escritura se protocoliza parcialmente.----------------------------------------------------------------------

IV.- **AVISO DE PRIVACIDAD**.- Que en términos de lo dispuesto por la Ley Federal de Protección de Datos Personales en Posesión de los Particulares, el compareciente manifiesta saber que el aviso de privacidad a que se refiere la



- 24 -                          45,619

misma, es el que aparece en la página de internet de esta Notaría con la dirección www.notaria83df.com.mx, y que se encuentra exhibido en las oficinas del suscrito Notario, por lo que está a su disposición para ser consultado en cualquier momento, y con la firma del presente instrumento otorga su consentimiento expreso con el tratamiento de sus datos personales. ------------------------------------------------

V.- Que el compareciente, de manera expresa y bajo protesta de decir verdad, declara por sus generales ser:------------------------------------------------------------

Mexicano, originario de Ciudad Victoria, Estado de Tamaulipas, lugar donde nació el día veintidós de diciembre de mil novecientos sesenta y dos, casado, con domicilio en Avenida Paseo de la Reforma número doscientos ochenta y cuatro, piso catorce, Colonia Juárez, Cuauhtémoc, Código Postal cero seis mil seiscientos, Ciudad de México, Abogado. ------------------------------------------------------

VI.- Que tuve a la vista los documentos citados en esta escritura.-----------------

VII.- Que hice saber al compareciente el derecho que tiene de leer esta escritura, y no la leyó personalmente.-------------------------------------------------------------

VIII.- Que leída y explicada esta escritura e ilustrado al compareciente acerca del valor, las consecuencias y alcances legales del contenido de la misma, manifestó su comprensión plena y conformidad con ella, firmando el día catorce de julio del año en curso, mismo momento en que la autorizo definitivamente.---------Doy fe.------

Firma de don Jacobo Guadalupe Martínez Flores.--------------------------------------

Sánchez Colín.-------------------------------------------------Firma.------------

El sello de autorizar.------------------------------------------------------------

Para cumplir con lo dispuesto por el artículo dos mil quinientos cincuenta y cuatro del Código Civil vigente para el Distrito Federal (hoy Ciudad de México), y Código Civil Federal, a continuación se transcribe:-----------------------------------------------

"ARTÍCULO 2554.- En todos los poderes generales para pleitos y cobranzas bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la ley, para que se entiendan conferidos sin limitación alguna.--------------------------------------------

En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter para que el apoderado tenga toda clase de facultades administrativas.-

En los poderes generales, para ejercer actos de dominio, bastará que se den con ese carácter para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones, a fin de defenderlos.-------------------------------------------------------------------

Cuando se quisieren limitar, en los tres casos antes mencionados, las facultades de los apoderados, se consignarán las limitaciones, o los poderes serán especiales.------------------------------------------------------------------

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13/08/24 20:00:01

## ALBERTO T. SÁNCHEZ COLÍN

**Notario No. 83**
Ciudad de México

- 25 -                                           45,619

Los notarios insertarán este artículo en los testimonios de los poderes que
otorguen ".------------------------------------------------------------

ES **PRIMER TESTIMONIO, PRIMERO EN SU ORDEN**, SACADO DEL
PROTOCOLO A MI CARGO, PROTEGIDO POR HOLOGRAMAS, QUE EXPIDO
PARA **"BANCO MONEX", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA
MÚLTIPLE, MONEX GRUPO FINANCIERO**, COMO **CONSTANCIA**, EN
VEINTICINCO PÁGINAS.------------------------------------------

CIUDAD DE MÉXICO, A CATORCE DE JULIO DEL AÑO DOS MIL VEINTIUNO.----
CORREGIDO.----------------------------------------DOY FE.--------------

IMJ/mlg*













REGISTRO PÚBLICO DE LA PROPIEDAD Y DE COMERCIO DEL
DISTRITO FEDERAL



## BOLETA DE INSCRIPCIÓN

LOS ACTOS DESCRITOS EN EL PRESENTE DOCUMENTO QUEDARON INSCRITOS EN EL
FOLIO MERCANTIL ELECTRÓNICO NÚMERO:          221912      - 1

NOMBRE / DENOMINACIÓN Ó RAZÓN SOCIAL

## BANCO MONEX,S.A. INSTITUCION DE BANCA MULTIPLE, MONEX GRUPO FINANCIERO.

Domicilio          MEXICO D.F.

DATOS DE RECEPCIÓN:

| Control | Fecha de Ingreso | Hora |
|---|---|---|
| 536202 | 24/08/2021 | 11:26:31 |

DATOS DEL FEDATARIO/AUTORIDAD:

109017083     ALBERTO T. SANCHEZ COLIN
Domicilio          DISTRITO FEDERAL

MEDIANTE EL DOCUMENTO NÚMERO:          45619

SE INSCRIBIERON LOS SIGUIENTES ACTOS

| Clave | FME | Forma Precodificada | Fecha Registro |
|---|---|---|---|
| M1 | 221912 | ACTA DE SESIÓN DE CONSEJO DE ADMINISTRACIÓN | 14/09/2021 |
| | /OTORGAMIENTO DE PODER | | |

Caracteres de autenticidad de la Firma          41f301310521af7a98f5846ca98ab74ed888          Secuencia No.   2073517

### DERECHOS DE INSCRIPCIÓN

| IMPORTE | FECHA DE PAGO | BOLETA DE PAGO |
|---|---|---|
| $    2,881.00 | 27/07/2021 | 93900107616609R5H26U |
| $    2,881.00 | | |

EL RESPONSABLE DE LA OFICINA:          NANCY ALATRISTE CID

Los caracteres de autenticidad de la firma electrónica que aparecen en seguida de cada acto, corresponden al sello electrónico autorizado por la Secretaría de Economía, de acuerdo a lo previsto en los artículos 21 Bis, Fracción II, inciso c) y d) y 30 Bis del Código de Comercio y 15 del Reglamento del Registro Público de Comercio.





REGISTRO PÚBLICO DE LA
PROPIEDAD Y DE COMERCIO
C I U D A D   D E   M É X I C O

BANCO MONEX, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE,
MONEX GRUPO FINANCIERO
SESIÓN DEL CONSEJO DE ADMINISTRACIÓN
FECHA: 27 DE ENERO DE 2021
LISTA DE ASISTENCIA

"A"

## CONSEJEROS PROPIETARIOS:

Héctor Pío Lagos Dondé

Georgina T. Lagos Dondé

Mauricio Naranjo González

Moisés Tiktin Nickin

David Aarón Margolín Schabes

Jorge Jesús Galicia Romero

## COMISARIO:

Karen Jazmín Pérez Olvera

## SECRETARIO:

Jacobo G. Martínez Flores

1

JACOBO GUADALUPE MARTINEZ FLORES
30.10.30 30.11.30.30.30.30.35.30.34.17.35.37.35.31.38
13.08.24 20.03.41

BANCO MONEX, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE,
MONEX GRUPO FINANCIERO
SESIÓN DEL CONSEJO DE ADMINISTRACIÓN
FECHA: 27 DE ENERO DE 2021
LISTA DE ASISTENCIA

## CONSEJEROS SUPLENTES:

Jorge Hierro Molina

Patricia García Gutiérrez

Hernando Carlos Luis Sabau García



## INVITADOS:

Ana Isabel Lagos Vogt

Julia Inés Lagos Vogt

Javier Alvarado Chapa

Antonio Nava Tamez

Ignacio Odriozola Garín



2



PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
0811001000000000001758840S.p7m
Autoridad Certificadora:
AUTORIDAD CERTIFICADORA
Firmante(s): 1

| FIRMANTE | | | | |
|---|---|---|---|---|
| Nombre: | JACOBO GUADALUPE MARTINEZ FLORES | Validez: | BIEN | Vigente |
| FIRMA | | | | |
| No. serie: | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | Revocación: | Bien | No revocado |
| Fecha: (UTC/ CDMX) | 19/07/22 17:48:23 - 19/07/22 12:48:23 | Status: | Bien | Valida |
| Algoritmo: | RSA - SHA256 | | | |
| Cadena de firma: | 5a 9c 2b ce 9b 17 52 fb 64 73 9a e8 9f c3 9f 70<br>00 11 43 fe db d2 d3 82 43 8b 4d 82 fa 79 b9 27<br>7c 55 d1 84 a2 ad 16 87 24 63 52 db 67 ab 82 26<br>2c 13 f7 20 32 09 b9 f0 0e 6d d6 05 31 e1 72 db<br>f1 bb 05 de b3 91 ff e6 a2 aa c9 10 2d 40 d1 c0<br>2d f6 ad 73 76 c0 58 71 04 ce c7 5d 07 9f 14 6c<br>a9 79 07 7e af 85 f0 e5 e2 0d 59 b7 81 78 6c 34<br>da a2 67 60 76 05 84 cf e1 13 7e 10 cb 88 a0 79<br>82 0f 68 e3 2a df 4e be b4 ff b8 73 20 dd 84 c0<br>05 a1 39 87 25 68 9e 9d 5e 88 b3 2e f5 bc 03 72<br>1d e3 c9 5e 7c ec bd c0 1e 33 02 09 3a 3b cd 93<br>89 5f 6d a4 89 60 4f 56 c9 99 a8 8a 31 01 ce 79<br>bd e5 b3 e8 db cd 9e 30 1e 84 7a 23 88 44 ab 77<br>41 9c d4 8b 2d c3 b5 62 b3 bf 7b 88 1a 86 b6 5a<br>8a 86 9c 74 44 22 bc 96 9b 71 4f fe d6 e3 7d 85<br>ca e6 8f fd b4 84 14 55 87 bb 33 91 e1 a1 16 3d | | | |
| OCSP | | | | |
| Fecha: (UTC / CDMX) | 19/07/22 17:48:23 - 19/07/22 12:48:23 | | | |
| Nombre del respondedor: | Servicio OCSP SAT | | | |
| Emisor del respondedor: | AUTORIDAD CERTIFICADORA | | | |
| Número de serie: | 30.30.30.30.31.30.38.38.38.38.38.38.30.30.30.30.30.33.39 | | | |
| TSP | | | | |
| Fecha : (UTC / CDMX) | 19/07/22 17:48:27 - 19/07/22 12:48:27 | | | |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | |
| Identificador de la respuesta TSP: | 126099520 | | | |
| Datos estampillados: | jZqo690AkPuPrpbHiyc3qRIfVMs= | | | |

Date:          1/4/2021 7:36:27 PM
Project:       Credito Real MTN Program
User Name:     JAVIER.PICHARDINI@US.DLAPIPER.COM
File Name:     2.6.2.6.1 Credito Real (2020) - Credit and Guaranty Agreement
               (Executed).PDF
File Path:

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.15.32.30.30.30.35.59.34.37.33.32.34.31.38
13082920.01.41

EXECUTION VERSION

CREDIT AND GUARANTY AGREEMENT

U.S.$110,000,000

dated as of February 19, 2020

among

CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.

and

MAREVALLEY CORPORATION,

as Borrowers,

CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.
as Guarantor of the obligations of
MAREVALLEY CORPORATION pursuant to Section 2.1,

the LENDERS referred to herein,

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

CREDIT SUISSE SECURITIES (USA) LLC
Lead Arranger

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,13,30,30,30,30,30,13,30,34,37,35,32,34,31,38
13,09,24 20:01:41

<u>TABLE OF CONTENTS</u>

Page

## ARTICLE I

### DEFINITIONS

Section 1.1    Certain Defined Terms ........................................................................ 1
Section 1.2    Interpretation of Terms Generally ..................................................... 25
Section 1.3    Accounting Terms and Determinations; Mexican Accounting Standards .... 26

## ARTICLE II

### THE LOANS

Section 2.1    The Loans ......................................................................................... 26
Section 2.2    Loans and Borrowing ....................................................................... 26
Section 2.3    Method of Borrowing ....................................................................... 27
Section 2.4    Funding of Borrowings .................................................................... 27
Section 2.5    Termination of the Commitments ..................................................... 28
Section 2.6    Repayment of Loans; Evidence of Debt ........................................... 29
Section 2.7    Promissory Notes ............................................................................. 30
Section 2.8    Prepayment of the Loans .................................................................. 32
Section 2.9    Fees ................................................................................................. 34
Section 2.10  Interest ............................................................................................. 34
Section 2.11  Alternate Rate of Interest ................................................................. 36
Section 2.12  Illegality ........................................................................................... 36
Section 2.13  Increased Costs ................................................................................ 36
Section 2.14  Break Funding Payments .................................................................. 38
Section 2.15  Taxes ................................................................................................ 38
Section 2.16  Payments Generally; Pro Rata Treatments; Sharing of Set-offs ......... 40
Section 2.17  Increase in Commitments ................................................................. 41

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Section 3.1    Corporate Existence; Powers; Capitalization ................................... 44
Section 3.2    Authorization; Enforceability .......................................................... 44
Section 3.3    Governmental Approvals; No Conflicts, Etc .................................... 45
Section 3.4    Financial Condition; No Material Adverse Change .......................... 45
Section 3.5    Properties ......................................................................................... 46
Section 3.6    Material Permits .............................................................................. 46
Section 3.7    Litigation ......................................................................................... 46
Section 3.8    Compliance with Laws and Agreements .......................................... 46
Section 3.9    Taxes ................................................................................................ 46

2022-03-10 19.25.com.mx1 1-858-0800

Confidential

AMERIPER DEPOSITION EXHIBIT
Romana DEAPI PERCCO
TH 35 29 PM
March 29, 2021

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,33,30,34,37,33,32,34,31,38
139024 2560 [+1]

I

Section 3.10 Environmental Matters...................................................47
Section 3.11 Reporting Disclosure...................................................48
Section 3.12 Legal Form...................................................48
Section 3.13 Rank of Debt...................................................48
Section 3.14 Investment Company Act...................................................48
Section 3.15 Commercial Activity; Absence of Immunity...................................................48
Section 3.16 Insurance...................................................49
Section 3.17 Labor Matters...................................................49
Section 3.18 Solvency...................................................49
Section 3.19 Unrestricted Subsidiaries...................................................49
Section 3.20 Margin Stock...................................................49
Section 3.21 OFAC...................................................49
Section 3.22 Anti-Corruption Laws...................................................49

ARTICLE IV

CONDITIONS

Section 4.1 Closing Date...................................................50

ARTICLE V

AFFIRMATIVE COVENANTS

Section 5.1 Financial Statements and Other Information...................................................53
Section 5.2 Notices of Material Events...................................................54
Section 5.3 Existence; Conduct of Business...................................................54
Section 5.4 Payment of Obligations...................................................55
Section 5.5 Maintenance of Properties...................................................55
Section 5.6 Insurance...................................................55
Section 5.7 Books and Records; Inspection Rights...................................................55
Section 5.8 Compliance with Laws and Contracts...................................................56
Section 5.9 Use of Proceeds...................................................56
Section 5.10 Pari Passu Ranking...................................................56
Section 5.11 Maintenance of Permits...................................................56
Section 5.12 Hedging Agreement...................................................57
Section 5.13 Further Assurances...................................................57

ARTICLE VI

NEGATIVE COVENANTS

Section 6.1 Liens...................................................57
Section 6.2 Fundamental Changes; Line of Business...................................................57
Section 6.3 Transactions with Affiliates...................................................58
Section 6.4 Accounting Changes; Limitation on Changes in Fiscal Year...................................................58
Section 6.5 Certain Ratios...................................................58

iii

JACOBO GUADALUPE MARTINEZ FLORES
30.30,30.31,30.30,30.30,30.33,30.34,37.35,33,34,31,38
130624.3E0H-H

Section 6.6    Limitation on Indebtedness................................................58
Section 6.7    Limitation on Investments................................................58
Section 6.8    Dispositions................................................................59
Section 6.9    Limitation on Restricted Payments....................................60
Section 6.10   Modifications of Certain Documents..................................60
Section 6.11   Sanctions..................................................................60
Section 6.12   Anti-Corruption Laws....................................................60

ARTICLE VII

EVENTS OF DEFAULT

Section 7.1    Events of Default..........................................................60
Section 7.2    Rights upon an Event of Default........................................62

ARTICLE VIII

THE ADMINISTRATIVE AGENT

Section 8.1    Appointment, Powers and Immunities..................................63
Section 8.2    Reliance by Administrative Agent......................................64
Section 8.3    Sub-Agents; Delegation of Duties......................................64
Section 8.4    Resignation or Removal of Administrative Agent....................65
Section 8.5    Non-Reliance on Administrative Agent and Other Lenders..........65
Section 8.6    Compensation of Administrative Agent................................66
Section 8.7    Execution of Financing Documents....................................66
Section 8.8    Indemnification...........................................................66

ARTICLE IX

Continuing Guaranty

Section 9.1    Guaranty...................................................................66
Section 9.2    Rights of Lenders.........................................................67
Section 9.3    Certain Waivers...........................................................67
Section 9.4    Obligations Independent.................................................68
Section 9.5    Subrogation...............................................................68
Section 9.6    Termination; Reinstatement..............................................69
Section 9.7    Subordination.............................................................69
Section 9.8    Stay of Acceleration......................................................69
Section 9.9    Condition of Mirevalley..................................................69
Section 9.10   Fraud.......................................................................70

ARTICLE X

MISCELLANEOUS

Section 10.1   Notices.....................................................................70

Confidential

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,33,50,54,57,35,32,34,31,38
130822 20:10:41

Section 10.2    Waiver; Amendments ........................................................................71
Section 10.3    Expenses; Indemnity; Damage Waiver ...............................................72
Section 10.4    Successors and Assigns ....................................................................73
Section 10.5    Survival ..........................................................................................77
Section 10.6    Integration .......................................................................................77
Section 10.7    Severability ......................................................................................77
Section 10.8    Right of Set-off ................................................................................77
Section 10.9    Governing Law; Jurisdiction; Service of Process; Etc. ......................77
Section 10.10   WAIVER OF JURY TRIAL ..............................................................78
Section 10.11   No Immunity .....................................................................................79
Section 10.12   Special Waiver .................................................................................79
Section 10.13   Judgment Currency ...........................................................................79
Section 10.14   Use of English Language ...................................................................80
Section 10.15   Headings ..........................................................................................80
Section 10.16   Treatment of Certain Information; Confidentiality ...............................80
Section 10.17   USA PATRIOT Act ..........................................................................81
Section 10.18   Counterparts ....................................................................................82
Section 10.19   Acknowledgement and Consent to Bail-In of EEA Financial Institutions .....82

Confidential

anema@hl.com

2022-03-10 19:25:38 -0800

CONFIDENTIAL
PICHARDING@US.DLAPIPER.COM
Credito Real MTN Program
Tuesday, January 4, 2023 7:26:26 PM

JACOBO GUADALUPE MARTINEZ FLORES
30,38,30,30,31,36,30,38,30,35,30,34,37,35,32,34,31,38
1370824 250114I

## List of Schedules

| | |
|---|---|
| Schedule 1.1-I | Lenders and Commitments |
| Schedule 1.1-II | Existing Liens |
| Schedule 1.1-III | Unrestricted Subsidiaries |
| Schedule 3.1(b) | Shareholders and Capital Stock of Subsidiaries of Crédito Real |
| Schedule 3.4(d) | Existing Indebtedness |

## List of Exhibits

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance Agreement |
| Exhibit B | Form of Borrowing Request |
| Exhibit C | Form of Process Agent Acceptance Letter |
| Exhibit D-1 | Form of Promissory Note (Crédito Real) |
| Exhibit D-2 | Form of Promissory Note (Marevalley) |
| Exhibit E | Form of Prepayment Notice |
| Exhibit F | Form of Lender Joinder Agreement |
| Exhibit G | Form of Officer's Certificate |
| Exhibit H | Form of Opinion of DLA Piper LLP (US), special New York counsel to the Loan Parties |
| Exhibit I | Form of Opinion of DLA Piper Mexico, S.C., special Mexican counsel to the Loan Parties |
| Exhibit J | Form of Opinion of Alemán, Cordero, Galindo & Lee, special Panamanian counsel to the Loan Parties |
| Exhibit K | Form of Solvency Certificate |
| Exhibit L | Form of Mexican Power of Attorney |
| Exhibit M | Form of Compliance Certificate |

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.42.30.34.17.35.12.34.31.28
13/08/24 22:01:41

INDEX OF DEFINED TERMS

| | Page |
|---|---|
| 2017 Credit Agreement | 1 |
| 2017 Existing Indebtedness | 1 |
| 2019 Credit Agreement | 1 |
| 2019 Credit Agreement Termination Date | 1 |
| 2023 Notes | 2 |
| 2023 Notes Indenture | 2 |
| 2026 Notes | 2 |
| 2026 Notes Indenture | 2 |
| Administrative Agent | 2 |
| Administrative Agent's Account | 2 |
| Administrative Questionnaire | 2 |
| Affected Interest Period | 2 |
| Affiliate | 2 |
| Agreement | 14 |
| Alternate Source | 2 |
| Applicable Laws | 2 |
| Applicable LIBO Rate Discount Rate | 2 |
| Applicable Margin | 3 |
| Applicable Percentage | 3 |
| Assignment and Acceptance Agreement | 3 |
| Bail-In Action | 3 |
| Bail-In Legislation | 3 |
| Base Rate | 3 |
| Beneficial Ownership Certification | 3 |
| Beneficial Ownership Regulation | 3 |
| Board | 3 |
| Borrower | 3 |
| Borrowers | 3 |
| Borrowing Request | 3 |
| Business Day | 3 |
| Capital Lease Obligations | 4 |
| Capital Securities | 4 |
| Capital Stock | 4 |
| Capitalization Ratio | 4 |
| Cash Equivalents | 4 |
| Change in Control | 6 |
| Change in Law | 6 |
| Closing Date | 6 |
| CNBV | 6 |
| Code | 6 |
| Commitment | 6 |
| Consolidated | 6 |
| Consolidated Indebtedness | 6 |
| Consolidated Net Indebtedness | 7 |

Confidential

anemata@h.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.35.120.30.30.30.35.30.35.32.34.31.38
130824.20031.4.1

Consolidated Net Worth ........................................................... 7
Consolidated Total Assets ........................................................ 7
Contest ............................................................................... 7
Contested ............................................................................ 7
Control ................................................................................ 7
Controlled ........................................................................... 7
Controlling .......................................................................... 7
Credit Suisse ........................................................................ 7
Crédito Real ......................................................................... 1
Debt Rating .......................................................................... 7
Default ................................................................................ 7
Delinquency Ratio ................................................................. 7
Designated Jurisdiction .......................................................... 7
Dispose ............................................................................... 7
Disposed of .......................................................................... 7
Disposition .......................................................................... 7
Disqualified Capital Stock ....................................................... 8
Dollars ................................................................................ 8
EEA Financial Institution ....................................................... 8
EEA Member Country ............................................................. 8
EEA Resolution Authority ....................................................... 8
Entitled Person ..................................................................... 9
Environmental Laws ............................................................... 9
Environmental Permits ........................................................... 9
EU Bail-In Legislation Schedule .............................................. 9
Events of Default ................................................................... 9
Exchange Act ........................................................................ 9
Excluded Taxes ..................................................................... 9
Facility ................................................................................ 9
Fair Market Value .................................................................. 9
FATCA ................................................................................. 9
FCPA ................................................................................... 10
FECI ................................................................................... 10
Federal Funds Effective Rate ................................................... 10
Fee Letter ............................................................................ 10
Financial Officer ................................................................... 10
Financing Documents ............................................................ 10
Fitch ................................................................................... 10
Governmental Authority ......................................................... 10
Guarantee ............................................................................ 10
Guaranteed Obligations ......................................................... 07
Guarantor ............................................................................ 11
Guaranty .............................................................................. 11
Hazardous Materials .............................................................. 11
Hedge Provider ..................................................................... 11
Hedging Agreement ............................................................... 11

CONFIDENTIAL
Credito Real MW Program
LAWYER.EXCHANGEFILES.DATAFILES.COM
Monday, January 24, 2022 1:36:08 PM

vii

HMT ............................................................................................................... 22
Impacted Interest Period ............................................................................... 13
Increase Effective Date .................................................................................. 42
Incremental Commitment ............................................................................. 42
Incremental Loan Maturity Date .................................................................. 43
Incremental Loans ......................................................................................... 11
Incur ............................................................................................................... 11
Incurrence ...................................................................................................... 11
Incurring ........................................................................................................ 11
Indebtedness .................................................................................................. 11
Indemnified Taxes ......................................................................................... 12
Indemnitee ..................................................................................................... 73
Information .................................................................................................... 83
Interest Payment Date .................................................................................. 12
Interest Period ............................................................................................... 12
Interpolated Rate .......................................................................................... 12
Investment ..................................................................................................... 12
ITDMS ............................................................................................................ 13
Judgment Currency ....................................................................................... 79
Latest Maturity Date ..................................................................................... 13
Lead Arranger ................................................................................................ 13
Lender Joinder Agreement ........................................................................... 44
Lender Parties ................................................................................................ 13
Lenders .......................................................................................................... 13
Lending Office ............................................................................................... 13
Leverage Ratio ............................................................................................... 13
LIBO Rate ....................................................................................................... 13
LIBOR ............................................................................................................. 13
LIBOR Screen Rate ....................................................................................... 13
LIBOR Successor Rate ................................................................................... 36
LIBOR Successor Rate Conforming Changes ............................................. 14
Lien ................................................................................................................. 14
Line of Business ............................................................................................. 14
Liquidity Ratio .............................................................................................. 14
Loan ................................................................................................................ 14
Loan Loss Reserves ....................................................................................... 14
Loan Parties ................................................................................................... 14
Loan Portfolio ............................................................................................... 93
Loan Receivables ........................................................................................... 14
Loan-Related Securitizations ....................................................................... 15
Make-Whole Amount ..................................................................................... 15
Marevalley ...................................................................................................... 1
Marevalley Change of Control ...................................................................... 35
Master Agreement ......................................................................................... 18
Material Adverse Effect ................................................................................. 15
Material Indebtedness ................................................................................... 61

Confidential
Creditor Rights NPL Program
MastorLPCFlag4GMBL_SW_MARTINEZ.com
Confidential
ariema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
20.34.30.19.1.28.30.30.38.30.35.30.34.37.33.32.34.31.38
1308024 26.01.41

Material Permit .................................................................................. 15
Maturity Date ..................................................................................... 15
Mexican Accounting Standards ......................................................... 15
Mexican Antecumption Law .............................................................. 30
Mexico .............................................................................................. 15
Moody's ............................................................................................. 15
Net Loan Portfolio ............................................................................ 15
Non-Performing Loan ........................................................................ 15
OFAC ................................................................................................ 15
Other Taxes ....................................................................................... 16
Panama .............................................................................................. 16
Participant ......................................................................................... 76
PATRIOT Act ................................................................................... 16
Performing Loan Portfolio ................................................................. 16
Permit ................................................................................................ 16
Permitted Acquisition Indebtedness .................................................. 16
Permitted Holders ............................................................................. 16
Permitted Indebtedness ..................................................................... 16
Permitted Liens ................................................................................. 18
Person ............................................................................................... 20
Prepayment Notice ............................................................................ 32
Prepayment Threshold ....................................................................... 33
Prime Rate ........................................................................................ 20
Process Agent .................................................................................... 20
Process Agent Acceptance ................................................................. 20
Promissory Notes .............................................................................. 20
Prudent Industry Practices ................................................................. 20
Purchase Money Indebtedness ........................................................... 20
Rating Agency ................................................................................... 20
Recipient ........................................................................................... 20
Reference Participant ......................................................................... 20
Reference Period ............................................................................... 14
Refinance .......................................................................................... 20
Register ............................................................................................. 75
Regulation U ..................................................................................... 21
Regulation X ..................................................................................... 21
Related Parties .................................................................................. 21
Related Transaction ........................................................................... 81
Required Lenders ............................................................................... 21
Reserve Coverage Ratio .................................................................... 21
Residual Interests .............................................................................. 21
Responsible Officer ........................................................................... 21
Restricted Payment ........................................................................... 21
Restricted Subsidiaries ...................................................................... 22
S&P .................................................................................................. 22
Sale and Leaseback Transaction ........................................................ 22

Confidential
amena@nl.com
2022-03-10 19:25:38 -0800

JAIME R PICHARDO RUIZ
Wendy Cecilia B-e-all RN Program
jamilto@ ... 25 0 ... RUIZ
Feb 2020 ... 93 PM

CONFIDENTIAL

JACOBO GUADALUPE MARTINEZ FLORES
30,32,30,30,31,30,30,30,35,30,35,37,35,32,34,31,18
13082.5 20:30:41

Sanction(s) .................................................................................. 22
Scheduled Unavailability Date ................................................... 35
Senior Notes ............................................................................... 22
Senior Notes Indenture ............................................................. 22
Solvent ........................................................................................ 22
Specified Hedging Agreement .................................................. 22
Subsidiary ................................................................................... 23
Taxes .......................................................................................... 23
Termination Date ....................................................................... 23
Threshold Amount ...................................................................... 23
Total Non-Performing Loan Portfolio ........................................ 23
Tranche A Commitment .............................................................. 23
Tranche A Facility ....................................................................... 23
Tranche A Lenders ..................................................................... 23
Tranche A Loan ........................................................................... 23
Tranche A Make-Whole Amount ................................................ 23
Tranche A Maturity Date ............................................................ 24
Tranche A Principal Repayment Date ....................................... 29
Tranche B Commitment .............................................................. 24
Tranche B Facility ....................................................................... 24
Tranche B Lenders ..................................................................... 24
Tranche B Loan ........................................................................... 24
Tranche B Make-Whole Amount ................................................ 25
Tranche B Maturity Date ............................................................ 25
Tranche B Principal Repayment Date ....................................... 29
Transactions ............................................................................... 25
Type ............................................................................................ 25
U.S.$ ........................................................................................... 25
Unrestricted Subsidiary ............................................................. 25
Write-Down and Conversion Powers ........................................ 25



Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

This CREDIT AND GUARANTY AGREEMENT, is dated as of February 19, 2020 (this "Agreement"), among:

(a)      CRÉDITO REAL, S.A.B DE C.V., SOFOM, E.N.R., a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada* incorporated and existing under the laws of Mexico ("Crédito Real");

(b)      MAREVALLEY CORPORATION, a corporation incorporated and existing under the laws of Panama ("Marevalley," and together with Crédito Real, the "Borrowers" and each, a "Borrower");

(c)      the GUARANTOR (as defined below);

(d)      the LENDERS referred to herein; and

(e)      CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

WHEREAS, the Borrowers have requested that the Lenders establish the credit facility set forth herein and the Lenders are willing to do so on the terms and conditions set forth herein; and

WHEREAS, the Guarantor will benefit directly from the transactions contemplated under the Financing Documents (as defined below) and the Guarantor is willing to guarantee the obligations of Marevalley under the Financing Documents;

NOW THEREFORE, in consideration of the premises and the agreements, provisions and covenants contained herein, the parties hereto agree as follows:



## ARTICLE I

## DEFINITIONS

Section 1.1      Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2017 Credit Agreement" means the Credit Agreement, dated as of February 16, 2017, among Crédito Real, as borrower, the lenders referred to therein and the Administrative Agent, as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"2017 Existing Indebtedness" means the Indebtedness of Crédito Real evidenced under the 2017 Credit Agreement.

"2019 Credit Agreement" means the Credit Agreement, dated as of August 1, 2019, among Crédito Real, as borrower, the lenders referred to therein and the Administrative

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.35.30.34.37.35.32.34.31.18
130824 20-01-01

Agent, as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time;

"2019 Credit Agreement Termination Date" means the date on which all principal of, and interest on, the loans evidenced under the 2019 Credit Agreement and any other amounts payable thereunder (other than (i) contingent indemnification obligations and (ii) expense reimbursement obligations, in each case, which are not yet due and payable and for which no claim has been made) have been paid in full in cash.

"2023 Notes" means the 7.250% Senior Notes of Crédito Real due 2023, in an aggregate amount of U.S.$625,000,000, governed by the 2023 Notes Indenture.

"2023 Notes Indenture" means that certain Indenture, dated as of July 20, 2014, among Crédito Real, as issuer, The Bank of New York Mellon, as trustee and The Bank of New York Mellon (Luxembourg) S.A., as Luxembourg paying agent, as amended, supplemented or otherwise modified from time to time.

"2026 Notes" means the 9.500% Senior Notes of Crédito Real due 2026, in an aggregate amount of U.S.$400,000,000, governed by the 2026 Notes Indenture.

"2026 Notes Indenture" means that certain Indenture, dated as of February 7, 2019, among Crédito Real, as issuer, Credito K, S, S.A. and Creal Nóminas S.A. de C.V., as guarantors, The Bank of New York Mellon, as trustee and The Bank of New York Mellon (Luxembourg) S.A., as Luxembourg paying agent, as amended, supplemented or otherwise modified from time to time.

"Administrative Agent's Account" means the bank account maintained by the Administrative Agent with The Bank of New York Mellon, A/C No. 8800492627, ABA: 021000018, reference: Crédito Real Marcvalley 2020 Loan, or such other bank account notified by the Administrative Agent to the Borrower.

"Administrative Questionnaire" means, with respect to each Lender, an administrative questionnaire in a form supplied by the Administrative Agent and supplied to the Administrative Agent duly completed by such Lender.

"Affiliate" means, with respect to a specified Person, another Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person.

"Applicable Law" means, as to any Person, all applicable constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules and regulations of any Governmental Authority binding upon such Person or to which such a Person is subject.

"Applicable Margin" means, (a) with respect to Tranche A Loans, a rate per annum equal to 3.75%, and (b) with respect to Tranche B Loans, a rate per annum equal to 4.00%.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.35.30.37.35.30.34.31.38
130030.30.01-H

"Applicable Percentage" means, with respect to any Lender (i) at any time, the percentage of the total amount of the Commitments represented by such Lender's Commitment, and (ii) if the Commitments have terminated, the percentage of the total Loans represented by the aggregate amount of such Lender's Loans hereunder.

"Assignment and Acceptance Agreement" means the assignment and acceptance agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.4), and accepted by the Administrative Agent, substantially in the form of Exhibit A.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Base Rate" means, for any day, a rate per annum equal to the greatest of: (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the LIBO Rate plus 1% (if the Administrative Agent shall have reasonably determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, the Base Rate shall be determined without regard to clause (b) of the preceding sequence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, respectively.



"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor thereto).

"Borrowing Request" means the request by any Borrower for a borrowing of Loans in accordance with Section 2.3, substantially in the form of Exhibit B with all blanks therein properly completed.

"Business Day" means a day other than a Saturday or Sunday on which (a) for all purposes other than as set forth in clause (b) of this definition, commercial banks are open for general business in New York, New York, Mexico City, Mexico, and Panama City, Panama and

3

(b) when used solely in connection with the determination of, or the calculation of interest based upon, the LIBO Rate, dealings in Dollar deposits are carried out between banks in the London inter-bank market.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under Mexican Accounting Standards, and the amount of such obligations shall be the capitalized amount thereof, determined in accordance with Mexican Accounting Standards.

"Capital Securities" means, with respect to any Borrower, any bonds, debentures, notes or other similar instruments of such Borrower (a) which are expressly subordinated in right of payment and in insolvency to the prior payment in full of any Loan, (b) which have a scheduled maturity date of at least ten years after the Closing Date, (c) the first principal payment in respect of which (pursuant to any redemption provision, amortization schedule or otherwise) may not occur until at least 12 months after the last scheduled principal payment of any Loan, (d) the principal of which may not be accelerated so long as any Loan remains outstanding (except pursuant to a customary bankruptcy Event of Default with respect to the Borrowers), (e) are senior only to Capital Stock of such Borrower, (f) in respect of which interest may be deferred and cancelled, and (g) which by their issuance, are provided equity-like treatment by at least two Rating Agencies pursuant to their respective rating criteria.

"Capital Stock" means, with respect to any Person, on any date of determination, any and all (a) shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital stock, (b) partnership interests (whether general or limited), partes sociales, membership interests or equivalent partnership interests in or issued by such Person, or (c) any warrants, rights or options to purchase any of the instruments referred to in clause (a) or (b) of this definition.

"Capitalization Ratio" means, on any date of determination, the ratio of (a) Consolidated Net Worth on such date, as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Net Loan Portfolio on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

"Cash Equivalents" means

(a)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(b)     Certificados de la Tesorería de la Federación (Cetes) or Bonos de Desarrollo del Gobierno Federal (Bondes) in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(c)     marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within



JACOBO GUADALUPE MARTÍNEZ FLORES
35.30.30.30.3.25.30.30.30.30.95.30.35.37.35.32.34.31.38
13.08.24. 26.01.41

"Consolidated Net Indebtedness" means, on any date, the positive difference between (i) Consolidated Indebtedness on such day, and (ii) the sum of cash and Cash Equivalents of Crédito Real on such day, determined on a Consolidated basis.

"Consolidated Net Worth" means, on any date, the positive difference between (i) the stockholders' equity of Crédito Real on such date, and (ii) without duplication, amounts attributable to Disqualified Capital Stock of Crédito Real and its Subsidiaries on such date, all determined on a Consolidated basis.

"Consolidated Total Assets" means, on any date, the aggregate of all assets as would be reflected in the Consolidated balance sheet of Crédito Real on such day.

"Contest" means, with respect to the payment of Taxes or any other claims or liabilities by any Person, to contest the validity or amount thereof in good faith by appropriate proceedings; provided that such Person has posted a bond or other security in accordance with Applicable Law (if required) or has established adequate reserves with respect to the contested items in accordance with, and to the extent required by, Mexican Accounting Standards. "Contested" shall have a meaning correlative thereto.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. For the avoidance of doubt, "Control" shall also mean the ability of a Person to represent or manage a fund, trust or similar investment vehicle or otherwise act on behalf of the funds under its administration.

"Credit Suisse" means Credit Suisse AG, a banking institution incorporated and existing under the laws of Switzerland.

"Debt Rating" means, with respect to any Person, such Person's long-term, unsecured, senior non-credit enhanced debt rating.

"Default" means any event or condition which upon notice, lapse of time or both or both, would, unless cured or waived, become an Event of Default.

"Delinquency Ratio" means, on any date of determination, the ratio of (a) Total Non-Performing Loan Portfolio of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Total Loan Portfolio of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Disposition" means, with respect to any property or asset, any sale, any sale, capital lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.34.37.35.32.34.31.38
13.00.24.2004.01

2022-01-10 10:26.38 -0800
evidenciadigital.com.mx

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the notes; provided, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of a "change of control" occurring prior to the final maturity of this Agreement shall not constitute Disqualified Capital Stock if:

(a)     the "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to this Agreement and described hereunder; and

(b)     any such requirement only becomes operative after compliance with such terms applicable to this Agreement.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any. The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock be determined pursuant to this Agreement; provided, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"Dollars" or "U.S.$" refers to lawful currency of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws" means any and all applicable, federal, state, provincial, territorial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, guidelines, concessions, grants, governmental restrictions, decrees or requirements of, under or prescribed by, any Governmental Authority, relating in any way to the environment or the

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.34.37.35.32.35.31.38
13089/4 2001/4

2022 September 01 15:38 -0800
Cancelar 001.800-19

release, emission, deposit, discharge, leaching, migration or spill of any Hazardous Materials into the environment, including pollution or protection of the environment (including ambient air, soil, subsurface strata, surface water, groundwater and natural resources such as flora, fauna and wetlands) or public or employee health, including, release or threatened release, manufacture, storage, treatment, handling, transport or disposal of Hazardous Materials, as now or may at any time hereafter be in effect.

"<u>Environmental Permits</u>" means any and all applicable permits, licenses, registrations, notifications, exemptions and any other authorizations required under any Environmental Law.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Exchange Act</u>" means the U.S. Securities Exchange Act of 1934, as amended.

"<u>Excluded Taxes</u>" means, with respect to any Recipient or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Financing Document, (i) Taxes imposed on or measured by its overall net income (however denominated), franchise taxes and branch profit taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Applicable Law of which such recipient is organized, is doing business (other than solely in connection with this Agreement), is considered a resident for tax purposes, or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (ii) any Taxes imposed by reason of any connection between such recipient and the taxing jurisdiction other than entering into this Agreement or any other Financing Document and receiving payments hereunder or thereunder, and (iii) any United States federal withholding Taxes imposed pursuant FATCA.

"<u>Facility</u>" means the TrancheA Facility and/or the TrancheB Facility, as the context may require.

"<u>Fair Market Value</u>" means, with respect to any asset, the price which could be negotiated in an arm's-length free market transaction, for cash or otherwise, between a willing seller and a willing buyer, neither of which is under compulsion to complete the transaction; provided, that the Fair Market Value of any such asset will be determined conclusively by the senior management of Crédito Real acting in good faith.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471 (b)(1) of the Code.

"<u>FCPA</u>" means the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.35.30.34.37.35.32.34.31.38
130925.20.01.41

2022-03-28 18:39:21 GMT -05:38 -0800

WWW.PIPEDREAM.COM

"FECI" means the special fund for interest compensation (*Fondo Especial de Compensación de Intereses*) set forth under Law 4 of the Republic of Panama, dated May 17, 1994, as amended or otherwise modified from time to time.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that if the Federal Funds Effective Rate for any day is less than zero, the Federal Funds Effective Rate for such day will be deemed to be zero.

"Fee Letter" means the fee letter dated as of the date hereof executed by the Borrowers in favor of the Administrative Agent and the Lead Arranger.

"Financial Officer" means, with respect to any Person, such Person's chief executive officer, chief financial officer, principal accounting officer, treasurer or controller.

"Financing Documents" means, collectively, this Agreement, the Promissory Notes, the Fee Letter and all other agreements, documents, instruments and certificates executed in connection with any of the foregoing.

"Fitch" means Fitch Ratings Ltd. or its Affiliates and any successor thereto.

"Governmental Authority" means the government of the United States, Mexico, Panama or any other nation, any state, department of any other political subdivision thereof, and any governmental body, agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity (including any federal or other associations of or with which any such nation may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means any obligation, contingent or otherwise, including an analysis of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(a)    to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise; or

(b)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part;

provided, that, in each case, the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.55.30.54.37.55.32.34.34.38
1030.29.2006.41

one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Fitch or any successor thereto;

(d)    commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least F1 from Fitch;

(e)    demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (x) any bank organized under the laws of the United States or any state thereof or the District of Columbia, (ii) any United States branch of a non-United States bank having at the date of acquisition thereof combined capital and surplus of not less than U.S.$500,000,000, or (iii) in the case of Mexican peso deposits, any of the five top-rated banks (as evaluated by an internationally recognized rating agency) organized under the laws of Mexico;

(f)    repurchase obligations (with a term of not more than seven days) for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above;

(g)    any other debt instruments having a rating of at least A-1 or AAA from S&P or F1 or AAA from Fitch with maturities of one year or less from the date of acquisition; and

(h)    investments in money market funds, which invest substantially all of their assets in securities of the types described in clauses (a) through (g) above.

"Change in Control" means the occurrence of any of the following events:

(a)    any "person" or "group" (as such terms are used in Sections 13(d) and Section 14(d) of the Exchange Act) other than the Permitted Holders becomes the "beneficial owner" (as such term is defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, in the aggregate of 35% (or more of) the total voting power of any Voting Capital Stock of Crédito Real; provided, that the Permitted Holders beneficially own, directly or indirectly a lesser percentage of the total voting power of any Voting Capital Stock of Crédito Real (or its successor by merger, consolidation or purchase of all or substantially all of its assets) than such other "person" or "group" (as such terms are used in Section 13(d) and Section 14(d) of the Exchange Act) and do not have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors of Crédito Real or such successor (for the purposes of this definition, such other "person" or "group" shall be deemed to beneficially own any Capital Stock of a specified entity held by a parent entity, if such other "person" or "group" beneficially owns, directly or indirectly, more than 35% of the voting power of any Capital Stock of such parent entity and the Permitted Holders "beneficially own" directly or indirectly, in the aggregate a lesser percentage of the voting power of any Voting Capital Stock of such parent entity and do not have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors of such parent entity);

(b)        Crédito Real consolidates with, or merges with or into, another Person, or Crédito Real sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of Crédito Real, determined on a Consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction, "beneficially owned" the outstanding of any Capital Stock of Crédito Real are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners", in the aggregate of a majority of the total voting power of the then outstanding Capital Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect wholly-owned subsidiary of another Person, such Person who is the ultimate parent entity); or

(c)        individuals who, on the Closing Date constituted the board of directors of Crédito Real, together with any new directors whose election by the board of directors or whose nomination for election by the stockholders of Crédito Real was voted upon favorably by the Permitted Holders, cease for any reason to constitute a majority of the board of directors of Crédito Real then in office, or the approval by the holders of any Capital Stock of Crédito Real of any plan or proposal for the liquidation or dissolution of Crédito Real.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in, or in the interpretation of, any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" means the first date upon which the conditions precedent set forth in Section 4.1 shall have been satisfied.

"CNBV" means the Mexican Securities and Banking Commission (*Comisión Nacional Bancaria y de Valores*) or any Governmental Authority succeeding to any of its principal functions.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commitment" means, collectively, the Tranche A Commitment and the Tranche B Commitment.

"Consolidated" refers to the consolidation of accounts of a Person and its Subsidiaries in accordance with Mexican Accounting Standards.

"Consolidated Indebtedness" means, on any date, the aggregate principal amount of all Indebtedness of Crédito Real, determined on a Consolidated basis.

JACOBO GUADALUPE MARTINEZ FLORES
30,30 30,30 33 30,30,30,30 30,33 30,34 37 35 32 34 71 38
130824 20:04:41

2022-Original en 19:25:38 -0800

Confidencial - Sujeta a Orden de Protección Confidencial

"Guarantor" means Credito Real, in its capacity as guarantor of the obligations of Marevalley pursuant to the Guaranty;

"Guaranty" means the Guarantee made by the Guarantor in favor of the Administrative Agent and the Lender under Article IX.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature defined, identified, regulated, limited or prohibited pursuant to any Environmental Law.

"Hedge Provider" means the Administrative Agent (or any of its Affiliates or a financial institution (or a Subsidiary of a financial institution) having a Debt Rating of at least "A-" by S&P or Fitch.

"Hedging Agreement" means (a) any and all interest rate protection agreements, interest rate future agreements, interest rate option agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, interest rate hedge agreements, foreign exchange contracts, currency swap agreements, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of the foregoing (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, traded at the over-the-counter or standardized markets and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by any form of master agreement published by the International Swaps and Derivative Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (including any such master agreement, together with any related schedules, a "Master Agreement").



"Incremental Loans" means any Loans made pursuant to any Incremental Commitment.

"Incur" means, with respect to any Indebtedness, to incur, create, issue, assume, guarantee or otherwise, contingently or otherwise, become liable, directly or indirectly, for or with respect to, or to extend the maturity of, or becomes responsible for, the payment of such Indebtedness; provided, that neither (i) the accrual of interest, (ii) the accretion of original issue discount nor (iii) an increase in the outstanding amount of Indebtedness caused by fluctuations in the exchange rates of currencies shall be considered an Incurrence of Indebtedness. The terms "Incurrence" and "Incurring" have corresponding meanings.

"Indebtedness" means, with respect to any Person, determined without duplication, (a) the principal amount of all obligations of such Person for borrowed money, (b)

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.35.30.34.37.35.32.34.31.38
13082A 200141

2022-EDD-a@z@z@r89.25.38-0800

the principal amount of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all Capital Lease Obligations of such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted), (e) all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof, (f) Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (a) through (e) above and clauses (h) through (j) below, (g) all Indebtedness of any other Person of the type referred to in clauses (a) through (f) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured, (h) all obligations under Hedging Agreements of such Person (determined by reference to the marked to market value thereof), (i) to the extent not otherwise included in this definition, all liabilities required to be recorded on the Consolidated balance sheet of such Person in connection with a sale or other disposition of securitized receivables or other accounts receivable and related assets, including in connection with any Loan-Related Securitization, and (j) all Disqualified Capital Stock issued by such Person.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Interest Payment Date" means the last day of each Interest Period.

"Interest Period" means, initially, in all respect to any Loans hereunder, the period commencing on the Closing Date and ending on May 21, 2020, and thereafter, each period commencing on the last day of the immediately preceding Interest Period and ending on the 21st day of the calendar month that is three months thereafter; provided, that (i) if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) in no case shall any Interest Period in respect of any Tranche A Loan end after the Tranche A Maturity Date, and (iii) in no case shall any Interest Period in respect of any Tranche B Loan end after the Tranche B Maturity Date.

"Interpolated Rate" means at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBOR Screen Rate for the longest period (for which such LIBOR Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the LIBOR Screen Rate for the shortest period (for which such LIBOR Screen Rate is available for Dollars) that is longer than the Impacted Interest Period, in each case, at such time; provided that, if the Interpolated Rate is less than zero, the "Interpolated Rate" at such time shall be deemed to be zero.

"Investment" means, with respect to any Person, any: (a) direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person, (b) capital contribution to (by means of any transfer of cash or other property to others or



12

JACOBO GOLDALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.30.33.30.34.37.33.32.34.31.38
13080.24 20.01.41

any payment for property or services for the account or use of others) any other Person, or (c) any purchase or acquisition by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by any other Person. "Investment" will exclude accounts receivable or deposits arising in the ordinary course of business. "Invest," "Investing" and "Invested" will have corresponding meanings.

"ITBMS" means the tax on the value of a service or movable property transferred or imported, known as the Tax on the Transfer of Tangible Property and Rendering of Services (*Impuesto sobre la Transferencia de Bienes Corporales Muebles y la Prestación de Servicios*) of Panama, as it may be amended or otherwise modified from time to time.

"Latest Maturity Date" means the latest of the Tranche A Maturity Date, the Tranche B Maturity Date and any Incremental Loan Maturity Date applicable to existing Incremental Loans, as of any date of determination.

"Lead Arranger" means Credit Suisse Securities (USA) LLC.

"Lender Parties" means the Lenders and the Administrative Agent.

"Lenders" means, collectively, the Tranche A Lenders and the Tranche B Lenders.

"Lending Office" means, as to each Lender, its office, branch or affiliate located at its address set forth in its Administrative Questionnaire or such other office, branch or Affiliate of such Lender as it may hereafter designate as its Lending Office by notice to the Borrowers and the Administrative Agent.

"Leverage Ratio" means, on any date of determination, the ratio of (a) Consolidated Net Indebtedness on such date as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Consolidated Net Worth on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

"LIBO Rate" means, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London, England time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the LIBOR Screen Rate for deposits in Dollars (for delivery on the last day of such Interest Period or on such other date on which interest is paid, as applicable) for a period approximately equal to such Interest Period; provided that in no event shall "LIBO Rate" be less than 0.0%; provided, further, that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "*LIBO Rate*" for such Interest Period (an "Impacted Interest Period") shall be the Interpolated Rate.

"LIBOR Screen Rate" means the London Interbank Offered Rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) ("LIBOR") (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration Limited as an authorized information vendor

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.31.30.30.30.30.35.30.34.37.35.32.34.31.38
13/08/24 20:01:41

for the purpose of displaying such rates (an "Alternate Source")) or a comparable or successor rate, which rate is approved by the Administrative Agent.

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, Make Whole Amount, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the reasonable discretion of the Administrative Agent, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines with the consent of the Borrowers).

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); provided, that the lessee in respect of a Capital Lease Obligation in Sale and Leaseback Transaction will be deemed to have incurred a Lien on the property leased thereunder.

"Line of Business" means business activities of Crédito Real, relating primarily to making payroll loans, durable goods loans, small business loans, group loans, car loans and other consumer and commercial loans and business activities reasonably ancillary related thereto.

"Liquidity Ratio" means, on any date of determination, the ratio of (a) the sum of (i) cash and Cash Equivalents of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real, (ii) all investments in securities on such date (other than investments in Subsidiaries of Crédito Real), as would be reported on the Consolidated balance sheet of Crédito Real, and (iii) the aggregate amount of Receivables due and payable in respect of the Performing Loan Portfolio during the period commencing on such date and ending on the Latest Maturity Date (the "Reference Period"), to (b) the aggregate amount of all Indebtedness of Crédito Real and its Subsidiaries due and payable during the Reference Period.

"Loan" means a Tranche A Loan or a Tranche B Loan (as the context may require).

"Loan Loss Reserves" means, on any date, the total loss reserves (estimación preventiva para riesgos crediticios) of Crédito Real, as would be reported on the Consolidated balance sheet of Crédito Real on such date.

"Loan Parties" means, collectively, Crédito Real and Marevalley in their capacity as Borrowers and Crédito Real in its capacity as Guarantor of the obligations of Marevalley pursuant to the Guaranty.

"Loan Receivables" means loans and other loan-related receivables purchased or originated by Crédito Real or any Restricted Subsidiary; provided, that for purposes of determining the amount of a given Loan Receivable at any time, such amount shall be determined in accordance with Mexican Accounting Standards.

2022年9月25日 confidential tlaxiacoana09.2538-0800

"Loan-Related Securitizations" means any securitization, factoring, discounting or similar financing transaction or series of transactions entered into by Crédito Real or any Restricted Subsidiary pursuant to which Crédito Real or any Restricted Subsidiary, directly or indirectly, through a securitization vehicle securitizes a pool of Loan Receivables, Residual Interests, net interest margin securities or similar or related assets of Crédito Real or any Restricted Subsidiary on terms than Crédito Real's board of directors (or similar governing body) has concluded are fair to and in the interest of Crédito Real or any Restricted Subsidiary and the proceeds of which are used for working capital, to repay any senior indebtedness of Crédito Real, make capital expenditures in the Line of Business, or purchase assets (other than current assets as determined in accordance with Mexican Accounting Standards or Capital Stock) to be used by Crédito Real or any Restricted Subsidiary in the Line of Business.

"Make-Whole Amount" means the Tranche A Make-Whole Amount or the Tranche B Make-Whole Amount (as the context may require).

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon the business, operations, properties or financial condition of Crédito Real and its Subsidiaries taken as a whole, (b) a material impairment of the ability of any Loan Party to perform its obligations under any Financing Document to which it is a party, or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Financing Document to which it is a party.

"Material Permit" means any and all Permits necessary to conduct the Line of Business.

"Maturity Date" means the Tranche A Maturity Date or the Tranche B Maturity Date (as the context may require).

"Mexico" means the United Mexican States.

"Mexican Accounting Standards" means with respect to any Person in Mexico, as applicable, (a) the generally accepted accounting principles or financial reporting standards (normas de información financiera), or (b) the financial reporting standards accepted or issued by the CNBV, in effect at the time being.

"Moody's" means Moody's Investors Services, Inc. and any successor thereto.

"Net Loan Portfolio" means, with respect to Crédito Real, on any day, the positive difference between (i) the Total Loan Portfolio on such day, as would be reported on the Consolidated balance sheet of Crédito Real, and (ii) the Loan Loss Reserves on such day, as would be reported on the Consolidated balance sheet of Crédito Real.

"Non-Performing Loan" means any loan in respect of which there are any amounts due and unpaid for a period of 90 or more days.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

14

"Other Taxes" means any and all present or future stamp, transfer, court or documentary taxes or any other excise or property taxes, charges or similar levies (together with any interest, charges, penalties, additions to tax and additional amounts) arising from any payment made under any Financing Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Financing Document.

"Panama" means the Republic of Panamá.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"Performing Loan Portfolio" means, on any date, the total performing loan portfolio (cartera de crédito vigente) of Crédito Real, irrespective of the maturity date of the loans comprising such loan portfolio, as would be reported in the Consolidated balance sheet of Crédito Real as such date.

"Permit" means any license, permit, consent, approval, registry and other authorization issued by any Governmental Authority.

"Permitted Acquisition Indebtedness" means Indebtedness of Crédito Real to the extent such Indebtedness was (a) Indebtedness of a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary, Indebtedness of a Person that was merged, consolidated or amalgamated into Crédito Real or (b) assumed in connection with the acquisition of assets from a Person, in each case, other than Indebtedness incurred in anticipation of, in connection with, or to provide all or any portion of the funds of credit support utilized to consummate, the transaction or series of related transactions where the Person was acquired by Crédito Real or a Subsidiary; provided, that, by the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged, consolidated or amalgamated into Crédito Real or assumed in connection with an asset acquisition, as applicable after giving pro forma effect thereto, Crédito Real shall be in compliance with the requirements of Section [...].

"Permitted Holders" means (i) any member of the Berrondo, Saiz or Esteve families who holds shares of Crédito Real on the Closing Date, (ii) a parent, brother or sister of any individual named in clause (i), (iii) the spouse of a former spouse of any individual named in clauses (i) or (ii), (iv) the lineal descendants of any person named in clauses (i) through (iii), (v) the estate or any guardian, custodian or other legal representative of any individual named in clauses (i) through (iv), (vi) any trust established principally for the benefit of any one or more of the individuals named in clauses (i) through (v); and (vii) any Person in which a majority of the voting capital stock is owned, directly or indirectly, by any one or more of the Persons named in clauses (i) through (vi).

"Permitted Indebtedness" means:

(a)    Indebtedness under the Financing Documents;

ACUERDO GUADALUPE MARTINEZ FLORES
30.30.30 30.31.30 30.30.30 30.35 30.34 37.35 32.34 41.38
1308624 2600 [v4]

(b)    Indebtedness outstanding as of the date hereof and disclosed in Schedule 3.4(d), without duplication of any Indebtedness otherwise specified as "Permitted Indebtedness" hereunder;

(c)    Indebtedness under any Hedging Agreements entered into by Crédito Real in the ordinary course of business and not for speculative purposes, including Hedging Agreements for the purpose of managing interest rate, foreign exchange, currency and other similar risks in respect of the Loans;

(d)    intercompany Indebtedness between Crédito Real and any Restricted Subsidiary or between any Restricted Subsidiary; provided that such Indebtedness of Crédito Real or Marevalley shall be (x) unsecured and (y) subordinated in right of payment to the Indebtedness under the Financing Documents;

(e)    Indebtedness of Crédito Real or any Restricted Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (including daylight overdrafts paid on the day such overdraft was incurred) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five Business Days of the Incurrence thereof;

(f)    Indebtedness of Crédito Real or any Restricted Subsidiary represented by letters of credit for the account of Crédito Real or any Restricted Subsidiary, as the case may be, or other similar credit support, in order to provide for judicial and other similar deposits required in connection with any judicial or administrative proceeding, provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(g)    Indebtedness in respect of bid, performance, surety bond or similar in the ordinary course of business for the account of Crédito Real or any Restricted Subsidiary, including Guarantees or obligations of Crédito Real or any Restricted Subsidiary with respect to letters of credit or financer supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);



(h)    refinancing Indebtedness in respect of Indebtedness of Crédito Real or any Restricted Subsidiary for borrowed money (including Indebtedness incurred by Crédito Real in connection with a Refinancing of the 2023 Notes and/or the 2026 Notes) otherwise permitted hereunder;

(i)    Capital Lease Obligations and Purchase Money Indebtedness of Crédito Real or any Restricted Subsidiary in an aggregate principal amount not to exceed U.S.$5,000,000 at any time;

(j)    Permitted Acquisition Indebtedness;

(k)    Capital Securities; and

(l)    indemnification, adjustment of purchase price, earn-out or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition

191

of any business or assets of Crédito Real or any Restricted Subsidiary or Capital Stock of a Restricted Subsidiary, other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or equity interests for the purposes of financing or in consummation of any such acquisition; provided, however, that, (A) any amount of such obligations included on the face of the balance sheet of Crédito Real or any Restricted Subsidiary shall not constitute "Permitted Indebtedness" and (B) in the case of a disposition, the maximum aggregate liability in respect of all such obligations outstanding under this subsection shall at no time exceed the gross proceeds actually received by Crédito Real and the Restricted Subsidiary in connection with such Disposition.

"Permitted Liens" means:

(a)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, landlords, vendors, salary and social security and other Liens imposed by law arising in the ordinary course of business for sums not yet delinquent or being Contested;

(b)     Liens created or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or (ii) to secure the performance of tenders, statutory obligations, surety and appeal bonds, bid, licenses, government performance and return of money bonds and other similar obligations (other than obligations for the payment of borrowed money);

(c)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(d)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(e)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of Crédito Real, including rights of offset and set-off;

(f)     Liens in existence on the date hereof and described in Schedule 1.1-II;

(g)     Liens to secure any refinancing Indebtedness which is incurred to refinance any Indebtedness which has been secured by a Lien permitted hereunder; provided, that, such new Liens (i) are no less favorable to the Lenders that are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being refinanced and (ii) do not extend to any property or assets, other than the property or assets securing the Indebtedness refinanced by such refinancing Indebtedness;



(h)    Liens securing Permitted Acquisition Indebtedness incurred in accordance with clause (j) of the definition of Permitted Indebtedness and not Incurred for the purpose of financing the relevant acquisition, merger or consolidation; provided, that, (i) such Liens secured such acquired Indebtedness at the time of, and prior to, the Incurrence of such acquired Indebtedness by Crédito Real or a Restricted Subsidiary and were not granted in connection with, or in anticipation of, the Incurrence of such acquired Indebtedness by Crédito Real or a Restricted Subsidiary, and (ii) such Liens do not extend to, or cover any, property of Crédito Real or a Restricted Subsidiary other than the property that secured the acquired Indebtedness prior to the time such Indebtedness became acquired Indebtedness of Crédito Real or a Restricted Subsidiary and are no more favorable to the lienholders than the Liens securing the acquired Indebtedness prior to the incurrence of such acquired Indebtedness by Crédito Real or a Restricted Subsidiary;

(i)    purchase money Liens securing Purchase Money Indebtedness or Capital Lease Obligations Incurred to finance the acquisition or leasing of property of Crédito Real; provided, that, (i) the related Purchase Money Indebtedness does not exceed the cost of such property and shall not be secured by any property of Crédito Real other than the property so acquired, and (ii) the Lien securing such Indebtedness are or will be created within 365 days of such acquisition;

(j)    any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)    Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Agreements or similar agreements or arrangements, designed to protect Crédito Real and the Restricted Subsidiaries from fluctuations in interest rates, currency fluctuations and other similar risks;

(m)    Liens for Taxes that are not yet delinquent or being Contested;

(n)    licenses of intellectual property in the ordinary course of business;

(o)    easements, rights of way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate, materially adversely affect the value of said properties (as such properties are used by Crédito Real or any Restricted Subsidiary) or materially impair their use in the operation of the business of Crédito Real and the Restricted Subsidiaries; and

(p)    Liens securing judgments that do not constitute an Event of Default under Section 7.1(g), so long as any appropriate proceedings that may have been duly initiated for the

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,30,31,33,32,34,31,38
13/08/23 20:01:41



19.

review of such judgment shall not have been finally terminated or the period within which such legal proceedings may be initiated shall not have expired.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity or organization.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Credit Suisse as its prime rate in effect at its principal office in New York City. The prime rate is a rate set by Credit Suisse based upon various factors including Credit Suisse's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate. Any change in such prime rate announced by Credit Suisse shall take effect at the opening of business on the day specified in the public announcement of such change.

"Process Agent Acceptance" means a letter from the Process Agent to the Administrative Agent, substantially in the form of Exhibit C.

"Promissory Notes" means (i) the promissory notes (pagarés) governed by Mexican law executed and delivered by Crédito Real, as issuer, and/or (ii) the promissory notes (pagarés) governed by Mexican law executed and delivered by Marevalley, as issuer, and Crédito Real, por aval, pursuant to Section 3.3 or, the context may require, as the same may be replaced as contemplated herein.

"Prudent Industry Practices" means those practices, methods, equipment, specifications and standards of safety and performance, as the same may change from time to time, as are commonly used in Mexico and Panama by companies engaged in the same Line of Business.

"Purchase Money Indebtedness" means Indebtedness incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of, any property; provided that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof on the date of the financing.

"Rating Agency" means S&P, Fitch or Moody's.

"Recipient" means the Administrative Agent, the Lead Arranger or a Lender.

"Reference Participant" means any Participant or prospective Participant, identified in writing by any Lender to the Borrower on or prior to the date hereof, that becomes at any time a Lender hereunder.

"Refinance" means, in respect of any Indebtedness under the Senior Notes, to refinance, refund, replace, renew, repay, modify, restructure, substitute, supplement, reissue, resell or extend (including pursuant to any defeasance or discharge mechanism) provided that (a) the amount of such Indebtedness is not increased at the time of such refinancing, refunding,

20

renewal or extension except (i) if such increased amount is permitted to be Incurred under Section 6.6(h) hereof, or (ii) by an amount equal to a reasonable premium or other reasonable amount required to be paid, and fees and expenses reasonably incurred, in connection with such refinancing and the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension, and (b) the scheduled maturity of such Indebtedness shall not fall earlier than July 20, 2023, with respect to any Indebtedness to Refinance the 2023 Notes, and February 7, 2026, with respect to any Indebtedness to Refinance the 2026 Notes, and no payment of principal thereof is required to be made prior to such applicable outside date; provided, further, that the terms relating to principal amount and like payments of any such refinancing, refunding, renewing or extending Indebtedness are no less favorable in any material respect to Crédito Real or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended. The terms "Refinances", "Refinanced" and "Refinancing" as used for any purpose in this Agreement shall have a correlative meaning.

"Regulation U" means Regulation U (12 C.F.R. Part 221) of the Board, as the same may be modified and supplemented and in effect from time to time.

"Regulation X" means Regulation X (12 C.F.R. Part 224) of the Board, as the same may be modified and supplemented and in effect from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person.

"Required Lenders" means, at any time, Lenders having more than 50% of the aggregate amount of the Commitments and/or the aggregate unpaid principal amount of the Loans.

"Reserve Coverage Ratio" means, on any date of determination, the ratio of (a) Loan Loss Reserves on such date, as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Total Non-Performing Loan Portfolio on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

"Residual Interests" means (a) any residual interests in Loan-Related Securitizations or any other interests in securitization vehicles or in the residual value of any assets that are financed through Indebtedness incurred in connection with a Loan-Related Securitization, regardless of whether required to appear on the face of the Consolidated financial statements of such Person and its Subsidiaries.

"Responsible Officer" means, with respect to any Person, any Financial Officer, the general counsel, secretary of the board or assistant secretary of the board.

"Restricted Payment" means, with respect to any Person, (a) any dividend or other distribution on any Capital Stock of such Person (except dividends payable solely in Capital Stock of the same class of the same issuer), (b) any payment on account of the purchase, redemption, retirement or acquisition of, or the setting apart of money for a sinking or other analogous fund for the purchase, redemption, retirement or acquisition of (i) any Capital Stock of such Person or (ii) any option, warrant or other right to acquire Capital Stock of such Person and



JACOBO GUADALUPE MARTINEZ FLORES
30.30 30.30 31 30.30 30 30.30 30.35 30 34.37 35 32 34 31.38
13/08/24 20:01:41

2022inline.com 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

(c) any payment in respect of irrevocable contributions made to such Person's shareholders' equity on account of future increases of the Capital Stock of such Person.

"Restricted Subsidiaries" means each Subsidiary of Crédito Real which is a "Restricted Subsidiary" (as defined under the 2026 Notes Indenture).

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement with any bank, insurance company or other lender or investor providing for the leasing by such Person or any of its Subsidiaries of any property or asset which has been or is being sold or transferred in connection with such lease by such Person or such Subsidiary to such lender or investor or to any person to whom funds have been or are to be advanced by such lender or investor on the security of such property or asset.

"Sanction(s)" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"Senior Notes" means, collectively, the 2023 Notes and the 2026 Notes.

"Senior Notes Indentures" means, collectively, the 2023 Notes Indenture and the 2026 Notes Indenture.

"Solvent" means, when used with respect to any Person, on any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, on such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," on such date, as such quoted terms are determined in accordance with applicable federal, provincial, territorial and state laws governing determinations of the insolvency of debtors, (b) the present fair salable value of the assets of such Person will on such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured (c) such Person will not have, on such date, an unreasonably small amount of capital with which to conduct its business, (d) such Person will be able to pay its debts as they mature, and (e) such Person is not insolvent pursuant to Article 2166 of the Mexican Federal Civil Code (Código Civil Federal) or its equivalent provisions of the Civil Codes of the States that comprise Mexico or that of the Federal District of Mexico and article 9, 10 and 11 of the Mexican Bankruptcy Law (Ley de Concursos Mercantiles) (or any successor provision).

"Specified Hedging Agreement" means a Hedging Agreement entered into from time to time between any Borrower and a Hedge Provider pursuant to Section 5.12, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding voting Capital Stock.

22

"Taxes" means any and all present or future taxes (including value added tax, the ITBMS and the FECI), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholdings) of whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"Termination Date" means the earlier of (a) February 21, 2020; and (b) the date on which the Commitments shall have been entirely utilized or terminated in accordance with this Agreement.

"Threshold Amount" means (i) at any time during the period commencing on the date of this Agreement and ending on the 2019 Credit Agreement Termination Date, U.S.$10,000,000, and (ii) at any time thereafter, U.S.$25,000,000.

"Total Loan Portfolio" on any date, means the total loan portfolio (*cartera de crédito*) of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real on such date.

"Total Non-Performing Loan Portfolio" on any date, means with respect to Crédito Real, the entire principal amount of and accrued but unpaid interest on a loan made by Crédito Real that is a Non-Performing Loan on such date, as would be reported on the Consolidated balance sheet of Crédito Real on such date.



"Tranche A Commitment" means, with respect to each Tranche A Lender, the commitment, if any, of such Tranche A Lender to make a Tranche A Loan to Crédito Real on the Closing Date, expressed as an amount representing the maximum principal amount of Tranche A Loans to be made by such Tranche A Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Tranche A Lender pursuant to Section 10.4, pursuant to Section 2.17, or otherwise adjusted from time to time in accordance with this Agreement. The amount of each Tranche A Lender's Commitment is set forth on Schedule 1.1-1, or in the Assignment and Acceptance Agreement pursuant to which such Tranche A Lender shall have assumed its Tranche A Commitment, as applicable.

"Tranche A Facility" means, at any time, the aggregate amount of the Tranche A Lenders' Tranche A Commitments or Tranche A Loans at such time.

"Tranche A Lenders" means the Persons listed as Tranche A Lenders on Schedule 1.1-1 and any other Person that shall have purchased a Tranche A Commitment or a Tranche A Loan, as applicable, and become a party hereto pursuant to an Assignment and Acceptance Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance Agreement.

"Tranche A Loan" means a Tranche A Loan outstanding hereunder made by a Tranche A Lender to Crédito Real on the Closing Date pursuant to Section 2.1(a) or at a later time pursuant to Section 2.17.

"Tranche A Make-Whole Amount" means, with respect to any prepayment of the Tranche A Loans made pursuant to Section 2.8(a) at any time on or prior to the first anniversary

23

2022.03.16 10:25:38 -08:00

JACOBO GUADALUPE MARTINEZ FLORES
30,35,30,45,31,30,30,30,30,30,35,30,34,47,35,32,34,31,38
130892-4 20:01:41

of the date such Tranche A Loans being prepaid were made, an amount equal to the present value of the aggregate amount of interest that would accrue on the aggregate principal amount of the Tranche A Loans being prepaid from the date of such prepayment through the first anniversary of the date such Tranche A Loans being prepaid were made, at a rate specified in Section 2.10(a) in effect at the time of such prepayment, discounted at the Applicable LIBO Rate Discount Rate. As used in this definition, "Applicable LIBO Rate Discount Rate" means a rate per annum equal to the LIBOR Screen Rate or the LIBOR Successor Rate, as applicable, for a period of time of three months, as determined by the Administrative Agent at approximately 11:00 a.m. (London, England time) on the date that is two Business Days prior to the date specified by the Borrowers for the making of any prepayment in a notice delivered pursuant to Section 2.8(a)(iii).

"Tranche A Maturity Date" means February 21, 2025 or, if such date is not a Business Day, on the immediately preceding Business Day.

"Tranche B Commitment" means, with respect to each Tranche B Lender, the commitment, if any, of such Tranche B Lender to make a Tranche B Loan to Marevalley on the Closing Date, expressed as an amount representing the maximum principal amount of Tranche B Loans to be made by such Tranche B Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Tranche B Lender pursuant to Section 10.4, pursuant to Section 2.17 or otherwise adjusted from time to time in accordance with this Agreement. The amount of each Tranche B Lender's Commitment is set forth on Schedule 1.1-1 or in the Assignment and Acceptance Agreement pursuant to which such Tranche B Lender shall have assumed its Tranche B Commitment, as applicable.

"Tranche B Facility" means, at any time, the aggregate amount of the Tranche B Lenders' Tranche B Commitments or Tranche B Loans at such time.

"Tranche B Lenders" means the Persons listed as Tranche B Lenders on Schedule 1.1-1 and any other Person that shall have purchased a Tranche B Commitment or a Tranche B Loan, as applicable, and become a party hereto pursuant to an Assignment and Acceptance Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance Agreement.

"Tranche B Loan" means a Tranche B Loan outstanding hereunder made by a Tranche B Lender to Marevalley on the Closing Date pursuant to Section 2.1(b) or at a later time, pursuant to Section 2.17.

"Tranche B Make-Whole Amount" means, with respect to any prepayment of the Tranche B Loans made pursuant to Section 2.8(a) at any time on or prior to the date which is 18 months following the date such Tranche B Loans being prepaid were made, an amount equal to the present value of the aggregate amount of interest that would accrue on the aggregate principal amount of the Tranche B Loans being prepaid from the date of such prepayment through the date which is 18 months following the date such Tranche B Loans being prepaid were made, at a rate specified in Section 2.10(a) in effect at the time of such prepayment, discounted at the Applicable LIBO Rate Discount Rate. As used in this definition, "Applicable LIBO Rate Discount Rate" means a rate per annum equal to the LIBOR Screen Rate or the LIBOR Successor Rate, as applicable, for a period of time of three months, as determined by the



-24-

JACOBO GUADALUPE MARTINEZ FLORES
36,30,30,33,30,30,30,38,30,33,30,34,37,35,32,34,31,38
13/08/24 20:01:41

Administrative Agent at approximately 11:00 a.m. (London, England time) on the date that is two Business Days prior to the date specified by the Borrowers for the making of any prepayment in a notice delivered pursuant to Section 2.8(a)(iii).

"Tranche B Maturity Date" means February 21, 2025 or, if such date is not a Business Day, on the immediately preceding Business Day.

"Transactions" means, collectively, the execution, delivery and performance by the Loan Parties of this Agreement and the transactions contemplated hereby (including the application of the proceeds of the Loans pursuant to this Agreement).

"Type" means, with respect to a Loan, its character as an Tranche A Loan or a Tranche B Loan.

"Unrestricted Subsidiary" means each Subsidiary of Crédito Real which is an "Unrestricted Subsidiary" (as defined under the 2026 Notes Indenture) on the Closing Date and identified in Schedule 1.1-III, provided, that such Schedule shall be amended by written notice of Crédito Real to the Administrative Agent pursuant to Section 5.1(d).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.2  Interpretation of Terms Generally.

(a)  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall."

(b)  Unless the context requires otherwise:

(i)  any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein);

(ii)  any reference herein to any Person shall be construed to include such Person's successors and assigns;

(iii)  the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

2022-03-10 from maria@nml.com 1-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

JACOBO GRADA.LUPE MARTINEZ TORRES
30.30.30.30.31.30.30.30.30.30.31.35.34.07.35.32.34.31.38
130024 20:01:41

(iv)    all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement; and

(v)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.3.    Accounting Terms and Determinations; Mexican Accounting Standards. All terms of an accounting or financial nature shall be construed in accordance with, and all determinations of an accounting or financial nature shall be made in accordance with, Mexican Accounting Standards applied on a basis consistent with the Consolidated financial statements of Crédito Real most recently delivered hereunder.

## ARTICLE II

## THE LOANS

Section 2.1    The Loans.

(a)    Tranche A Loans.  On the Closing Date and on such other dates contemplated by Section 2.17, and subject to the terms and conditions set forth herein, each Tranche A Lender severally agrees to make a Tranche A Loan in Dollars to Crédito Real, in an aggregate principal amount not to exceed the Tranche A Commitment of such Tranche A Lender.

(b)    Tranche B Loans.  On the Closing Date and on such other dates contemplated by Section 2.17, and subject to the terms and conditions set forth herein, each Tranche B Lender severally agrees to make a Tranche B Loan in Dollars to Marevalley, in an aggregate principal amount not to exceed the Tranche B Commitment of such Tranche B Lender.

Section 2.2    Loans and Borrowing.

(a)    The failure of any Lender to make a Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided, however, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make its Loan as required.

(b)    Each Lender at its option may make any Loan by causing any domestic or foreign Lending Office of such Lender to make such Loan; provided, however, that the exercise of such option shall not affect the obligation of the relevant Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    There shall be a single borrowing of the Loans hereunder, except for any additional borrowing made pursuant to Section 2.17. The aggregate amount of the borrowing of the Tranche A Loans and the Tranche B Loans shall not exceed the aggregate amount of the Tranche A Commitments and the Tranche B Commitments, respectively.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13080.34.32601/41


2022-XX-XX Confidential xxxxxxx@xxxxx.com T 17:25:38 -0800

(d)    This Agreement is not a revolving credit agreement.  Any amounts prepaid or repaid hereunder may not be reborrowed.

Section 2.3    Method of Borrowing.

(a)    To request any Loans on the Closing Date, the relevant Borrower shall give the Administrative Agent a written Borrowing Request signed by such Borrower not later than 1:00 p.m. (New York City time) two Business Days prior to the Closing Date (or such shorter time as may be acceptable to the Administrative Agent). Each Borrowing Request shall be given by e-mail in portable documents format (.pdf), facsimile (with confirmation of transmission) or by hand delivery, and shall be irrevocable.

(b)    Each Borrowing Request shall specify the following information:

(i)    the aggregate principal amount of the Loans to be borrowed on the Closing Date (which with respect to the borrowing of Tranche A Loans, shall not be in excess of the aggregate amount of the Tranche A Commitments, and with respect to a Tranche B Loans, shall not be in excess of the aggregate amount of the Tranche B Commitments), identifying the Borrower that would borrow such Loans (which with respect to the Tranche A Loans shall be Crédito Real and with respect to the Tranche B Loans shall be Marevalley);

(ii)    whether the Loans to be borrowed are Tranche A Loans or Tranche B Loans;

(iii)    the proposed Effective Date;

(iv)    with respect to the Borrowing Request delivered by Crédito Real, (A) an irrevocable instruction to the Administrative Agent to transfer, on behalf of Crédito Real, to the Administrative Agent's Account (as defined in the 2017 Credit Agreement) a portion of the proceeds of the Tranche A Loans requested thereunder in an amount equal to the amount of the 2017 Existing Indebtedness (including interest and any other amounts owed in respect thereof) on account of repayment by Crédito Real of the 2017 Existing Indebtedness, and (B) the account or accounts of Crédito Real into which the funding of the remaining proceeds of the requested borrowing of the Tranche A Loans should be made; and

(v)    with respect to the Borrowing Request delivered by Marevalley, the account or accounts of Marevalley into which the funding of the proceeds of the Tranche B Loans requested thereunder to such Borrower should be made.

(c)    Promptly following receipt of any Borrowing Request, the Administrative Agent shall advise each Lender of the details thereof and of the amount of the Loan of such Lender to be made as part of the requested borrowing of the Loans thereunder.

Section 2.4    Funding of Borrowings.

2022-03 ... from ... 38 -0800

CONFIDENTIAL
Crédito Real | N ... 4
HARADA v ... 2
January 24 ...

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,33,30,34,37,35,32,34,31,38
13082A 2001-A1

(a)    Each Lender shall make each of its Loans available on the Closing Date by wire transfer of immediately available funds by 11:00 a.m. (New York City time) to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make the Loans available to the applicable Borrower by promptly (but in any event on the same Business Day) crediting from the amounts so received, in like funds, to the account or accounts designated by the relevant Borrower, an amount specified in the applicable Borrowing Request.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to 2:00 p.m. (New York City time) on the Business Day immediately preceding the Closing Date that such Lender will not make available to the Administrative Agent such Lender's share of the borrowing to be made on the Closing Date, the Administrative Agent may assume that such Lender has made such share available on the Closing Date in accordance with Section 2.4(a) and may, in reliance upon such assumption, make available to the relevant Borrower on such date a corresponding amount. In such event, if a Lender has not in fact made its share of such borrowing available to the Administrative Agent, then the Administrative Agent shall be entitled to recover such corresponding amount from such Lender on demand. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the relevant Borrower, and such Borrower (without prejudice to any rights of such Borrower against such Lender) shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent shall also be entitled to recover on demand from such Lender or the relevant Borrower, as the case may be, interest on such corresponding amount in respect of each day from and including the date such amount is made available by the Administrative Agent to such Borrower to but excluding the date of payment to the Administrative Agent, at a rate per annum equal to (i) if such amount is recovered from such Lender, a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) if such amount is recovered from such Borrower, the interest rate applicable thereto pursuant to Section 2.10. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in the borrowing for the purposes of this Agreement.

(c)    The Borrowers shall not be permitted to make a Borrowing of Loans of the Facilities in an amount which would cause the Applicable Percentage of the Lenders prior to the Termination Date to be different from the Applicable Percentage of such Lenders after the Termination Date.

Section 2.3    Termination of the Commitments.

(a)    The Commitment of each Lender shall automatically terminate at 5:00 p.m. (New York City time) on the Termination Date for, in respect of the Commitment of any Lender increased in accordance with Section 2.17, the obligation of such Lender to make a Loan in the amount of the relevant increase shall automatically terminate at 5:00 p.m. (New York City time, on the Increase Effective Date).

(b)    The Borrowers may not reduce or terminate the Commitments.

28

2022-08-09 on 19:35:38 -0800

Section 2.6   Repayment of Loans; Evidence of Debt.

(a)   Crédito Real hereby unconditionally promises to repay to the Administrative Agent, for the account of the Tranche A Lenders, the outstanding principal amount of the Tranche A Loans made to Crédito Real in three installments on each Interest Payment Date falling in the months specified in the table below and on the Tranche A Maturity Date (each such date, a "Tranche A Principal Repayment Date"), each such installment in an amount equal to the lesser of (i) the amount set forth in the table below opposite the date on which such installment is required to be made (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.8), and (ii) the aggregate principal outstanding amount of the Tranche A Loans on the date on which such installment is required to be made:

| Principal Repayment Date | Amount of Principal Repayment |
|---|---|
| August, 2021 | 30% of the aggregate amount of the Tranche A Loans made on the Closing Date |
| May, 2022 | 30% of the aggregate amount of the Tranche A Loans made on the Closing Date |
| Tranche A Maturity Date | Aggregate principal amount of all Tranche A Loans outstanding on such date |

(b)   Marevalley hereby unconditionally promises to repay to the Administrative Agent, for the account of the Tranche B Lenders, the outstanding principal amount of the Tranche B Loans made to Marevalley in seven installments on each Interest Payment Date falling in the months specified in the table below and on the Tranche B Maturity Date (each such date, a "Tranche B Principal Repayment Date"), each such installment in an amount equal to the lesser of (i) the amount set forth in the table below opposite the date on which such installment is required to be made (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.8), and (ii) the aggregate principal outstanding amount of the Tranche B Loans on the date on which such installment is required to be made:

| Principal Repayment Date[1] | Amount of Principal Repayment |
|---|---|
| February, 2022 | 14.10% of the aggregate amount of the Tranche B Loans made on the Closing Date |

[1] NTD. Proposed dates assuming Closing Date will occur on February 2020.

29

| August, 2022 | 14.00% of the aggregate amount of the Tranche B Loans made on the Closing Date |
| February, 2023 | 14.00% of the aggregate amount of the Tranche B Loans made on the Closing Date |
| August, 2023 | 14.00% of the aggregate amount of the Tranche B Loans made on the Closing Date |
| February, 2024 | 14.00% of the aggregate amount of the Tranche B Loans made on the Closing Date |
| August, 2024 | 14.00% of the aggregate amount of the Tranche B Loans made on the Closing Date |
| Tranche B Maturity Date | Aggregate principal amount of all Tranche B Loans outstanding on such date |



(c)　Each Lender shall maintain in accordance with its usual practice records evidencing the indebtedness of each Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)　The Administrative Agent shall maintain records in which it shall record (i) the amount of the Loans made hereunder and the Interest Periods therefor, (ii) the amount of any principal or interest due and payable or to become due and payable from each Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for account of the Lenders and each Lender's share thereof.

(e)　The entries made in the records maintained pursuant to Section 2.6(c) or Section 2.6(d) shall be, absent manifest error, prima facie evidence of the existence and amounts of the obligations recorded therein; provided, however, that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligation of each Borrower to repay such Loans in accordance with the terms of this Agreement.

Section 2.7　Promissory Notes.

(a)　Each Loan shall be evidenced by a Promissory Note (which qualifies as a pagaré under Mexican law), executed by the applicable Borrower as issuer, substantially in the form of Exhibit D-1, with respect to the Promissory Notes issued by Crédito Real, and Exhibit D-2, with respect to the Promissory Notes issued by Marevalley. The Promissory Notes shall be delivered to the Administrative Agent for the benefit of the applicable Lender on

30

JACOBO GUADALUPE MARTINEZ FLORES
30.30, 30.30.1, 30.30, 30.30, 30.35, 30.34, 37.35, 32.34, 31.38
13.08, 24.25.01, H1

or before the Closing Date, appropriately completed.  Each Loan and interest thereon shall at all times (including after assignment pursuant to Section 10.4) be represented by one or more Promissory Notes in such form payable to the payee named therein.

(b)    The payment of any part of the principal of any such Promissory Note shall discharge the obligation of the applicable Borrower under this Agreement to pay principal of the Loan evidenced by such Promissory Note *pro tanto*, and the payment of any principal of a Loan in accordance with the terms hereof shall discharge the obligations of the applicable Borrower under the Promissory Note evidencing such Loan *pro tanto*.  Notwithstanding the discharge in full of any Promissory Note, (i) if the amount paid or payable under any such Promissory Note (whether arising from the enforcement thereof in Mexico, Panama or otherwise) is less than the amount due and payable in accordance with this Agreement with respect to the Loan evidenced by such Promissory Note, to the fullest extent permitted under Applicable Law, the relevant Borrower agrees to pay to the Administrative Agent upon demand such difference and (ii) if the amount paid or payable under any such Promissory Note (whether arising from the enforcement thereof in Mexico, Panama or otherwise) exceeds the amount due and payable in accordance with this Agreement with respect to the Loan evidenced by such Promissory Note, each Lender that has received any amounts under such Promissory Notes in excess of the amounts due to such Lender hereunder agrees, to the fullest extent permitted under Applicable Law, to pay such excess to the applicable Borrower upon demand.

(c)    Upon discharge of all obligations of any Borrower under a Loan evidenced by a Promissory Note, the Lender holding such Promissory Note shall promptly cancel such Promissory Note and promptly (and in any event within 10 Business Days) return it to the applicable Borrower.

(d)    Each Lender shall be entitled to have its Promissory Notes substituted, exchanged or subdivided for Promissory Notes of lesser denominations in connection with a permitted assignment of all or any portion of such Lender's Loans and Promissory Notes pursuant to Section 10.4.

(e)    Without limiting any other provision of this Section 7, in case any Borrower is required pursuant to the terms of this Agreement or is duly requested to accurately reflect the terms of each Loan, to deliver a new Promissory Note to one or more of the Lenders in exchange of the existing Promissory Notes held by such Lenders, such delivery by such Borrower shall be made promptly following the written request of any of the Lenders or the Administrative Agent (but no later than five Business Days following the delivery to such Borrower of such request) and such Lender or Lenders shall cancel the existing Promissory Note upon receipt of the new Promissory Note and promptly return to such Borrower, no later than ten Business Days after the delivery by such Borrower of such replacement Promissory Note, the existing Promissory Note (or a lost note affidavit and indemnity in form and substance reasonably satisfactory to such Borrower) of such Lender (including through escrowed delivery to the Administrative Agent, counsel for the parties or otherwise as reasonably agreed) relating to the Loan by such Lender; *provided* that the receipt of such replacement Promissory Note will constitute an acknowledgement and acceptance by such Lender or Lenders that the existing Promissory Note shall be null and void at the time of receipt of such replacement Promissory Note.

(I)    In the event of a conflict between the terms of this Agreement and a Promissory Note, the terms of this Agreement shall prevail.

Section 2.8.    Prepayment of the Loans.

(a)    Optional Prepayments.

(i)    The Borrowers shall have the right, at any time and from time to time, to prepay their respective Loans, in whole or in part; provided, that any prepayment made on a day other than on the last day of its Interest Period shall be subject to Section 2.14; provided, further, that (x) any prepayment of the Tranche A Loans made on or prior to the first anniversary of the Closing Date shall be made together with the applicable Tranche A Make-Whole Amount, and (y) any prepayment of the Tranche B Loans made on or prior to the date which is 18 months following the Closing Date shall be made together with the applicable Tranche B Make-Whole Amount.

(ii)    Partial prepayments of Loans shall be in an aggregate principal amount of U.S.$5,000,000 or a whole multiple of U.S.$1,000,000 in excess thereof or, if less, in the remaining aggregate principal amount of the Loans then outstanding. Except as contemplated in this Section 2.8(a), the Borrowers shall not have the right to voluntarily prepay the Loans, whether in whole or in part.

(iii)    The Borrowers shall provide written notice to the Administrative Agent of any optional prepayment hereunder not later than 1:00 p.m. (New York City time) 15 Business Days prior to the date of prepayment.  Each such notice shall be irrevocable and substantially in the form of Exhibit F (a "Prepayment Notice").  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid; provided, however, that until the Tranche A Loans shall have been prepaid in full, a prepayment of the Tranche B Loans shall only be permitted to the extent accompanied by a prepayment of the Tranche A Loans on a pro rata basis. Promptly following receipt of any such Prepayment Notice, the Administrative Agent shall advise the Lenders of the contents thereof. For the avoidance of doubt, the Borrowers shall not be permitted to prepay only Tranche B Loans at any time that any Tranche A Loan is outstanding.

(iv)    Any prepayment of the Loans pursuant to this Section 2.8(a) shall be applied (A) if such prepayment is made in respect of a single Facility, to the unpaid installments of the Loans thereunder, in inverse order of maturity, and (B) if such prepayment is made in respect of both Facilities, (x) ratably to each Facility (based on the amount of the Loans thereunder) and (y) with respect to each Facility, to the unpaid installments of the Loans thereunder, in inverse order of maturity, in each case under (A) and (B) above, irrespective of the Borrower making any such prepayment.

(b)    Mandatory Prepayments.

(i)    In the event a Change in Control occurs, the Borrowers shall, substantially concurrently with the occurrence of such Change in Control (or at such later time agreed between the Borrowers and the Lenders), prepay all Loans then outstanding

JACOBO GUZMAN/LUPE MARTINEZ/FLORES
30.39.30.30.31.39.30.30.26.30.30.38.35.30.34.37.35.32.34.31.38
13/09/24 20:01:47

The Borrowers shall provide a Prepayment Notice to the Administrative Agent of any prepayment hereunder not later than 1:00 p.m. (New York City time) at least five Business Days before the date a Change of Control is consummated specifying the relevant prepayment date. Promptly following receipt of any such Prepayment Notice, the Administrative Agent shall advise the relevant Lenders of the contents thereof.

(ii)    In the event that any principal of the Loans hereunder is outstanding and Crédito Real redeems all or any portion of the amounts outstanding under the 2023 Notes as a result of which the principal outstanding under the 2023 Notes is less than U.S.\$325,000,000 (the "Prepayment Threshold"), other than with the proceeds of Indebtedness that Refinances the 2023 Notes, then the Borrowers shall prepay, on the same day of such redemption, such outstanding Loans in an amount equal to the lesser of (x) the product of (A) the aggregate principal amount of the 2023 Notes actually redeemed minus the portion, if any, of the principal of the 2023 Notes that exceeds the Prepayment Threshold prior to giving effect to such prepayment and (B) a fraction, the numerator of which is the aggregate amount of principal outstanding under the Loans on such day, and the denominator of which is the lesser of (i) the aggregate principal amount outstanding under the 2023 Notes on such day (prior to giving effect to such redemption of the 2023 Notes) minus (II) the Prepayment Threshold, and (y) the then aggregate principal amount outstanding of the Loans. The Borrowers shall notify the Administrative Agent of any prepayment required to be made pursuant to this clause 2.8(b)(ii) at least five Business Days before the date a redemption of the 2023 Notes is consummated specifying the relevant prepayment date. Promptly following receipt of any such notice, the Administrative Agent shall advise the relevant Lenders of the contents thereof.

(iii)    In the event the Guarantor shall for any reason cease to, directly or indirectly, Control Marevalley (such event, a "Marevalley Change of Control"), Marevalley shall, substantially concurrently with the occurrence of such Marevalley Change of Control (or at such later time as agreed between the Borrowers and the Tranche B Lenders) prepay all Tranche B Loans then outstanding. Marevalley shall provide notice to the Administrative Agent of any prepayment pursuant to this clause (iii) not later than 1:00 p.m. (New York City time) at least five Business Days before the date a Marevalley Change of Control is consummated, specifying the relevant prepayment date. Promptly following the receipt of such notice, the Administrative Agent shall advise the Tranche B Lenders of the contents thereof.

(iv)    Any prepayment of the Loans pursuant to Sections 2.8(b)(i) and (iii) shall be applied (x) ratably to each Facility (based on the amount of the Loans thereunder) and (y) with respect to each Facility, to the unpaid installments of the Loans thereunder, in inverse order of maturity, in each case irrespective of the Borrower making any such prepayment.

(c)    Each prepayment of the Loans shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid and all other amounts in respect therewith then due and payable hereunder in accordance with Section 2.10, (ii) with respect each prepayment of the Tranche A Loans, if such prepayment is made on or prior to the first

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,30,33,30,30,30,30,30,30,34,37,35,32,34,33,38
130823 29:01:41

anniversary of the Closing Date, be made together with the applicable Tranche A Make-Whole Amount, (iii) with respect each prepayment of the Tranche B Loans, if such prepayment is made on or prior to the date which is 18 months following the Closing Date, be made together with the applicable Tranche B Make-Whole Amount, and (iv) be subject to Section 2.14.

Section 2.9    Fees.

(a)    Each Borrower agrees to pay to the Administrative Agent, for its own account or the account of the Lead Arranger or the Lenders, as applicable, any and all fees payable in the amounts and at the times set forth in this Agreement and in the Fee Letter.

(b)    All fees payable under the Financing Documents shall be paid on the dates due, in immediately available funds and shall not be subject to reduction by way of set-off or counterclaim. Fees paid under any Financing Document shall not be refundable under any circumstances.

Section 2.10    Interest.

(a)    Each Loan shall bear interest on the outstanding principal amount thereof, for the period from and including the Closing Date to but excluding the date such Loan shall be repaid in full, at a rate per annum equal to the LIBO Rate determined for the Interest Period then in effect, plus the Applicable Margin applicable to such Loans. Accrued (and theretofore unpaid) interest shall be payable (i) in arrears on each Interest Payment Date, (ii) on the date of any prepayment (on the amount prepaid), and (iii) at maturity (whether at stated maturity, by acceleration or otherwise) and, after such maturity, on demand.

(b)    Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by any Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraph of this Section or (ii) in the case of any other amount, to the extent permitted by Applicable Law, 2% plus the Base Rate determined from time to time plus the Applicable Margin applicable to the Tranche B Loans. Accrued and unpaid interest on past due amounts (including interest on past due interest), to the extent permitted by Applicable Law) shall be due and payable upon demand.

(c)    Computation. All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The Administrative Agent shall calculate the amounts of interest pursuant to this Section 2.10, and each such calculation shall be conclusive absent manifest error.

Section 2.11    Alternate Rate of Interest.

(a)    If, on or before the first day of any Interest Period (an "Affected Interest Period"):

2022-03-14 13:50:38 -0800

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that: (a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount of an existing or proposed Loan based on the LIBO Rate for the Affected Interest Period or (ii) adequate and reasonable means do not exist for determining the LIBO Rate for such Affected Interest Period with respect to an existing or proposed Loan based on the LIBO Rate or in connection with an existing or proposed Loan based on the Base Rate; or

(ii)    subject to clause (b), the Required Lenders determine and notify the Administrative Agent that the LIBO Rate for such Affected Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans for such Affected Interest Period.

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders by telephone or e-mail as promptly as practicable thereafter and, with respect to such Affected Interest Period: (i) the obligation of the Lenders to make or maintain Loans based on the LIBO Rate shall be suspended and the Borrowers may revoke any pending Borrowing Request of Loans based on the LIBO Rate for such Affected Interest Period for, failing that, will be deemed to have converted such request into a request for Loans based on the Base Rate for such Affected Interest Period,) and (ii) any Loan then outstanding shall, during such Affected Interest Period, bear interest at a rate equal to the Base Rate plus the applicable Applicable Margin.

(b)    If the Administrative Agent determines (which determination shall be conclusive absent manifest error, or the Borrowers or the Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, agree to the Borrowers that the Borrowers or the Required Lenders (as applicable) have determined, that:

(i)    adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period, including, without limitation, because the Bloomberg screen page and Alternate Sources are not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    the administrator of the Bloomberg screen page or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "Scheduled Unavailability Date"), or

(iii)    syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR.

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Borrowers shall negotiate in good faith (for a period of not more than 30 Business Days) to amend this Agreement to replace the LIBO Rate with an alternate benchmark rate (including

35



any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "LIBOR Successor Rate"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to negotiated with the Borrowers to all Lenders unless, prior to such time, the Required Lenders have delivered to the Administrative Agent written notice that such Lenders do not accept such amendment.

(c)     If no LIBOR Successor Rate has been determined pursuant to an amendment of this Agreement in the manner described in the immediately preceding paragraph and the circumstances under clause (c)(i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrowers and each Lender, and, until the Administrative Agent notifies the Borrowers and each Lender that the circumstances giving rise to the necessity of such LIBOR Successor Rate no longer exist, (x) the obligation of the Lenders to make or maintain Loans for the applicable Interest Period shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice, (y) the LIBOR Rate component shall no longer be utilized in determining the Base Rate, and (z) any Loan then outstanding shall bear interest at a rate equal to the Base Rate plus the applicable Applicable Margin. Upon receipt of such notice, the Borrowers may revoke any pending Borrowing Request of Loans based on the LIBOR Rate (or, failing that, will be deemed to have converted the request into a request for Loans based on the Base Rate (subject to the foregoing clauses (x) of the amount specified therein)).

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

Section 2.12    Illegality. Notwithstanding any other provision of this Agreement, in the event that, on or after the date of this Agreement, it becomes unlawful for any Lender to honor its obligation to make, maintain or fund its Loans hereunder, then such Lender shall promptly notify the Borrowers thereof (with a copy to the Administrative Agent) and such Lender's obligation to maintain or fund its Loans shall be suspended until such Lender shall so notify the Borrowers (with a copy to the Administrative Agent) that the circumstances giving rise to such suspension no longer exist. If such Lender shall determine in good faith that it may not lawfully continue to maintain or fund its Loans, each Borrower shall, upon the request of such Lender (such request to be made at least ten days prior to any required prepayment of such shorter period commencing on the date of such request and ending on the immediately succeeding Interest Payment Date), prepay the outstanding amount of such Lender's Loans made to such Borrower (and only such Lender's Loans), together with accrued interest thereon and all other amounts payable hereunder, on such Interest Payment Date; provided, however, that if such Lender notifies to such Borrower that earlier prepayment is required in order to enable such Lender to comply with the relevant law, rule or regulation or change therein and specifies an earlier date for the prepayment, such Borrower shall make the prepayment on the date so specified by such Lender.

Section 2.13    Increased Costs.

36

(a)    If on or after the date of this Agreement, any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, including any reserve against "Eurocurrency liabilities" (as defined in Regulation D of the Board (or any successor provision thereof)), special deposit, compulsory loan or similar requirement against assets of, deposits with or for account of, or credit extended by, any Lender (or its Lending Office);

(ii)    impose on or subject any Lender to any tax or mandatory contribution, or change the basis of taxation of payment to any such Lender in respect of this Agreement (except for Indemnified Taxes or Other Taxes payable by the Loan Parties pursuant to Section 2.15 and Taxes described in clauses (i) or (n) of the definition of Excluded Taxes); or

(iii)    impose on any Lender any other condition affecting this Agreement or Loans made by such Lender,

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower owing any Loans to such Lender shall pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines in good faith that any Change in Law regarding capital adequacy or liquidity requirements is applicable to it has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower owing any Loans to such Lender will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)    A certificate of a Lender setting out (i) the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.13(a) or Section 2.13(b) and (ii) in reasonable detail how such amount or amounts were calculated, which description shall in no event contain any disclosure of matters deemed by such Lender to be confidential or proprietary, shall be delivered to the Borrowers and shall be conclusive absent manifest error. In determining such amount or amounts, such Lender may use any generally used averaging and attribution methods. The relevant Borrower shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.13 shall not constitute a waiver of such Lender's right to demand



2022-3.....................38-0800

37

such compensation; provided, that, the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.13 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Administrative Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation (except, if the Change in Law giving rise to such increased cost or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.14    Break Funding Payments.    In the event of:

(a)    the failure by any Borrower in making the borrowing of the Loans after such Borrower has delivered a Borrowing Request in accordance with Section 2.3 (including as a result of the failure of any of the conditions set forth in Article IV to be satisfied);

(b)    the payment or prepayment (other than (i) on an Interest Payment Date and (ii) a prepayment in respect of which the Borrowers are required to pay a Make-Whole Amount covering all interest on the Loans for the then current Interest Period of the principal of any Loan (including as a result of an Event of Default)) or the payment or prepayment of any principal of the Loans other than on the scheduled date of repayment thereof pursuant to Section 2.9(a); or

(c)    the failure to prepay any Loan on the date specified in any notice delivered pursuant hereto;

then, in any such event, each Borrower to which any of the events specified under clauses (a) through (c) above is attributable shall compensate each Lender for the loss, cost and expense attributable to such event (but excluding loss of margin), provided that such losses shall include any payments to be made by the Lenders as a consequence of the events described in clauses (a) and (b) above pursuant to any Hedging Agreement entered into by any Lender relating to or in connection with this Agreement.

A certificate of any Lender setting out (i) any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.14 and (ii) in reasonable detail how such amount or amounts were calculated, which description shall in no event contain any disclosure of matters deemed by such Lender in good faith to be confidential or proprietary, shall be delivered to the relevant Borrower and shall be conclusive absent manifest error.  The relevant Borrower shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

Section 2.15    Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Financing Document shall be made free and clear of and without any withholding or deduction for or on account of any Indemnified Taxes or Other Taxes; provided, however, that if any Loan Party shall be required by Applicable Law to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required withholdings or deductions (including withholdings or deductions for or on account of any Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 2.15) the

Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (c) such Loan Party shall make such withholdings or deductions and (iii) such Loan Party shall pay the full amount so withheld or deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    The Borrowers shall indemnify the Administrative Agent and each Lender, within ten Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) paid by the Administrative Agent or such Lender, as the case may be, and all reasonable expenses arising therefrom or with respect thereto plus interest thereon for each day from (and including) the day of delivery to the Borrowers of a request for such payment to (but excluding) the date of actual reimbursement at a rate per annum equal to the interest rate then applicable to the Loans, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent) or by the Administrative Agent on behalf of a Lender shall be conclusive absent manifest error.

(c)    Within 30 days after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent a certified copy by a Responsible Officer of a stamped filed form (declaración) or any substitute thereof under Applicable Law evidencing such payment.

(d)    The Administrative Agent and each Lender, as the case may be, shall, at the request of the Borrowers, use reasonable efforts to furnish the Borrowers with any documentation required under Applicable Law as may be necessary to establish any available exemption from or reduction in the amount of otherwise applicable Indemnified Taxes or Other Taxes.  Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to an unreimbursed cost or expense or would prejudice the legal or commercial position of such Lender.

(e)    If a payment made to a Lender under any Financing Document would be subject to any United States federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by Applicable Law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers or the Administrative Agent to comply with their obligations under FATCA or to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

2022-0...m 12:38-0800

(f)     The payment obligations of the Loan Parties under this Section 2.15 are joint and several.

Section 2.16   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrowers shall make each payment required to be made by them hereunder (whether of principal, interest or fees, or under Section 2.13, Section 2.14 or Section 2.15, or otherwise) prior to 2:00 p.m. (New York City time) on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Administrative Agent's Account (or at such other account or accounts designated by the Administrative Agent by notice to the Borrowers), except for payments pursuant to Sections 2.12, 2.13, 2.14, 2.15 and 10.3, which shall be made directly by the relevant Borrower to the Person entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)     Whenever any payment received by the Administrative Agent under this Agreement or any other Financing Document is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement and the other Financing Documents, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent in the following order: first, to the payment of fees and expenses due and payable to the Administrative Agent and the Lead Arranger under and in connection with this Agreement and the Fee Letter; second, to the payment of all expenses due and payable under Section 10.3, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each such Lender; third, to the payment of interest then due and payable on the Loans ratably in accordance with the aggregate amounts of interest owed to each such Lender; fourth, to the payment of the principal amount of the Loans which is then due and payable ratably among the Lenders in accordance with the amounts of principal owed to each such Lender; and fifth, to the payment of any other amounts then due and payable under any other Financing Document.

(c)     Except to the extent otherwise provided herein, (i) each payment or prepayment of principal of the Loans (except for prepayments under Section 2.12) shall be made for the account of the Lenders of each Facility pro rata in accordance with the respective unpaid principal amounts of the Tranche A Loans and Tranche B Loans, as the case may be, (ii) within each Facility shall be made for the account of the Lenders of each Facility pro rata in accordance with the respective unpaid principal amounts of the Loans of such Facility held by the respective Lenders and (ii) each payment of interest shall be made for the account of the Lenders of each Facility pro rata in accordance with the respective unpaid principal amounts of the Tranche A Loans and Tranche B Loans, and within each Facility shall be made for account of the Lenders

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
130.30.34.01.41

of such Facility pro-rata in accordance with the amounts of interest on the Loans of that same Facility then due and payable to the Lenders of such Facility.

(d)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon then due than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided, however, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (d) shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any other Financing Document or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in its Loans to any assignee or participant, other than to any Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so, or permitted, under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(e)    Unless the Administrative Agent shall have received notice from any Borrower prior to the date on which any payment is due to the Administrative Agent for account of the Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(f)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.16(e), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for account of such Lender to satisfy such Lender's obligations under Section 2.16(e) until all such unsatisfied obligations are fully paid.

Section 2.17    Increase in Commitment.    At any time during the period commencing on the Closing Date and ending on the first anniversary of the Closing Date, upon notice by any Borrower to the Lenders (through the Administrative Agent), such Borrower shall have the right to request, in one or more occasions, the establishment of one or more new term loans hereunder, including, in the case of Marevalley, an increase to the amount of the then-

2022-C05469-1094-738-0800

existing Tranche B Loans (each, an "Incremental Commitment") to the extent the aggregate amount of Commitments on the Closing Date and on each Increase Effective Date (as defined below) thereafter (in each case, before giving effect to the making of any Loan) does not exceed U.S.$200,000,000. Each Incremental Commitment shall be in an aggregate amount of U.S.$10,000,000 or any whole multiple of U.S.$500,000 in excess thereof. At the time of sending such notice, the relevant Borrower shall specify the time period within which the Lenders are requested to respond (which shall in no event be less than five Business Days from the date of delivery of such notice to the applicable Lender). If the Commitments are increased in accordance with this Section 2.17, the Administrative Agent and such Borrower shall determine the effective date (the "Increase Effective Date") and the final allocation of such increase. The Administrative Agent shall promptly notify the Borrowers and the Lenders of the final allocation of such increase and the Increase Effective Date. The Administrative Agent shall promptly (i) execute and deliver a Lender Joinder Agreement (as defined below) with respect to each new Lender with an Incremental Commitment, delivered to it by and which appears on its face to be in order and (ii) enter, as applicable, the name of each new Lender and the details of each Lender's Incremental Commitment (if any) in the Register. Each party to this Agreement and the other Financing Documents (other than the Lender with an Incremental Commitment party thereto) irrevocably (x) authorizes and directs the Administrative Agent to complete and duly execute and deliver a Lender Joinder Agreement, if applicable, on its behalf and (y) agrees to be bound by the amendment to this Agreement evidenced thereby as if it were a signatory thereto. As of the date of execution and delivery of its Lender Joinder Agreement, (A) each new Lender with an Incremental Commitment party thereto will assume the rights and obligations of a Lender hereunder with a Commitment in the amount of its Incremental Commitment and (B) any reference in this Agreement or in any other Financing Document to Lenders will include such Person.



(a)  Conditions. As a condition precedent to the making of each Incremental Loan, (i) the relevant Borrower shall deliver to the Administrative Agent a certificate dated as of the Increase Effective Date and effective through the making of such Incremental Loan (in sufficient copies for each Lender) signed by a Responsible Officer certifying that: (x) in respect to such Borrowers, all necessary governmental authorizations approvals or consenting to such increase have been obtained and attaching a true, correct and complete copy thereof; and (y) before and after giving effect to such increase and such Incremental Loan, (A) the representations and warranties contained in Article III and the other Financing Documents are true and correct in all material respects (or in all respects if already qualified by materiality or Material Adverse Effect) on and as of the Increase Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or in all respects if already qualified by materiality or Material Adverse Effect) as of such earlier date and that the representations and warranties contained in Section 3.4 shall be deemed to refer to the most recent statements furnished pursuant to Section 5.1, respectively, and (B) no Default or Event of Default has occurred and is continuing; (ii) since the date of the most recently delivered audited financial statements of Crédito Real pursuant to Section 4.1(e) or 5.1(a), there has been no event or circumstance (whether or not covered by insurance) which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (iii) the Administrative Agent shall have received a Borrowing Request in accordance with the terms of Section 2.3, but assuming that the references to the Closing Date are to the date of the making

41

JACOBO GUADALUPE MARTINEZ FLORES
20.59.30.30.13.20.30.30.30.26.39.55.30.54.37.35.32.53.31.38
13/08/24 20:01:41

of such Incremental Loan, (iv) the Administrative Agent shall have received financial projections relating to the consolidated operations of Crédito Real after giving pro forma effect to the requested increase, in form satisfactory to the Administrative Agent and the Lenders, (v) on or before the date of the making of such Incremental Loan, the Administrative Agent shall have received, for further delivery to each new Lender, Promissory Notes evidencing such Incremental Loan duly executed and delivered by the relevant Borrower, (vi) this Agreement shall be amended (including Schedule 1.1-I hereto), in form and substance satisfactory to the Administrative Agent and the Lenders accepting such Incremental Commitment, to reflect such increase, and (vii) in case the maturity date of the Incremental Loans falls after the then Latest Maturity Date, the Loan Parties shall have delivered to the Administrative Agent an updated Process Agent Acceptance effective through a date falling not earlier than the first anniversary of such maturity date.

(b)   Terms of New Loans and Commitments. The terms and provisions of the Incremental Loans made pursuant to Incremental Commitments shall be as follows:

(i)   the terms and provisions of Incremental Loans shall be, except as otherwise set forth herein or in the applicable Lender Joinder Agreement, identical to the Tranche B Loans and to the extent that the terms and provisions of Incremental Loans are not identical to the Tranche B Loans (except to the extent permitted by clause (ii), (iii) or (iv) below) they shall be reasonably satisfactory to the Lenders and the Administrative Agent; provided that in any event the Incremental Loans must comply with clauses (ii), (iii) and (iv) below;

(ii)   the weighted average life to maturity of any Incremental Loans shall be no shorter than the remaining weighted average life to maturity of the Tranche B Loans;

(iii)   the maturity date of Incremental Loans (the "Incremental Loan Maturity Date") shall not be earlier than the then Latest Maturity Date; and

(iv)   the Applicable Margin for Incremental Loans shall be determined by the Borrowers and the Lenders of the Incremental Loans; provided that the Applicable Margin for any Incremental Loan shall not be greater than the Applicable Margin for the Tranche B Loans.

Each Lender will have the option, but not the obligation, to participate in such proposed Incremental Commitments in accordance with the ratable portion of the Loans owing to such Lender at the time of receipt of the notice referred to in Section 2.17(a). Each Lender will notify the Administrative Agent and the relevant Borrower within the time period referred to in Section 2.17(a) whether or not it would like to participate in the Incremental Commitments and the proposed amount of such Lender's Incremental Commitment. If a Lender does not respond within such time period, such Lender shall be deemed to have declined to increase its Commitment from that in effect immediately prior to the time of delivery of the notice referred to in Section 2.17(a).

43

(c)    Increase Joinder. To achieve the full amount of a requested increase, the Lenders may also invite other Persons not located in a Designated Jurisdiction (other than the Borrowers, any Affiliate thereof, or a natural Person) reasonably acceptable to the Borrowers to become Lenders pursuant to a joinder agreement, substantially in the form of Exhibit F (a "Lender Joinder Agreement") (subject to the Borrowers having received all authorizations, consents and approvals, if any, that are required at that time for the execution of such Lender Joinder Agreement); provided, however, that Lenders holding a Commitment or outstanding Loan hereunder at the date on which such request is made shall be preferred in the allocation of such increase.

(d)    Making of New Loans. On any Increase Effective Date on which new Incremental Commitments are effective, subject to the satisfaction of the terms and conditions set forth in this Section 2.17, each Lender with such a new Incremental Commitment shall make an Incremental Loan to the relevant Borrower in an amount equal to its new Incremental Commitment.

(e)    Equal and Ratable Benefit. The Loans and Incremental Commitments established pursuant to this Section shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Financing Documents.

This Section shall supersede any provisions in Sections 2.16 or 10.2 to the contrary.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each of Crédito Real and Marevalley, with respect to itself and its Subsidiaries, represents and warrants to the Administrative Agent and the Lenders, on the Closing Date, that:

Section 3.1    Corporate Existence; Powers; Capitalization.

(a)    Crédito Real and each Restricted Subsidiary is duly organized, validly existing and in good standing (where applicable) under the laws of their respective jurisdiction of incorporation and have all requisite power to carry on their business as presently conducted.

(b)    Schedule 3.1(b) contains a list of each Subsidiary of Crédito Real as of the date of this Agreement, including its name, jurisdiction of incorporation, number of shares of Capital Stock outstanding and class and holders thereof.

Section 3.2    Authorization; Enforceability. The execution, delivery and performance by each Loan Party of the Financing Documents to which such Loan Party is a party are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate action. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Financing Document, when executed and delivered by such Loan Party, shall constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, concurso mercantil or similar laws affecting the enforcement

44



of creditors' rights generally, or by equitable principles relating to enforceability (regardless of whether enforcement thereof is sought in a proceeding at law or in equity).

Section 3.3   Governmental Approvals, No Conflicts, Etc.

(a)   All governmental authorizations, if any, and actions of any kind necessary for the execution, delivery and performance by each Loan Party of the Financing Documents to which such Loan Party is a party, or required for the validity of such Financing Documents or enforceability of such Financing Documents against such Loan Party, have been obtained or performed and are valid and subsisting in full force and effect.

(b)   The execution, delivery and performance of the Financing Documents, the incurrence of, and use of the proceeds of, the Loans do not violate any Applicable Law, judgment, award, injunction, or similar legal restriction or the memorandum and articles of association, charter, by-laws, estatutos sociales or other organizational documents of Crédito Real or any of the Restricted Subsidiaries or any order of any Governmental Authority.

(c)   The execution, delivery and performance of the Financing Documents, the incurrence of, and use of the proceeds of, the Loans do not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party, any Restricted Subsidiary or their property or assets, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Restricted Subsidiary to any Person, except for any such violation or default which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)   The execution, delivery and performance of the Financing Documents do not and will not result in the creation or imposition of any Lien on any property or asset of any Loan Party or any Restricted Subsidiary.

Section 3.4   Financial Condition; No Material Adverse Change.

(a)   Crédito Real has furnished to the Lenders (i) the audited Consolidated balance sheet and related statements of income and cash flows of Crédito Real as of and for the years ended December 31, 2017, and December 31, 2018, audited by Galaz, Yamazaki, Ruiz Urquiza S.C., independent public accountants and (ii) the balance sheet and related statements of income and cash flows of Crédito Real as of September 30, 2019.

(b)   The financial statements specified in clause (a) above present fairly, in all material respects, the financial condition, results of operations and cash flows of Crédito Real and its Subsidiaries on such dates and for such periods in accordance with Mexican Accounting Standards.

(c)   Neither Crédito Real nor any Restricted Subsidiary has any material contingent liabilities, material liabilities for taxes, material unusual forward or long-term commitments or material unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the financial statements specified in clause (a) above (including the notes thereto).



2022-0-0-10-10-01-01 confidential.com 18:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.30.53.05.34.37.33.52.34.3..38
13060324 2020141

-48-

(d)     None of the Borrowers has any Indebtedness outstanding as of the date of this Agreement, except as provided under Schedule 3.4(d).

(e)     Since December 31, 2018, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(f)     No Default or Event of Default has occurred and is continuing.

Section 3.5    Properties.

(a)     Each Loan Party has valid title to, or valid leasehold interests in, all its real and personal property material to its business.

(b)     Intellectual Property.  Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business.

Section 3.6    Material Permits.  Each Loan Party (a) has all Material Permits, (b) is in compliance with all Material Permits under Applicable Law, and (c) has not received any notice of proceedings relating to the revocation, cancellation, expiration or modification of any Material Permit.

Section 3.7    Litigation.  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority now pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Restricted Subsidiary (a) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or (b) that purport to affect the legality, validity or enforceability of this Agreement, any of the other Financing Documents or the transactions contemplated thereunder or seek to prevent or enjoin any of such transactions.

Section 3.8    Compliance with Laws and Agreements.

(a)     Each Loan Party and each Restricted Subsidiary is in compliance with all laws (including, without limitation, labor and social security laws), regulations and orders of any Governmental Authority applicable to such Loan Party, such Restricted Subsidiary or their businesses or properties, except in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b)     Each Loan Party and each Restricted Subsidiary is in compliance with all indentures, agreements and other instruments binding upon such Loan Party or such Restricted Subsidiary, except in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 3.9    Taxes.

(a)     Each Loan Party has timely filed or caused to be filed all tax returns, declarations, reports, estimates, information returns and statements and other information required to have been filed and have paid or caused to be paid all Taxes required to have been paid by them, except for (i) Taxes that are being Contested, or (ii) to the extent that failure to so file or pay would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except for Panamanian and Mexican withholding taxes on payments of interest on the Loans and fees made by Crédito Real, and Panamanian stamp taxes payable on or in respect of any Financing Document, there are no Taxes imposed either (i) on or by virtue of the Transactions, its enforcement or admissibility into evidence or (ii) on any payments to be made by any Loan Party pursuant to any Financing Document.

(c)     Each Loan Party is permitted to pay any additional amounts payable pursuant to Section 2.15(a).

Section 3.10     Environmental Matters. Except as otherwise, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:

(a)     The properties presently owned, leased or otherwise operated by each Loan Party do not contain, and, to the Loan Parties' knowledge, have not previously contained, therein, thereon or thereunder, including, the soil and groundwater thereunder, any Hazardous Materials in amounts or concentrations that constitute or constituted a violation of, or would reasonably be expected to give rise to liability under, Environmental Laws;

(b)     The properties presently owned, leased or otherwise operated by each Loan Party and all operations and facilities at such properties are in compliance with all Environmental Laws, and there is no contamination or violation of any Environmental Law which could interfere with the continued operation of, or impair the otherwise fair saleable value of, such properties;

(c)     None of the Loan Parties has received or has knowledge of any complaint, notice of violation, alleged violation or notice of investigation or of potential liability under Environmental Laws with regard to any Loan Party or any properties presently owned, leased or otherwise operated by any Loan Party, nor does any Loan Party have knowledge that any such action is being contemplated, considered or threatened;

(d)     Hazardous Materials have not been generated, treated, stored or disposed of at, on or under any properties presently owned, leased or otherwise operated by any Loan Party or during any Loan Party's ownership, lease or operation of any property formerly owned, leased or otherwise operated by any Loan Party or any of its Subsidiaries nor have any Hazardous Materials been transported from any such property by any Loan Party, in each case, in violation of or in a manner that could reasonably be expected to give rise to liability on the part of any Loan Party under any Environmental Laws;

(e)     Each Loan Party is in compliance with all Environmental Permits, except in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.35.30.34.37.35.32.34.31.38
130624 20001.01

Section 3.11   Reports; Disclosure.

(a)   The reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Lenders in connection with the negotiation of this Agreement and the other Financing Documents, taken as a whole, are true and correct in all material respects and do not omit to state any material fact necessary to make the statements contained therein, in the light of the circumstances under which they were made, not misleading, in each case on the date on which such information was furnished; provided that, with respect to any projected financial information, each Loan Party represents only that such information was prepared in good faith on assumptions believed to be reasonable at the time.

(b)   As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.12   Legal Form.

(a)   To ensure the legality, validity, enforceability or admissibility in evidence of this Agreement and each other Financing Document in Mexico and Panama, it is not necessary that (i) this Agreement or any other Financing Document be filed or recorded with any Governmental Authority in Mexico or Panama, or (ii) that any stamp or similar tax (other than Panamanian stamp taxes required to be paid in order to file any Financing Document before the courts in Panama) be paid for in respect of this Agreement or any other document to be furnished under this Agreement, unless such stamp or similar taxes have been paid by the Loan Parties.

(b)   Each Promissory Note qualifies as a credit instrument (*título de crédito*) under Mexican law and entitles the holder thereof to commence a commercial executory proceeding (*acción ejecutiva*) against the Relevant issuer in the Mexican competent courts.

Section 3.13   Rank of Debt.   The obligations represented by each Financing Document constitute direct and unconditional general obligations of the Loan Parties, and rank in right of payment and otherwise at least *pari passu* with all other senior unsecured indebtedness of the Loan Parties.

Section 3.14   Investment Company Act.   None of the Loan Parties is an "investment company," or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 3.15   Commercial Activity; Absence of Immunity.   Each Loan Party is subject to civil and commercial law with respect to its obligations under the Financing Documents to which it is a party. The execution and performance by each Loan Party of the Financing Documents to which it is a party constitute private and commercial acts rather than public or governmental acts. None of the Loan Parties nor any of their respective properties is entitled to any right of immunity on the ground of sovereignty or the like from the jurisdiction of any court of competent jurisdiction or from any action, suit or proceeding or the service of process in connection therewith, arising under the Financing Documents.

-48-

2022-_____-_____@_____-10-22-38-0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.10.30.33.30.30.30.30.35.30.34.37.35.32.34.31.38
170824-20-04-41

Section 3.16   Insurance.  The properties of the Loan Parties and the Restricted Subsidiaries are insured with financially sound and reputable insurance companies, in such amounts and against such risks as are required by Applicable Law and otherwise as are customarily maintained by companies engaged in the same or similar Line of Businesses operating in the same or similar locations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 3.17   Labor Matters.  There is no strike, slowdown or work stoppage or other labor disputes actually pending or, to the knowledge of any Loan Party, threatened against or involving any Loan Party or any Restricted Subsidiary, except to the extent that such slowdown or work stoppage or other labor disputes would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.18   Solvency.  The Loan Parties and the Restricted Subsidiaries are Solvent.

Section 3.19   Unrestricted Subsidiaries.  The Subsidiaries of Crédito Real identified in Schedule 1.1-III are all the "Unrestricted Subsidiaries" (as defined under the 2026 Notes Indenture) on the Closing Date.

Section 3.20   Margin Stock.  None of the Borrowers is engaged in the business of extending credit for the purposes, whether immediate, incidental or ultimate, of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or Regulation X of the Board.

Section 3.21   OFAC.  None of the Loan Parties nor any of their respective Subsidiaries, nor, to the knowledge of any Loan Party or its Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

Section 3.22   Anti-Corruption Laws.

(a)    Each Loan Party and its Subsidiaries have conducted their businesses in compliance with the FCPA and other similar anti-corruption legislation in other jurisdictions (including, without limitation, the Mexican General Laws for the National Anticorruption System (*Ley General del Sistema Nacional Anticorrupción*), the Mexican General Law of Administrative Responsibilities (*Ley General de Responsabilidades Administrativas*) of Mexico, Panamanian Law 33 of April 25, 2013, creating the Transparency National Authority and of Access to Information (*Autoridad Nacional de Transparencia y Acceso a la Información*), any regulations issued by the Transparency National Authority and of Access to Information (*Autoridad Nacional de Transparencia y Acceso a la Información*) and the provisions of the Panamanian Criminal Code (*Código Penal de Panamá*) relating to corruption

Confirmada@925.238-0800
2022-0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.35.30.34.37.35.32.34.31.38
15082240 20:01:41

crimes) and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

(b)     None of the Loan Parties nor any of their respective Subsidiaries, nor to the knowledge of any Loan Party after due inquiry, any director, officer, agent, employee or Affiliate of any Loan Party acting on behalf of any Loan Party is aware of or has taken any action, directly or indirectly, that would result in a violation by such person of the Federal Anticorruption Law in Public Contracting (*Ley Federal Anticorrupción en Contrataciones Públicas*), the Mexican Anti Money Laundering Law (*Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita*) or the Mexican Federal Penal Code (*Código Penal Federal*) (collectively, the "Mexican Anticorruption Law") and their regulations.

## ARTICLE IV

## CONDITIONS

Section 4.1     Closing Date. The obligations of the Lenders to make a Loan hereunder shall not become effective until the date on which the Administrative Agent shall have received each of the following documents or the following conditions shall have been waived in accordance with Section 10.2 or satisfied, as applicable, which date shall fall on or prior to the Termination Date:

(a)     Organizational Documents. The Administrative Agent shall have received (i) copies of the public deeds containing the current articles of incorporation and by-laws (*estatutos sociales*) of each Loan Party (iii) copies of the public deed containing powers-of-attorney pursuant to which the signatories of each Loan Party are authorized to execute and deliver this Agreement and any other Financing Document to which such Loan Party is a party on behalf of such Loan Party, including for any of management forms or *administration* and to issue and execute negotiable instruments (*títulos de crédito*) and (iii) the resolution of the board of directors of each Loan Party authorizing such Loan Party to execute, deliver and perform this Agreement and the transactions contemplated hereunder.

(b)     Representations and Warranties. Each of the representations and warranties of the Loan Parties set out in this Agreement and in each of the Financing Documents shall be true and correct on the Closing Date (except to the extent that any such representation or warranty speaks or is referenced to a particular date, in which case such representation or warranty shall be true and correct on such date).

(c)     Officer's Certificate. The Administrative Agent shall have received a certificate from each Borrower, dated as of the Closing Date, substantially in the form of Exhibit G, executed by a Responsible Officer of such Borrower.

(d)     Financing Documents. The Administrative Agent shall have received this Agreement and the Fee Letter duly executed and delivered by each Loan Party that is an intended signatory thereto, and this Agreement and the Fee Letter shall be in full force and effect.

2022-0800 @[21.25.38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.31.30.30.30.30.53.30.54.57.55.22.34.31.38
130624 09.00.41

(e)    Financial Statements. The Administrative Agent shall have received a true, correct and complete copy of the financial statements described in Section 3.4(a).

(f)    Opinions of Counsel. The Administrative Agent shall have received the following legal opinions, each dated the Closing Date, in the English language, addressed to the Administrative Agent and the Lenders:

(i)    an opinion of DLA Piper LLP (US), special New York counsel to the Loan Parties, substantially in the form of Exhibit H (and the Loan Parties shall have instructed such counsel to deliver such opinion to the Administrative Agent and the Lenders);

(ii)    an opinion of DLA Piper Mexico, S.C., special Mexican counsel to the Loan Parties, substantially in the form of Exhibit I (and the Loan Parties shall have instructed such counsel to deliver such opinion to the Administrative Agent and the Lenders); and

(iii)    an opinion of Alemán, Cordero, Galindo & Lee, special Panamanian counsel to the Loan Parties, substantially in the form of Exhibit J (and the Loan Parties shall have instructed such counsel to deliver such opinion to the Administrative Agent and the Lenders).

(g)    Solvency Certificate. The Administrative Agent shall have received a certificate signed by a Financial Officer of Pedica Real, substantially in the form of Exhibit K, confirming the solvency of each Borrower on the Closing Date and immediately after giving effect on a pro forma basis to the occurrence thereof.

(h)    Borrowing Requests. The Administrative Agent shall have received a Borrowing Request from each Borrower intending to borrow Loans on the Closing Date.

(i)    Promissory Notes. The Administrative Agent shall have received the corresponding Promissory Notes duly executed and delivered by such relevant Borrower together with respect to the Promissory Notes issued by Materralty, guaranteed by Credito Real (as avad), in each case, dated as of the Closing Date.

(j)    Payment of Fees. The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Closing Date, including reimbursement or payment of all reasonable and documented expenses (including fees, charges and disbursements of Morgan & Morgan, Ritch, Mueller, Heather y Nicolau, S.C. and Skadden, Arps, Slate, Meagher & Flom LLP) required to be reimbursed or paid by the Borrowers hereunder or under any other Financing Document, provided that invoices for any such fees and other amounts shall have been received by the Borrowers on or prior the Closing Date.

(k)    Process Agent Acceptance. (i) Each Loan Party shall have appointed the Process Agent as its agent for service of process in New York in respect of any dispute arising from or relating to this Agreement and the other Financing Documents (except for the Promissory Notes) to which it is a party, and shall have furnished to the Administrative Agent a Process Agent Acceptance, duly executed and delivered by the Process Agent, and (ii)

111

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,33,33,34,73,33,32,34,31,38
130024-20051-03

Crédito Real shall have granted an irrevocable special power of attorney for lawsuits and collections before Mexican notary public substantially in the form of Exhibit L.

(l)      No Default or Event of Default.  No event, act or condition shall have occurred and be continuing or would result from the execution, delivery or performance of this Agreement or the other Financing Documents which would constitute a Default or Event of Default.

(m)      No Order.  There shall not (i) be in effect any statute, regulation, order, decree or judgment of any Governmental Authority that makes illegal or enjoins or prevents the execution, delivery and performance of the Financing Documents and/or the consummation of the transactions thereunder or (ii) have been commenced any action or proceeding that seeks to prevent or enjoin the execution, delivery and performance of the Financing Documents and/or the transactions thereunder.

(n)      No Material Adverse Effect.  No event, development or circumstance shall have occurred that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(o)      No Change in Law.  No Change in Law shall have imposed, modified or deemed applicable any reserve, special deposit, compulsory loan or similar requirement with respect to the Loan.

(p)      Debt Rating.  The Administrative Agent shall have received documentation, in form and substance reasonably satisfactory to the Administrative Agent, evidencing that the Senior Notes have a Debt Rating of "BB+" from S&P or the equivalent or higher from any other Rating Agency.

(q)      KYC Requirements.  Upon the reasonable request of any Lender, the Borrowers shall have provided to such Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(r)      Beneficial Ownership Certification.  Upon the request of any Lender made at least three days prior to the Closing Date, the Borrowers shall deliver to such Lender not later than two days prior to the Closing Date, a Beneficial Ownership Certification in accordance with the Beneficial Ownership Regulation.

(s)      Repayment of Existing Facility.  Crédito Real shall have made arrangements in substance and form satisfactory to the Lenders, so that concurrently with the borrowing of the Loans on the Closing Date, each and all obligations of Crédito Real arising out of or in connection with the 2017 Credit Agreement shall have been paid in full in cash in accordance with the terms thereof.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Loans and all other amounts outstanding hereunder and under the other Financing Documents shall have been paid in full, Crédito Real and Marevalley, as applicable, covenant and agree with the Lenders that:

Section 5.1    Financial Statements and Other Information.  Crédito Real will furnish to the Administrative Agent (and the Administrative Agent shall make available for distribution to each Lender):

(a)    as soon as available, but in any event within 120 days after the end of each fiscal year of Crédito Real, the audited Consolidated balance sheet and related statements of income and cash flows of Crédito Real as of the end of and for such year, setting forth in each case in comparative form the figures for, in the case of the balance sheet, as of the end of, the previous fiscal year, all reported on by independent public accountants of recognized international standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of Crédito Real and its Subsidiaries on a Consolidated basis;

(b)    as soon as available, but in any event within 60 days after the end of each of the first three fiscal quarters of each fiscal year of Crédito Real, the Consolidated balance sheet and related statements of income and cash flows of Crédito Real for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for (or, in the case of the balance sheet, as of the end of) the corresponding period or periods of the previous fiscal year, all certified by a Financial Officer of Crédito Real as presenting fairly in all material respects the financial condition and results of operations of Crédito Real and its Subsidiaries on a Consolidated basis, subject to normal year-end audit adjustments;

(c)    concurrently with any delivery of financial statements under clauses (a) and (b) of this Section 5.1, a certificate of a Financial Officer of Crédito Real substantially in the form of Exhibit M (i) certifying as to whether any Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken by the Loan Parties with respect thereto, (ii) certifying the compliance by the Loan Parties with Section 6.5 and setting forth in reasonable detail the calculations required to establish the compliance by the Loan Parties with Section 6.5 and (iii) stating whether any change in Mexican Accounting Standards, or in the application thereof, has occurred since the date of the audited financial statements referred to in Section 3.4 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)    promptly following (i) the designation of a Subsidiary of Crédito Real as an "Unrestricted Subsidiary," or (ii) the revocation of the designation of a Subsidiary of Crédito Real as an "Unrestricted Subsidiary," in each case pursuant to the 2026 Notes Indenture, a certificate of a Responsible Officer of Crédito Real certifying as to such



123

designation or revocation of designation and requesting the amendment of Schedule 1.1-III; and

(e) promptly following reasonable request therefor, (i) such other information regarding the operations, business affairs and financial condition of the Loan Parties and their respective Subsidiaries, or compliance with the terms of this Agreement and the other Financing Documents (including the use of proceeds of any Loan), as the Administrative Agent or any Lender may reasonably request through the Administrative Agent, or (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know-your-customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws; provided that the Loan Parties shall not be required to provide pursuant to this Section 5.1(e) any information that is subject to attorney-client or similar privilege, or constitutes attorney work product or that is confidential or proprietary trade secret or commercially strategic information (as determined in good faith by the Loan Parties).

The Loan Parties hereby acknowledge and agree that all financial statements and certificates furnished pursuant to paragraphs (a), (b) and (c) above are hereby deemed to be suitable for public distribution, and to be made available, to the Lenders on a public basis and may be treated by the Administrative Agent and the Lenders as if the same had been clearly and conspicuously marked "PUBLIC".

Section 5.2    Notices of Material Events. Crédito Real shall furnish to the Administrative Agent written notice of the following:

(a) prompt notice after any Responsible Officer of any Loan Party obtains actual knowledge of the filing or commencement of any material action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Party or any Restricted Subsidiaries, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect;

(b) of the occurrence of any Default or Event of Default;

(c) prompt notice of any other circumstance that, individually or in the aggregate, has or would reasonably be expected to have a Material Adverse Effect; and

(d) any change in the information provided in the Beneficial Ownership Certification most recently provided that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice delivered pursuant to this Section 5.2 shall be accompanied by a statement of a Responsible Officer or other executive officer of Crédito Real setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken by the Loan Parties with respect thereto.

Section 5.3    Existence; Conduct of Business.

(a)    Crédito Real shall, and shall cause each Restricted Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and good standing under the laws of its jurisdiction of its organization.

(b)    Crédito Real shall, and shall cause the Restricted Subsidiaries, to conduct their respective businesses in accordance with Prudent Industry Practices.

Section 5.4    Payment of Obligations. Crédito Real shall, and shall cause each Restricted Subsidiary to, pay its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being Contested or (ii) the failure to so file or pay, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.5    Maintenance of Properties. Crédito Real shall, and shall cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted and keep all properties in all material respects with all necessary equipment and make all reasonable repairs, renewals, replacements, betterments and improvements thereto in accordance with Prudent Industry Practices.

Section 5.6    Insurance. Crédito Real shall, and shall cause each of the Restricted Subsidiaries to, at all times maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are required by Applicable Law and otherwise as are customarily maintained by companies engaged in the same or similar Lines of Businesses operating in the same or similar locations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.7    Books and Records; Inspection Rights. Crédito Real shall, and shall cause each Restricted Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Crédito Real shall, and shall cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon five Business Days prior notice and during normal business hours, in a manner that does not disrupt the operation of Crédito Real or any Subsidiary, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and conditions with its officers and independent accountants, all at the expense of Crédito Real; provided, that Crédito Real shall not be required to reimburse the Lenders or the Administrative Agent for more than one visit per fiscal year; provided, further, that (i) for so long as no Event of Default shall have occurred and is continuing, the representatives of the Administrative Agent and any Lenders shall, collectively, only have the right under this Section 5.7 to visit twice during any fiscal year (it being understood that the representatives of the Lenders and the Administrative Agent are not entitled to visit separately), and (ii) when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of Crédito Real at any time during normal business hours and without advance notice.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
138029.2009-A1

Section 5.8.    Compliance with Laws and Contracts.

(a)    Crédito Real shall, and shall cause each Restricted Subsidiary to, comply with all Applicable Laws, except in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b)    Crédito Real shall and shall cause each Restricted Subsidiary to (i) comply with all the terms and conditions of all contracts to which Crédito Real or such Restricted Subsidiary is a party or by which any of its properties or assets is bound, (ii) keep each such contract in full force and effect and (iii) enforce each such contract in accordance with its terms, except, in each of clause (i) through (iii), in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.9.    Use of Proceeds.

(a)    The proceeds of the Loans shall be used solely (i) to prepay existing Indebtedness of Crédito Real (including the 2017 Existing Indebtedness), (ii) for general corporate purposes of the Borrowers and their respective Subsidiaries and (iii) to pay the fees and expenses incurred in connection with the execution and delivery of this Agreement.

(b)    Neither the Administrative Agent nor any Lender shall have any responsibility as to the use of any of such proceeds.

(c)    No part of the proceeds of the Loans will be used for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of such terms quoted terms under Regulation U as now in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or Regulation X of the Board.

Section 5.10    Pari Passu Ranking.    The Loan Parties shall take or cause to be taken, all actions which may be or become necessary to or appropriate to ensure that the obligations of the Loan Parties under the Financing Documents will continue to constitute their direct and unconditional obligations ranking at least pari passu in right of payment with all other senior unsecured Indebtedness of the Loan Parties, including, without limitation, Indebtedness under the Senior Notes.

Section 5.11    Maintenance of Permits.    Crédito Real shall, and shall cause each Restricted Subsidiaries to, (i) obtain and maintain, or cause to be obtained and maintained, in full force and effect (or where appropriate, promptly renew or cause to be renewed) all Permits required to be obtained and maintained by Crédito Real or any Restricted Subsidiary in connection with the conduct of its businesses, and (ii) perform and observe, and cause to be performed and observed, all obligations and conditions contained in, or imposed on Crédito Real or any Restricted Subsidiary by all such Permits, except, as each of clauses (i) and (ii), in such instances in which the failure to comply therewith, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.35.38.34.97.35.32.34.31.38
13/08/24 20:01:41

Section 5.12   Hedging Agreement.  No later than ten Business Days following the Closing Date, Crédito Real shall enter into and maintain, at all times thereafter, a cross-currency Specified Hedging Agreement covering obligations of Crédito Real in respect of the Tranche A Loans, on terms and conditions mutually acceptable to Crédito Real and the Administrative Agent, acting reasonably.

Section 5.13   Further Assurances.  The Loan Parties shall from time to time take such actions and execute and deliver, or cause to be executed and delivered, any and all such further documents and instruments as may reasonably be requested by the Administrative Agent that are necessary for the compliance by the Loan Parties with their obligations under this Agreement and the other Financing Documents.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Loans and all other amounts outstanding hereunder and under the other Financing Documents shall have been paid in full, Crédito Real and Marevalley, as applicable, covenant and agree with the Lenders that:

Section 6.1   Liens.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset (including any Capital Stock), income or revenue (including accounts receivable) or rights in respect of any thereof, whether presently owned or hereafter acquired, other than:

    (a)   Permitted Liens;

    (b)   Liens created in respect of Dispositions permitted by Section 6.5(f); and

    (c)   any other Liens securing Indebtedness; provided, that such Indebtedness secured by any such Liens together with any Indebtedness related to, or associated with, any Loan-Related Securitization of the type specified in Section 6.8(g) shall not exceed, at any time, individually or in the aggregate, 15% of the Consolidated Total Assets at such time.

Section 6.2   Fundamental Changes; Line of Business.

    (a)   Mergers, Consolidations, Disposal of Assets, Etc.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, (i) merge or consolidate with any other Person, (ii) Dispose of all, or substantially all, assets of Crédito Real or any such Restricted Subsidiary, or (iii) liquidate, apply to be wound up or dissolve; provided, that if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and is continuing, (x) any Person may merge with and into Crédito Real in a transaction in which Crédito Real is the surviving entity, and (y) any Person (other than a Borrower) may merge with and into any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary.

    (b)   Lines of Business.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, engage in any lines of business other than the Line of Business.

Section 6.3    Transactions with Affiliates.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, Dispose of any assets to, or purchase, lease or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except for (a) transactions that are permitted by the Financing Documents; and (b) transactions in the ordinary course of business that are at prices and on terms and conditions substantially as favorable to Crédito Real shall not or such Restricted Subsidiary as could reasonably be obtained at that time from unaffiliated third parties in a comparable arm's length transaction.

Section 6.4    Accounting Changes; Limitation on Changes in Fiscal Year.  Crédito Real shall not, and shall not permit any of its Subsidiaries to (a) make any change in accounting treatment and reporting practices or tax reporting treatment, except as required or permitted by Mexican Accounting Standards, or Applicable Law; or (b) change its current fiscal year end to end on a day other than on December 31.

Section 6.5    Certain Ratios

(a)    Crédito Real shall no permit the Capitalization Ratio to be, on the last day of any fiscal quarter of Crédito Real, less than 0.135:1.00.

(b)    Crédito Real shall not permit the Delinquency Ratio to be, on the last day of any fiscal quarter of Crédito Real, more than 0.04:1.00.

(c)    Crédito Real shall not permit the Reserve Coverage Ratio to be, on the last day of any fiscal quarter of Crédito Real, less than 1.00:1.00.

(d)    Crédito Real shall not permit the Leverage Ratio to be, on the last day of any fiscal quarter of Crédito Real, more than 3:3.50.

(e)    Crédito Real shall not permit the Liquidity Ratio to be, on the last day of any fiscal quarter of Crédito Real, less than 1.10:1.00.

Section 6.6    Limitation on Indebtedness.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, Incur any Indebtedness other than:

(a)    Permitted Indebtedness; and

(b)    additional Indebtedness, provided that:

(i)    at the time of and immediately after giving pro forma effect to the Incurrence thereof and the application of the proceeds therefrom, the Loan Parties comply with Section 6.5; and

(ii)    no Default or Event of Default shall have occurred and be continuing or would occur after giving effect on a pro forma basis to the incurrence of such Indebtedness.

Section 6.7    Limitation on Investments.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, make any Investment in any Person, other than Investments



2022-03-10 19:25:38 -0800 confidential sentoma@xhl.com

permitted (or would have been permitted in case any Senior Notes are no longer outstanding or any of the Senior Notes Indentures is no longer in effect) under the Senior Notes Indentures as in effect on the date hereof.

Section 6.8 Dispositions. Crédito Real shall not, and shall not permit any Restricted Subsidiary to, make any Disposition or enter into any agreement to make any Disposition, except:

(a) Dispositions of obsolete or worn-out property, whether now owned or hereafter acquired, in the ordinary course of business consistent with past practice;

(b) Dispositions of Loan Receivables in the ordinary course of business;

(c) Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d) Dispositions of any property or asset among any Loan Party and the Restricted Subsidiaries;

(e) Dispositions permitted by Section 6.2(a);

(f) Dispositions of Loan Receivables in connection with Loan-Related Securitizations; provided, that (i) the aggregate consideration received in such Disposition is at least equal to the Fair Market Value of the Loan Receivables so Disposed; (ii) all of the Indebtedness related to or associated with such Loan-Related Securitizations is non-recourse to Crédito Real or any of its Restricted Subsidiaries; and (iii) such Dispositions shall not exceed, at any time, individually or in the aggregate, 25% of the Total Loan Portfolio as of the last day of the fiscal year of Crédito Real most recently ended prior to the Closing Date;

(g) Dispositions of Loan Receivables in connection with Loan-Related Securitizations; provided, that (i) the aggregate consideration received in each such Disposition is at least equal to the Fair Market Value of the Loan Receivables so Disposed; (ii) all or any portion of the Indebtedness related to or associated with such Loan-Related Securitizations is Incurred or otherwise Guaranteed by Crédito Real or any of its Restricted Subsidiaries; and (iii) all Indebtedness under clause (ii) above related to, or associated with, such Loan-Related Securitizations, together with all Indebtedness secured by Liens permitted by Section 6.1(g), shall not exceed, at any time, individually or in the aggregate, 15% of the Consolidated Total Assets on the date of such Disposition; and

(h) any other Disposition or series of Dispositions in any fiscal year of Crédito Real of any property or asset (including any tangible or intangible asset, but excluding Loan Receivables) of Crédito Real or any Restricted Subsidiary not exceeding, individually or in the aggregate, with other Dispositions actually made during such fiscal year pursuant to this Section 6.8(h), 5% of the Consolidated Total Assets exclusive of such Disposition.

2022-09-30 CEST 15:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
20.30.30.30.31.30.30.30.30.30.55.30.34.37.35.32.34.31.38
130030 2039141

Section 6.9    Limitation on Restricted Payments.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, declare or make any Restricted Payment, unless (a) immediately before or after giving effect thereto no Event of Default shall have occurred and be continuing, (b) if such Restricted Payment consists in a dividend payment, such Restricted Payment is made out of net income of Crédito Real or such Restricted Subsidiary (as applicable) available for distribution, and (c) Crédito Real or such Restricted Subsidiary (as applicable) is permitted (or would have been permitted in case any Senior Notes are no longer outstanding or any of the Senior Notes Indentures is no longer in effect) to declare and make such Restricted Payment under the Senior Notes Indentures as in effect on the date hereof.

Section 6.10    Modifications of Certain Documents.  Crédito Real shall not, and shall not permit any Restricted Subsidiary to, amend, supplement, terminate or otherwise modify its by-laws (estatutos sociales) other than any such amendment or supplement that would not adversely affect the interests of the Lenders hereunder in any material respect.

Section 6.11    Sanctions.  The Loan Parties shall not, and shall not permit any of their respective Subsidiaries to, directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary of Crédito Real, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as Lender, Lead Arranger, Administrative Agent or otherwise) of Sanctions.

Section 6.12    Anti-Corruption Laws.  The Loan Parties shall not and shall not permit any of their respective Subsidiaries to, directly or indirectly, use the proceeds of any Loan for any purpose which would breach the FCPA, the Mexican Anticorruption Law and other similar anti-corruption legislation in other jurisdictions.

# ARTICLE VII
# EVENTS OF DEFAULT

Section 7.1    Events of Default.  Each of the following events shall be and constitute "Events of Default":

(a)    Any Borrower (i) shall fail to pay when due any principal of any Loan, or (ii) shall fail to pay within three or more days any interest on any Loan, any fee or any other amount payable by it hereunder or under any other Financing Document when and as the same shall become due and payable; or

(b)    any representation or warranty made or deemed made by any Loan Party in or in connection with any Financing Document (or any amendment or modification hereof or thereof or waiver hereunder or thereunder), or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Financing Document (or any amendment or modification hereof or thereof, or waiver hereunder or thereunder), shall prove to have been incorrect in any material respect when made or deemed made; or

Confidential
marta@hl.com
2022-19.25:38 -0800
9.25:38 -0800

(c) any Loan Party shall fail to observe or perform any covenant contained in any of Section 5.1, Section 5.2, Section 5.3, Section 5.9, Section 5.10 and Section 5.12 or Article VI; or

(d) any Loan Party shall fail to observe or perform any other covenant contained in any Financing Document (other than those specified in clause (a) or (c) of this Section 7.1), and such failure shall continue unremedied for a period of 30 or more days; or

(e) any Loan Party shall fail to pay any amount or amounts, which individually or in the aggregate, are equal to or greater than the Threshold Amount when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) under any Indebtedness of any Loan Party (other than Indebtedness under this Agreement and the other Financing Documents (a "Material Indebtedness"), and such failure shall continue after the applicable notice and grace period, if any, specified in the corresponding agreements or instruments; or any other event shall occur or condition shall exist under any agreements or instrument relating to such Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if as a result of such event or condition the holder or holders (or an agent or trustee on its or their behalf) thereof shall have caused or may cause such Material Indebtedness to become due prior to its scheduled maturity; or

(f) (i) an involuntary proceeding or other proceeding shall be commenced or an involuntary petition shall be filed, in each case seeking concurso mercantil, quiebra, liquidation, reorganization, arrangement, adjustment, or an adjudication of bankruptcy, insolvency, judicial management, reorganization, liquidation, administration or relief of debtors or other similar relief in respect of any Loan Party, any of its Subsidiaries, or any of its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the Bankruptcy Code of the United States, the Mexican bankruptcy Law (Ley de Concursos Mercantiles) and the Panamanian Insolvency Law No. 12 of May 19, 2016, or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Restricted Subsidiary or for a substantial part of their respective assets shall have been entered and, in any such case described in clause (i) or (ii) hereof, such proceeding or petition shall continue undismissed or shall be not stayed for a period of 60 or ilegal days; or

(g) any Loan Party or any Restricted Subsidiary, shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, arrangement, adjustment, an adjudication of concurso mercantil, quiebra, bankruptcy, insolvency, judicial management, reorganization, liquidation, administration or relief of debtors or other similar relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the Bankruptcy Code of the United States, the Mexican bankruptcy law (Ley de Concursos Mercantiles) and the Panamanian Insolvency Law No. 12 of May 19, 2016, (ii) consent to the institution of any proceeding or petition described in clause (i) above, apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, conciliador or similar official for any Person, or for a substantial part of its respective assets, (iii) file an answer admitting the

material allegations of a petition filed against it in any such proceeding; or (xvi) make a general assignment for the benefit of creditors; or

(h)     any Loan Party or any Restricted Subsidiary shall admit in writing its inability, or fail generally, to pay its debts as they become due; or

(i)     one or more final, non-appealable judgments by a court of competent jurisdiction for the payment of money in an aggregate amount in excess of the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and does not deny or fail to acknowledge coverage) shall be rendered by one or more courts, administrative tribunals or other bodies against any Loan Party or any Restricted Subsidiary, with respect to any single or related series of transactions, incidents or conditions, and such judgments shall not have been paid, vacated or discharged in full within the time required by the terms of such judgment; or

(j)     any Governmental Authority shall take any action to condemn, seize, nationalize or appropriate any substantial portion of the property of any Loan Party or any Restricted Subsidiary (either with or without payment of compensation), or any Loan Party or any Restricted Subsidiary shall be prevented from exercising normal control over all of a substantial part of their property, to the extent that such action has, or would reasonably be expected to have, a Material Adverse Effect; or

(k)     the validity or enforceability of any Financing Document shall be contested in writing by any Loan Party or any Restricted Subsidiary, in any way so as to render any material provision of any such Financing Document invalid or unenforceable or to purport to delay the performance or observance by any Loan Party of any of its obligations under any Financing Document, or any of the Financing Documents shall at any time after its execution and delivery cease to be in full force and effect for any reason other than as expressly permitted hereunder or thereunder; or

(l)     any Loan Party shall deny in writing that it has any further liability or renounce any of its obligations under any Financing Document; or

(m)     any non-monetary judgment, order or decree is entered against any Loan Party which has or would reasonably be likely to have a Material Adverse Effect, and there shall be any period of 45 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(n)     any Governmental Authority shall, by imposition of moratorium laws, exchange controls, currency convertibility controls, currency transferability controls or otherwise, take any action which has or could reasonably be expected likely to have a Material Adverse Effect and such action shall continue for 45 or more consecutive days.

Section 7.2    Rights upon an Event of Default.    If any Event of Default shall occur, then:

(a)     in the case of any Event of Default other than an Event of Default referred to in Section 7.1(f) or Section 7.1(g), the Administrative Agent shall, by notice to the

2022 JACOBO GUADALUPE MARTINEZ FLORES Completed on... 25:38 -0800

Borrowers, upon request of the Required Lenders, declare all or any portion of the Commitments terminated and/or the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the Commitments shall be terminated and the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and

(b)    in the case of any Event of Default referred to in Section 7.1(a) or Section 7.1(a), automatically the Commitments shall immediately terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees and other obligations of the Loan Parties accrued hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties.

<div align="center">

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

</div>

Section 8.1    Appointment; Powers and Immunities.

(a)    Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent hereunder and under the other Financing Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. For such purposes, each Lender hereby appoints and authorizes the Administrative Agent as its agent (comisionista) pursuant to the articles 273 and 274 of the Mexican Commerce Code (Código de Comercio) to execute, deliver and perform its obligations under this Agreement and any other document, agreement or instrument related hereto. The provisions of this Article VIII are solely for the benefit of the Administrative Agent and the Lenders, and neither any Loan Party nor any other party shall have rights as a third party beneficiary of any of such provisions.

(b)    The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Loan Parties and any of their respective Affiliates as if the Person serving as the Administrative Agent were not the Administrative Agent hereunder.

(c)    The Administrative Agent shall not have any duties or obligations except those expressly set out herein and in the other Financing Documents. Without limiting the generality of the foregoing:

(i)    the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

<div align="center">-68-</div>



2022-23-04 10:11:00 2038-0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,30,30,30,30,35,30,35,32,34,31,38
1308024 25501-61

(ii)    the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Financing Documents that the Administrative Agent is required to exercise in writing by the Required Lenders; and

(iii)    except as expressly set out herein and in the other Financing Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their respective Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.

(d)    Neither the Administrative Agent nor any of its Related Parties shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or in the absence of its own gross negligence or willful misconduct. The Administrative Agent and its Related Parties shall be deemed not to have knowledge of any Default, unless and until written notice thereof is given to the Administrative Agent by the Loan Parties or a Lender, as applicable, and neither the Administrative Agent nor any of its Related Parties shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set out herein or therein or (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Financing Document or any other agreement, instrument or document. Except for actions expressly required of the Administrative Agent hereunder, the Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from the Lenders of their indemnification obligations hereunder against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

Section 8.2    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and neither the Administrative Agent nor any of its Related Parties shall incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone or telex and believed by it to be made by the proper Person and neither the Administrative Agent nor any of its Related Parties shall incur any liability for relying thereon. The Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.3    Sub-Agents; Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such

64

sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 8.4    Resignation or Removal of Administrative Agent.  The Administrative Agent may resign at any time by notifying the Lenders and the Borrowers, and the Administrative Agent may be removed with due cause at any time by the Required Lenders.  The Administrative Agent agrees to continue to perform its duties and obligations hereunder until the earlier of the appointment of a successor thereof and the period ending 30 days following the resignation of the Administrative Agent hereunder.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor which shall be a Lender or an entity that is an Affiliate of a Lender.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent's resignation or removal, as the case may be, shall nonetheless become effective and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and (b) the Required Lenders (or any Person temporarily appointed by the Required Lenders) shall perform the duties of the Administrative Agent (and all payments and communications provided to be made by, to or through the Administrative Agent shall instead made by or to each Lender, directly) until such time as the Required Lenders appoint a successor agent as provided for above in this Section 8.4.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder if not already discharged therefrom as provided above in this Section 8.4.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the Administrative Agent's resignation or removal hereunder, the provisions of this ARTICLE VIII and Section 10.3 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Administrative Agent.

Section 8.5    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender expressly acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and made its own decision to make its Loans hereunder and enter into this Agreement and the other Financing Documents.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decision in taking or not taking action under the Financing Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, financial and other

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,35,31,38,30,30,30,30,30,30,35,30,34,37,35,32,34,31,38
12082.29360941

condition or creditworthiness of the Loan Parties which may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

Section 8.6    Compensation of Administrative Agent. The Borrowers, jointly and severally, agree to pay from time to time all reasonable and documented fees, costs and expenses of the Administrative Agent required to be paid by the Borrowers as previously agreed in writing by the Borrowers and the Administrative Agent.

Section 8.7    Execution of Financing Documents. Each Lender hereby acknowledges the terms of each of the Financing Documents and authorizes and instructs the Administrative Agent to execute and deliver, for the benefit of the Lenders, each of the Financing Documents to which it is an intended party.

Section 8.8    Indemnification. The Lenders agree to indemnify the Administrative Agent (to the extent not reimbursed under Section 10.3, but without limiting the obligations of the Borrowers under Section 10.3) ratably in accordance with the aggregate principal amount of the Loans held by the Lenders (or, if no Loans are at the time outstanding, ratably in accordance with their respective Commitments), for any and all losses, liabilities, claims, obligations, damages or expenses (including the fees and disbursements of counsel) incurred by it arising out of or by reason of any investigation in any way relating to or arising out of this Agreement or any other Financing Documents to which the Administrative Agent is a party or the transactions contemplated hereby (including the costs and expenses that the Borrowers are obligated to pay under Section 10.3, but excluding, other than judicial and administrative costs and expenses resulting from a Default or Event of Default, the Administrative costs and expenses incident to the performance of its agency duties hereunder or the enforcement of any of the terms hereof or of any such other documents; provided that, no Lender shall be liable for any of the foregoing to the extent that it arises solely from the gross negligence or willful misconduct of the Administrative Agent as determined by a final and appealable judgment by a court of competent jurisdiction. In no event shall any Lender be liable to the Administrative Agent for any punitive or consequential damages in connection with any other Financing Documents. The obligations of the Lenders under this Section 8.8 shall survive the termination of this Agreement, the repayment of the Loans and/or the earlier resignation or removal of the Administrative Agent.

## ARTICLE IX
## CONTINUING GUARANTY

Section 9.1    Guaranty.

(a)    The Guarantor hereby absolutely and unconditionally guarantees, as primary obligor and not as surety merely, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all of the obligations, whether for principal, interest, premiums, fees (including any Make-Whole Amount), indemnities, damages, costs, expenses or otherwise, of Marevalley to the Lender Parties, and whether arising hereunder or under any other Financing Document (including all renewals, extensions, amendments, refinancings and other modifications thereof

JACOBO GUADALUPE MARTINEZ FLORES
30.30-30.30.31.30-30.32-30.30.33-30.34.37.33-32.34-31.38
13/08/21 20:01:41

66

and all costs, attorneys' fees and expenses incurred by the Lender Parties in connection with the collection or enforcement thereof) (the "Guaranteed Obligations"). The Administrative Agent's books and records showing the amount of the Guaranteed Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon the Guarantor, absent manifest error, and conclusive for the purpose of establishing the amount of the Guaranteed Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of the Guarantor under this Guaranty, and the Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

(b)    Each payment to be made by the Guarantor pursuant to this Guaranty shall be (i) made in Dollars, (ii) in immediately available funds, (iii) without set-off or counterclaim, (iv) free and clear of and without deduction or withholding for or on account of any present and future Taxes and any penalties, interest and other payments on or in respect thereof and (v) subject to all conditions set forth in Section 2.15.

Section 9.2    Rights of Lenders. The Guarantor consents and agrees that the Lender Parties may, at any time and from time to time in accordance with the terms of this Agreement, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Guaranteed Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or the Guaranteed Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of the Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of the Guarantor.

Section 9.3    Certain Waivers. The Guarantor waives (a) any defense arising by reason of any disability or other defense of Marevalley, or the cessation from any cause whatsoever (including any act or omission of any Lender Party) of the liability of Marevalley; (b) any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Marevalley; (c) the benefit of any statute of limitations affecting the Guarantor's liability hereunder; (d) any right to proceed against Marevalley, proceed against or exhaust any security for the Guaranteed Obligations or pursue any other remedy in the power of any Lender Party whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by any Lender Party; (f) to the fullest extent permitted by Applicable Law, any and all other defenses or benefits that may be derived from or afforded by Applicable Law (whether now existing or due to a change in Applicable Law occurring after the date hereof) limiting the liability of or exonerating guarantors or sureties (other than payment in full of the Guaranteed Obligations); (g) all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest,

JACOBO GUADALUPE MARTINEZ FLORES
2018.03.30.15.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13002.24 20:01:41

notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Guaranteed Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Guaranteed Obligations; (h) any requirement that the Administrative Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right or take any action against Marevalley or any Person; and (i) to the extent permitted by Applicable Law, the benefits of *orden, excusión, división, prórroga, quita and espera* and any benefits it may have under any of Articles 2825, 2827, 2837, 2838, 2839, 2840 and 2844 through 2849 (in each case inclusive) of the Mexican Federal Civil Code (*Código Civil Federal*), and the correlative articles of the civil codes of each political subdivision of Mexico (including Mexico City). The obligations assumed by the Guarantor hereunder shall not be affected by the absence of (x) judicial request of payment by the Administrative Agent or any Lender Party to Marevalley, or (y) action within the time set forth in Articles 2848 and 2849 of the Mexican Federal Civil Code (*Código Civil Federal*) and the correlative articles of the civil codes of each political subdivision of Mexico (including Mexico City), which provisions are hereby waived by the Guarantor. The Lender Parties shall not be required to marshal any assets in favor of the Guarantor, or against or in payment of the Guaranteed Obligations.

Section 9.4    Obligations Independent.    The obligations of the Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Guaranteed Obligations and the obligations of any other guarantor, and a separate action may be brought against the Guarantor to enforce this Guaranty whether or not Marevalley or any other person or entity is joined as a party.

No election to proceed in one form of action or proceeding, or against any Person, or on any Guaranteed Obligations, shall constitute a waiver of the Administrative Agent's right to proceed in any other form of action or proceeding, or against any Person, or on any Guaranteed Obligations, shall constitute a waiver of the Administrative Agent's right to proceed in any other form of action or proceeding or against any other Person unless the Administrative Agent has expressed any such right in writing. Without limiting the generality of the foregoing, no action or proceeding by the Administrative Agent against any of Marevalley under any document evidencing or securing Indebtedness of Marevalley to the Administrative Agent shall diminish the liability of the Guarantor hereunder, except to the extent the Administrative Agent receives actual payment on account of Guaranteed Obligations by such action or proceeding, notwithstanding the effect of any such election, action or proceeding upon the right of subrogation of the Guarantor in respect of Marevalley.

Section 9.5    Subrogation.

(a)    The Guarantor shall not exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Guaranteed Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the Commitments are terminated. If any amounts are paid to the Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Lender Parties and shall forthwith be paid to the Lender Parties to reduce the amount of the Guaranteed Obligations, whether matured or unmatured.

68

(b)    To the extent permitted by Applicable Law, the Guarantor hereby expressly waives any right of subrogation provided in Article 2830 of the Mexican Federal Civil Code (*Código Civil Federal*) and the correlative articles of the civil code of each political subdivision of Mexico (including Mexico City) until all Guaranteed Obligations and any other amounts payable under this Guaranty are indefeasibly paid in full in cash and the Commitments are terminated.

Section 9.6    Termination; Reinstatement.    This Guaranty is a continuing and irrevocable guaranty of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until all Guaranteed Obligations and any other amounts payable under this Guaranty are indefeasibly paid in full in cash and the Commitments are terminated. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of Marevalley is made, or any of the Lender Parties exercises its right of setoff, in respect of the Guaranteed Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Lender Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy or insolvency proceedings or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Lender Parties are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction. The obligations of the Guarantor under this paragraph shall survive termination of this Guaranty.

Section 9.7    Subordination.    The Guarantor hereby subordinates the payment of all obligations and indebtedness of Marevalley owing to the Guarantor, whether now existing or hereafter arising, including but not limited to any obligation of Marevalley to the Guarantor as subrogee of the Lender Parties or resulting from the Guarantor's performance under this Guaranty, to the indefeasible payment in full in cash of all Guaranteed Obligations. If the Lender Parties so request, any such obligation or indebtedness of Marevalley to the Guarantor shall be enforced and performance received by the Guarantor as trustee for the Lender Parties and the proceeds thereof shall be paid over to the Lender Parties on account of the Guaranteed Obligations, but without reducing or affecting in any manner the liability of the Guarantor under this Guaranty.

Section 9.8    Stay of Acceleration.    If acceleration of the time for payment of any of the Guaranteed Obligations is stayed, in connection with any case commenced by or against Marevalley under any bankruptcy or insolvency proceeding or otherwise, all such amounts shall nevertheless be payable by the Guarantor immediately upon demand by the Lender Parties.

Section 9.9    Condition of Marevalley.    The Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from Marevalley and any other guarantor such information concerning the financial condition, business and operations of Marevalley as the Guarantor requires, and that none of the Lender Parties has any duty, and the Guarantor is not relying on the Lender Parties at any time, to disclose to the Guarantor any information relating to the business, operations or financial condition of Marevalley.

JACOBO GUADALUPE MARTINEZ FLORES
20,10,30,30,15,20,30,30,30,30,30,30,35,30,30,35,30,25,30,23,32,34,31,38
130824 20:31:44



## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
0811001000000000017588410.p7m
Autoridad Certificadora:
AUTORIDAD CERTIFICADORA
Firmante(s): 1

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | JACOBO GUADALUPE MARTINEZ FLORES | **Validez:** | BIEN | Vigente |
| **FIRMA** | | | | |
| **No. serie:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | **Revocación:** | Bien | No revocado |
| **Fecha:** (UTC/ CDMX) | 19/07/22 17:48:28 - 19/07/22 12:48:28 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA - SHA256 | | | |
| **Cadena de firma:** | 4c 0c 36 08 84 a0 1e 91 36 b3 b4 18 8b 1f 8f fe<br>b3 03 c4 d4 14 a8 24 21 05 b2 78 f6 54 8e 1f 19<br>cd e1 4d 33 10 2f 10 e6 f0 e0 13 73 fd 56 aa 5f<br>cd ed c5 d0 53 c2 aa e2 d6 d7 e1 75 57 1e fa d5<br>e2 d5 55 b3 c0 16 2f 8c 4f e9 fe ee 70 9d d3 08<br>a5 99 42 97 fe 5b 0c 43 97 09 26 37 b3 f6 82 50<br>55 05 cf 3a cf f1 0b e5 29 e4 0a 09 56 3f 34 e9<br>53 2d a2 a8 7e c5 03 cf cc c9 8e 3f c0 f0 65 93<br>03 e6 0b 54 a1 10 23 a0 a2 f7 a1 18 d4 63 f9 b9<br>8c 57 c9 ad 98 99 20 e2 c4 19 61 4f 5a a1 33 21<br>95 5a 48 3f 00 9c cf bc fb cb 05 a2 e9 6f b4 00<br>67 a5 bb d5 5b b3 04 23 db 7e 94 06 fa 9e e5 64<br>65 f1 7c d1 c1 e9 c5 8f c6 5c c3 04 f3 56 97 da<br>72 04 0b 3a af e2 ad dd e5 56 99 58 f2 f2 f1 a6<br>1b 1a 36 cf 7b c7 c9 8e 47 41 1a ec fd 94 92 c5<br>96 bf e3 86 4f 75 11 de c4 c9 b7 dc 73 77 b5 a2 |

| OCSP | |
|---|---|
| **Fecha: (UTC / CDMX)** | 19/07/22 17:48:24 - 19/07/22 12:48:24 |
| **Nombre del respondedor:** | Servicio OCSP SAT |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA |
| **Número de serie:** | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.30.33.39 |

| TSP | |
|---|---|
| **Fecha : (UTC / CDMX)** | 19/07/22 17:48:28 - 19/07/22 12:48:28 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 126099531 |
| **Datos estampillados:** | htKqSpu0+5ZZ/Ufx/8+vrGtq6lA= |

Section 9.10  Fraud.  The Guarantor, the Lenders and the Administrative Agent, hereby confirm that it is the intention of such Persons that this guaranty and the obligations of the Guarantor hereunder not constitute a fraudulent transfer or conveyance under any Applicable Law or any foreign, federal or state law to the extent applicable to this guaranty and the obligations of the Guarantor hereunder.  To effectuate the foregoing intention, the Guarantor, the Lenders and the Administrative Agent hereby irrevocably agree that the obligations of the Guarantor under this guaranty at any time shall be limited to the maximum amount as will result in the obligations of the Guarantor under this guaranty not constituting a fraudulent transfer or conveyance.

## ARTICLE X

## MISCELLANEOUS

Section 10.1  Notices.  Except in the case of notices and other communications expressly permitted to be given by telephone, (ii) demands, notices, consents and other communications provided under this Agreement shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by e-mail in portable document format (.pdf) or facsimile, as follows:

if to any Loan Party, at:

Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.,
Avenida Insurgentes Sur No. 730,
Piso 20, Colonia Del Valle,
Delegación Benito Juárez 03104
Ciudad de México, México.
Attention: Carlos E. Ochoa Valdés, Claudia Volly
and Raúl A. Farías.
Telephone: +52(55) 5228.9700
Email: cochoa@creditoreal.com.mx,
cvolly@creditoreal.com.mx
and rfarias@creditoreal.com.mx

With a copy to (which shall not constitute notice to the Loan Parties):

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Attention: José A. Sosa Llorens
Telephone: +1 (212) 335-4485
Email: jose.sosa@us.dlapiper.com

If to the Administrative Agent, at:

Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue
New York, NY 10010
United States
Attn: Agency Manager
Tel: +1 (919) 994-6369

-70-

2022-January-31 7:36 PM PRIVILEGED & CONFIDENTIAL

Confidential.com

2022-January-31 9:25:38 -0800

Email: agency.loanssc@credit-suisse.com

with a copy to:

Credit Suisse
Eleven Madison Avenue
New York, NY 10010
United States
Attn: Shelly Diaz / Filip Maes
Tel: +1 (212) 322 0864
Email: shelly.diaz@credit-suisse.com /
filip.maes@credit-suisse.com / list.structured-
lendinglalium@credit-suisse.com

If to a Lender, at its address (or telex or telecopy number) set out in its Administrative Questionnaire.

Any party hereto may change its address, e-mail address or facsimile number for notices and other communications hereunder by notice to the other parties hereto (or, in the case of any such change by a Lender, by notice to the Borrowers and the Administrative Agent). All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 10.2   Waivers; Amendments.

(a)   No Deemed Waivers; Remedies Cumulative. No failure conferred by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 10.2(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given.

(b)   Amendments. Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders, or by the Borrowers and the Administrative Agent with the consent of the Required Lenders; provided, however, that no such agreement shall:

(i)   increase or extend any Commitment of any Lender without its written consent;

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,30,35,37,35,32,34,31,38
13002-24-20:01-01

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby;

(iii)    except as set forth in Section 2.8, postpone the scheduled date of payment (whether at stated maturity, upon prepayment or acceleration or otherwise) of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender affected thereby;

(iv)    alter the manner in which payments or prepayments of principal, interest or other amounts hereunder shall be applied as among the Lenders, without the written consent of each Lender affected thereby;

(v)    change the currency in which amounts are payable hereunder without the consent of each Lender affected thereby;

(vi)    change any of the provisions of this Section 10.2 or the definition of the term Required Lenders or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; and

(vii)    waive any condition set out in ARTICLE IV without the written consent of each Lender;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

Section 10.3    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  The Borrowers, jointly and severally, agree to pay (i) all reasonable and documented costs and expenses incurred by the Administrative Agent or any Lender, including fees, charges and disbursements of counsel to the Administrative Agent or any Lender, in connection with the syndication of the Loans and the preparation and administration of this Agreement and the other Financing Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all expenses incurred by the Administrative Agent or any Lender, including fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with (x) the enforcement or protection of its rights in connection with this Agreement and the other Financing Documents, including its rights under this Section 10.3, (y) the exercise of its rights under Section 7.2 upon the occurrence of a Default or an Event of Default or (z) any amendment, waiver, workout, restructuring or negotiations in respect of the Loans

Confidential — Subject to Protective Order in re MALLINCKRODT PLC, et al., No. 22-10630-JTD

2022-09-...-jacobi@tcehl.com ...5.38-0800

(b)  **Indemnification by the Borrowers.** The Borrowers shall, jointly and severally, indemnify the Administrative Agent and each Lender, and each Related Party thereof (each such Person being called an "Indemnitee") against, and shall hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Financing Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereof of their respective obligations hereunder or the consummation of the Transactions, (ii) the Loans and the use of the proceeds therefrom or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided, however, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses have resulted solely and directly from the gross negligence or willful misconduct of such Indemnitee as determined by non-appealable judgment of a court of competent jurisdiction.

(c)  **Reimbursement by Lenders.** To the extent that the Borrowers fail to indefeasibly pay any amount required to be paid by them to the Administrative Agent under Section 10.3(a) or Section 10.3(b), each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, however, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was actually incurred by or asserted against the Administrative Agent in its capacity as such.

(d)  **Payments.** All amounts due under this Section 10.3 shall be payable promptly after written demand therefor and in any event within five days from the day of delivery to the Borrowers of an invoice of the appropriate amount therefor.

(e)  **Waiver of Consequential Damages, Etc.** To the fullest extent permitted by Applicable Law, none of the Loan Parties shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Financing Document or any agreement or instrument contemplated hereby, the Transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in clause (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the Transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

Section 10.4  **Successors and Assigns.**

735

(a)    Assignments Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that none of the Loan Parties may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may assign to one or more assignees all or a portion of its rights, benefits and obligations under this Agreement and the other Financing Documents (including all or a portion of its Loans and Commitments at the time outstanding hereunder); provided, however, that

(i)    the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than U.S.$500,000 and increments of U.S.$500,000 in excess thereof (or the aggregate amount of the Commitment or the aggregate principal amount of the Loans of the assigning Lender); provided that simultaneous assignments by or to two or more Related Parties of such assigning Lender shall be combined for purposes of determining whether the minimum assignment requirement is met;



(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iii)    the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of U.S.$3,500 (which fee may be waived or declined in the sole discretion of the Administrative Agent);

(iv)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms;

(v)    any corresponding Promissory Note must also be assigned together with the Lender's rights and obligations;

(vi)    for so long as any Default or Event of Default shall have occurred and is continuing at the time of such assignment, no such assignment shall be permitted to be made without the prior written consent of Crédito Real, to any Person that is, at the

2022-0-051-confidential.com-049.129.38-0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,31,30,30,30,30,30,33,30,34,37,33,32,34,31,38
13980-2 26:00-L31

time of such assignment, primarily and directly engaged in the making of payroll loans in Mexico; and

(vii)    for so long as no Default or Event of Default shall have occurred and is continuing at the time of such assignment, the Loan Parties shall not be required to pay to such assignee amounts pursuant to Section 2.16(b) in excess of the maximum amounts that the Loan Parties would have been obligated to pay to the assigning Lender if the assigning Lender had not assigned such Loan to such assignee, unless the circumstances giving rise to such excess payment result from a Change in Law after the date of such assignment; provided, however, that the provisions of this clause (vii) shall not apply to any Reference Participant.

Upon acceptance and recording pursuant to Section 10.4(d), from and after the effective date specified in each Assignment and Acceptance Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance Agreement, have the rights and obligations of a Lender under this Agreement and the other Financing Documents, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.13, Section 2.14 and Section 2.15). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.4(e). Within ten Business Days after its receipt of notice from the Administrative Agent stating that the Administrative Agent has received and accepted the documents referred to in Section 10.4(d) and receipt of each applicable original predecessor Promissory Note (as described below), each relevant Borrower shall execute and deliver to the Administrative Agent (for delivery to the relevant assignee Lender) a new Promissory Note evidencing such assignee Lender's assigned Loans and, if the assignor Lender has retained Loans hereunder (and if requested by such Lender), a replacement Promissory Note in the principal amount of the Loans retained by the assignor Lender hereunder (such Promissory Notes to be in exchange for, but not in payment of, the Promissory Note then held by such assignor Lender). The assignor Lender shall mark each predecessor Promissory Note "cancelled" and "exchanged" and deliver each of them to each applicable Borrower simultaneously with the requested exchange. Accrued interest on that part of each predecessor Promissory Note evidenced by a new Promissory Note issued to such assignee Lender, and accrued fees, shall be paid as provided in the Assignment and Acceptance Agreement. Accrued interest on that part of each predecessor Promissory Note evidenced by a replacement Promissory Note issued to the assignor Lender shall be paid to the assignor Lender.

(e)    Maintenance of Register by the Administrative Agent.    The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in New York City a copy of each Assignment and Acceptance Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, their respective Commitments, and the principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register

shall, absent manifest error, be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Effectiveness of Assignments.  Upon its receipt of a duly completed Assignment and Acceptance Agreement executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.4(b)(ii), if applicable, and any applicable tax forms, the Administrative Agent shall accept such Assignment and Acceptance Agreement and promptly record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)    Participations.  Any Lender may sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's Commitment or Loans; provided, however, that (i) such Lender's obligations under this Agreement and the other Financing Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Loan Parties, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Financing Document; provided, however, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.2(b) that affects such Participant. Subject to this Section 10.4(e), the Borrowers agree that each Participant shall be entitled to the benefits of Section 2.13, Section 2.14 and Section 2.15 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.4(b).

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights and benefits under this Agreement and the other Financing Documents to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank, and this Section 10.4 shall not apply to any such pledge or assignment of a security interest; provided, however, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(g)    No Assignments to the Loan Parties or Affiliates Etc.  Anything in this Section 10.4 to the contrary notwithstanding, no Lender may assign or participate any interest in any Commitment or any Loan held by it hereunder to any Loan Party, any of its Affiliates or Subsidiaries or to a natural person without the prior consent of each Lender.

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.34.35.30.34.37.35.32.34.31.38
15/00/24 20:01:41

Section 10.5   Survival.  All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and to this extent shall survive the execution and delivery of this Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and to this extent shall continue in full force and effect as long as the principal of or any accrued interest on the Loans or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Section 2.13, Section 2.15, Section 10.3 and Section 10.16 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 10.6   Integration.  This Agreement and the other Financing Documents constitute the entire contract between and among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

Section 10.7   Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.8   Right of Set-off.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender or Affiliate to or for the credit or the account of any Borrower against any of and all the obligations of any Borrower now or hereafter existing under this Agreement or any other Financing Document held by such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender and its Affiliates under this Section 10.8 are in addition to other rights and remedies (including other rights of set-off) which such Lender or Affiliate may have.

Section 10.9   Governing Law; Jurisdiction; Service of Process; Etc.

(a)   Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)   Submission to Jurisdiction.  Each of the parties hereto agrees that any suit, action or proceeding with respect to this Agreement, the other Financing Documents (except for



JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,33,30,34,33,35,32,34,31,38
1308024 1010141

77

the Financing Documents governed by Mexican law or Panamanian law, as applicable) or any judgment entered by any court in respect thereof may be brought in the United States District Court for the Southern District of New York, in the Supreme Court of the State of New York sitting in New York County (including its Appellate Division), or in any other appellate court in the State of New York, and each of the parties hereto hereby expressly and irrevocably and unconditionally submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment and expressly waives the right to any other jurisdiction to which it may be entitled to by reason of its present or future domicile or for any other reason.

(c)    Process Agent. Each Loan Party hereby agrees that service of all writs, process and summonses in any such suit, action or proceeding, brought in the State of New York relating to this Agreement or any other Financing Document (except for the Financing Documents governed by Mexican law or Panamanian law, as applicable) may be made upon C T Corporation System, presently located at 28 Liberty St., New York, New York 10005, United States (the "Process Agent"), and each Loan Party hereby agrees that the failure of the Process Agent to give any notice of any such service of process to such Loan Party shall not impair or affect the validity of such service or of any judgment based thereon. If the Process Agent shall cease to serve as agent for any Loan Party to receive service of process hereunder, such Loan Party shall promptly appoint a successor agent reasonably satisfactory to the Administrative Agent. Each Loan Party hereby further irrevocably consents to the service of process in any suit, action or proceeding in such courts by the mailing thereof by the Administrative Agent or by any Lender by registered or certified mail, postage prepaid, at its address set forth in Section 10.1.

(d)    Other Service. Nothing herein shall in any way be deemed to limit the ability of the Administrative Agent or any Lender to serve any such writs, process or summonses in any other manner permitted by Applicable Law.

(e)    Waiver of Venue. Each party hereto hereby irrevocably waives any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Financing Document to which such party is a party brought in the Supreme Court of the State of New York, County of New York or in the United States District Court for the Southern District of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 10.10. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO

THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

Section 10.11  No Immunity.  To the extent that any Loan Party may be or become entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Agreement or any other Financing Document, to claim for itself or its properties or assets any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment, or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), such Loan Party hereby irrevocably agrees not to claim and hereby irrevocably waives, with respect to its obligations hereunder or under any other Financing Document, such immunity to the fullest extent permitted by the laws of such jurisdiction.

Section 10.12  Special Waiver.  To the extent that any Loan Party may be entitled to the benefit of any provision of law requiring the Administrative Agent or any Lender in any suit, action or proceeding brought in a court of Mexico, Panama or other jurisdiction arising out of or in connection with any of this Agreement, any other Financing Documents and the Transactions, to post security for litigation costs or otherwise, post a performance bond or guaranty, or to take any similar action, such Loan Party hereby irrevocably waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of Mexico, Panama or, as the case may be, such other jurisdiction.

Section 10.13  Judgment Currency.  This is an international loan transaction in which payment in New York is of the essence, and the obligations of the Loan Parties under this Agreement to make payment to (or for account of) the Administrative Agent or a Lender in Dollars shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any other currency or in another place except to the extent that such tender or recovery results in the effective receipt by such Person in New York of the full amount of Dollars payable to such Person under this Agreement.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder in Dollars into another currency (in this Section 10.13 called the "Judgment Currency"), the rate of exchange that shall be applied shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase such Dollars at its principal office of the Administrative Agent in New York with the Judgment Currency on the Business Day next preceding the day on which such judgment is rendered.  The obligation of the Loan Parties in respect of any such sum due to the Administrative Agent or any Lender hereunder or under any other Financing Document (in this Section 10.13 called an "Entitled Person") shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by such Entitled Person of any sum adjudged to be due hereunder in the Judgment Currency, such Entitled Person may in accordance with normal banking procedures purchase and transfer Dollars to New York with the amount of the Judgment Currency so adjudged to be due, and the Loan Parties hereby, as a separate obligation and notwithstanding any such judgment, agree to indemnify any such Entitled Person against, and to pay such Entitled Person on demand, in Dollars, the amount (if any) by which the sum originally due to such Entitled Person in Dollars hereunder exceeds the amount of the Dollars so purchased and transferred.

2022-0... 3538 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,30,34,77,35,32,34,31,38
1308261 20:00 41

Section 10.14  Use of English Language.  This Agreement has been negotiated and executed in the English language. All certificates, reports, notices and other documents and communications given or delivered pursuant to this Agreement (including any modifications or supplements hereto) shall be in the English language, or accompanied by a certified English translation thereof. Except in the case of (a) laws or official communications of Mexico or Panama, (b) the Financing Documents governed by Mexican law and other documents filed with any Governmental Authority in Mexico or Panama, or (c) corporate documents of any Person organized or formed in Mexico or Panama, in the case of any document originally issued in a language other than English, the English language version of any such document shall, for purposes of this Agreement, and absent manifest error, control the meaning of the matters set out therein.

Section 10.15  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.16  Treatment of Certain Information; Confidentiality.  Each of the Lenders and the Administrative Agent agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder, under any other Financing Document or any Related Transaction or any action or proceeding relating to this Agreement, any other Financing Document or any Related Transaction or the exercise of enforcement of rights or remedies hereunder or thereunder, (f) (i) to any assignee of or Participant in, or any prospective assignee of or prospective Participant in, any of its rights or obligations under this Agreement, (ii) any direct or indirect investor or prospective investor (including via a special purpose vehicle) that acquires credit exposure to any risks, rights or obligations under or associated with this Agreement, (iii) any new lender or prospective new lender in a refinancing of all or a portion of the Loans or otherwise or (g) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (g) to the partners, directors, officers, employees, agents, advisors, trustees, other representatives, professional advisers and third party service providers of or for those Persons described in subclauses (f)(i), (f)(ii) and (iv), including rating agencies, and auditors, it being understood that the partners, directors, officers, employees, agents, advisors, other representatives, professional advisers and third party service providers to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (h) to the extent not provided under the last paragraph of this Section 10.16, to the CUSIP Service Bureau or any similar agency (including, without limitation, any settlement service provider or numbering service provider in connection with (i)(i) above) in connection with the issuance and monitoring of CUSIP numbers or ISINs,

2022-06-01 08-0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30.30,30.13.30,30.30,30.33.30,34.73.35.32.34.31.38
1309624 20:01:41

(i) with the consent of Crédito Real or (ii) to the extent such Information: (i) becomes, or is required under Applicable Law to be, publicly available other than as a result of a breach of this Section 10.16 or (ii) becomes available to any Lender, the Administrative Agent, the Collateral Agent or any of their respective Affiliates on a nonconfidential basis from a source other than any Loan Party.

For purposes of this Section, "Information" means all information received from Crédito Real or any of its Subsidiaries relating to Crédito Real or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Lender or the Administrative Agent on a nonconfidential basis prior to disclosure by Crédito Real or any of its Subsidiaries; provided that, in the case of information received from Crédito Real or any of its Subsidiaries after the date hereof, such information is clearly identified in writing at the time of delivery as confidential (it being understood that all such information shall be deemed to not be confidential unless such information is clearly identified in writing at the time of delivery as being confidential). Notwithstanding anything to the contrary in the Financing Documents or this Agreement, upon the occurrence and during the continuance of a Default, each of the Lenders may disclose copies of this Agreement and all notices received by it in relation to such Default to any other party. Any Person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Notwithstanding anything to the contrary in the Financing Documents, the Administrative Agent (or the Person acting as Administrative Agent, in its capacity as a Lender) may disclose to any applicable service provider appointed by the Administrative Agent (or such Lender) to provide information services, identification numbering services and/or paying agent services in respect of or in any way relating to this Agreement, any Loan, any related security or related capital markets, derivative or risk transfer transaction (each, a "Related Transaction") and/or any Loan Party the following information (with the purpose to enable such service provider to provide its usual services (which may include without limitation syndicated loans or other financial or securities information and numbering/identification services)): (i) name of every Loan Party; (ii) existence of the Loan and the Financing Documents (including the dates thereof); (iii) name of the Lead Arranger; (iv) type of each amendment and restatement of this Agreement; (v) amount of Commitments; (vi) currency of the Loans; (vii) ranking of the Loans; (viii) payment dates under this Agreement; (ix) pricing information, interchanges to any of the information previously supplied pursuant to paragraphs (i) to (x) above; and (x) such other information agreed between the Administrative Agent and the Loan Parties. The Loan Parties acknowledge and agree that such identification numbers and above-described information associated therewith may be disclosed to users of its service in accordance with the standard terms and conditions of that numbering service provider.

Section 10.17  USA PATRIOT Act. Each Lender (whether a party hereto on the date hereof or hereafter) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in

2022-10-[illegible]38-0800

accordance with the PATRIOT Act and to provide notice of these requirements, and this Section 10.17 shall satisfy such notice requirements of the PATRIOT Act.

Section 10.18  Counterparts.  Delivery of an executed counterpart of a signature page of this Agreement by e-mail in portable document format (.pdf) or facsimile (with acknowledgment of receipt) will be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.19  Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all or any portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

*[Remainder of this page intentionally left blank]*

CRÉDITO REAL, S.A.B. DE C.V., SOFOM,
E.N.R., as Borrower

By:
Name: Carlos Enrique Ochoa Valdés
Title: Attorney-in-Fact (*Apoderado*)

MAREVALLEY CORPORATION, as Borrower

By:
Name: Carlos Enrique Ochoa Valdés
Title: Attorney-in-Fact (*Apoderado*)

CRÉDITO REAL, S.A.B. DE C.V., SOFOM,
E.N.R., as Guarantor

By:
Name: Carlos Enrique Ochoa Valdés
Title: Attorney-in-Fact (*Apoderado*)

[*Signature Page to Credit Agreement*]

Confidential

anema@h..com

2022-03-10  19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,33,30,34,37,35,32,33,34,31,35
Credito Real S.A.B. de C.V. SOFOM
J.PPICHARDO@BBB.COM
J.PPER.COM
Monday, January 4, 2021 7:30:54 PM
13082-4-26051-61

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as Administrative Agent

By:
Name:      Michael Jacob
Title:     Authorized Signatory

By:
Name:
Title:     Martin Cames
           Authorized Signatory

[Signature Page to Credit Agreement]

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as Lender

By:
Name:    Michael Jakob
Title:    Authorized Signatory

By:
Name:
Title:    Martin Camseo
         Authorized Signatory

[Signature Page to Credit Agreement]

CONFIDENTIAL
JAVIER_PICHARDINI@US.DLAPIPER.COM
Erocho Reel MTN Program
Monday, January 4, 2021 7:36:38 PM

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,34,35,30,34,37,35,32,34,31,38
13.08/24.20.01.41

BANCARIBE CURACAO BANK, N.V.,
as Lender

By:
Name:
Title:          NELSON DAVID DAO
                PRESIDENT

By:
Name:
Title:

*[Signature Page to Credit Agreement]*

CONFIDENTIAL
Credito Real MTN Program
JAVIER PICHARDINGUS.CLAPPER.COM
Monday, January 4, 2021 at 36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30,30.31,30.49,30.90,30.53,30.54,33.35,32,34,11.38
13.0929 20:01:44



BANCO ALIADO, S.A.,
as Lender

By:
Name: Moises Cherim
Title: Chairman

By:
Name: Alexis Arjona
Title: CEO

*[Signature Page to Credit Agreement]*

JACOBO GUADALUPE MARTINEZ FLORES
20.32.30.30.31.30.30.30.30.40.35.30.34.37.35.32.34.31.38
13/08/24 20:01:41

BANCO INTERNACIONAL DE COSTA RICA,
S.A., MIAMI AGENCY,
as Lender

By:
Name: J. Antonio Bejarano
Title: General Manager

[Signature Page to Credit Agreement]

CONFIDENTIAL
Credece Real MTN Program
JAVIER.PICHARDIN@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM

anema@hl.com
Confidential
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,31,30,30,30,30,30,35,30,33,37,35,32,34,31,38
130029 20:01:01

BANCO FINANTIA SPAIN S.A.,
as Lender

By:
Name:
Title:

By:
Name:
Title:

CONFIDENTIAL
Crédito Real BTN Program
JAVIER.PICHARDO@HL.COM.LAPIERRE.COM
Monday, January 4, 2021 7:58:20 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

[Signature Page to Credit Agreement]

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,33,30,30,30,30,30,35,30,35,37,35,32,34,31,38
130B224 20:01:41

KEB HANA BANK, NEW YORK AGENCY,
as Lender

By: _____
Name:    Byung Hyun Lee
Title:    General Manager
         KEB Hana Bank, New York Agency

[Signature Page to Credit Agreement]

CONFIDENTIAL
Credito Real MTN Program
JAVIER.PICHARDENIQUES DLAPIPER.COM
Monday, January 4, 2021 7:39:74 PM

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.30.30.30.32.30.33.30.34.37.35.32.34.31.38
13.0029.30.01.41

BANCO LAFISE PANAMA, S.A.,
as Lender

By
Name: Luis Carlos Díaz
Title: VP Crédito

By
Name:
Title:

CONFIDENTIAL
Credito Real MYR Program
JAVIER.PICHARDO@US.DLAPIPER.COM
Monday, January 4, 2021 2:38:44 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.30.30.30.30.30.30.30.30.17.35.32.34.31.38
130024 26101/61

[Signature Page to Credit Agreement]

LONDON FORFAITING COMPANY LTD.,
as Lender

By: _____
Name: Mimi Farrukin
Title: VP

By: _____
Name: Margarita De Giorgio
Title: AVP

[Signature Page to Credit Agreement]

CONFIDENTIAL
Creditor Rehabilitation Program
JAVIER PICHARDO@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
26.30.30.30.31.36.30.30.30.30.30.35.30.34.37.35.32.34.31.38
1308024 20:01:04

METROBANK, S.A.,
as Lender

By:
Name: Ernesto A. Boyd, Jr.
Title:  Power of Attorney

By:
Name:
Title:

[Signature Page to Credit Agreement]

CONFIDENTIAL
Crédito Real MTN Program
JAVIER-PUCHARDIN@US.DLAPIPER.COM
Monday, January 4, 2021 7:45:26 PM

JACOBO GUADALUPE MARTINEZ FLORES
30.33.30.33.31.36.30.33.30.33.30.36.30.35.30.34.37.35.32.34.31.38
110675 20.01.41

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

RESPONSABILITY GLOBAL MICRO AND
SME FINANCE FUND,
as Lender

By: _____
Name:        Martin Heimes
Title:    Head Financial Institutions
              Debt Investments

By: _____
Name:
Title:
              Pim Fisher
         Head Risk Management

CONFIDENTIAL
Credito Real MTN Program
JAVIER PICHARDIN@US.DLA PIPER.COM
Monday, January 4, 2021 7:36:26 PM

anema@hl.com
2022-03-10 19:25:38 -0800
Confidential

[Signature Page to Credit Agreement]

JACOBO GUADALUPE MARTINEZ FLORES
30,39,30,30,13,30,30,30,39,30,30,35,30,34,37,33,32,33,34,31,38
13708/24,2861/41

RESPONSABILITY SICAV (LUX)
FINANCIAL INCLUSION FUND,
as Lender

By:

Name:    Maren Hermes

Title:    Head Financial Institutions
         Debt Investments

By:

Name:    Rijn Fischer

Title:    Head FIA Management

CONFIDENTIAL
Credito Real MTN Program
JAVIER.PICHARDINE@US.GT.AFBPBER..COM
Monday, January 4, 2021, 1:56:06 PM

JACOBO GUADALUPE MARTINEZ FLORES
29.30.30.30.31.30.30.30.35.30.35.30.34.17.35.32.34.31.38
13082424 20061:41

[Signature Page to Credit Agreement]

RESPONSABILITY SICAV (LUX) MICRO
AND SME FINANCE DEBT FUND,
as Lender

By:
Name: Martin Heimes
Title: Head Financial Institutions
Debt Investment

By:
Name: Pius Fischer
Title: Head Risk Management

CONFIDENTIAL
Creditor Reaal MTN Program
JAVIER PICHARDINI, US DLLP/PIPER CENT
Monday, January 4, 2021 7:36:38 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31 30.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13/08/25 20:01.41

[Signature Page to Credit Agreement]

BANK OF CHINA MÉXICO, S.A.,
INSTITUCIÓN DE BANCA MÚLTIPLE,
as Lender

By: _____
Name: _____
Title: CEO

By: _____
Name: _____
Title: _____

CONFIDENTIAL
JAVIER PICHARDO PICHARDO@US.DLAPIPER.COM
Credito Real MTN Program
Monday, January 4, 2021 2:36:24 PM

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.35.30.34.37.33.32.34.31.38
13/08/24 20:01.41

[Signature Page to Credit Agreement]

BANK OF CHINA LIMITED, PANAMA
BRANCH,
as Lender

By:
Name: QIAN RONGGUANG
Title: EVP

By:
Name:
Title:

CONFIDENTIAL
Credito Real MTN Program
JAVIER PICHARDINI@BES DLAFIPER COM
Monday, January 4, 2021 1:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

[Signature Page to Credit Agreement]

JACOBO GUADALUPE MARTINEZ FLORES
30.35/30.30.31.36.30.30.36.30.30.33.30.34.37.35.32.34.31.38
13002/24-20.01-/41

FIRST CITIZENS FINANCIAL SERVICES (ST. LUCIA) LIMITED,
as Lender

By:
Name: Karen Darbasie
Title: Director

By:
Name: Shiva Manraj
Title: Director

CONFIDENTIAL
Credito Real MTN Program
JAVIER.PICHARDINI@YS.DLAPIPER.COM
Monday, January 4, 2021 7:32:38 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

[Signature Page to Credit Agreement]

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.77.35.32.34.31.36
13002420101A1

BANCO MONEX, S.A. INSTITUCION
MULTIPLE, GRUPO FINANCIERO MONEX,
as Lender

By: _____
Name: Juan Pablo Duque Donde
Title: Attorney in fact

By: _____
Name: Jose Humberto Estevane Dager
Title: Attorney in fact

[Signature Page to Credit Agreement]

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

CONFIDENTIAL
Credito Real MTN Program
JAVIER.PICHARDO@MKUS.DLAPIPER.COM
Monday, January 4, 2021 7:36:24 PM

ACOSO GUADALUPE MARTINEZ FLORES
30.31.30.30.31.30.30.30.30.30.30.31.35.30.54.37.35.32.34.31.38
13/08/21 20:01:41

## Schedule 1.1-I

### Lenders and Commitments

| Tranche A Lender | Tranche A Commitments | Tranche A Commitments/% |
|---|---|---|
| Credit Suisse AG, Cayman Islands Branch | U.S.$13,000,000 | 21.667% |
| Banco de Curacao Bank, N.V. | U.S.$2,000,000 | 3.333% |
| Banco Aliado, S.A. | U.S.$2,000,000 | 3.333% |
| Banco Internacional de Costa Rica, S.A. Miami Agency | U.S.$1,000,000 | 1.667% |
| Banco Financia Spain S.A. | U.S.$2,000,000 | 0.667% |
| KEB Hana Bank, New York Agency | U.S.$5,000,000 | 6.325% |
| Banco Latise Panama, S.A. | U.S.$1,000,000 | 1.617% |
| London Forfaiting Company Ltd. | U.S.$2,000,000 | 0.325% |
| Microbak, S.A. | U.S.$4,000,000 | 13.333% |
| responsAbility SICAV (Lux) Financial Inclusion Fund | U.S.$4,000,000 | 13.333% |
| responsAbility SICAV (Lux) Micro and SME Finance SICAV Fund | U.S.$3,000,000 | 1.667% |
| responsAbility Global Micro and SME Finance Fund | U.S.$3,000,000 | 3.333% |
| Bank of China México, S.A. Institución de Banca Múltiple | U.S.$4,000,000 | 6.667% |
| Bank of China Limited, Panama Branch | U.S.$6,000,000 | 6.667% |
| **Total** | **U.S.$60,000,000** | **100%** |

| Tranche B Lender | Tranche B Commitments | Tranche B Commitments/% |
|---|---|---|
| Credit Suisse AG, Cayman Islands Branch | U.S.$19,000,000 | 38% |
| Bank of China Limited, Panama Branch | U.S.$5,000,000 | 10% |
| First Citizens Financial Services (St. Lucia) Limited | U.S.$13,000,000 | 26% |
| Banco Monex, S.A. Institución Múltiple, Grupo Financiero Monex | U.S.$13,000,000 | 26% |
| **Total** | **U.S.$50,000,000** | **100%** |

Schedule 1.1-I

anemad...om
Confidential
2022-03-10 19...8-0800
JACOBO GUADALUPE MARTINEZ FLORES
JAVIER MARTINEZ DLAPIER CONFIDENTIAL
...RBITRATE Program
...uary 4, 2021 7.36
198062-2009/H
33.30.39.30.31.30.70.30.70.30.30.70.35.30.54.77.35.32.34.31.38

Schedule 1.1-II

Existing Liens

| Type of Property | Type of Security (possessory and non-possessory) | Secured Party | Indebtedness Secured by Lien | Net Total Amount of Pledged Loan Receivables | Currency |
|---|---|---|---|---|---|
| Loan Receivables | Pledge | BAJIO | See Item 5 of Schedule 3.4(d) | 435,983,431.25 | MXN |
| Loan Receivables | Pledge | BANAMEX | See Item 6 of Schedule 3.4(d) | 1,995,218,562.76 | MXN |
| Loan Receivables | Pledge | BANCOMER | See Item 7 of Schedule 3.4(d) | 923,691,252.79 | MXN |
| Loan Receivables | Pledge | BANCOMER | See Item 8 of Schedule 3.4(d) | 156,510,698.09 | MXN |
| Loan Receivables | Pledge | BANORTE | See Item 9 of Schedule 3.4(d) | 3,190,710,427.08 | MXN |
| Loan Receivables | Pledge | BID | See Item 10 of Schedule 3.4(d) | 1,277,286,938.57 | MXN |
| Loan Receivables | Pledge | BOTF | See Item 11 of Schedule 3.4(d) | 176,680,255.87 | MXN |
| Loan Receivables | Pledge | BX+ | See Item 15 of Schedule 3.4(d) | 408,249,129.62 | MXN |
| Loan Receivables | Pledge | DVEX | See Item 17 of Schedule 3.4(d) | 435,903,877.48 | MXN |
| Loan Receivables | Pledge | MIFEL | See Item 18 of Schedule 3.4(d) | 117,516,982.97 | MXN |
| Loan Receivables | Pledge | MULTIVA | See Item 19 of Schedule 3.4(d) | 179,456,525.85 | MXN |
| Loan Receivables | Pledge | MULTIVA | See Item 20 of Schedule 3.4(d) | 179,023,938.74 | MXN |
| Loan Receivables | Pledge | SCOTIABANK | See Item 23 of Schedule 3.4(d) | 876,143,872.49 | MXN |
| Loan Receivables | Pledge | SUMITOMO | See Item 28 of Schedule 3.4(d) | 492,882,119.64 | MXN |
| TOTAL | | 11,138,653,050.00 | | | |

Schedule 1.1-II

Schedule 1.1-III

Unrestricted Subsidiaries*

1.    Servicios Corporativos Chapultepec, S.A. de C.V.
2.    Directodo México, S.A.P.I. de C.V., SOFOM, E.N.R.
3.    CR-FACT, S.A.P.I. de C.V.
4.    Crédito Rent USA, Inc.
5.    CRHOLDINGINT, S.A. de C.V.
6.    Controladora CR México, S.A. de C.V.

* Includes subsidiaries of each of the entities listed above.

Schedule 1.1-III

CONFIDENTIAL
Credito Real DIPJA Program
JAVIER.PICHARDIN@US.DLAPIPER.COM
Monday, January 4, 2021 1:25:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13.03.24.20.01.47

Schedule 3.1(b)

Shareholders and Capital Stock of Subsidiaries of Crédito Real

| 1. BLUESTREAM CAPITAL, S.A.P.I. DE C.V. (México) | | | | |
|---|---|---|---|---|
| Accionistas | Número de acciones | | | |
| | Parte Fija Clase I | Parte Variable Clase II | Total | % |
| Polygon Digital CRK, S.A. de C.V. | 50,000 | 2'080,000 | 2'130,000 | 75.93 |
| Gerardo Antonio Gutiérrez Ongay | - - - | 30,000 | 30,000 | 1.07 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | - - - | 645,200 | 645,200 | 23 |
| TOTAL: | 50,000 | 2'755,200 | 2'805,200 | 100 |

| 2. CEGE CAPITAL, S.A.P.I. DE C.V., SOFOM, E.N.R. (México) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Accionistas | Parte Fija | | Número de acciones Parte Variable | | | Total | % |
| | Clase I Serie A | Clase I Serie B | Clase II Serie A | Clase II Serie C | Clase II Serie C Preferente | Clase II Serie "D" | |
| CGM VC Inversiones, S. de R.L. de C.V. | - - - | 11,625 | - - - | | | 1'135,375 | 9.74 |
| Controladora RR., S.A.P.I. de C.V. | - - - | 133,688 | - - - | | | 13'097,165 | 8.16 |
| Misrón CEGE, S.A. de C.V. | - - - | 447,561 | - - - | | | 43'843,215 | 28.61 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | - - - | 569,625 | - - - | 56'069,750 | | 55'633,375 | 36.29 |
| Nueva CC Express, S.A.P.I. de C.V. | - - - | 337,501 | - - - | 22'21,000 | | 22'903,505 | 13.96 |
| CEGE Capital, S.A.P.I. de C.V., SOFOM, E.N.R. | - - - | - - - | - - - | | 4'810,581 | 6'810,536 | 4.40 |
| TOTAL: | 1'500,000 | 143'000,000 | | | | 153'310,536 | 100 |

| 3. PUBLISEG, S.A.P.I. DE C.V. SOFOM, E.N.R. (México) | | | | | | |
|---|---|---|---|---|---|---|
| Accionistas | Serie A | | Serie C | | Total | % |
| | Clase I | Clase II | Clase I | Clase II | | |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | - - - | - - - | - - - | 2,690 | 2,690 | 49.00 |
| CIBanco, S.A., Institución de Banca Múltiple, como fiduciaria del Fideicomiso de administración CIB/2840. | 861 | 861 | - - - | - - - | 1,723 | 31.25 |
| Luis Antonio Sesarón Cortes | 203 | 203 | - - - | - - - | 406 | 7.40 |

Schedule 3.1(b)

| | | | | | |
|---|---|---|---|---|---|
| Miguel de Jesús Guillén Valencia | 168 | 168 | --- | --- | 336 | 6.12 |
| Adalberto Rushoya Sanchez | 168 | 168 | --- | --- | 336 | 6.12 |
| TOTAL | 2,800 | | 2,690 | | 5,480 | 100 |

| 4. SERVICIOS CORPORATIVOS CHAPULTEPEC, S.A. DE C.V. (Mexico) | | | |
|---|---|---|---|
| **Accionistas** | **Número de acciones** | | |
| | Serie A | Serie B | Total | % |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | 49,950 | 6'440,985 | 6'490,935 | 99,999 |
| Francisco Bernardo Lumbreras | 25 | --- | 25 | 0.0005 |
| Tatiana Bernardo Lumbreras | 25 | --- | 25 | 0.0005 |
| TOTAL | 50,000 | 6'440,985 | 6'490,985 | 100 |

| 5. CEPACT, S.A.P.I. DE C.V. (Mexico) | | | | | |
|---|---|---|---|---|---|
| **Accionistas** | **Número de acciones** | | | | |
| | Serie A | Serie B | Serie C | Total | % |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | --- | --- | 5'344,800 | 5'344,800 | 54 |
| Gerardo Clark Díaz | 50,000 | 2'160,500 | --- | 2'210,500 | 22.03 |
| Tigre Advisors, S. de R.L. de C.V. | --- | 1'502,200 | --- | 1'602,200 | 16.02 |
| José Leonardo Martínez González | 50,000 | 3'463,530 | --- | 3'513,530 | 4.71 |
| Jorge Bernal Álvarez | --- | 1'108,240 | --- | 1'108,240 | 1.11 |
| TOTAL | 100,000 | 5'035,200 | 5'344,800 | 10'480,000 | 100 |

| 6. GRUPO EMPRESARIAL MAESTROS, S.A.P.I. DE C.V. (Mexico) | | | | | | |
|---|---|---|---|---|---|---|
| **Accionistas** | **Número de acciones** | | | | | |
| | Clase I | | | Clase II | | Total | % |
| | Serie A | Serie B | Serie N | Serie A | Serie B | Serie N | |
| Oliver Fernández Mena | 1'900,000 | | | 400,000 | | | 2'300,000 | 46.8 |
| Grupo T empleado Mena | 400,000 | | | 500,000 | | | 500,000 | 10.2 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | --- | --- | --- | 2'690,196 | | | 2'690,196 | 48 |
| TOTAL | 2'300,000 | | | 3'190,196 | | | 5'490,196 | 100 |

Schedule 3.1(b)

**6.1. SERVICIOS EMPRESARIALES OFEM, S.A. DE C.V.**
(México)

| Accionistas | Parte Fija | Parte Variable | Total |
|---|---|---|---|
| Grupo Empresarial Maestro, S.A.P.I. de C.V | 99 | 99 | 198 |
| OFEM Servicios Corporativos, S.A. de C.V. | 1 | 1 | 2 |
| TOTALES | 100 | 100 | 200 |

**6.2. FINANCIERA MAESTRA, S.A. DE C.V., SOFOM, E.N.R.**
(México)

| Accionistas | Parte Fija | Parte Variable | Total |
|---|---|---|---|
| Grupo Empresarial Maestro, S.A.P.I. de C.V. | 199 | 449,988 | 450,187 |
| OFEM Servicios Corporativos, S.A. de C.V. | 1 | 12 | 13 |
| TOTAL | 200 | 450,000 | 450,200 |

**6.3. OFEM VIDA, S.A. DE C.V.**
(México)

| Accionistas | Parte Fija | Parte Variable | Total |
|---|---|---|---|
| Grupo Empresarial Maestro, S.A.P.I. de C.V. | 99 | 39,900 | 39,999 |
| OFEM Servicios Corporativos, S.A. de C.V. | 1 | — | 1 |
| TOTALES | 100 | 39,900 | 40,000 |

**6.4. OFEM IGF, S.A. de C.V.**
(México)

| Accionistas | Parte Fija Serie A | Parte Variable Serie B | Total |
|---|---|---|---|
| Grupo Empresarial Maestro, S.A.P.I. de C.V. | 99 | 45,900 | 45,999 |
| OFEM Servicios Corporativos, S.A. de C.V. | 1 | — | 1 |
| TOTAL | 100 | 45,900 | 46,000 |

**6.5. FUNDACION OFEM, A.C.**
(México)

| Asociados | Votos |
|---|---|
| Grupo Empresarial Maestro, S.A.P.I. de C.V. | 1 |
| OFEM Servicios Corporativos, S.A. de C.V. | 1 |
| TOTAL | 2 |

Schedule 3.1(b)

Confidential — For Settlement Purposes Only — cjmontemn@hotmail.com — 19.55.38 -0800

2022-06-10

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.35.30.35.37.35.32.34.31.38
100024 2010(4)

| A.8. OPEN SERVICIOS CORPORATIVOS, S.A. de C.V. (México) | | |
|---|---|---|
| Accionistas | Parte Fija Serie A | Total |
| Grupo Empresarial Maestro, S.A.P.I. de C.V. | 396 | 396 |
| Financiera Maestro, S.A. de C.V., SOFOM, E.N.R. | 4 | 4 |
| TOTAL | 400 | 400 |

| J. DIRECTODO MÉXICO, S.A.P.I. DE C.V., SOFOM, E.N.R. (México) | | | | | | |
|---|---|---|---|---|---|---|
| | Número de acciones | | | | | |
| Accionistas | Clase I Parte Fija | | Clase II Variable Capital | | Acciones | % |
| | Serie A | Serie B | Serie A | Serie B | | |
| Angel Francisco Romano Serrano | — | — | — | — | 1 | 0.000003 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | 50,000 | 100 | 29'899,999 | — | 79'949,999 | 99.999997 |
| TOTAL: | 50,000 | | 30'000,000 | | 30'950,000 | 100 |

| E. CRHOLDINGINT, S.A. DE C.V. (México) | | | | | |
|---|---|---|---|---|---|
| | | Número de acciones | | | |
| Accionistas | Parte Fija | Variable Capital | | Acciones | % |
| | Serie A | Serie B | | | |
| Angel Francisco Romano Serrano | 1 | — | — | 1 | 0.01 |
| Crédito Real, S.A. de C.V., SOFOM, E.N.R. | 999 | 3,599 | 4,598 | 4,598 | 99.99 |
| TOTAL: | 1,000 | 3,600 | 4,600 | 4,600 | 100 |

| 8.1. CRÉDITO REAL HONDURAS, S.A. DE C.V. (Honduras) | | |
|---|---|---|
| Accionistas | Número de acciones | % |
| CRHOLDINGINT, S.A. de C.V. | 10'326,175 | 99.999 |
| Angel Francisco Romano Serrano | 2 | 0.001 |
| TOTAL: | 10'326,177 | 100 |

| 8.2. Matevalley Corporation (Panamá) | | |
|---|---|---|
| Accionistas | Número de acciones | % |
| CRHOLDINGINT, S.A. de C.V. | 7,714 | 70 |
| Fundación Wild Aceto | 3,306 | 30 |
| TOTAL: | 11,020 | 100 |

Schedule 5.1(b)

Confidential
2022-05-10 19:25:58 -0800

| 8.2.1. Instacredit, S.A. (Panamá) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 5,000 |
| **TOTAL:** | **5,000** |

| 8.2.2. Instacredit, S.A. (Nicaragua) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 99 |
| Instacredit, S.A. (Costa Rica) | 1 |
| **TOTAL:** | **100** |

| 8.2.3. Instacredit, S.A. (Costa Rica) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 5,733,884,500 |
| **TOTAL:** | **5,733,884,500** |

| 8.2.4. Multicréditos de Centroamérica, S.A. (Costa Rica) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 10 |
| **TOTAL:** | **10** |

| 8.2.4.1. Multicréditos de Nicaragua, S.A. (Nicaragua) | |
| --- | --- |
| Accionistas | Número de acciones |
| Multicréditos de Centroamérica, S.A. | 98 |
| Multicréditos El Salvador, S.A. de C.V. | 1 |
| Megavalley Corporation | 1 |
| **TOTAL:** | **100** |

| 8.2.4.2. Multicréditos El Salvador, S.A. de C.V. (El Salvador) | |
| --- | --- |
| Accionistas | Número de acciones |
| Multicréditos de Centroamérica, S.A. | 99 |
| Megavalley Corporation | 1 |
| **TOTAL:** | **100** |

| 8.2.5. Consorcio Jurídico de Cobranzas, S.A. (Costa Rica) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 10 |
| **TOTAL:** | **10** |

| 8.2.6. Centro Corporativo de Centro CENCOR, S.A. (Costa Rica) | |
| --- | --- |
| Accionistas | Número de acciones |
| Megavalley Corporation | 95,010,000 |
| **TOTAL:** | **95,010,000** |

Schedule 1(b)

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.34.77.35.32.34.31.38
130824-20-01-41

**B.2.7. Tangente Marketing, S.A.**
**(Costa Rica)**

| Accionistas | Número de acciones |
| --- | --- |
| Manevalley Corporation | 1,000 |
| TOTAL: | 1,000 |

**B.2.8. CMP Share Services Corporation, S.A.**
**(Panamá, Zona Franca)**

| Accionistas | Número de acciones |
| --- | --- |
| Manevalley Corporation | 500 |
| TOTAL: | 500 |

**B.2.9. Manevalley Mexico, S.A. de C.V.**
**(México)**

| Accionistas | Número de acciones |
| --- | --- |
| Manevalley Corporation | 999 |
| Netxcredit, S.A. (Costa Rica) | 1 |
| TOTAL: | 1,000 |

**S.3. CREDITOREAD S.A.**
**(Panamá)**

| Accionistas | Número de acciones | % |
| --- | --- | --- |
| CREDITDIGENT, S.A. de C.V. | 99 | 99 |
| Angel Francisco Remudas Bermudis | 1 | 1 |
| TOTAL: | 100 | 100 |

**B.4. CREDITOREAD GUATEMALA, S.A.**
**(Guatemala)**

| Accionistas | Número de acciones | % |
| --- | --- | --- |
| CREDITDIGENT, S.A. de C.V. | 498 | 99 |
| Angel Francisco Remudas Bermudis | 1 | 1 |
| TOTAL: | 499 | 100 |

**B. CONTROLADORA CREDITMEXICO, S.A. de C.V.**
**(México)**

| Accionistas | Número de acciones Parte Fija Serie A | Variable Capital Serie B | Acciones | % |
| --- | --- | --- | --- | --- |
| Angel Francisco Remudas Bermudis | 1 | 1 | 1 | .023 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | 999 | 3,400 | 4,399 | 99.977 |
| TOTAL: | 1,000 | 3,400 | 4,400 | 100 |

**B.2. CONFIANZA DIGITAL, S.A.P.I. DE C.V., SOFOM, E.N.R. (CREDILINEME)**
**(México)**

| Accionistas | Parte Fija Serie I Clase A | Variable Capital Serie II Clase A | Clase B | Clase C | Acciones | % |
| --- | --- | --- | --- | --- | --- | --- |
| Jesús Armando Barrida Alvarado | 850,000 | 1,720,101 | | ** | 2,570,101 | 17.82% |
| Controladora SMGR, S.A.P.I. de C.V. | ** | 452,730 | | ** | 452,730 | 3.20% |
| Jorge Enriquez González | 150,000 | 517,010 | | ** | 667,010 | 4.42% |

Schedule 5.1(b)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Luis Roberto Pérez Aguirre Ruiz | 200,000 | 591,238 | -- | -- | 791,238 | 5.24% |
| Controladora GEK, S.A.P.I. de C.V. | -- | -- | 4'235,769 | | 4'235,769 | 28.05% |
| CLG, S.A. de C.V. | -- | -- | 1'058,530 | | 1'058,530 | 7.01% |
| Controladora CR México, S.A. de C.V. | -- | -- | -- | 5'294,260 | 5'294,260 | 35.06% |
| **TOTAL** | 1,000,000 | 3'511,107 | 5'294,259 | 5'294,260 | 15,089,626 | 100 |

**9.1.1 CONFIANZA PRESENCIAL, S.A.P.I. DE C.V. / (CREDILIKEME)**
**(México)**

| Accionistas | Número de acciones | |
|---|---|---|
| | Serie A | % |
| Confianza Digital, S.A.P.I. de C.V., SOFOM, E.N.R. | 99,999 | 99.99 |
| Controladora CRKO, S.A.P.I. de C.V. | 1 | 0.01 |
| **TOTAL** | 100,000 | 100 |

**9.2. CATeO, S.A.P.I. DE C.V. / (RESUELVE TU DEUDA)**
**(México)**

| Accionista | Capital Fijo Serie "1" | | | | Capital Variable Serie "2" | | | | | % |
|---|---|---|---|---|---|---|---|---|---|---|
| | Clase "A" | Clase "B" | Clase "C" | Clase "D" | Clase "A" | Clase "B" | Clase "C" | Clase "D" | Clase "E" | |
| Banco Actinver, S.A. Institución de Banca Múltiple Grupo Financiero Actinver como fiduciario del fideicomiso de número 4355 | 40,000 | | | | 41,766 | 118,002* | 6,759 | | -- | 79.1741% |
| Sr. Francisco Javier Velázquez López | | | 1 | | | | | | | 0.0004% |
| Sr. Francisco Javier Salinas de Rascal | | | | | -- | | | | 152 | 0.1000% |
| Sr. Jorge Zaja Orkin | | | | | -- | | | | 484 | 1.9980% |
| Sr. Arturo Tahak Bush | | | | | -- | | | | 484 | 1.9980% |
| Sr. Sandro Sánchez Caballero | | | | | -- | | | | 0 | 0.000% |
| Sra. Patricia Ivette Contreras Espíritu | | | | | -- | 47,529 | 12,311 | | 0 | 16.9146% |
| Subtotal por Clase | 40,000 | | | | 40,766 | 165,531 | 6,759 | 12,311 | | |
| Subtotal por Serie | | 40,000 | | | | | | 225,043 | | 100.00% |
| **Total** | | | | | 265,043 | | | | | 100.00% |

* 96,498 acciones propiedad de **Controladora CR México, S.A. de C.V.**, equivalentes al 36.4250% del capital social, se encuentran aportadas al fideicomiso de garantía.

**9.2.1. Reparadora RTD, S.A. de C.V. / (RESUELVE TU DEUDA)**
**(México)**

| Accionistas | Número de acciones | |
|---|---|---|
| | Serie A | % |
| Controladora CR México, S.A. de C.V. | 1 | 0.002 |
| CateO, S.A.P.I. de C.V. | 49,999 | 99.998 |
| **TOTAL** | 50,000 | 100 |

**9.2.2. RTF Agente de Seguros, S.A. de C.V. / (RESUELVE TU DEUDA)**
**(México)**

| Accionistas | Número de acciones | |
|---|---|---|
| | Serie A | % |
| Controladora CR México, S.A. de C.V. | 1 | 0.002 |
| CateO, S.A.P.I. de C.V. | 49,999 | 99.998 |
| **TOTAL** | 50,000 | 100 |

**9.2.3. Resuelve tu Deuda Colombia, S.A.S. / (RESUELVE TU DEUDA)**

Schedule 5.1(b)

CONFIDENTIAL — CRKO 25.08-0800
2020-01-10 20:01:41

| (Colombia) | | |
|---|---|---|
| | Número de acciones | |
| Accionistas | Serie A | % |
| Cetto, S.A.P.I. de C.V. | 4,000 | 100 |
| TOTAL | 4,000 | 100 |

**9.2.4. Reparadora RTD Colombia S.A.S./ (RESUELVE TU DEUDA) (Colombia)**

| | Número de acciones | |
|---|---|---|
| Accionistas | Serie A | % |
| Cetto, S.A.P.I. de C.V. | 195,000 | 100 |
| TOTAL | 195,000 | 100 |

**9.2.5. FMD Servicios Técnicos y Especializados, S.A. de C.V./ (RESUELVE TU DEUDA) (México)**

| | Número de acciones | | |
|---|---|---|---|
| Accionistas | Serie A | Serie B | % |
| Controladora CR México, S.A. de C.V. | 1 | 1 | 0.01 |
| Cetto, S.A.P.I. de C.V. | 49,999 | 2,981,416 | 99.99 |
| TOTAL | 50,000 | 2,981,417 | 100 |

**9.2.6. Reparadora RTD ESPAÑA, S.L./ (RESUELVE TU DEUDA) (España)**

| | Número de acciones | |
|---|---|---|
| Accionistas | Serie A | % |
| Cetto, S.A.P.I. de C.V. | 3,000 | 100 |
| TOTAL | 3,000 | 100 |

**9.2.7. Resuelve Tu Deuda, S.A./ (RESUELVE TU DEUDA) (Argentina)**

| | Número de acciones | Porcentaje |
|---|---|---|
| Cetto, S.A.P.I. de C.V. | 90,000 | 90% |
| Reparadora RTD, S.A. de C.V. | 10,000 | 10% |
| TOTAL | 100,000 | 100% |

**9.2.8. Servicios Conjuntdenz, S.A. de C.V. / (RESUELVE TU DEUDA) (México)**

| | Número de acciones | |
|---|---|---|
| Accionistas | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,886 | 77.772 |
| TOTAL | 50,000 | 100 |

**9.2.9. ...endum Servicios, S.A. de C.V. / (RESUELVE TU DEUDA) (México)**

| | Número de acciones | |
|---|---|---|
| Accionistas | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,886 | 77.772 |
| TOTAL | 50,000 | 100 |

Schedule 5.1(b)

Confidencial · com · 2022-01-11 19:55:38-0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.34.37.35.32.34.31.38
13.06824 2009/04

| 9.5. Mega Tendencias, S.A. de C.V. / (RESUELVE TU DEUDA) (México) | | |
|---|---|---|
| Accionistas | Número de acciones | |
| | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,555 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,888 | 77.771 |
| TOTAL | 50,000 | 100 |

| 9.6. TVOC2, S.A. de C.V. / (RESUELVE TU DEUDA) (México) | | |
|---|---|---|
| Accionistas | Número de acciones | |
| | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,888 | 77.771 |
| TOTAL | 50,000 | 100 |

| 9.7. Capacitadora Erkel, S.A. de C.V. / (RESUELVE TU DEUDA) (México) | | |
|---|---|---|
| Accionistas | Número de acciones | |
| | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,888 | 77.771 |
| TOTAL | 50,000 | 100 |

| 9.8. Capacitadora Calce, S.A. de C.V. / (RESUELVE TU DEUDA) (México) | | |
|---|---|---|
| Accionistas | Número de acciones | |
| | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Saavedra | 5,557 | 11.114 |
| Francisco Javier Velázquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,888 | 77.771 |
| TOTAL | 50,000 | 100 |

Schedule 5.9(h)

Confidential
anelgadobb1.com
2022-03-10 10:35.38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.1.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13/30/21 28:01:41

| C.D. SCID, S.A. de C.V. / (RESUELVE TU DEUDA) (México) | | |
|---|---|---|
| **Accionistas** | **Número de acciones** | |
| | Serie A Clase 1 | % |
| Juan Pablo Zorrilla Salvador | 5,557 | 11.114 |
| Francisco Javier Velásquez López | 5,557 | 11.114 |
| Controladora CR México, S.A. de C.V. | 38,886 | 77.773 |
| **TOTAL** | **50,000** | **100** |

| 9.20. CREAL ARRENDAMIENTO, S.A. DE C.V. / (CREDITO REAL ARRENDADORA) (México) | | | | |
|---|---|---|---|---|
| **Accionistas** | **Número de acciones** | | | |
| | Parte Fija Serie A | Variable Capital Serie B | Acciones | % |
| Controladora CR México, S.A. de C.V. | 1,000 | 8,800 | 9,800 | 49.20% |
| Jesús Eduardo Tapia Herrera | | 1,662 | 1,661 | 8.41% |
| Ernesto Antonio Arrieta Barraga | | 1,822 | 1,822 | 3.51% |
| Yvette Trujillo Núñez | | 1,822 | 1,822 | 5.66% |
| Jaime Antonio Arrieta Reséndiz | | 1,820 | 1,820 | 5.61% |
| Juan Pablo Arrieta Venegas | | 1,819 | 1,820 | 5.61% |
| Jesús José María Sobarzo Sumichrasu | | 1,620 | 1,620 | 5.10% |
| Luis Romero Serrano | | 626 | 626 | 2.19% |
| Eduardo Romero Serrano | | 626 | 626 | 2.19% |
| Gerardo Fernando Rueda Ramírez | | 585 | 585 | 2.00% |
| Luis Genaro Macías Noguera | | 585 | 585 | 2.02% |
| Antonio Sobarzo Sumichrast | | 589 | 589 | 2.03% |
| **TOTAL:** | **1,000** | **19,000** | **20,000** | **100%** |

| 9.10. CREAL IMPORTA, S.A. DE C.V. (México) | | | | |
|---|---|---|---|---|
| **Accionistas** | **Número de acciones** | | | |
| | Parte Fija Serie A | Variable Capital Serie B | Acciones | % |
| Ángel Francisco Romanos Bertonio | 1 | | 1 | 0.100 |
| Creal Arrendamiento, S.A. de C.V. | 999 | | 999 | 99.9 |
| **TOTAL:** | **1,000** | **3,000** | **100** | |

| 9.11. IDEA REAL, S.A. DE C.V. (México) | | | | |
|---|---|---|---|---|
| **Accionistas** | **Número de acciones** | | | |
| | Parte Fija Serie A | Variable Capital Serie B | Acciones | % |
| Ángel Francisco Romanos Bertonio | 1 | | 1 | 0.100 |

Schedule 9.9(b)

| Controladora CR México, S.A. de C.V. | 999 | -- | 999 | 99.9 |
|---|---|---|---|---|
| TOTAL: | 1,000 | -- | 1,000 | 100 |

**9.12. CREAL NOMINA, S.A. DE C.V. (México)**

| Accionistas | Número de acciones | | | |
|---|---|---|---|---|
| | Parte Fija Serie A | Variable Capital Serie B | Acciones | % |
| Ángel Francisco Romanos Berrondo | 1 | -- | 1 | 0.100 |
| Controladora CR México, S.A. de C.V. | 999 | -- | 999 | 99.9 |
| TOTAL: | 1,000 | -- | 1,000 | 100 |

**9.13. ANTICIPA, S.A.P.I. de C.V. (México)**

| Accionistas | Número de acciones | | | | | |
|---|---|---|---|---|---|---|
| | Clase II Serie A | Serie B | Clase II Serie A | Serie B | Acciones | % |
| Luis Fernando Casas | 5,000 | -- | -- | -- | 5,000 | 25 |
| Fernando Guzmán Martínez | 5,000 | -- | -- | -- | 5,000 | 25 |
| Controladora CR México, S.A. de C.V. | 10,000 | -- | -- | 10,000 | 10,000 | 50 |
| TOTAL: | 20,000 | | 10,000 | | 20,000 | 100 |

**10. CREDITOREAD USA, Inc. (Delaware, USA)**

| Shareholder | Porcentaje de capital social |
|---|---|
| Credito Real, S.A.B. de C.V., SOFOM, E. R. | 100% |
| TOTAL | 100% |

**10.1 CR MPM, LLC (Delaware, USA)**

| Shareholder | Porcentaje de capital social |
|---|---|
| Credito Real USA, Inc. | 80% |
| Ilan Oraqui Sek | 20% |
| TOTAL | 100% |

**10.2 CR MPM Financial, LLC (Delaware, USA)**

| Shareholder | Porcentaje de capital social |
|---|---|
| Credito Real USA, Inc. | 100% |
| TOTAL | 100% |

Schedule II-1

| 10.9 Crédito Real USA Finance, LLC (Florida, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 99.24% |
| Scot Seagrave | 58.73% |
| **TOTAL** | 100% |

| 10.2.1 Auto Funding Services, LLC (Florida, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA Finance, LLC | 100% |
| **TOTAL** | 100% |

| CR-PRO HOLDINGS, LLC (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 80% |
| Autoprendas, Corp. | 20% |
| **TOTAL** | 100% |

| 10.3.2 CR-PRO, LLC (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 51% |
| Fermín Reveriano | 24.5% |
| Leonardo Rabinov | 24.5% |
| **TOTAL** | 100% |

| 10.4 CR-PRO LEASING, LLC (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 51% |
| Fermín Reveriano | 24.5% |
| Leonardo Rabinov | 24.5% |
| **TOTAL** | 100% |

| CR-REPAIR, LLC (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 51% |
| Fermín Reveriano | 24.5% |
| Leonardo Rabinov | 24.5% |
| **TOTAL** | 100% |

| CR-SME, LLC (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 100% |
| **TOTAL** | 100% |

Schedule 3.1(h)

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.31.30.30.30.30.33.30.34.37.35.32.34.31.38
110824-2001411

Confidential
prem19@mi.com 925.508-0800
2022-03-10

| 10.9. Crédito Real USA Reinsurance Company, Ltd. (Islas Turcas y Caicos) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 100% |
| TOTAL | 100% |

| 10.10. CR Reinsurance Company, Ltd. (Islas Turcas y Caicos) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real USA, Inc. | 100% |
| TOTAL | 100% |

| 10.11. Camino Financial, Inc. (Delaware, USA) | | |
|---|---|---|
| Shareholder | acciones | Porcentaje de capital social |
| Christian Reyes | 16,371 | 0.0599% |
| Francisco Islas | 314,416 | 0.9966% |
| Gordon Machieri | 59,411 | 0.1637% |
| High Desert Properties LLC | 295,346 | 0.8120% |
| Maria Elena Assad Canavati | 38,945 | 0.1115% |
| Investment de Ventures LLC | 502,573 | 0.6018% |
| Kanlesha Inc. | 28,551 | 0.0818% |
| Pablo Fernandez | 77,981 | 0.2230% |
| Rummel Schnabel Family Trust UAD 9/16/07 | 192,425 | 0.5456% |
| Romario Noudia | 58,548 | 0.1601% |
| Rios Venue | 250,791 | 0.7162% |
| Santa Fonts & Ofer Maldanado | 265,227 | 0.7547% |
| The Startupts Syndicate Fund I, LLC | 276,341 | 0.7973% |
| Valley Dag Investments, L.P. | 273,211 | 0.7860% |
| Kode Ventures, S.A.P.I. DE C.V. | 64,292 | 0.1836% |
| Textile Salas | 380,000 | 0.3742% |
| Impact America Fund, LP | 414,364 | 1.1699% |
| Bahn Industrial Co., Ltd | 414,364 | 1.1844% |
| Chiban Investments LLC | 558,237 | 1.6039% |
| Flux Financial USA LLC | 552,466 | 1.5069% |
| Riss Bio Vul | 555,890 | 1.5956% |
| Riss Riss | 398,808 | 1.1%% |
| Par-Tex Investments LLC | 391,106 | 1.1182% |
| Crescia Ventures, LP | 697,595 | 1.9812% |
| Amir Lazari | 704,045 | 2.1047% |
| Tarek Fahmkh | 987,000 | 2.3077% |
| 19R Capital Management Limited | 1,400,123 | 4.9389% |
| Hunt Holdings Limited Partnership | 1,906,822 | 5.0234% |
| Celebration III, LP | 2,354,299 | 5.7638% |
| Dex Capital III, L.P. | 3,645,954 | 10.0061% |
| Kenneth R. Rosen | 3,64a0ou | 11.6032% |
| Shen O. Shan | 4,950,076 | 14.3147% |
| Crédito Real USA, Inc. | 3,675,074 | 22.1014% |
| TOTAL | 34,623,120 | 100% |

| 10.12. (Delaware, USA) | |
|---|---|
| Shareholder | Porcentaje de capital social |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. | 100% |
| TOTAL | 100% |

Schedule 5.17(b)

Schedule 3.4(d)

Existing Indebtedness*

| Item | Note Issuance or Lender | Type | Debtor | Total Amount | Outstanding Amount | Currency | Funding Date | Maturity Date | % of Total Indebtedness |
|---|---|---|---|---|---|---|---|---|---|
| 1 | NOTES CHF 2022 | FOREIGN ISSUANCE | Crédito Real | 170,000,000 | 170,000,000 | CHF | 09/02/2018 | 09/02/2022 | 8.87% |
| 2 | Senior Notes 2023 | US Rule 144-A and Reg S NOTES | Crédito Real | 625,000,000 | 416,805,000 | USD | 20/07/2018 | 20/07/2023 | 21.74% |
| 3 | Senior Notes 2026 | US Rule 144-A and Reg S NOTES | Crédito Real | 400,000,000 | 400,000,000 | USD | 07/02/2019 | 07/02/2026 | 19.04% |
| 4 | Senior Notes 2027 | US Rule 144-A and Reg S NOTES | Crédito Real | 350,000,000 | 350,000,000 | EUR | 01/10/2019 | 01/10/2027 | 19.54% |
| 5 | BAJIO | LOCAL CREDIT LINE | Crédito Real | | | MXN | 18/07/2017 | 23/11/2021 | 1.06% |
| 6 | BANAMEX | LOCAL CREDIT LINE | Crédito Real | | | MXN | 20/08/2018 | 29/05/2020 | |
| 7 | BANCOMER | LOCAL CREDIT LINE | Crédito Real | 600,000,000 | 600,000,000 | MXN | 03/04/2019 | 27/03/2020 | 1.50% |
| 8 | BANCOMER | LOCAL CREDIT LINE | Crédito Real | 100,000,000 | 100,000,000 | MXN | 05/04/2019 | 27/03/2020 | 0.28% |
| 9 | BANORTE | LOCAL CREDIT LINE | Crédito Real | 1,000,000,000 | | MXN | 22/06/2018 | 31/08/2021 | 2.43% |
| 10 | BID | LOCAL CREDIT LINE | Crédito Real | | | MXN | 10/05/2019 | 10/11/2024 | 2.47% |
| 11 | BOTF | LOCAL CREDIT LINE | Crédito Real | | | MXN | 17/01/2019 | 10/11/2025 | 0.11% |
| 12 | BLADEX | LOCAL CREDIT LINE | Crédito Real | 500,000,000 | | MXN | 24/09/2018 | 20/07/2021 | 1.01% |
| 13 | BX+ | LOCAL CREDIT LINE | Crédito Real | 300,000,000 | | MXN | 31/06/2019 | 11/06/2021 | 0.68% |

Schedule 3.4(d)

CONFIDENTIAL

| 14 | BNP | INTERNATIONAL CREDIT LINE | Crédito Real | 50,000,000 | 50,000,000 | USD | 27/04/2019 | 27/04/2020 | 1.47% |
|----|-----|---------------------------|--------------|------------|------------|-----|------------|------------|-------|
| 15 | CREDIT SUISSE | INTERNATIONAL CREDIT LINE | Crédito Real | 110,000,000 | 44,000,000 | USD | 21/02/2017 | 21/02/2020 | 2.35% |
| 16 | CREDIT SUISSE | INTERNATIONAL CREDIT LINE | Crédito Real | 110,000,000 | 110,000,000 | USD | 07/08/2019 | 05/08/2022 | 5.65% |
| 17 | INVEX | LOCAL CREDIT LINE | Crédito Real | 300,000,000 | 240,000,000 | MXN | 13/07/2018 | 29/07/2020 | 0.62% |
| 18 | MIFEL | LOCAL CREDIT LINE | Crédito Real | 100,000,000 | 100,000,000 | MXN | 15/05/2019 | 01/02/2020 | 0.26% |
| 19 | MULTIVA | LOCAL CREDIT LINE | Crédito Real | 100,000,000 | 100,000,000 | MXN | 16/04/2019 | 15/04/2020 | 0.26% |
| 20 | MULTIVA | LOCAL CREDIT LINE | Crédito Real | 100,000,000 | 100,000,000 | MXN | 16/04/2019 | 15/04/2020 | 0.26% |
| 21 | NAFIN | LOCAL CREDIT LINE | Crédito Real | 1,500,000,000 | 1,414,313,889 | MXN | 20/07/2018 | 18/06/2021 | 3.69% |
| 22 | SANTANDER | LOCAL CREDIT LINE | Crédito Real | | | MXN | 20/05/2019 | 23/02/2020 | 0.52% |
| 23 | SCOTIABANK | LOCAL CREDIT LINE | Crédito Real | | | MXN | 31/03/2017 | 08/12/2020 | % |
| 24 | SUMITOMO | LOCAL CREDIT LINE | Crédito Real | 790,000,000 | 262,500,000 | MXN | 18/09/2017 | 18/09/2020 | 0.68% |
| | | | | | | | | TOTAL | 100.00% |

\* To the extent considered as indebtedness, the 9.125% Subordinated Perpetual Notes of Crédito Real due 2022, in an aggregate amount of U.S.$230,000,000, governed by that Group Indenture dated as of November 29, 2017, among Crédito Real, as issuer, The Bank of New York Mellon, as trustee and The Bank of New York Mellon SA/NV, Luxembourg Branch, as Luxembourg Paying Agent, as amended, amended and restated, supplemented or otherwise modified from time to time, shall be deemed to be included in this Schedule 3.14(i).

Schedule 3.14(i)

Confidential
anema@hil.com
2022-03-10 19:25:3...

## Exhibit A

### Form of Assignment and Acceptance Agreement

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February 19, 2020, among CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Credito Real"), and MAREVALLEY CORPORATION ("Marevalley," and together with Credito Real, the "Borrowers"), as borrowers, the guarantor party thereto (the "Guarantor," and together with the Borrowers, the "Loan Parties"), the lenders referred to therein (the "Lenders") and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent").

Capitalized terms used but not defined herein have the meanings assigned to them in the Credit Agreement.

[•] (the "Assignor") and [•] (the "Assignee") agree as follows:

1. The Assignor hereby and irrevocably sells and assigns to the Assignee, without recourse and without representation or warranty (except as expressly provided herein) and the Assignee hereby purchases and assumes from the Assignor, without recourse to the Assignor a [•]% interest in and to all of the Assignor's rights and obligations under the Loans held by the Assignor as of the Effective Date (as defined below), the Promissory Note(s) held by the Assignor on the Effective Date evidencing the Assignor's interest assigned hereunder and the Loans of the Assignor as of the Effective Date.

2. The Assignor (i) represents and warrants that, as of the date hereof, the aggregate outstanding principal amount of the Loans made by the Assignor is $[•], (ii) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, (iii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or any of the other Financing Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Financing Documents or any other instrument or document furnished pursuant thereto, (iv) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Loan Parties, of any of its obligations under the Credit Agreement, the other Financing Documents or any other instrument or document furnished pursuant thereto and (v) attaches the Promissory Note(s) referred to in paragraph 1 above and requests that in accordance with the provisions of the Credit Agreement, the Administrative Agent exchange such Promissory Note(s) for new Promissory Note(s) substantially in the form of Schedules 1-1 and 1-2.

Exhibit A

3. The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance Agreement, (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Assignee or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of the Loan Parties and will make its own credit analysis, appraisals and decisions in taking or not taking action under the Credit Agreement, (iii) appoints and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers under the Credit Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender and (v) specifies as its address for notices the office set forth beneath its name on the signature pages hereof.

4. Following its execution, this Assignment and Acceptance Agreement will be delivered to (i) the Administrative Agent for its acceptance in accordance with Section 10.4(d) of the Credit Agreement and (ii) the Borrowers for their acknowledgement. If the Assignment and Acceptance Agreement is accepted by the Administrative Agent in accordance with Section 10.4(d) of the Credit Agreement, if the Administrative Agent shall fail to accept this Assignment and Acceptance Agreement prior to the expiration of a ten day period after the date hereof, this Assignment and Acceptance Agreement shall be without force and effect for any purpose, and the Assignor shall remain the owner of the interest in the Assignor's rights and obligations under the Credit Agreement purported to be sold hereby.

5. The effective date of this Assignment and Acceptance Agreement (the "Effective Date") shall be the date on which (i) it shall have been executed and delivered by the parties hereto, (ii) a fee of U.S.$3,500 shall have been paid to the Administrative Agent in accordance with Section 10.4(b)(ii) of the Credit Agreement, and (iii) the Assignee shall have delivered to the Administrative Agent an Administrative Questionnaire if required pursuant to Section 10.4(b)(v) of the Credit Agreement.

6. As of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance Agreement, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance Agreement, relinquish its rights and be released from its obligations under the Credit Agreement.

7. From and after the Effective Date, the Administrative Agent shall make all payments under the Credit Agreement in respect of the interest assigned hereby (including, without limitation, all payments of principal, reimbursement amounts, interest and commitment fees with respect thereto) to the Assignee. The Assignor and the Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Financing Documents for periods prior to the Effective Date directly between themselves.

Exhibit ??

8.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 8.

9.  THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

[*Remainder of this page intentionally left blank*]



Confidential

anema@hl.com

2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.39.30.30.13.30.30.30.30.35.30.34.37.35.32.34.31.38
130824-20.01-41

IN WITNESS WHEREOF, the undersigned, have executed this Assignment and Acceptance Agreement this [●] day of [●], 20[●].

[●],
as Assignor

By: _____
Name:
Title:

Notice to:
[●]

[●],
as Assignee

By: _____
Name:
Title:

Notice to:
[●]

Exhibit 4c

Credito Real a la N Program
JAVIER.PICHARDO@HGUS-DLAPIPER.COM
Monday, January 4, 2021 7:39:26 PM

CONFIDENTIAL

Confidential

anema@hl.com

2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.33.30.30.35.37.33.32.34.31.38
13.08.02-20.01-44

Accepted and acknowledged this [•] day of [•].[•]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By: _____
    Name:
    Title:

CONFIDENTIAL
JAVIER.PICHARDINI@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:28 PM

Credito Real MTN Program

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit #

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30.15.30,30,30,30,34.35.30,34.73.35.32,34.31.38
170824.30161-01

Schedule I-1

FORM OF PROMISSORY NOTE (CRÉDITO REAL)

[Attached]

CONFIDENTIAL
Credito Real BEIN Program
JAVIER.PICHARDO@US-DLAPIPER.COM
Monday, January 4, 2021 7:30:24 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit A – Schedule I

JACOBO GUADALUPE MARTINEZ FLORES
20.36.30.30.31.30.30.30.30.30.35.30.34.37.33.32.34.31.38
13/0827 120/01:41

Form of Promissory Note to be Issued by Crédito Real (Tranche A)

NON-NEGOTIABLE PROMISSORY NOTE     PAGARÉ NO NEGOCIABLE

U.S.$ [•] DOLLARS     E.U.S [•] DÓLARES

For value received, the undersigned, Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. (the "Undersigned"), a sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada duly organized and validly existing under the laws of the United Mexican States ("Mexico"), by this Promissory Note (the "Promissory Note"), unconditionally promises to pay to the order of [•] (the "Lender") the principal sum of U.S.$ [•] ([•] Dollars 00/100) legal currency of the United States of America ("Dollars"), plus interest thereon pursuant to the terms hereof, in Dollars in immediately available funds, at the Administrative Agent's Account (as defined below), in 3 (three) installments of principal which shall be due and payable on each Interest Payment Date (as defined below) falling in the months specified in the table below and on the Maturity Date (as defined below) and in the amounts set forth on the payment schedule below, provided that, if any such date is not a Business Day (as defined below), the relevant payment shall be made on the next succeeding Business Day, except that if the Maturity Date is not a Business Day, the relevant payment shall be made the immediately preceding Business Day (each such date a "Principal Repayment Date").

Por valor recibido, la suscrita, Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. (la "Suscrita"), una sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada, debidamente constituida y válidamente existente de conformidad con las leyes de los Estados Unidos Mexicanos ("México"), por este Pagaré (el "Pagaré") promete incondicionalmente pagar a la orden de [•] (el "Acreditante") la suma principal de E.U. $ [•] ([•] Dólares 00/100), moneda de curso legal de los Estados Unidos de América ("Dólares"), más intereses sobre la misma conforme a este Pagaré, en Dólares, en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo (según se define más adelante), mediante 3 (tres) amortizaciones de principal, mismas que Vencerán y serán pagaderas en cada Fecha de Pago de Intereses (según se Define más adelante) que corresponda a los meses especificados en la siguiente tabla y en la Fecha de Vencimiento (según se define más adelante) en los cantidades que se especifican conforme el calendario de pago que a continuación dichas fechas no fuera un Día Hábil (según se define más adelante), dicho pago se hará el Día Hábil inmediato siguiente, excepto que si la Fecha de Vencimiento de este Pagaré no fuera un Día Hábil, dicho pago se hará el Día Hábil inmediato anterior (cada uno, una "Fecha de Pago de Principal").

| Principal Repayment Date | Amount of Principal Repayment | Fecha de Pago de Principal | Monto de Pago de Principal |
|---|---|---|---|
| [•], [•] | 30% of the aggregate principal amount of this Promissory Note | [•] de [•] | 30% del monto total de principal de este Pagaré |
| [•], [•] | 30% of the aggregate principal amount of this Promissory Note | [•] de [•] | 30% del monto total de principal de este Pagaré |

Exhibit A – Schedule 1

2022-08-10 19:00:00 -0800
Confidential

[●],   [●]   (the   Aggregate   principal
"Maturity Date").   amount   of   this
Promissory   Note
outstanding   on   such
Principal   Repayment
Date.

[●] de [●] de [●] (la   Saldo   insoluto   de
"Fecha   de   principal de este Pagaré
Vencimiento").   en esta Fecha de Pago
de Principal.

Prepayment of any amounts due hereunder shall   El   pago   anticipado   de   cualquier   cantidad
be applied to the payment of any unpaid   conforme a este Pagaré será aplicado al pago de
installments of this Promissory Note, in inverse   las amortizaciones pendientes de pago de este
order of maturity.   Pagaré en orden inverso al de su vencimiento.

The obligation of the Undersigned to repay the   La obligación de la Suscrita de pagar el principal
principal of this Promissory Note, together with   de este Pagaré, junto con los intereses devengados
interest accrued thereon and all other amounts   y cualesquiera otras sumas pagaderas bajo el
payable hereunder shall be dischargeable only by   mismo será cumplida exclusivamente mediante el
payment in Dollars, outside of the territory of   pago en Dólares, fuera del territorio de México,
Mexico, as set forth in this Promissory Note.   en los términos previstos en este Pagaré.

The Undersigned also unconditionally promises   La Suscrita además promete incondicionalmente
to pay, from the date hereof and until (but   pagar, a partir de la fecha de este Pagaré y hasta
excluding) the date on which the outstanding   (pero excluyendo) la fecha en que el monto
principal amount of this Promissory Note is paid   principal insoluto de este Pagaré sea pagado en su
in full, interest on the outstanding principal   totalidad, intereses sobre el monto principal
amount of this Promissory Note, for each day   insoluto de este Pagaré por cada día durante cada
during each Interest Period (as defined below) at   Periodo de Intereses (según se define más
a rate per annum equal to the LIBO Rate (as   adelante), a una tasa anual equivalente a la Tasa
defined below) determined for the Interest Period   LIBO (según se define más adelante) determinada
then in effect, plus the Applicable Margin (as   para el Periodo de Intereses vigente en dicho
defined below) (the "Interest Rate"). Interest shall   momento, más el Margen Aplicable (según se
be payable in arrears on each Interest Payment   define más adelante) (la "Tasa de Interés"). Los
Date (as defined below), on the Maturity Date, on   intereses serán pagados conforme venzan en cada
the date of any prepayment (on the amount   Fecha de Pago de Intereses (según se define más
prepaid), and at maturity and after such maturity   adelante), en la Fecha de Vencimiento, en la
on demand.   fecha de cualquier prepago (sobre la cantidad
prepagada), en su vencimiento y después a dicho
vencimiento, a la vista.

Notwithstanding the foregoing, (a) any principal   Sin perjuicio de lo anterior, (a) cualquier monto
amount not paid when due under this Promissory   de principal que no sea pagado cuando sea debido,
Note, shall bear interest for each day until paid,   conforme al presente Pagaré, devengará intereses
payable on demand, at a rate per annum that is   pagaderos a la vista, a una tasa anual equivalente
2% in excess of the Interest Rate then applicable   a la Tasa de Interés aplicable en ese momento
pursuant hereto, and at any time following the   conforme al presente Pagaré, más 2%, y una vez
termination of the Interest Period then in effect,   vencido el Periodo de Interés correspondiente a

Exhibit A - Schedule 1

| | |
|---|---|
| determined from time to time plus the Applicable Margin, and (b) to the extent permitted by applicable law, any overdue interest hereunder shall bear interest at a rate equal to 2% plus the Base Rate determined from time to time plus the Applicable Margin. Accrued and unpaid interest, including interest on past due amounts (including interest on past due interest, to the extent permitted by applicable law) shall be due and payable upon demand. | dicha Tasa de Interés, la tasa de intereses moratorios será una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable, y (b) en la medida permitida por la legislación aplicable, cualquier interés vencido y no pagado en la fecha en que sea debido devengará intereses moratorios a una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable. Los intereses moratorios (incluyendo intereses sobre intereses, en la medida permitida por la legislación aplicable) serán debidos y pagaderos a la vista. |
| All interest hereunder will be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day). | Todos los intereses conforme a este Pagaré se calcularán sobre la base de un año de 360 días y el número de días efectivamente transcurridos (incluyendo el primero pero excluyendo el último día). |
| As used in this Promissory Note, the following terms have the meanings specified below: | Según se utilizan en este Pagaré, los siguientes términos tienen los siguientes significados: |
| "Administrative Agent" means Credit Suisse AG, Cayman Islands Branch. | "Agente Administrativo" significa Credit Suisse AG, Cayman Islands Branch. |
| "Administrative Agent's Account" means the bank account maintained by the Administrative Agent with The Bank of New York Mellon, A/C No. 8900492627, ABA: 021000018, or such other bank account notified by the Administrative Agent to the Undersigned. | "Cuenta del Agente Administrativo" significa la cuenta bancaria que mantiene el Agente Administrativo en The Bank of New York Mellon, No. A/C 8900492627, ABA 021000018, o cualquier otra cuenta que el Agente Administrativo notifique a la Suscrita. |
| "Applicable Margin" means a rate per annum equal to [3.75]%. | "Margen Aplicable" significa una tasa del [3.25]% anual. |
| "Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day (b) the Federal Funds Effective Rate in effect on such date plus 1/2 of 1%, and (c) the LIBO Rate plus 1%. If the Administrative Agent shall have reasonably determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, the Base Rate shall be determined without regard to clause | "Tasa Base" significa, para cualquier día, la tasa, equivalente a lo que resulte mayor de entre (a) la Tasa Prime correspondiente a dicho día, (b) la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) correspondiente a dicho día, más ½ de 1% y (c) la Tasa LIBO más 1%. Si determinara el Agente Administrativo razonablemente (cuya determinación que será definitiva en ausencia de error manifiesto) que no es posible determinar la Tasa de Interés de |

Exhibit A – Schedule I

JACOBO GUADALUPE MARTINEZ/OJ085
30.30.30.30.31.30.30.30.30.30.35.35.35.37.35.32.34.31.18
13.08.29 20:01:41

(b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, respectively.

Fondos Federales (Federal Funds Effective Rate) por cualquier razón, la Tasa Base será determinada sin considerar la sección (b) de la oración antes mencionada hasta que las circunstancias que den origen a dicha situación dejen de existir. Cualquier cambio en la Tasa Base causado por un cambio en la Tasa Prime, la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) o la Tasa LIBO, será efectivo a partir, e incluyendo el día en que dicho cambio surta efectos en la tasa "prime," la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) o la Tasa LIBO, respectivamente.

"Business Day" means a day other than a Saturday or Sunday on which (a) for all purposes other than as set forth in clause (b) of this definition, commercial banks are open for general business in New York, New York, Mexico City, Mexico and Panama City, Panama, and (b) when used solely in connection with the determination of or the calculation of interest based upon the LIBO Rate, dealings in Dollar deposits are carried out between banks in the London inter-bank market.

"Día Hábil" significa un día que no sea sábado o domingo en que tal para todos los efectivos, salvo en el caso mencionado en el cláusula (b) de la presente definición los bancos comerciales lleven a cabo operaciones bancarias en la ciudad de Nueva York, Nueva York, en la Ciudad de México, México y en la Ciudad de Panamá, Panamá, y (b) únicamente cuando se utilice en relación con la determinación o el cálculo de intereses con base en la misma de la Tasa LIBO, los bancos lleven a cabo operaciones de depósito en Dólares en el mercado interbancario de Londres.

"Code" means the Internal Revenue Code of 1986, as amended.

"Código" significa el Código Fiscal de 1986 de los Estados Unidos de América (Internal Revenue Code), según sea modificado.

"Excluded Taxes" means, with respect to the holder of this Promissory Note, (i) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes and branch profit taxes imposed on it in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the applicable law of which the holder of this Promissory Note is organized, is doing business, is considered a resident for tax purposes or in which its principal office is located or in which its applicable lending office is located, (ii) any Taxes imposed by reason of any connection between the holder of this Promissory Note and the taxing jurisdiction

"Impuestos Excluidos" significa respecto al tenedor de este Pagaré (i) Impuestos establecidos o determinados con base al total de su ingreso neto (cualquiera que sea su denominación), impuestos de franquicia y de ingresos atribuibles sobre la renta) previstos en la legislación de la jurisdicción (o cualquier subdivisión política) donde el tenedor de este Pagaré esté constituido, sea residente para efectos fiscales, o en la cual se encuentre su centro principal de negocios o su oficina de fondos, (ii) cualquier Impuesto establecido con base a cualquier relación entre el tenedor de este Pagaré

Exhibit A – Schedule 1

other than receiving payments hereunder; and (iii) any United States federal withholding Taxes imposed pursuant to FATCA.

y la jurisdicción impositiva del impuesto distinto del recibo del pago bajo este Pagaré y (iii) cualquier retención de Impuestos federales impuesta por los Estados Unidos de América conforme a FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of this date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471 (b) (1) of the Code.

"FATCA" significa las Secciones 1471 a 1474 del Código, a esta fecha (o cualquier modificación o versión que la sustituya que sea sustancialmente comparable y no materialmente más onerosa en su cumplimiento), cualquier regulación o interpretación oficial presente o futura en relación con la misma y cualesquier convenios o contratos celebrados conforme a la Sección 1471 (b) (1) del Código.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depository institutions as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal fund effective rate; provided that if the Federal Fund Effective Rate for any day is less than zero, the Federal Fund Effective Rate for such day shall be deemed to be zero.

"Tasa de Interés de Fondos Federales (Federal Funds Effective Rate)" significa, para cualquier día, la tasa de interés calculada por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) con base en transacciones de fondos federales de tal día correspondiente según sea determinada de tal manera por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) y publicación en su página de internet de tiempo en tiempo, republicando el Día Hábil inmediato siguiente, por el Banco de la Reserva Federal de los Estados Unidos de América, en Nueva York como la tasa de interés aplicable a fondos federales; en el entendido que, si la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) para cualquier día es menor de cero, la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) para dicho día será cero.

"Governmental Authority" means the government of the United States, Mexico, Panama or any other nation, any state, department or any other political subdivision thereof, and any governmental body, agency, authority,

"Autoridad Gubernamental" significa el gobierno de los Estados Unidos de América, de México, de Panamá o de cualquier otra nación, cualquier Estado, departamento u otra subdivisión política de los mismos y cualquier cuerpo gubernamental.

Exhibit A – Schedule 1

instrumentality, regulatory body, court, tribunal, central bank or other entity forming any federal or other association of or with which any such nation may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

agencia gubernamental, autoridad, cuerpo regulatorio, corte, tribunal, banco central o cualquier otra entidad (incluyendo, sin limitación, cualquier asociación federal o de cualquier otra naturaleza de la cual dicha nación sea miembro o con la cual esté asociada) que ejerza funciones ejecutivas, legislativas, judiciales, fiscales, regulatorias o administrativas respecto de, o que pertenezcan al gobierno.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Impuestos Indemnizables" significa todos los Impuestos distintos de los Impuestos Excluidos.

"Interest Payment Date" shall mean the last day of each Interest Period.

"Fecha de Pago de Intereses" significa el último día de cada Período de Intereses.

"Interest Period" means the period commencing on the date hereof and ending on [●], [●] and thereafter, each period commencing on the last day of the immediately preceding Interest Period, and ending on the [●] day of the calendar month that is three months thereafter; provided, that if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) in no case shall any Interest Period end after the Maturity Date.

"Período de Intereses" significa el período que comienza en la fecha de suscripción de este Pagaré y que termina el día [●] de [●] de [●], y después de dicho primer Período de Intereses, cada período que comienza en el último día del Período de Intereses inmediato anterior y que termina en el día [●] del mes calendario que sea tres meses después, en el entendido que (i) si cualquier Período de Intereses terminara en un día que no sea un Día Hábil, dicho Período de Intereses se extenderá al Día Hábil inmediato siguiente salvo que dicho Día Hábil siguiente corresponda al siguiente mes calendario, en cuyo caso dicho Período de Intereses terminará el Día Hábil inmediato anterior, y (ii) ningún Período de Intereses terminará después de la Fecha de Vencimiento.

"Interpolated Rate" means, at any time, the rate per annum equal to the rate that results from interpolating on a linear basis between: (a) the LIBOR Screen Rate for the longest period (for which such LIBOR Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period (as such term is defined below) and (b) the LIBOR Screen Rate for the shortest period (for which such LIBOR Screen Rate is available for Dollars) that is longer than the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate is less than zero, the Interpolated Rate

"Tasa Interpolada" significa, en cualquier momento, la tasa anual equivalente a la tasa que resulte de interpolar en una base lineal entre: (a) la LIBOR Publicada por el período más largo (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más corto que el Período del Interés Impactado (según dicho término se define más adelante) y (b) la LIBOR Publicada para el período más corto (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más largo que el Período de Interés Impactado, en cada caso, en dicho

Exhibit A – Schedule I

JACOBO GUADALUPE MARTÍNEZ FLORES
30.34.50.30.31.30.30.30.68.30.35.30.34.37.35.32.34.31.38
1308/24 20:01-41

2022-06-22 15:42:21 -0800

"Interpolated Rate" at such time shall be deemed to be zero.

momento; en el entendido que, en caso que la Tasa Interpolada sea menor a cero, la "Tasa Interpolada" en dicho momento deberá ser considerada como cero;

---

"LIBO Rate" means, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London, England time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the LIBOR Screen Rate for deposits in Dollars (for delivery on the last day of such Interest Period or on such other date as which interest is paid, as applicable) for a period approximately equal to such Interest Period; provided that in no event shall "LIBO Rate" be less than zero for purposes of this Promissory Note; provided, further, that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" for such Interest Period (an "Imputed Interest Period"), shall be the Interpolated Rate.

"Tasa LIBO" significa, para cualquier Periodo de Intereses, la tasa de interés anual determinada por el Agente Administrativo aproximadamente a las 11:00 a.m., hora de Londres, Inglaterra, en la fecha que sea dos Días Hábiles previos al inicio de dicho Periodo de Intereses por referencia a la LIBOR Publicada, para depósitos en Dólares (para entrega el último día de dicho Periodo de Intereses o en cualquier otra fecha en la que los intereses sean pagaderos, según sea aplicable) por un periodo aproximadamente igual a dicho Periodo de Interés; en el entendido que, en ningún caso la "Tasa LIBO" será menor a 0.0% para efectos de este Pagaré; en el entendido además que, en caso que la tasa de interés no sea determinable de conformidad con lo señalado en la presente definición, la "TASA LIBO" para dicho Periodo de Interés (un "Periodo de Interés Imputado") deberá ser la Tasa Interpolada.

---

"LIBOR Screen Rate" means the London Interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) ("LIBOR") (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration Limited as an authorized information vendor for the purpose of displaying such rates) or a comparable or successor rate, which rate is approved by the Administrative Agent.

"LIBOR Publicada" significa la tasa de referencia interbancaria de Londres (London Interbank offered rate) administrada por ICE Benchmark Administration Limited (o cualquier otra persona que asuma la administración de dicha tasa de referencia ("LIBOR") (conforme a lo establecido en el Servicio de Información Bloomberg o cualquier otro servicio seleccionado por el Agente Administrativo, que sea nombrado por ICE Benchmark Administration Limited como un vendedor de información autorizado para efectos de publicar dicha tasa, o una tasa comparable o una tasa que lo sustituya, cuya tasa sea aprobada por el Agente Administrativo.

---

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Credit Suisse AG as its prime rate in effect as its

"Tasa Prime" significa la tasa de interés anual públicamente anunciada de tiempo en tiempo por Credit Suisse AG como su tasa "prime" aplicable

Exhibit A – Schedule 1

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.30.35.30.34.37.35.32.33.31.38
1108624 208614

2022-_____ -0800

principal office in New York City. The prime rate is a rate set by Credit Suisse AG based upon various factors including Credit Suisse AG's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate. Any change in such prime rate announced by Credit Suisse AG shall take at the opening of business on the day specified in the public announcement of such change.

en sus principales oficinas en la ciudad de Nueva York. La tasa "prime" es una tasa establecida por Credit Suisse AG con base en diversos factores incluyendo los costos y retornos esperados de Credit Suisse AG, las condiciones económicas generales y diversos factores, y se usa como punto de referencia para la fijación de precios de ciertos créditos, cuyos precios podrían estar, por encima o por debajo de dicha tasa. Cualquier cambio anunciado a la tasa "prime" por Credit Suisse AG entrará en vigor a partir del inicio del día hábil especificado en el anuncio público de dicho cambio.

"Other Taxes" means any and all present or future stamp, transfer, court or documentary taxes or any other excise or property taxes, charges or similar levies (together with any interest, charges, penalties, additions to tax and additional amounts) arising from any payment made under this Promissory Note or from the execution, delivery or enforcement of, or otherwise with respect to, this Promissory Note.

"Otros Impuestos" significa cualesquier impuestos de timbre o documentación, o cualesquiera impuestos de uso y consumo o propiedad, o imposiciones o cargos similares (junto con todos los intereses, cargos, penas, adiciones a impuestos y otras cantidades adicionales), en todos los casos, presentes o futuros, que surjan como consecuencia de cualquier pago hecho de conformidad con este Pagaré o de la suscripción, entrega o ejecución de, o por cualquier otro motivo en relación con, este Pagaré.

"Panama" means the Republic of Panama.

"Panamá" significa la República de Panamá.

"Taxes" means any and all present or future taxes (including value added tax), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholding) of whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"Impuestos" significa todos y cada uno de los impuestos (incluyendo el impuesto al valor agregado), deducciones, cargos, o retenciones, presentes o futuros, de cualquier naturaleza, junto con cualesquier intereses, cargos, penas, adiciones de impuestos o cantidades adicionales impuestas o recogidas por cualquier Autoridad Gubernamental.

Any and all payments (including any prepayments) to be made by the Undersigned hereunder whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim, and shall be made prior to 2:00 p.m. (New York City time) on the due dates specified in this Promissory Note, in Dollars and in immediately available funds, to the

Any y cada uno los pagos (incluyendo cualquier pago previo) que deba hacer la Suscrita, conforme a este Pagaré ya sea por concepto de principal, intereses, comisiones o por cualquier otro concepto, serán efectuados sin compensación o reclamación alguna, antes de las 2:00 pm., hora de la Ciudad de Nueva York, en las fechas de pago previstas en el presente Pagaré, en Dólares y en fondos

Exhibit A – Schedule I

Administrative Agent's Account.

inmediatamente disponibles, en la Cuenta del Agente Administrativo.

The Undersigned agrees to reimburse all reasonable out-of-pocket expenses of the holder hereof, if any, incurred in connection with the enforcement of this Promissory Note (including, without limitation, the fees, charges and disbursements of any counsel for the holder hereof).

La Suscrita conviene en reembolsar todos los gastos razonables frente a terceros incurridos por el tenedor de este Pagaré, en su caso, en relación con la ejecución del presente Pagaré (incluyendo, sin limitación, los honorarios, costos y gastos legales de los asesores legales del tenedor de este Pagaré).

Any and all payments by or on account of any obligation of the Undersigned hereunder shall be made free and clear of and without any withholding or deduction for or on account of any Indemnified Taxes or Other Taxes provided, however, that if the Undersigned shall be required to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required withholdings or deductions, the holder of this Promissory Note receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) the Undersigned shall make such withholdings or deductions and (iii) the Undersigned shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law.

Todos y cada uno de los pagos hechos por o a nombre de cualquier obligación de la Suscrita de conformidad con este Pagaré se harán libres de y sin deducción por cualesquier Impuestos Indemnizables u Otros Impuestos en el entendido, sin embargo, que en caso de que la Suscrita sea requerida a deducir cualesquier Impuestos Indemnizables u Otros Impuestos respecto de dichos pagos, entonces (i) las cantidades pagaderas al tenedor de este Pagaré se incrementarán en las cantidades adicionales necesarias para que dicho tenedor reciba un monto igual a lo que hubiera recibido si dichas deducciones o retenciones no hubieren sido realizadas, (ii) la Suscrita efectuará dichas deducciones o retenciones y (iii) la Suscrita pagará el total de las cantidades que deduzca o retenga a la Autoridad Gubernamental correspondiente, de conformidad con la legislación aplicable.

The Undersigned shall indemnify the holder of this Promissory Note, within 10 (ten) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such holder, and all reasonable expenses arising therefrom or with respect thereto plus interest thereon for each day from (and including) the day of delivery to the Undersigned of a request for such payment to (but excluding) the date of actual reimbursement at a rate per annum equal to the interest rate then applicable to this Promissory Note, whether or not such

La Suscrita se obliga a indemnizar al tenedor de este Pagaré dentro de los 10 (diez) Días Hábiles siguientes al requerimiento por escrito para dichos efectos, por el monto total de cualesquier Impuestos Indemnizables u Otros Impuestos pagados por dicho tenedor, y todos los gastos derivados de o relacionados con las mismas más intereses sobre dicho pago por cada día desde (e incluyendo) el día en que la Suscrita reciba el requerimiento por escrito por dicho pago, hasta (pero excluyendo) la fecha

Exhibit A - Schedule I

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13380.24.2018141

Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

correspondiente, a una tasa anual equivalente a la tasa de interés que en ese momento sea aplicable al presente Pagaré, independientemente de que dichos Impuestos Indemnizables u Otros Impuestos hayan sido o no determinados o impuestos correcta o legalmente por la Autoridad Gubernamental correspondiente.

For everything related to this Promissory Note, the Undersigned designates the following as its domicile:

Para todo lo relacionado con este Pagaré, la Suscrita designa como su domicilio el siguiente:

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Mexico City, México
Attention: Carlos E. Ochoa Valdés, Claudia Jolly and Raúl A. Farías
Telephone: +52.55.5228.9700
Email: cochoa@creditoreal.com.mx, cjolly@creditoreal.com.mx and rfarias@creditoreal.com.mx

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Ciudad de México, México
Atención: Carlos E. Ochoa Valdés, Claudia Jolly y Raúl A. Farías
Teléfono: +52.55.5228.9700
Correo electrónico: cochoa@creditoreal.com.mx, cjolly@creditoreal.com.mx y rfarias@creditoreal.com.mx

The Undersigned extends the period of presentment for payment of this Promissory Note until the date that is six (6) months after its Maturity Date, in terms of Article 128 of the Mexican General Law of Negotiable Instruments and Credit Transactions.

La Suscrita extiende el plazo para la presentación para pago de este Pagaré hasta la fecha que sea seis (6) meses después de la Fecha de Vencimiento, en los términos del Artículo 128 de la Ley General de Títulos y Operaciones de Crédito.

This Promissory Note is issued in accordance with and governed by the laws of the State of New York, United States of America, provided that in connection with any legal action or proceeding (other than an action to enforce a judgment obtained in other jurisdiction) brought in respect of this Promissory Note, in the courts of Mexico, this Promissory Note shall be deemed to be made under the laws of Mexico, and for such purposes shall be governed by and construed in accordance with the laws of Mexico. The Undersigned expressly and irrevocably submits to the jurisdiction of (a) the competent courts of the State of New York sitting

Este Pagaré se suscribe en conformidad con y se rige por las leyes del Estado de Nueva York, Estados Unidos de América, en el entendido que, en relación con cualquier acción o procedimiento legal (distinto de una acción para ejecutar una sentencia en otra jurisdicción) que, surja, en relación con este Pagaré, ante los tribunales de México, este Pagaré será considerado como celebrado conforme a las leyes de México, y para dichos propósitos será regido por, e interpretado conforme con, las leyes de México. La Suscrita se somete expresa e irrevocablemente a la jurisdicción de (a) las cortes competentes del Estado de Nueva York con sede en el Condado de

Exhibit A – Schedule 1

2022-... ...05-09...-0800

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.35.35.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13.080.74.20.01-41

<div style="display:flex">
<div>

in New York County and of the United States
District Court of the Southern District of New
York; and any other appellate court in the State of
New York, and (b) the competent federal courts of
Mexico City, Mexico, at the election of the
party initiating the action, in any action or
proceeding arising out of, or relating to this
Promissory Note, or for recognition or
enforcement of any judgment. The Undersigned
of this Promissory Note hereby expressly,
unconditionally and irrevocably waives its right
to any other jurisdiction that may apply by virtue
of its present or future domicile or for any other
reason.

This Promissory Note is executed in both the
English and Spanish languages, both versions of
which shall bind the Undersigned; provided,
however, that in the event of any suit or action
brought in New York, United States of America,
the English version shall prevail and, in the event
of any suit or action brought in Mexico, the
Spanish version shall prevail.

The Undersigned hereby waives diligence,
demand, protest and notices of any kind
whatsoever. The Undersigned hereby binds itself
to pay costs of collection and attorney's fees in
the case of default in the timely payment of this
Promissory Note.

*IN WITNESS WHEREOF*, the Borrower has
duly executed this Promissory Note as of the date
mentioned below.

</div>
<div>

Nueva York y de la Corte de Distrito de los
Estados Unidos de América del Distrito Sur de
Nueva York, y cualquier otro tribunal de
apelación en el Estado de Nueva York, y (b) los
tribunales federales competentes de la Ciudad de
México, México, a elección de la parte que inicie
la acción, en cualquier acción o procedimiento
que surja como consecuencia de o en relación con
este Pagaré, o para el reconocimiento o ejecución
de cualquier sentencia. La Suscrita en este acto
renuncia de manera expresa, incondicional e
irrevocable, a cualquier otra jurisdicción que
pudiere corresponderle en razón de su domicilio
presentes o futuros o por cualquier otro motivo.

El presente Pagaré se suscribe en los idiomas
inglés y español, obligando ambas versiones a la
Suscrita; en el entendido, sin embargo, de que en
caso de cualquier demanda o acción en Nueva
York, Estados Unidos de América, la versión en
inglés será la que prevalezca y, en caso de
cualquier demanda o acción en México, la versión
en español será la que prevalezca.

La Suscrita por el presente, renuncia expresa e
irrevocablemente a cualquier diligencia,
demanda, protesta o notificación de cualquier
clase. La Suscrita se obliga a pagar los gastos de
cobranza y honorarios de abogados en caso de
incumplimiento en el pago oportuno de este
Pagaré.

*EN VIRTUD DE LO CUAL*, la Suscrita ha
firmado debidamente este Pagaré en la fecha
abajo mencionada.

</div>
</div>

Ciudad de México, México, a [●] de [●] de [●].
Mexico City, Mexico, on [●], [●].

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.**

_____

Name/Nombre: [●]
Title/Cargo: Attorney-in-Fact / Apoderado

Exhibit A – Schedule 1

JACOBO GUADALUPE MARTINEZ FLORES
30.03.30.30.13.30.30.30.30.30.30.30.75.30.34.75.35.32.34.31.38
13.08.21.20.01.41

2022-03-31-01-19:25:00-0800
Compulista.com
answer@compulista.com

Schedule I-1

FORM OF PROMISSORY NOTE (MAREVALLEY)

[Attached]

CONFIDENTIAL
Creditor Real MTN Program
JAVIER.PICHARDO@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit A – Schedule I

JACOBO GUADALUPE MARTINEZ FLORES
30.26.30.30.31.30.30.30.30.30.35.30.30.35.35.32.34.31.38
13.00.24 20:01:41

Form of Promissory Note to be issued by Marevalley and guaranteed (*por aval*) by Credito Real (Tranche B)

| NON-NEGOTIABLE PROMISSORY NOTE | PAGARÉ NO NEGOCIABLE |
|---|---|
| U.S.$ [•] DOLLARS | E.U.$ [•] DÓLARES |

For value received, the undersigned, MAREVALLEY CORPORATION, a corporation duly organized and validly existing under the laws of Panama (the "Undersigned"), by this Promissory Note (the "Promissory Note"), unconditionally promises to pay to the order of [•] (the "Lender") the principal sum of U.S.$ [•] ([•] Dollars 00/100) legal currency of the United States of America ("Dollars"), plus interest thereon pursuant to the terms hereof, in Dollars, in immediately available funds, to the Administrative Agent's Account (as defined below), in 7 (seven) installments of principal, which shall be due and payable on each interest Payment Date (as defined below) falling in the months specified in the table below and on the Maturity Date (as defined below) and in the amounts set forth on the payment schedule below; provided that, if any such date is not a Business Day (as defined below), the relevant payment shall be made on the next succeeding Business Day, except that if the Maturity Date is not a Business Day, the relevant payment shall be made the immediately preceding Business Day (each such date a "Principal Repayment Date").

Por valor recibido, la suscrita, MAREVALLEY CORPORATION, una sociedad anónima debidamente constituida y válidamente existente de conformidad con las leyes de Panamá (la "Suscrita"), por este pagaré (el "Pagaré") promete incondicionalmente pagar a la orden de [•] ([•] "Acreditante"), la suma principal de E.U.$ [•] ([•] Dólares 00/100), moneda de curso legal de los Estados Unidos de América ("Dólares"), más intereses sobre la misma conforme a este Pagaré, en Dólares, en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo (según se define más adelante), 7 (siete) amortizaciones de principal, las cuales que vencerán y serán pagaderas en cada Fecha de Pago de Interés (según se define más adelante) que correspondan a _los meses_ de Vencimiento (según se define más adelante) en las cantidades que se especifican en el estándar que si cualquiera de dichas fechas no fuere un Día Hábil (según se define más adelante), dicho pago se hará el Día Hábil inmediato siguiente, excepto que si la Fecha de Vencimiento de este Pagaré no fuere un Día Hábil, dicho pago se hará el Día Hábil inmediato anterior (cada una una "Fecha de Pago de Principal").

| Principal Repayment Date | Amount of Principal Repayment | Fecha de Pago de Principal | Monto de Pago de Principal |
|---|---|---|---|
| [•], | 14% of the aggregate principal amount of this Promissory Note. | [•]de [•]. | 14% del monto total de principal de este Pagaré. |
| [•],[•], | 14% of the aggregate principal amount of this Promissory Note. | [•],[•], | 14% del monto total de principal de este Pagaré. |
| [•],[•], | 14% of the aggregate | | |

Exhibit A – Schedule I

2022-03-10 19:00-0800
Copia en papel anexo

JACOBO GUADALUPE MARTINEZ FLORES
30/30.30.93.130.30.30.30.93.30.34.73.33.34.73.38
180024.30.04.94

|  | principal amount of this Promissory Note. | [●] de [●], | 1.4% del monto total de principal de este Pagaré. |
| [●],[●]. | 1.4% of the aggregate principal amount of this Promissory Note. | [●] de [●]. | 1.4% del monto total de principal de este Pagaré. |
| [●],[●]. | 1.4% of the aggregate principal amount of this Promissory Note. | [●] de [●]. | 1.4% del monto total de principal de este Pagaré. |
| [●],[●]. | 14% of the aggregate principal amount of this Promissory Note. | [●] de [●]. | 1.4% del monto total de principal de este Pagaré. |
| [●]. [●] (the "Maturity Date"). | The Aggregate principal amount of the Promissory Note outstanding on such Principal Repayment Date. | [●] de [●] de [●] (la "Fecha de Vencimiento"). | Saldo insoluto de principal de este Pagaré en esta Fecha de Pago de Principal. |

Prepayment of any amounts due hereunder shall be applied to the payment of any unpaid installments of this Promissory Note, in inverse order of maturity.

The obligation of the Undersigned and guarantor (*avalista*) to repay the principal of this Promissory Note, together with interest accrued thereon and all other amounts payable hereunder shall be dischargeable only by payments in Dollars, outside of the territory of Mexico, as set forth in this Promissory Note.

The Undersigned also unconditionally promises to pay, from the date hereof and until but excluding the date on which the outstanding principal amount of this Promissory Note is paid in full, interest on the outstanding principal amount of this Promissory Note, for each day during each Interest Period (as defined below) at a rate per annum equal to the LIBO Rate (as defined below) determined for the Interest Period then in effect, plus the Applicable Margin (as defined below) (the "Interest Rate"). Interest shall

El pago anticipado de cualquier cantidad conforme a este Pagaré será aplicada al pago de las amortizaciones pendientes de pago de este Pagaré en orden inverso al de su vencimiento.

La obligación de la Suscriptora del avalista de pagar el principal de este Pagaré, junto con los intereses devengados y cualesquier otras cantidades pagaderas bajo el mismo sólo quedará cumplida mediante el pago en Dólares, fuera del territorio de México, en los términos previstos en este Pagaré.

La Suscriptora además promete incondicionalmente pagar a partir de la fecha de este Pagaré y hasta pero excluyendo la fecha en que el monto principal insoluto de este Pagaré sea pagado en su totalidad, intereses sobre el monto principal insoluto de este Pagaré por cada día durante cada Periodo de Intereses (según se define más adelante) a una tasa anual equivalente a la Tasa LIBO (según se define más adelante) determinada para el Periodo de Intereses vigente en dicho momento, más el Margen Aplicable (según se

Exhibit A - Schedule I

be payable in arrears on each Interest Payment Date (as defined below), on the Maturity Date, on the date of any prepayment (on the amount prepaid, and at maturity and after such maturity, on demand.

define más adelante) (la "Tasa de Interés"). Los intereses serán pagados conforme venzan en cada Fecha de Pago de Intereses (según se define más adelante), en la Fecha de Vencimiento, en la fecha de cualquier prepago (sobre la cantidad prepagada), y a su vencimiento y después a dicho vencimiento, a la vista.

Notwithstanding the foregoing, (a) any principal amount not paid when due under this Promissory Note, shall bear interest for each day until paid, payable on demand, at a rate per annum that is 2% in excess of the Interest Rate then applicable pursuant hereto, and in any time following the termination of the Interest Period then in effect, such rate shall be equal to 2% plus the Base Rate determined from time to time plus the Applicable Margin, and (b) to the extent permitted by applicable law, any overdue interest hereunder shall bear interest at a rate equal to 2% plus the Base Rate determined from time to time plus the Applicable Margin. Accrued and unpaid interest on past due amounts (including interest on past due interest, to the extent permitted by applicable law) shall be due and payable upon demand.

Sin perjuicio de lo anterior, (a) cualquier monto de principal que no sea pagado cuando sea debido conforme al presente Pagaré, devengará intereses diariamente por cada día hasta ser pagado, pagaderos a la vista, a una tasa anual equivalente a la Tasa de Interés aplicable en ese momento conforme al presente Pagaré, más 2%, y una vez vencido el Período de Interés correspondiente a dicha Tasa de Interés, la tasa de intereses moratorios será una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable, y (b) en la medida permitida por la legislación Aplicable, cualquier interés vencido y no pagado en la fecha en que sea debido devengará intereses moratorios a una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable. Los intereses moratorios (incluyendo intereses sobre intereses, en la medida permitida por la legislación aplicable) serán debidos y pagaderos a la vista.

All interest hereunder will be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day).

Todos los intereses, conforme a este Pagaré, se calcularán sobre la base de un año de 360 días y días efectivamente transcurridos (incluyendo el primer día pero excluyendo el último día).

As used in this Promissory Note, the following terms have the meanings specified below:

Según se utilizan en este Pagaré, los siguientes términos tienen los siguientes significados:

"Administrative Agent" means Credit Suisse AG, Cayman Islands Branch.

"Agente Administrativo" significa Credit Suisse AG, Cayman Islands Branch.

"Administrative Agent's Account" means the bank account maintained by the Administrative Agent with The Bank of New York Mellon, A/C No. 8900492627, ABA 021000018, or such Mellon No. A/C 8900492627, ABA 021000018.

"Cuenta del Agente Administrativo" significa la cuenta bancaria que mantiene el Agente Administrativo en The Bank of New York Mellon No. A/C 8900492627, ABA 021000018.

Exhibit A - Schedule 1



other bank account notified by the Administrative Agent to the Undersigned.

o cualquier otra cuenta que el Agente Administrativo notifique a la Suscrita.

"Applicable Margin" means a rate per annum equal to [4.00]%.

"Margen Aplicable" significa una tasa del [4.00]% anual.

"Base Rate" means, for any day, a rate per annum equal to the greatest of: (a) the Prime Rate in effect on such day (b) the Federal Funds Effective Rate in effect on such date plus 1/2 of 1%, and (c) the LIBO Rate plus 1%. If the Administrative Agent shall have reasonably determined (which determination shall be conclusive absent manifest error) that is unable to ascertain the Federal Funds Effective Rate for any reason, the Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, respectively.

"Tasa Base" significa, para cualquier día, la tasa anual, equivalente a lo que resulte mayor de entre: (a) la Tasa Prime correspondiente a dicho día, (b) la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) correspondiente a dicho día, más ½ de 1%, y (c) la Tasa LIBO más 1%. Si el Agente Administrativo razonablemente determina (misma determinación que será definitiva en ausencia de error manifiesto) que no es posible determinar la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) por cualquier razón, la Tasa Base será determinada sin considerar la sección (b) de la oración antes mencionada hasta que las circunstancias que den origen a dicha situación dejen de existir. Cualquier cambio en la Tasa Base causado por un cambio en la Tasa Prime, la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) o la Tasa LIBO, será efectivo a partir de incluyendo el día en que dicho cambio surta efectos en la tasa "prime", la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) o la Tasa LIBO, respectivamente.

"Business Day" means a day other than a Saturday or Sunday on which (a) for all purposes other than as set forth in clause (b) of this definition, commercial banks are open for general business in New York, New York, Mexico City, Mexico and Panama City, Panama, and (b) when used solely in connection with the determination of, or the calculation of interest based upon, the LIBO Rate, dealings in Dollar deposits are carried out between banks in the London interbank market.

"Día Hábil" significa un día que no sea sábado o domingo en que (a) para todos los propósitos, salvo en el caso mencionado en el acápite (b) de la presente definición los bancos comerciales lleven a cabo operaciones bancarias en la ciudad de Nueva York, Nueva York, en la Ciudad de México, México y en la Ciudad de Panamá, Panamá, y (b) únicamente cuando se utilice en relación con la determinación o el cálculo de intereses con base en la misma de la Tasa LIBO, los bancos lleven a cabo operaciones de depósito en Dólares en el mercado interbancario de Londres.

"Code" means the Internal Revenue Code of 1986, as amended.

"Código" significa el Código Fiscal de 1986 de los Estados Unidos de América (Internal Revenue

Exhibit A – Schedule 1

Code), según sea modificado,

"Excluded Taxes" means, with respect to the holder of this Promissory Note, (i) Taxes imposed on or measured by its overall net income (however denominated), franchise taxes and branch profit taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the applicable law of which the holder of this Promissory Note is organized, is doing business, is considered a resident for tax purposes or in which its principal office is located or in which its applicable lending office is located, (ii) any Taxes imposed by reason of any connection between the holder of this Promissory Note and the taxing jurisdiction other than receiving payments hereunder and (iii) any United States federal withholding Taxes imposed pursuant to FATCA.

"Impuestos Excluidos" significa, respecto al tenedor de este Pagaré (i) Impuestos establecidos en o medidos por su overall net income o determinados con base al total de su ingreso (cualquiera que sea su denominación), impuestos de franquicia y de ingresos atribuibles a sucursales (establecidos en lugar de impuestos sobre la renta), previstos en la legislación de la jurisdicción (o cualquier subdivisión política) donde el tenedor de este Pagaré esté constituido, lleve a cabo su negocio, sea residente para efectos fiscales o en la cual se encuentre su centro de negocios o su oficina de fondeo, (ii) cualquier Impuesto establecido con base a cualquier relación entre el tenedor de este Pagaré y la jurisdicción impositiva del impuesto distinto del recibo del pago bajo este Pagaré y (iii) cualquier retención de Impuestos Federales impuesta por los Estados Unidos de América conforme a FATCA.

"FATCA" means Sections 1471 through the Code, as of this date (or any amended successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations official interpretations thereof and any agreements entered into pursuant to Section (b) (1) of the Code.

"FATCA" significa la Secciones 1471 a 1474 del Código, a esta fecha (o cualquier modificación o versión que la sustituya que sea sustancialmente comparable y no materialmente más onerosa en cumplimiento), cualquier regulación o interpretación oficial presente o futura en relación con los mismos y cualesquiera convenios o contratos celebrados conforme a la Sección 1471 (b) (1) del Código.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal fund effective rate; provided, that if the Federal Fund Effective Rate for any day is less than zero, the Federal Fund Effective Rate for such day will be deemed to be zero.

"Tasa de Interés de Fondos Federales (Federal Funds Effective Rate)" significa, para cualquier día, la tasa de interés calculada por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) con base en transacciones de fondos federales del día, en determinado de tal manera por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) y publicado en su página de internet de tiempo en tiempo) y publicada el Día Hábil

Exhibit A – Schedule I

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.33.30.30.30.33.30.43.73.33.33.43.138
109825 309814

inmediato siguiente por el Banco de la Reserva Federal de los Estados Unidos de América en Nueva York como la tasa de interés aplicable a fondos federales, en el entendido que, si la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) para cualquier día es menos de cero, la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) para dicho día será cero.

"Governmental Authority" means the government of the United States, Mexico, Panama or any other nation, any state, department or any other political subdivision thereof, and any governmental body, agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity (including any federal or other association of or with which any institution may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions pertaining to government.

"Autoridad Gubernamental" significa el gobierno de los Estados Unidos de América, de México, de Panamá o de cualquier otra nación, cualquier estado, departamento u otra subdivisión política de los mismos y cualquier cuerpo gubernamental, agencia gubernamental, autoridad, cuerpo regulatorio, corte, tribunal, banco central o cualquier otra entidad (incluyendo, sin limitación, cualquier asociación federal o de cualquier otra naturaleza de la cual dicha nación sea miembro o con la cual esté asociada) que ejerza funciones ejecutivas, legislativas, judiciales, fiscales, regulatorias o administrativas respecto de o que pertenezcan al gobierno.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Impuestos Indemnizables" significa todos los Impuestos distintos de los Impuestos Excluidos.

"Interest Payment Date" shall mean the last day of each Interest Period.

"Fecha de Pago de Intereses" significa el último día de cada Período de Intereses.

"Interest Period" means the period commencing the date hereof and ending on [•], [•], and thereafter, each period commencing on the last day of the immediately preceding Interest Period, and ending on the [•]th day of the calendar month that is three months thereafter; provided, that (i) if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) in no case shall any Interest Period end after the Maturity Date.

"Período de Intereses" significa el período que comienzan en la fecha de suscripción de este Pagaré y que termina el día [•] de [•] de [•]; y después de dicho primer Período de Intereses, cada período que comience en el último día del Período de Intereses inmediato anterior y que termine en el día [•] del mes calendario que sea tres meses después; en el entendido, que (i) si cualquier Período de Intereses terminara en un día que no sea un Día Hábil, dicho Período de Intereses se extenderá al Día Hábil inmediato siguiente, salvo que dicho Día Hábil siguiente corresponda al siguiente mes calendario, en cuyo caso dicho Período de Intereses terminará el Día

2022-0800-0800 2025-536-0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.34.37.33.32.34.31.38
13.08/23 20:01.41

MTN DNS.DISPIEL.COM
digital program MTN 16 4 2022

Exhibit A – Schedule I

Hábil inmediato anterior, y (ii) ningún Periodo de Intereses terminará después de la Fecha de Vencimiento.

"Interpolated Rate" means, at any time, the rate per annum equal to the, rate that results from interpolating on a linear basis between (a) the LIBOR Screen Rate for the longest period (for which such LIBOR Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period (as such term is defined below) and (b) the LIBOR Screen Rate for the shortest period (for which such LIBOR Screen Rate is available for Dollars) that is longer than the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate is less than zero, the "Interpolated Rate" at such time shall be deemed to be zero.

"Tasa Interpolada" significa, en cualquier momento, la tasa anual equivalente a la tasa que resulte de interpolar en una base lineal entre: (a) la LIBOR Publicada por el periodo más largo (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más corto que el Periodo de Intereses Impactado (según dicho término se define más adelante) y (b) la LIBOR Publicada para el periodo más corto (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más largo que el Periodo de Intereses Impactado, en cada caso, en dicho momento; en el entendido que, en caso que la Tasa Interpolada sea menor a cero, la "Tasa Interpolada" en dicho momento deberá ser considerada como cero.

"LIBO Rate" means, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London, England time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the LIBOR Screen Rate for deposits in Dollars (for delivery on the first day of such Interest Period or on such other date on which interest is paid, as applicable) for a period approximately equal to such Interest Period; provided that in no event shall "LIBO Rate" be less than zero for purposes of this Promissory Note; provided, further, that to the extent that any interest rate is not ascertainable pursuant to the foregoing provisions of this definition of "LIBO Rate" for such Interest Period (an "Impacted Interest Period"), shall be the Interpolated Rate.

"Tasa LIBO" significa, para cualquier Periodo de Intereses, la tasa de interés anual determinada por el Agente Administrativo aproximadamente a las 11:00 a.m., hora de Londres, Inglaterra, en la Fecha que sea dos Días Hábiles previos al inicio de dicho Periodo de Intereses por referencia a la LIBOR Publicada, para depósitos en Dólares (para entrega el último día de dicho Periodo de Intereses o en cualquier otra fecha en la que los Intereses sean pagaderos, según sea aplicable) por un periodo aproximadamente igual a dicho Periodo de Interés, en el entendido que, en ningún caso la "Tasa LIBO" será menor a 0.0% para efectos de este Pagaré, en el entendido, además, que en esto que la tasa de interés no sea determinable de conformidad con lo señalado en la presente definición, la "TASA LIBO" para dicho Periodo de Interés (un "Periodo de Interés Impactado") deberá ser la Tasa Interpolada.

"Mexico" means the United Mexican States.

"México" significa los Estados Unidos Mexicanos.

"LIBOR Screen Rate" means the London

"LIBOR Publicada" significa la tasa de referencia

Exhibit A—Schedule 1

Interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) ("LIBOR") (as set forth by the Bloomberg Information Service or any successor thereto, or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration Limited as an authorized information vendor for the purpose of displaying such rates), or a comparable or successor rate, which rate is approved by the Administrative Agent.

Interbancaria de Londres (*London Interbank Benchmark Administration Limited* (o cualquier otra persona que asuma la administración de dicha tasa de referencia ("LIBOR") (conforme a lo establecido en el Servicio de Información Bloomberg (*Bloomberg Information Service*) o cualquier sucesor del mismo o cualquier otro servicio seleccionado por el Agente Administrativo que sea nominado por ICE Benchmark Administration Limited como un vendedor de información autorizado para efectos de publicar dicha tasa), o una tasa comparable o una tasa que la sustituya, cuya tasa sea aprobada por el Agente Administrativo.

"Prime Rate" means the rate of interest annum publicly announced from time to time by Credit Suisse AG as its prime rate in effect at its principal office in New York City. The prime rate is a rate set by Credit Suisse AG based on various factors including Credit Suisse AG's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate. Any change in such prime rate announced by Credit Suisse AG shall take at the opening of business on the day specified in the public announcement of such change.

"Tasa Prime" significa la tasa de interés anual publicamente anunciada de tiempo en tiempo por Credit Suisse AG como su tasa "prime" aplicable en sus principales oficinas en la ciudad de Nueva York. La tasa "prime" es una tasa establecida por Credit Suisse AG con base en diversos factores incluyendo los costos y retornos esperados de Credit Suisse AG, las condiciones económicas generales y diversos factores, y se usa como punto de referencia para la fijación de precios de ciertos créditos, cuyos precios podrán estar, por encima o por debajo de dicha tasa. Cualquier cambio anunciado a la tasa "prime" por Credit Suisse AG entrará en vigor a partir del inicio del día hábil especificado en el anuncio público de dicho cambio.

"Other Taxes" means any and all present, future stamp, transfer, court or documentary taxes or any other excise or property taxes, charges or similar levies (together with any interest, charges, penalties, additions to tax and additional amounts) arising from any payment made under this Promissory Note from the execution, delivery or enforcement of, or otherwise with respect to, this Promissory Note.

"Otros Impuestos" significan cualesquier impuestos de timbre o documentación, o cualesquier impuestos de uso y consumo o propiedad, o imposiciones o cargas similares (junto con todos los intereses, cargos, penas adicionales, o impuestos y otras cantidades adicionales), en bases los casos, presentes o futuros, que surjan como consecuencia de cualquier pago hecho de conformidad con este Pagaré o de la suscripción, entrega o ejecución de, o por cualquier otro motivo en relación con este Pagaré.

Exhibit A – Schedule 1

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,30,34,33,32,34,31,38
13/09/21 20:21:41

"Panama" means the Republic of Panama.   "Panamá" significa la República de Panamá.

"Taxes" means any and all present or future taxes (including value added tax), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholding) of whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"Impuestos" significa todos y cada uno de los impuestos (incluyendo el impuesto al valor agregado), derechos, deducciones, cargos, o retenciones, presentes o futuros, de cualquier naturaleza junto con cualesquier intereses, cargos, adiciones de impuestos o cantidades adicionales impuestas o cobradas por cualquier Autoridad Gubernamental.

Any and all payments (including any prepayments) to be made by the Undersigned hereunder whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim, and shall be made prior to 2:00 p.m. (New York City time) on the due dates specified in this Promissory Note in Dollars and in immediately available funds to the Administrative Agent's Account.

Todos y cada uno de los pagos (incluyendo prepagos) que deba hacer la Suscrita conforme a este Pagaré, ya sea por concepto de principal, interés, comisiones o por cualquier otro concepto, serán efectuados sin compensación o reclamación alguna, antes de las 2:00 p.m. (hora de la Ciudad de Nueva York), en las fechas de pago previstas en el presente Pagaré, en Dólares y en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo.

The Undersigned and the guarantor (avalista) hereby agree to reimburse all reasonable out-of-pocket expenses of the holder hereof, if any, incurred in connection with the enforcement of this Promissory Note (including, without limitation, the fees, charges and disbursements of any counsel for the holder hereof).

La Suscrita y el avalista convienen en reembolsar todos los gastos razonables, frente a terceros, incurridos por el tenedor de este Pagaré, en su caso, en relación con la ejecución del presente Pagaré (incluyendo, sin limitación, los honorarios, costos y gastos legales de los abogados legales del tenedor de este Pagaré).

Any and all payments by or on account of any obligation of the Undersigned and the guarantor (avalista) hereunder shall be made free and clear of and without any withholding or deduction for or on account of any Indemnified Taxes or Other Taxes; provided, however, that if the Undersigned or the guarantor (avalista) shall be required to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required withholdings or deductions, the holder of such Promissory Note receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) the Undersigned or the guarantor (avalista) shall

Todos y cada uno de los pagos hechos por o a nombre de cualquier obligación de la Suscrita y del avalista de conformidad con este Pagaré se harán libres de y sin deducción por cualesquier Impuestos Indemnizables u Otros Impuestos; en el entendido, sin embargo, que en caso de que la Suscrita o el avalista sea requerido a deducir cualesquier Impuestos Indemnizables u Otros Impuestos respecto de dichos pagos, entonces (i) la cantidad pagadera al tenedor de este Pagaré se incrementará en las cantidades adicionales necesarias para que dicho tenedor reciba un monto igual a la suma que hubiere recibido si dichas deducciones o retenciones no hubieran sido realizadas, (ii) la Suscrita o el avalista efectuará dichas deducciones o retenciones y (iii)

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.35.30.34.57.35.33.34.31.38
1120826.20.03.34

make such withholdings or deductions and (iii) the Undersigned or the guarantor (avalista) shall pay the full amount so withheld or deducted to the relevant Governmental Authority in accordance with applicable law.

la Suscrita o el avalista pagará el total de las cantidades que deduzca o retenga a la Autoridad Gubernamental correspondiente, de conformidad con la legislación aplicable.

The Undersigned and the guarantor (avalista) shall indemnify the holder of this Promissory Note, within 10 (ten) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such holder, and all reasonable expenses arising therefrom or with respect thereto plus interest thereon for each day from (and including) the day of delivery to the Undersigned of a request for such payment to (but excluding) the date of actual reimbursement at a rate per annum equal to the interest rate then applicable to this Promissory Note, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

La Suscrita y el avalista se obligan a indemnizar al tenedor de este Pagaré, dentro de los 10 (diez) Días Hábiles siguientes al requerimiento por escrito para dichos efectos, por el monto total de cualesquier Impuestos Indemnizados u Otros Impuestos pagados por dicho tenedor, y todos los gastos razonables derivados de o relacionados con cualquier dicho pago más intereses sobre dicho monto por cada día desde (e incluyendo) el día en que la Suscrita reciba el requerimiento por escrito de dicho pago, hasta (pero excluyendo) la fecha en que se lleve a cabo el reembolso correspondiente, a una tasa anual equivalente a la tasa de interés que en ese momento sea aplicable al presente Pagaré, independientemente de que dichos Impuestos Indemnizables u Otros Impuestos hayan sido o no determinados o impuestos o correcta o legalmente por la Autoridad Gubernamental correspondiente.

For everything related to this Promissory Note, the Undersigned and the guarantor (obligoria) hereby designate the following as their domicile:

Para todo lo relacionado con este Pagaré, la Suscrita y el avalista designan como su domicilio el siguiente:

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
México City, México
Attention: Carlos E. Ochoa Valdés, Claudia Jolly and Raúl A. Farias
Telephone: +52.55.5228.9700
Email: cochoa@crediteral.com.mx, cjolly@crediteral.com.mx and rfarias@crediteral.com.mx

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Ciudad de México, México
Atención: Carlos E. Ochoa Valdés, Claudia Jolly y Raúl A. Farias
Teléfono: +52.55.5228.9700
Correo electrónico: cochoa@crediteral.com.mx, cjolly@crediteral.com.mx y rfarias@crediteral.com.mx

The Undersigned and the guarantor (avalista) La Suscrita y el avalista extienden el plazo para la

Exhibit A - Schedule 1

Compiled on 2022-05-10 jhon@alejandro.com 19.25.38.66-0800

JACINTO GUADALUPE MARTINEZ FLORES
30.30.30.30.1.30.30.30.30.30.30.35.30.34.37.33.35.32.34.31.18
13.09.24.12001.41

extend the period of presentment for payment of este Pagaré hasta la this Promissory Note until the date that is six (6) fecha que sea seis (6) meses después de la Fecha months after the Maturity Date, in terms of de Vencimiento, en los términos del Artículo 128 Article 128 of the Mexican General Law of de la Ley General de Títulos y Operaciones de Negotiable Instruments and Credit Transactions. Crédito.

This Promissory Note is issued in accordance Este Pagaré se suscribe de conformidad con, y se with and governed by the laws of the State of rige por, las leyes del Estado de Nueva York, New York, United States of America, provided Estados Unidos de América, en el entendido que, that in connection with any legal action or en relación con cualquier acción o procedimiento proceeding (other than an action to enforce a legal (distinto de una acción para ejecutar una judgment obtained in other jurisdiction) brought sentencia en otra jurisdicción) que surja en in respect of this Promissory Note, in the courts relación con este Pagaré, ante los tribunales de of Mexico, this Promissory Note shall be deemed México, este Pagaré será considerado como to be made under the laws of Mexico, and for suscrito conforme a las leyes de México, y para such purposes shall be governed by, and dichos propósitos será regida por, e interpretado construed in accordance with, the laws of de conformidad con, las leyes de México. La Mexico. The Undersigned and the guarantor Suscrita y el avalista se someten expresa e expressly and irrevocably submit to the irrevocablemente a la jurisdicción de (a) las cortes jurisdiction of (a) the competent courts of the competentes del Estado de Nueva York con sede State of New York sitting in New York County en el Condado de Nueva York y de la Corte de and of the United States District Court for the Distrito de los Estados Unidos de América del Southern District of New York, and any other Distrito Sur de Nueva York, y cualquier otro appelling court in the State of New York, and (b) tribunal de apelación en el Estado de Nueva York, the competent federal courts of Mexico City (b) los tribunales federales competentes de la Mexico, at the election of the party initiating the Ciudad de México, México, a elección de la parte action, in any action or proceeding arising from or que inicie la acción, en cualquier acción relating to this Promissory Note, or the procedimiento que surja como consecuencia de o recognition or enforcement of any judgment. The en relación con este Pagaré, o para el Undersigned and the guarantor (avalista) of this reconocimiento o ejecución de cualquier Promissory Note hereby expressly sentencia. La Suscrita y el avalista en este acto unconditionally and irrevocably waive their right renuncian de manera expresa incondicional, e to any other jurisdiction that may apply by virtue irrevocable. La cualquier otra jurisdicción que of their present or future domicile or for any pudiere corresponderles en razón de su domicilio reason. presente o futuro o por cualquier otro motivo.

This Promissory Note is executed in both the El presente Pagaré se suscribe en los idiomas English and Spanish languages, both versions of inglés y español, obligando ambas versiones a la which shall bind the Undersigned; provided, Suscrita; que, en el entendido, de que en however, that in the event of any suit or action caso de cualquier demanda o acción en Nueva brought in New York, United States of America, York, Estados Unidos de América, la versión en the English version shall prevail and, in the event inglés será la que prevalezca y en caso de of any suit or action brought in Mexico, the cualquier demanda o acción en México, la versión Spanish version shall prevail. en español será la que prevalezca.

Exhibit A – Schedule 1

The Undersigned and the guarantor (avalista) hereby waive diligence, demand, protest and notices of any kind whatsoever. Each of the Undersigned and the guarantor (avalista) hereby binds itself to pay costs of collection and attorney's fees in the case of default in the timely payment of this Promissory Note.

La Suscrita y el avalista por el presente, renuncian expresa e irrevocablemente a cualquier diligencia, demanda, protesto o notificación de cualquier clase Cada uno de la Suscrita y el avalista se obliga a pagar los gastos de cobranza y honorarios de abogados en caso de incumplimiento en el pago oportuno de este Pagaré.

*IN WITNESS WHEREOF*, the Borrower and the guarantor (avalista) have duly executed this Promissory Note as of the date mentioned below.

*EN VIRTUD DE LO CUAL*, la Suscrita y el avalista han firmado debidamente este Pagaré en la fecha abajo mencionada.



Ciudad de México, México, a [∎] de [∎] de [∎]
México City, Mexico on [∎], [∎]

**LA ESCRITA**

**MAREVALLEY CORPORATION**

_____
Name/Nombre: [∎]
Title/Cargo: Attorney-in-Fact / Apoderado

**EL AVAL**

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.**

_____
Name/Nombre: [∎]
Title/Cargo: Attorney-in-Fact / Apoderado

Exhibit A – Schedule I

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.35.37.35.32.34.31.38
1308024-26.01-4I

Exhibit B

Form of Borrowing Request

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent (as defined below)
Eleven Madison Avenue
New York, NY 10010
United States
Attention: Agency Manager
Tel: +1 (919) 994-6369
Email: list.structured-lending@team@credit-suisse.com

The undersigned refers to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February [●] 2020, among CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Crédito Real"), and MAREVALLEY CORPORATION ("Marevalley," and together with Crédito Real, the "Borrowers"), as Borrowers, the guarantor party thereto, the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"), and hereby gives you irrevocable notice pursuant to Section 2.3(a) of the Credit Agreement, that the undersigned hereby requests a borrowing of [Tranche A Loans][Tranche B Loans] under the Credit Agreement, and in that connection sets forth below the information relating to such borrowing (the "Reference Borrowing") as required by Section 2.3(a) of the Credit Agreement. Capitalized terms used but not defined herein shall have the meaning assigned to them in the Credit Agreement.

(i)    The aggregate principal amount of the Reference Borrowing is U.S.$[●].

(ii)    The proposed Closing Date is [●], 2020; and

(iii)    Crédito Real hereby irrevocably instructs the Administrative Agent to disburse the proceeds of the Requested Borrowing as follows:

(a)    The amount of U.S.$[●], constituting the amount of the 2017 Existing Indebtedness (including interest and any other amounts owed in respect thereof), shall be wire transferred by the Administrative Agent, on behalf of Crédito Real to the following account:

Beneficiary: [●]
Account Number: [●]

(b)    The balance of U.S.$[●] shall be disbursed to the following account:

Exhibit B

Confidential
EP_PR.COMPRA.APPLE
Fecha: 2022-03-10 21:25:38 -0800
email@live.hl.com

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.41.30.30.30.30.35.30.35.37.35.32.34.31.38
15.00.24 26.00.41

Beneficiary: [●]
Account Number: [●]¹

(iii)    The Requested Borrowing shall be disbursed to the following account:

Beneficiary: [●]
Account Number: [●]²

[*Remainder of this page intentionally left blank*]

---

¹ NTD: Include in the Borrowing Request to be sent by Credito Real.

² NTD: Include in the Borrowing Request to be sent by Marco Rey.

CONFIDENTIAL
JAVIER PICHARDING@US.DLAPIPER.COM
Monday, January 4, 2021 7:30 26 PM

Confidential

anema@hl.com

2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.33.30.30.30.30.30.35.30.34.37.33.32.34.31.38
13.08.24.20.01.41

Exhibit B



PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
0811001000000000017588411.p7m
Autoridad Certificadora:
AUTORIDAD CERTIFICADORA
Firmante(s): 1

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| **Nombre:** | JACOBO GUADALUPE MARTINEZ FLORES | | **Validez:** | BIEN | Vigente |
| FIRMA | | | | | |
| **No. serie:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | | **Revocación:** | Bien | No revocado |
| **Fecha:** (UTC/ CDMX) | 19/07/22 17:48:29 - 19/07/22 12:48:29 | | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA - SHA256 | | | | |
| **Cadena de firma:** | 4f 21 ce d3 d3 91 1b 35 e5 25 35 a1 63 d8 6f 67 cd 13 3f 0d c0 22 bc 10 f6 e8 a9 3a d1 91 35 e2 57 8e 27 0d 8d c4 36 7a a5 d3 9d bd 37 87 45 f4 2c e6 0d 01 c1 d6 de b6 c9 96 3f 10 c8 92 b0 d5 4d 6a 63 b4 ce 4e ca 94 61 3b ee d2 01 bf 8d df be 1e 56 13 93 18 04 4b 00 25 78 4c 2e 36 d8 d3 9d 17 7b fa 13 4f a7 4d 64 8b ee 49 41 80 1c 76 49 db bd ee de 9b cb 1f f7 7e 33 69 df 03 e9 4b c4 92 f4 24 83 48 ab 22 c9 e8 41 b1 22 8e 69 20 d9 07 a7 88 d9 ec 6a 7d 04 4b 79 02 59 9c b8 25 68 1b e8 e0 70 2d 8f 8a 05 d3 ab a8 ec 48 49 58 86 16 61 68 18 8a a8 87 c9 f6 b8 56 e8 a6 f8 ba 13 9e 23 c9 8c 42 07 e0 87 28 7e d4 97 2b 43 62 e9 f0 19 7d cd f6 82 21 0c 00 ba 44 17 42 7c 91 38 5e da 50 fb f9 16 68 dc 73 98 76 6c 4e 4d 8a 5d 84 48 b5 05 a2 82 25 d2 b6 91 1c 6f c2 62 44 | | | | |
| OCSP | | | | | |
| **Fecha: (UTC / CDMX)** | 19/07/22 17:48:26 - 19/07/22 12:48:26 | | | | |
| **Nombre del respondedor:** | Servicio OCSP SAT | | | | |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA | | | | |
| **Número de serie:** | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | | |
| TSP | | | | | |
| **Fecha : (UTC / CDMX)** | 19/07/22 17:48:31 - 19/07/22 12:48:31 | | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Identificador de la respuesta TSP:** | 126995546 | | | | |
| **Datos estampillados:** | O9GaVi7uNHOhPEGqOydvAOid378= | | | | |

Signature Page
Borrowing Request

Very truly yours,

[CRÉDITO REAL, S.A.B. DE C.V.,
SOFOM, E.N.R. / MAREVALLEY
CORPORATION],
as Borrower

By:_____
Name:
Title:

CONFIDENTIAL
Credito Real MTN Program
JAVIER.RICHARDS@US.DLAPIPER.COM
Monday, January 4, 2021 7:30:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit B

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,35,35,34,17,35,32,34,31,38
13/08/24 20:01:41

Exhibit C

Form of Process Agent Acceptance

[•], 2020

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent (as defined below)
Eleven Madison Avenue
New York, NY 10010
United States
Attention: Agency Manager
Tel: +1 (919) 994-6369
Email: list.structured-lendingistam@credit-suisse.com

Ladies and Gentlemen:

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February [•], 2020 among CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Credito Real"), and MASEY AL KEY CORPORATION ("Marevalley," and together with Credito Real, the "Borrowers"), as Borrowers, the guarantors party thereto (the "Guarantor," and together with the Borrowers, the "Loan Parties") and the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent") and to the Fee Letter dated as of February 19, 2020 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Fee Letter"), executed by the Borrowers in favor of the Administrative Agent and the lead arranger identified thereunder.

Pursuant to Section 10.9(c) of the Credit Agreement, each Loan Party has appointed the undersigned (at the undersigned's office located at 28 Liberty Street, New York, New York 10005) as its agent in its name, place and stead to receive and forward service of any writ, process or proceedings in New York arising out of or in connection with the Credit Agreement or the Fee Letter.

The undersigned hereby (a) informs you that it accepts such appointment by each Loan Party as is set forth in Section 10.9(c) of the Credit Agreement and (b) agrees with you that (i) it will not terminate such agency relationship prior to February 19, 2026 (the "Term"), (ii) it will maintain an office in the State of New York at all times to and including said date and will use commercial reasonable efforts to notify you of any change of its address during such period and (iii) it will promptly forward to each Loan Party any summons, complaint or other legal process that the undersigned receives in connection with its appointment as agent and attorney-in-fact of such Loan Party, by overnight courier service and by e-mail, to the following address:

Avenida Insurgentes Sur No. 730

Exhibit C

2022-09-03 at 09:15:38 -0800
Corporation Service Company

LAW OFFICES
Miami

JACOBO GUADALUPE MARTINEZ FLORES
3D.80.30.80.31.80.30.30.80.30.35.30.34.71.35
13.80.24.20.01.41

Piso 20, Colonia Del Valle,
Delegación Benito Juárez 03103
Ciudad de México, México
Attention:   Carlos E. Ochoa Valdés, Claudia
Jolly and Raúl A. Farías
Telephone:  +52.55.5228.9700
Email:  cochoa@creditoreal.com.mx,
cjolly@creditoreal.com.mx
and rfarias@creditoreal.com.mx

Each Loan Party will provide to C T Corporation System ("CT") in writing with
any changes to its address.  CT shall have no responsibility for the receipt or non-receipt by any
Loan Party of such summons or other legal process; should such summons or legal process be
returned to CT for any reason. CT shall have no responsibility other than to return such summons
or other legal process to the sender by first class mail.  CT's services are limited to the receipt
and forwarding of legal process.

Unless the Administrative Agent informs CT to the contrary, CT's appointment
will terminate on February 21, 2026.  CT hereby acknowledges receipt of payment in full by the
Loan Parties of all amounts payable to CT hereunder.

C T CORPORATION SYSTEM

By: _____
Name:
Title:

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.35.30.34.37.35.32.34.31.38
13080219601141

Exhibit D-1

Form of Promissory Note (Crédito Real)

[Attached]

CONFIDENTIAL
Crédito Real RVM Program
JAVIER.PICHARDIN@E3 DLAPPER.COM
Monday, January 4, 2004 7:36:38 PM

Confidential
anema@hl.com
2020-03-10 19:25:38 -0800

Exhibit D-1

JACOBO GUADALUPE MARTINEZ FLORES
30.08.30.05.11.30.70.50.30.30.30.55.30.54.27.55.32.53.41.38
100028.20.01-1

Form of Promissory Note to be Issued by Crédito Real (Tranche A)

| NON-NEGOTIABLE PROMISSORY NOTE | PAGARÉ NO NEGOCIABLE |
|---|---|
| **U.S.$ [•] DOLLARS** | **E.U.$ [•] DÓLARES** |

For value received, the undersigned, **Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.** (the "Undersigned"), a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada* duly organized and validly existing under the laws of the United Mexican States ("Mexico"), by this Promissory Note (the "Promissory Note"), unconditionally promises to pay to the order of [•] (the "Lender") the principal sum of U.S.$ [•] ([•] Dollars 00/100) legal currency of the United States of America ("Dollars"), plus interest thereon pursuant to the terms hereof, in Dollars in immediately available funds, at the Administrative Agent's Account (as defined below), in 3 (three) installments of principal, which shall be due and payable on each Interest Payment Date (as defined below) falling in the months specified in the table below and on the Maturity Date (as defined below) and on the amounts set forth on the payment schedule below; provided that, if any such date is not a Business Day (as defined below), the relevant payment shall be made on the next succeeding Business Day, except that if the Maturity Date is not a Business Day, the relevant payment shall be made the immediately preceding Business Day (each such date a "Principal Repayment Date").

Por valor recibido, la suscrita, **Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.** (la "Suscrita"), una sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada debidamente constituida y válidamente existente de conformidad con las leyes de los Estados Unidos Mexicanos ("México"), por este pagaré (el "Pagaré") promete incondicionalmente pagar a la orden de [•] (el "Acreditante") la suma principal de E.U. $[•] ([•] Dólares 00/100), moneda de curso legal de los Estados Unidos de América ("Dólares"), más intereses sobre la misma conforme a este Pagaré, en Dólares, en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo (según se define más adelante), mediante 3 (tres) amortizaciones de principal, mismas que vencerán y serán pagaderas en cada Fecha de Pago de Interés (según se define más adelante) que corresponda a los meses especificados en la siguiente tabla y en la Fecha de Vencimiento (según se define más adelante), en las cantidades que se especifican en el encabezado que si cualquiera de dichas fechas no fuere un Día Hábil (según se define más adelante), dicho pago se hará un Día Hábil inmediatamente siguiente, excepto que si la Fecha de Vencimiento de este Pagaré no fuere un Día Hábil, dicho pago se hará un Día Hábil inmediato anterior (cada uno, una "Fecha de Pago de Principal").

| Principal Repayment Date | Amount of Principal Repayment | Fecha de Pago de Principal | Monto de Pago de Principal |
|---|---|---|---|
| [•], [•]. | 30% of the aggregate principal amount of this Promissory Note | [•] de [•], [•] | 30% del monto total de principal de este Pagaré |
| [•], [•]. | 30% of the aggregate principal amount of this Promissory Note | [•] de [•], [•] | 30% del monto total de principal de este Pagaré |

Exhibit 24

JACOBO GUADALUPE MARTINEZ 73 OMIS
30.34.30.13.34.30.35.30.36.30.30.35.30.34.37.35.32.34.31.38
13908/24 20:01:41

[•],   [•]   (the   Aggregate   principal
"Maturity Date").   amount   of   this
Promissory   Note
outstanding   on   such
Principal   Repayment
Date.

[•] de [•] de [•] (la   Saldo   insoluto   de
"Fecha   de   principal de este Pagaré
Vencimiento").   en   esta   Fecha   de   Pago
de Principal.

Prepayment of any amounts due hereunder shall   El pago anticipado de cualquier cantidad
be applied to the payment of any unpaid   conforme a este Pagaré será aplicado al pago de
installments of this Promissory Note, in inverse   las amortizaciones pendientes de pago de este
order of maturity.   Pagaré en orden inverso al de su vencimiento.

The obligation of the Undersigned to repay the   La obligación de la Suscrita de pagar el principal
principal of this Promissory Note, together with   de este Pagaré, junto con los intereses devengados
interest accrued thereon and all other amounts   y cualesquiera otras sumas pagaderas, bajo el
payable hereunder shall be dischargeable only by   mismo será cumplida exclusivamente mediante el
payment in Dollars, outside of the territory of   pago en Dólares, fuera del territorio de México,
Mexico, as set forth in this Promissory Note.   en los términos previstos en este Pagaré.

The Undersigned also unconditionally promises   La Suscrita además promete incondicionalmente
to pay, from the date hereof and until (but   pagar, a partir de la fecha de este Pagaré y hasta
excluding the date on which the outstanding   (pero excluyendo la fecha en que el monto
principal amount of this Promissory Note is paid   principal insoluto de este Pagaré sea pagado en su
in full, interest on the outstanding principal   totalidad, intereses sobre el monto principal
amount of this Promissory Note, for each day   insoluto de este Pagaré por cada día durante cada
during each Interest Period (as defined below) at   Período de Intereses (según se define más
a rate per annum equal to the LIBO Rate (as   adelante), a una tasa anual equivalente a la Tasa
defined below) determined for the Interest Period   LIBO (según se define más adelante) determinada
then in effect, plus the Applicable Margin (as   para el Período de Intereses vigente en dicho
defined below) (the "Interest Rate"). Interest shall   momento, más el Margen Aplicable (según se
be payable in arrears on each Interest Payment   define más adelante) (la "Tasa de Interés"). Los
Date (as defined below), on the Maturity Date, on   intereses serán pagados conforme venzan en cada
the date of any prepayment (on the amount   Fecha de Pago de Intereses (según se define más
prepaid), and at maturity and after such maturity,   adelante), en la Fecha de Vencimiento, en la
on demand.   fecha de cualquier prepago (sobre la cantidad
prepagada), y a su vencimiento y después a dicho
vencimiento, a la vista.

Notwithstanding the foregoing, (a) any principal   Sin perjuicio de lo anterior, (a) cualquier monto
amount not paid when due under this Promissory   de principal que no sea pagado cuando sea debido
Note, shall bear interest for each day until paid,   conforme al presente Pagaré, devengará intereses
payable on demand, at a rate per annum that is   pagaderos a la vista, a una tasa anual equivalente
2% in excess of the Interest Rate then applicable   a la Tasa de Interés aplicable en ese momento,
pursuant hereto, and at any time following the   más 2%, y una vez
termination of the Interest Period then in effect,   conforme al presente Pagaré, más 2%, y una vez
such rate shall be equal to 2% plus the Base Rate   vencido el Período de Interés correspondiente a

CONFIDENTIAL 2022-•••-0800

Exhibit D-4

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.30.35.30.34.37.33.32.34.31.38
1380.23.20.01-01

determined from time to time plus the Applicable Margin, and (b) to the extent permitted by applicable law, any overdue interest hereunder shall bear interest at a rate equal to 2¾ plus the Base Rate determined from time to time plus the Applicable Margin. Accrued and unpaid interest on past due amounts (including interest on past due interest, to the extent permitted by applicable law) shall be due and payable upon demand.

dicha Tasa de Interés, la tasa de intereses moratorios será una tasa anual equivalente a la suma de 2% más la Tasa Base, determinada de tiempo en tiempo más el Margen Aplicable, y (b) en la medida permitida por la legislación aplicable, cualquier interés vencido y no pagado en la fecha en que sea debido devengará intereses moratorios a una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable. Los intereses moratorios (incluyendo intereses sobre intereses, en la medida permitida por la legislación aplicable) serán debidos y pagaderos a la vista.

All interest hereunder will be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day).

Todos los intereses conforme a este Pagaré se calcularán sobre la base de un año de 360 días y el número de días efectivamente transcurridos (incluyendo el primero pero excluyendo el último día).

As used in this Promissory Note, the following terms have the meanings specified below:

Según se utilizan en este Pagaré, los siguientes términos tienen los siguientes significados:

"Administrative Agent" means Credit Suisse AG, Cayman Islands Branch.

"Agente Administrativo" significa Credit Suisse AG, Cayman Islands Branch.

"Administrative Agent's Account" means the bank account maintained by the Administrative Agent with The Bank of New York Mellon, A/C No: 8900482627, ABA: 021000018, or such other bank account notified by the Administrative Agent to the Undersigned.

"Cuenta del Agente Administrativo" significa la cuenta bancaria que mantiene el Agente Administrativo en The Bank of New York Mellon, No. A/C 8900482627, ABA: 021000018, o cualquier otra cuenta que el Agente Administrativo notifique a la Suscrita.

"Applicable Margin" means a rate per annum equal to [3.75]%.

"Margen Aplicable" significa una tasa del [3.75]% anual.

"Base Rate" means, for any day, a rate per annum equal to the greatest of: (a) the Prime Rate in effect on such day (b) the Federal Funds Effective Rate in effect on such date plus 1/2 of 1%, and (c) the LIBO Rate plus 1%. If the Administrative Agent shall have reasonably determined (which determination shall be conclusive absent manifest error) that is unable to ascertain the Federal Funds Effective Rate for any reason, the Base Rate shall be determined without regard to clause

"Tasa Base" significa para cualquier día, la tasa anual equivalente a lo que resulte mayor de entre: (a) la Tasa Prime correspondiente a dicho día, (b) la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) correspondiente a dicho día, más ½ de 1% y (c) la Tasa LIBO más 1%. Si el Agente Administrativo razonablemente determina (cuya determinación que será definitiva en ausencia de error manifiesto) que no es posible determinar la Tasa de Interés de

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.34.37.35.32.34.31.38
13080.74 20:01:41

(b) of the preceding sentence until the circumstances giving rise to such liability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, respectively.

Fondos Federales (*Federal Funds Effective Rate*) circunstancias giving rise to cualquier razón, la Tasa Base será determinada sin considerar la sección (b) de la oración antes mencionada hasta que las circunstancias que den origen a dicha situación dejen de existir. Cualquier cambio en la Tasa Base causado por un cambio en la Tasa Prime, la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) o la Tasa LIBO, será efectiva a partir, e incluyendo el día en que dicho cambio surta efectos en la tasa "*prime*," la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) o la Tasa LIBO, respectivamente.

"Business Day" means a day other than a Saturday or Sunday on which (a) for all purposes other than as set forth in clause (b) of this definition, commercial banks are open for general business in New York, New York, Mexico City, Mexico and Panama City, Panama, and (b) when used solely in connection with the determination of or the calculation of interest based upon the LIBO Rate, dealings in Dollar deposits are carried out between banks in the London interbank market.

"Día Hábil" significa un día que no sea sábado o domingo en que (a) para todos los motivos, salvo en el caso mencionado en el clausula (b) de la presente definición los bancos comerciales lleven a cabo operaciones bancarias en la ciudad de Nueva York, Nueva York, en la Ciudad de México, México y en la Ciudad de Panamá, Panamá; y (b) únicamente cuando se utilice en relación con la determinación o el cálculo de intereses con base en la misma de la Tasa LIBO, los bancos lleven a cabo operaciones de depósito en Dólares en el mercado interbancario de Londres.

"Code" means the Internal Revenue Code of 1986, as amended.

"Código" significa el Código Fiscal de 1986 de los Estados Unidos de América (*Internal Revenue Code*), según sea modificado.

"Excluded Taxes" means, with respect to the holder of this Promissory Note, (i) Taxes imposed on or measured by its overall net income (however denominated), franchise taxes and branch profit taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the applicable law of which the holder of this Promissory Note is organized, is doing business, is considered resident for tax purposes or in which its principal office is located or in which its applicable lending office is located, (ii) any Taxes imposed by reason of any connection between the holder of this Promissory Note and the taxing jurisdiction

"Impuestos Excluidos" significa respecto al tenedor de este Pagaré (i) Impuestos establecidos en o determinados, con base al nivel de su ingreso neto (cualquiera que sea su denominación), impuestos de franquicia y de ingresos atribuibles a sucursales (establecidos en lugar de impuestos sobre la renta) previstos en la legislación de la jurisdicción (o cualquier subdivisión política) donde el tenedor de este Pagaré esté constituido, lleve a cabo su negocio sea residente para efectos fiscales o en la cual se encuentre su centro principal de negocios o su oficina de fondeo, (ii) cualquier Impuesto establecido con base a cualquier relación entre el tenedor de este Pagaré



2022-05-38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30630.30.40.30.15.30.30.30.35.30.34.37.55.12.34.71.38
100824.290514.

Exhibit A-4

other than receiving payments hereunder; and (iii) any United States Federal Withholding Taxes imposed pursuant to FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of this date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471 (b) (1) of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depository institutions, as determined in such manners as the Federal Reserve Bank of New York shall set forth on its public website from time to time and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal fund effective rate; provided, that if the Federal Fund Effective Rate for any day is less than zero, the Federal Fund Effective Rate for such day will be deemed to be zero.

"Governmental Authority" means the government of the United States, Mexico, Panama or any other nation, any state, department or any other political subdivision thereof, and any governmental body, agency, authority,

y la jurisdicción impositiva del impuesto distinto del recibo del pago bajo este Pagaré; y (iii) cualquier retención de Impuestos federales impuesta por los Estados Unidos de América conforme a FATCA.

"FATCA" significa la Secciones 1471 a 1474 del Código, a esta fecha (o cualquier modificación o versión que la sustituya que sea sustancialmente comparable y no materialmente más onerosa en su cumplimiento), cualquier regulación o interpretación oficial presente o futura en relación con la misma y cualesquier convenios o contratos celebrados conforme a la Sección 1471 (b) (1) del Código.

"Tasa de Interés de Fondos Federales (Federal Funds Effective Rate)" significa, para cualquier día, la tasa de interés calculada por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) con base en las transacciones de fondos federales de tal día correspondiente según sea determinado de tal manera por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) publicada en su página de internet de tiempo en tiempo, y publicada el Día Hábil inmediato siguiente por el Banco de la Reserva Federal de los Estados Unidos de América en Nueva York como la tasa de interés aplicable a fondos federales; en el entendido que, si la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) para cualquier día es menor de cero, la Tasa de Interés de Fondos Federales (Federal Funds Effective Rate) para dicho día será cero.

"Autoridad Gubernamental" significa el gobierno de los Estados Unidos de América, de México, de Panamá o de cualquier otra nación, cualquier estado, departamento u otra subdivisión política de los mismos y cualquier cuerpo gubernamental,

JAVIER MONTER.COM.MX
Con firme No. 2020-00074310-0800

Exhibit D-1

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,35,30,30,30,35,32,34,11,38
13082924.20-01-04

instrumentality, regulatory body, court, tribunal, central bank or other entity (including any federal or other association of or with which any such nation may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

agencia gubernamental, autoridad, cuerpo regulatorio, corte, tribunal, banco central o cualquier otra entidad (incluyendo, sin limitación, cualquier asociación federal o de cualquier otra naturaleza de la cual dicha nación sea miembro o con la cual esté asociada) que ejerza funciones ejecutivas, legislativas, judiciales, fiscales, regulatorias o administrativas respecto de, o que pertenezcan al gobierno.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Impuestos Indemnizables" significa todos los Impuestos distintos de los Impuestos Excluidos.

"Interest Payment Date" shall mean the last day of each Interest Period.

"Fecha de Pago de Intereses" significa el último día de cada Periodo de Intereses.

"Interest Period" means the period commencing on the date hereof and ending on [•], [•] and thereafter, each period commencing on the last day of the immediately preceding Interest Period and ending on the [•] day of the calendar month that is three months thereafter; provided, that if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) in no case shall any Interest Period end after the Maturity Date.

"Periodo de Intereses" significa el periodo que comienza en la fecha de suscripción de este Pagaré y que termina el día [•] de [•] de [•], y después de dicho primer Periodo de Intereses, cada periodo que comience en el último día del Periodo de Intereses inmediato anterior y que termine en el día [•] del mes calendario que sea tres meses después; en el entendido, que (i) si cualquier Periodo de Intereses terminase en un día que no sea un Día Hábil, dicho Periodo de Intereses se extenderá al Día Hábil inmediato siguiente, salvo que dicho Día Hábil siguiente corresponda al siguiente mes calendario, en cuyo caso dicho Periodo de Intereses terminará el Día Hábil inmediato anterior, y (ii) ningún Periodo de Intereses terminará después de la Fecha de Vencimiento.



"Interpolated Rate" means, at any time, the rate per annum equal to the rate that results from interpolating on a linear basis between (a) the LIBOR Screen Rate for the longest period (for which such LIBOR Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period (as such term is defined below) and (b) the LIBOR Screen Rate for the shortest period (for which such LIBOR Screen Rate is available) that is longer than the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate is less than zero, the

"Tasa Interpolada" significa, en cualquier momento, la tasa anual equivalente a la tasa que resulte de interpolar en una base lineal entre (a) la LIBOR Publicada por el periodo más largo (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más corto que el Periodo del Interés Impactado (según dicho término se define más adelante) y (b) la LIBOR Publicada para el periodo más corto (para el que dicha LIBOR Publicada se encuentre disponible) que sea más largo que el Periodo de Intereses Impactado, en cada caso, en dicho

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.15.30.30.30.30.30.30.30.45.73.51.32.4.31.38
13.08.024 20.01.41

"Interpolated Rate" at such time shall be deemed to be zero.

momento; en el entendido que, en caso que la Tasa Interpolada sea menor a cero, la "Tasa Interpolada" en dicho momento deberá ser considerada como cero.

"LIBO Rate" means, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. London, England time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the LIBOR Screen Rate for deposits in Dollars (for delivery on the last day of such Interest Period) on or on such other date on which interest is paid, as applicable) for a period approximately equal to such Interest Period; provided, that in no event shall "LIBO Rate" be less than zerofor purposes of this Promissory Note; provided, further, that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" for such Interest Period (an "Impacted Interest Period"), shall be the Interpolated Rate.

"Tasa LIBO" significa, para cualquier Periodo de Intereses, la tasa de interés anual determinada por el Agente Administrativo aproximadamente a las 11:00 a.m. hora de Londres, Inglaterra, en la fecha que sea dos Días Hábiles previos al inicio de dicho Periodo de Intereses por referencia a la LIBOR Publicada, para depósitos en Dólares (para entrega el último día de dicho Periodo de Intereses o en cualquier otra fecha en la que los intereses sean pagaderos, según sea aplicable) por un periodo aproximadamente igual a dicho Periodo de Interés; en el entendido que, en ningún caso la "Tasa LIBO" será menor a 0.0% para efectos de este Pagaré, en el entendido además, que en caso que la tasa de interés no sea determinable de conformidad con lo señalado en la presente definición, la "TASA LIBO" para dicho Periodo de Interés (un "Periodo de Interés Impactado") deberá ser la Tasa Interpolada.



"LIBOR Screen Rate" means the London Interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) ("LIBOR") (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration Limited, or any authorized information vendor for the purpose of displaying such rates), or a comparable or successor rate which rate is approved by the Administrative Agent.

"LIBOR Publicada" significa la tasa de referencia interbancaria de Londres (London Interbank offered rate) administrada por ICE Benchmark Administration Limited (o cualquier otra persona que asuma la administración de dicha tasa de referencia) ("LIBOR") (conforme a lo establecido por el Servicio de Información Bloomberg (Bloomberg Information Service) o cualquier sucesor del mismo o cualquier otro servicio seleccionado por el Agente Administrativo que sea nombrado por ICE Benchmark Administration Limited como un vendedor de información autorizado para efectos de publicar dicha tasa), o una tasa comparable o una tasa que la sustituya, cuya tasa sea aprobada por el Agente Administrativo.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Credit Suisse AG as its prime rate in effect as its

"Tasa Prime" significa la tasa de interés anual públicamente anunciada de tiempo en tiempo por Credit Suisse AG como su tasa "prime" aplicable

Exhibit D-6

principal office in New York City. The prime rate is a rate set by Credit Suisse AG based upon various factors including Credit Suisse AG's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate. Any change in such prime rate announced by Credit Suisse AG shall take at the opening of business on the day specified in the public announcement of such change.

en sus principales oficinas en la ciudad de Nueva York. La tasa "prime" es una tasa establecida por Credit Suisse AG con base en diversos factores incluyendo los costos y retornos esperados de Credit Suisse AG, las condiciones económicas generales y diversos factores, y se usa como punto de referencia para la fijación de precios de ciertos créditos; cuyos precios podrán estar, por encima o por debajo de dicha tasa. Cualquier cambio anunciado a la tasa "prime" por Credit Suisse AG entrará en vigor a partir del inicio del día hábil especificado en el anuncio público de dicho cambio.

"Other Taxes" means any and all present or future stamp, transfer, court or documentary taxes or any other excise or property taxes, charges or similar levies (together with any interest, charges, penalties, additions to tax and additional amounts) arising from any payment made under this Promissory Note or from the execution, delivery or enforcement of, or otherwise with respect to, this Promissory Note.

"Otros Impuestos" significa cualesquier impuestos de timbre o documentación, cualesquiera impuestos de uso y consumo o similares (junta con todos los intereses, cargos, penas adicionales o impuestos y otras cantidades adicionales), en todos los casos, presentes o futuros, que surjan como consecuencia de cualquier pago hecho de conformidad con este Pagaré o de la Suscripción, entrega o ejecución de, o por cualquier otro motivo en relación con este Pagaré.



"Panama" means the Republic of Panama.

"Panamá" significa la República de Panamá.

"Taxes" means any and all present or future taxes (including value added tax), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholding) whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"Impuestos" significa todos y cada uno de los (including value added tax), levies, impuestos, (incluyendo el impuesto al valor agregado), derechos, deducciones, cargos o retenciones, presentes o futuros, de cualquier naturaleza junto con cualesquier intereses, cargos, penas, adiciones de impuestos o cantidades adicionales impuestas o cobradas por cualquier Autoridad Gubernamental.

Any and all payments (including any prepayments) to be made by the Undersigned hereunder whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim, and shall be made prior to 2:00 p.m. (New York City time) on the due dates specified in this Promissory Note, in Dollars and in immediately available funds, to the

Todos y cada uno de los pagos (incluyendo cualesquier pago que deba hacer la Suscrita conforme a este Pagaré ya sea por concepto de principal, interés, comisiones o por cualquier otro concepto, serán efectuados sin compensación o reclamación alguna, antes de las 2:00 p.m. (hora de la Ciudad de Nueva York), en las fechas de pago previstas en este Pagaré, en Dólares y en fondos

Exhibit D-1

JACOBO GUADALUPE MARTINEZ JUARES
20.30.30.30.31.30.30.30.35.30.34.37.33.32.34.31.38
13.08.24.20.01.41

Administrative Agent's Account.

inmediatamente disponibles, en la Cuenta del Agente Administrativo.

The Undersigned agrees to reimburse all reasonable out-of-pocket expenses of the holder hereof, if any, incurred in connection with the enforcement of this Promissory Note (including, without limitation, the fees, charges and disbursements of any counsel for the holder hereof).

La Suscrita conviene en reembolsar todos los gastos razonables frente a terceros incurridos por el tenedor de este Pagaré, en su caso, en relación con la ejecución del presente Pagaré (incluyendo, sin limitación, los honorarios, costos y gastos legales de los asesores legales del tenedor de este Pagaré).

Any and all payments by or on account of any obligation of the Undersigned hereunder shall be made free and clear of and without any withholding or deduction for or on account of any Indemnified Taxes or Other Taxes, provided, however, that if the Undersigned shall be required to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required withholdings or deductions, the holder of this Promissory Note receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) the Undersigned shall make such withholdings or deductions and (iii) the Undersigned shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law.

Todos y cada uno de los pagos hechos por o a nombre de cualquier obligación de la Suscrita de conformidad con este Pagaré se harán libres de y sin deducción por cualesquier Impuestos Indemnizables u Otros Impuestos; en el entendido, sin embargo, que en caso de que la Suscrita sea requerida a deducir cualesquier Impuestos Indemnizables u Otros Impuestos respecto de dichos pagos, entonces (i) las cantidades pagaderas al tenedor de este Pagaré se incrementarán en las cantidades adicionales necesarias para que dicho tenedor reciba un monto igual a la suma que hubiere recibido si dichas deducciones o retenciones no hubieran sido realizadas, (ii) la Suscrita efectuará dichas deducciones o retenciones (y (iii) la Suscrita pagará el total de las cantidades que deduzca o retenga a la Autoridad Gubernamental correspondiente, de conformidad con la legislación aplicable.



The Undersigned shall indemnify the holder of this Promissory Note, within 10 (ten) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such holder, and all reasonable expenses arising therefrom or with respect thereto, plus interest thereon for each day from (and including) the day of delivery to the Undersigned of a request for such payment to (but excluding) the date of actual reimbursement at a rate per annum equal to the interest rate then applicable to this Promissory Note, whether or not such

La Suscrita se obliga a indemnizar al tenedor de este Pagaré, dentro de los 10 (diez) Días Hábiles siguientes al requerimiento por escrito para dichos efectos, por el monto total de cualesquier Impuestos Indemnizados u Otros Impuestos pagados por dicho tenedor, y todos los gastos razonables derivados de o relacionados con los mismos, más intereses sobre dicho monto por cada día desde (e incluyendo) el día en que la Suscrita reciba el requerimiento por escrito de dicho pago, hasta (pero excluyendo) la fecha de reembolso

2022-01-25 @ PIER.COM 0800

Exhibit D-1

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.33.33.30.30.30.30.33.30.37.33.32.34.31.38
13082-25 30-01-61

Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority."

correspondiente, a una tasa anual equivalente a la tasa de interés que en ese momento sea aplicable al presente Pagaré, independientemente de que dichos Impuestos indemnizables u Otros Impuestos hayan sido o no determinados o impuestos correcta o legalmente por la Autoridad Gubernamental correspondiente.

For everything related to this Promissory Note, the Undersigned designates the following as its domicile:

Para todo lo relacionado con este Pagaré, la Suscrita designa como su domicilio el siguiente:

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Mexico City, México
Attention: Carlos E. Ochoa Valdés, Claudia Jolly and Raúl A. Farías
Telephone: +52.55.5228.9700
Email: cochoa@creditoreal.com.mx, cjolly@creditoreal.com.mx and rfarias@creditoreal.com.mx.

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Ciudad de México, México
Atención: Carlos E. Ochoa Valdés, Claudia Jolly y Raúl A. Farías
Teléfono: +52.55.5228.9700
Correo electrónico: cochoa@creditoreal.com.mx, cjolly@creditoreal.com.mx y rfarias@creditoreal.com.mx.



The Undersigned extends the period of presentment for payment of this Promissory Note until the date that is six (6) months after the Maturity Date, in terms of Article 128 of the Mexican General Law of Negotiable Instruments and Credit Transactions.

La Suscrita extiende el plazo para la presentación para pago de este Pagaré hasta la fecha que sea seis (6) meses después de la Fecha de Vencimiento, en los términos del artículo 128 de la Ley General de Títulos y Operaciones de Crédito.

This Promissory Note is issued in accordance with and governed by the laws of the State of New York, United States of America, provided that in connection with any legal action or proceeding (other than an action to enforce a legal judgment obtained in other jurisdiction brought in respect of this Promissory Note in the courts of Mexico, this Promissory Note shall be deemed to be made under the laws of Mexico, and for such purposes shall be governed by and construed in accordance with the laws of Mexico. The Undersigned expressly and irrevocably submits to the jurisdiction of (a) the competent courts of the State of New York sitting

Este Pagaré se suscribe de conformidad con y se rige por las leyes del Estado de Nueva York, Estados Unidos de América, en el entendido que, en relación con cualquier acción o procedimiento (distinto de una acción para ejercer una sentencia en otra jurisdicción) que surja en respecto con este Pagaré, ante los tribunales de México, este Pagaré será considerado como hecho bajo las leyes de México, y para dichos propósitos será regido por, e interpretado de conformidad con, las leyes de México. La Suscrita expresa e irrevocablemente se somete a la jurisdicción de (a) las cortes competentes del Estado de Nueva York con sede en el Condado de

2022-06-05T11:00:00.000-05:00

Exhibit 14

in New York County and of the United States District Court of the Southern District of New York, and any other appellate court in the State of New York, and (b) the competent federal courts of Mexico City, Mexico, at the election of the party initiating the action, in any action or proceeding arising out of or relating to this Promissory Note, or for recognition or enforcement of any judgment. The Undersigned of this Promissory Note hereby expressly, unconditionally and irrevocably waives its right to any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason.

This Promissory Note is executed in both the English and Spanish languages, both versions of which shall bind the Undersigned; provided, however, that in the event of any suit or action brought in New York, United States of America, the English version shall prevail and, in the event of any suit or action brought in Mexico, the Spanish version shall prevail.

The Undersigned hereby waives diligence, demand, protest and notices of any kind whatsoever. The Undersigned hereby binds itself to pay costs of collection and attorney's fees in the case of default in the timely payment of this Promissory Note.

*IN WITNESS WHEREOF*, the Borrower has duly executed this Promissory Note as of the date mentioned below.

Nueva York y de la Corte de Distrito de los Estados Unidos de América del Distrito Sur de Nueva York, y cualquier otro tribunal de apelación en el Estado de Nueva York, y (b) los tribunales federales competentes de la Ciudad de México, México, a elección de la parte que inicie la acción, en cualquier acción o procedimiento que surja como consecuencia de o en relación con este Pagaré, o para el reconocimiento o ejecución de cualquier sentencia. La Suscrita en este acto renuncia, de manera expresa, incondicional e irrevocable, a cualquier otra jurisdicción que pudiere corresponderle en razón de su domicilio presentes o futuros o por cualquier otro motivo.

El presente Pagaré se suscribe en los idiomas inglés y español, obligando ambas versiones a la Suscrita; en el entendido, sin embargo, de que en caso de cualquier demanda o acción en Nueva York, Estados Unidos de América, la versión en inglés será la que prevalezca y en caso de cualquier demanda o acción en México, la versión en español será la que prevalezca.

La Suscrita por el presente, renuncia expresa e irrevocablemente a cualquier diligencia, demanda, protesto o notificación de cualquier clase. La Suscrita se obliga a pagar los gastos de cobranza y honorarios de abogados en caso de incumplimiento en el pago oportuno de este Pagaré.

*EN VIRTUD DE LO CUAL*, la Suscrita ha firmado debidamente este Pagaré en la fecha abajo mencionada.

Ciudad de México, México, a [•] de [•] de [•].
Mexico City, Mexico, on [•], [•].

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.**

---

Name/Nombre: [•]
Title/Cargo: Attorney-in-Fact / Apoderado

Exhibit D-4

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
13/08/24 20:01:41

Confidential
2022-03-10 19:25:58 -0800

Exhibit D-2

Form of Promissory Note (Marzvalley)

[Attached]

CONFIDENTIAL
Credito Real MTN Program
JAVIER.PICHARDO@HUS.OLAPAPER.COM
Monday, January 4, 2021 7:36:28 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.11.30.30.30.38.39.33.30.14.37.33.32.34.31.38
139654 20-01-01

Exhibit D-4

Form of Promissory Note to be issued by Marevalley and guaranteed *(por aval)* by Crédito Real (Tranche B)

| NON-NEGOTIABLE PROMISSORY NOTE | PAGARÉ NO NEGOCIABLE |
|---|---|
| U.S.$ [*] DOLLARS | E.U.$ [*] DÓLARES |

| | |
|---|---|
| For value received, the undersigned, MAREVALLEY CORPORATION, a corporation duly organized and validly existing under the laws of Panama (the "Undersigned"), by this Promissory Note (the "Promissory Note"), unconditionally promises to pay to the order of U.S.$ [*] (the "Lender") the principal sum of U.S.$ [*] ([*] Dollars 00/100) legal currency of the United States of America ("Dollars"), plus interest thereon pursuant to the terms hereof, in Dollars, in immediately available funds, in the Administrative Agent's Account (as defined below), in 7 (seven) installments of principal which shall be due and payable on each Interest Payment Date (as defined below) falling on the months specified in the table below and on the Maturity Date (as defined below) and in the amounts set forth on the payment schedule below; provided that, if any such date is not a Business Day (as defined below), the relevant payment shall be made on the next succeeding Business Day, except that if the Maturity Date is not a Business Day, the relevant payment shall be made the immediately preceding Business Day (each such date a "Principal Repayment Date"). | Por valor recibido, la suscrita, MAREVALLEY CORPORATION, una sociedad anónima debidamente constituida y válidamente existente de conformidad con las leyes de Panamá (la "Suscrita"), por este pagaré (el "Pagaré") promete incondicionalmente pagar a la orden de [*] (el "Acreditante") la suma principal de E.U. $[*] ([*] Dólares 00/100), moneda de curso legal de los Estados Unidos de América ("Dólares"), más intereses sobre la misma conforme a este Pagaré, en Dólares, en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo (según se define más adelante), mediante 7 (siete) amortizaciones de principal, las mismas que vencerán y serán pagaderas en cada Fecha de Pago de Intereses (según se define más adelante) que corresponda a los meses especificados en la tabla siguiente y en la Fecha de Vencimiento (según se define más adelante) en las cantidades que se especifican en el extendido tabla cualquiera de dichas fechas no fuera un Día Hábil (según se define más adelante), dicho pago se hará el Día Hábil inmediato siguiente, excepto que si la Fecha de Vencimiento de este Pagaré no diera un Día Hábil, dicho pago se hará el Día Hábil inmediato anterior (cada uno, una "Fecha de Pago de Principal"). |

| Principal Repayment Date | Amount of Principal Repayment | Fecha de Pago de Principal | Monto de Pago de Principal |
|---|---|---|---|
| [*]. | 14% of the aggregate principal amount of this Promissory Note. | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*],[*]. | 14% of the aggregate principal amount of this Promissory Note. | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*],[*]. | 14% of the aggregate | | |

Exhibit D-2

| | | |
|---|---|---|
| | principal amount of this Promissory Note | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*],[*]. | 14% of the aggregate principal amount of this Promissory Note. | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*],[*]. | 14% of the aggregate principal amount of this Promissory Note. | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*],[*]. | 14% of the aggregate principal amount of this Promissory Note. | [*] de [*]. | 14% del monto total de principal de este Pagaré. |
| [*], [*] (the "Maturity Date"). | Aggregate principal amount of this Promissory Note outstanding on such Principal Repayment Date. | [*] de [*] de [*] (la "Fecha de Vencimiento"). | Saldo insoluto de principal de este Pagaré en esta Fecha de Pago de Principal. |

Prepayment of any amounts due hereunder shall be applied to the payment of any unpaid installments of this Promissory Note, in inverse order of maturity.

El pago anticipado de cualquier cantidad conforme a este Pagaré será aplicado al pago de las amortizaciones pendientes de pago de este Pagaré en orden inverso al de su vencimiento.

The obligation of the Undersigned and any guarantor (avalisant) to repay the principal of this Promissory Note, together with interest accrued thereon and all other amounts payable hereunder shall be dischargeable only by payment in Dollars, outside of the territory of Mexico, as set forth in this Promissory Note.

La obligación de la Suscriptora y cualquier avalista de pagar el principal de este Pagaré, junto con los intereses devengados y cualesquiera otras sumas pagaderas bajo el mismo, sólo podrán liberarse mediante el pago en Dólares, fuera del territorio de México, en los términos previstos en este Pagaré.

The Undersigned also unconditionally promises to pay, from the date hereof and up to but excluding the date on which the outstanding principal amount of this Promissory Note is paid in full, interest on the outstanding principal amount of this Promissory Note, for each day during each Interest Period (as defined below) at a rate per annum equal to the LIBO Rate (as defined below) determined for the Interest Period then in effect, plus the Applicable Margin (as defined below) (the "Interest Rate"). Interest shall

La Suscriptora además promete incondicionalmente pagar a partir de la fecha de este Pagaré y hasta pero excluyendo la fecha en que el monto principal insoluto de este Pagaré sea pagado en su totalidad, intereses sobre el monto principal insoluto de este Pagaré por cada día durante cada Período de Intereses (según se define más adelante) a una tasa anual equivalente a la Tasa LIBO (según se define más adelante) determinada para el Período de Intereses vigente en dicho momento, más el Margen Aplicable (según se

2022-09-ICC-08-0800
CONFIDENTIAL
Exhibit C

be payable in arrears on each Interest Payment Date (as defined below), on the Maturity Date, on the date of any prepayment (on the amount prepaid), and at maturity and after such maturity, on demand.

Notwithstanding the foregoing, (a) any principal amount not paid when due under this Promissory Note, shall bear interest for each day until paid, payable on demand, at a rate per annum that is 2% in excess of the Interest Rate then applicable pursuant hereto, and at any time following the termination of the Interest Period then in effect, such rate shall be equal to 2% plus the Base Rate determined from time to time the Applicable Margin, and (b) to the extent permitted by applicable law, any overdue interest hereunder shall bear interest at a rate equal to 2% plus the Base Rate determined from time to time plus the Applicable Margin. Accrued and unpaid interest on past due amounts (including interest on past due interest, to the extent permitted by applicable law) shall be due and payable upon demand.

All interest hereunder will be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day).

As used in this Promissory Note, the following terms have the meanings specified below:

"Administrative Agent" means Credit Suisse AG, Cayman Islands Branch.

"Administrative Agent's Account" means the bank account maintained by the Administrative Agent with The Bank of New York Mellon. A/C No. 8900492627, ABA 021000018, or such

define más adelante) (la "Tasa de Interés"). Los intereses serán pagados conforme venzan en cada Fecha de Pago de Intereses (según se define más adelante), en la Fecha de Vencimiento, en la fecha de cualquier prepago (sobre la cantidad prepagada), y a su vencimiento y después a dicho vencimiento, a la vista.

Sin perjuicio de lo anterior, (a) cualquier monto de principal que no sea pagado cuando sea debido conforme al presente Pagaré, devengará intereses moratorios por cada día hasta ser pagado, pagaderos a la vista, a una tasa anual equivalente a la Tasa de Interés aplicable en ese momento conforme al presente Pagaré, más 2%, y una vez vencido el Período de Interés correspondiente a dicha Tasa de Interés, la tasa de intereses moratorios será una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable, y (b) en la medida permitida por la legislación aplicable, cualquier interés vencido y no pagado En la fecha en que sea debido devengará intereses moratorios a una tasa anual equivalente a la suma de 2% más la Tasa Base determinada de tiempo en tiempo más el Margen Aplicable. Los intereses moratorios (incluyendo intereses sobre intereses en la medida permitida por la legislación aplicable) serán debidos y pagaderos a la vista.

Todos los intereses conforme a este Pagaré se calcularán sobre la base de un año de 360 días y el número de días efectivamente transcurridos (incluyendo el primero pero excluyendo el último día).

Según se utilizan en este Pagaré, los siguientes términos tienen los siguientes significados:

"Agente Administrativo" significa Credit Suisse AG, Cayman Islands Branch.

"Cuenta del Agente Administrativo" significa la cuenta bancaria que mantiene el Agente Administrativo en The Bank of New York Mellon No. A/C 8900492627, ABA: 021000018,



Exhibit D-2

ACUERDO GUADALUPE MARTINEZ FLORES
30.30,30,30.31,30.30,30.30,30.30.30.35,30.35,30.35,35,32,34,31,38
13/08/21 20:01:41

JACOBO GUADALUPE MARTINEZ FLORES
30.36.30.30.31.29.30.30.36.30.35.30.34.37.33.32.34.31.38
13.08.24.20.01.41

either bank accounts notified by the Administrative o cualquier otra cuenta que el Agente
Agent to the Undersigned.    Administrativo notifique a la Suscrita.

"**Applicable Margin**" means a rate *per annum* "**Margen Aplicable**" significa una tasa del
equal to [4.00]%.    [4.00]% anual.

"**Base Rate**" means, for any day, a rate *per annum* "**Tasa Base**" significa, para cualquier día, la tasa,
equal to the greatest of: (a) the Prime Rate in anual, equivalente a lo que resulte mayor de entre:
effect on such day (b) the Federal Funds Effective (a) la Tasa Prime correspondiente a dicho día; (b)
Rate in effect on such date plus 1/2 of 1%, and (c) la Tasa de Interés de Fondos Federales (*Federal
the LIBO Rate plus 1%. If the Administrative Funds Effective Rate*) correspondiente a dicho
Agent shall have reasonably determined (which día, más ½ de 1%, y (c) la Tasa LIBO más 1%. Si
determination shall be conclusive absent manifest el Agente Administrativo razonablemente
error) that is unable to ascertain the Federal determina (misma determinación que será
Funds Effective Rate for any reason, the Base definitiva en ausencia de error manifiesto) que no
Rate shall be determined without regard to clause es posible determinar la Tasa de Interés de
(b) of the preceding sentence until the Fondos Federales (*Federal Funds Effective Rate*)
circumstances giving rise to such inability no por cualquier razón, la Tasa Base, será
longer exist. Any change in the Base Rate due to determinada sin considerar la sección (b) de la
a change in the Prime Rate, the Federal Funds oración antes mencionada hasta que las
Effective Rate or the LIBO Rate shall be effective circunstancias que den origen a dicha situación
from and including the effective date of such dejen de existir. Cualquier cambio en la Tasa
change in the Prime Rate, the Federal Funds Base causado por un cambio en la Tasa Prime, la
Effective Rate or the LIBO Rate, respectively. Tasa de Interés de Fondos Federales (*Federal
    Funds Effective Rate*) o la Tasa LIBO, será
    efectivo a partir e incluyendo el día en que dicho
    cambio surta efectos en la tasa "Prime", la Tasa de
    Interés de Fondos Federales (*Federal Funds
    Effective Rate*) o la Tasa LIBO, respectivamente.

"**Business Day**" means a day other than a "**Día Hábil**" significa un día que no sea sábado o
Saturday or Sunday on which (a) for all purposes, domingo en que (a) para todos los efectos, salvo
other than as set forth in clause (b) of this en el caso mencionado en el cláusula (b) de la
definition, commercial banks are open for general presente definición, los bancos comerciales lleven
business in New York, New York, Mexico City, a cabo operaciones bancarias en la ciudad de
Mexico and Panama City, Panama, and (b) when Nueva York, Nueva York, en la Ciudad de
used solely in connection with the determination México, México y en la Ciudad de Panamá,
of or the calculation of interest based upon, the Panamá y (b) únicamente cuando se utilice en
LIBO Rate, dealings in Dollar deposits are relación con la determinación o el cálculo de
carried out between banks in the London inter- intereses con base en la misma de la Tasa LIBO,
bank market.    los bancos lleven a cabo operaciones de depósito
    en Dólares, en el mercado Interbancario de
    Londres.

"**Code**" means the Internal Revenue Code of "**Código**" significa el Código Fiscal de 1986 de
1986, as amended.    los Estados Unidos de América (*Internal Revenue*

2022-05-10-0800



MAIN PROGRAM
2022.17.35.59.35 DRAFTER

Exhibit D-

Conför, según sea modificado.

"Excluded Taxes" means, with respect to the holder of this Promissory Note, (i) Taxes imposed on or measured by its overall net income (however denominated), franchise taxes, and branch profit taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the applicable law of which the holder of this Promissory Note is organized, is doing business, is considered a resident for tax purposes or in which its principal office is located or in which its applicable lending office is located, (ii) any Taxes imposed by reason of any connection between the holder of this Promissory Note and the taxing jurisdiction other than receiving payments hereunder; and (iii) any United States federal withholding Taxes imposed pursuant to FATCA.

"Impuestos Excluidos" significa, respecto al tenedor de este Pagaré (i) Impuestos establecidos o determinados con base al total de su ingreso neto (cualquiera que sea su denominación), impuestos de franquicia y de ingresos atribuibles a sucursales (establecidos en lugar de impuestos sobre la renta), previstos en la legislación de la jurisdicción (o cualquier subdivisión política donde el tenedor de este Pagaré esté constituido, lleve a cabo su negocio, sea residente para efectos fiscales o en la cual se encuentre su centro principal de negocios o su oficina de fondeo, (ii) cualquier Impuesto establecido con base a cualquier relación entre el tenedor de este Pagaré y la jurisdicción impositiva del impuesto distinto del recibo del pago bajo este Pagaré; y (iii) cualquier retención de Impuestos federales impuesta por los Estados Unidos de América conforme a FATCA.

"FATCA" means Sections 1471 through the Code, as of this date (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FATCA" significa la Secciones 1471 a 1474 del Código, a esta fecha (o cualquier modificación o versión que le signifique que sea sustancialmente comparable y no materialmente más onerosa en su cumplimiento), cualquier regulación e interpretación oficial presente o futura en relación con la misma y cualesquier convenios o contratos celebrados conforme a la Sección 1471 (b) del Código.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that if the Federal Reserve Bank of New York Fund Effective Rate for any day is less than zero, the Federal Fund Effective Rate for such day will be deemed to be zero.

"Tasa de Interés de Fondos Federales (Federal Funds Effective Rate)" significa, para cualquier día, la tasa de interés calculada por la Reserva Federal del Banco de la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) con base en publicar website (en su tiempo) las secciones de fondos federales del día en la próxima manera por la Reserva Federal del Banco de la fund effective rate, previsto, que si la Reserva Federal de los Estados Unidos de América en Nueva York (Federal Reserve Bank of New York) y publicado en su página de internet de tiempo en tiempo) y publicado el Día Hábil

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,30,33,30,30,31,33,32,34,31,38
130628 20:01:41

Credito Real
PICHARDO@
25.250-0800
2022-

Exhibit 2

inmediato siguiente por el Banco de la Reserva Federal de los Estados Unidos de América en Nueva York como la tasa de interés aplicable a fondos federales en el entendido que, si la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) para cualquier día es menor de cero, la Tasa de Interés de Fondos Federales (*Federal Funds Effective Rate*) para dicho día, será cero.

"Governmental Authority" means the government of the United States, Mexico, Panama or any other nation, any state, department or any other political subdivision thereof, and any governmental body, agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity (including any federal or other association of or with which any such nation may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions pertaining to government.

"Autoridad Gubernamental" significa el gobierno de los Estados Unidos de América, de México, de Panamá o de cualquier otra nación, cualquier estado, departamento u otra subdivisión política de los mismos y cualquier cuerpo gubernamental, autoridad, cuerpo regulatorio, corte, tribunal, banco central o cualquier otra entidad (incluyendo, sin limitación, cualquier asociación federal o de cualquier otra naturaleza de la cual dicha nación sea miembro o de la cual esté asociada) que ejerza funciones ejecutivas, legislativas, judiciales, fiscales, regulatorias o administrativas respecto de, o que pertenezcan al gobierno.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Impuestos Indemnizables" significa todos los Impuestos distintos de los Impuestos Excluidos.

"Interest Payment Date" shall mean the last day of each Interest Period.

"Fecha de Pago de Intereses" significa el último día de cada Periodo de Intereses.

"Interest Period" means the period commencing on the date hereof and ending on [•], [•] and thereafter, each period commencing on the last day of the immediately preceding Interest Period and ending on the [•]ᵗʰ day of the calendar month that is three months thereafter, provided, that (i) if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) in no case shall any Interest Period end after the Maturity Date.

"Periodo de Intereses" significa el periodo que comienza en la fecha de suscripción de este Pagaré y que termina el día [•] de [•] y que después de dicho primer Periodo de Intereses, cualquier periodo que comience en el último día del Periodo de Intereses inmediato anterior y que termine en el día [•] del mes calendario que sea tres meses después, en el entendido, que (i) si cualquier Periodo de Intereses termina en un día que no sea un Día Hábil, dicho Periodo de Intereses se extenderá al Día Hábil inmediato siguiente, salvo que dicho Día Hábil siguiente corresponda al siguiente mes calendario, en cuyo caso dicho Periodo de Intereses terminará el Día.



JACOBO GUADALUPE MARTINEZ FLORES
30.29.30.30.15.38.30.30.30.30.53.30.34.37.35.32.34.31.38
13.08.24 20:01:41

2022-04-20.13.08.24 - WWW.MRPPH.COM - JACOBO GUADALUPE MARTINEZ FLORES - +1.305.938-0800

Exhibit D-2

Libor inmediato anterior, y (ii) ningún Período de Intereses terminará después de la Fecha de Vencimiento.

"Interpolated Rate" means, at any time, the rate per annum equal to the rate that results from interpolating on a linear basis between (a) the LIBOR Screen Rate for the longest period (for which such LIBOR Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period (as such term is defined below) and (b) the LIBOR Screen Rate for the shortest period (for which such LIBOR Screen Rate is available for Dollars) that is longer than the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate is less than zero, the "Interpolated Rate" at such time shall be deemed to be zero.

"Tasa Interpolada" significa, en cualquier momento, la tasa anual equivalente a la tasa que resulte de interpolar en una base lineal entre: (a) la LIBOR Publicada por el período más largo (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más corto que el Período de Intereses Impactado (según dicho término se define más adelante) y (b) la LIBOR Publicada para el período más corto (para el que dicha LIBOR Publicada se encuentre disponible en Dólares) que sea más largo que el Período de Intereses Impactado, en cada caso, en dicho momento; en el entendido que, en caso que la Tasa Interpolada sea menor a cero, la Tasa Interpolada" en dicho momento deberá ser considerada como cero.

"LIBO Rate" means, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London, England time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the LIBOR Screen Rate for deposits in Dollars (for delivery on the first day of such Interest Period or on such other date on which interest is paid, as applicable) for a period approximately equal to such Interest Period; provided, that in no event shall "LIBO Rate" be less than zero for purposes of this Promissory Note; provided, further, that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" for such Interest Period (an "Impacted Interest Period"), shall be the Interpolated Rate.

"Tasa LIBO" significa, para cualquier Período de Intereses, la tasa de interés anual determinada por el Agente Administrativo aproximadamente a las 11:00 a.m., hora de Londres, Inglaterra, en la fecha que sea dos Días Hábiles previos al inicio de dicho Período de Intereses por referencia a la LIBOR Publicada, para depósitos en Dólares (para entrega el último día de dicho Período de Intereses o en cualquier otra fecha en que las Intereses sean pagaderos, según sea aplicable) por un período aproximadamente igual a dicho caso la "Tasa LIBO" será menor a 0.0% para efectos de este Pagaré, en el entendido además, que en caso que la tasa de interés no sea determinable de conformidad con lo señalado en la presente definición, la "TASA LIBO" para dicho Período de Intereses (un "Período de Intereses Impactado") deberá ser la Tasa Interpolada.

"Mexico" means the United Mexican States.

"México" significa los Estados Unidos Mexicanos.

"LIBOR Screen Rate" means the London

"LIBOR Publicada" significa la tasa de referencia

2022-09-19 18:01:10 -0800

Interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) ("LIBOR") (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration Limited as an authorized information vendor for the purpose of displaying such rates), or a comparable or successor rate which rate is approved by the Administrative Agent.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Credit Suisse AG as its prime rate in effect at its principal office in New York City. The prime rate is a rate set by Credit Suisse AG based on various factors including Credit Suisse AG's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate. Any change in such prime rate announced by Credit Suisse AG shall take at the opening of business on the day specified in the public announcement of such change.

"Other Taxes" means any and all present or future stamp, transfer, court or documentary taxes or any other excise or property taxes, charges or similar levies (together with any interest, charges, penalties, additions to tax and additional amounts) arising from any payment made under this Promissory Note or from the execution, delivery or enforcement of, or otherwise with respect to, this Promissory Note.

Interbancaria de Londres (London Interbank offered rate) administrada por ICE Benchmark Administration Limited (o cualquier otra persona que asuma la administración de dicha tasa de información) ("LIBOR") (conforme a lo establecido en el Servicio de Información Bloomberg (Bloomberg Information Service) o cualquier otro servicio del mismo o cualquier otro servicio seleccionado por el Agente Administrativo que sea nominado por ICE Benchmark Administration Limited como un vendedor de información autorizado para efectos de publicar dicha tasa, o una tasa comparable o una tasa que la sustituya, cuya tasa sea aprobada por el Agente Administrativo.

"Tasa Prime" significa la tasa de interés anual públicamente anunciada de tiempo en tiempo por Credit Suisse AG como su tasa "prime" aplicable en sus principales oficinas en la ciudad de Nueva York. La tasa "prime" es una tasa establecida por Credit Suisse AG con base en diversos factores incluyendo los costos y retornos esperados de Credit Suisse AG, las condiciones económicas generales y diversos factores, y se usa como punto de referencia para la fijación de precios de ciertos créditos, cuyos precios podrán estar por encima o por debajo de dicha tasa. Cualquier cambio anunciado a la tasa "prime" por Credit Suisse AG entrará en vigor a partir del inicio del día hábil especificado en el anuncio público de dicho cambio.

"Otros Impuestos" significa cualesquier impuestos de timbre o documentación, o cualesquiera impuestos de uso y consumo o propiedad o impuestos o cargos similares (junto con todos los intereses, cargos, penas adicionales, adiciones a los impuestos, presentes o cualquier pago hecho de conformidad con este Pagaré o de la suscripción, entrega o ejecución de, o por cualquier otro motivo en relación con, este Pagaré.

Exhibit D-2

"Panama" means the Republic of Panama.

"Panamá" significa la República de Panamá.

"Taxes" means any and all present or future taxes (including value added tax), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholding) of whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"Impuestos" significa todos y cada uno de los impuestos (incluyendo el impuesto al valor agregado), derechos, deducciones, cargas, o retenciones, presentes o futuros, de cualquier naturaleza junto con cualesquier intereses, cargos, penas, adiciones de impuestos o cantidades adicionales impuestos o cobradas por cualquier Autoridad Gubernamental.

Any and all payments (including any prepayments) to be made by the Undersigned hereunder whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim, and shall be made prior to 2:00 p.m. (New York City time) on the due dates specified in this Promissory Note in Dollars and in immediately available funds to the Administrative Agent's Account.

Cualquier y todos los pagos (incluyendo prepagos) que debe hacer la Suscrita conforme a este Pagaré, ya sea por concepto de principal, interés, comisiones o por cualquier otro concepto, serán efectuados sin compensación o reclamación alguna, antes de las 2:00 p.m. (hora de la Ciudad de Nueva York), en las fechas de pago previstas en el presente Pagaré, en Dólares y en fondos inmediatamente disponibles, en la Cuenta del Agente Administrativo.

The Undersigned and the guarantor (witness) hereby agree to reimburse all reasonable out-of-pocket expenses of the holder hereof, if any incurred in connection with the enforcement of this Promissory Note (including, without limitation, the fees, charges and disbursement of any counsel for the holder hereof).

La Suscrita y el avalista convienen en reembolsar todos los gastos razonables fuera de terceros incurridos por el tenedor de este Pagaré, en su relación con la ejecución del presente Pagaré (incluyendo, sin limitación, los honorarios, costos y gastos legales de los garantes legales del tenedor de este Pagaré).

Any and all payments by or on account of any obligation of the Undersigned and the guarantor (witness) hereunder shall be made free and clear of and without any withholding or deduction for or on account of any Indemnified Taxes or Other Taxes, provided, however, that, if a the Undersigned or the guarantor (witness) shall be required to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required withholdings or deductions, the holder of this Promissory Note receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) the Undersigned or the guarantor (witness) shall

Todos y cada uno de los pagos hechos por o a nombre de cualquier obligación de la Suscrita y el avalista en conformidad con este Pagaré se harán libres de y sin deducción por cualesquier Impuestos Indemnizables u Otros Impuestos; en el entendido, sin embargo, que en caso de que la Suscrita o el avalista sea requerido a deducir cualesquier Impuestos Indemnizables u Otros Impuestos respecto de dichos pagos; entonces (i) la cantidad pagadera al tenedor de este Pagaré se incrementarán en las cantidades adicionales necesarias para que dicho tenedor reciba un monto igual a la suma que hubiere recibido si no se hubieren realizadas dichas deducciones o retenciones no hubieren, (ii) la Suscrita o el avalista efectuará dichas deducciones o retenciones y (iii)



JACOBO GUADALUPE MARTINEZ FLORES
30.03.30.35.31.30.30.39.30.30.33.30.33.35.32.34.31.38
13.08.21.20-01-41

make such withholdings or deductions and (iii) the Undersigned or the guarantor (avalista) shall pay the full amount so withheld or deducted to the relevant Governmental Authority in accordance with applicable law.

la Suscrita o el avalista pagará el total de las cantidades que deduzca o retenga a la Autoridad Gubernamental correspondiente, de conformidad con la legislación aplicable.

The Undersigned and the guarantor (avalista) shall indemnify the holder of this Promissory Note, within 10 (ten) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such holder, and all reasonable expenses arising therefrom or with respect thereto plus interest thereon for each day from (and including) the day of delivery to the Undersigned of a request for such payment to (but excluding) the date of actual reimbursement at a rate per annum equal to the interest rate then applicable to this Promissory Note, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

La Suscrita y el avalista se obligan a indemnizar al tenedor de este Pagaré, dentro de los 10 (diez) Días Hábiles siguientes al requerimiento por escrito para dichos efectos, por el monto total de cualesquier Impuestos Indemnizados u Otros Impuestos pagados por dicho tenedor, y todos los gastos razonables derivados de o relacionados con cualquier dicho pago, más intereses sobre dicho monto por cada día desde (e incluyendo) el día en que la Suscrita reciba el requerimiento por escrito de dicho pago, hasta (pero excluyendo) la fecha en que se lleve a cabo el reembolso correspondiente, a una tasa anual equivalente a la tasa de interés que en ese momento sea aplicable al presente Pagaré, independientemente de que dichos Impuestos Indemnizados u Otros Impuestos hayan sido o no determinados o impuestos correcta o legalmente por la Autoridad Gubernamental correspondiente.



For everything related to this Promissory Note, the Undersigned and the guarantor (avalista) hereby designate the following as their domicile:

Para todo lo relacionado con este Pagaré, la Suscrita y el avalista designan como su domicilio el siguiente:

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Mexico City, Mexico
Attention: Carlos E. Ochoa Valdés, Claudia Jolly and Raúl A. Farías
Telephone: +52.55.5228.9700
Email: eochoa@creditoreal.com.mx, cjollw@creditoreal.com.mx and rfarias@creditoreal.com.mx

Avenida Insurgentes Sur No. 730,
Piso 20,
Colonia Del Valle,
Delegación Benito Juárez 03103
Ciudad de México, México
Atención: Carlos E. Ochoa Valdés, Claudia Jolly y Raúl A. Farías
Teléfono: +52.55.5228.9700
Correo electrónico: eochoa@creditoreal.com.mx, cjolly@creditoreal.com.mx y rfarias@creditoreal.com.mx

The Undersigned and the guarantor (avalista)

La Suscrita y el avalista entienden el plazo para la

2022-08-04 19:25:38 -0800
anniepope@19.25.38 -0800
Confidential

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.34.75.35.30.34.31.38
1308024.20.01-01

| | |
|---|---|
| extend the period of presentment for payment of this Promissory Note until the date that is six (6) months after the Maturity Date, in terms of Article 128 of the Mexican General Law of Negotiable Instruments and Credit Transactions. | presentación para pago de este Pagaré hasta la fecha que sea seis (6) meses después de la Fecha de Vencimiento, en los términos del Artículo 128 de la Ley General de Títulos y Operaciones de Crédito. |
| This Promissory Note is issued in accordance with and governed by the laws of the State of New York, United States of America, provided, that in connection with any legal action or proceeding (other than an action to enforce a judgment obtained in other jurisdiction) brought in respect of this Promissory Note, in the courts of Mexico, this Promissory Note shall be deemed to be made under the laws of Mexico, and for such purposes shall be governed by and construed in accordance with, the laws of Mexico. The Undersigned and the guarantor (avalista) expressly and irrevocably submit to the jurisdiction of (a) the competent courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court in the State of New York, and (b) the competent federal courts of Mexico, or the competent courts of Mexico, at the election of the party initiating the action, in any action or proceeding arising out of or relating to this Promissory Note, or the recognition or enforcement of any judgment. The Undersigned and the guarantor (avalista) of this Promissory Note hereby expressly, unconditionally and irrevocably waive their right to any other jurisdiction that may apply by virtue of their present or future domicile or for any other reason. | Este Pagaré se suscribe de conformidad con, y se rige por, las leyes del Estado de Nueva York, Estados Unidos de América, en el entendido que, en relación con cualquier acción o procedimiento legal (distinto de una acción para ejecutar una sentencia en otra jurisdicción) que surja en relación con este Pagaré, ante las tribunales de México, este Pagaré será considerado como suscrito conforme a las leyes de México, y para dichos propósitos será regido por, e interpretado de conformidad con, las leyes de México. La Suscrita y el avalista se someten expresa e irrevocablemente a la jurisdicción de (a) los cortes competentes del Estado de Nueva York con sede en el Condado de Nueva York y de la Corte de Distrito de los Estados Unidos de América del Distrito Sur de Nueva York, y cualquier otro tribunal de apelación en el Estado de Nueva York, y (b) los tribunales federales competentes de la Ciudad de México, México, a elección de la parte que inicie la acción, en cualquier acción o procedimiento que surja como consecuencia de o en relación con este Pagaré, o para el reconocimiento o ejecución de cualquier sentencia. La Suscrita y el avalista en este acto renuncian, de manera expresa, incondicional e irrevocable, a cualquier otra jurisdicción que pudiere corresponderles en razón de su domicilio presente, futuro o por cualquier otro motivo. |
| This Promissory Note is executed in both the English and Spanish languages, both versions of which shall bind the Undersigned; provided, however, that in the event of any suit or action brought in New York, United States of America, the English version shall prevail and, in the event of any suit or action brought in Mexico, the Spanish version shall prevail. | El presente Pagaré se suscribe en los idiomas inglés y español, utilizando ambas versiones a la Suscrita; en el entendido, sin embargo, de que en caso de cualquier demanda o acción en Nueva York, Estados Unidos de América, la versión en inglés será la que prevalezca y en caso de cualquier demanda o acción en México, la versión en español será la que prevalezca. |

CONFIDENTIAL 2020-0...-0800

JACOBO GUADALUPE MARTINEZ FLORES 30.38.30.30.11.30.30.30.30.35.30.04.35.35.32.34.11.38 13.00.24 22:01:41

The Undersigned and the guarantor (*avalista*) hereby waive diligence, demand, protest and notices of any kind whatsoever. Each of the Undersigned and the guarantor (*avalista*) hereby binds itself to pay costs of collection and attorney's fees in the case of default in the timely payment of this Promissory Note.

La Suscrita y el avalista por el presente, renuncian expresa e irrevocablemente a cualquier diligencia, demanda, protesto o notificación de cualquier clase. Cada uno de la Suscrita y el avalista se obliga a pagar los gastos de cobranza y honorarios de abogados en caso de incumplimiento en el pago oportuno de este Pagaré.

*IN WITNESS WHEREOF*, the Borrower and the guarantor (*avalista*) have duly executed this Promissory Note as of the date mentioned below

*EN VIRTUD DE LO CUAL*, la Suscrita y el avalista han firmado debidamente este Pagaré en la fecha abajo mencionada.

Ciudad de México, México, a [•] de [•] de [•]
Mexico City, Mexico, on [•], [•]

LA SUSCRITA

MAREVALLEY CORPORATION

Name/Nombre: [•]
Title/Cargo: Attorney-in-Fact / Apoderado

POR AVAL

CRÉDITO REAL, S.A.B. DE C.V. SOFOM, E.N.R.

Name/Nombre: [•]
Title/Cargo: Attorney-in-Fact / Apoderado

Exhibit D-2



Confidential
anena@hnl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.15.30.30.30.30.15.30.34.75.15.32.34.31.38
130824 20:01:41

Exhibit E

Form of Prepayment Notice

Date: [•]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent (as defined below)
Eleven Madison Avenue
New York, NY 10010
United States
Attention: Agency Manager
Tel: +1 (919) 994-6369
Email: list.structured-lending@credit-suisse.com

    The undersigned refer to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February 10, 2020, among CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Crédito Real"), and MAREX ALLEY CORPORATION ("Marevalley," and together with Crédito Real, the "Borrowers"), as Borrowers, the guarantor party thereto, the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined herein shall have the meaning assigned to them in the Credit Agreement.



    The undersigned hereby give(s) irrevocable notice pursuant to Section 2.8(a)(iii) of the Credit Agreement, that the Borrowers shall make a prepayment of [a portion of] the principal amount of the [Tranche A][Tranche B] Loans, together with accrued and unpaid interest thereon, and any other amounts payable by the Borrowers pursuant to Section 2.14 of the Credit Agreement, and in such regard sets forth below the information relating to such prepayment.

1.   On [•] (a Business Day) (the "Prepayment Date").

2.   In the amount of:

    a)   U.S.$[•] in respect of principal.

    b)   U.S.$[•] in respect of interest.

    c)   [U.S.$[•] in respect of other amounts payable pursuant to Section 2.8(n)(i) of the Credit Agreement.]

Exhibit E

Very truly yours,

CRÉDITO REAL, S.A.B. DE C.V.,
SOFOM, E.N.R.,
as Borrower

By:_____
Name:
Title:

MAREVALLEY CORPORATION,
as Borrower

By:_____
Name:
Title:

Exhibit F

## Form of Lender Joinder Agreement

### LENDER JOINDER AGREEMENT

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February 19, 2020, among CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Crédito Real"), and MAREVALLEY CORPORATION ("Marevalley," and together with Crédito Real, the "Borrowers"), as borrowers, the guarantor party thereto, the lenders referred to therein (the "Lenders") and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent").

This Joinder Agreement (the "Joinder Agreement") is entered into on [●] among [●] (the "New Lender"), the Borrowers and the Administrative Agent, acting on behalf of the Lenders.

The parties hereto agree as follows:

1. Unless otherwise defined in this Joinder Agreement, terms defined in the Credit Agreement are used in this Joinder Agreement with the same meanings given to them in the Credit Agreement, and the rules of construction of the Credit Agreement apply to this Joinder Agreement *mutatis mutandis*.

2. The New Lender hereby agrees to, effective on [●], become a Lender for all purposes of the Credit Agreement and the other Financing Documents.

3. The New Lender (i) confirms that it has received a copy of the Credit Agreement and the other Financing Documents, together with copies of the financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Joinder Agreement, (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Arranger or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisal of, and investigation into, the business, operations, property, prospects, financial and other conditions and creditworthiness of the Loan Parties and will make its own credit analysis, appraisals and decisions in taking or not taking action under the Credit Agreement and the other Financing Documents, (iii) appoints and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers under the Credit Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender, (v) specifies as its address for notice the office set forth beneath its name on the signature pages hereof, and (vi) hereby expressly acknowledges and agrees to the terms of the Credit Agreement and the other Financing Documents.

Exhibit F

2022-June-con-03 08-0800



JACOBO GUADALUPE MARTÍNEZ FLORES
30,30,30,03,33,30,30,30,35,30,04,37,35,32,34,31,38
130023.20101.41

4. As of [•], the New Lender shall be a party to and be bound by the provisions of the Credit Agreement and have the rights and obligations of a Lender.

5. This Joinder Agreement shall be binding upon, and inure to the benefit of, the parties hereto and each other party to the Credit Agreement and their respective successors and assigns. This Joinder Agreement may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Joinder Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

6. EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED IN A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS JOINDER AGREEMENT OR ANY PROVISION HEREIN. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS JOINDER AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 6.

7. THIS JOINDER AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

[Remainder of this page intentionally left blank]

Exhibit E

IN WITNESS WHEREOF, the New Lender has caused this Joinder Agreement to be duly executed by its authorized officers, as of the day and year first written above.

[*], as New Lender

By: _____
Name:
Title:

Accepted and Agreed to:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Administrative Agent

By: _____
Name:
Title:

CONFIDENTIAL
JAVIER PICHARDINIJS-DL-04HPER.COM
Credito Real MTN Program
Monday, January 2, 2023 7:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit E

JACOBO GUADALUPE MARTINEZ FLORES
90.30.30.30.31.30.30.30.30.30.30.30.35.30.35.37.35.32.34.31.38
DOS82/4 2E01/41

Exhibit G

Form of Officer's Certificate

[•], 2020

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), dated as of February 19, 2020, among CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("**Credito Real**") and MAREVALLEY CORPORATION ("**Marevalley**" and together with Credito Real, the "**Borrowers**"), as borrowers, the guarantor party thereto, the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "**Administrative Agent**"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Credit Agreement.

The undersigned certifies that [he / she] is a duly appointed [Financial Officer / the general counsel / secretary of the board or assistant secretary of the board] of [Credito Real/Marevalley] (the "**Company**"), and that, as such, is authorized to execute and deliver this certificate pursuant to Section 4.1(c) of the Credit Agreement in the name and on behalf of the Company, and further certifies that:

1.   each of the representations and warranties of the Company set out in the Credit Agreement and in each of the Financing Documents are true and correct as of the date hereof (except to the extent that any such representation or warranty speaks as to, or referenced to a particular date, in which case such representation or warranty shall be true and correct on such date);

2.   no event, act or condition has occurred and is continuing or would result from the execution, delivery or performance of the Credit Agreement or another Financing Documents which would constitute a Default or Event of Default;

3.   no event, development or circumstance has occurred that individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

4.   no Change in Law has imposed, modified or deemed applicable any reserve, special deposit, compulsory loan or similar requirement with respect to the Loans;

5.   (i) there is not in effect statute, regulation, order, decree or judgment of any Governmental Authority that makes illegal or enjoins or prevents the execution, delivery and performance of the Financing Documents and/or consummation of the transactions thereunder and (ii) no action or proceeding has been commenced that seeks to prevent or enjoin the execution, delivery and performance of the Financing Documents and/or the transactions thereunder;

Exhibit G

corteplus.com
appagenda.com
019.25.38 -0800
2022-03

6. each of the persons named in <u>Schedule I</u> hereto has been duly elected or appointed and is duly qualified as an officer of the Company on the date hereof, holding the office or offices set forth opposite to its name and is authorized to execute any and all documents relating to the Credit Agreement and the other Financing Documents. The signature set forth opposite to each name is a specimen of such person's signature;

7. attached hereto as <u>Schedule II</u> are true and correct copies of the *estatutos sociales* of the Company;

8. attached hereto as <u>Schedule III</u> are true and correct copies of all corporate authority for the Company (including, without limitation, all necessary action of the board of directors, shareholders or other governing body) with respect to the execution, delivery and performance of each Financing Document and each other document to be signed and delivered by the Company in connection with any Financing Document on this date. The execution, delivery and performance of each Financing Document and each other document to be signed and delivered by the Company in connection with any Financing Document on this date, is in compliance with the authorizations conferred by the documents included in <u>Schedule III</u>;

9. attached hereto as <u>Schedule IV</u> are true and correct copies of all public deeds containing the powers of attorney granted to the officers of the Company executing the Loan Documents to which the Company is a party[, duly registered with the Public Registry of Property and Commerce][7]. Such powers of attorney are in full force and effect, have not been revoked [or amended and remain in effect as of the date hereof; and

10. [attached hereto as <u>Schedule V</u> is a true, correct and complete copy of (i) the audited Consolidated balance sheet and related statements of income and cash flows of the Company as of and for the years ending December 31, 2017 and December 31, 2018, audited by Galaz, Yamazaki, Ruíz Urquiza S.C., independent public accountant, and (ii) the balance sheet and related statements of income and cash flows of the Company as of September 30, 2019][8]

IN WITNESS WHEREOF, the undersigned has executed this certificate on the date first above written.

*[Remainder of this page intentionally left blank].*

---

[7] NTD: Include only in the Officer's Certificate of Credito Real.

[8] NTD: Include only in the Officer's Certificate of Credito Real.

Exhibit G

JACOBO GUADALUPE MARTINEZ FLORES
39.31.39.30.33.39.30.33.30.35.30.35.37.35.32.34.31.38
13.082-3.20.01-541

[CRÉDITO REAL, S.A.B. DE C.V.,
SOFOM, E.N.R./MAREVALLEY
CORPORATION]

By: _____
    Name:
    Title:

CONFIDENTIAL
Credito Real BTB Program
JAVIER.PEÑA@NORTONROSEFULBRIGHT.COM
Monday, January 4, 2021 7:38:20 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit C

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,33,30,30,30,30,30,19,32,30,34,37,33,33,34,31,38
1308924-20 01-41

Schedule J

## SIGNATURES OF OFFICERS

| Name | Title | Signature |
|------|-------|-----------|
| _____ | [•] | _____ |
| _____ | [•] | _____ |
| _____ | [•] | _____ |

CONFIDENTIAL
JAVIER.PICH(ARDING)-US.D.LAPPER.com
Monday, January 4, 2021 7:36 34 PM
Credito &&a.I.M.IR Program

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit 07

JACOBO GUADALUPE MARTINEZ FLORES
30.32.34.30.31.30.30.30.30.35.30.34.73.33.32.34.31.38
130082v20-20-01-v01

Schedule II

*Estatutos Sociales*

[Attached]

CONFIDENTIAL
Creditos Reali NTW Program
JAVIER_PICHARDIN@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit G

JACOBO GUADALUPE MARTINEZ/ZUARES
30.00.30.30.3.30.30.30.30.30.35 30.34/7.35.32 34.31.38
13.08/24 20:01:41

Schedule III

Diplomatic Authority

[Attached]

JACOBO GUADALUPE MARTINEZ FLORES
20,28,30,30,13,32,30,30,35,30,33,54,57,35,22,34,31,38
1508926.20191-01

Exhibit G

CONFIDENTIAL
Credito Real S.A.B. Program
JAVIER PICHARDINI@US.DLAPIPER.COM
Monday, January 4, 2021 4:36:15 PM

Schedule IV

Powers of Attorney

[Attached]

CONFIDENTIAL
JAVIER PICHARDINEVOS-DEAPPER.COM
Crocito Real MTN Program
Monday, February 4, 2021 7:30:24 PM

Confidential
anema@hl.com
2020-03-10 19:25:38 -0800

Exhibit G

JACOBO GUAYANA,LPP.MARTINEZ.FLORES
30.39.30.30.13.28.30.30.26.30.30.55.30.34.37.35.32.34.31.38
13/08/24 20:01:41

Schedule V

Financial Statements

[Attached]¹

CONFIDENTIAL
Credito Real MTN Program
JAVIER PICHARDING@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM

Confidential

anema@hl.com

2022-03-10 19:25:38 -0800

¹ NTD: Include only in the Officer's Certificate of Credito Real.

Exhibit G

Exhibit H

Form of Opinion of Special New York Counsel to the Loan Parties

[Attached]

CONFIDENTIAL
Jacobo Real MTR Program
JAVIER.PICHARDO@US.DLAPIPER.COM
Monday, January 4, 2021 7:26:26 PM

Confidential
anema@hl.com
2021-03-10 19:25:38 -0800

Exhibit H

JACOBO GUADALUPE MARTINEZ FLORES
30.30-30.30-31.30-30.30-30.35-30.34-37.35.12.34.31.38
13/08/24 26011/41



DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104

February [__], 2020

To the Administrative Agent and the
Lenders party to the Credit and
Guaranty Agreement referred to
below:

c/o Credit Suisse AG, Cayman Islands Branch,
as Administrative Agent
Eleven Madison Avenue
New York, NY 10010
United States of America
Attention: Agency Manager
E-mail: agency loanops@credit-suisse.com

Ladies and Gentlemen:

We have acted as special New York counsel to Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada*, organized and existing under the laws of Mexico ("**Crédito Real**") and Marevalley Corporation, a corporation incorporated and existing under the laws of Panama ("**Marevalley**"; together with Crédito Real, each a "**Loan Party**" and collectively, the "**Loan Parties**"), in connection with the execution and delivery of the following documents (collectively, the "**Documents**"):

1.    Credit and Guaranty Agreement, dated as of February [__], 2020 (the "**Credit and Guaranty Agreement**"), among Crédito Real and Marevalley, as borrowers, Crédito Real, as guarantor of certain obligations of Marevalley, the financial institutions party thereto as lenders (the "**Lenders**") and Credit Suisse AG, Cayman Islands Branch, as administrative agent (in such capacity, the "**Administrative Agent**" and, together with the Lenders, the "**Creditors**"); and

2.    Fee Letter, dated as of February [__], 2020 (the "**Fee Letter**"), made by the Loan Parties in favor of Credit Suisse Securities (USA) LLC, as lead arranger, and the Administrative Agent.

Exhibit H

CONFIDENTIAL
Crédito Real MTR Program
JAVIER PICHARDINA/US DLA PIPER
Mandato January 6, 2021 1:36

2022-08-Confidential.com 1938-0800

In rendering the opinions expressed below, we have examined electronic copies presented to us as being true and correct copies of each of the Documents. We are rendering this opinion at the request of the Loan Parties pursuant to Section 4.1(f)(i) of the Credit and Guaranty Agreement. Capitalized terms that are used herein but not otherwise defined in this opinion shall have the same meanings as those ascribed to them in the Credit and Guaranty Agreement, as applicable.

In connection with the opinions set forth below, we have also examined originals, or copies certified or otherwise identified to our satisfaction, of such documents, corporate records, certificates and other instruments as we have deemed necessary or appropriate for the purpose of this opinion. In our examination, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of all such documents.

Insofar as this opinion relates to factual matters, we have relied (without independent investigation) upon the factual representations and warranties contained in the Documents and upon certificates of certain government officials and of officers of the Loan Parties and other persons delivered without limitation the certificate of such Loan Party attached hereto as Schedule I, with respect to Credits Real, and as Schedule II, with respect to Marevalley (collectively, the "Opinion Certificates"). We assume, in rendering the opinions contained herein, that none of such information contains any untrue statement of a material fact or omits to state a material fact necessary to render the statements made, in light of the circumstances in which they were made, not materially misleading.

In basing the opinions and other matters set forth herein on "our knowledge" (or words of like import), the words "our knowledge" (or words of like import) signify that, in the course of our representation of the Loan Parties in connection with the transaction contemplated by the Documents, no information has come to the attention of the individual lawyers within our firm who have devoted significant attention to the transaction contemplated by the Documents on behalf of the Loan Parties that would give us actual knowledge or notice that any such opinions or other matters are not accurate or that any of the documents, certificates, reports and information on which we have relied are not accurate and complete. We have undertaken no independent investigation or verification of such matters. We do not accept any liability whatsoever for any knowledge of any other persons, including the other attorneys or legal assistants of this firm, or imputed knowledge regarding such matters or any matters about which we should have known except as noted above. No opinion is being expressed as to the effect of any event, fact or circumstance of which we have no actual knowledge.

Assumptions:

In reaching the opinions set forth below, we have assumed the following:

(a)    (i) each of the parties to the Documents (x) has duly and validly authorized, executed and delivered each of the Documents to which it is a party and (y) is duly organized, validly existing and (to the extent such concept is relevant to such jurisdiction) is duly qualified to engage in the transactions covered by this opinion, and has the necessary corporate or other power and authority, as the case may be, to enter into and perform the instruments, documents and

Exhibit F

2022 Filed Open D-058-0800

JACOBO GUADA LUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.30.30.30.34.37.35.32.34.31.38
130.08.23.20.01.41

agreements to which it is a party; (ii) the obligations of each of the parties to each of the Documents (other than the obligations of the Loan Parties to the extent specifically addressed in our opinion in paragraph 1 below) set forth in the Documents are each such party's legal, valid, and binding obligations, enforceable in accordance with their respective terms; (iii) each of the parties to the Documents (other than the Loan Parties to the extent specifically addressed in our opinion in paragraph 2 below) has complied with all orders, rules, regulatory requirements and laws applicable to such parties in entering into and delivering the Documents, carrying out the transactions contemplated thereby and performing its obligations thereunder; (iv) there is adequate and lawful consideration for the obligations undertaken by each Loan Party under the Documents, and each Loan Party has received value in respect thereof; and (v) none of the parties to the Documents (other than the Loan Parties to the extent specifically addressed in our opinion in paragraph 3 below) requires any order, consent, approval, license or authorization of, or filing, recording or registration with, any governmental or public body or authority of the United States of America or any state or agency or political subdivision thereof in connection with the execution, delivery and performance of any of the Documents, the validity, binding effect or enforceability of any of the Documents or any of the transactions contemplated thereby which has not been obtained;

(b)     the Loans and the Documents are made solely for business or commercial purposes, and are not a contract or agreement for labor or personal services or for personal, family or household services;

(c)     each of the parties to the Documents entered into the Documents in good faith and without any intent to hinder, delay or defraud creditors;

(d)     the Documents will be enforced and the rights and discretion of the Creditors will be exercised, in circumstances and in a manner which are commercially reasonable;

(e)     each of the parties to the Documents is qualified to do business and is in good standing in each jurisdiction other than its jurisdiction of formation required for such party to conduct its business;

(f)     each natural person executing any of the Documents is legally competent to do so;

(g)     each person or entity executing any of the Documents on behalf of a party to any of the Documents has been duly and validly authorized to do so;

(h)     the execution and delivery by each of the parties to the Documents and the performance by each such party of its obligations thereunder do not and will not contravene any provision of the applicable organizational documents of any of such parties;

(i)     each of the parties to the Documents has the legal right, under its governing documents, corporate and regulatory legislation and the laws of its jurisdiction of organization, to execute and deliver each of the Documents to which it is a party, to carry out the transactions contemplated thereunder and to perform its obligations thereunder, and each Lender has duly authorized the Administrative Agent to act as its agent for the purposes set forth in the Documents;

Exhibit H



JACOBO GUADALUPE MARTINEZ FLORES
2D.30.30.30.31.30.30.30.30.30.30.25.30.34.37.33.32.34.31.38
130023 20:31:41

(j)     the execution and delivery by each of the parties to the Documents and the performance by each such party of its obligations thereunder do not and will not contravene (i) except to the extent specifically addressed in our opinion in paragraph 2 below as to the Loan Parties, any current requirement of law applicable to any of such parties or the public policies of any jurisdiction; (ii) any indenture, mortgage, deed of trust, guaranty, lease or other agreement or instrument to which any of such parties is a party or by which it or any of its property is bound; or (iii) any court order or consent decree applicable to such party;

(k)     all public records and other documents reviewed, and all statements therein are accurate and complete; and

(l)     there are no oral or written modifications of, or amendments to, any of the Documents, there has been no waiver of any of the provisions of any of the Documents by actions or conduct of the parties or otherwise.

We express no opinion as to the effect of (i) the compliance or noncompliance of any of the Creditors with any state, federal or other laws or regulations applicable to it or (ii) the legal or regulatory status or nature of any of the Creditors on the opinions herein stated.

We express no opinion as to the laws of any state or jurisdiction other than (i) the internal laws of the State of New York (excluding those of counties, cities and other municipalities) and (ii) federal laws of the United States, which in the case of each of the laws referred to in clauses (i) and (ii), in the experience of our attorneys who are members of the bar in New York, in the exercise of customary professional diligence, are normally applicable to the Loan Parties and to the transactions of the type provided for in the Documents, but without our having made any special investigation concerning any other laws, rules or regulation, in each case in effect on the date hereof (the laws referred to in clauses (i) and (ii), but specifically excluding those set forth in the following sentence, collectively, "Applicable Laws"). We express no opinion as to the effect upon the Documents of (A) except to the extent specifically addressed in our opinion in paragraph 5 below, any federal or state securities laws or regulations, including, without limitation, any "Blue Sky" laws, (B) the U.S. Commodity Exchange Act, as amended, or any rules or regulations promulgated thereunder, (C) the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, or any rules or regulations promulgated thereunder, (D) any federal or state anti-trust or unfair competition laws or regulations, (E) any federal, state or other tax laws or regulations, (F) any federal, state or other environmental or hazardous materials laws or regulations, (G) any federal criminal or civil forfeiture laws including, without limitation, the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, as amended, (H) any federal, state or other privacy laws or regulations, (I) any federal, state or other land use, zoning or subdivision laws or regulations, (J) the Employee Retirement Income Security Act, as amended, or related laws or regulations and any other federal, state or other pension laws or regulations, (K) the Patient Protection and Affordable Care Act, as amended, or any rules or regulations promulgated thereunder, (L) any federal or state laws related to copyrights, patents, trademarks, service marks or other intellectual property, (M) any federal, state or other health, safety and welfare laws or regulations, (N) except to the extent specifically addressed in our opinion in paragraph 4 below, any federal or state banking laws or regulations, (O) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot) Act of 2001), the Uniting and

Exhibit H

2022-08-0800

JACOBO GUADALUPE MARTINEZ FLORES
26.39.30.30.31.18.30.30.29.30.43.30.34.73.53.12.34.31.38
170824 20:01:41

Strengthening America by Fulfilling Rights and Ensuring Discipline Over Monitoring Act of 2015 (USA Freedom Act of 2015), in each case including all amendments or other modifications thereto, or any other federal, state or other anti-terrorism or anti-money-laundering laws, (P) any laws that may apply to a party to the Documents due to the nature of any person's business or activities or the industry in which such person does business, (Q) any federal, state or other insurance laws or regulations, (R) any federal, state or other usury laws or regulations, (S) any federal, state or other gaming laws or regulations, (T) any federal, state or other criminal laws or regulations, (U) any federal, state or other tribal laws or regulations, (V) except to the extent specifically addressed in our opinion in paragraph 4 below, any Federal Reserve Board regulations, (W) federal and state laws and regulations concerning filing and notice requirements (e.g., Hart-Scott-Rodino and Exon-Florio), (X) any federal, state or other laws, regulations or policies concerning (1) national and local emergencies, and (2) possible judicial deference to acts of sovereign states, (Y) compliance with fiduciary duty requirements, or (Z) any treaties.

Moreover, our opinion is based upon the current interpretation of the Applicable Laws and laws existing on the date hereof. Except as otherwise expressly indicated herein, the opinions expressed are given as of the date hereof, and we disclaim any obligation to advise you of any developments or changes either in the Applicable Laws or facts that may occur after the date of this opinion or if additional information is brought to our attention.

Opinions:

Based on our review of the foregoing and subject to the assumptions and qualifications set forth herein, our opinion is that:

1. Each of the Documents constitutes a valid and legally binding obligation of each Loan Party that is a party thereto, enforceable against such Loan Party in accordance with its terms.

2. Neither (a) the execution and delivery by any Loan Party of the Documents to be executed by it nor (b) the performance by the applicable Loan Party of its obligations thereunder, will result in a violation of any Applicable Law applicable to each Loan Party.

3. No consent, approval or action of, or filing by any Loan Party with any governmental or public body or authority of any jurisdiction having jurisdiction over such Loan Party under any Applicable Law is required under Applicable Law to authorize or is otherwise required in connection with, the execution, delivery and performance by any Loan Party of any of the Documents to which such Loan Party is a party that has not already been obtained or made; provided that we express no opinion with respect to any authorizations, filings or approvals that may be required relating to the express nature of the business of any Loan Party.

4. Assuming that the proceeds of the Loans are applied in the manner contemplated by, and subject to the limitations contained in, the Credit and Guaranty Agreement, the making of the Loans under the Credit and Guaranty Agreement, nor the application of the proceeds thereof, will violate the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System of the United States of America.

5. Based solely upon the Opinion Certificates, none of the Loan Parties is required to

Exhibit H

register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.

Qualifications:

(a)   We express no opinion as to (i) the creation, existence, attachment, or enforceability of any security interests or liens or (ii) the perfection or priority of any security interest or lien. Without limitation of the generality of the foregoing, we express no opinion with respect to any security interest created under the Documents or any document or instrument executed in connection therewith which purports to secure any present or future obligations, indebtedness, or liabilities of any Loan Party to any of the Creditors.

(b)   Our opinions in paragraphs above are subject to the following additional assumptions and qualifications:

(i)   Enforceability is subject to, and may be limited by (A) bankruptcy, insolvency, reorganization, arrangement, moratorium and other similar laws affecting creditors' rights generally, including, without limitation New York Debtor and Creditor Law and other laws regarding fraudulent conveyances and preferential transfers; (B) general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding at law or at equity; (C) any statute, decision or rule of law prohibiting or limiting the exercise of unsuccessful remedies; and (D) limitations or qualifications on the enforcement of certain rights, remedies, waivers and other provisions in the jurisdiction in which enforcement thereof is sought.

(ii)   Enforceability may be limited to the extent that the remedies are waived by a party with respect to a breach that a court concludes is not material or does not adversely affect such party. Enforceability may also be limited by any unconscionable, inequitable, or unreasonable conduct on the part of such party seeking enforcement, defenses arising from such party's failure to act in accordance with the terms and conditions of the Documents, defenses arising as a consequence of the passage of time, or defenses arising as a result of such party's failure to act reasonably or in good faith or to comply with the terms of the Documents or comply with procedural requirements of Applicable Law that are not necessarily reflected in the Documents.

(iii)   We express no opinion on the enforceability of the self-help or non-judicial remedies provided in the Documents to the extent inconsistent with, or not permitted by, Applicable Law.

(iv)   We express no opinion, however, as to (i) the enforceability of any rights to indemnification or contribution provided for in the Documents which are violative of the public policy underlying any law, rule or regulation (including any federal or state securities law, rule or regulation), or (ii) the enforceability of any provisions that purport to release, exculpate or exempt a party from, or requiring indemnification of a party for, liability for its own action or inaction, to the extent the action or inaction involves gross negligence, recklessness, willful misconduct or unlawful conduct.

Exhibit E

(v) We express no opinion as to (A) the enforceability of any rights to specific performance contained in the Documents, (B) the enforceability of any provisions that purport to make void any act done in contravention thereof, (C) the enforceability of any provisions that purport to authorize a party to act in its sole discretion; (D) the enforceability of any provisions that impose liquidated damages in the nature of penalties or forfeitures (or other provisions imposing penalties or forfeiture; and (E) the enforceability of any provisions purporting to require a party thereto to pay or reimburse attorneys' fees incurred by another party, or to indemnify another party therefor, which provisions may be limited by applicable statutes and decisions relating to the collection and award of attorneys' fees.

(vi) We express no opinion on the enforceability of any provisions of the Documents requiring any party to waive the effect of Applicable Laws, constitutional or equitable rights, or any procedural, judicial, or substantive rights or defenses, such as rights to notice, right to a jury trial, statutes of limitation, appraisal or valuation rights, redemption rights, and marshaling of assets, or any provisions purporting to authorize or consent to a confessed judgment, or any provisions purporting to waive any right to consequential or other damages, or any provisions purporting to require the Loan Parties to give notice to any of the Creditors of any acts or omissions of any of the Creditors or any of their agents or employees, to the extent, in any such case, that (x) the same may not be waived as a matter of law or public policy or (y) the effectiveness of any such waiver is subject to judicial determination as to the effectiveness thereof.

(vii) Certain of the provisions in the Documents may be further limited or rendered unenforceable by Applicable Law, but, in our opinion such law does not make the remedies afforded by the Documents inadequate for the practical realization of the principal benefits intended to be provided.

(viii) We express no opinion as to the legally-binding nature or enforceability of any confession of judgment, cognovit or similar right of any of the Creditors to appear for and enter judgment against any Loan Party.

(ix) Our opinion as to the legality, validity, binding effect and enforceability of the provisions of the Documents in respect of the submission to the jurisdiction of the courts of the State of New York is based solely on Section 5-1402 of the New York General Obligations Law. Any provisions of the Documents which provide for jurisdiction of the courts of any particular jurisdiction other than New York may not be binding on the courts in the forums selected or excluded.

(x) We express no opinion on the enforceability of any provisions of the Documents that entitle any of the Creditors, as a matter of right, to the appointment of a receiver after the occurrence of a default.

(xi) We express no opinion with respect to any issue arising out of or related to (A) the identity or status of any successor to any of the Creditors or any assignee or any transferee of the Loans or any evidence of the indebtedness or any interest therein, whether by participation or otherwise or (B) any syndication or securitization of the Loans or any interests therein, or (C) any subsequent transaction.

Exhibit E

Confidential
2022-01-10 15.58 -0800

(xii)    Any waiver of defenses contained in the Documents may be ineffective to the extent that any such defense involves a matter of public policy in the State of New York. We have assumed that both before and after giving effect to the transactions contemplated by the Documents, each Loan Party is solvent.

(xiii)   We express no opinion as to the validity, binding effect or enforceability of any provision of the Documents that purports to create a trust, power of attorney, proxy or other fiduciary relationship.

(xiv)    We express no opinion as to the enforceability of any grant by any Loan Party of any right of set-off on behalf of any of its Affiliates.

(xv)     We express no opinion as to the enforceability of provisions that enumerated remedies are not exclusive or that any of the Creditors has the right to pursue multiple remedies without regard to other remedies elected or that all remedies are cumulative.

(xvi)    We express no opinion as to the enforceability of provisions permitting the exercise, under certain circumstances, of rights without notice or without providing opportunity to cure failure to perform.

(xvii)   We express no opinion as to the validity, binding effect or enforceability of (A) any purported waiver, release, variation, disclaimer, consent or other agreement to similar effect (each, a "Waiver") by any Loan Party under the Documents insofar as it relates to causes or circumstances that would operate as a discharge or release of a defense available to such Loan Party as a matter of law (including judicial and administrative decisions), except to the extent that such a Waiver is effective under and is not prohibited by or void or invalid under Applicable Law (including judicial and administrative decisions), (B) any provision of the Documents insofar as it provides that any person or entity purchasing a participation from a Creditor or other person or entity pursuant thereto may exercise set-off or similar rights with respect to such participation or that any Creditor or any other person or entity may exercise set-off rights other than in accordance with and pursuant to Applicable Law, (C) any provision of the Documents related to (x) forum selection or submission to jurisdiction (including, without limitation, any waiver of any objection to venue in any court or any objection that a court is an inconvenient forum) to the extent that any relevant action or proceeding does not arise out of or relate to the Documents or the transactions contemplated thereon or other jurisdiction and parties have not agreed to submit to the jurisdiction of the stated forum and/or the governing law specified in the Documents was not chosen by the relevant parties as the governing law or (y) waivers of any rights to trial by jury; or (D) any provision of the Documents that requires or relates to payment of late charges, interest (or discount or equivalent amounts), liquidated damages, or any premium or "make-whole" payment at a rate or in an amount, or exit fees or similar charges, after the maturity or after or upon acceleration of the respective liabilities evidenced or secured thereby, or after or during the continuance of any default, event of default or other circumstance, or upon prepayment, that a court would determine in the circumstances under Applicable Law to be commercially unreasonable or a penalty or a forfeiture.

(xviii)  We express no opinion as to the enforceability of any provision in the Documents specifying that provisions thereof may be waived or amended only in writing, to the

Exhibit E

JACOBO GUADALUPE MARTINEZ FLORES
30;30;30.31;30.30;30.30;30.35;30.34;37;35;37;34;31.38
13.09;24.20;01;40

extent that an oral agreement or an implied agreement by trade practice or course of conduct has been created that modified any provisions of the Documents.

(xix)   We express no opinion as to the enforceability of any provision of the Documents (A) that purports to give any person or entity the power to accelerate obligations or to pursue any other remedy without any notice to the obligor or (B) that obligates any Loan Party to pay costs, expenses or other amounts incurred by any of the Creditors to the extent that such costs, expenses or amounts were not reasonably incurred or were not reasonable in amount.

(xx)   We express no opinion as to the enforceability of provisions relating to delay or omission of enforcement of rights or remedies, severance, marshalling of assets, rights of third parties, or prohibitions against transfer, alienation or hypothecation of property.

(xxi)   We express no opinion as to any provision in the Documents insofar as such provision relates to the jurisdiction of courts other than courts of the State of New York or federal courts located in the State of New York, or the subject matter jurisdiction of the United States District Court for the Southern District of New York, in each case to adjudicate any controversy related to the Documents. We call to your attention as well that United States federal court jurisdiction is limited by 29 U.S.C. § 1332 where diversity of citizenship is lacking, and, even where diversity exists, federal courts retain the power to transfer an action from one federal court to another under 28 U.S.C. § 1404, or to dismiss by reason of the doctrine of forum non conveniens.

(xxii)   We express no opinion as to any provision of the Documents insofar as it constitutes (A) a waiver of forum non conveniens in respect of any court, (B) a waiver of the right to object to improper venue, or (C) a waiver of immunity to the extent such waiver purports to apply to immunity acquired by the waiving party after such Document is entered into.

(c)   We express no opinion as to any agreement, document, certificate, or instrument other than the Documents, that may be submitted to, or referred to in or contemplated by, the Documents.

(d)   We express no opinion as to (i) title to or value of any collateral or any other property, (ii) the physical condition or actual use or mode of any property, (iii) whether any property is in compliance with any laws and regulations relating to the construction, occupancy or use thereof (including zoning laws, building codes and environmental laws), (iv) the accuracy, completeness or sufficiency (including for purposes of notices of conveyance) of any description of any property, (v) the characterization of any property, or (vi) the tax or good standing of any party.

(e)   We call your attention to the fact that our representation of the Loan Parties has been limited to the transaction contemplated by the Documents and certain other specific matters as to which we have been consulted.

(f)   This opinion is limited to the matters stated herein. This opinion is provided to you, as a legal opinion only and not as a guaranty or warranty with respect to the matters discussed herein and the documents referred to herein. No opinion is implied or may be inferred beyond the matters expressly stated herein.

Exhibit E

2022-03-21.authenticated.com 855.558-0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.31.31.34.31.38
1300124-200914J

(g)   No opinion is expressed with regard to: (i) the financial ability of any Loan Party to meet its obligations under the Documents; (ii) the truthfulness or accuracy of any applications, reports, plans, documents, financial statements or other matters furnished to any of the Creditors by (or on behalf of) any Loan Party in connection with the Documents or the transactions contemplated therein; or (iii) the truthfulness or accuracy of any representations or warranties made by any of the Loan Parties in any of the Documents, which has not the subject of any of the opinions stated herein.

Except as expressly set forth herein, this opinion letter is being rendered solely for the benefit of the addressees hereof and solely in connection with the above described transaction. This opinion may not be used or relied upon for any other purpose, relied upon by any other party, or filed with any governmental authority or disclosed to any party other than the addressees, without our prior written consent; provided that this opinion may be provided by any of the Creditors to regulators having jurisdiction over it and to its rating agencies, and on a confidential basis to its auditors, potential assignees or participants, affiliates entering into hedging transactions with respect to obligations under the Credit and Guaranty Agreement, controlled affiliates providing services related to the transactions contemplated in the Credit and Guaranty Agreement, legal counsel and other advisers (that not relied on by any of the foregoing). The previous sentence notwithstanding, this opinion letter may be provided to and relied upon by any person that subsequently becomes a Creditor under and in accordance with the terms of the Credit and Guaranty Agreement, as if this opinion were addressed to such person on the date hereof.

Very truly yours,

DLA PIPER LLP (US)

Exhibit D

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.38.30.30.30.30.35.30.35.37.35.12.34.31.38
130829 29:01 -41

Schedule I

Cédula  Certificate of Crédito Real

[See attached]

CONFIDENTIAL
Credito Real MX Program
JAVIER PICHARDINI@US.DLAPIPER.COM
Monday, January 4, 2021 6:25:38 PM

Exhibit H

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.39.30.30.38.34.35.30.34.37.35.32.34.31.38
13.09.24.20.01.61

Schedule II

Quinto Certificate of Mary Valley

[See attached]

Exhibit H

CONFIDENTIAL
Credno Real Estate Program
JAVIER.PICHARDINI@US.DLA.SIPER.COM
Monday, January 4, 2021 4:36:38 PM

Confidential

anema@hl.com

2022-03-10 19:25:38 -0

Exhibit I

Form of Opinion of Special Mexican Counsel to the Loan Parties

[Attached]

CONFIDENTIAL
JAVIER.PICHARDIN@US.DLAPIPER.COM
Credito Real MTN Program
Monday, January 4, 2021 7:36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit I

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38
1340024 2660 1-61

[*], 2020

To the Agent and Lenders
Referred to below,
c/o
**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**
Eleven Madison Avenue
New York, NY 10010
United States
Attn: Agency Manager

Re: Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.

Ladies and Gentlemen:

We have acted as special Mexican counsel to Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada,* organized and existing under the laws of Mexico (the "Company"), as borrower and guarantor, in connection with the Credit and Guaranty Agreement, dated as of [*], 2020 (the "Agreement"), among the Company and Marevalley Corporation, as borrowers, the guarantor party thereto, the lenders from time to time party thereto (the "Lenders"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent for the Lenders (in such capacity, the "Agent"). This opinion is furnished to you pursuant to Section 4.1(f)(ii) of the Agreement. Capitalized terms used herein and not otherwise defined herein have the meanings assigned to such terms in the Agreement. All assumptions and statements of reliance herein have been made without any independent investigation or verification on our part except to the extent, if any, otherwise expressly stated, and we express no opinion with respect to the subject matter or accuracy of the assumptions or items upon which we have relied.

In connection with the opinions expressed herein, we have examined such documents, records and matters of law as we have deemed necessary for the purposes of such opinions. We have examined, among other documents, the following:

(1)    an executed copy of the Agreement;

(2)    executed copies of the Promissory Notes listed in Exhibit A hereto (the "Promissory Notes");

Exhibit D

(3)    an executed copy of the Fee Letter;

(4)    a copy of the by-laws *(estatutos sociales)* of the Company (the "By-laws");

(5)    a copy of (i) the powers-of-attorney granted by the Company to each individual who is a signatory to the Financing Documents, and (ii) the resolutions of the Board of Directors of the Company held on [*], authorizing the entering into and execution of the Financing Documents (as defined below); and

(6)    a copy of the special irrevocable power-of-attorney granted by the Company to C T Corporation System, as Company's agent for service of process pursuant to the Agreement (the "C T Power-of-Attorney").

The documents referred to in items (1) through (6) above, inclusive, are referred to herein collectively as the "Documents" and the documents referred to in items (1) through (3) above, inclusive, are referred to herein collectively as the "Financing Documents".

In all such examinations, we have assumed the legal capacity of all natural persons executing documents, the genuineness of all signatures, the authenticity of original and certified documents, and the conformity to original or certified documents of all copies submitted to us as conformed or reproduction copies. As to various questions of fact relevant to the opinions expressed herein, we have relied upon, and assume the accuracy of, representations and warranties contained in the Documents and certificates and oral or written statements and other information of, or from representatives of the Company and others and assume compliance on the part of the Company with its covenants and agreements contained therein.

We have also assumed, without any independent investigation or verification of any kind, with respect to all of the documents referred to in this opinion, except to the extent set forth in the opinions expressed below as to the Company, that: (i) such documents have been duly authorized by, have been duly executed and delivered by, and, under all laws other than the laws of Mexico, constitute legal, valid, binding and enforceable obligations of, all of the parties to such documents (other than the Company to the extent specifically addressed in our opinion in paragraph (e) below), (ii) all signatories to such documents have been duly authorized (other than the signatories of the Company to the extent specifically addressed in our opinion in paragraph (c) below), (iii) all of the parties to such documents are



2020-01-14 09:00:41

JACOBO GUADALUPE MARTINEZ FLORES
33.30.30.30.13.30.30.30.30.55.30.34.47.33.33.34.31.38
130824 28:01:41

duly organized and validly existing and have the power and authority (corporate or other) to execute, deliver and perform such documents (other than the Company to the extent specifically addressed in our opinions in paragraphs (a) and (b) below) and (iv) each of the Documents which is expressed to be or is to be governed by the law of the State of New York constitutes legal, valid and binding obligations of the parties thereto, enforceable in accordance with its terms, under the laws of the State of New York, United States of America.

Based on the foregoing, and subject to the qualifications stated herein, we are of the opinion that:

(a)    The Company is a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada* duly organized and validly existing under the laws of Mexico.

(b)    The Company has the power and authority to enter into and perform its obligations under the Financing Documents to which it is a party.

(c)    The execution, delivery and performance by the Company of the Financing Documents to which it is a party are within its corporate powers, have been duly authorized by all necessary corporate action and do not contravene (i) any law, rule, regulation, treaty or convention applicable to the Company or its property, or, to our knowledge, any judgment, order or decree of any Mexican court or Mexican Governmental body of which we are aware, applicable to the Company or its property, or, (ii) any provisions of the By-laws of the Company.

(d)    No authorization or approval or other action by, or notice to or filing with, any Governmental Authority in Mexico is required for the due execution, delivery and performance of the Financing Documents by the Company, for the validity or enforceability of the Financing Documents or for the enforcement of the rights and remedies of the Agent and the Lenders under the Financing Documents.

(e)    The Financing Documents and the C.T Power of Attorney have been duly executed and delivered by the Company and constitute legal, valid and binding obligations of the Company, enforceable in accordance with their terms. Messrs. [*] and [*], who have signed the Financing Documents on behalf of the Company had, at the time of execution of such Financing Documents, sufficient authority to execute such Financing Documents on behalf of the Company.

(f)    Each Promissory Note qualifies as a credit instrument (*título de crédito*) under Mexican law granting the holder thereof access to commercial executory proceedings (*acción ejecutiva mercantil*) under Mexican law.

(g)    There is no tax, levy, stamp duty, impost, deduction, charge or withholding imposed by Mexico or any political subdivision thereof either (i) on or by virtue of the execution or delivery of the Financing Documents, or (ii) on any payment to be made by the Company pursuant thereto, other than applicable withholding taxes payable by the Company on payments of interest, commissions and fees made by the Company to a non-resident of Mexico for tax purposes.

(h)    The choice of New York law as the substantive law of the Financing Documents (the "New York Law Financing Documents") is a valid choice of law. The submission to the jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (each a "New York Court") by the Company is a valid submission to jurisdiction under Mexican law, and in both cases, will be recognized by Mexican courts as valid choices of law and jurisdiction, respectively; unless any action or proceeding related to a Promissory Note is brought in Mexico, in which case, Mexican law and the jurisdiction of Mexican courts will prevail pursuant to the terms of such Promissory Note.

(i)    The submission to the laws of Mexico as the governing law under the Promissory Notes, is legal, valid and binding. The submission to the jurisdiction of the courts sitting in Mexico City, Mexico, is legal, valid and binding.

(j)    A judgment rendered by a New York Court, pursuant to a legal action instituted before such Court in connection with the New York Law Financing Documents would be enforceable against the Company in the competent courts of Mexico pursuant to Article 1347-A of the Commerce Code, which provides *inter alia*, that any judgment rendered outside Mexico may be enforced by Mexican courts, provided that:

(i)    such judgment is obtained in compliance with legal requirements of the jurisdiction of the court rendering such judgment and in compliance with all legal requirements of the document sought to be enforced;

(ii)    such judgment is strictly for the payment of a certain sum of money and has been rendered in an *in personam* action as opposed to an *in rem* action;

(iii) service of process is made personally on the Company or on the duly appointed process agent (in the understanding that service of process by mail does not constitute personal service of process for purposes of Mexican law), as appropriate;

(iv) such judgment does not contravene Mexican law, public policy of Mexico, international treaties or agreements binding upon Mexico or generally accepted principles of international law;

(v) the applicable procedural requirements under the law of Mexico with respect to the enforcement of foreign judgments (including the issuance of letters rogatory by the competent authority of such jurisdiction requesting enforcement of such judgment and the certification of such judgment as authentic by the corresponding authorities of such jurisdiction in accordance with the laws thereof), are complied with;

(vi) such judgment is final in the jurisdiction where obtained;

(vii) the judgment fulfills the necessary requirements to be considered authentic;

(viii) the New York Court recognizes the principles of reciprocity in connection with the enforcement of Mexican judgments in its jurisdiction;

(ix) the action on which the final judgment is rendered is not the subject matter of a lawsuit among the same parties pending before a Mexican court or resolved by definite judgment (sentencia definitiva) by a Mexican court that has previously served process (notificado) or delivered a rogatory letter to the competent authorities in accordance with Mexican law;

(x) the court issuing the judgment is considered of competent jurisdiction under the rules internationally accepted that are compatible with Mexican procedural laws; and

(xi) the documents relating to the legal action instituted before the New York Court and the judgment rendered thereunder, are translated into Spanish by an expert duly authorized by the Mexican courts for their admissibility before the Mexican court before which enforcement is requested (such translation would have to be approved by the Mexican court after the defendant had been given an opportunity to be heard with respect to the accuracy of the translation, and such proceedings would thereafter be based upon the translated documents).

2022-0...09...38 -0800

Exhibit B

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.33.30.34.37.35.33.34.31.38
13/08/24 20:01:41

(k)    It is not necessary under the laws of Mexico (i) in order to enable the Agent or the Lenders to enforce their rights under or that derive from the Financing Documents or (ii) solely by reason of the execution, delivery or performance of the Financing Documents, that any of them should be licensed or otherwise qualified to carry on business in Mexico.

(l)    Neither the Company nor any of its assets or properties has any immunity from the jurisdiction of any Mexican court or from set-off or any other legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of Mexico.

(m)    The Company is subject to civil and commercial laws with respect to its obligations under the Financing Documents to which it is a party.

(n)    C T Corporation System has been duly and validly appointed under the laws of Mexico as process agent by the Company to receive and accept for and on behalf of the Company service of process with respect to any legal action, suit or proceeding arising out of or in connection with the Agreement or the Fee Letter.

(o)    Neither the Agent nor the Lenders will be deemed to be a resident of Mexico solely by reason of the execution, delivery and performance of the Financing Documents.

The above opinions are subject to the following qualifications:

(A)    Enforcement may be limited or affected by concurso mercantil, bankruptcy, insolvency, liquidation reorganization, moratorium and other similar laws of general application relating to or affecting the rights of creditors generally.

(B)    Provisions of the Financing Documents granting discretionary authority to the Agent cannot be exercised in a manner inconsistent with relevant facts nor defeat any requirements from a competent authority to produce satisfactory evidence as to the basis of any determination; in addition, under Mexican law, the Company will have the right to contest in court any notice or certificate of the Agent purporting to be conclusive and binding.

(C)    Any obligation to pay interest on interest is currently unenforceable under Mexican Law.

(D)   Although the Company's obligation to pay in Dollars outside of Mexico is valid, it should be noted that, pursuant to Article 8 of the Mexican Monetary Law (*Ley Monetaria de los Estados Unidos Mexicanos*), if collection of amounts payable by the Company in foreign currency outside Mexico under the Financing Documents is sought in Mexico, Mexican courts might render a judgment in Pesos or, if such judgment is rendered in foreign currency but payable in Mexico, such judgment may be discharged in Pesos, at the rate of exchange in effect at the date and place where payment is made, as determined by the Central Bank of Mexico (*Banco de México*). We express no opinion with respect to any provision contrary to the above in the Agreement, including Section 10.13 (Judgment Currency).

(E)   The right to initiate an action may expire under the applicable statute of limitations, and any action may be or become subject to defenses, set-off or counterclaims including those under the Agreement. Any waiver, limitation or provision against public order (*orden público*) in Mexico is currently unenforceable under Mexican law.

(F)   In any proceeding instituted in Mexico for the enforcement of any of the Financing Documents, a Mexican court will apply Mexican procedural law and an official translation into Spanish of the Financing Documents not executed in Spanish by a translator authorized by such Mexican court would have to be prepared to initiate any proceeding for the enforcement thereof in the courts of Mexico (such translation would have to be approved by the Mexican court after the defendant had been given an opportunity to be heard with respect to the accuracy of the translation, and such proceedings would thereafter be based upon the translated documents).

(G)   Under the laws of Mexico, labor claims, claims of tax authorities for unpaid taxes, social security quotas, workers' housing fund quotas, retirement fund quotas and claims of secured creditors or creditors with a special privilege under law will have priority over claims of unsecured creditors.

(H)   Covenants of the Company or its Subsidiaries which purport to bind it on matters reserved by law to shareholders, or which purport to bind shareholders to vote or refrain from voting their shares in the Company or its Subsidiaries, are not specifically enforceable under Mexican law.

(I)   We express no opinion on Section 10.8 (Right of set-off) and 10.12 (Special Waiver) of the Agreement and as to the enforcement through specific performance of any of the Company's obligations (other than



Exhibit I

payment obligations) under the Agreement.

(J)    We note that the irrevocability of the appointment of C T Corporation System as the Company's authorized agent for service of process may not be enforceable under Mexican law and, as consequence, such appointment may be legally revoked.

(K)    As to the provisions contained in the Agreement regarding service of process, it should be noted that service of process by mail does not constitute personal service of process under Mexican law and, since such service of process is considered to be a basic procedural requirement under such law, if for purposes of proceedings outside Mexico service of process is made by mail, we believe a final judgment based on such service of process would not be enforced by the courts of Mexico.

We express no opinion as to any laws other than the federal laws of Mexico in effect as of the date hereof and we have assumed that there is nothing in any other jurisdiction that affects our opinions which is delivered based on the legal provisions as of the date hereof. In particular, we have made no independent investigation of the laws of the United States of America as a basis for the opinion stated herein and do not express or imply any opinion based or standards provided for in such laws. We express no opinion as to the rights, obligations or other matters arising subsequent to the date hereof, and we assume no obligation to advise you, your counsel or any other person or entity of any changes to our opinion subsequent to the date hereof.

This opinion shall be governed by and construed in accordance with the applicable laws of Mexico.

The opinions expressed herein are solely for the benefit of the addressees hereof and your assignees and participants referred to below, in each case, in connection with the transaction referred to herein and may not be relied on by such addressees or such other persons or entities for any other purpose or in any manner, or for any purpose by any other person or entity. At your request (we) hereby consent to reliance hereon by any hedge provider or any future assignee or participant of your interest in the Loans under the Agreement pursuant to an assignment or participation, as applicable, that is made and, to the extent required, consented to in accordance with the express provisions of Section 10.4 of the Agreement, on the condition and understanding that (i) this opinion letter speaks only as of the date hereof, (ii) we have no responsibility or obligation to update this opinion letter, to consider its applicability or correctness to any person or entity other than its addressee(s), or to take into account changes in law, facts or any other developments of which we may later become aware and (iii) any such reliance by a future assignee must be actual and reasonable under the circumstances existing at the time of assignment, including any changes in law, facts or any other

developments known to or reasonably knowable by the assignee at such time.

Sincerely,

**DLA Piper México, S.C.**

CONFIDENTIAL
Credito Real NTN Program
JAVIER.PICHARDINO@US.DLAPIPER.COM,
Monday, January 4, 2021 7:25:38 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit F

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,33,30,30,30,33,30,34,17,35,32,34,31,36
130824 2061-14

### Exhibit A
### Promissory Notes

1. Promissory Note dated [*], executed by the Company [as issuer] [por aval] in favor of [*], in the amount of U.S.$ [*][6].

CONFIDENTIAL
Crédito 804 IMN Program
JAVIER.PICHARDEN@US.DLAPIPER.COM
Monday, January 4, 2021 7:30:74 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.30.30.30.30.30.30.30.30-57.15.32.34.31.38
1308924.2020141

[6] NTD. To be included.

Exhibit A

Exhibit J

Form of Opinion of Special Panamanian Counsel to the Loan Parties

[LETTERHEAD OF ALEMAN, CORDERO, GALINDO & LEE]

[ ], 2020

To the Administrative Agent
and the Lenders from time to time party
to the Credit Agreement referred to below

Re: Crédito Real and Marevalley

Ladies and Gentlemen:

We have acted as special Panamanian counsel to Crédito Real, S. AB, de C.V., SOFOM, E.N.R. ("Crédito Real") and Marevalley Corporation ("Marevalley"), as borrower and, with respect to Crédito Real, guarantor of certain obligations of Marevalley, in connection with a Credit and Guaranty Agreement (the "Credit Agreement") entered into by and among Crédito Real, Marevalley, Credit Suisse AG, Cayman Islands Branch, as administrative agent (in such capacity, the "Administrative Agent"), and the Lenders party thereto (the "Lenders"). This letter is furnished pursuant to Section 4.1(f)(x) of the Credit Agreement. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

As such counsel and for purposes of our opinions and reviewed forth below, we have examined originals or copies, certified or otherwise identified to our satisfaction, of such documents, corporate records, certificates of public officials and other instruments as we have deemed necessary or appropriate as a basis for the opinions and views set forth herein, including, without limitation:

    a. The Credit Agreement;
    b. The promissory notes issued by Marevalley, as Issuer, and Crédito Real, por aval, dated [•], 2020 ("Promissory Notes");
    c. The Articles of Incorporation (Pacto Social) of Marevalley; and
    d. Public Deed No. 6,391 of the Fifth Notary Public of the Panama dated February 22, 2016 and registered under Folio number 460679.

Exhibit J

In addition to the foregoing, we have made such investigations of law, as we have deemed necessary or appropriate as a basis for the opinions and views set forth herein.

The Credit Agreement and the Promissory Notes are referred to herein, individually, as a "Transaction Document" and collectively, as the "Transaction Documents".

In such examination and in rendering the opinions and views expressed below, we have assumed: (i) the due authorization, execution and delivery of all agreements, instruments and other documents by all the parties thereto (other than Marevalley); (ii) the genuineness of all signatures on all documents submitted to us; (iii) the authenticity and completeness of all documents, corporate records, certificates and other instruments submitted to us; (iv) that photocopy, electronic, certified, conformed, facsimile and other copies submitted to us of original documents, corporate records, certificates and other instruments conform to the original documents, records, certificates and other instruments, and that all such original documents were authentic and complete; (v) the legal capacity of all individuals executing documents, (vi) that the Transaction Documents are the valid and binding obligations of each of the parties thereto (other than Marevalley), enforceable against such parties (other than Marevalley) in accordance with their respective terms and that no such documents have been amended or terminated orally or in writing except as has been disclosed to us and (vii) that the rights and remedies set forth in the Transaction Documents will be exercised reasonably and in good faith and were granted without fraud or duress and for good, valuable and adequate consideration and without intent to hinder, delay or defeat any rights of any creditors or stockholders of Marevalley.

We understand that all of the Transaction Documents are governed by laws other than the laws of the Republic of Panama. We have assumed the validity and enforceability under such laws of said documents governed by laws other than the laws of the Republic of Panama. We express no opinion or view as to any laws other than the laws of the Republic of Panama as in effect on the date of this letter and we have assumed that there is nothing in any other laws that affect our opinions and views.

As to all questions of fact material to the opinions and views expressed herein and as to the materiality of any fact or other matter referred to herein, we have relied (without independent investigation) upon certificates or comparable documents of officers and representatives of Marevalley and upon the representations, warranties and covenants contained in the Transaction Documents.

Our knowledge of Marevalley and its legal and other affairs is limited by the scope of our engagement, which scope includes the delivery of this letter. We have been engaged by Marevalley in connection with specified matters (which includes the transactions contemplated in the Transaction Documents), and do not represent Marevalley with respect to all legal matters or issues. Marevalley employs other independent counsel and handles certain legal matters and issues without the assistance of independent counsel.

Statements in this letter which are qualified by the expression "to our knowledge", or "known to us" or other expressions of like import are limited to the current actual knowledge of the individual attorneys in this firm who have devoted substantive attention to the representation



2022-1-14 11:58 -0800
COPIADO DE SU ORIGINAL

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,31,30,30,30,30,33,30,34,37,35,32,34,31,38
(30624 2020-14)

of Marevalley in connection with the preparation, negotiation, execution and delivery of the Transaction Documents (but not the knowledge of any other attorney in this firm or any constructive or imputed knowledge of any information, whether by reason of our representation of Marevalley or otherwise).

Based upon the foregoing, and in reliance thereon, and subject to the limitations, qualifications and exceptions set forth herein, we are of the opinion that:

1. Marevalley is a corporation (*sociedad anónima*) duly organized and validly existing under the laws of Panama and has all corporate power and authority required to own and operate its assets and to carry on its business as currently conducted.

2. Marevalley has all requisite corporate power and authority to execute, deliver and perform its obligations under the Transaction Documents and to consummate the other agreements, documents and instruments to be executed by or in furtherance of the transactions contemplated thereby.

3. The execution and delivery by Marevalley of the Transaction Documents, and the performance by Marevalley of the transactions contemplated thereby, have been duly and validly authorized by all necessary corporate actions of Marevalley in accordance with Panamanian law and its organizational documents.

4. The execution, delivery and performance of the Transaction Documents by Marevalley, the consummation by Marevalley of the transactions contemplated thereby and the fulfillment of the terms thereof will not conflict with or constitute or result in a breach of or a default under (or an event that with the passage of time or both would constitute a default under) or violation of, (i) the provisions of the Articles of Incorporation of Marevalley, or (ii) any applicable law, decree or regulation of Panama.

5. The Transaction Documents have been duly executed and delivered by Marevalley and when duly executed and delivered by each of the parties thereto, will constitute a valid and legally binding obligation of Marevalley enforceable against it in accordance with their terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, intervention, liquidation or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

6. No consent, authorization, approval or notice to or registration or filing with, or other action of any court or other governmental authority in Panama is necessary for the due authorization, due execution, delivery or performance by Marevalley of any of the Transaction Documents, for the validity and enforceability thereof, in accordance with their respective terms and for the consummation by Marevalley of the transactions contemplated therein.

7. Each of the Transaction Documents is in proper legal form for enforcement thereof against Marevalley in Panama, and except as otherwise expressed in this opinion, to ensure the legality, validity, enforceability or admissibility in evidence in Panamanian courts of the Transaction Documents, it is not necessary that such documents be filed or

Exhibit

recorded with any court or other authority in Panama, or that any stamp tax or similar tax be paid on or in respect of such documents in Panama. Notwithstanding the above, please take note that: (i) Panamanian law provides that documents executed outside of Panama are to be authenticated by a Panama Consul or pursuant to the 1961 Hague Convention on the Apostille, and translated into Spanish by a licensed translator in Panama, if the documents are in a foreign language, before being submitted as evidence in the courts of Panama, and (ii) the Transaction Documents will be subject in Panama to a Stamp Tax at a rate of US$0.10 for each US$100.00 of the value of the document, if presented before a court or administrative authority in Panama as evidence.

8. (a) There is no income, stamp or other Tax, of any kind imposed by Panama (or any municipality or other political subdivision or taxing authority thereof or therein that exercises de facto or de jure power to impose such Tax) either (i) on or by virtue of the execution or delivery of the Transaction Documents or (ii) on any payment to be made by any Borrower pursuant to the Transaction Documents, except for, (A) stamp taxes payable on each Transaction Document setting forth a payment obligation in excess of US$10 at the rate of US$0.10 per US$100 of the face value of such Transaction Document if the proceeds of such Transaction Document are used to generate Panama source income *renta de fuente panameña*), the Promissory Notes shall not pay stamp tax pursuant to Art. 973(11) of the Fiscal Code of Panama in the event that the Loan Agreement is stamped and the Promissory Notes expressly reference the Loan Agreement; (B) interest and fee payments made by any Borrower pursuant to any of the Transaction Documents to any Lender not having a tax domicile in the Republic of Panama will be subject to income tax at an effective withholding rate of 12.5% of the amount of the applicable interest or fee payment or such other withholding rate as may be applicable under any applicable treaty (for the avoidance of double taxation) (C) interest and fee payments made pursuant to any of the Transaction Documents to any Lender having a tax domicile in the Republic of Panama will be subject to income tax at ordinary rates; (D) fee payments made pursuant to any of the Transaction Documents to any Lender having a tax domicile in the Republic of Panama will be subject to the tax on transfers of tangible moveable assets and the provisions of services (impuesto sobre la *transferencia de bienes corporales muebles y la prestación de servicios* or ITBMS) if a rate of 7% of the amount of the applicable fee payment; and (E) the Loans made pursuant to any of the Transaction Documents by any Lender having a tax domicile in the Republic of Panama will be subject to the special fund on compensation of interest (*fondo especial de compensación de intereses* or FECI) at a rate of 1% of the amount of the applicable Loan.

9. Marevalley is subject to civil and commercial law with respect to its obligations under the Transaction Documents, and the making and performance of the Transaction Documents by Marevalley constitute commercial acts, neither than public or governmental acts. Marevalley is not entitled to any immunity on the grounds of sovereignty or any other grounds in respect of itself or any of its assets from the jurisdiction of any court or from any action, suit, proceeding or attachment, or the service of process, in connection therewith arising under the Transaction Documents.

Exhibit

10. Under the laws of Panama, the payment obligations of Marevalley under the Transaction Documents will rank at least pari passu in priority of payment with all other unsecured and unsubordinated obligations for borrowed money of Marevalley, except for obligations having priority by operation of law such as claims for taxes, court-related expenses, salaries and social security charges.

11. Under the laws of Panama or of any Governmental Authority or political subdivision of Panama, the choice of the law of the State of New York and the choice of the laws of Mexico as governing laws are legal, valid, binding and enforceable subject to the proof of the provisions of the applicable law of New York and the applicable law of Mexico in the manner provided for in such proceedings in Panama.

12. Under the laws of Panama or of any Governmental Authority or political subdivisions of Panama, (i) the submission by Marevalley to the jurisdiction expressly set forth in each Transaction Document to which it is a party and (ii) the irrevocable appointment by Marevalley of C T Corporation System (the "Process Agent") as process agent, are legal, valid, effective and binding and enforceable.

13. Subject to the qualifications set forth below, service of process to the Process Agent in any suit or proceeding against Marevalley based on or arising out of the Transaction Documents in any federal or state court in the State of New York, assuming its validity under the laws of the State of New York, will be effective insofar as Panamanian law is concerned to confer service of process in any such suit or proceeding.

14. Subject to the issuance of a writ of exequatur by the Supreme Court of Panama, any final judgment obtained against Marevalley in a foreign court relating to any of the Transaction Documents would be recognized, conclusive and enforceable in the courts of Panama without reconsideration of the merits, provided that (i) such foreign court grants reciprocity to the enforcement of judgments of courts of Panama, (ii) the party against whom the judgment was rendered or its agent, was personally (not by mail) served in such action within such foreign jurisdiction if the judgment arises out of a personal action against the defendant, (iv) the obligation in respect of which the judgment was rendered is lawful in Panama and does not contradict the public policy of Panama, (v) the judgment is properly authenticated by diplomatic or consular officers of Panama or pursuant to the 1961 Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents and (vi) a copy of the final judgment is translated into Spanish by a licensed translator in Panama.

15. It is not necessary under the Laws of Panama (i) in order to enable the parties to the Transaction Documents to enforce their rights under the Transaction Documents or (ii) by reason of the execution, delivery or performance of the Transaction Documents, that such parties to the Transaction Documents should be licensed, qualified or entitled to carry on business in Panama.

16. The parties to the Transaction Documents are not or will not be deemed to be a resident, domiciled or carrying on business in Panama solely by reason of the execution, delivery, performance or enforcement of the Transaction Documents.



The above opinions are subject to the following further qualifications:

(a) Since service of process by mail does not constitute personal service under the law of Panama, and since such service is considered to be a basic procedural requirement under such law, if service of process is made by mail or in any manner that does not constitute personal service, the final judgment in connection with such proceeding may not be enforced in the courts of Panama.

(b) Service of any writs, processes or summaries in connection with actions in the courts of Panama will have to be made in compliance with the civil procedure rules of Panama, and service upon the Process Agent will not constitute valid service of such writs, process or summaries in connection with said actions in the courts of Panama.

(c) In case of any suit brought before the courts of Panama, said courts may apply the law of Panama on statute of limitations and expiration (prescripción or caducidad), notwithstanding the fact that the parties to the Transaction Documents have selected New York law or Mexico law to govern such documents. We express no opinion as to the enforceability of a foreign judgment deriving from a lawsuit brought once the statutes of limitations of Panama have elapsed.

We are licensed to practice law in the Republic of Panama, and we do not purport to be experts on, or to express any opinion herein concerning, any laws other than the laws of the Republic of Panama as in effect on the date hereof. We expressly disclaim any responsibility to advise you of any development or circumstance of any kind, including any change of law or fact, that may occur after the date of this letter.

These opinions are limited to the matters expressly set forth herein, and no opinion is implied or may be inferred beyond the matters expressly set forth herein. The opinions expressed herein are being delivered to you as of the date hereof in connection with the Transaction Documents and are solely for your benefit in connection with the Transaction Documents and may not be relied on in any manner or for any purpose by any other person, nor any copies published, communicated or otherwise made available in whole or in part to any other person or entity without our specific prior written consent, provided, however, that (i) copy of this letter may be disclosed by you to any potential successor or assignee, on a non-reliance basis, without our prior consent. However, at your request, we hereby consent to reliance hereon by any future successor or assignee of your interests on the condition and understanding that (i) this letter speaks only as of the date hereof, (ii) we have no responsibility or obligation to update this letter, to consider its applicability or correctness to any person other than the Lenders on this date, or to take into account changes in law, facts or any other developments of which we may later become aware, and (iii) any such reliance by a future successor or assignee must be actual and reasonable under the circumstances existing at the time of assignment, including any changes in law, facts or any other developments known or reasonably knowable by such successor or assignee at such time. In addition, we also hereby consent to your furnishing a copy of this letter to: (A) governmental regulatory agencies having jurisdiction over any person permitted to rely on this letter to the extent required or requested by such agencies in connection with their regulatory function, (B) as potential assignees of your interest in the loans under the Credit Agreement and (C) as required by any order of any court or governmental authority;

Exhibit I

provided, however, that, in each case, no such person or entity shall be entitled to rely on this letter.

Very truly yours,

ALEMAN, CORDERO, GALINDO & LEE

Arturo Gerbaud de la G.

AG/sg

CONFIDENTIAL
Crodux Real MTN Program
JAVIER_RICHARDSON@US.DLAPIPER.COM
Monday, January 4, 2021 7:38:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Exhibit 7

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.39.34.73.33.34.31.38
130924 20:01:41

Exhibit K

Solvency Certificate

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February 19, 2020, among CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Crédito Real"), and MAREVALLEY CORPORATION ("Marevalley," and together with Crédito Real, the "Borrowers"), as borrowers, the guarantor party thereto, the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined herein have the meanings assigned to them in the Credit Agreement.

In connection with the foregoing, the undersigned certifies, for purposes of Section 4.1(e) of the Credit Agreement, that [he / she] is the [chief financial officer / principal accounting officer / treasurer / controller] of Crédito Real and that on the Closing Date, prior to and after giving effect to the borrowing of the Loans, each Borrower is Solvent.

IN WITNESS WHEREOF, the undersigned has executed this certificate on the date first above written.

[Remainder of this page intentionally left blank]



Exhibit K

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.33.30.35.30.34.37.35.22.34.31.38
13.08/23 20:01:41

CRÉDITO REAL, S.A.B. DE C.V.,
SOFOM, E.N.R.

By: _____
        Name:
        Title:

CONFIDENTIAL
Credito Real MTN Program
JAVIER_PICHARDO@US.DLAPIPER.COM
Monday, January 4, 2021 7:38:26 PM

Confidential
anema@hl.com

2022-03-10 19:25:38 -0800

Exhibit

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.13.30.30.30.30.90.35.50.34.47.35.12.34.31.38
13:08:24 26:01:41

Exhibit L

Form of Mexican Power of Attorney in Favor of Process Agent

La sociedad denominada CRÉDITO REAL, SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE, SOCIEDAD FINANCIERA DE OBJETO MÚLTIPLE, ENTIDAD NO REGULADA (la "Sociedad"), por conducto de su apoderado, otorga en favor de C T CORPORATION SYSTEM (el "Agente de Proceso"), con domicilio en el número 28 (veintiocho) Liberty Street, Nueva York, Nueva York, código postal 10005 (diez mil cinco), Estados Unidos de América; teléfono (212) (dos uno dos) 894-8940 (ocho nueve cuatro guión ocho nueve cuatro cero) y telefax (212) (dos uno dos) 894-8581 (ocho nueve cuatro guión ocho cinco ocho uno) o cualquier otro domicilio que C T CORPORATION SYSTEM designe, un PODER ESPECIAL IRREVOCABLE por ser condición en un contrato bilateral en el que la Sociedad es parte, según lo previsto en el Artículo 2596 (dos mil quinientos noventa y seis) del Código Civil Federal y su correlativo del Código Civil para la Ciudad de México (antes el Distrito Federal) y de los Códigos Civiles de los Estados de la República Mexicana.

El Poder que se otorga por medio de la presente escritura es especial en cuanto a su objeto, pero tan amplio como sea necesario en derecho, para que sea ejercido en cualquier jurisdicción, con facultades para pleitos y cobranzas, incluidas las cláusulas especiales, de conformidad con lo dispuesto por los Artículos 2554 (dos mil quinientos cincuenta y cuatro) y 2587 (dos mil quinientos ochenta y siete) del Código Civil Federal y sus correlativos del Código Civil para la Ciudad de México y de los Códigos Civiles de los Estados de la República, para que el Agente de Proceso, a través de sus representantes o apoderados, sin notificar, representación de la Sociedad, pueda oír y recibir todas y cualesquiera notificaciones, citatorios o emplazamientos a juicio de cualquier índole y en cualquier jurisdicción en relación con cualquier demanda, acción, procedimiento o juicio de cualquier carácter incluyendo, sin limitación, procedimientos judiciales, administrativos o arbitrales derivado de o relacionado con el Contrato de Crédito y Garantía (Credit and Guaranty Agreement) según el mismo sea modificado, suplementado o reexpresado de tiempo en tiempo, el "Contrato de Crédito"), a ser celebrado por y entre la Sociedad y Marevalley Corporation, como Acreditado (Borrower) de la Sociedad, como Garante (Guarantor) de Marevalley Corporation, los Acreditantes (Lenders) que de tiempo en tiempo sean parte del mismo, y Credit Suisse AG, Cayman Islands Branch, como Agente Administrativo (Administrative Agent) y Credit Suisse Securities (USA) LLC, como Lead Arranger; así como cualquier otro contrato, convenio, acuerdo, instrumento o título, certificado, documento o transacción que se derive de, o se relacione con, directa o indirectamente, el Contrato de Crédito. Igualmente, la Sociedad, en este acto, señala como domicilio convencional, para recibir cualesquiera de las notificaciones, citatorios o emplazamientos antes citados el ubicado en el número 28 (veintiocho) Liberty Street, Nueva York, Nueva York, código postal 10005 (diez mil cinco), Estados Unidos de América; teléfono (212) (dos uno dos) 894-8940 (ocho nueve cuatro guión ocho nueve cuatro cero) y telefax (212) (dos uno dos) 894-8581 (ocho nueve cuatro guión ocho cinco ocho uno), o cualquier otro domicilio que en el futuro pudiera establecer C T CORPORATION SYSTEM y que le fuere notificado a la Sociedad.

Exhibit L

2020-0_8-0800

JACOBO GUADALUPE MARTÍNEZ FLORES
30.30.30.30.31.30.30.30.30.35.30.34.37.35.32.34.31.38
130829.20:01:41

Exhibit M

Form of Compliance Certificate

Financial Statement Date: [•]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent (as defined below)
Eleven Madison Avenue
New York, NY 10010
United States
Attention: Agency Manager
Tel: +1 (919) 994-6769
Email: list.structured-lendingteam@credit-suisse.com

Ladies and Gentlemen:

Reference is made to the Credit and Guaranty Agreement (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of February 19, 2020, among CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. ("Credito Real"), and MARIVI ALLEY CORPORATION ("Marevalley," and together with Credito Real, the "Borrowers"), the borrowers, the guarantor party thereto, the lenders referred to therein and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Credit Agreement.

The undersigned certifies that [he/she] is a duly appointed Financial Officer of Credito Real and that, as such, is authorized to execute and deliver this certificate pursuant to Section 5.1(e) of the Credit Agreement in the name and on behalf of Credito Real, and further certifies that:

1. after reading Articles V (*Affirmative Covenants*), VI (*Negative Covenants*) and VII (*Events of Default*) of the Credit Agreement, no event and no condition has occurred and is continuing which constitutes, or would constitute, a Default or Event of Default as of the date hereof;

2. the Loan Parties are in compliance with Section 6.3 of the Credit Agreement. Attached hereto as Schedule I is a description in reasonable detail of the calculations to establish the compliance by the Loan Parties with Section 6.3 of the Credit Agreement; and

3. no change in Mexican Accounting Standards or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.4 of the Credit Agreement.

[*Remainder of this page intentionally left blank*].

Exhibit L

Confirmation.pdf
2022-03-10 09:15:38 -0800

*IN WITNESS WHEREOF*, the undersigned has executed this Certificate as of [●], [●].

CRÉDITO REAL, S.A.B. DE C.V.,
SOFOM, E.N.R.

By:
Name:
Title:

CONFIDENTIAL
Crédito Real MTN Program
JAVIER PICKHARDT@US.DLAPIPER.COM,
MONDAY, JANUARY 4, 2021 7 36:26 PM

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

JACOBO GUADALUPE MARTINEZ FLORES
50.30.30.15.1.40.50.30.30.30.55.30.34.37.35.52.34.31.38
130824 20016 41

Schedule I

For the [Quarter][Year] ended [●] ("Statement Date")

### 1. Capitalization Ratio – Section 6.5(a) of the Credit Agreement.

"Capitalization Ratio" means, on any date of determination, the ratio of (a) Consolidated Net Worth on such date, as would be reported on the Consolidated balance sheet of Crédito Real to (b) Net Loan Portfolio on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

| minimum Capitalization Ratio | 0.135:1.00 |

As of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[●]:

| | stockholders' equity of Crédito Real on a Consolidated basis: | U.S.$[●] |
| | (-) amounts attributable to Disqualified Capital Stock of Crédito Real and its Subsidiaries on a Consolidated basis: | U.S.$[●] |
| (a) | Consolidated Net Worth: | U.S.$[●] |

| | Total Loan Portfolio: | U.S.$[●] |
| | (-) Loan Loss Reserves: | U.S.$[●] |
| (b) | Net Loan Portfolio: | U.S.$[●] |

(a)/(b) = [●]

Capitalization Ratio as of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[●] is: [●]:1.00

exchange rate used: MXPS[●] per U.S.$1.00
*exchange rate published by the Mexican Central Bank in the Mexican Official Gazette of the Federation applicable on the last day of the fiscal quarter of Crédito Real most recently ended.

### 2. Delinquency Ratio – Section 6.5(b) of the Credit Agreement.

"Delinquency Ratio" means, on any date of determination, the ratio of (a) Total Non-Performing Loan Portfolio of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real to (b) Total Loan Portfolio of Crédito Real on such date, as would be reported on the Consolidated balance sheet of Crédito Real, all in accordance with Mexican Accounting Standards.

| maximum Delinquency Ratio | 0.04:1.00 |

As of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[●]:

Exhibit M

(a) the entire principal amount of and accrued but unpaid interest on a loan made by Crédito Real that is a Non-Performing Loan is: U.S.$[•].

(b) the Total Loan Portfolio is: U.S.$[•].

(a)/(b)= [•]

Delinquency Ratio as of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[•] is: [•]:1.00

exchange rate used: MXPS[•] per U.S.$1.00 *
* exchange rate published by the Mexican Central Bank in the Mexican Official Gazette of the Federation applicable on the last day of the fiscal quarter of Crédito Real most recently ended.

3. **Reserve Coverage Ratio– Section 6.5(c) of the Credit Agreement.**

"Reserve Coverage Ratio" means, on any date of determination, the ratio of (a) Loan Loss Reserves on such date, as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Total Non-Performing Loan Portfolio on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

| minimum Reserve Coverage Ratio | 1.00:1.00 |
|---|---|

As of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[•]:

(a) the Loan Loss Reserves are: U.S.$[•].

(b) the entire principal amount of and accrued but unpaid interest on a loan made by Crédito Real that is a Non-Performing Loan is: U.S.$[•].

(a)/(b)= [•]

Reserve Coverage Ratio as of [include last day of the fiscal quarter of Crédito Real most recently ended], 201[•] is: [•]:1.00

exchange rate used: MXPS[•] per U.S.$1.00 *
* exchange rate published by the Mexican Central Bank in the Mexican Official Gazette of the Federation applicable on the last day of the fiscal quarter of Crédito Real most recently ended.

4. **Leverage Ratio– Section 6.5(d) of the Credit Agreement.**

"Leverage Ratio" means, on any date of determination, the ratio of (a) Consolidated Net Indebtedness on such date, as would be reported on the Consolidated balance sheet of Crédito Real, to (b) Consolidated Net Worth on such date, as would be reported on the Consolidated balance sheet of Crédito Real.

Exhibit M

2022-07-19_12:25:38 -0800
jmanma@hl.com Confidential
CONFIDENTIAL
MARTINEZ FLORES DRAFT
PROGRAM CARR, CCH
L-RE-MEH PAT

JACOBO GUADALUPE MARTINEZ FLORES
30,30,30,30,13,30,30,30,33,30,54,37,33,32,34,31,38
130024 20631-41

| maximum Leverage Ratio: | 3.50:1.00 |

As of [*include last day of the fiscal quarter of Crédito Real most recently ended*], 201[●]:

    the aggregate principal amount of all Indebtedness of Crédito Real    U.S.$[●]
    and its Subsidiaries on a Consolidated basis
    (-) the sum of cash and Cash Equivalents of Crédito Real and its    U.S.$[●]
    Subsidiaries on a Consolidated basis
  (a)   Consolidated Net Indebtedness:    U.S.$[●]

    stockholders' equity of Crédito Real on a Consolidated basis    U.S.$[●]
    (-) amounts attributable to Disqualified Capital Stock of Crédito    U.S.$[●]
    Real and its Subsidiaries on a Consolidated basis
  (b)   Consolidated Net Worth:    U.S.$[●]

(a)/(b) = [●].

Consolidated Leverage Ratio as of [*include last day of the fiscal quarter of Crédito Real most recently ended*], 201[●] is: [●]:1.00

exchange rate used: MXP$[●] per U.S.$1.00
"exchange rate published by the Mexican Central Bank in the Mexican Official Gazette of the
Federation applicable on the last day of the fiscal quarter of Crédito Real most recently ended.

5. **Liquidity Ratio**—Section 6.5(e) of the Credit Agreement.

"Liquidity Ratio" means, on any date of determination, the ratio of (i) the sum of (i) cash and
Cash Equivalents of Crédito Real on such date that would be reported on the Consolidated
balance sheet of Crédito Real, (ii) investments in securities on such date (other than investments
in Subsidiaries of Crédito Real), as would be reported on the Consolidated balance sheet of
Crédito Real, and (iii) the aggregate amount of Receivables due and payable in respect of the
Performing Loan Portfolio during the period commencing on such date and ending on the
Tranche B Maturity Date (the "Reference Period"), to (b) the aggregate amount of all
Indebtedness of Crédito Real and its Subsidiaries due and payable during the Reference Period.

| minimum Liquidity Ratio | 1.10:1.00 |

As of [*include last day of the fiscal quarter of Crédito Real most recently ended*], 201[●]:

    cash and Cash Equivalents of Crédito Real;    U.S.$[●]
    (+) investments in securities (other than investments in Subsidiaries of    U.S.$[●]
    Crédito Real);
    (+) the aggregate amount of Receivables due and payable in respect of    U.S.$[●]
    the Performing Loan Portfolio during the period commencing on such
    date and ending on the Tranche B Maturity Date (the "Reference

Exhibit M



JACOBO GUADALUPE MARTINEZ FLORES
30.93.30.93.138.30.93.138.30.93.35.20.34.77.35.33.34.5.138
13/08/24 20:01:41

Period* ┌

(a)  Total:                                                                                                U.S.$[•]

(b) the aggregate amount of all Indebtedness of Crédito Real and its Subsidiaries due and
payable during the Reference Period is: U.S.$[•].

(a)/(b)= [•]

Liquidity Ratio as of [*include last date of the fiscal quarter of Crédito Real most recently ended*],
201[•] is: [•]:1.00

exchange rate used: MXP$[•] per U.S.$1.00 *
*exchange rate published by the Mexican Central Bank in the Mexican Official Gazette of the
Federation applicable on the last day of the fiscal quarter of Crédito Real most recently ended.

Confidential
anema@hl.com
2022-03-10 19:25:38 -0800

Crédito Real MTN Program
JAVIER.PICHARDINI@US.DLAPIPER.COM
Monday, January 4, 2021 7:36:26 PM
CONFIDENTIAL

JACOBO GUADALUPE MARTINEZ FLORES
30.30.30.30.31.30.30.30.30.30.31.30.30.30.30.32.30.35.30.37.35.32.34.31.38
13/08/24 20:01:41

Exhibit M



## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

**Archivo Firmado:**
**0811001000000000017588412.p7m**
**Autoridad Certificadora:**
**AUTORIDAD CERTIFICADORA**
**Firmante(s): 1**

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| **Nombre:** | JACOBO GUADALUPE MARTINEZ FLORES | | **Validez:** | BIEN | Vigente |
| **FIRMA** | | | | | |
| **No. serie:** | 30.30.30.30.31.30.30.30.30.30.35.30.34.37.35.32.34.31.38 | | **Revocación:** | Bien | No revocado |
| **Fecha:**<br>**(UTC/ CDMX)** | 19/07/22 17:48:23 - 19/07/22 12:48:23 | | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA - SHA256 | | | | |
| **Cadena de firma:** | 8a c6 67 79 ee e5 9e d0 62 3d af 33 5c 3c 77 c7<br>25 90 ec 3b f5 b5 4a fd bd ee f9 60 9a 50 22 5b<br>b2 b2 a9 58 6f cb 5d af d2 d7 9b e8 e7 4d 17 06<br>c6 0b 3c 44 8f 4b e8 92 38 20 e0 db 55 3a 47 98<br>23 12 08 fa 1f 63 4d d8 fe c2 74 e3 f7 8c af 6c<br>de a0 27 1a 9c e7 61 8e 42 a3 49 e0 4d 29 de bf<br>af 4f a5 f1 ec 37 bf 35 3b fe 79 4c 90 e9 35 3a<br>68 69 2b 9b 63 90 77 bc 99 0d f6 dd 87 23 99 02<br>53 8b 55 b9 c5 11 36 72 42 05 da 90 c0 55 75 9f<br>60 2b af 26 ed 68 fb 42 64 70 2b dc d5 e9 28 b8<br>6a 75 e4 26 0d 7c f2 6c eb dd c7 f9 7c 6e d8 ca<br>58 92 e8 06 9e 33 69 d0 7e 34 d7 7f 57 65 a0 71<br>79 da 5a 88 39 24 53 9f 11 f0 60 2c bd a5 3c be<br>b1 28 1c 87 31 5d 6d 12 a1 51 19 bf f4 a3 5a 4c<br>75 f4 3a 97 34 41 be 0c 77 eb ae fe de d8 61 04<br>d0 f7 a4 a9 d1 13 dd 84 c0 49 c0 86 26 71 cd f0 | | | | |
| OCSP | | | | | |
| **Fecha: (UTC / CDMX)** | 19/07/22 17:48:20 - 19/07/22 12:48:20 | | | | |
| **Nombre del respondedor:** | Servicio OCSP SAT | | | | |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA | | | | |
| **Número de serie:** | 30.30.30.30.31.30.38.38.38.38.38.30.30.30.30.30.33.39 | | | | |
| TSP | | | | | |
| **Fecha : (UTC / CDMX)** | 19/07/22 17:48:23 - 19/07/22 12:48:23 | | | | |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| **Identificador de la respuesta TSP:** | 126099495 | | | | |
| **Datos estampillados:** | v9txAGJ8Tj6man+TWXVWv4yv9JE= | | | | |