## Exhibit J

**Moreno Appeal**



**PODER JUDICIAL**
CIUDAD DE MÉXICO

# Sistema Integral de Gestión Judicial
# PROMOCIÓN



ID DOCUMENTO:            1660575751963
JUZGADO:                 Quincuagésimo Segundo de lo Civil
EXPEDIENTE:              691/2022
FECHA DE DOCUMENTO:      2022-08-15 10:02:29
FECHA DE RECEPCIÓN:      2022-08-15 10:01
COMENTARIOS:

\* La presente hoja NO forma parte del expediente;
fue generada con motivo del proceso interno de digitalización.





PODER JUDICIAL
DE LA
CIUDAD DE MÉXICO

RECIBIDO

2022 AGO 15 A 9:42

JUZGADO QUINCUAGÉSIMO
SEGUNDO DE LO CIVIL

NUMERO 22
OFICIALÍA DE PARTES COMÚN
PARA JUZGADOS Y SALAS

00000006

ROMANOS BERRONDO ÁNGEL FRANCISCO

VS.

CRÉDITO REAL, S.A.B. DE C.V. SOCIEDAD FINANCIERA DE OBJETO MÚLTIPLE, ENTIDAD NO REGULADA

JUICIO ESPECIAL MERCANTIL

EXPEDIENTE: 691/2022

**SE INTERPONE RECURSO DE APELACIÓN DE TRAMITACIÓN INMEDIANTA EN AMBOS EFECTOS EN CONTRA DE LA SENTENCIA DEFINITIVA DE 13 DE JULIO DEL 2022.**

**C. JUEZ QUINCUAGÉSIMO SEGUNDO DE LO CIVIL DEL TRIBUNAL SUPERIOR DE JUSTICIA DE LA CIUDAD DE MÉXICO.**

**JESÚS NAVA MORENO**, en mi carácter de accionista de la persona moral denominada **CRÉDITO REAL, S.A.B. DE C.V. SOCIEDAD FINANCIERA DE OBJETO MÚLTIPLE, ENTIDAD NO REGULADA**, (en lo sucesivo "**CRÉDITO REAL**"), personalidad que solicito me sea reconocida en términos del Contrato de Intermediación Bursátil AKJ786 que en copia certificada se acompaña como **Anexo "1"**, así como de la Constancia de Depósito de acciones representativas del capital social de Crédito Real, expedidas por S.D. Indeval Institución para el Depósito de Valores, S.A. de C.V., en términos del artículo 290, fracción II, de la Ley del Mercado de Valores que se acompaña como **Anexo "2"** y con la carta expedida (listado de posición de acciones del suscrito en Crédito Real) por Grupo Bursátil Mexicano S.A. de C.V., Casa de Bolsa ("**GBM**") el 11 de agosto del 2022, de la que se desprende que tengo celebrado el Contrato de Intermediación Bursátil con GBM y que soy titular de "200,600" acciones representativas del capital social de CREAL que se exhibe como **Anexo "3"**, ante Usted con el debido respeto comparezco a exponer::

Que, en términos de lo dispuesto en los artículos 1079 fracción II, 1336, 1338, 1339, 1345 bis, 1345 bis-1, 1345 bis-2, y demás relativos del Código de Comercio y el tercer párrafo del artículo 232 de la Ley General de Sociedades Mercantiles, en tiempo y forma, en nombre propio promuevo **RECURSO DE APELACIÓN DE TRAMITACIÓN INMEDIATA EN AMBOS EFECTOS EN CONTRA DE LA SENTENCIA DEFINITIVA** dictada por su Señoría el **13 de julio del 2022**, expresando los agravios que más adelante se exponen, solicitando a su Señoría, en términos del artículo 1345 bis 2 del Código de Comercio, forme el testimonio de apelación con todas las constancias que obran en el presente expediente, y en el momento procesal oportuno lo remita a la Superioridad.

Asimismo, con independencia de que no se me ha permitido el acceso al expediente, a fin de no poner en riesgo mi derecho de impugnar la ilegal resolución dictada por su Señoría, **solicito que se me tenga por reservado expresamente mi derecho para ampliar los agravios una vez que tenga conocimiento formal, total y completo de la sentencia que se recurre.**

**CAPÍTULO PREVIO DE LEGITIMACIÓN.**

**1.** Al ser **CRÉDITO REAL** una sociedad pública o abierta, cuyos títulos de acciones por ministerio de la ley se encuentran depositados en el S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., resulta aplicable la Ley del Mercado de Valores por lo que hace a la forma de acreditar mi carácter de accionista respecto la sociedad demandada, y evidenciar el ser titular de diversas acciones correspondientes al capital social de la emisora, siendo aplicable lo siguiente:



PJCDMX
PODER JUDICIAL
CIUDAD DE MEXICO
RECIBIDO
1 2 AGO. 2022
NUMERO 22
OFICIALIA DE PARTES COMÚN
PARA JUZGADOS Y SALAS

30000000



| | |
|---|---|
| PJCDMX PODER JUDICIAL CIUDAD DE MÉXICO | |
| COPIAS DE TRASLADO | 2 |
| BILLETES DE DEPOSITO | |
| PAGARES | |
| CHEQUES | |
| RECIBOS | |
| FACTURAS | |
| CONTRATOS | |
| TESTIMONIOS NOTARIALES | |
| COPIAS DE REGISTRO CIVIL | |
| COPIAS CERTIFICADAS | 3 |
| COPIAS SIMPLES | |
| SOBRES CERRADOS | |
| OTROS | 2 |
| TOTAL DE ANEXOS | 7 |

(i)     El artículo 280 de la Ley del Mercado de Valores, dispone que las instituciones para el depósito de valores otorgan el servicio de depósito, guarda, administración, compensación, liquidación y transferencia de valores inscritos en el Registro Nacional de Valores, en favor, entre otras, de instituciones de crédito y de casas de bolsa. Además, el propio artículo referido establece que las instituciones para el depósito de valores llevan el registro de acciones representativas del capital social de sociedades anónimas bursátiles y las inscripciones correspondientes en los términos y para los efectos a que se refieren los artículos 128 y 129 de la Ley General de Sociedades Mercantiles. A continuación, se transcribe el artículo 280 de la Ley de Mercado de Valores, para pronta referencia:

*"Artículo 280.- Las instituciones para el depósito de valores realizarán las actividades siguientes:*

*I. Otorgar los servicios de depósito, guarda, administración, compensación, liquidación y transferencia de valores inscritos en el Registro, en favor de:*

*a) Entidades financieras nacionales o extranjeras.*

*b) Otras personas que reúnan las características que establezca la Comisión mediante disposiciones de carácter general.*

*II. Otorgar servicios de depósito, guarda, administración, compensación, liquidación y transferencia de valores y prestar de otros servicios inherentes a las funciones que les son propias en favor de entidades financieras, instituciones de crédito nacionales o del exterior o*
*instituciones para el depósito de valores extranjeras, así como recibir dichos servicios de las entidades que corresponda, ajustándose a las disposiciones de carácter general que expida la Comisión.*

*III. Entregar valores que mantengan en depósito, mediante anotaciones en cuenta que lleven a sus depositantes con motivo de las operaciones que realicen sobre dichos valores o conforme a las instrucciones que reciban de éstos, así como hacer constar mediante los asientos correspondientes en cuenta los derechos patrimoniales de los depositantes.*

*IV. Proporcionar servicios para la compensación y liquidación de operaciones con valores que realicen sus depositantes, sin asumir el carácter de contraparte en dichas transacciones.*

*V. Operar sistemas de negociación para que sus depositantes celebren operaciones de préstamo de valores, siendo aplicable lo previsto en el artículo 258 de esta Ley.*

*VI. Intervenir en operaciones mediante las cuales se constituya prenda bursátil sobre los valores que les sean depositados, sin responsabilidad ante la eventual ejecución de la prenda, salvo que actúen de manera negligente o en contravención de las instrucciones del depositante.*

*VII. Llevar el registro de acciones representativas del capital social de sociedades anónimas y realizar las inscripciones correspondientes en los términos y para los efectos a que se refieren los artículos 128 y 129 de la Ley General de Sociedades Mercantiles.*

*VIII. Expedir certificaciones de los actos que realicen en el ejercicio de las funciones a su cargo.*

*IX. Administrar los valores que se les entreguen en depósito, a solicitud del depositante, en cuyo caso sólo podrán hacer efectivos los derechos patrimoniales que deriven de los mismos. Tratándose de depositantes domiciliados en el extranjero, las instituciones para el depósito de valores podrán ejercer los derechos corporativos inherentes a los títulos, siempre que, en cada caso, reciban instrucción por escrito sobre el sentido en que habrán de cumplir con tal representación.*

*X. Realizar actos necesarios para la consecución de su objeto social.*

*XI. Elaborar y publicar estadísticas con la información que obtenga por la prestación de sus servicios o actividades, así como realizar y difundir estudios sobre tal información. Lo anterior, siempre que la información correspondiente no contenga información reservada o confidencial.*

*XII. Las análogas, conexas o complementarias de las anteriores, que les sean autorizadas por la Secretaría, mediante disposiciones de carácter general.*

(ii)     De conformidad con el artículo 283 de la Ley del Mercado de Valores, el servicio de depósito que prestan las instituciones para el depósito de valores se constituirá mediante la entrega de los valores a la institución respectiva, la que abrirá cuentas a favor de los depositantes. **Constituido el depósito, la transferencia de los valores depositados se hará mediante asientos en los registros de la institución depositaria, sin que sea procedente la "entrega física" de los valores, ni su anotación en los mismos o, en su caso, en el registro de las emisoras,** como es el caso de **CRÉDITO REAL**. A continuación, se transcribe el artículo 283 de la Ley del Mercado de Valores, para pronta referencia:

*"Artículo 283.- El servicio de depósito a que se refiere este Capítulo se constituirá mediante la entrega de los valores a la institución para el depósito de valores, la que abrirá cuentas a favor de los depositantes. Adicionalmente, tratándose del servicio de depósito de valores que consten en medios electrónicos, ópticos o de cualquier otra tecnología, la recepción de los mismos se hará ajustándose a las disposiciones contenidas en el Código de Comercio.*

*...*

*Constituido el depósito, la transferencia de los valores depositados se hará mediante asientos en los registros de la institución depositaria sin que sea necesaria la entrega física de los valores, ni su anotación en los mismos o, en su caso, en el registro de sus emisiones.*

*..."*

(iii)     En términos del artículo 284 de la Ley del Mercado de Valores, los depósitos constituidos por los depositantes se harán siempre a su nombre, indicando, en su caso, cuáles son por cuenta propia y cuáles por cuenta de terceros. A continuación, se transcribe el artículo 284 de la Ley del Mercado de Valores para pronta referencia:

*"Artículo 284.- Los depósitos constituidos por los depositantes se harán siempre a su nombre, indicando, en su caso, cuáles son por cuenta propia y cuáles por cuenta de terceros."*

(iv)     El artículo 290 de la Ley del Mercado de Valores dispone que las instituciones para el depósito de valores expedirán a los depositantes, esto es, a los bancos y casas de bolsa, entre otros, constancias no negociables sobre valores depositados, las cuales complementadas, en su caso, con el listado de dichos valores que los propios depositantes formulen al efecto, servirán, respectivamente, para: *(i)* **acreditar la titularidad de los valores y el derecho de asistencia a asambleas**; y *(ii)* **legitimar el ejercicio de derechos que otorguen los valores, inclusive de carácter procesal en juicio, en los que sea necesario exhibir los referidos valores**.

(v)     La S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., es una institución para el depósito de valores debidamente autorizada por las autoridades financieras competentes para actuar como tal, en términos del artículo 272 de la Ley del Mercado de Valores.

(vi)     Las acciones representativas del capital social de **CRÉDITO REAL**, sociedad pública o abierta, se encuentran depositadas en la S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., por lo que rigen los artículos de la Ley del Mercado de

Valores señalados con anterioridad. En adición a lo anterior, conforme al artículo 10, fracción II, de la Ley del Mercado de Valores, las sociedades anónimas que hayan obtenido la inscripción en el Registro Nacional de Valores de las acciones representativas de su capital social o títulos de crédito que representen dichas acciones, como es el caso de **CRÉDITO REAL,** tendrán el carácter de sociedades anónimas bursátiles. A continuación se transcribe el artículo en comento:

> *"**Artículo 10.-** Las sociedades anónimas que se ubiquen en alguno de los supuestos siguientes, estarán sujetas a lo previsto en esta Ley:...*
>
> *...**II.**    Obtengan la inscripción en el Registro de las acciones representativas de su capital social o títulos de crédito que representen dichas acciones, en cuyo caso tendrán el carácter de sociedades anónimas bursátiles. ..."*

(vii)    El suscrito, celebré el Contrato de Intermediación Bursátil AKJ786 con **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa,** el cual se adjunta en copia certificada como **Anexo "1"** al presente escrito, al amparo del cual se abrió cuenta en la que consta la tenencia que tengo respecto de acciones representativas del capital social de **CRÉDITO REAL.**

(viii)    Las acciones de **CRÉDITO REAL,** que tiene por cuenta propia y por cuenta de terceros **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa,** se encuentran depositadas en S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., incluyendo, por cuenta de terceros, aquellas de las cuales soy titular.

(ix)    Derivado de lo anterior, la S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., emitió la constancia en favor de **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa,** respecto de la tenencia que por cuenta propia y de terceros dicha institución tiene de acciones de **CRÉDITO REAL,** misma que se exhibe como **Anexo "2".**

(x)    **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa,** emitió la carta expedida (listado de posición de acciones del suscrito en Crédito Real) el que se hace constar que soy titular de 200,600 acciones representativas del capital social **de CRÉDITO REAL,** mismo que se exhibe como **Anexo "3"**

(xi)    La constancia expedida por la S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., y el listado de **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa,** en términos del artículo 290, fracción II, de la Ley del Mercado de Valores, acredita que soy titular de 200,600 acciones representativas del capital social de **CRÉDITO REAL,** lo que acredita mi legitimación.

En relación con lo anterior, la validez de las operaciones realizadas por el suscrito en términos del Contrato de Intermediación Bursátil celebrado con **Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa,** entre las que se incluye la adquisición de las acciones referidas respecto el capital social de **CRÉDITO REAL,** se desprende, entre otros, de lo dispuesto por los artículos 199 y 200 de la Ley del Mercado de Valores, resultando a su vez aplicable el siguiente criterio emitido por nuestros más importantes tribunales:

> *Registro digital: 182155*
> *Instancia: Tribunales Colegiados de Circuito*
> *Novena Época*
> *Materias(s): Administrativa, Civil*
> *Tesis: I.4o.A.420 A*
> *Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XIX, Febrero de 2004, página 1086*

*Tipo: Aislada*

**MERCADO DE VALORES. EXISTE CAMBIO EFECTIVO DE PROPIEDAD DE ACCIONES BURSÁTILES CUANDO EN LA MISMA FECHA UNA PERSONA VENDE Y COMPRA LAS MISMAS ACCIONES BURSÁTILES AL AMPARO DE DOS CONTRATOS DIVERSOS EN LOS QUE FIGURA COMO TITULAR Y COTITULAR, RESPECTIVAMENTE.**

*Si el quejoso solicitó la venta de determinadas acciones con base en un contrato de intermediación bursátil del cual es titular y en la misma fecha solicitó la compra de las mismas acciones con base en otro contrato de igual naturaleza del cual es cotitular, sí existe un cambio efectivo de la propiedad de las acciones pues, en el primer caso, la propiedad y posesión de los valores son exclusivas de él y, en el segundo, son compartidos, de suerte que las partes no son las mismas y la disposición de los valores en uno y otro contratos puede realizarse de manera autónoma por los cotitulares, amén de que formalmente el titular no es la misma y única persona en uno y otro, por lo que atento el principio de identidad no se está frente a un mismo propietario o titular de las acciones.*

*CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.*

*Amparo directo 334/2003. Francisco Agustín Coppel Luken. 26 de noviembre de 2003. Unanimidad de votos. Ponente: Jean Claude Tron Petit. Secretario: Alfredo A. Martínez Jiménez.*

*Véase: Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo XIII, enero de 2001, página 1699, tesis I.5o.C.90 C, de rubro: "CONTRATO DE INTERMEDIACIÓN BURSÁTIL NO DISCRECIONAL. MEDIOS A TRAVÉS DE LOS CUALES PUEDEN PROBARSE LAS INSTRUCCIONES QUE LOS INVERSIONISTAS DAN A LAS CASAS DE BOLSA PARA QUE REALICEN OPERACIONES AUTORIZADAS POR LA LEY."*

(xii)   En otras palabras, siendo que las acciones emitidas por **CRÉDITO REAL**, de las que soy titular se encuentran depositadas en S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., depósito realizado por conducto de su intermediario, **Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa**, resulta aplicable el artículo 290, fracción II, de la Ley del Mercado de Valores, donde se prevé que para acreditar y legitimar el ejercicio de derechos que otorgan valores depositados ante dicha institución dentro de juicio, se requiere *(i)* la constancia de depósito no negociable sobre los valores depositados, como es el caso de las acciones de mi representado/a, expedidas por S.D. INDEVAL, Instituto para el Depósito de Valores, S.A. de C.V., a los intermediarios; y, *(ii)* el listado de titulares que emitan los intermediarios de dichos valores para acreditar la legitimación de los accionistas para el ejercicio de derechos que otorgan los valores, inclusive de carácter procesal en juicio. Documentos que ya fueron solicitados. A continuación, se transcribe el artículo 290, fracción II, de la Ley del Mercado de Valores para pronta referencia:

*"**Artículo 290.-** Las instituciones para el depósito de valores expedirán a los depositantes constancias no negociables sobre los valores depositados, las cuales complementadas, en su caso, con el listado de titulares de dichos valores que los propios depositantes formulen al efecto, servirán, respectivamente, para:*

*I. Acreditar la titularidad de los valores y el derecho de asistencia a asambleas y, tratándose de acciones, para exigir la inscripción en el registro a que se refieren los artículos 128 y 129 de la Ley General de Sociedades Mercantiles.*

*Los requisitos previstos en los artículos 128, fracción I, y 129 de la Ley General de Sociedades Mercantiles, no serán exigibles respecto de sociedades cuyas acciones se encuentren depositadas en una institución para el depósito de valores. Sin perjuicio de lo anterior, tratándose de acciones que otorguen diferentes derechos deberá anotarse la serie o clase que corresponda.*

Tipo: Acción

**MÉTODO DE VALORAS... EXISTE UN ÚNICO EFECTIVO... DE ACCIONES SEÑALADAS CUANDO EN LA MIS... PERSONA VENDE Y COMPRA LAS MISMAS ACCIONES... NÚMERO DE ROS CONTRATA... DIFIEREN EN LOS QU... TITULAR Y CONTROLAR RESPECTIVAMENTE**

Si tenga o sólo lo la venta de ... compañía... con tan ... ...
mancomunada... fijación del cuál ... titular ... la misma ... ... ...
... al mismo acciones con ... ... ... ... todo la del ... ...
... camine ... al cabo un cambio de ... de promedio de la ... de ... ... ...
... caso, la propiedad y posesión de los ... ... ... ... ... ... ... ...
seguido... son compartidos de ... que los ... poder ... ... ... ...
fijación de los ... ... ... otra entidades pues ... ... ... ...
... ... por las entidades ... en ... mancomunado ... ... ... ...
... pertenecen en uno y otras ... que estén el principio del ... ... ... ...
... el mismo propietario ... ... de las ...

CUARTO TRIBUNAL COLEGIADO EN MATERIA ... ... ...
DEL PRIMER CIRCUITO.

Amparo directo ...14/2004. ... ... ... ... Corp... ... de C... ... ...
noviembre de 2005. Unanimidad de votos. Ponente: ... ... ... ... Van
Secretario: Alfredo A. Martínez Jiménez.

... Semanario Judicial de la Federación y su Gaceta, Novena ... ...,
Tomo XXII, enero de 2006, página 2653, tesis I.5o.C.50 C, de rubro "..., ...
DE INTERMEDIACIÓN BURSÁTIL. NO DESNATURALIZA AQUELLA A PARTE
DE LOS CUALES PUEDEN COBRARSE LAS INSTRUCCIONES QUE ... DE ...
INVERSIONISTAS DAN A LAS CASAS DE BOLSA PARA QUE REALICEN
OPERACIONES AUTORIZADAS POR LA LEY."

(LII) En otras palabras, siendo que las acciones emitidas por ... INDEVAL, S.A. ...
no las que se ... se encuentran depositadas en S.D. INDEVAL, Institución para el Depósito
de Valores, S.A. de C.V., depósito realizado, por conducto de un intermediario, el propio
Bursatil Mexicano, S.A. de C.V., Casa de Bolsa, resulta aplicable el artículo 290, numeral ...
II, de la Ley del Mercado de Valores, donde se prevé que para acreditar y legitimar el
ejercicio de derechos que otorgan valores depositados ante dicha Institución deberá requerir,
a requerimiento (IV) la constancia de depósito no negociable sobre los valores depositados, como
exclusivo de las acciones de ... presentadora, expedidos por S.D. INDEVAL, ... mismo para
... el depósito de C.V. Valores, S.A. de C.V. a los intermediarios y (VI) el listado de valores que
enumera los intermediarios de dichos valores para acreditar la legitimación de los accionistas
para el ejercicio de derechos que otorgan los valores, inclusive de carácter ... en el público.
Lo anterior se deriva a lo que se solicitaba... A continuación, se transcribe el artículo 290, fracción
II, de la Ley del Mercado de Valores para pronta referencia:

"Artículo 290.- Las instituciones para el depósito de valores están obligadas a los
depositantes, a mantener en depósito los valores depositados, los cuales
no conservarán en su caso, con el cumplimiento de dichos ... que los que toca ...
depositados respecto a al gún servicios, respectivamente, por:

I. devolver a la titularidad de los valores y el de créditos ... ... ... ...
II. ... custodia de valores, para exigir la suscripción, la exigir ... que se refieren los
... ... los 129 y 130 de la Ley General de Sociedades Mercantiles.
... ... requisitos previstos en los artículos 128 ... ... y 135 de la Ley General
... Sociedades Mercantiles, no serán exigibles respecto de ... emitidas acciones son
representativos... una institución ... para el depósito de valores. Sin perjuicio de
... ... número de acciones que integral al registro que se encuentra ... ... ... ...

*En el período comprendido desde la fecha en que se expidan las constancias mencionadas en esta fracción, hasta el día hábil siguiente de celebrada la asamblea respectiva, los depositantes no podrán retirar los valores que las referidas constancias amparen.*

*II. Legitimar el ejercicio de derechos que otorgan los valores, inclusive de carácter procesal en juicio, en los que sea necesario exhibir los referidos valores.*

*Las personas que pretendan convocar a una asamblea de accionistas o de tenedores de valores en términos de esta Ley, de los estatutos sociales, del acta de emisión o del título correspondiente, deberán proporcionar a las instituciones para el depósito de valores un ejemplar de la convocatoria a más tardar el día hábil anterior al de su publicación. Además, deberán informarle con una anticipación no menor de cinco días hábiles la fecha de cierre de sus registros de asistencia. Previamente a la celebración de cualquier asamblea y a fin de actualizar las inscripciones correspondientes, los depositantes estarán obligados a proporcionar a la persona que convocó a asamblea, los listados de titulares de los valores correspondientes.*

*Las constancias deberán referirse expresamente al tipo y cantidad de valores que éstas representan de la emisora.*

**9.**     Con base en lo anterior, y para acreditar la calidad de accionista del suscrito, en **CRÉDITO REAL**, se exhibirán en cuanto me sean entregados los siguientes documentos:

El Contrato de Intermediación Bursátil AKJ786 que en copia certificada se acompaña como **Anexo "1"**, así como de la Constancia de Depósito de acciones representativas del capital social de Crédito Real, expedidas por S.D. Indeval Institución para el Depósito de Valores, S.A. de C.V., en términos del artículo 290, fracción II, de la Ley del Mercado de Valores que se acompaña como **Anexo "2"** y con la carta expedida (listado de posición de acciones del suscrito en Crédito Real) por Grupo Bursátil Mexicano S.A. de C.V., Casa de Bolsa ("**GBM**") el 11 de agosto del 2022, de la que se desprende que tengo celebrado el Contrato de Intermediación Bursátil con GBM y que soy titular de "200,600" acciones representativas del capital social de CREAL que se exhibe como **Anexo "3"**

**10.**     Derivado de lo anterior se acredita que soy es titular de 200,600 acciones representativas del capital social de **CRÉDITO REA**, siendo que deberá aplicarse al suscrito un tratamiento igualitario al que se otorgó al promovente del presente procedimiento, mismo que también acreditó su carácter de accionista de la referida sociedad mediante copia certificada de la constancia de depósito de acciones de la sociedad demandada.

Ahora bien, para complementar lo anterior y para brindar mayor claridad respecto de la procedencia de este recurso, a continuación, se exponen los siguientes:

## ANTECEDENTES

**1.** El 14 de julio de 2022, CREDITO REAL publicó un evento relevante en la Bolsa Mexicana y de Valores en el que anunció que el 13 de julio se dictó sentencia por la que se declaró su disolución y se puso en liquidación a dicha empresa.

**2.** De dichos eventos relevantes se desprende que el señor Ángel Francisco Romanos Berrondo, accionista y, supuestamente en carácter de Presidente del Consejo de Administración de CREDITO REAL presentó una demanda de disolución anticipada y liquidación judicial de la empresa.

**3.** Aparentemente un subordinado de la empresa dio contestación a la misma allanándose y sin respetar la garantía de audiencia de los accionistas diversos a la parte actora, entre los que se encuentra el suscrito, fueron decretadas diversas medidas restrictivas y violatorias de derechos, dictándose apenas en cuestión de días sentencia ordenando la

disolución y liquidación de la sociedad demandada, resolución contra la que el suscrito comparece a inconformarse.

**4.** De una revisión que el suscrito realizó en el Boletín Judicial observó que la demanda se radicó en el Juzgado Quincuagésimo Segundo del Tribunal Superior de Justicia de la Ciudad de México con el número de expediente 691/2022 y que el 14 de julio de 2022 se publicó la sentencia definitiva correspondiente, siendo que a pesar de desconocer las consideraciones de la misma, los resolutivos de dicha resolución en sí mismos causan claros perjuicios al suscrito, quien comparece a través del presente escrito a recurrirlos.

## CAPÍTULO PREVIO DE PROCEDENCIA

Se manifiesta a su Señoría que el presente recurso de apelación es procedente en términos de lo dispuesto en el artículo 232 de la Ley General de Sociedades Mercantiles, toda vez que este dispone que, cuando se decrete la disolución de una sociedad por medio de una sentencia dictada en juicio, como es el caso que nos ocupa, los interesados deberán hacer valer los medios ordinarios de defensa que estén a su alcance para combatir el sentido de la resolución. Para mayor claridad y pronta referencia, a continuación, se transcribe el artículo en comento:

> *Artículo 232.- En el caso de la fracción I del artículo 229, la disolución de la sociedad se realizará por el solo transcurso del término establecido para su duración.*
> *En los demás casos, comprobada por la sociedad la existencia de causas de disolución, la causa de disolución se inscribirá de manera inmediata en el Registro Público de Comercio.*
> *Si la inscripción no se hiciere a pesar de existir la causa de disolución, cualquier interesado podrá ocurrir ante la autoridad judicial, en la vía sumaria o, en los casos que la disolución sea por resolución judicial, en la vía incidental, a fin de que ordene el registro de la disolución.*
> *Cuando se haya inscrito la disolución de una sociedad, sin que a juicio de algún interesado hubiere existido alguna causa de las enumeradas por la Ley, podrá ocurrir ante la autoridad judicial, dentro del término de treinta días contados a partir de la fecha de la inscripción, y demandar, en la vía sumaria, la cancelación de la inscripción, salvo los **casos en que la disolución sea por resolución judicial, en los cuales aplicará los medios de impugnación correspondientes a la materia** que emitió la resolución judicial correspondiente.*

Ahora bien, como se desprende del último párrafo del artículo arriba citado, debe ser evidente para su Señoría que existen dos medios de defensa e impugnación ante la disolución de una sociedad en términos de lo dispuesto por los artículos 229 y siguientes de la Ley General de Sociedades Mercantiles, a saber: *i)* los interesados podrán ocurrir ante autoridad judicial dentro del término de 30 días contados desde la fecha de inscripción a demandar la cancelación de la misma; o *ii)* cuando la disolución se haya decretado mediante resolución judicial, procederán los medios de impugnación aplicables al caso específico.

Visto lo anterior, tomando en consideración que el suscrito cuenta con interés jurídico en la resolución del presente juicio, al ser accionista de Crédito Real, tal como se desprende del capítulo previo de legitimación, sociedad que hoy se pretende liquidar mediante sentencia dictada el 13 de julio del 2022, y tomando en consideración que dicha resolución me genera un perjuicio, el suscrito se encuentra en posibilidades de impugnar la sentencia a través del medio ordinario de defensa que se encuentra previsto en el Código de Comercio, es decir, el recurso de apelación en contra de la sentencia definitiva.

En ese sentido, es que el suscrito comparece por medio del presente a interponer el recurso que nos ocupa en contra de la resolución de 13 de julio del 2022 que le causa diversos agravios, mismos que se exponen con claridad en párrafos posteriores.

Asimismo, se manifiesta que el recurso que nos ocupa se interpone en tiempo y forma, toda vez que el suscrito tuvo conocimiento de la existencia de la sentencia de 13 de julio del 2022, el día 14 de julio de 2022, sin embargo dicha resolución surtió efectos el 1 de agosto de 2022, al haber estado la Autoridad Responsable en periodo vacacional, por lo que, en términos de lo dispuesto en la fracción II del artículo 1079 del Código de Comercio, el suscrito comparece a interponer el presente recurso dentro del plazo de 9 días previstos en ley.

En virtud de que el presente recurso de apelación resulta procedente, se solicita a su Señoría que en el momento procesal oportuno remita el presente recurso de apelación a la **H. SALA CIVIL DEL TRIBUNAL SUPERIOR DE JUSTICIA DE LA CIUDAD DE MÉXICO QUE POR TURNO CORRESPONDA**, por lo que a partir de este momento me dirigiré a esa H. Sala.

Independientemente de lo anterior, es importante hacer notar que al momento el suscrito desconoce las consideraciones de la sentencia definitiva impugnada; sin embargo, los resolutivos le causan diversos perjuicios por lo que se recurren de conformidad con los siguientes:

## AGRAVIOS

**PRIMERO.** La sentencia impugnada viola lo dispuesto en los artículos 1, 14 y 16 de la Constitución Política de los Estados Unidos Mexicanos, en relación con los artículos 182, 229, 232, 233, 234 y demás aplicables de la Ley General de Sociedades Mercantiles.

En la sentencia impugnada el Juez A quo determinó que se actualizó la causal de disolución prevista en la fracción V del artículo 232 de la Ley General de Sociedades Mercantiles; sin embargo, dicha determinación resulta inconstitucional debido a que un requisito previo, indispensable y necesario para que pueda declararse por parte de la autoridad jurisdiccional que ha operado una causal de disolución, es que sean en primer lugar los accionistas los que adopten dicha resolución en una asamblea de accionistas.

A efecto de evidenciar lo anterior conviene tener presente el contenido de los artículos 182, fracción II, 229 y 232 de la Ley General de Sociedades Mercantiles que disponen lo siguiente:

*"Artículo 182. Son asambleas extraordinarias, las que se reúnan para tratar cualquiera de los siguientes asuntos:*
*[...] II.- Disolución anticipada de la sociedad; [...] Estas asambleas podrán reunirse en cualquier tiempo."*

*"Artículo 229.- Las sociedades se disuelven: I.- Por expiración del término fijado en el contrato social; II.- Por imposibilidad de seguir realizando el objeto principal de la sociedad o por quedar éste consumado; III.- Por acuerdo de los socios tomado de conformidad con el contrato social y con la Ley; IV.- Porque el número de accionistas llegue a ser inferior al mínimo que esta Ley establece, o porque las partes de interés se reúnan en una sola persona; V.- Por la pérdida de las dos terceras partes del capital social. (ADICIONADO, D.O.F. 24 DE ENERO DE 2018) VI.- Por resolución judicial o administrativa dictada por los tribunales competentes, conforme a las causales previstas en las leyes aplicables."*

*"Artículo 232.- En el caso de la fracción I del artículo 229, la disolución de la sociedad se realizará por el solo transcurso del término establecido para su duración. En los demás casos, comprobada por la sociedad la existencia de causas de disolución, se inscribirá ésta en el Registro Público de Comercio. Si la inscripción no se hiciere a pesar de existir la causa de disolución, cualquier interesado podrá ocurrir ante la autoridad judicial, en la vía sumaria, a fin de que ordene el registro*

*de la disolución. Cuando se haya inscrito la disolución de una sociedad, sin que a juicio de algún interesado hubiere existido alguna causa de las enumeradas por la Ley, podrá ocurrir ante la autoridad judicial, dentro del término de treinta días contados a partir de la fecha de la inscripción, y demandar, en la vía sumaria, la cancelación de la inscripción."*

En efecto, de una interpretación sistemática de los artículos 182, fracción II, 229 y 232 de la Ley General de Sociedades Mercantiles, se extrae que dentro de las causas que provocan la disolución de una sociedad, se encuentran las previstas en las fracciones I y III del señalado artículo 229, que no requieren de declaración alguna.

Lo cual no acontece con las restantes causas que sí requieren de una declaración, **la cual debe efectuarse exclusivamente por los socios**, pues no debe perderse de vista que, conforme el numeral 182, fracción II, de la citada ley mercantil, la disolución anticipada de la sociedad deberá determinarse en asamblea extraordinaria y, acorde a lo previsto en los arábigos 183 y 184 de la citada ley, estas sólo pueden iniciarse por convocatoria del Consejo de Administración, los Comisarios o los accionistas.

De ahí que, el legislador previó que **en todos los casos de disolución distintos de la expiración del término, resulta indispensable que la sociedad mercantil, actuando a través de su órgano supremo que es la Asamblea de Accionistas, se pronuncie al respecto**, para de esa forma poder inscribir en el Registro Público de Comercio la determinación tomada por los socios, o, en su defecto, se den los supuestos de intervención judicial.

En consecuencia, una vez actualizada la causa de disolución de la sociedad, existen únicamente dos vías para materializarla, dependiendo la causa correspondiente, a saber: *(i)* si debe disolverse por la expiración del término fijado en el Contrato social, la disolución operará por el mero transcurso del tiempo, de pleno derecho; y, *(ii)* en cualquier otro caso, debe seguirse el procedimiento establecido en la Ley General de Sociedades Mercantiles, a saber:

*i.*   Que se compruebe, discuta y resuelva lo relativo a la actualización de la referida causal de disolución anticipada, en Asamblea Extraordinaria de Accionistas, tal como lo exige el artículo 182, fracción II., de la Ley General de Sociedades Mercantiles;

*ii.*   Que la Sociedad comparezca ante el Registro Público de Comercio a inscribir la disolución; y,

*iii.*   Sólo si la Sociedad se abstiene de llevar a cabo la inscripción ante el Registro Público de Comercio, cualquier interesado puede acudir ante la autoridad judicial, ya sea en la vía sumaria o incidental, dependiendo la causa generadora, a requerir el registro de la disolución.

Como se desprende de lo anterior, contrario a lo resuelto en el juicio en que se actúa y salvo lo dispuesto por el artículo 229, fracción VI, de la Ley General de Sociedades Mercantiles, **para que se pueda dar la intervención judicial en un caso de disolución de sociedades mercantiles, se debe haber agotado el procedimiento interno ante la propia sociedad a disolver**, a saber: *(i)* que se haya comprobado y resuelto, en Asamblea Extraordinaria de Accionistas, la actualización de la causa de disolución anticipada; y, *(ii)* que no obstante ello, la Sociedad a través de sus representantes, haya sido omisa en solicitar la inscripción correspondiente ante el Registro Público de Comercio. Lo anterior se corrobora si atendemos además, al contenido del diverso ordinal 178 de la Ley General de Sociedades Mercantiles, que señala que la Asamblea General de Accionistas es el órgano supremo de la sociedad y al 182 del citado cuerpo de leyes, que establece que mediante la Asamblea Extraordinaria es que se debe resolver cualquier asunto relacionado con la disolución anticipada de la sociedad.

Comprobada por los socios la causa de disolución y cuando esta no sea inscrita en el referido registro público, cualquier interesado podrá ocurrir ante la autoridad judicial para solicitar se haga la inscripción conducente, refiriéndose "cualquier interesado" únicamente a los socios de la moral involucrada en el proceso de disolución, puesto que, conforme al artículo 182 del citado cuerpo de leyes, los socios de una moral tienen dentro de sus facultades exclusivas, entre otras, prorrogar la duración de la sociedad, disolverla anticipadamente o aumentar o reducir su capital, de tal forma que, sería inadmisible que un tercero ajeno a los socios fuera quien demande la comprobación de una causal de disolución o la inscripción de la misma, pues los asuntos relativos a la constitución, permanencia o disolución de una sociedad mercantil no corresponde a terceros sino a los integrantes de la sociedad. Es inconcuso que solamente los socios o accionistas son quienes tienen interés en las cuestiones propias de la sociedad mercantil a la que pertenecen y no cualquier tercero ajeno a las mismas, pues el hecho de que exista una relación comercial entre diversas sociedades, ello no daría lugar mas a que a un interés derivada de su relación comercial, pero no injerencia en cuestiones internas de cada sociedad.

Sirve de apoyo a lo anterior, el siguiente criterio jurisprudencial de aplicación al caso concreto:

*Registro digital: 2007758*
*Instancia: Tribunales Colegiados de Circuito*
*Décima Época*
*Materias(s): Civil*
*Tesis: I.11o.C.66 C (10a.)*
*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 11, Octubre de 2014, Tomo III, página 2818*
*Tipo: Aislada*
***CONCURSO MERCANTIL SOLICITADO POR EL APODERADO GENERAL PARA PLEITOS Y COBRANZAS DE LA SOCIEDAD COMERCIANTE. CONSTITUYE UN REQUISITO DE PROCEDENCIA PARA SU ADMISIÓN QUE, PREVIAMENTE, ESA DECISIÓN SE TOME EN ASAMBLEA GENERAL EXTRAORDINARIA DE ACCIONISTAS, POR SER UN CASO ANÁLOGO A LA DISOLUCIÓN DE LA SOCIEDAD PREVISTA EN LA FRACCIÓN II DEL ARTÍCULO 182 DE LA LEY GENERAL DE SOCIEDADES MERCANTILES (LEY DE CONCURSOS MERCANTILES VIGENTE HASTA EL 10 DE ENERO DE 2014).***
*De la interpretación armónica de los artículos 178, 181 y 182 de la Ley General de Sociedades Mercantiles, se advierte que la asamblea general de accionistas, como órgano supremo de la sociedad, tiene la facultad de celebrar asambleas extraordinarias para tratar asuntos de gran trascendencia que afecten o comprometan en forma directa e indirecta el patrimonio, permanencia y viabilidad de la sociedad, como son: la prórroga de su duración, su disolución anticipada, el aumento o reducción del capital social, el cambio de objeto o de nacionalidad, su transformación, la fusión con otra sociedad, la emisión de acciones privilegiadas, y la modificación del contrato social. Con relación a **la disolución anticipada** de la sociedad prevista en la fracción II del artículo 182 de la ley en cita, **es el primer paso para que ésta se coloque en estado de liquidación** y su objeto es concluir las operaciones sociales pendientes al momento de la disolución, como realizar el activo social, pagar el pasivo de la sociedad y distribuir el remanente -si lo hubiere-entre los socios, en la proporción que les corresponda, de acuerdo con lo convenido o lo dispuesto por la legislación. Por otra parte, de lo dispuesto en los artículos 20, 37, 117, 176, 177, 178, 179, 180, 183, 185, 186, 195 y 196 de la Ley de Concursos Mercantiles, vigente hasta el 10 de enero de 2014, se desprende que la decisión de solicitar el concurso mercantil es un caso análogo a la disolución anticipada de la sociedad, pues entre las consecuencias que conlleva su admisión, destaca la relativa a que de resultar fundado éste, la sociedad comerciante puede pedir, de manera expresa, que en lugar de la conciliación, se abra la etapa de quiebra, lo que evidentemente tendrá repercusión en los órganos que la conforman, ya que esa determinación no sólo se ve reflejada en la empresa, como persona moral, sino en sus socios, administradores, representantes, y todo aquel que tenga una relación*

*directa o indirecta con ese ente jurídico. Es así, pues la quiebra implica ponerla en estado de liquidación con la consecuente enajenación de sus unidades productivas o de sus bienes para el pago de los créditos reconocidos y, por tanto, sus efectos tendrán impacto en todos sus órganos. En ese sentido, **la decisión relativa a solicitar que la autoridad jurisdiccional la declare en concurso mercantil es un asunto que, por su trascendencia, debe tratarse por el órgano supremo de la sociedad, al ser un caso análogo a su disolución anticipada** y, en esa medida, esa determinación debe constar de manera indubitable cuando se presente la solicitud de concurso mercantil, lo que trae como consecuencia lógica, jurídica y necesaria que si el promovente es el apoderado general para pleitos y cobranzas de la sociedad comerciante, entonces debe acreditar con las constancias respectivas, que esa decisión emana directamente de la asamblea general extraordinaria de accionistas, pues de no ser así, carecerá de legitimación para solicitarla, ya que no se trata de un aspecto de personalidad, sino de un requisito de procedencia para que se provea sobre su admisión.*

*DÉCIMO PRIMER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.*

*Amparo directo 794/2013. Préstamos para Crecer, S.A. de C.V., S.F. de O.M., entidad no regulada. 24 de marzo de 2014. Unanimidad de votos. Ponente: Fernando Rangel Ramírez. Secretaria: Isabel Rosas Oceguera.*
*Esta tesis se publicó el viernes 24 de octubre de 2014 a las 09:35 horas en el Semanario Judicial de la Federación.*

En ese tenor, en primer término, **no existe en la Ley General de Sociedades Mercantiles un procedimiento como el que se pretendió llevar en el juicio que nos ocupa**, sino que su tramitación se debió a una interpretación tergiversada por parte del Juez A Quo de las disposiciones jurídicas aplicables al caso concreto. Lo anterior es así, puesto que si bien supuestamente se siguió el presente procedimiento, conforme lo dispuesto por los artículos 229, 232 y siguientes de la Ley General de Sociedades Mercantiles, **no se cumplieron los requisitos legales indispensables para su procedencia y se tramitó conforme un supuesto que al no tener regulación en Ley, debió seguirse en todo caso bajo las reglas del Juicio Ordinario Mercantil.**

En términos de la acción ejercida en el juicio que nos ocupa, cierto supuesto accionista de CRÉDITO REAL compareció ante el Juez A Quo, a manifestar que dicha sociedad había perdido dos terceras partes de su capital social, solicitando en consecuencia la disolución de la misma, lo que pretendió ejecutar mediante el procedimiento sumario previsto por el artículo 232, **mismo que no es aplicable en el caso concreto**. El procedimiento sumario referido, únicamente es aplicable en los supuestos en que: *(i)* ya se decidió, por el Órgano Supremo de la Sociedad, a saber, la Asamblea Extraordinaria de Accionistas, que se materializó la causal de disolución anticipada invocada; y, *(ii)* no obstante ello, la Sociedad se negó a realizar la inscripción correspondiente ante el Registro Público de Comercio, **en cualquier caso diverso, tal como acontece en el presente procedimiento, el interesado en que el Juzgador realice determinada declaración, debe acudir ante el mismo en la vía ordinaria mercantil.**

Contrario a lo anterior y actuando con total arbitrariedad, sin fundamento alguno, la sentencia impugnada: *(i)* dio trámite a la acción ejercida, no obstante su evidente improcedencia; y, *(ii)* determinó la disolución de CRÉDITO REAL, sin que la supuesta causa de disolución fuera reconocida ni determinada previamente por su Asamblea de Accionistas, y, sin que dichos accionistas fueran oídos y vencidos en juicio, en lo que se insistirá más adelante.

El suscrito manifiesta bajo protesta de decir verdad que nunca existió una convocatoria, y mucho menos una asamblea extraordinaria de los accionistas de CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., por la cual se analizara, discutiera y en su caso reconociera la supuesta causa de disolución de dicha sociedad, siendo que precisamente para que la autoridad jurisdiccional pueda reconocer dicha causa de disolución se requiere que

ésta haya sido previamente adoptada y reconocida por los accionistas de la sociedad, lo cual no aconteció en el caso que nos ocupa.

Bajo esa línea, se advierte que todo el procedimiento y la sentencia impugnada resultan inconstitucionales e ilegales, debido que **el procedimiento de disolución y liquidación únicamente pueden ser sometido ante la autoridad jurisdiccional una vez que la asamblea de accionistas de la sociedad haya comprobado la causa de disolución,** es decir, resulta un requisito previo, necesario e indispensable para acudir a un procedimiento de disolución y liquidación conforme a la Ley General de Sociedades Mercantiles que la asamblea de accionistas haya reconocido y declarado que se actualizó alguna de las causales distintas a la expiración del plazo y que, no obstante ello, la Sociedad se haya abstenido a inscribir el acto relativo y continuar con la liquidación. Lo anterior ha sido reconocido en diversos criterios emitidos por nuestros más altos tribunales:

> *Registro digital: 198597*
> *Instancia: Tribunales Colegiados de Circuito*
> *Novena Época*
> *Materias(s): Civil*
> *Tesis: XIV.2o.48 C*
> *Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo V, Junio de 1997, página 784*
> *Tipo: Aislada*
>
> **SOCIEDADES. PREVIAMENTE A ACUDIR ANTE LA AUTORIDAD JUDICIAL A SOLICITAR QUE SE DECLARE SU DISOLUCIÓN, ÉSTA DEBE PROPONERSE A LA ASAMBLEA.**
>
> *El artículo 232 de la Ley General de Sociedades Mercantiles señala que de las causas de disolución de una sociedad, contenidas en las fracciones I a V del diverso numeral 229 del mismo ordenamiento, únicamente la que se refiere a la expiración del término fijado en el contrato, se realizará por el solo transcurso del tiempo; según en cualquier otra hipótesis, al no hacerse la inscripción una vez comprobada por la sociedad la causa respectiva, la disolución se inscribirá en el Registro Público de Comercio y, de no ser así, alguno de los interesados puede acudir ante la autoridad judicial para que la ordene. Por su parte, el artículo 182, fracción II, de la citada ley mercantil prevé que la disolución anticipada de la sociedad deberá determinarse en asamblea extraordinaria, cuya celebración puede ser solicitada por cualquier socio, según lo disponen los artículos 183 y 184 siguientes. **En este contexto, se evidencia que en todos los casos de disolución, distintos de la expiración del término, resulta necesario que la sociedad mercantil de que se trate se pronuncie al respecto, previamente a formular la solicitud correspondiente ante el órgano judicial; de ahí que si tal determinación no ha sido tomada por la asamblea, el Juez natural se encuentra imposibilitado para decretarla.**
>
> *SEGUNDO TRIBUNAL COLEGIADO DEL DÉCIMO CUARTO CIRCUITO.*
>
> *Amparo directo 185/97. Irene del Socorro Rivas Garrido. 24 de abril de 1997. Unanimidad de votos. Ponente: Pablo V. Monroy Gómez. Secretario: José Guadalupe Orta Méndez.*
>
> *Registro digital: 2020032*
> *Instancia: Tribunales Colegiados de Circuito*
> *Décima Época*
> *Materias(s): Civil*
> *Tesis: XVII.1o.C.T.31 C (10a.)*
> *Fuente: Gaceta del Semanario Judicial de la Federación. Libro 67, Junio de 2019, Tomo VI, página 5364*
> *Tipo: Aislada*
>
> **SOCIEDADES MERCANTILES. CARECE DE INTERÉS LEGÍTIMO UN TERCERO AJENO A LOS SOCIOS PARA DEMANDAR LA COMPROBACIÓN DE UNA CAUSAL DE DISOLUCIÓN O SU INSCRIPCIÓN EN EL REGISTRO PÚBLICO DE COMERCIO.**
>
> *De la interpretación sistemática de los artículos 182, 183, 184, 229 y 232 de la Ley General de Sociedades Mercantiles, se advierte que dentro de las causas que originan la disolución de una sociedad, se encuentran las previstas en las fracciones I y III del*

*artículo 229 citado, que no requieren de declaración alguna, mientras que las restantes sí; asimismo, conforme al numeral 182, fracción II, referido, la disolución anticipada de la sociedad deberá determinarse en asamblea extraordinaria la que, acorde con lo previsto en los artículos 183 y 184 invocados, sólo puede iniciarse por convocatoria del administrador o por el consejo de ·administración, o los comisarios o los accionistas; en consecuencia, una vez comprobada por los socios la causa de disolución y cuando ésta no sea inscrita en el Registro Público de Comercio "cualquier interesado" podrá ocurrir ante la autoridad judicial para solicitar que se haga la inscripción conducente, refiriéndose dicho término únicamente a los socios de la moral involucrada en el proceso de disolución, puesto que, conforme al artículo 182, fracciones I, II y III, mencionado, los socios de una persona moral tienen, dentro de sus facultades exclusivas, entre otras, prorrogar la duración de la sociedad, disolverla anticipadamente o aumentar o reducir su capital; de tal forma que un tercero ajeno a los socios carece de interés legítimo para demandar la comprobación de una causal de disolución o su inscripción, pues el hecho de que exista una relación comercial entre diversas sociedades, sólo da lugar a un interés derivado de su relación comercial, pero no su injerencia en cuestiones internas de cada sociedad; además, si la intención del legislador hubiera sido que cualquier tercero contara con dicha facultad, así lo hubiera establecido.*

*PRIMER TRIBUNAL COLEGIADO EN MATERIAS CIVIL Y DE TRABAJO DEL DÉCIMO SÉPTIMO CIRCUITO.*

*Amparo directo 706/2018. Inmobiliaria Axial, S.A. de C.V. 22 de marzo de 2019. Unanimidad de votos. Ponente: María del Carmen Cordero Martínez. Secretaria: Silvia Patricia Chavarría Hernández.*
*Esta tesis se publicó el viernes 07 de junio de 2019 a las 10:13 horas en el Semanario Judicial de la Federación.*

*Registro digital: 183842*
*Instancia: Tribunales Colegiados de Circuito*
*Novena Época*
*Materias(s): Civil*
*Tesis: I.9o.C.104 C*
*Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XVIII, Julio de 2003, página 1095*
*Tipo: Aislada*

**DISOLUCIÓN DE SOCIEDADES MERCANTILES. PARA QUE CUALQUIER INTERESADO OCURRA ANTE LA AUTORIDAD JUDICIAL A SOLICITAR SU INSCRIPCIÓN EN EL REGISTRO PÚBLICO DE COMERCIO, ES REQUISITO DE PROCEDIBILIDAD ACREDITAR QUE LA ASAMBLEA HUBIESE COMPROBADO LA CAUSA DE DISOLUCIÓN.**

*Dentro de las causas que provocan la disolución total de la sociedad contempladas por el artículo 229 de la Ley General de Sociedades Mercantiles, la prevista en la fracción I no requiere de declaración alguna, pues se actualiza en el momento preciso en que expira el plazo para el cual fue constituida la sociedad. En cambio, las restantes causas de disolución contempladas en el citado artículo, con excepción de la causa de disolución voluntaria prevista en la fracción III, atinente a que la sociedad puede disolverse por acuerdo de los socios, sí requieren de declaración, la cual no es potestativa sino necesaria en razón de la multiplicidad de compromisos que adquiere la sociedad durante su vida jurídica. Ahora, de la literalidad del segundo párrafo del artículo 232 de la legislación especial en consulta, se infiere que previamente a la solicitud de la inscripción de la disolución de la sociedad debe existir la declaración por parte de ésta de que se actualizó la causa de disolución. En ese contexto, para que cualquier interesado pueda acudir ante la autoridad judicial a solicitar la inscripción de la disolución de la sociedad mercantil, debe satisfacer como requisito de procedibilidad la previa comprobación por parte de la sociedad de la existencia de las causas de disolución en que fundó la pretensión contenida en el escrito de demanda.*

*NOVENO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.*

*Amparo directo 339/2003. 27 de mayo de 2003. Unanimidad de votos. Ponente: Ana María Serrano Oseguera. Secretario: Marco Antonio Guzmán González.*

En consecuencia, la sentencia impugnada deviene notoriamente inconstitucional e ilegal debido a que nunca existió ni una convocatoria para asamblea, ni mucho menos una

asamblea extraordinaria de los accionistas de CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., en la cual se reconociera y declarara que se actualizó la causal de disolución por la pérdida de las dos terceras partes del capital social, requisito que resultaba indispensable, aunado a la negativa de la Sociedad a inscribir dicho acto, para que procediera el procedimiento sumario previsto por el artículo 232 de la Ley General de Sociedades Mercantiles.

**SEGUNDO.** La sentencia impugnada viola lo dispuesto en los artículos 1, 14, 16 y 17 de la Constitución Política de los Estados Unidos Mexicanos, en relación con los artículos 182, 229, 232, 233, 234 y demás aplicables de la Ley General de Sociedades Mercantiles.

El artículo 14 de la Constitución Política de los Estados Unidos Mexicanos prevé la garantía de audiencia de asiste a los gobernados, mismo que en su segundo párrafo dispone lo siguiente:

> *"Artículo 14.- [...]*
> *Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho."*

El artículo transcrito establece la conocida garantía de audiencia, conforme a la cual todo gobernado tiene la posibilidad de ser escuchado por un tribunal previamente establecido, de manera previa a sufrir un acto privativo y mediante un procedimiento que cumpla con la totalidad de sus formalidades esenciales, otorgando protección jurídica al gobernado en su vida, libertad, propiedades, posesiones y derechos; por ende, permite al gobernado ejercer oposición en contra de la acción arbitraria por parte de las autoridades, o bien la violación a ésta garantía incluso en la expedición de normas generales de observancia obligatoria, condicionando la existencia de congruencia entre lo que se alega y lo que se resuelve, además de contextualizar obligaciones de autoridades para proceder constitucionalmente.

En ese tenor, todas las autoridades en sus funciones judiciales, ejecutivas así como legislativas deben prever y respetar, antes de generar cualquier acto que pueda tener efectos privativos, la existencia de un juicio que cumpla con las formalidades esenciales del procedimiento, en el que se otorgue al gobernado la suficiente oportunidad de defenderse de aquellos actos que la autoridad pretende hacer valer en su contra, siendo que el cumplimiento de ésta garantía debe estar presente en todo momento.

Lo anterior, toda vez que al negar la existencia de un juicio, recurso u oposiciones correspondientes previo se ven perdidos los atributos de la formalidad del procedimiento y se deja en estado de indefensión a las partes y por ende el contenido esencial del derecho es la garantía de defenderse de un procedimiento mediante las formalidades establecidas en la constitución, obligando así un debido actuar a las autoridades respecto a la aplicación de la ley mediante un procedimiento forzoso, por lo que el gobernado tiene la seguridad de recibir la justa aplicación de la ley y así garantizar la regularidad de la actuación de las autoridades.

Asimismo, la Convención Americana Sobre Derechos Humanos, en su artículo octavo primer párrafo, establece lo siguiente:

> *"Artículo 8.- Garantías Judiciales*
> *1. Toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter."*

En este sentido, las garantías judiciales son un requisito de acceso de la administración de la justicia de manera legal y efectiva que se deben observar para hacer

referencia a la regulada protección de derechos mediante la ley, sobre cualquier acto ejecutado por autoridades competentes que determinen derechos y obligaciones de las personas, y que exigen al Estado garantice la tramitación de un proceso que ampare a las personas contra actos que pudieran resultar violatorios de sus derechos.

Así las cosas, resulta indiscutible que un proceso legal garantiza, protege, asegura y hace valer la titularidad o ejercicio de un derecho de defensa y acceso a la justicia, donde las partes tienen la posibilidad de presentar ante un juez imparcial pruebas y objetar a la contraparte con las debidas garantías en un respectivo proceso para esclarecer el hecho de un modo imparcial y sancionar a los responsables.

Así, la garantía de audiencia está compuesta de diversos elementos, según se explica en la Jurisprudencia emitida por nuestros más importantes tribunales, que sigue:

> *"Época: Novena Época*
> *Registro: 169143*
> *Instancia: Tribunales Colegiados de Circuito*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo XXVIII, Agosto de 2008*
> *Materia(s): Común*
> *Tesis: I.7o.A. J/41*
> *Página: 799*
> *AUDIENCIA, CÓMO SE INTEGRA ESTA GARANTÍA.*
> *De entre las diversas garantías de seguridad jurídica que contiene el segundo párrafo del artículo 14 de la Constitución Política de los Estados Unidos Mexicanos, destaca por su primordial importancia, la de audiencia previa. Este mandamiento superior, cuya esencia se traduce en una garantía de seguridad jurídica para los gobernados, impone la ineludible obligación a cargo de las autoridades para que, de manera previa al dictado de un acto de privación, cumplan con una serie de formalidades esenciales, necesarias para oír en defensa a los afectados. Dichas formalidades y su observancia, a las que se unen, además, las relativas a la garantía de legalidad contenida en el texto del primer párrafo del artículo 16 constitucional, se constituyen como elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario y anárquico sino, por el contrario, en estricta observancia del marco jurídico que la rige. Así, con arreglo en tales imperativos, todo procedimiento o juicio ha de estar supeditado a que en su desarrollo se observen, ineludiblemente, distintas etapas que configuran la garantía formal de audiencia en favor de los gobernados, a saber, que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite, que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de comprobación tal, que quien sostenga una cosa tenga oportunidad de demostrarla, y quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; que cuando se agote dicha etapa probatoria se le dé oportunidad de formular las alegaciones correspondientes y, finalmente, que el procedimiento iniciado concluya con una resolución que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas."*

En términos de lo anterior, resulta indiscutible que la garantía de audiencia como tal se constituye de diversos elementos fundamentales útiles para demostrar a los afectados por un acto de autoridad, que la resolución que los agravia no se dicta de un modo arbitrario, anárquico o incluso como consecuencia de un fraude a la ley sino, por el contrario, en estricta observancia del marco jurídico que la rige; por lo tanto, todo procedimiento debe estar compuesto por distintas etapas **que configuran la garantía formal de audiencia en favor de los gobernados**, a saber: *(i)* que el afectado tenga conocimiento de la iniciación del procedimiento, así como de la cuestión que habrá de ser objeto de debate y de las consecuencias que se producirán con el resultado de dicho trámite; *(ii)* que se le otorgue la posibilidad de presentar sus defensas a través de la organización de un sistema de comprobación tal, **que quien sostenga una cosa tenga oportunidad de demostrarla**, y

quien estime lo contrario, cuente a su vez con el derecho de acreditar sus excepciones; *(iii)* que cuando se agote dicha etapa probatoria se le dé oportunidad de **formular las alegaciones correspondientes**; y, finalmente, *(iv)* que el procedimiento iniciado **concluya con una resolución** que decida sobre las cuestiones debatidas, fijando con claridad el tiempo y forma de ser cumplidas.

En dichos términos, el segundo párrafo del artículo 14 constitucional dispone que previamente a la privación de la libertad, propiedades, posesiones o derechos de cualquier persona **debe mediar juicio** seguido ante los tribunales previamente establecidos. Se ha destacado que la palabra "mediante" contenida en el citado artículo implica que previo al acto de privación debe haber concluido un juicio; y al mismo tiempo debe colegirse que al mencionar juicio se alude a una persona con autoridad que emita una resolución de manera imparcial.

Por su parte, el artículo 8 de la Convención Americana sobre Derechos Humanos dispone que toda persona tiene derecho a ser oída con las debidas garantías por un juez competente, independiente e imparcial. La idea de un juez no puede existir jurídicamente hablando si no se trata de una persona imparcial, puesto que, en un litigio, quien tiene encomendada la tarea de resolverlo nunca puede tener un interés por alguna de las partes. La idea anterior es la base sobre la que descansan otras figuras jurídicas como los impedimentos, las excusas y la recusación.

Ahora bien, tradicionalmente se ha interpretado el segundo párrafo del artículo 14 de la carta magna como el continente de lo que se denomina "garantía de audiencia" que consiste, esencialmente, **en el derecho de todo gobernado a ser escuchado de manera previa al dictado de un acto de privación respetando las formalidades esenciales del procedimiento.** Al efecto, la Suprema Corte de Justicia ha definido que las formalidades esenciales del procedimiento se componen de cuatro garantías esenciales, a saber: *(i)* la notificación del inicio del procedimiento, *(ii)* la facultad de ofrecer pruebas, *(iii)* la facultad de alegar; y, *(iv)* el dictado de una resolución que dirima las cuestiones objeto de la controversia. Sirven de sustento de lo anterior las siguientes tesis de jurisprudencia:

> *"Época: Novena Época*
> *Registro: 200234*
> *Instancia: Pleno*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo II, Diciembre de 1995*
> *Materia(s): Constitucional, Común*
> *Tesis: P./J. 47/95*
> *Página: 133*
> ***FORMALIDADES ESENCIALES DEL PROCEDIMIENTO. SON LAS QUE GARANTIZAN UNA ADECUADA Y OPORTUNA DEFENSA PREVIA AL ACTO PRIVATIVO.***
> *La garantía de audiencia establecida por el artículo 14 constitucional consiste en otorgar al gobernado la oportunidad de defensa previamente al acto privativo de la vida, libertad, propiedad, posesiones o derechos, y su debido respeto impone a las autoridades, entre otras obligaciones, la de que en el juicio que se siga "se cumplan las formalidades esenciales del procedimiento". Estas son las que resultan necesarias para garantizar la defensa adecuada antes del acto de privación y que, de manera genérica, se traducen en los siguientes requisitos: 1) La notificación del inicio del procedimiento y sus consecuencias; 2) La oportunidad de ofrecer y desahogar las pruebas en que se finque la defensa; 3) La oportunidad de alegar; y 4) El dictado de una resolución que dirima las cuestiones debatidas. De no respetarse estos requisitos, se dejaría de cumplir con el fin de la garantía de audiencia, que es evitar la indefensión del afectado.*

Ahora bien, las descritas formalidades esenciales del procedimiento presuponen la debida notificación del inicio o realización de cada una de las etapas de este, a efecto de estar en la posibilidad de ejercer dichos derechos en plazos determinados y con una oportunidad procesal suficiente para que los mismos puedan hacerse válidos y en tal medida resulten

eficaces. Esto es, para que las referidas formalidades esenciales del procedimiento se materialicen es necesario que se dé al gobernado la posibilidad de hacerlas valer, mediante la oportuna notificación y los términos con los que cuenta al efecto en los términos de la legislación específica que esté siendo aplicable. Así, para poder hablar efectivamente de que a un gobernado se le han respetado las garantías esenciales del procedimiento se le debió haber notificado previamente que estaba en esa posibilidad y los momentos para hacerlas valer, quedando obligada la autoridad correspondiente además a tomar en consideración aquellas manifestaciones que al efecto señale alguna de las partes en el proceso o el propio quejoso, pues no puede ser omisa a los hechos o acontecimientos que necesariamente implican llamar o requerir la comparecencia de un tercero cuyos derechos pueden ser vulnerados por las actuaciones del juzgador. Con base en el conocimiento superficial que se tiene en este momento del acto reclamado, la garantía de audiencia del suscrito no ha sido respetada.

En efecto, uno de los componentes esenciales de la garantía de audiencia es la notificación del procedimiento, para que así el gobernado se encuentre en la posibilidad de ofrecer pruebas, alegar e interponer los recursos que estime oportunos.

Ahora bien, en el caso que nos ocupa, **el suscrito nunca fue notificado formalmente del inicio del procedimiento por virtud del cual se pretendió acreditar la supuesta causa de disolución**, lo que acredita que la sentencia es en sí misma ilegal e inconstitucional por violentar la garantía de audiencia. Además, derivado de la falta de notificación formal del procedimiento, el suscrito no tuvo posibilidad alguna de ofrecer prueba alguna dentro del procedimiento alguno ni alegar lo que en derecho corresponda. Lo que implica que la sentencia únicamente dirimió cuestiones que fueron introducidas sin haber oído a todas las partes.

Es decir, la sentencia que se impugna es violatoria del debido proceso debido a que no se llamó a todos los interesados al procedimiento. Resulta indiscutible que los accionistas debieron ser llamados a juicio, pues precisamente son éstos los que celebraron el pacto societario, por lo cual si la finalidad del procedimiento es terminar y disolver la sociedad, esto es, que el pacto que celebraron los accionistas deje de surtir efectos, es indudable que deben ser llamados al procedimiento a efecto de que puedan ser oídos y vencidos.

En relación con lo anterior, el artículo 1º del Código de Procedimientos Civiles para la Ciudad de México, de aplicación supletoria a la materia mercantil, sólo puede iniciar un procedimiento judicial o intervenir en él, quien tenga interés en que la autoridad judicial declare o constituya un derecho o imponga una condena y **quien tenga el interés contrario**; así, necesariamente deben ser llamados a juicio también, quienes tengan un interés contrario al manifestado al ejercer la acción, a efecto de hacer valer sus derechos y ser oído y vencido en juicio.

Lo anterior es conocido en Derecho como litisconsorcio pasivo necesario, implica pluralidad de demandados y unidad de acción; de ahí que deban ser llamados a juicio todos los litisconsortes quienes, al estar vinculados entre sí por un derecho litigioso, deben ser afectados por una sola sentencia. En el caso concreto es **innegable e indiscutible que todos los accionistas de CRÉDITO REAL, como lo es el suscrito, gozan de interés jurídico en la decisión relativa a su disolución anticipada**, lo que además de resultar lógico, se desprende lisa y llanamente de lo dispuesto por el artículo 182, fracción II., de la Ley General de Sociedades Mercantiles, así como los criterios referidos en el Agravio Primero que antecede; consecuentemente, la sentencia impugnada no debió dictarse sin su intervención en el juicio que nos ocupa.

Por dicho motivo, dado que en el caso concreto no se configuró el litisconsorcio pasivo necesario, al abstenerse tanto el actor como el Juez A Quo de llamar a juicio a la totalidad de accionistas de CRÉDITO REAL, a efecto de ser oídos y vencidos en relación con la supuesta actualización de cierta causal de disolución de dicha sociedad, sus Señorías deberán ordenar la reposición del procedimiento, tal como se desprende de la Jurisprudencia

cuyo rubro es *"LITISCONSORCIO PASIVO NECESARIO. CUANDO EL TRIBUNAL DE ALZADA ADVIERTA QUE ALGUNA DE LAS PARTES NO FUE LLAMADA AL JUICIO NATURAL, OFICIOSAMENTE DEBE MANDAR REPONER EL PROCEDIMIENTO."* Y a cuyo contenido se hace referencia en el agravio inmediato siguiente, en el que se hacen valer a su vez diversas causas por las que se considera que en el caso concreto no se configuró el litisconsorcio pasivo necesario.

Aun y cuando el suscrito interpone el presente recurso de apelación en contra de la sentencia, ello no implica que la violación a la garantía de audiencia quede purgado o convalidado, pues la garantía de audiencia únicamente se ve colmada cuando a quien debió haber sido parte se le respeta los siguientes componentes: (i) la notificación del inicio del procedimiento; (ii) la oportunidad de ofrecer y desahogar las pruebas en que se finque la defensa; (iii) la oportunidad de alegar; y, (iv) una resolución que dirima las cuestiones debatidas y cuya impugnación ha sido considerada por esta.

En efecto, el suscrito queda en un estado de indefensión debido a que no tiene posibilidad alguna de ofrecer pruebas en segunda instancia, por lo que es indudable que el efecto de la apelación deberá ser reponer el procedimiento en primera instancia, a efecto de que el suscrito pueda deducir sus acciones y derechos dentro del mismo, respetándose así de manera integral su garantía de audiencia.

**TERCERO.** La sentencia impugnada viola lo dispuesto en los artículos 1, 14, 16 y 17 de la Constitución Política de los Estados Unidos Mexicanos, en relación con los artículos 182, 229, 232, 233, 234 y demás aplicables de la Ley General de Sociedades Mercantiles.

En la sentencia impugnada el Juez A quo dejó sin efectos el pacto social que suscribió el suscrito sin haber otorgado garantía de audiencia para tal efecto, esto es, no se configuró el litisconsorcio pasivo necesario en el procedimiento. En efecto, el suscrito debió ser llamado a juicio a efecto de deducir sus derechos en virtud de que la acción que se pretendió era la disolución de la sociedad, esto es, la privación de los efectos de un contrato al cual el suscrito decidió celebrar en ejercicio de su derecho fundamental del principio de autonomía y propiedad.

El Juez A Quo privó de efectos jurídicos el pacto social mediante la disolución anticipada de la sociedad mercantil, afectando el derecho fundamental del principio de autonomía del suscrito, pues todos los derechos que tenía en virtud de dicho pacto social fueron extinguidos sin ni siquiera contar con una garantía de audiencia, esto es, se privó de un derecho fundamental sin que se cumplieran con las formalidades esenciales del procedimiento.

De acuerdo a los artículos 1,792 y 1,793 del Código Civil para el Distrito Federal,[1] el contrato es un convenio (acuerdo de dos o más personas) que producen o transfieren derechos y obligaciones. Así, mediante los contratos las personas (morales o jurídicas) pretenden un tráfico de derechos y obligaciones, a través de la libre expresión de su voluntad.

En ese sentido, el elemento fundamental en el ámbito de los contratos es la **autonomía de la voluntad de las partes**. La cual, se puede entender como el "margen de libertad que el derecho concede a la persona para que voluntariamente cree las reglas o herramientas jurídicas que estime convenientes en vista de la consecución de un fin privado y lícito".[2] Por lo tanto, la autonomía de la voluntad conlleva por una parte, tres importantes elementos: libertad para constituir o no relaciones contractuales, la libertad para elegir al contratante y libertad para determinar las reglas o herramientas, y por otra, el efecto de que las partes deben cumplir con las obligaciones pactadas, lo cual se ve reflejado con el principio *pacta sunt servanda.*

---

[1] ARTÍCULO 1,792.- Convenio es el acuerdo de dos o más personas para crear, transferir, modificar o extinguir obligaciones.
ARTÍCULO 1,793.- Los convenios que producen o transfieren las obligaciones y derechos toman el nombre de contratos.
[2] Soro Russell Olivier. "El principio de la autonomía de la voluntad privada en la contratación: génesis y contenido actual". Departamento de Derecho Civil. Universidad Complutense de Madrid.

Así, la autonomía de la voluntad de las partes implica un principio fundamental al pretender contratar, pues constituye la expresión de la persona al obligarse o no. En este sentido, esta Suprema Corte ya ha señalado que **el principio de autonomía de la voluntad goza de rango constitucional y no debe ser reconducido a un simple principio que rige el derecho civil.** En esa línea, se estableció que el respeto del individuo como persona requiere **el respeto de su autodeterminación individual, por lo que si no existe libertad del individuo para estructurar sus relaciones jurídicas de acuerdo con sus deseos, no se respeta la autodeterminación de ese sujeto.** El principio de autonomía de la voluntad tiene reflejo en el derecho de propiedad y en la libertad de contratación, la cual también es un elemento central del libre desarrollo de la personalidad, y en cuya virtud las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas.[3]

Lo anterior, hace evidente que de manera implícita la Constitución reconoce **la existencia de un derecho a la autonomía de la voluntad en la contratación.** No obstante, **dicha libertad no es absoluta,** pues existen limitaciones derivadas de su propia naturaleza y evolución, lo anterior "debido fundamentalmente a la aparición de factores, entre otros, contratos de adhesión, condiciones generales de la contratación, que influyen muy activamente limitando el margen de decisión de los particulares".[4] Así, dichas limitaciones a la libertad contractual han partido principalmente de la interacción de los valores superiores del ordenamiento jurídico, plasmados en conceptos como orden público, buenas costumbres, o bien por razón del desequilibrio político y económico existente entre las partes.

En efecto, en el amparo directo en revisión 992/2014, la Primera Sala de la Suprema Corte, textualmente afirmó lo siguiente:

> *"aún desde los planteamientos más abstractos que identifican la autonomía de la voluntad y la libertad de contratación con los postulados del laissez faire que permiten a los eventuales contratantes hacer elecciones autónomas y consideran equivocada cualquier interferencia en los acuerdos privados, no se trata de una libertad de carácter absoluto, pues "la historia de la libertad de contratación es la de su limitación"[5].*

---

[3] Dichas consideraciones se desprende de la tesis emitida por esta Primera Sala de rubro: "AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL." [Tesis: 1a. CDXXV/2014 (10a.). Localizable en la Gaceta del Semanario Judicial de la Federación Libro 13, Diciembre de 2014, Tomo I Materia(s): Constitucional Página: 219]

[4] Soro Russell Olivier. "El principio de la autonomía de la voluntad privada en la contratación: génesis y contenido actual". Departamento de Derecho Civil. Universidad Complutense de Madrid.

[5] Véase al respecto M. P. García Rubio, "La discriminación por razón de sexo en la contratación privada", en *El levantamiento del velo: las mujeres en el Derecho Privado*, Valencia, Tirant lo Blanch, pp. 1073-1119; y A. Aguilera Rull, "Prohibición de discriminación y libertad de contratación", en *Indret*, nº 1/2009, pp. 1-30. Asimismo, es importante mencionar que actualmente el significado de la libertad de contratación es analizado bajo prismas distintos de los tradicionales postulados liberales. Al respecto, resulta muy sugerente la propuesta de la profesora Hila Keren, la cual distingue tres caras distintas de la libertad en el contexto contractual y que denomina *"freedom IN contract"*, *"freedom FROM contract"* and *"freedom TO contract"*. La primera, calificada como la libertad contractual primaria, se identificaría con la libertad de denominar la transacción, establecer sus términos, elegir las palabras adecuadas que describen el acuerdo y puede conllevar también la libertad de elegir a la contraparte. La *"freedom FROM contract"*, que es considerada una libertad secundaria, supone la capacidad de las partes para celebrar acuerdos que no sean jurídicamente exigibles y es, por ejemplo, la que permite abandonar las negociaciones antes de celebrar un contrato. En el contexto de esta sentencia serviría al autor de la discriminación para negarse a contratar con un determinado sujeto que no le gusta. Por su parte, *"freedom TO contract"* se refiere a la capacidad básica de los individuos para ligarse por una relación contractual voluntaria. Desde la perspectiva que nos ocupa, las personas que son discriminadas ven negada radicalmente su libertad de contratar en este último sentido y con ello su esencial libertad de ser un miembro autónomo de nuestra sociedad. Pues bien, con esta perspectiva plural es difícil afirmar que al prohibir la discriminación en el ámbito privado se está sin más negando la libertad contractual, puesto que si bien, por ejemplo, la persona que se ve privada de su capacidad de rechazar a una determinada contraparte por razones discriminatorias ve parcialmente afectada su libertad en el contrato, todavía conserva buena parte de ésta puesto que puede usarla en todos los demás aspectos del negocio, excepto en lo que afecta a la elección del otro contratante; en cambio, si no se prohíbe la discriminación, se está negando esencialmente la libertad hacia el contrato de la persona discriminada, quien se ve privada del acceso al bien o servicio o ha de buscarlo en otro contrato, tal vez en condiciones muy desventajosas. Así las cosas, fácilmente se comprende que esta nueva perspectiva múltiple de la libertad contractual, que es capaz de diseccionarla en varias vertientes, supone la superación de la concepción liberal tradicional según la cual la libertad y la igualdad son valores opuestos entre sí. Véase al respecto H. Keren, "We Insist! Freedom Now: Does Contract Doctrine Have Anything Constitutional to Say?", disponible en SSRN: http://ssrn.com/abstract=678438 o doi:10.2139/ssrn.678438, marzo, 2003; T. Keren-Paz, *Torts, Egalitarianism and Distributive Justice*, Ashgate, Aldershot, 2007; y D. Schiek, *Allgemeines Gleichbehandlungsgesetz (AGG). Ein Kommentar aus europäis-cher Perspektive*, D. Schiek (Hrsg.), Séller. European Law Publishers, 2007.

*Desde un punto de vista clásico la mayor parte de esas limitaciones a la libertad de contratación se han producido bien por la interacción de los valores superiores del ordenamiento jurídico, plasmados en conceptos como orden público o buenas costumbres, o bien por razón del desequilibrio político y económico existente entre las partes, como sucede con las normas de protección de los trabajadores o de los consumidores. En esta lógica, hay que preguntarse si al anterior elenco de límites hemos de añadir ahora nuevos factores de desequilibrio, tales como el sexo, la raza, la edad, la pertenencia a una minoría religiosa o a una determinada opción sexual, etcétera, que deben ser tomados en consideración para limitar la libertad contractual."*

Es preciso recordar que la intervención del Estado en la autonomía de la voluntad del individuo, como es la voluntad contractual, debe ser limitada y siempre al amparo de la presunción de una grave violación a los derechos fundamentales, pues de otra forma el Estado podría incidir en la autonomía de los individuos para decidir las personas con las que van a relacionarse y la regulación de estas.

En conclusión, el principio de la autonomía de la voluntad contractual es de rango constitucional que si bien, de manera general tiene una autodeterminación, pues parte de la propia voluntad de las personas en obligarse o no, en elegir con quién realizar dicha obligación; y en establecer los derechos y obligaciones que adquirirá. Sin embargo en su propia operatividad y eficacia requiere de la intervención de los poderes públicos, pues de otra forma se haría nugatorio su ejercicio. Sirve de sustento el siguiente criterio:

*Registro digital: 2008086; Instancia: Primera Sala, Décima Época, Materias(s): Constitucional, Tesis: 1a. CDXXV/2014 (10a.), Fuente: Gaceta del Semanario Judicial de la Federación. Libro 13, Diciembre de 2014, Tomo I, página 219, Tipo: Aislada*

**AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL.**

*A consideración de esta Primera Sala de la Suprema Corte de Justicia de la Nación, el principio de autonomía de la voluntad goza de rango constitucional y no debe ser reconducido a un simple principio que rige el derecho civil. Así las cosas, el respeto del individuo como persona requiere el respeto de su autodeterminación individual, por lo que si no existe libertad del individuo para estructurar sus relaciones jurídicas de acuerdo con sus deseos, no se respeta la autodeterminación de ese sujeto. Aunado a lo anterior, el principio de autonomía de la voluntad tiene reflejo en el derecho de propiedad y en la libertad de contratación, la cual también es un elemento central del libre desarrollo de la personalidad, y en cuya virtud las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas.*

En ese sentido, resulta inconcuso que si mediante la sentencia impugnada el Juez A quo pretendió dejar sin efectos el pacto social y por ende dejar sin efectos derechos que el suscrito tenía en su carácter de accionista, pretendió afectar el derecho fundamental del principio de autonomía de la voluntad, sin ni siquiera conceder la garantía de audiencia.

Es decir, es incuestionable que existe un litisconsorcio pasivo necesario, en virtud de que se debió haber llamado a los accionistas de la sociedad de CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., pues si lo que se pretendía era afectar y dejar sin efectos el pacto social, a través de la disolución, es indudable que debió de haberse configurado la relación jurídico procesal, pues los accionistas de la sociedad tienen un claro interés jurídico en dicho procedimiento.

Bajo esa línea, la sentencia impugnada resulta inconstitucional e ilegal en virtud de que no se configuró el litisconsorcio pasivo necesario, pues debió de haberse llamada a todos los accionistas de la sociedad CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. a efecto de que pudieran deducir sus derechos dentro del procedimiento. Sirve de sustento los siguientes criterios jurisprudenciales:

*Registro digital: 2020987*
*Instancia: Tribunales Colegiados de Circuito*
*Décima Época*
*Materias(s): Civil*
*Tesis: III.2o.C.111 C (10a.)*

De ese modo, se tiene claro que la mayor parte de esta llamada [illegible] la doctrina de [illegible] contratación [illegible] y [illegible] la intervención de [illegible] autonomía de la voluntad, [illegible] el orden público [illegible] del equilibrio político [illegible] existe entre [illegible] de la protección de los trabajadores, de los consumidores [illegible] de lo anterior [illegible] [illegible] tales como [illegible] [illegible] del contrato.

Es preciso recordar que la intervención del Estado en la autonomía de la voluntad de individuos, como es la voluntad contractual, debe ser limitada y sólo en el [illegible] normal que una grave violación a los derechos fundamentales, pues no [illegible] para modificar la autonomía de los individuos para decidir las personas con las [illegible] [illegible] y la regulación de esta.

En conclusión, el principio de la autonomía de la voluntad [illegible] constitucional que si bien de manera general tiene una amplia determinación, pues parte de la voluntad de las personas en obligarse o no, así como [illegible] en establecer los derechos y obligaciones que adquirirán [illegible] operatividad y eficacia requiere de la intervención de los poderes públicos [illegible] [illegible] el siguiente criterio:

Registro digital: 2008086. Instancia: Primera Sala. [illegible] Materia(s): Constitucional. Tesis: 1a. CDXXV/2014 (10a.). Fuente: Gaceta del Semanario Judicial de la Federación. Libro 13, Diciembre de 2014, Tomo I, página 219. [illegible]

**AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL.**

[illegible] esta Primera Sala de la Suprema Corte de Justicia de la Nación [illegible] principio de autonomía de la voluntad goza de rango constitucional [illegible] [illegible] aunque principio que rige [illegible] las cosas [illegible] trato como persona requiere el respeto de su autodeterminación individual [illegible] libertad del individuo para regular sus relaciones jurídicas [illegible] la autodeterminación de [illegible] principio de autonomía de la voluntad [illegible] en el ámbito [illegible] libertad de contratación, la cual también existe [illegible] personalidad y en cuya virtud las partes de una relación jurídica están libres para gestionar [illegible] sus relaciones [illegible].

En ese sentido, resulta incongruente que si mediante sentencia se ordena la [illegible] y se mandó dejar sin efectos el pacto social y por ende dejar sin efectos derechos que el [illegible] tenía en su carácter de accionista, pretenda alterar el derecho fundamental [illegible] principio de autonomía de la voluntad, sin ninguna razón que lo permita de [illegible].

Es decir, es inaceptable que exista un litisconsorcio pasivo necesario, en virtud de debió haberse llamado a los accionistas de la sociedad de CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., pues si lo que se pretende era afectar y dejar sin efectos el pacto social a través de su disolución, es indudable que debió de haberse configurado la relación procesal con los accionistas de la sociedad, por un claro interés jurídico en dicho procedimiento.

Bajo esa línea, la sentencia impugnada resulta inconstitucional e ilegal en virtud de que no se configuró el litisconsorcio pasivo necesario, pues debió de haberse llamado a todos los accionistas de la sociedad CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., a efecto de que pudieran ejercer sus derechos dentro del procedimiento. Sirve de sustento los siguientes criterios jurisprudenciales:

Registro digital: 2020[illegible]
Instancia: Tribunales Colegiados de Circuito
Décima Época
Materias: Civil
Tesis: III.2o.C.[illegible] C (10a.)

*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 72, Noviembre de 2019,
Tomo III, página 2427
Tipo: Aislada*

**LITISCONSORCIO PASIVO NECESARIO. ES UN PRESUPUESTO PROCESAL
ABSOLUTO E INSUBSANABLE, CUYA FALTA NO ES SUSCEPTIBLE DE
·RATIFICARSE POR EL CONSENTIMIENTO DE LAS PARTES, SEA POR COMISIÓN
U OMISIÓN.**

*Tratándose de presupuestos procesales, existen los relativos o subsanables y los absolutos o
insubsanables, por lo que la falta de aquéllos vicia al proceso, pero en el caso de los
primeros, el vicio puede subsanarse, bien sea por ratificación del interesado por no alegarlo
oportunamente, o porque se cumplan al ser exigidos por el Juez o reclamados por una de las
partes, siendo un ejemplo de ellos la personalidad de quien comparece a juicio a nombre de
otro o la no caducidad de la acción. En cambio, la falta de los segundos, no puede ser
subsanada ni ratificada, porque son presupuestos absolutos e insubsanables, de orden
público. Ahora bien, la Suprema Corte de Justicia de la Nación ha sido consistente a través
de los años en cuanto a destacar la naturaleza de orden público del litisconsorcio pasivo
necesario, por lo cual, se trata de una condición necesaria para la regularidad del desarrollo
del proceso. Así, éste debe considerarse un presupuesto procesal absoluto e insubsanable, es
decir, no susceptible de ratificarse por el consentimiento de las partes, sea por comisión u
omisión, pues la conducta de los postulantes no sustituye o hace las veces de esa condición
necesaria para la regularidad del proceso y, por ende, no aporta validez a un procedimiento
viciado por falta de llamamiento a juicio de un interesado, ni sirve para dotar de efectos a
una sentencia de suyo incapaz de producirlos, por falta de ese elemento imprescindible para
dictar válidamente resolución de fondo sobre la pretensión litigiosa.*

*Registro digital: 2004262
Instancia: Primera Sala
Décima Época
Materias(s): Civil
Tesis: 1a./J. 19/2013 (10a.)
Fuente: Semanario Judicial de la Federación y su Gaceta. Libro XXIII, Agosto de 2013,
Tomo 1, página 595
Tipo: Jurisprudencia*

**LITISCONSORCIO PASIVO NECESARIO. CUANDO EL TRIBUNAL DE ALZADA
ADVIERTA QUE ALGUNA DE LAS PARTES NO FUE LLAMADA AL JUICIO
NATURAL, OFICIOSAMENTE DEBE MANDAR REPONER EL PROCEDIMIENTO.**

*El litisconsorcio pasivo necesario implica pluralidad de demandados y unidad de acción; de
ahí que deban ser llamados a juicio todos los litisconsortes quienes, al estar vinculados entre
sí por un derecho litigioso, deben ser afectados por una sola sentencia. En ese sentido,
cuando se interpone un recurso de apelación y el tribunal de alzada advierte que en el juicio
hubo litisconsortes que no fueron llamados, aunque no medie petición de parte, en cualquier
etapa del procedimiento debe mandar reponerlo de oficio, para que el juez de primera
instancia los oiga y dicte una sentencia apegada a los principios de igualdad, seguridad
jurídica y economía procesal, sobre la base de que debe protegerse en todo momento el
derecho humano de acceso efectivo a la justicia consagrado en el artículo 17 de la
Constitución Política de los Estados Unidos Mexicanos. Lo anterior es así, toda vez que el
litisconsorcio constituye un presupuesto procesal sin el cual no puede dictarse una sentencia
válida, ya que involucra la protección de un derecho humano y la correlativa obligación de
los jueces como autoridades a protegerlo, por lo que la carga procesal de citar a todas las
partes corresponde al órgano jurisdiccional.*

*Registro digital: 174230
Instancia: Primera Sala
Novena Época
Materias(s): Civil
Tesis: 1a./J. 47/2006
Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXIV, Septiembre de 2006,
página 125
Tipo: Jurisprudencia*

**LITISCONSORCIO PASIVO NECESARIO. AL SER UN PRESUPUESTO PROCESAL,
EL TRIBUNAL DE ALZADA DEBE MANDAR REPONER EL PROCEDIMIENTO
OFICIOSAMENTE CUANDO ADVIERTA QUE NO TODOS LOS INTERESADOS**

*FUERON LLAMADOS AL JUICIO NATURAL (LEGISLACIÓN DEL ESTADO DE MÉXICO VIGENTE A PARTIR DE JULIO DE 2002).*

*El litisconsorcio pasivo necesario implica pluralidad de demandados y unidad de acción; de ahí que deban ser llamados a juicio todos los litisconsortes, quienes al estar vinculados entre sí por un derecho litigioso deben ser afectados por una sola sentencia, conforme a los artículos 1.86, 1.87 y 1.88 del Código de Procedimientos Civiles del Estado de México. En ese sentido, cuando se interpone un recurso de apelación y el tribunal de alzada advierte que en el juicio natural hubo litisconsortes que no fueron llamados, aunque no medie petición de parte, en cualquier etapa del procedimiento está obligado a mandar reponerlo de oficio, para el efecto de que el Juez de primera instancia los oiga y dicte una sentencia completa, en atención a los principios de igualdad, seguridad jurídica y economía procesal, siendo que en términos del último numeral, los efectos son reponer el procedimiento a fin de que el Juez de primer grado prevenga al actor para que amplíe su demanda o la reconvención contra las personas que formen el litisconsorcio necesario. Lo anterior en virtud de que el litisconsorcio constituye un presupuesto procesal sin cuyos requisitos no puede dictarse una sentencia válida en tanto que involucra cuestiones de orden público; por lo que la carga procesal de citar a todas las partes corresponde al órgano jurisdiccional.*

Consecuentemente, la sentencia impugnada deberá ser revocada a efecto de quedar sin efectos y en su lugar, ordenarse la reposición del procedimiento en primer instancia, a efecto de que se llame a juicio, para que hagan valer sus derechos, a la totalidad de los accionistas de CRÉDITO REAL.

**CUARTO.**   La sentencia impugnada viola lo dispuesto en los artículos 1, 14, 16 y 17 de la Constitución Política de los Estados Unidos Mexicanos, en relación con los artículos 182, 229, 232, 233, 234 y demás aplicables de la Ley General de Sociedades Mercantiles.

De los eventos relevantes publicados por CRÉDITO REAL, se desprende que en la sentencia que se impugna el Juez A quo resolvió que la sociedad CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R. perdió más de dos partes de su capital social de conformidad con el artículo 229, fracción V de la Ley General de Sociedades Mercantiles, y por lo tanto, el Juez A Quo consideró actualizada la causal de disolución anticipada. Al respecto, aunado al hecho de que el Juez A Quo se abstuvo de requerir de la actora el primer requisito de procedencia de la acción que pretendió ejercer, a saber, el que dicha supuesta causal de disolución se hubiera analizado, discutido y resuelto en Asamblea Extraordinaria de Accionistas, lo cierto es que ni siquiera se desahogó en el juicio prueba idónea alguna que acreditara la actualización de dicha causal.

En términos de los artículos 1194 y 1326 del Código de Comercio, para que el actor pruebe su acción es necesario que narre los hechos en que la funda y los demuestre, a fin de que el Juez los valore y les atribuya la calidad y las consecuencias jurídicas que en derecho procedan, conforme a la máxima "dame los hechos y te daré el derecho"

Por su parte el artículo 229 de la Ley General de Sociedades Mercantiles, en específico la fracción V dispone que las sociedades se disuelven por la pérdida de las dos terceras partes del capital social; dicho artículo es del tenor literal siguiente:

*"Artículo 229.- Las sociedades se disuelven: I.- Por expiración del término fijado en el contrato social; II.- Por imposibilidad de seguir realizando el objeto principal de la sociedad o por quedar éste consumado; III.- Por acuerdo de los socios tomado de conformidad con el contrato social y con la Ley; IV.- Porque el número de accionistas llegue a ser inferior al mínimo que esta Ley establece, o porque las partes de interés se reúnan en una sola persona; V.- Por la pérdida de las dos terceras partes del capital social. (ADICIONADO, D.O.F. 24 DE ENERO DE 2018) VI.- Por resolución judicial o administrativa dictada por los tribunales competentes, conforme a las causales previstas en las leyes aplicables."*

De una lectura de la hipótesis normativa se desprende que los elementos para acreditar la acción consisten en **demostrar** que la sociedad perdió más de sus dos terceras partes del capital social; es decir, debe quedar plenamente acreditado que la sociedad sufrió la perdida

**FECHA Y EL [illegible] JUICIO [illegible] (REFORMA [illegible] DEL [illegible] MÉXICO VIGENTE A PARTIR DE [illegible] DE 2002).**

El razonamiento [illegible] necesario implica [illegible] llamados a juicio todos los [illegible] por un derecho litigioso deben ser [illegible] por una sola sentencia [illegible] artículos [illegible] y 1.88 del Código de Procedimientos Civiles del Estado [illegible] siendo [illegible] caso se interpone un recurso [illegible] apelación [illegible] tribunal [illegible] aquí [illegible] fallo [illegible] litisconsorcio [illegible] pero en cualquier etapa del procedimiento [illegible] el efecto de que [illegible] de la presente [illegible] los [illegible] principios de igualdad, seguridad jurídica [illegible] del último numeral los [illegible] sin reponer el procedimiento [illegible] primer grado prevenga al actor para que amplíe su demanda [illegible] personas que formen el litisconsorcio necesario. Lo anterior, [illegible] presupuesto procesal sin cuyos requisitos no puede [illegible] en tanto que [illegible] partes corresponde al órgano jurisdiccional.

Consecuentemente, la sentencia [illegible] deberá ser revocada [illegible] se [illegible] reposición del procedimiento [illegible] para que haga [illegible] sus derechos [illegible] CRÉDITO REAL [illegible]

CUARTO.- La sentencia impugnada viola lo dispuesto en los artículos 14 y 16 de la Constitución Política de los Estados Unidos Mexicanos, en relación con [illegible] 182, 232, 233, 234 y demás aplicables de la Ley General de Sociedades Mercantiles.

De los estados relevantes publicados por CRÉDITO REAL, se desprende que [illegible] sentencia que se impugna el Juez A quo resolvió que la sociedad CRÉDITO REAL, S.A. DE C.V. SOFOM, E.N.R. perdió más de dos partes de su capital social de conformidad con el artículo 229, fracción V de la Ley General de Sociedades Mercantiles, y por lo tanto, el Juez A quo considero actualizada la causal de disolución anticipada. Al respecto, aunado al hecho de que el Juez A Quo se abstuvo de reconocer de la acción el primer requisito de procedencia de la acción que pretendió ejercer, a saber, el que dicha supuesta causal de disolución se hubiera analizado, discutido y resuelto en Asamblea Extraordinaria de Accionistas, lo cierto es que ni siquiera se desahogó en el juicio prueba idónea alguna que acreditara la actualización de dicha causal.

En términos de los artículos 1194 y 1326 del Código de Comercio, para que el actor pruebe su acción es necesario que narre los hechos en que la funda y los demuestre, a fin de que el juez los valore y les atribuya la calidad y las consecuencias jurídicas [illegible] derecho procedan, conforme a la máxima "dame los hechos y te daré el derecho".

Por su parte el artículo 229, de la Ley General de Sociedades Mercantiles, en específico la fracción V dispone que las sociedades se disuelven por la pérdida de las dos terceras partes del capital social; dicho artículo es del tenor literal siguiente:

"Artículo 229.- Las sociedades se disuelven: I.- Por expiración del término fijado en el contrato social; II.- Por imposibilidad de seguir realizando el objeto principal de la sociedad o por quedar éste consumado; III.- Por acuerdo de los socios tomado de conformidad con el contrato social y con la Ley; IV.- Porque el número de accionistas llegue a ser inferior al mínimo que esta Ley establece, o porque las partes de interés se reúnan en una sola persona; V.- Por la pérdida de las dos terceras partes del capital social; (ADICIONADO, D.O.F. 24 DE ENERO DE 2009) VI.- Por resolución judicial o administrativa dictada por los tribunales competentes, conforme a las causales previstas en las leyes aplicables."

De una lectura de la hipótesis normativa se desprende que los elementos para acreditar la [illegible] consisten en demostrar que la sociedad perdió más de sus dos terceras partes del [illegible]

de las dos terceras partes de su capital social, lo que indudablemente implica un análisis contable y económico respecto a la situación económica de la sociedad, mediante las pruebas periciales necesarias para dichos efectos puesto que un juzgador mercantil no goza de los conocimientos técnicos indispensables en la materia contable y financiera, para determinar el valor real del capital de determinada sociedad mercantil ni un análisis correcto de sus estados financieros y documentación contable.

Ahora bien, en primer lugar, debe mencionarse que en el caso que nos ocupa, todo el procedimiento se desarrolló en inverosímil periodo de tiempo de 11 días hábiles, lo que en sí mismo, demuestra indicios de irregularidades y de la imposibilidad de haberse rendido las pruebas idóneas y pertinentes para acreditar la perdida de las dos terceras partes del capital social.

Es decir, el Juez A quo de manera ilegal resolvió que se acreditó la pérdida de más de las dos terceras partes del capital social, sin elemento idóneo alguno, pues para efecto de poder realizar dicha determinación es indudable que debieron de haberse rendido pruebas periciales a efecto de acreditar dicha situación económica, lo que que no pudo haberse realizado en el periodo de 11 días hábiles que duró toda la tramitación de la primera instancia -lo anterior se afirma, partiendo de la simple premisa de que para desahogar una prueba pericial, se requieren como mínimo 13 días hábiles conforme lo dispone el artículo 1253 del Código de Comercio, a efecto de que los peritos acepten el cargo conferido y rindan su dictamen-.

Lo anterior nos hace presumir que el Juez A Quo pretendió tener por acreditados los elementos de la acción mediante probanzas que fueron realizadas unilateralmente por el actor, las cuales, al tratarse de un tema financiero y contable, que afecta los derechos tanto de accionistas como de acreedores, no pueden ser prueba suficiente para acreditar los elementos de la acción, máxime cuando ni siquiera se dio intervención alguna a los demás interesados en el caso concreto, violando notoriamente su garantía de audiencia tal como se explicó en los agravios inmediatos anteriores. En ese tenor, si el Juez A Quo se abstuvo de ordenar que se llamara a juicio a los demás accionistas de CRÉDITO REAL, no obstante su evidente interés en la acción ejercida por el actor, al menos debió exigir la presentación de pruebas suficientes, imparciales e idóneas que le permitieran analizar realmente la cuestión aludida, lo que no aconteció y deriva en la clara y evidente ilicitud de la sentencia impugnada.

La determinación para poder acreditar la perdida de las dos terceras partes del capital social de determinada sociedad, requiere de un análisis histórico, económico y contable de la sociedad CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R., lo cual no pudo haberse realizado en los 11 días que duró la primera instancia, por lo cual es indudable que no se acreditaron los extremos ni los elementos de la acción. Sirven de sustento los siguientes criterios jurisprudenciales:

*Registro digital: 166145*
*Instancia: Tribunales Colegiados de Circuito*
*Novena Época*
*Materias(s): Civil*
*Tesis: III.1o.C.173 C*
*Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXX, Octubre de 2009, página 1567*
*Tipo: Aislada*

**IMPROCEDENCIA DE LA ACCIÓN POR FALTA DE COMPROBACIÓN DE ALGUNO DE SUS ELEMENTOS. AL NO CONSTITUIR UNA EXCEPCIÓN DILATORIA NO PROCEDE DEJAR A SALVO LOS DERECHOS DE LA ACTORA (LEGISLACIÓN MERCANTIL).**

*La improcedencia de la acción por falta de comprobación de alguno de sus elementos no constituye una excepción dilatoria procesal, ya que no se encuentra contemplada como tal en alguno de los preceptos del Código de Comercio que regulan esa clase de excepciones, y en su artículo 1326, expresamente se contempla la absolución para el*

*caso de que el actor no pruebe su acción; por lo que es evidente que no procede dejar a salvo los derechos de la actora, ya que la declaración de improcedencia de la acción no deriva de alguna excepción dilatoria, es decir, de alguna de aquellas que tienen por objeto dilatar la resolución de la controversia de fondo y no propiamente destruir su acción, como sí ocurre con las perentorias, en virtud de que aquellas excepciones tienen que ver con los requisitos formales necesarios para que el juzgador pueda, válidamente, entrar a examinar y resolver sobre las pretensiones de fondo del actor, a saber, la competencia del propio juzgador, la personalidad de quienes comparecieron al juicio a ejercer la acción y a oponerse a la misma, la vía elegida para deducir la acción y la debida integración de la relación jurídico-procesal; o bien, procede esa declaratoria cuando el incumplimiento de alguno de esos requisitos, doctrinaria y legislativamente conocidos como presupuestos procesales, es advertido oficiosamente por el juzgador; de ahí que no procede dejar a salvo los derechos de la actora ante la falta de acreditamiento de uno de los elementos de su acción, sino absolver de las prestaciones reclamadas.*

*Suprema Corte de Justicia de la Nación*

*Registro digital: 2024533*
*Instancia: Tribunales Colegiados de Circuito*
*Undécima Época*
*Materias(s): Civil*
*Tesis: I.11o.C. J/8 C (11a.)*
*Fuente: Gaceta del Semanario Judicial de la Federación. Libro 12, Abril de 2022, Tomo III, página 2600*
*Tipo: Jurisprudencia*

***RECURSO DE APELACIÓN. CUANDO EL TRIBUNAL DE ALZADA REVOCA LA SENTENCIA IMPUGNADA Y REASUME JURISDICCIÓN, ESTÁ OBLIGADO A ESTUDIAR TODOS LOS ELEMENTOS DE LA ACCIÓN AUN CUANDO ELLO NO HAYA SIDO IMPUGNADO (LEGISLACIÓN APLICABLE PARA LA CIUDAD DE MÉXICO).***

*Del artículo 688 del Código de Procedimientos Civiles para el Distrito Federal, aplicable para la Ciudad de México, se advierte que la apelación es un medio de impugnación ordinario por el cual el tribunal de alzada puede confirmar, modificar o revocar las resoluciones emitidas por el inferior. Por lo que tratándose de apelaciones contra el fallo definitivo de primera instancia, el tribunal de alzada debe estudiar los agravios formulados por el inconforme y de considerarlos fundados debe revocar la resolución apelada y, con plenitud de jurisdicción, proceder a analizar si fueron o no comprobados los presupuestos procesales, las condiciones o requisitos de procedencia de la acción y superadas éstas, sus elementos, en los que deberá analizar conjuntamente las excepciones y las pruebas que se hubieran rendido para tales fines; ello aun en el supuesto de que el Juez de la causa no se hubiera pronunciado sobre aquéllos y esto no hubiese sido impugnado por la parte que venció. Esto es así, pues en nuestro sistema jurídico no existe el reenvío, ya que los tribunales superiores de justicia, de conformidad con la división de poderes, son los encargados de ejercer la función jurisdiccional, quienes si bien la delegan a los Jueces de primera instancia, dicha jurisdicción les es devuelta a través del recurso de apelación. Ahora bien, la plenitud de jurisdicción establecida en la ley se refiere a un derecho pleno o total para decidir, no solamente la controversia jurisdiccional, sino también para subsanar ciertas deficiencias en el trámite y sustanciación de los recursos o juicios correspondientes. Dicha figura jurídica de la "plenitud de jurisdicción" se identifica como el acto procesal que tiende a conseguir resultados definitivos en el menor tiempo posible, de modo que la sentencia debe otorgar una reparación total e inmediata, mediante la sustitución a la autoridad responsable en la que ésta debió hacer en el acto o resolución materia de la impugnación, para reparar directamente la infracción cometida. Dicha postura tiene su fundamento en la disposición expresa de la ley, así como en la facultad de los tribunales de revocar o modificar los actos y resoluciones impugnados e, incluso, restituir al promovente en el uso y goce del derecho violado. Así, con base en dicho principio, el tribunal revisor no sólo puede anular o revocar la decisión de su inferior, sino que, inclusive, tiene facultades para corregir y modificar dichos actos y reducirlos al marco legal. Por consiguiente, en el caso de que el tribunal ad quem determina revocar la resolución recurrida emitida por el Juez de primera instancia, en ese momento reasume totalmente la jurisdicción y, por tanto, se encuentra facultado y obligado a estudiar de oficio los presupuestos procesales, las condiciones o requisitos de procedencia de la acción, y superadas éstas, sus elementos, así como las excepciones y las pruebas*

*rendidas para estas dos últimas cuestiones, y no dejar inaudita a la contraparte que obtuvo sentencia favorable.*

**POR TODO LO ANTES EXPUESTO, ES INCONCUSO QUE LA SENTENCIA RECURRIDA CONTRAVIENE LA LEY, EN ENTERO PERJUICIO DEL SUSCRITO Y CONSECUENTEMENTE, RESULTA PROCEDENTE, Y SE SOLICITA A ESA H. SALA, REVOQUE LA SENTENCIA DEFINITIVA DE 13 DE JULIO DEL 2022 PARA LOS EFECTOS PRECISADOS A LO LARGO DEL PRESENTE ESCRITO.**

**INDEPENDIENTEMENTE DE LO ANTERIOR, EL SUSCRITO SE RESERVA EXPRESAMENTE SU DERECHO PARA AMPLIAR LOS AGRAVIOS QUE NOS OCUPA O BIEN, OPONER NUEVOS, UNA VEZ QUE TENGA CONOCIMIENTO DEL CONTENIDO ÍNTEGRO DE LA SENTENCIA IMPUGNADA.**

Por lo anteriormente expuesto y fundado, a **USTED C. JUEZ** atentamente solicito se sirva:

**PRIMERO.** - Tener a mi representada interponiendo en tiempo y forma recurso de apelación en contra de la sentencia definitiva de 13 de julio del 2022.

**SEGUNDO.** - Admitir el recurso de apelación, y previos los trámites de ley, remitir a la Superioridad, junto con el testimonio de apelación, para su debida tramitación y resolución.

Por lo anteriormente expuesto y fundado, a esa **H. SALA** atentamente solicito se sirva:

**ÚNICO.** Admitir el presente recurso de apelación y previos los trámites de ley, emitir sentencia revocando la sentencia definitiva de 13 de julio del 2022.

**PROTESTO LO NECESARIO**
Ciudad de México, a la fecha de su presentación

**JESÚS NAVA MORENO**
Por mi propio derecho, en mi calidad de accionista de
**CRÉDITO REAL, S.A. B. DE C.V.
SOCIEDAD FINANCIERA DE OBJETO MÚLTIPLE,
ENTIDAD NO REGULADA**



PJCDMX
PODER JUDICIAL
CIUDAD DE MÉXICO
RECIBIDO
1 2 AGO. 2022
NUMERO 22
OFICIALIA DE PARTES COMÚN
PARA JUZGADOS Y SALAS

# Contrato de Intermediación Bursátil



**Fecha de contrato:** 06/08/2020

**No. de contrato:** AKJ786

CONTRATO DE INTERMEDIACIÓN BURSÁTIL QUE EN LOS TÉRMINOS DEL PRESENTE PROEMIO, LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS, CELEBRAN POR UNA PARTE GRUPO BURSÁTIL MEXICANO, S.A. DE C.V. CASA DE BOLSA, REPRESENTADA POR EL LIC. PATRICIO DE LA VEGA FLORES (EN ADELANTE 'CASA DE BOLSA'), Y POR LA OTRA, LA(S) PERSONA(S) INDICADA(S) A CONTINUACIÓN (EN ADELANTE 'CLIENTE').


JESUS NAVA MORENO

**Titular/Cliente**

**Firma**

- Calle: AV JUAREZ SUR

- No. Ext.: 424

- No. Int.:

- Colonia: San Lorenzo

- Del./CD.: Texcoco de Mora

- C.P.: 56140

- Estado: Estado de México

- País: México

- Calidad migratoria: No inmigrante

- Residencia: Mexicana

- Identificador fiscal: NAMJ721014I27

- CURP: NAMJ721014HMCVRS06

- Nacionalidad: Mexicana


**Correo electrónico:** jnavawsl@yahoo.com

| **Teléfono:** | **Int. Cod.:** | **Lada:** | **Ext.:** |
|---|---|---|---|
| 13754419 | 52 | 55 | |

TODOS LOS DEPÓSITOS O ABONOS QUE REALICE EL CLIENTE A GRUPO BURSÁTIL MEXICANO, S.A. DE C.V., CASA DE BOLSA PARA SU INVERSIÓN, DEBERÁN EFECTUARSE MEDIANTE DEPÓSITO O TRANSFERENCIA BANCARIA A LAS CUENTAS QUE ESTE INTERMEDIARIO MANTIENE ABIERTAS CON CADA UNA DE LAS INSTITUCIONES DE CRÉDITO E INDICANDO, EN LA FICHA DE DEPÓSITO U ORDEN DE TRANSFERENCIA RESPECTIVA, LA REFERENCIA BANCARIA QUE LA CASA DE BOLSA LE SEÑALE EN CADA CONFIRMACIÓN DE APERTURA DE CUENTA. CUALQUIER OTRA FORMA DE DEPÓSITO O ABONO QUE NO SEA REALIZADO EN LA FORMA AQUÍ ESTABLECIDA, SERÁ RESPONSABILIDAD EXCLUSIVA DEL CLIENTE.

**DECLARACIONES**

I.- Declara la CASA DE BOLSA:

a) Ser una sociedad constituida conforme a las leyes de los Estados Unidos Mexicanos, según se desprende de la escritura pública 89,877, de fecha 16 de enero de 2008, otorgada ante la fe del Lic. José Luis Quevedo Salceda, Notario Público No. 99 de México, Distrito Federal, e inscrita en el Registro Público de la Propiedad y de Comercio del Distrito Federal, el día 4 de marzo de 2008, bajo el folio mercantil número 376,589; autorizada para organizarse y operar como casa de bolsa mediante Oficio No. 312-3/852612/2007, de fecha 17 de diciembre de 2007, expedido por la Comisión Nacional Bancaria y de Valores, teniendo como Registro Federal de Contribuyentes GGB080116 EZ0.

b) Que el representante comparece en su carácter de apoderado, según se acredita con la escritura pública 89,877, de fecha 16 de enero de 2008, otorgada ante la fe del Lic. José Luis Quevedo Salceda, Notario Público No. 99 de México, Distrito Federal, e inscrita en el Registro Público de la Propiedad y de Comercio del Distrito Federal, el día 4 de marzo de 2008, bajo el folio mercantil número 376,589. Dichas facultades no le han sido revocadas, suspendidas, modificadas ni limitadas en forma alguna.

c) Ser el legítimo propietario o tener la facultad de disponer de todos y cada uno de los Valores objeto de las operaciones que realice al amparo del presente Contrato, así como de las garantías que, en su caso, constituya.

II.- Declara el CLIENTE:

a) Que son ciertos los datos que han quedado indicados en la Carátula y aquellos establecidos en el cuestionario de Conocimiento del Cliente, mismos que forman parte integrante del presente Contrato, incluso sus modificaciones, los cuales acredita con los documentos que en copia forman parte del expediente del CLIENTE, y acepta que la CASA DE BOLSA podrá en cualquier momento verificar y/o solicitar la actualización de los datos ahí asentados o documentos presentados y, en consecuencia, integrarlos a su expediente. Si el CLIENTE es Persona Moral, declara estar legalmente constituida y tener por representante legal a cualquier persona indicada en la Carátula, declarando las facultades para actuar a nombre y por cuenta del CLIENTE no han sido revocadas, modificadas, limitadas ni suspendidas en forma alguna. El CLIENTE declara irrevocablemente reconocer su obligación y exclusiva responsabilidad de informar oportunamente a la CASA DE BOLSA de cualquier modificación a los datos aquí mencionados y cualesquiera otros declarados o acreditados de cualquier manera ante la CASA DE BOLSA.

b) Ser el legítimo propietario o tener la facultad de disponer de todos y cada uno de los Valores objeto de las operaciones que realice al amparo del presente Contrato, así como de las garantías que, en su caso, constituya.

c) Que conoce el alcance de los derechos y las obligaciones que en los términos de la vigente Ley del Mercado de Valores se derivan de este Contrato, y que conoce y acepta que las operaciones que celebre la CASA DE BOLSA a su amparo, las llevará a cabo con apego a la Ley del Mercado de Valores y a las disposiciones de carácter general expedidas por las autoridades competentes, a los Reglamentos Interiores de las Bolsas, al Reglamento de la S.D. Indeval, Institución para el Depósito de Valores, S.A. de C.V., a las normas de autorregulación expedidas por el organismo autorregulatorio al que pertenece la CASA DE BOLSA y, en su caso, a las normas de operación a las que la CASA DE BOLSA deba sujetarse cuando se trate de valores negociados en el extranjero.

d) Que reconoce expresamente que por la naturaleza de las inversiones en el mercado de valores que son materia de este Contrato, incluso aquellas realizadas en acciones de sociedades de inversión, no es posible asegurar rendimientos, garantizar tasas de interés, estando sus inversiones sujetas, por tanto, a pérdidas o ganancias derivadas tanto del riesgo de las fluctuaciones del mercado. Cualquier rendimiento que se garantice, no importando el medio, se tendrá por inexistente, salvo tratándose de Operaciones de Reporto y Operaciones de Préstamo de Valores.

e) Que los recursos con los que celebre las operaciones objeto del presente Contrato provendrán en todos los casos de fuentes lícitas, reconociendo en este acto que conoce las normas relativas al reporte de operaciones relevantes e inusuales establecidas en las disposiciones aplicables en materia de prevención de lavado de dinero, o aquellas que las sustituyan en el futuro, no siendo la CASA DE BOLSA responsable de movimientos que ordene realizar el CLIENTE en contravención a las disposiciones señaladas.

f) Que cuenta con los conocimientos suficientes para ordenar las operaciones a las que se refiere el presente Contrato, así como recibir los servicios que la CASA DE BOLSA le proporcione.

g) Que en términos de la Ley del Mercado de Valores, otorga su consentimiento para que la Comisión Nacional Bancaria y de Valores investigue actos o hechos que contravengan lo previsto en dicha Ley, para lo cual le podrá practicar visitas de inspección que versen sobre tales actos o hechos, así como emplazarlo, requerirle información que pueda contribuir al adecuado desarrollo de la investigación y tomar su declaración en relación con dichos actos. Asimismo, reconoce y acepta que la CASA DE BOLSA podrá compartir su información para cumplir con cualesquiera obligaciones legales y regulatorias aplicables, sin la necesidad de solicitar autorización adicional al CLIENTE.

III.- Declaran ambas partes:

a) Que en el presente Contrato de Intermediación Bursátil se estipulan los derechos y las obligaciones de las partes, derivados del mandato general que otorga el CLIENTE a la CASA DE BOLSA, de los servicios de guarda y administración de valores que se obliga a prestar la CASA DE BOLSA y de las operaciones que celebren ambas partes entre sí, de manera general, y en específico aquellas que se realicen con o por cuenta del CLIENTE; rigiéndose la relación contractual por todo el clausulado del presente instrumento, con independencia de su división en capítulos.

Con base en lo anterior, las partes convienen las siguientes:

**CLÁUSULAS**

**I. DEFINICIONES**

**PRIMERA.-** Para los efectos del presente Contrato las partes entenderán por:

Apoderado Autorizado: Al apoderado de la CASA DE BOLSA autorizado para celebrar operaciones con el público, en términos de las disposiciones aplicables, a través del cual la CASA DE BOLSA presta servicios al CLIENTE sobre determinada Cuenta.

Asesor en Inversiones: Es aquella persona que sin ser intermediario del mercado de valores proporciona de manera habitual y profesional servicios de administración de cartera de valores tomando decisiones de inversión a nombre y por cuenta de terceros y otorga asesoría de inversión en valores, análisis y emisión de recomendaciones de inversión.

Bolsas: Las sociedades denominadas Bolsa Mexicana de Valores, S.A.B. de C.V., y Bolsa Institucional de Valores, S.A. de C.V., quienes proporcionan el servicio de Bolsa de Valores en México.

Carátula: Se refiere a la o las hojas iniciales del presente Contrato que incluye datos de Identificación del CLIENTE, elecciones específicas por éste respecto de su relación contractual con la CASA DE BOLSA, datos de identificación de la CASA DE BOLSA, y cualquier otra

información acordada específicamente por las partes mediante la suscripción que de tiempo en tiempo realicen de sus términos.

CCV: La sociedad denominada Contraparte Central de Valores de México, S.A. de C.V.

Claves de Identificación: Son, en conjunto, y según se requieran según el Medio de Acceso, Plataforma y/o servicio que ofrezca la CASA DE BOLSA al CLIENTE, la Clave o Nombre de Usuario, Contraseña, números de identificación personal de carácter confidencial (NIP), la clave que emita un Token, y/o cualquier otro requisito de acceso al medio y/o servicio de que se trate.

Comercialización: Recomendación generalizada, sin necesidad de perfilar al CLIENTE, efectuada a través del alcance de los servicios prestados mediante determinada plataforma para realizar las operaciones sobre ciertos instrumentos de aquellos detallados en el Anexo 6, o el que corresponda de momento a momento, de las Disposiciones de carácter general aplicables a las entidades financieras y demás personas que proporcionen servicios de inversión.

Comisión: La Comisión Nacional Bancaria y de Valores.

Confirmación de Apertura de Cuenta: Documento que forma parte integral del presente Contrato, mediante el cual, la CASA DE BOLSA confirma al CLIENTE la apertura que realice de cualquier Cuenta al amparo del mismo, sus características, el manejo que respecto de ésta se hubiere pactado y demás información contemplada al efecto en este Contrato o cualquier otra que la CASA DE BOLSA considere pertinente. En uso de Plataformas u otros Medios de Acceso que cuenten con la funcionalidad correspondiente, se considerará como tal la información que al efecto muestre la CASA DE BOLSA a través de la Plataforma o Medio de Acceso.

Confirmación de Modificaciones en Cuenta: Documento que forma parte integral del presente Contrato, mediante el cual, la CASA DE BOLSA confirma al CLIENTE la modificación a alguna característica específica de la Cuenta de que se trate. En uso de Plataformas u otros Medios de Acceso que cuenten con la funcionalidad correspondiente, se considerará como tal la información que al efecto muestre la CASA DE BOLSA a través de la Plataforma o Medio de Acceso.

Contrato: Al presente Contrato de intermediación Bursátil.

Cuenta: Cualquiera que la CASA DE BOLSA abra al CLIENTE al amparo del presente, según lo establecido en la Cláusula Tercera y para todos los efectos contemplados en este Contrato.

Días Hábiles: Aquellos que se señalen como tales en el calendario bursátil que publique la Comisión.

Divisas: A los dólares de los Estados Unidos de América, así como a cualquier otra moneda extranjera libremente transferible y convertible de inmediato a la moneda citada.

Divisa Base: Significa la divisa que la parte que actúe como comprador deberá pagar a la parte que actúe como vendedor y que precisamente las partes convengan en la Fecha de Celebración de cada Operación con Divisas.

Divisa de Referencia: Significa la Divisa que la parte que actúe como vendedor deberá entregar a la parte que actúe como comprador y que precisamente las partes convengan en la Fecha de Celebración de cada Operación con Divisas.

Otorgamiento de Discrecionalidad: Acto mediante el cual el CLIENTE, otorga la discrecionalidad a la CASA DE BOLSA para el manejo de alguna Cuenta, bajo los parámetros del Perfil de Inversión, o especificando, en su caso, los Valores, operaciones, porcentajes, parámetros, plazos o cualesquiera otras características conforme a las cuales el CLIENTE otorga la discrecionalidad, por los medios que GBM establezca.

Fecha de Celebración: Al Día Hábil en que las partes convengan una Operación con Divisas.

Fecha de Liquidación: Al Día Hábil en el cual deba, pagarse el cumplimiento de las obligaciones en cada Operación con Divisas, según haya sido pactada por las partes.

Firma Electrónica: Es un conjunto de datos unidos a partir de una comunicación electrónica, en mensaje de datos, como Claves de Identificación, cuyo propósito es identificar al CLIENTE como autor legítimo de éste, e indicar que el CLIENTE aprueba la información que firma, y que produce los mismos efectos jurídicos que la firma autógrafa, siendo admisible como prueba en juicio.

Firma Digital: Significa la firma autógrafa de cualquiera de las partes realizada mediante medios digitales.

Firma Autógrafa: Significa a la firma que una persona plasma en un documento con su propio puño y letra.

Folleto Informativo: Documento elaborado por la CASA DE BOLSA mediante el cual se dan a conocer al CLIENTE para la realización de operaciones en las Bolsas, los tipos de orden, medios de recepción de instrucciones, mecanismos y políticas de transmisión de ordenes y asignación de operaciones, en términos del Manual de Políticas y Lineamientos para la Recepción, Registro y Ejecución de Órdenes y Asignación de Operaciones.

Grupo Empresarial: En términos de la Ley del Mercado de Valores, es el conjunto de personas morales organizadas bajo esquemas de participación directa o indirecta del capital social, en las que una misma sociedad mantiene el control de dichas personas morales.

Guía de Servicios de Inversión: Documento en el que se describen, entre otras cosas, los servicios de inversión que la CASA DE BOLSA proporciona a su clientela, las clases o categorías de Valores objeto de sus servicios, los rubros y límites de comisiones, costos, contraprestaciones y cualesquiera otros cargos derivados de los servicios prestados, y que la CASA DE BOLSA pone a disposición de la clientela por medios de acceso público o entrega a posibles clientes antes de su contratación.

Indeval: A la sociedad denominada S.D. Indeval, Institución para el Depósito de Valores, S.A. de C.V.

Internet: La red mundial de telecomunicaciones conocida como internet.

Moneda Nacional: Pesos moneda de curso legal en los Estados Unidos Mexicanos, según lo establecido en la Ley Monetaria de los Estados Unidos Mexicanos.

Medios de Acceso: Cualquier medio electrónico, de cómputo o telecomunicaciones, así como equipos, sistemas automatizados, incluyendo Plataformas, que hubieren sido aceptados por las partes con las Claves de Identificación que les correspondan.

Montos de Referencia: Al monto de la Operación con Divisas pactado por las partes.

Operaciones con Divisas: Aquellas operaciones de compraventa en que las Divisas y su contravalor se entreguen a más tardar tres Días Hábiles después de la Fecha de Celebración de la Operación correspondiente, pudiendo determinarse como "Fecha Valor mismo Día", "Fecha Valor 24 horas", "Fecha Valor 48 horas" o "Fecha Valor 72 horas".

Operación de Reporto: Aquella operación mediante la cual el Reportador adquiere por una suma de dinero la propiedad de determinados Valores y se obliga a transferir al Reportado la propiedad de otros tantos Valores de la misma especie en el plazo convenido y contra el reembolso del mismo precio, más un Premio. El Premio queda en beneficio del Reportador, salvo pacto en contrario. Por Valores de la misma especie se entenderán aquellos que tengan igual clave de emisión.

Operaciones por Cuenta Propia o de Autoentrada: Aquellas operaciones mediante las cuales la CASA DE BOLSA compra o vende por sí misma Valores de renta variable de o a la posición del CLIENTE a través de las Bolsas con el objeto de proveer de liquidez al mercado y facilitar el intercambio de títulos entre los inversionistas, así como

aquellas autorizadas a realizar a la CASA DE BOLSA directamente con el CLIENTE de conformidad con la Ley del Mercado de Valores y con las Disposiciones de Carácter General emitidas por las autoridades competentes.

Perfil de Inversión: Categorización del Cliente y de cada Cuenta que abra al amparo del presente Contrato, cuando se reciban Servicios de Inversión asesorados, en el entendido que el Perfil de Inversión asignado a una Cuenta se encuentra conformado por el Perfil del Cliente y el Perfil de la Cuenta.

Personas Autorizadas: La o las personas que el CLIENTE designe y comunique a la CASA DE BOLSA para actuar como tales de la manera señalada en las Cláusulas Cuadragésima Quinta y Cuadragésima Sexta, según corresponda, quienes podrán instruir la celebración de operaciones y en general realizar cualesquiera actos por cuenta del CLIENTE que no se encuentren reservadas a éste ya sea por las políticas de la CASA DE BOLSA o por restricción expresa del propio CLIENTE. En caso de que el CLIENTE sea Persona Física, también se considerarán Personas Autorizadas en términos del presente Contrato los representantes legales debidamente acreditados, sin más limitaciones que las de los poderes correspondiente.

Plataforma: Cualquier aplicación o plataforma de acceso vía internet que la CASA DE BOLSA ponga a disposición de su clientela, a través de las cuales puede prestar determinados servicios, según la funcionalidad que mantenga aplicación o plataforma que corresponda de momento a momento.

Políticas Operativas: Aquellas políticas que mantenga la CASA DE BOLSA vigentes en cada momento, que resultan relevantes para el CLIENTE en la prestación de los servicios amparados en este Contrato.

Precio de Cierre: Al determinado como tal en la Bolsa respectiva, o en el mercado que coticen.

Precio de Mercado: El último Precio de Cierre en el caso de acciones que coticen en la Bolsa y, tratándose de Valores distintos a las antes mencionadas y acciones de sociedades o fondos de inversión, el último precio que para los mismos hubiere proporcionado un proveedor de precios autorizado por la Comisión.

Premio: Para cada Operación de Reporto, la cantidad que el Reportador se obliga a pagar al Reportado en la fecha de vencimiento, denominado en la misma moneda que los Valores objeto de la operación, con excepción de las operaciones celebradas con Valores denominados en UDIS, en cuyo caso deberán denominarse en moneda nacional.

Solicitud de Apertura de Cuenta: Documento que forma parte integral del presente Contrato, mediante el cual, el CLIENTE solicita a la CASA DE BOLSA la apertura de cualquier Cuenta adicional al amparo del mismo, el manejo que respecto de la Cuenta que corresponda desee pactar con la CASA DE BOLSA así como cualquier otra característica que en este Contrato se contemple se deba incluir dicho documento. En uso de Plataformas u otros Medios de Acceso que cuenten con la funcionalidad correspondiente, se considerará como tal el registro por el CLIENTE de la información que corresponda a una Solicitud de Apertura de Cuenta a través de la propia Plataforma o Medio de Acceso, sin necesidad de suscribir documento adicional alguno.

Servicios de Inversión: Significan aquellos servicios definidos en las Disposiciones de carácter general aplicables a las entidades financieras y demás personas que proporcionen servicios de inversión.

Términos y Condiciones: Al documento de dicho nombre en el cual se especifican los términos en los que funcionará la prestación de los servicios al CLIENTE contemplados en la Plataforma correspondiente.

Tipo de Cambio Pactado: Significa, respecto de cada Operación, el tipo de cambio de la Divisa Base frente a la Divisa de Referencia que libremente convengan las partes en la Fecha de Celebración.

Token: Dispositivo físico que emite una contraseña aleatoria, misma que permite la autenticación de determinado usuario de un sistema computacional.

Valores: Son aquellos que se refieren como tales en la Ley del Mercado de Valores y, tratándose por operaciones cuya regulación esté sujeta a las disposiciones del Banco de México, se estará a lo dispuesto en la definición de las mismas establezca.

Las definiciones establecidas en esta cláusula serán aplicables ya sea que se presenten en singular o plural, así como sus conjugaciones y modalidades, obligándose las partes al contenido de las mismas.

Los términos utilizados con mayúscula inicial que no se hubieren definido en la presente cláusula o en cualquier otra parte del presente Contrato, tendrán el significado atribuido en la Guía de Servicios de Inversión, en la Ley del Mercado de Valores, en las disposiciones y reglas aplicables, así como en el Reglamento Interior de la Bolsa y su Manual Operativo, en el orden mencionado.

## II.  MANDATO GENERAL PARA ACTOS DE INTERMEDIACIÓN EN EL MERCADO DE VALORES

**SEGUNDA.- Mandato.** El CLIENTE otorga a la CASA DE BOLSA, un mandato general para que por cuenta del CLIENTE, realice actos de intermediación en el mercado de valores, así como para la realización de cualesquiera actos relacionados con el mercado de valores, entre los que se mencionan, de manera enunciativa mas no limitativa, los de comprar, vender, dar y recibir en garantía, guardar, administrar y depositar los valores; actuar como representante del CLIENTE en asambleas de accionistas, obligacionistas, tenedores de certificados de participación o de otros Valores, en el ejercicio de derechos corporativos y patrimoniales; recibir fondos; canjear; reportar; prestar; ceder; transmitir, traspasar y en general, realizar cualquier otra operación o movimiento en la Cuenta autorizado por la Ley del Mercado de Valores y las disposiciones de carácter general emanadas de ella, así como las disposiciones de carácter general de Banco de México, y llevar a cabo cualquier acto relacionado con valores, títulos o documentos a ellos asimilables u otros instrumentos autorizados bursátiles o extrabursátiles y cualquier otro que autorice la Ley, incluyendo operaciones con valores denominados o referenciados a divisas emitidos en México o en el extranjero, realizar operaciones en el Sistema Internacional de Cotizaciones, así como operaciones con metales amonedados y divisas.

En el supuesto de que las autoridades aprueben alguna nueva operación con posterioridad, la CASA DE BOLSA quedará facultada para llevarla a cabo sin necesidad de modificar el presente Contrato.

La CASA DE BOLSA podrá poner a disposición del CLIENTE servicios de mediación, depósito, administración y, en general, servicios relacionados sobre Valores no inscritos en el Registro Nacional de Valores o listados en el Sistema Internacional de Cotizaciones.

**TERCERA.- Cuenta.** Las partes convienen que la CASA DE BOLSA abrirá al CLIENTE una o más Cuentas en las que se registrarán, de manera enunciativa y no limitativa, las operaciones realizadas, las entregas o traspasos de Valores o efectivo hechos por el CLIENTE, o por instrucciones de éste, las percepciones de intereses, rendimientos, dividendos, amortizaciones, importe de ventas de títulos y derechos y en general cualquier saldo a favor del propio CLIENTE en Valores o efectivo; así como los retiros de Valores o efectivo hechos por el CLIENTE y los honorarios, remuneraciones, gastos, comisiones y demás pagos que el CLIENTE cubra o deba pagar a la CASA DE BOLSA conforme a este Contrato.

Se abrirá una primera Cuenta de manera automática con la celebración del presente Contrato. Cuentas adicionales serán abiertas a solicitud que extienda el CLIENTE por escrito a la CASA DE BOLSA mediante cualquier Solicitud de Apertura de Cuenta que suscriba, documento que en todo caso formará parte integral del presente Contrato. El CLIENTE reconoce y acepta que todas y cada una de las Cuentas adicionales abiertas se regirán por lo estipulado en el presente Contrato, así como a los Términos y Condiciones aceptados por el CLIENTE. y que en ningún caso las Cuentas podrán mantener titulares distintos a los referidos en el presente Contrato y/o sus modificaciones.

3

La CASA DE BOLSA, luego de abrir cualquier Cuenta al amparo del presente, dirigirá al CLIENTE la Confirmación de Apertura de Cuenta, en la que se señalan las características de la Cuenta que ha sido abierta a solicitud del CLIENTE, el manejo y tipo de servicio de inversión que respecto de la misma se hubiere pactado, y demás información contemplada al efecto en este Contrato o cualquier otra que la CASA DE BOLSA considere pertinente. Cualquier Confirmación de Apertura de Cuenta formará parte integrante del presente Contrato. La Solicitud de Apertura de Cuenta, junto con la Confirmación de Apertura de Cuenta correspondiente, conformará de manera plena el acuerdo de voluntades entre el CLIENTE y la CASA DE BOLSA respecto de la información ahí contenida.

**CUARTA.- Servicios de Inversión.** El CLIENTE reconoce haber recibido o haber consultado la Guía de Servicios de Inversión y conocer sus términos, confirmando su aceptación y acuerdo con dichos términos al contratar la prestación de éstos en cada Cuenta que solicite abrir.

Aunado a lo anterior, y según el servicio de inversión pactado, el CLIENTE reconoce expresamente que:

a) Ejecución de Operaciones: Al contratar el servicio de Ejecución de Operaciones, las operaciones que se efectúen en la Cuenta no derivarán de asesoría alguna por parte de la CASA DE BOLSA, siendo exclusiva responsabilidad del CLIENTE informarse debidamente sobre los Valores y operaciones a realizar, verificar que las operaciones que instruya vayan de acuerdo a sus objetivos de inversión y asegurarse de mantengan niveles de riesgo adecuados a su situación personal.

En caso de que el CLIENTE designe a un Asesor en Inversiones o persona encargada del manejo de la Cuenta, el servicio de inversión que la CASA DE BOLSA brindará respecto de dicha Cuenta será exclusivamente el de Ejecución de Operaciones, y en ningún caso podrá considerarse a la CASA DE BOLSA responsable de las recomendaciones u operaciones efectuadas por el Asesor en Inversiones o persona encargada del manejo de la Cuenta designado por el CLIENTE. Igualmente, el CLIENTE declara que al contratar al Asesor en Inversiones, la CASA DE BOLSA le reconocerá el carácter de sofisticado y elegible para todos los efectos, según lo dispuesto en las disposiciones de carácter general emitidas por la Comisión.

b) Asesoría de Inversiones: En la prestación del servicio de Asesoría de Inversiones, la CASA DE BOLSA no mantendrá obligación alguna de dirigir al CLIENTE las recomendaciones para la celebración de operaciones de tiempo en tiempo, sino que se podrá limitar a asesorar o brindar consejos o recomendaciones personalizadas, de acuerdo con el Perfil de Inversión, únicamente cuando el CLIENTE establezca comunicación con el Apoderado Autorizado correspondiente, siendo responsabilidad exclusiva del CLIENTE las operaciones que instruya u omita instruir, derivadas de las recomendaciones de la CASA DE BOLSA.

Por su parte, tratándose de Cuentas con dos o más cotitulares, la CASA DE BOLSA podrá limitar la prestación del servicio de Asesoría de Inversiones y la correspondiente recepción de instrucciones para la celebración de operaciones en determinada Cuenta, a la persona que los titulares del Contrato hubieren designado como Persona Designada para girar Instrucciones de Inversión. Lo anterior sin perjuicio de la facultad con la que en todo momento contarán todos los cotitulares de ordenar traspasos de Valores o retiros de efectivo con cargo a la Cuenta, sumado, en su caso, a la correspondiente operación de venta de Valores para generar la liquidez necesaria al efecto.

Si al momento de encontrarse prestando el servicio de Asesoría de Inversiones, el CLIENTE pretendiera instruir la realización de una operación que no se encuentre dentro de lo que la CASA DE BOLSA considera adecuado para la Cuenta al amparo de este servicio, indicará al CLIENTE que para aceptar la Instrucción correspondiente, la operación deberá realizarse al amparo del servicio de Ejecución de Operaciones.

El CLIENTE acuerda expresamente que la CASA DE BOLSA no tendrá responsabilidad alguna, si por motivos de la actuación posterior a la realización de la operación o prestación del servicio, o derivado del retiro de recursos de la Cuenta, la situación de la misma se aleja de la Integración que la CASA DE BOLSA hubiere determinado como adecuada según el Perfil de Inversión que mantenga la Cuenta.

c) Comercialización: Al contratar este servicio, el CLIENTE recibe recomendaciones generalizadas para realizar Operaciones de compra, venta o reporto sobre los Valores establecidos en el Anexo 6 de las Disposiciones de carácter general aplicables a las entidades financieras y demás personas que proporcionen servicios de inversión.

d) Gestión de Inversiones: Al contratar el manejo discrecional de determinada Cuenta, el CLIENTE reconoce que estará recibiendo el servicio de Gestión de Inversiones para dicha Cuenta, rigiéndose además la discrecionalidad mencionada por lo establecido en la Cláusula Novena de este Contrato.

El CLIENTE únicamente podrá instruir la celebración de operaciones en una Cuenta con manejo discrecional, cuando se trate de instrucciones de traspaso o retiro de recursos, siendo totalmente responsable el CLIENTE de la elección de Valores que, en su caso, determine con este fin.

La CASA DE BOLSA no tendrá responsabilidad alguna cuando por cuestiones de valuación, cambios de Perfil de Inversión, así como por los señalados en el párrafo anterior, la integración de la Cuenta se aleja de aquella determinada como adecuada según el Perfil de Inversión o el Mandato Específico que se mantenga para la Cuenta, reconociendo el CLIENTE que la CASA DE BOLSA gestionará la reintegración correspondiente en el tiempo que estime conveniente para el CLIENTE, con base en la situación prevaleciente en el mercado, entre otros factores.

El CLIENTE reconoce que para la prestación de Servicios de Inversión asesorados, la CASA DE BOLSA basará sus recomendaciones o manejo discrecional, según sea el caso, en el Perfil de Inversión que de los cuestionarios correspondientes hubiere resultado para el CLIENTE y la Cuenta de que se trate, y aquellos productos, servicios, Valores, operaciones o integraciones de cartera que la CASA DE BOLSA determine de tiempo en tiempo como adecuados para dicho Perfil de Inversión. Por este motivo, el CLIENTE reconoce la importancia de que la información proporcionada a la CASA DE BOLSA sea verdadera y de acuerdo a la realidad del CLIENTE, a sus propósitos, objetivo, nivel de tolerancia al riesgo y horizonte de las inversiones, siendo total y exclusivamente responsable de la información proporcionada, y de tomar en cuenta cualesquiera advertencias y aclaraciones de la CASA DE BOLSA para estos efectos.

De acuerdo a lo establecido en la Ley del Mercado de Valores, se reconoce que, sin importar el tipo de servicio de inversión pactado, la CASA DE BOLSA: (i) no garantiza, directa o indirectamente, rendimientos ni el éxito de las inversiones; (ii) no asume la obligación de devolver la suerte principal de los recursos que le hayan sido entregados para la celebración de operaciones con Valores; (iii) no se responsabiliza de las pérdidas que pueda sufrir el CLIENTE como consecuencia de las operaciones realizadas al amparo de este Contrato, ni de forma alguna asume el riesgo en el diferencial de precio o tasa a favor del CLIENTE. Lo anterior, sin perjuicio de aquellas obligaciones de pago asumidas por la CASA DE BOLSA en la celebración de operaciones concretas por cuenta propia.

**QUINTA.- Instrucciones y Cumplimiento de Operaciones.** El CLIENTE se obliga a cumplir en sus términos las operaciones celebradas por la CASA DE BOLSA por cuenta del primero, a fin de que esta última esté en posibilidad de cumplir a su vez con las operaciones celebradas frente a terceros.

Salvo que el CLIENTE haya optado por encomendar a la CASA DE BOLSA discrecionalidad en el manejo de la Cuenta correspondiente, el mandato para efectuar operaciones con Valores que se refiere la Cláusula Segunda será desempeñado por la CASA DE BOLSA con sujeción a las Instrucciones expresas del CLIENTE, o de cualquier

4

persona debidamente facultada al efecto, que reciba la CASA DE BOLSA a través del uso de canales de acceso electrónico directo proporcionados por la CASA DE BOLSA o Apoderado Autorizado, reconociendo el CLIENTE que el resto de los empleados, directivos y/o apoderados de la CASA DE BOLSA están impedidos de darles cumplimiento, sin responsabilidad ni para ellos ni para la CASA DE BOLSA.

La CASA DE BOLSA estará facultada para encomendar la realización del encargo a otra casa de bolsa, sin necesidad de obtener el consentimiento del CLIENTE, en el caso de operaciones a realizarse en mercados internacionales o en otros supuestos previstos en las normas aplicables, pero haciéndose responsable de la actuación del delegatario respectivo.

El CLIENTE autoriza expresamente a que la CASA DE BOLSA realice operaciones de facilitación con el fin de satisfacer de manera total o parcial instrucciones para la realización de operaciones pendientes de realizar por parte del CLIENTE, pudiendo ser incluso mediante órdenes globales.

**SEXTA.- Sistema de Recepción y Asignación.** El CLIENTE reconoce y acepta los términos y condiciones establecidos en el Folleto Informativo que le ha sido proporcionado, y cuyas modificaciones le serán igualmente dadas a conocer a través de nuevas versiones del folleto mencionado. La CASA DE BOLSA podrá modificar unilateralmente el Folleto Informativo, debiendo proporcionar a el CLIENTE el Folleto con las modificaciones, para el reconocimiento de éste último.

En este acto, el CLIENTE acuerda que en operaciones celebradas al amparo de órdenes derivadas de instrucciones a la mesa de operación de la CASA DE BOLSA, podrá compartir la asignación con otras órdenes derivadas de instrucciones a la mesa, según la política de agrupación y asignación que para estos efectos mantiene la CASA DE BOLSA y que se muestra en el Folleto Informativo señalado en el párrafo anterior.

El CLIENTE reconoce que no deberá solicitar la ejecución de operación alguna en la que mantenga simultáneamente el carácter de comprador y vendedor y, en caso de presentarse injustificadamente una operación con esa característica, la CASA DE BOLSA podrá ordenar su cancelación, o realizar actos tendientes a mitigar o subsanar la falta, en cuyo caso el CLIENTE se obliga a reembolsar cualquier cantidad erogada o pérdida generada con motivo del incumplimiento del CLIENTE a lo establecido en el presente párrafo.

**SÉPTIMA.- Incumplimiento de Operaciones.**

En ningún caso la CASA DE BOLSA estará obligada a cumplir instrucciones por cuenta del CLIENTE si éste no la ha provisto de los recursos o Valores necesarios para ello, o si no existen en la Cuenta saldos acreedores o cualquier tipo de crédito disponible para liquidar las operaciones instruidas.

Si por cualquier motivo la CASA DE BOLSA efectúa la liquidación, total o parcial, de alguna operación con recursos propios, el CLIENTE queda obligado a reembolsarle dichas cantidades o Valores a la CASA DE BOLSA, incluyendo cualesquiera comisiones y gastos relacionados con dichas operaciones y su liquidación, el mismo día en que ésta las hubiere erogado.

En caso de que el CLIENTE incumpla su obligación en términos del párrafo anterior, la CASA DE BOLSA quedará facultada para vender desde la Cuenta, o en su defecto en cualquier otra cuenta que mantenga con la CASA DE BOLSA, por lo que el CLIENTE la instruye irrevocablemente al efecto, en primer lugar, Valores de mercado de dinero, y si su valor no es suficiente, podrá vender cualquier Valor propiedad del CLIENTE hasta por la cantidad equivalente a la sumatoria cualquier cantidad adeudada más los intereses moratorios generados hasta el momento, en el siguiente orden de prelación y según se obtenga la liquidez más inmediata a su venta: acciones de sociedades o fondos de inversión, cualesquier Valores no incluidos en las clases o categorías de este párrafo y Valores del mercado de capitales.

Con el producto de dichas ventas, la CASA DE BOLSA pagará el cargo de las cantidades adeudadas por el CLIENTE, los conceptos de pago de éstas.

Si el producto de las ventas efectuadas conforme lo anterior no fuere suficiente para cubrir el monto adeudado, el CLIENTE reconoce que quedará expedita la acción de la CASA DE BOLSA por el resto de la deuda a su favor.

**OCTAVA.- Excusas.** La CASA DE BOLSA se reserva el derecho de corroborar la existencia y veracidad de la instrucción del CLIENTE, y el solicitar su confirmación por los medios que juzgue convenientes, pudiendo la CASA DE BOLSA dejar en suspenso la ejecución de la instrucción hasta en tanto el CLIENTE no confirme de manera fehaciente la misma. En este supuesto, al no recibir la confirmación del CLIENTE, la CASA DE BOLSA quedará liberada de la obligación de darle cumplimiento y por lo mismo no tendrá responsabilidad alguna derivada de su inejecución por cambios en los precios del mercado, conclusión de los horarios de operación u otros de naturaleza semejantes, sino hasta en tanto reciba la confirmación.

Igualmente, y conforme a lo dispuesto por la Ley del Mercado de Valores, la CASA DE BOLSA deberá excusarse, sin su responsabilidad, a dar cumplimiento a las instrucciones del CLIENTE que contravengan lo establecido en las leyes y disposiciones de carácter general expedidas por las autoridades competentes, así como en el Reglamento Interior de la Bolsa, del Indeval, la CCV, y de las normas de autorregulación emitidas por el organismo autorregulatorio al que pertenece.

**NOVENA.- Discrecionalidad.** En caso de que el CLIENTE convenga el Otorgamiento de Discrecionalidad en el manejo de la Cuenta, dicho manejo se regirá por las siguientes estipulaciones:

a) El CLIENTE autoriza a la CASA DE BOLSA para ejercer el mandato y manejar la Cuenta como considere conveniente, realizando las operaciones a las que se refiere la Cláusula Segunda y cualquier otra contemplada o no excluida en el presente Contrato, siempre de acuerdo al Perfil de la Cuenta del CLIENTE que se hubiere establecido para la Cuenta que corresponda; de igual manera, el CLIENTE autoriza expresamente a la CASA DE BOLSA a ejercer los derechos derivados de los Valores que le han sido encomendados en guarda y administración.

El CLIENTE podrá establecer los términos de la discrecionalidad para determinada Cuenta, para lo cual deberá obtener el consentimiento previo de la CASA DE BOLSA mediante la suscripción por las Partes de un mandato específico, en donde se determinen los Valores, operaciones, porcentajes, parámetros, plazos o cualesquiera otras características conforme a las cuales la CASA DE BOLSA llevará a cabo el manejo de la Cuenta.

Sin perjuicio de lo anterior y de conformidad con lo establecido en la fracción VIII del artículo 200 de Ley del Mercado de Valores, cuando en una Cuenta con manejo discrecional, el CLIENTE, o alguna Persona Autorizada de éste, ordene o instruya a la CASA DE BOLSA la realización de determinados actos u operaciones, se entenderá que tal discrecionalidad quedará limitada sólo respecto de los mismos y por ende, el CLIENTE asume la responsabilidad que corresponda a dichas órdenes. Las instrucciones que gire el CLIENTE o alguna Persona Autorizada a la CASA DE BOLSA, al amparo de una Cuenta con manejo discrecional, en ningún caso implicarán mayor limitación que la del acto u operación específica, menos aún su revocación, la cual en todo caso deberá notificarse por escrito.

b) El CLIENTE declara que al otorgar la discrecionalidad en el manejo de su Cuenta a la CASA DE BOLSA, se le reconocerá el carácter de elegible para todos los efectos, según lo dispuesto en las disposiciones de carácter general emitidas por la Comisión.

c) El CLIENTE acepta expresamente que la CASA DE BOLSA no será responsable de las minusvalías reflejadas en la Cuenta,

5

derivadas del manejo discrecional de la misma, por lo que libera a la CASA DE BOLSA de toda responsabilidad por dicho manejo.

d)  Las operaciones a que se refiere la presente cláusula serán ordenadas por el Apoderado Autorizado que maneje la Cuenta, sin que sea necesaria la previa aprobación o ratificación del CLIENTE para cada operación, salvo que la CASA DE BOLSA así lo requiera.

La discrecionalidad pactada podrá revocarse en cualquier momento por el CLIENTE mediante comunicación fehaciente por escrito, dada a la CASA DE BOLSA, la cual surtirá sus efectos desde el momento en que la CASA DE BOLSA la hubiere confirmado de recibido, sin afectar de manera alguna aquellas operaciones pendientes de liquidar.

El CLIENTE autoriza expresamente a la CASA DE BOLSA para que en cumplimiento del manejo discrecional pactado, pueda asignarle operaciones provenientes de órdenes globales y de paquete, incluso con títulos de baja, mínima o nula bursatilidad, ya sea de compra o venta según sea el caso.

El manejo discrecional de cualquier Cuenta pactado de conformidad con la presente continuará aún de no presentarse cualquier comunicación con el CLIENTE, o ante su fallecimiento o incapacidad, en tanto no se giren instrucciones distintas por quien se acredite ante la CASA DE BOLSA como facultado al efecto.

## III.  GUARDA Y ADMINISTRACIÓN

**DÉCIMA.- Naturaleza.** Las partes convienen que la CASA DE BOLSA prestará al CLIENTE el servicio de guarda y administración respecto de los Valores que el CLIENTE le confíe para tal efecto, y de los fondos que éste le entregue para la celebración de operaciones, en los términos establecidos en la Ley del Mercado de Valores.

En virtud del servicio de guarda y administración de Valores, la CASA DE BOLSA se obliga a recibir los Valores propiedad del CLIENTE que el mismo le entregue o que le sean transferidos por orden de éste o los que se adquieran en cumplimiento del presente Contrato y a tenerlos depositados en institución para el depósito de valores. Así mismo, la CASA DE BOLSA se obliga a efectuar en relación a dichos Valores, los cobros y a practicar los actos necesarios para la conservación de los derechos y el cumplimiento de las obligaciones que los referidos Valores confieran o impongan al CLIENTE y a disponer de ellos para la ejecución de sus instrucciones, sin que dentro de estos actos se comprenda el ejercicio de derechos o acciones judiciales.

Las partes reconocen la naturaleza fungible de los Valores derivada de su depósito en una institución para el depósito de valores y por ministerio de la Ley del Mercado de Valores, por lo que la CASA DE BOLSA, en calidad de administradora de los mismos, únicamente está obligada a restituir otros tantos Valores de la misma especie y calidad de los depositados originalmente.

En el supuesto de que los Valores respecto de los cuales la CASA DE BOLSA esté prestando el servicio a que se refiere esta cláusula dejen de estar inscritos en el Registro Nacional de Valores, la CASA DE BOLSA notificará al CLIENTE de este hecho y por consiguiente cesarán sus obligaciones en relación con tales Valores.

Por consiguiente, al ocurrir el supuesto a que se refiere el párrafo anterior, el CLIENTE será responsable del ejercicio de todas las acciones judiciales o extrajudiciales de cobro y de todos los actos necesarios para la conservación de los derechos que confieran los Valores en cuestión y del cumplimiento de las obligaciones que los mismos impongan. La CASA DE BOLSA pondrá a disposición del CLIENTE dichos Valores cuando ello sea posible. El CLIENTE, además, deberá pagar a la CASA DE BOLSA cualquier erogación que realice en relación con dichos Valores y con los actos que, en su caso, siga para concretar su retiro.

Tratándose de efectivo, cuando por cualquier circunstancia la CASA DE BOLSA no pueda aplicar los recursos al fin señalado por el CLIENTE el mismo día de su recepción, adquirirá, de persistir el impedimento para su aplicación, acciones representativas de algún fondo de inversión en instrumentos de deuda, depositándolas en la

Cuenta correspondiente, o bien, los invertirá en reportos a corto plazo sobre valores gubernamentales, en cualquier caso a elección de la CASA DE BOLSA.

Igualmente, en caso de que la CASA DE BOLSA reciba Valores por parte el CLIENTE, y éste último no haya dado instrucción expresa para su inversión al final del día, el CLIENTE, por este conducto autoriza a la CASA DE BOLSA, realice los actos necesarios con la finalidad de comprar acciones representativas del algún fondo de inversión en instrumentos de deuda en dólares, depositándolas en la Cuenta correspondiente.

El retiro físico o traspaso de los Valores depositados, se podrá ordenar por el CLIENTE mediante la suscripción de los documentos que para tales efectos le solicite la CASA DE BOLSA que acrediten la devolución o transferencia a entera conformidad de quien recibe, previa legitimación de éste último.

**DÉCIMA PRIMERA.- Asambleas.** El CLIENTE que desee asistir a una asamblea a la cual mantenga el derecho de asistir, lo solicitará por escrito a la CASA DE BOLSA con cuando menos 8 (ocho) Días Hábiles de anticipación a la fecha en que se cierre el registro de participantes y si no hubiera éste, a la fecha de la celebración de la asamblea, a efecto de que la CASA DE BOLSA pueda, en los términos de la Ley del Mercado de Valores y de las demás disposiciones aplicables, entregar al CLIENTE oportunamente la documentación necesaria para acreditar su derecho de asistencia a la asamblea de accionistas, obligacionistas, tenedores de certificados de participación u otros Valores ("Asambleas"), en el entendido de que cualquier gasto que se genere con motivo de lo señalado en este párrafo deberá ser pagado por el CLIENTE.

En el caso de que la CASA DE BOLSA no reciba la solicitud a que se refiere el párrafo anterior dentro del plazo establecido, podrá cuando así lo considere prudente y sin responsabilidad de ésta, representar al CLIENTE en Asambleas respecto de los Valores sobre los que se esté prestando el servicio de guarda y administración, en ejercicio del mandato que le fue conferido de conformidad con la Cláusula Segunda del presente Contrato. Para estos efectos, el CLIENTE autoriza a la CASA DE BOLSA a proporcionar toda aquella información o documentos del CLIENTE que resulten necesarios para acreditar su titularidad al representarlo en asambleas de accionistas o tenedores, en relación con el presente mandato.

Si el CLIENTE desea que otra persona lo represente en la asamblea, deberá solicitar por escrito a la CASA DE BOLSA la entrega de la documentación necesaria para acreditar su derecho de asistencia a la misma, con la antelación señalada en el primer párrafo. Dicha documentación será entregada al CLIENTE siempre que la emisora la ponga a disposición de la CASA DE BOLSA.

La CASA DE BOLSA informará al CLIENTE, cuando éste así lo solicite por escrito, sobre los acuerdos tomados en las Asambleas a las que hubiere concurrido en ejercicio del mandato conferido en los términos de la presente cláusula. Queda expresamente convenido que la CASA DE BOLSA no tendrá obligación alguna de avisar al CLIENTE de la o las convocatorias a las Asambleas que se celebren con relación a los Valores propiedad del CLIENTE, por lo que será responsabilidad y obligación de éste enterarse de dichas convocatorias a través de los medios de comunicación empleados por las propias emisoras de los Valores, así como obtener los formatos de poderes que en su caso requiera.

Dentro del mandato que el CLIENTE confiere a la CASA DE BOLSA en este Contrato, se comprenden específicamente las facultades a que se refieren los artículos 192 de la Ley General de Sociedades Mercantiles, 221 y 228s de la Ley General de Títulos y Operaciones de Crédito y demás preceptos aplicables de éstas u otras leyes, a fin de que la CASA DE BOLSA lo represente en Asambleas, respecto de los Valores de los cuales se esté prestando el servicio de guarda y administración.

**DÉCIMA SEGUNDA.- Ejercicio de Derechos y Exhibiciones.** Cuando haya que ejercer derechos o efectuar exhibiciones o pagos de cualquier clase en relación con los Valores respecto de los cuales la CASA DE BOLSA esté prestando el servicio de guarda y administración, se estará a lo siguiente:

a) Si los Valores atribuyen un derecho de opción o preferencia, la CASA DE BOLSA ejercerá tal derecho de acuerdo a las instrucciones del CLIENTE, siempre y cuando haya sido provista de los fondos suficientes por lo menos 2 (dos) Días Hábiles antes del vencimiento del plazo señalado para efectuar el pago del derecho opcional o de preferencia. La falta de entrega por parte del CLIENTE de los fondos señalados en este párrafo, eximirá a la CASA DE BOLSA de toda responsabilidad por la falta de ejecución de los actos de administración mencionados.

b) Los derechos patrimoniales correspondientes a los Valores respecto de los cuales se esté prestando el servicio de guarda y administración serán ejercidos por la CASA DE BOLSA por cuenta del CLIENTE y, acreditados a éste en la Cuenta en la que se encuentren los Valores de los cuales deriven.

c) La CASA DE BOLSA no será responsable frente al CLIENTE por actos o situaciones propios del Indeval, la CCV o de cualquier otra institución, cámara o entidad que preste servicios similares, por los que se afecte u obstaculice el ejercicio de algún derecho a los que se refiere la presente cláusula.

d) Cuando se haya pactado discrecionalidad en el manejo de la Cuenta, o el CLIENTE haya conferido discrecionalidad respecto de determinados Valores y éstos otorguen un derecho de opción o de preferencia, la CASA DE BOLSA actuará siempre que el CLIENTE le haya provisto de fondos suficientes.

**DÉCIMA TERCERA.- Endosos, Cesiones y Canjes.** Con objeto de que la CASA DE BOLSA pueda cumplir con el servicio de guarda y administración a que se refiere este capítulo, en los términos de la Ley del Mercado de Valores, las partes convienen en que la CASA DE BOLSA queda facultada para suscribir, en nombre y representación del CLIENTE, los endosos, cesiones y canjes de Valores nominativos, expedidos o endosados a favor del CLIENTE respecto de los cuales se esté prestando el servicio antes aludido.

**IV.    OPERACIONES POR CUENTA PROPIA DE LA CASA DE BOLSA CON EL CLIENTE**

**DÉCIMA CUARTA.-** Con independencia del tipo de manejo de la Cuenta, el CLIENTE otorga su consentimiento expreso para celebrar directamente como contraparte de la CASA DE BOLSA, operaciones con Valores, incluyendo compraventas denominadas de Autoentrada, Ventas en Corto, Operaciones de Reporto, Operaciones con Divisas, operaciones de préstamo de valores y, en general, realizar cualquier otra Operación por Cuenta Propia autorizada, o que con posterioridad autorice la Comisión o Banco de México.

En caso de que el CLIENTE haya pactado discrecionalidad en el manejo de la Cuenta, en este acto instruye de manera general a la CASA DE BOLSA para que le puedan ser asignados a la Cuenta Valores de la posición propia de la CASA DE BOLSA.

La CASA DE BOLSA identificará las Operaciones por Cuenta Propia efectuadas con el CLIENTE en los estados de cuenta que emita mensualmente respecto de cada Cuenta.

Las Operaciones de Autoentrada podrán igualmente derivar de la actividad que, en su caso, la CASA DE BOLSA desempeñe como Formador de Mercado, sobre Valores de renta variable, las cuales mantienen por objeto promover la liquidez de dichos Valores, establecer precios de referencia y contribuir a la estabilidad y continuidad de los mismos.

**V.    OPERACIONES DE REPORTO**

**DÉCIMA QUINTA.- Naturaleza.** En las Operaciones de Reporto sobre Valores que celebren las partes, invariablemente la CASA DE BOLSA actuará como reportada y el CLIENTE como reportador. Consecuentemente la CASA DE BOLSA se obliga a transferir la propiedad de los Valores reportados al CLIENTE, y éste se obliga a pagar un precio en dinero a transferir a la CASA DE BOLSA la propiedad de otros tantos Valores de la misma especie en el plazo convenido, contra el reembolso que haga la CASA DE BOLSA del

mismo precio más el Premio pactado. Por los Valores de la misma especie se entenderá aquellos que tengan igual clave de emisión.

**DÉCIMA SEXTA.- Objeto.** Solamente podrán ser objeto de Operaciones de Reporto los Valores inscritos en el Registro Nacional de Valores que sean autorizados en las disposiciones de carácter general emitidas por las autoridades competentes para ser objeto. Podrán ser objeto de reporto los Valores denominados en Moneda Nacional, en Unidades de Inversión (UDIS) o en Divisas.

Los Valores reportados se mantendrán depositados en una institución para el depósito de valores autorizada.

**DÉCIMA SÉPTIMA.- Concertación.** Siempre que se trate de Cuentas con manejo no discrecional, la contratación de Operaciones de Reporto se llevará a cabo conforme a las instrucciones del CLIENTE.

Tratándose de Cuentas con manejo discrecional, mediante la celebración y firma del presente Contrato, el CLIENTE instruye expresamente en forma general a la CASA DE BOLSA para que ésta realice por su cuenta Operaciones de Reporto, así como para prorrogarlas y ejecutar los diferentes actos derivados de dichas operaciones.

En toda Operación de Reporto que celebren las partes y, en su caso sus prórrogas, deberá especificarse cuando menos el reportador, reportado, precio, Premio y plazo del reporto, así como las características específicas de los Valores objeto del mismo como son: emisor, clave de emisión, valor nominal, tipo de valor y en su caso el avalista, aceptante o garante de los Valores.

Cuando al prorrogarse la operación se modifique la cantidad de los Valores objeto del reporto o la tasa del Premio convenido originalmente, se entenderá que se trata de una nueva operación y deberá liquidarse la primeramente convenida en los términos de este Contrato.

**DÉCIMA OCTAVA.- Precio y Premio.** El precio y el Premio del reporto se denominarán en la misma moneda de los Valores objeto de la operación de que se trate, con excepción de reportos celebrados con Valores denominados en UDIS, en cuyo caso se denominarán invariablemente en Moneda Nacional, al valor de conversión de dicha unidad de cuenta que publique el Banco de México para el día de la concertación de la operación.

El precio y el Premio serán pactados libremente por la CASA DE BOLSA y el CLIENTE, sin que pueda exceder su Valor de Mercado.

El Premio de las Operaciones de Reporto se expresará como un porcentaje o tasa de interés sobre el precio, aplicada durante el plazo del reporto. El Premio podrá pactarse como una tasa fija o variable.

**DÉCIMA NOVENA.- Liquidación de Operaciones de Reporto.** Al vencimiento del plazo de la Operación de Reporto, la liquidación consistente en la transferencia de otros tantos Valores y el reembolso del precio más el Premio, deberá efectuarse el propio día del vencimiento; en caso contrario se estará a lo estipulado en la Cláusula Vigésima Tercera de este Contrato.

En las Operaciones de Reporto todos los cálculos se harán con la fórmula de año comercial de trescientos sesenta días y número de días naturales efectivamente transcurridos en la operación de que se trate.

Todos los pagos o entregas que deban ser hechos por la CASA DE BOLSA o por el CLIENTE se harán en la fecha en que sean exigibles, en la forma y moneda estipulada para cada operación y a las cuentas que correspondan o domicilios señalados en el presente instrumento.

**VIGÉSIMA.- Moneda de Liquidación.** Las Operaciones de Reporto podrán ser liquidadas en la misma moneda en que se encuentren denominados los Valores reportados o en Moneda Nacional, según hayan convenido las partes al momento de la concertación correspondiente y siempre consignándose el comprobante respectivo, en el entendido de que si tal denominación es en Unidades de Inversión (UDIS), las operaciones se liquidarán invariablemente en Pesos moneda de curso legal en México tal como fueron concertadas.

7

En el caso de que se pacte que alguna Operación de Reporto sea liquidada en una moneda distinta a aquella en que se encuentren denominados los Valores, el CLIENTE deberá, al momento de concertarse la operación, convenir con la CASA DE BOLSA la referencia de tipo de cambio aplicable, mismo que deberá ser en todo caso el que se encuentre vigente en la fecha en que deba realizarse tal liquidación.

Lo anterior deberá consignarse además en el comprobante respectivo.

**VIGÉSIMA PRIMERA.- Plazo.** El plazo de toda Operación de Reporto será el que libremente determinen las partes, respetando siempre lo establecido en la presente cláusula.

Las Operaciones de Reporto, incluyendo sus prórrogas, deberán vencer a más tardar el día hábil anterior a la fecha de vencimiento de los Valores objeto de la operación de que se trate.

Tratándose de Operaciones de Reporto celebradas con Valores objeto de operaciones de arbitraje internacional, el plazo de dichas operaciones no podrá ser superior a cuatro (4) Días Hábiles.

Si el plazo de alguna Operación de Reporto vence en un día que no fuere hábil, se entenderá prorrogado al primer día hábil siguiente.

**VIGÉSIMA SEGUNDA.- Vencimiento Anticipado.** El plazo fijado para el vencimiento de cada operación, incluyendo sus prórrogas, sólo podrá darse por vencido anticipadamente cuando exista acuerdo entre las partes, o en el supuesto de incumplimiento de las obligaciones asumidas por el reportador.

**VIGÉSIMA TERCERA.- Abandono.** Si el día en que la Operación de Reporto deba ser liquidada en los términos pactados, la CASA DE BOLSA no la liquida o la operación es prorrogada, se tendrá por abandonada la misma, extinguiéndose la obligación del CLIENTE prevista en la Cláusula Décima Quinta; no obstante lo anterior, el CLIENTE podrá exigir a la CASA DE BOLSA el pago del Premio convenido, así como las diferencias que resulten a cargo de la CASA DE BOLSA, tomando como base para determinar dichas diferencias la información proporcionada por el proveedor de precios designado por la CASA DE BOLSA.

**VIGÉSIMA CUARTA.- Intereses.** Los intereses que, en su caso, devenguen los Valores objeto de alguna Operación de Reporto se pagarán a las personas que aparezcan como titulares de dichos Valores en los registros de la institución para el depósito de valores en la cual se encuentren depositados los mismos, al cierre de operaciones del día hábil inmediato anterior al del vencimiento de cada período de interés.

Los intereses devengados durante el plazo del reporto quedarán a favor de la CASA DE BOLSA, por lo que en el supuesto de que el CLIENTE reciba los intereses pagados por el emisor correspondientes a los Valores objeto del reporto, deberá entregarlos a la CASA DE BOLSA el mismo día en que los reciba.

**VIGÉSIMA QUINTA.- Transferencia.** La transferencia de los Valores y de los fondos respectivos derivada de la celebración de la Operación de Reporto deberá efectuarse en la fecha valor determinada para la operación al momento de su concertación, la cual no podrá ser posterior al cuarto día hábil inmediato siguiente al de la concertación correspondiente.

**VIGÉSIMA SEXTA.- Comprobante.** La CASA DE BOLSA emitirá, el mismo día de la concertación de la Operación de Reporto y, en su caso, el de sus prórrogas, un comprobante mediante algún medio que deje constancia documental, incluso en Medios de Acceso, de la celebración o prórroga de la citada operación, el cual conservará a disposición del CLIENTE o bien se lo enviará en caso de que éste así lo solicite. En dicho comprobante se deberá establecer cuando menos el reportado, el reportador, precio, Premio y plazo del reporto, así como las características específicas de los Valores materia del mismo como son: emisor; clave de la emisión; valor nominal; tipo de Valor y, en su caso, avalista, aceptante o garante de los Valores.

**VIGÉSIMA SÉPTIMA.- Normatividad.** En la celebración de Operaciones de Reporto, se observarán las estipulaciones señaladas anteriormente, las reglas que al efecto emita el Banco de México mediante disposiciones de carácter general, la Ley General de Títulos y Operaciones de Crédito y la Ley del Mercado de Valores, en lo conducente.

En caso de que el CLIENTE sea una entidad que por sus características deba sujetarse a las disposiciones emitidas por Banco de México para la celebración de Operaciones de Reporto, el presente capítulo no le será aplicable, sujetándose dichas operaciones, a los términos y condiciones que se establezcan en los contratos que al efecto celebren ambas partes en términos de las disposiciones mencionadas.

## VI.   OPERACIONES CON DIVISAS

**VIGÉSIMA OCTAVA.-** Las partes acuerdan realizar operaciones de compraventa de Divisas, contra moneda nacional o contra otras Divisas, actuando para cada Operación con Divisas, indistintamente ya sea como compradores o vendedores, de conformidad con lo siguiente:

a)   Por virtud de cada una de las Operaciones con Divisas, las partes llevarán a cabo compraventas de Divisas, en las que dependiendo del carácter con el que actúen, sea que como vendedores transmitan la propiedad de Divisas de Referencia, o bien, sea que como compradores paguen por ellas el correspondiente contravalor en Divisa Base, precisamente en la Fecha de Liquidación y conforme al Tipo de Cambio Pactado para cada una de las Operaciones con Divisas.

b)   La Fecha de Liquidación, el Monto de Referencia, el Tipo de Cambio Pactado, la Divisa Base y la Divisa de Referencia, se pactarán en específico para cada una de las Operaciones con Divisas.

c)   La Fecha de Liquidación podrá pactarse como:

I.Fecha Valor mismo Día: La operación será liquidada en la Fecha de Celebración.
II.Fecha Valor 24 horas: La operación se liquidará el Día Hábil inmediato siguiente a la Fecha de Celebración.
III.Fecha Valor 48 horas: La operación se liquidará el segundo Día Hábil siguiente a la Fecha de Celebración.
IV.Fecha Valor 72 horas: Sólo tratándose de Operaciones con Divisas necesarias para la liquidación de compras de Valores denominados en moneda distinta a la Moneda Nacional, se podrá pactar que la Fecha de Liquidación sea el tercer Día Hábil siguiente a la Fecha de Celebración.

Al efecto, la CASA DE BOLSA dará a conocer los tipos de cambio, sólo con fines informativos, mediante carteles, pantallas, pizarrones o tableros en sus instalaciones, que en forma destacada muestren las cotizaciones respectivas, sin perjuicio de que los tipos de cambio también puedan mostrarse en otros lugares de sus instalaciones. Las Operaciones con Divisas que realice la CASA DE BOLSA, deberán efectuarse a tipos de cambio iguales o más favorables para el CLIENTE, que aquellos anunciados.

Cada Operación con Divisas deberá pactarse a través de las formas establecidas al efecto y se confirmarán el mismo día de su concertación, mediante correo electrónico con acuse de recibo, o en su defecto, utilizando algún otro medio de comunicación acordado por las partes que deje constancia documental con acuse de recibo. Así mismo, la CASA DE BOLSA emitirá un comprobante que mantendrá a disposición del CLIENTE y podrá enviárselo cuando éste así lo solicite.

**VIGÉSIMA NOVENA.- Pagos.** Todos los pagos que se deriven de las Operaciones con Divisas a favor del CLIENTE, se harán en la Cuenta o, en su caso, en aquellas cuentas bancarias del CLIENTE debidamente acreditadas ante la CASA DE BOLSA para efectos de este Contrato.

Dichos pagos serán efectuados en la Fecha de Liquidación, en fondos disponibles y libres de cualquier deducción o reclamación, a excepción

8

de las deducciones o retenciones de impuestos que las partes estuvieran obligados a efectuar.

La CASA DE BOLSA no podrá cobrar al CLIENTE comisiones por las Operaciones con Divisas que celebre.

**TRIGÉSIMA.- Intereses en Operaciones con Divisas.** Las partes acuerdan expresamente que si en la Fecha de Liquidación pactada para las Operaciones con Divisas, una parte no paga a la otra parte la contraprestación correspondiente, dicha parte pagará intereses moratorios sobre la tasa que se determine en el inciso III de la Cláusula Quincuagésima Segunda de este Contrato, así como los costos de las líneas de crédito que en su caso se hayan dispuesto por la CASA DE BOLSA; en la inteligencia de que la tasa moratoria se devengará diariamente desde el día en que la cantidad correspondiente sea líquida y exigible, y hasta la fecha en que la misma sea cubierta. En todo caso, la tasa que se determine conforme a lo establecido en esta cláusula, se aplicará por igual a los adeudos que sean exigibles tanto a la CASA DE BOLSA como al CLIENTE.

Los intereses moratorios pagaderos conforme a esta cláusula, serán calculados sobre la base de un año de trescientos sesenta (360) días y del número de días efectivamente transcurridos, incluyendo el primero pero excluyendo el último de dichos días.

**TRIGÉSIMA PRIMERA.- Responsabilidad.** Cada parte asume toda responsabilidad derivada de las Operaciones con Divisas concertadas, y se compromete a honrar la Operación con Divisas de que se trate y a conocer al destinatario de los fondos. Así mismo, la parte de que se trate no responsabilizará a la otra parte, ni a sus directores, funcionarios o empleados en caso de que la moneda nacional o divisa materia del presente Contrato, sea incautada, embargada, retenida, interceptada, bloqueada o de cualquier manera se interrumpa la liquidación de las Operaciones con Divisas, por virtud de una ley, regla o disposición que se aplique en cualquier jurisdicción concurrente, ni por orden judicial o de autoridad regulatoria, incluyendo el tránsito por otra jurisdicción que se utilice para llevar a cabo las Operaciones con Divisas. Adicionalmente, la parte de que se trate indemnizará a su contraparte por cualquier daño o perjuicio que le ocasione por razones de incumplimiento de un ordenamiento judicial o legislación aplicable.

**TRIGÉSIMA SEGUNDA.- Compensación.** De conformidad con lo establecido en el artículo 2185 y demás aplicables del Código Civil Federal, en caso de existir cantidades pagaderas en la misma Divisa por ambas partes respecto de una o varias Operaciones con Divisas, las dos deudas, hasta la cantidad que importe la menor, serán forzosamente compensadas y, por lo tanto, se extinguirán, debiendo la parte cuyo importe sea mayor realizar el pago por la cantidad en exceso de las cantidades compensadas, en las cuentas que se señalan en el presente Contrato.

Solamente procederá la compensación a que se refiere esta cláusula cuando las Divisas materia de las Operaciones con Divisas sean Dólares de los Estados Unidos de América o Moneda Nacional y las partes hayan pactado que la Fecha de Liquidación de las mismas se lleve a cabo uno, o bien, dos Días Hábiles siguientes a la Fecha de Celebración.

Por lo que las Operaciones con Divisas distintas a las mencionadas en el párrafo anterior, incluyendo aquellas cuya Fecha de Celebración sea la misma que su Fecha de Liquidación, serán pagaderas individualmente de conformidad con lo pactado por las partes en el momento de su concertación.

## VII.  OPERACIÓN CON ACCIONES DE SOCIEDADES DE INVERSIÓN

**TRIGÉSIMA TERCERA.- Operación con Acciones de Sociedades de Inversión.** En el supuesto de que la CASA DE BOLSA adquiera por cuenta del CLIENTE acciones representativas del capital social de sociedades de inversión, las partes convienen en sujetarse a la Ley de Sociedades de Inversión y las disposiciones de carácter general emitidas por la Comisión así como a las características que la sociedad de inversión de que se trate dé a conocer en los prospectos de información al público inversionista, en los términos de la Ley de Sociedades de Inversión.

Las partes acuerdan que el mecanismo establecido por la CASA DE BOLSA para dar a conocer la información que en la medida se detalla, consistirá en distribuir al CLIENTE dicha información o bien ponerla a su disposición, según sea el caso, para ello cualquiera de los siguientes medios:

(i)  En las sucursales de la CASA DE BOLSA
(ii)  A través de la página internet de la CASA DE BOLSA, sea de manera directa o mediante link a la página web de la Institución o de las sociedades de inversión correspondientes.
(iii)  A través del envío al CLIENTE por parte de la CASA DE BOLSA de avisos o documentación relacionada con sociedades de inversión, por correo certificado o por conducto de empresas de mensajería especializadas, con la periodicidad que a su juicio considere conveniente.
(iv) A través del envío al CLIENTE por medios electromagnéticos, o a través de correo electrónico.
(v)  A través del estado de cuenta del CLIENTE.

Las partes convienen que a través de cualquiera de los mecanismos establecidos en el párrafo anterior, la CASA DE BOLSA dará a conocer al CLIENTE cuando sea necesario o cuando así lo considere conveniente, la siguiente documentación o información:

(i)  Los prospectos de Información al público inversionista de cada sociedad de inversión en la que invierta, incluyendo las actualizaciones o modificaciones que en su caso llegasen a tener, mismas que dará a conocer al CLIENTE según se presenten dichas actualizaciones o modificaciones, formando parte integrante del presente Contrato.
(ii)  Los documentos con información clave de las sociedades de inversión en las que invierta.
(iii)  El porcentaje y concepto de comisiones que sean cobradas al CLIENTE con relación a las sociedades de inversión en las que invierta.
(iv) Cualquier aviso que la CASA DE BOLSA deba dar al CLIENTE en relación con sociedades de inversión.

Así mismo, las partes acuerdan que será a través de los prospectos de información al público inversionista, en los términos anteriormente mencionados, que se dará a conocer al CLIENTE que cuente con acciones representativas del capital social tanto de sociedades de inversión de renta variable como en instrumentos de deuda:

(i)  Los términos, condiciones y procedimientos respecto del cálculo de las comisiones que se le cobrarán, así como la periodicidad en que éstas serán cobradas y la antelación con que se le informará respecto de los aumentos o disminuciones que se pretendan llevar a cabo.
(ii)  Los resultados que se hayan obtenido sobre el rendimiento de las acciones representativas del capital social de las sociedades de inversión, incluyendo las comisiones que se refieran o calculen por el desempeño del administrador de activos.
(iii)  El tipo de personas que podrán adquirir las acciones representativas del capital social de cada sociedad de inversión en cuestión, las que, en su caso, podrán diferenciarse en función de las distintas series y clases de acciones.
(iv) Las características, derechos y obligaciones que, en su caso, otorguen las distintas series y clases de acciones representativas del capital social de las sociedades de inversión, la política detallada de compra y venta de dichas acciones, la anticipación con que deberán presentarse las órdenes relativas, los días y horarios de operación y el límite máximo de tenencia por inversionista.

Estarán en todo momento a disposición del CLIENTE, y de esta manera el CLIENTE reconoce como entregados, tanto los prospectos de información al público inversionista actualizados como los documentos con información clave de las sociedades de inversión respecto de las cuales la CASA DE BOLSA actúe como distribuidor, mismos que podrán ser consultados ya sea de manera electrónica a través de la página de Internet de la CASA DE BOLSA (www.gbm.com.mx) o de manera impresa luego que el CLIENTE lo solicite a la CASA DE BOLSA.

En atención a lo anterior, el CLIENTE se obliga a conocer el contenido del prospecto de información al público inversionista vigente relacionado con la sociedad de Inversión cuyas acciones pretenda adquirir, así como el respectivo documento con Información clave, a

9

fin de evaluar las características de dicha sociedad de inversión, sus objetivos y los riesgos que puedan derivar del manejo de tales valores, previamente a que realice la adquisición respectiva.

Las partes acuerdan que al momento de realizar la compra de acciones representativas del capital social de sociedades de inversión que en términos de este Contrato realice el CLIENTE, se entenderá que:

(i) El CLIENTE revisó el prospecto de información al público inversionista, así como el documento con información clave correspondiente.

(ii) El CLIENTE aceptó los términos de los respectivos prospectos de información al público inversionista, y que manifestó su conformidad respecto de cualquier otra información distinta al prospecto de información al público inversionista referida en la presente cláusula y dada a conocer por la CASA DE BOLSA mediante el mecanismo citado. El consentimiento del CLIENTE expresado de la forma aquí prevista liberará tanto a la CASA DE BOLSA, a la sociedad de inversión de que se trate así como a su sociedad operadora, de toda responsabilidad.

El Cliente reconoce que en el caso celebrarse cualquier tipo de operaciones con acciones de sociedades de inversión referenciadas a Divisas, éstas se considerarán conforme a los tipos de cambio que publique el Banco de México en el Diario Oficial de la Federación, las que podrán liquidarse en Moneda Nacional conforme a las disposiciones previstas en la Ley Monetaria, y regirse además por las disposiciones generales expedidas por la Comisión al efecto.

## VIII. DISPOSICIONES GENERALES

**TRIGÉSIMA CUARTA.- Medios de Comunicación.** Las partes convienen que las instrucciones que el CLIENTE gire a la CASA DE BOLSA para celebrar operaciones, ejercer derechos, cumplir obligaciones, así como para concertar operaciones con la CASA DE BOLSA o girar otras instrucciones para la realización de movimientos en su Cuenta y ordenar retiros de Valores o efectivo, salvo que en el presente Contrato se establezca una forma especial o se hubiere acordado alguna limitación entre el CLIENTE y la CASA DE BOLSA, podrán hacerse en forma verbal, ya sea personal o telefónica, escrita, y/o a través de cualquier medio electrónico, de cómputo o telecomunicaciones, así como equipos, sistemas automatizados, incluyendo Plataformas, que hubieren sido aceptados por las partes con las Claves de Identificación que les correspondan, los que conocerán como "Medios de Acceso" para efectos de este Contrato.

El CLIENTE reconoce que la CASA DE BOLSA mantiene a su disposición distintos medios de comunicación para la recepción de instrucciones, encontrándose el CLIENTE facultado a elegir cualquiera de ellos, y que, en el entendido que comprende que ciertos medios de comunicación permiten mayores medidas de seguridad que otros, como lo son la Firma Autógrafa, Firma Digital o Electrónica, claves de identificación, entre otras, la elección del medio a través del cual gire instrucciones a la CASA DE BOLSA es su exclusiva responsabilidad.

Igualmente y con independencia del tipo de cuenta de que se trate, la CASA DE BOLSA podrá notificar al CLIENTE cualquier confirmación, aviso, requerimiento o comunicado, inclusive el estado de cuenta, por los mismos medios señalados en el primer párrafo de esta cláusula.

Entre los equipos y sistemas automatizados, las partes reconocen expresamente, sin limitar, los mecánicos, electrónicos, ópticos o telemáticos, el teléfono, las terminales de cómputo y la red mundial de telecomunicaciones conocida como Internet, en el entendido que el acceso a estos equipos y sistemas atenderá a la naturaleza de la operación a realizar y el alcance de los distintos equipos y sistemas automatizados. Cuando la CASA DE BOLSA se encuentre en posibilidad de incorporar cualquier equipo o sistema para la prestación de servicios, así lo comunicará al CLIENTE junto con las bases para determinar las operaciones y servicios que podrán contratarse a través del equipo o sistema de que se trate, los medios de identificación del usuario y las responsabilidades correspondientes a su uso, conviniendo expresamente las partes desde ahora que su utilización por parte del CLIENTE implica la aceptación del equipo o sistema y de todos los efectos jurídicos que se deriven de su uso.

Mediante el uso de los equipos y sistemas automatizados, las partes reconocen en este acto, el CLIENTE podrá concertar operaciones, ejercer derechos, cumplir obligaciones, hacer movimientos en la Cuenta que corresponda, en los casos, hacer requerimientos y girar cualquier otra instrucción que el ámbito y el sistema permitan, en atención a su naturaleza, bajo las condiciones de marca y servicio que la CASA DE BOLSA llegue a tener a disposición del CLIENTE.

**TRIGÉSIMA QUINTA.- Claves de Identificación Recíproca.** En la utilización de Medios de Acceso, la CASA DE BOLSA asignará al CLIENTE, según corresponda, una Clave de Usuario, Contraseña, números de identificación personal de carácter confidencial (NIP) que determine el propio CLIENTE para cada medio de acceso y/o servicio, así como cualquier otro requisito que determine la CASA DE BOLSA, mismos que lo identificarán como el CLIENTE, y le permitirán acceder a los distintos equipos y sistemas automatizados reconocidos por las partes, para efecto de concertar operaciones, recibir servicios e interactuar electrónicamente con la CASA DE BOLSA. La CASA DE BOLSA mantendrá un registro de todas las operaciones y/o consultas realizadas por el CLIENTE.

La custodia y el uso de las mencionadas Claves de Identificación serán de la exclusiva responsabilidad del CLIENTE. La información e instrucciones que el CLIENTE transmita o comunique a la CASA DE BOLSA utilizando dichas Claves de Identificación para realizar los actos a que se refiere el párrafo anterior, tendrán pleno valor probatorio y fuerza legal para acreditar la operación realizada, el importe de la misma, su naturaleza, así como las características y alcance de sus instrucciones.

Por su parte, el CLIENTE no necesitará elemento adicional para identificar a la CASA DE BOLSA que el uso del Medio de Acceso puesto a su disposición por ésta como medio de comunicación, o, en su caso, el uso de cuentas de correo electrónico de su Apoderado Autorizado o personal distinto de la CASA DE BOLSA facultado para enviar comunicaciones al CLIENTE, con la terminación "@gbm.com.mx" y páginas de Internet reconocidos públicamente como propiedad de la CASA DE BOLSA.

En los términos de lo establecido en el Título II, Libro Segundo del Código de Comercio y por lo dispuesto en la Ley del Mercado de Valores, las partes convienen que las Claves de Identificación, que se establezcan para el uso de equipos y sistemas automatizados, sustituirán a la Firma Autógrafa por una de carácter electrónico y se les reconocerá el carácter de Firma Digital, por lo que las constancias documentales o técnicas derivadas del uso de esos medios en donde se evidencie el uso de dichas Claves de Identificación, producirán los mismos efectos que las leyes otorgan a los documentos suscritos por las partes y tendrán igual valor probatorio.

Adicionalmente, para comunicaciones efectuadas por medios distintos a los electrónicos según lo establecido en los párrafos precedentes de esta cláusula, la CASA DE BOLSA establecerá los requisitos mínimos que deberán contener las comunicaciones emitidas por el CLIENTE, con el objeto de su debida identificación.

**TRIGÉSIMA SEXTA.- Responsabilidad en Medios de Acceso.** La CASA DE BOLSA quedará liberada de cualquier responsabilidad al ejecutar instrucciones recibidas a través de los Medios de Acceso que ha puesto a disposición del CLIENTE y atribuirá a él su uso aun cuando las Claves de Identificación hubieren sido extraviadas por el CLIENTE o robadas, si éste no lo notificó a la CASA DE BOLSA según el procedimiento establecido por ésta, o en su defecto por escrito, a fin de que se tomen las medidas necesarias tendientes a evitar el acceso a terceros no autorizados.

Cuando por negligencia, culpa, dolo o mala fe del CLIENTE, llegaran a ser rebasadas las medidas de seguridad para el acceso a equipos y sistemas automatizados e incluso induzcan al error, causándose con ello un daño o perjuicio al CLIENTE, la CASA DE BOLSA quedará liberada de cualquier responsabilidad al ejecutar las instrucciones recibidas, sin perjuicio de las acciones civiles y/o penales que pudieran proceder en contra del responsable. La CASA DE BOLSA quedará liberada de cualquier responsabilidad al ejecutar instrucciones recibidas a través de los Medios de Acceso que ha puesto a disposición del CLIENTE. Así mismo, el CLIENTE se obliga a

indemnizar y a sacar en paz y a salvo a la Casa de Bolsa, en relación con cualquier tipo de erogaciones que tuviera que realizar por cualquier reclamación que pudiera presentarse por los supuestos previstos en éste párrafo.

Así mismo, el CLIENTE reconoce y acepta que la CASA DE BOLSA por ningún motivo estará obligada a identificar ni verificar la dirección IP desde la cual el CLIENTE accede a cualquier medio de acceso, incluyendo los accesos a las Plataformas, o cualquier otro que ponga la CASA DE BOLSA a disposición del CLIENTE.

**TRIGÉSIMA SÉPTIMA.- Plataformas.** La CASA DE BOLSA podrá poner a disposición del CLIENTE Plataformas para, entre otras cosas, la prestación de sus servicios, incluyendo Servicios de Inversión, recabar del CLIENTE aquella información y documentos para la debida integración de su expediente, y mantener constante comunicación con el mismo.

Al momento que el CLIENTE ingrese en alguna Plataforma y haga uso de ésta, estará aceptando los Términos y Condiciones aplicables al uso de dicha Plataforma. Se contará con Claves de Identificación para el uso de la Plataforma, que permitirán la identificación recíproca entre la CASA DE BOLSA y el CLIENTE en el uso de la misma, cuya guarda y custodia serán responsabilidad única del CLIENTE.

Asimismo, el CLIENTE reconoce que podrá firmar los documentos necesarios para el uso de Plataformas, mediante Firma Electrónica o Firma Digital, según se establezca de momento a momento en las Plataformas, reconociendo en todo momento la validez de dichas firmas como constancia de su aceptación de los términos contenidos en los mismos, y reconociendo que su uso produce los mismos efectos legales que la firma autógrafa.

Entre otras cosas, podrá tener acceso a su estado de cuenta, efectuar el alta y baja de sus cuentas de retiro, así como ordenar retiros, según la funcionalidad que de tiempo en tiempo se mantenga en la Plataforma.

Adicionalmente, a través de su Plataforma, la CASA DE BOLSA podrá poner a disposición del CLIENTE, comunicados, avisos, documentos de actualización de términos de los servicios, entre otros, sobre los cuales, en ocasiones se podrá requerir la aceptación, la cual podrá consistir en la Firma Electrónica del CLIENTE. En caso de no requerirse la aceptación expresa del CLIENTE, la sola puesta a disposición y el ingreso del CLIENTE a la Plataforma, constituirán prueba suficiente del conocimiento del CLIENTE de los términos de las referidas comunicaciones.

El CLIENTE reconoce y acepta que todas las instrucciones que gire a la CASA DE BOLSA a través de su acceso en alguna Plataforma, se presumirán giradas por él, de conformidad con lo estipulado por el Código de Comercio, así como por la Ley del Mercado de Valores y las Disposiciones emitidas por la Comisión Nacional Bancaria y de Valores. Sólo se excluirán de esta presunción, las instrucciones recibidas cuando haya mediado el aviso sobre la pérdida de Claves de Identificación según el procedimiento establecido para la Plataforma.

El CLIENTE reconoce y acepta que en el uso del servicio al que se refiere la presente cláusula, deberá operar con completo apego a las leyes y demás disposiciones de carácter general aplicables, así como a lo estipulado en el presente Contrato, en cuyo caso la CASA DE BOLSA será responsable de las operaciones efectuadas por el CLIENTE a través de este medio.

La CASA DE BOLSA se reserva la facultad de modificar, limitar o suspender la funcionalidad y servicios que de tiempo en tiempo preste a través de cualquier Plataforma, en el entendido que mantendrá a disposición del CLIENTE, mecanismos alternativos para la recepción de los servicios de la CASA DE BOLSA y la recepción de sus instrucciones.

**TRIGÉSIMA OCTAVA.- Grabaciones Telefónicas.** El CLIENTE autoriza a la CASA DE BOLSA a grabar, a su entera discreción, las conversaciones telefónicas que mantenga con el CLIENTE, sus representantes y/o Personas Autorizadas. El CLIENTE acepta desde ahora que la CASA DE BOLSA no tendrá obligación de informarle, en

su momento, que se están grabando dichas conversaciones, así como que tales grabaciones serán propiedad exclusiva de la CASA DE BOLSA y que su contenido producirá los mismos efectos que las leyes otorgan a los documentos autógrafos, en su caso, así como teniendo en consecuencia el mismo valor probatorio.

**TRIGÉSIMA NOVENA.- Mensajes de Datos.** Las partes reconocen que en términos del Código de Comercio, los datos relacionados con los equipos y sistemas automatizados, son de naturaleza mercantil. De acuerdo a lo anterior, el CLIENTE y la CASA DE BOLSA convienen que:

a)  Se entenderá como "mensaje de datos" a toda información generada, enviada, recibida o archivada por medios electrónicos, ópticos o cualquier otra tecnología o medio tecnológico (como pudieran ser los equipos y sistemas automatizados y tecnológicos especializados).

b)  Se entenderá que un "mensaje de datos" ha sido enviado por el propio CLIENTE, cuando éste realice operaciones a través del equipo o sistema de que se trate, utilizando las Claves de Identificación a las que se refiere este clausulado.

c)  La CASA DE BOLSA recibe un "mensaje de datos" enviado por el CLIENTE, cuando éste lo ingrese al sistema que ponga a su disposición la CASA DE BOLSA, digitando sus Claves de Identificación.

d)  Se entenderá que la información y notificaciones que envíe la CASA DE BOLSA al CLIENTE a través de ese servicio serán recibidas por el CLIENTE en el momento en que ingresen en dicho sistema.

La CASA DE BOLSA solo será responsable de omisiones o retrasos en la ejecución de órdenes efectivamente recibidas en sus sistemas automatizados o informáticos, según sea el caso y, en consecuencia, no asumirá responsabilidad alguna por fallas o retrasos propios o de terceros que provean servicios relacionados o que sean necesarios para el uso de Medios de Acceso.

**CUADRAGÉSIMA.- Reserva de Derechos Sobre Medios de Acceso.** La CASA DE BOLSA podrá ampliar, disminuir o modificar en cualquier tiempo, en todo o en parte, temporal o permanentemente, sin necesidad de notificación previa al CLIENTE, las condiciones, características y alcances de los Medios de Acceso que pone a disposición del CLIENTE, así como restringir el uso y acceso a los mismos, limitando inclusive su duración o cantidad de uso. De igual forma y a su propio juicio, la CASA DE BOLSA podrá suspender temporal o permanentemente los derechos del CLIENTE para utilizar los equipos y sistemas automatizados por considerar que su uso viola los términos de este documento o que se puede dañar los intereses de otros clientes o proveedores, a la CASA DE BOLSA o a los otros miembros del Grupo Empresarial al que pertenezca.

**CUADRAGÉSIMA PRIMERA.- Exclusión de Responsabilidad.** El CLIENTE acepta expresamente que la CASA DE BOLSA no será responsable de daño alguno, incluyendo sin límite, daños, pérdidas, gastos directos, indirectos, inherentes o consecuentes que surjan en relación con los sistemas, o su uso o imposibilidad de uso por alguna de las partes, o en relación con cualquier falla en el rendimiento, error, omisión, interrupción, defecto, demora en la operación o transmisión, virus de computadora o falla de sistema o línea, o por cualquier falla en los sistemas de terceros que impidan el correcto funcionamiento de los servicios, o por cualquier otra razón ajena a la CASA DE BOLSA, así como tampoco será responsable de los daños o perjuicios que se ocasionen como consecuencia de deficiencias, desperfectos, fallas u otros problemas que se originen por la instalación, adecuación y conexión de los sistemas del CLIENTE referidos en el presente Contrato, así como de los daños y perjuicios que le pudieran causar, por caso fortuito, fuerza mayor o por cualquier otro acontecimiento o circunstancia inevitable, más allá del control razonable de la CASA DE BOLSA, el CLIENTE no pudiera hacer uso de los sistemas automatizados o realizar alguna de las operaciones previstas en este Contrato. En tal caso el CLIENTE podrá girar instrucciones a través de cualquier otro procedimiento convenido.

**CUADRAGÉSIMA SEGUNDA.- Valor Probatorio.** El CLIENTE y la CASA DE BOLSA aceptan, en los términos aquí previstos, dar al medio o medios de comunicación pactados en este Contrato, la fuerza probatoria a que se refiere la Ley del Mercado de Valores, es decir, el valor probatorio que las leyes otorgan a los documentos suscritos por las partes.

En todo caso, las instrucciones del CLIENTE para la ejecución de operaciones o movimientos en cualquier Cuenta, deberán precisar el tipo de operación o movimiento, el sentido de la operación así como las características necesarias para identificar los Valores materia de las mismas.

El CLIENTE conviene en que, la falta de alguno o algunos de los requisitos antes mencionados constituirá causa suficiente para que la CASA DE BOLSA pueda, a su juicio, excusarse legítimamente y sin responsabilidad de llevar a cabo las operaciones solicitadas por el medio respectivo.

**CUADRAGÉSIMA TERCERA.- Liberación de Responsabilidad.** El CLIENTE en este acto libera de antemano a la CASA DE BOLSA, sus directivos y empleados, sus accionistas, apoderados y delegatarios de cualquier responsabilidad surgida por operaciones ejecutadas con base en instrucciones que ésta reciba identificando al CLIENTE como emisor de las mismas, aún de haber sido giradas por un tercero incluso en contra de la voluntad del CLIENTE.

**CUADRAGÉSIMA CUARTA.- Apoderado para Celebrar Operaciones.** Para los efectos previstos en este Contrato, la CASA DE BOLSA, conforme a sus procedimientos, asignará al CLIENTE a alguno de sus Apoderados Autorizados para recibir a través de éste instrucciones del CLIENTE, y en general prestar Servicios de Inversión servicios en cada Cuenta, cuyo nombre aparecerá en los estados de cuenta correspondientes. El Apoderado Autorizado podrá ser sustituido en sus ausencias temporales por otro Apoderado Autorizado, quien estará igualmente facultado para recibir instrucciones y prestar los Servicios de Inversión al CLIENTE para la o las Cuentas de que se trate.

La CASA DE BOLSA podrá libremente sustituir en forma definitiva al Apoderado Autorizado asignado a la Cuenta, notificando a éste la sustitución en el estado de cuenta del mes en que se produzca el cambio, anotando el nombre y número telefónico del nuevo facultado.

**CUADRAGÉSIMA QUINTA.- Personas Autorizadas. (SÓLO PARA PERSONAS FÍSICAS)** El CLIENTE, cuando así convenga a sus intereses y bajo su exclusiva responsabilidad, podrá hacerse representar en este Contrato por medio de uno o más representantes legales o bien, designar a personas autorizadas, para que a su nombre y por su cuenta realicen cualesquiera actos contemplados en este Contrato que no se encuentren reservados al CLIENTE ya sea por las políticas de la CASA DE BOLSA o por restricción expresa del propio CLIENTE, entre las cuales se encuentran, sin excluir, girar instrucciones, ordenar retiros, confirmar operaciones o movimientos, ejercer derechos y cumplir obligaciones derivadas del presente Contrato y de las operaciones celebradas a su amparo.

La designación de Personas Autorizadas así como el establecimiento de limitaciones en su actuación, podrá efectuarse mediante comunicación por escrito del CLIENTE dirigida a la CASA DE BOLSA o mediante la inclusión de los mismos en la Carátula, en todo caso con las formalidades que requiera la CASA DE BOLSA según sus políticas.

El CLIENTE reconoce y acepta como válidas todas y cada una de las instrucciones que al amparo de dicha designación instruya el o los representantes legales y/o personas autorizadas, sin necesidad de ulterior formalidad. Queda convenido que las personas autorizadas no podrán registrar cuentas bancarias para la liquidación de operaciones, ni designar beneficiarios ni nombrar a personas que los sustituyan, siendo éstas facultades exclusivas del CLIENTE.

Cuando el CLIENTE sustituya o revoque el poder o autorización al representante legal y/o Personas Autorizadas, deberá comunicarlo de forma inmediata por escrito a la CASA DE BOLSA, en su caso adjuntando la documentación que esta última le requiera, por lo que ésta no será responsable de la omisión o retraso de tal aviso.

El CLIENTE reconoce y acepta como válidas todas y cada una de las instrucciones que al amparo de dichos documentos instruyan las Personas Autorizadas, sin necesidad de ulterior formalidad. En todo caso, el CLIENTE libera de toda responsabilidad a la CASA DE BOLSA por las operaciones realizadas conforme a las instrucciones dadas por el representante legal y/o personas autorizadas.

**CUADRAGÉSIMA SEXTA.- Representantes Legales y Personas Autorizadas. (SÓLO PARA PERSONAS MORALES)** Las Partes convienen expresamente que este Contrato, y cualquier Cuenta abierta a su amparo, son individuales y que no existe ni podrá existir cotitular alguno ni beneficiario de los mismos. El CLIENTE designa para representarlo en todo lo relativo al presente instrumento a aquellas personas que aparezcan como su representante legal o apoderado en la Carátula, quienes habrán acreditado su personalidad y facultades a satisfacción de la CASA DE BOLSA.

De así convenir a sus intereses, el CLIENTE podrá designar a Personas Autorizadas mediante comunicación por escrito del CLIENTE dirigida a la CASA DE BOLSA o mediante la inclusión de los mismos en la Carátula, en todo caso con las formalidades que requiera la CASA DE BOLSA según sus políticas, para que a su nombre y por su cuenta realicen cualesquiera actos contemplados en este Contrato que no se encuentren reservados al CLIENTE a través de sus representantes legales o apoderados, ya sea por las políticas de la CASA DE BOLSA o por restricción expresa del propio CLIENTE, entre las cuales se encuentran, sin excluir, girar instrucciones, ordenar retiros, confirmar operaciones o movimientos, ejercer derechos y cumplir obligaciones derivadas del presente Contrato y de las operaciones celebradas a su amparo.

Asimismo, el CLIENTE otorga expresamente tanto a sus representantes legales como a las personas que nombre como Personas Autorizadas, la autorización a que se refiere el artículo 310 del Código de Comercio. Las personas mencionadas en el presente párrafo se considerarán factores del CLIENTE para todos los efectos legales a que haya lugar.

Cuando el CLIENTE sustituya o revoque el poder o autorización a los representantes legales y/o Personas Autorizadas, deberá comunicarlo de forma inmediata por escrito a la CASA DE BOLSA, en caso de sustitución adjuntando la documentación que esta última le requiere con el fin de acreditar la personalidad y facultades de los nuevos representantes legales y/o Personas Autorizadas, por lo que ésta no será responsable de la omisión o retraso de tal aviso, ni afectará las operaciones concertadas pendientes de liquidar.

El CLIENTE reconoce y acepta como válidas todas y cada una de las instrucciones que al amparo de dichos documentos instruya el o los representantes legales y/o Personas Autorizadas, sin necesidad de ulterior formalidad. En todo caso, el CLIENTE libera de toda responsabilidad a la CASA DE BOLSA por las operaciones realizadas conforme a las instrucciones dadas por medio de sus representantes o las Personas Autorizadas que designe.

**CUADRAGÉSIMA SÉPTIMA.- Tipo de Cuentas. (SÓLO PARA PERSONAS FÍSICAS).-** Las partes convienen expresamente que cualquier Cuenta abierta al amparo del presente Contrato será del tipo que corresponda dependiendo de la existencia de un único titular, o de dos o más personas como titulares. Para los efectos del presente instrumento se entiende por Cuenta:

1.- Individual, aquella que mantiene como titular a una sola persona.

2.- Solidaria, en la que dos o más personas físicas son titulares de la misma Cuenta, estando todas ellas sujetas a las obligaciones y gozando de los derechos derivados de este Contrato. Salvo, en su caso, por aquellos actos reservados a la Persona Designada para Girar Instrucciones de Inversión, cada uno de los titulares podrá recibir los servicios, girar en forma independiente cualesquiera instrucciones, y convenir con la CASA DE BOLSA las operaciones previstas en el mismo, así como hacer retiros parciales o totales de cualquier Cuenta.

Los titulares solidarios estarán facultados cualquiera de ellos para solicitar a la CASA DE BOLSA la modificación de sus propios datos personales acreditados para efectos del presente Contrato, así como

aquellas cuentas bancarias a su nombre acreditadas para el retiro de recursos. Adicionalmente, cualquier titular podrá dar de alta cuentas bancarias a nombre de otro titular en el Contrato.

En el caso de Contrato y Cuenta(s) solidarias, la CASA DE BOLSA requerirá de la solicitud o confirmación de todos los titulares para: (i) dar de alta o baja a cualquier cotitular y (ii) modificar la acumulación o carga fiscal definida conforme a la Cláusula Sexagésima.

**CUADRAGÉSIMA OCTAVA.- Beneficiarios. (SÓLO PARA PERSONAS FÍSICAS)** Conforme a lo dispuesto en la Ley del Mercado de Valores, el CLIENTE señala como beneficiarios de cada Cuenta abierta al amparo de este Contrato, a aquellos que determine como tales en cada Solicitud de Apertura de Cuenta; quienes tendrán derecho, luego de acreditar fehacientemente a la CASA DE BOLSA el fallecimiento del CLIENTE, a recibir la totalidad de los recursos acreditados en la Cuenta sobre la cual hubieren sido designados como beneficiarios, en las proporciones que les correspondan de ser más de uno, según lo establece la Ley del Mercado de Valores en su artículo 201.

Cualquier beneficiario tendrá derecho de elegir la entrega de Valores registrados en la Cuenta o el importe de su venta.

Si no existieren beneficiarios, el importe deberá entregarse conforme a la legislación común.

Los montos correspondientes serán entregados previa acreditación de la personalidad de los beneficiarios, entrega de los documentos solicitados por la CASA DE BOLSA y suscripción de la instrucción que requiera la CASA DE BOLSA para estos efectos. Si fueran varios los beneficiarios designados, la CASA DE BOLSA les entregará la parte proporcional determinada por el CLIENTE y si no se hubiere establecido la proporción que a cada uno de ellos le corresponda, les entregará por partes iguales el saldo a que tengan derecho, de acuerdo a lo estipulado en la presente cláusula.

Dicha entrega se efectuará directamente a los beneficiarios si fueren mayores de edad o a su representante legal si fueren menores de edad o sufrieron alguna incapacidad legalmente declarada.

La CASA DE BOLSA calculará los saldos de la Cuenta conforme a los precios que para los Valores rijan en el mercado, y en ningún momento asumirá responsabilidad alguna ante los beneficiarios ni ante los causahabientes legítimos o testamentarios del CLIENTE por el demérito que los Valores puedan sufrir entre la fecha de fallecimiento del CLIENTE y aquella en que los beneficiarios y, en su caso, causahabientes legítimos o testamentarios del CLIENTE le soliciten la entrega de los saldos que reporte la Cuenta.

En Contratos con dos o más titulares, la designación de los beneficiarios deberá hacerse conjuntamente por todos los titulares. En este caso, el derecho de los beneficiarios nacerá hasta que todos los titulares hayan fallecido. Únicamente se podrán hacer modificaciones en relación con la designación de beneficiarios y, en su caso, a los porcentajes establecidos, mediante comunicación suscrita por todos los titulares del Contrato.

Cualquier designación o modificación en la designación de beneficiarios surtirá efectos una vez que ésta hubiere sido registrada en los sistemas de la CASA DE BOLSA. Lo anterior, sin perjuicio que ante las circunstancias de algún caso particular, la CASA DE BOLSA determine a su discreción que se tenga como válida alguna designación o modificación en la designación de beneficiarios, aún sin haber quedado registrada en sus sistemas, siempre que al menos se cuente con prueba de la voluntad del CLIENTE, así como que éste había comunicado la designación o modificación a la CASA DE BOLSA.

En caso de que algún beneficiario no aceptare la parte que le corresponde manifestándolo por escrito, o hubiere fallecido con anterioridad al titular, la parte que se hubiere determinado a su favor se repartirá entre los demás beneficiarios a prorrata según el porcentaje que le corresponda a cada uno.

Una vez que se hayan entregado los recursos a los beneficiarios, la CASA DE BOLSA procederá a cancelar el Contrato sin necesidad de instrucción adicional alguna.

**CUADRAGÉSIMA NOVENA.- Comprobantes.** La CASA DE BOLSA elaborará un comprobante de cada operación que realice al amparo de este Contrato, que contendrá todos los datos necesarios para la identificación y el importe de la operación. Este comprobante y el número de su registro contable, quedarán a disposición del CLIENTE en la oficina principal de la CASA DE BOLSA en donde se maneje la Cuenta, a partir del siguiente día hábil de celebrada la operación; a menos de que la misma se maneje a través de una oficina ubicada fuera de la plaza en la que se encuentre la oficina matriz de la CASA DE BOLSA, caso en el cual, tal comprobante estará a disposición del propio CLIENTE el segundo día hábil posterior a la fecha en que lo solicite. Lo anterior con independencia de que la misma operación se vea reflejada en el estado de cuenta mensual.

Adicionalmente, la CASA DE BOLSA podrá emitir comprobantes de depósitos, retiros u otros movimientos que se efectúen en alguna Cuenta; y dirigirlos al CLIENTE por aquellos medios de comunicación que señale al CLIENTE para estos efectos. En caso de existir discrepancia entre lo indicado en los comprobantes emitidos en términos de este párrafo, el CLIENTE deberá comunicar tal situación de manera inmediata a la CASA DE BOLSA, con el objeto de efectuar la aclaración de cualquier eventualidad que se hubiere presentado.

**QUINCUAGÉSIMA.- Envío de Estado de Cuenta.** La CASA DE BOLSA enviará al CLIENTE, dentro de los primeros cinco Días Hábiles posteriores al corte mensual, un estado de cuenta autorizado con los requisitos legales y fiscales conforme a las disposiciones aplicables, con la relación de las operaciones realizadas con él o por su cuenta y que reflejará la posición de Valores y efectivo de la Cuenta al último Día Hábil del mes que corresponda, así como la posición de Valores y efectivo del corte mensual anterior.

El CLIENTE acuerda expresamente que los citados estados de cuenta sean puestos a su disposición mediante la página de Internet de la CASA DE BOLSA, a través del acceso individualizado con el uso de Claves de Identificación, y/o en su caso, a través de Plataformas, los cuales se entenderán entregados al momento en que se encuentren consultables por el CLIENTE. Adicionalmente, la CASA DE BOLSA podrá enviar notificaciones sobre la emisión de los estados de cuenta en el acceso antes mencionado, o incluso adjuntar el archivo electrónico que contenga dichos estados de cuenta, así como el envío de cualquier otra comunicación o información relacionada con el presente Contrato, al correo electrónico que el CLIENTE mantenga registrado ante la CASA DE BOLSA para estos efectos. El CLIENTE sólo deberá reconocer como válidos aquellos correos electrónicos provenientes de la siguiente dirección notificaciones@gbm.com.mx, o cualquier otro correo que por él para dichos efectos notifique la CASA DE BOLSA.

El CLIENTE reconoce y acepta que será su exclusiva responsabilidad la verificación del contenido de los estados de cuenta para los efectos legales a que haya lugar, y reconoce por cumplida en tiempo la obligación a que se encuentra sujeta la CASA DE BOLSA conforme a este Contrato, al momento en que estén disponibles para su consulta los referidos estados de cuenta.

En su caso, los asientos que aparezcan en los estados de cuenta podrán ser objetados por el CLIENTE por escrito a través de cualquier medio convenido en este Contrato, dentro de los sesenta Días Hábiles siguientes a la fecha de su recepción por parte del CLIENTE, en la inteligencia de que, si dichos asientos no son objetados por el CLIENTE dentro del plazo señalado, se entienden plenamente aceptados y ratificados aquellas operaciones y movimientos que fueren causa de los mismos.

Así mismo, para que el CLIENTE, en su caso, pueda hacer las objeciones en tiempo, la CASA DE BOLSA tendrá a disposición de aquél, a partir del Día Hábil siguiente a la fecha de corte, en la oficina donde se maneje la Cuenta, una copia de dicho estado de cuenta.

Independientemente del acuerdo sobre la consulta de estados de cuenta a través de Medios de Acceso, la CASA DE BOLSA podrá, con el objeto de comprobar el domicilio del CLIENTE ante ésta o por

cualquier otro motivo de seguridad, enviar el estado de cuenta de manera física al domicilio del CLIENTE acreditado ante la CASA DE BOLSA para estos efectos.

Con independencia de lo establecido en esta cláusula, la CASA DE BOLSA podrá remitir al CLIENTE, por cualquier medio de comunicación aceptado por las partes en términos de este Contrato, requerimientos de confirmación de información, ratificación de saldos de Valores y efectivo y/o de las operaciones o movimientos efectuados en cualquier Cuenta, los cuales las partes reconocen que contarán con el valor probatorio a que se refiere la Cláusula Cuadragésima Segunda.

**QUINCUAGÉSIMA PRIMERA.- Contraprestaciones.** El CLIENTE deberá cubrir a favor de la CASA DE BOLSA, como remuneración por las operaciones en que intervenga y los servicios que preste, las comisiones, costos, honorarios y cualesquiera otras contraprestaciones que las partes determinen libremente. El CLIENTE manifiesta conocer los esquemas de contraprestación a la CASA DE BOLSA establecidos en la Guía de Servicios de Inversión, su forma de cálculo, así como sus límites, y acepta por completo sus términos al solicitar cualquier servicio.

El CLIENTE reconoce que, salvo que acuerde por escrito un esquema de comisiones distinto con la CASA DE BOLSA, el porcentaje base de la comisión aplicable para las operaciones de compra y venta de Valores llevadas a cabo en cada Cuenta, será aquel pactado con la CASA DE BOLSA y reflejado en cada Confirmación de Apertura de Cuenta o Confirmación de Modificaciones en Cuenta, según sea el caso, quedando facultada la CASA DE BOLSA a aplicar un porcentaje menor por cualquier motivo, sin encontrarse obligada a ello.

En cualquiera de los casos, y de estimarlo así conveniente, las partes podrán acordar libremente la comisión aplicable para operaciones específicas, ya sea mayor o menor al porcentaje base pactado, indistintamente y por cualquier motivo.

**QUINCUAGÉSIMA SEGUNDA.- Cargos a la Cuenta.** El CLIENTE autoriza expresamente a la CASA DE BOLSA a cargarle en la Cuenta en la que se hubieren generado las obligaciones de pago, entre otros conceptos, lo siguiente:

I.-    El importe de las operaciones que la CASA DE BOLSA realice en cumplimiento del presente Contrato.

II.-   Las remuneraciones que la CASA DE BOLSA devengue, de acuerdo con los aranceles o tarifas establecidos para cada tipo de operación o servicio, o aquellos que las partes hubieren acordado.

III.-  Los intereses a razón del 2% anual, calculado sobre la base de 360 días por el número de días efectivamente transcurridos, sobre las cantidades que éste le adeude, en el entendido de que la CASA DE BOLSA podrá cargar en la Cuenta el interés referido. El mismo interés estipulado en esta cláusula deberá pagar la CASA DE BOLSA al CLIENTE por los adeudos a favor de éste que le sean exigibles a aquella únicamente por causas imputables a la CASA DE BOLSA.

Los intereses a que se refiere esta fracción habrán de diferenciarse de los gastos en que incurra la CASA DE BOLSA (entre otros, por el uso de líneas de crédito o financiamientos) y que habrá de repercutir al CLIENTE.

IV.-   Los gastos diversos que se originen con motivo del cumplimiento de las operaciones y servicios realizados por la CASA DE BOLSA y, en su caso, los impuestos, derechos y contribuciones derivados de los mismos.

V.-    El monto al que hubiere ascendido cualquier cantidad erogada o pérdida generada a la CASA DE BOLSA derivado del incumplimiento del CLIENTE a lo señalado en la Cláusula Sexta del presente Contrato.

El CLIENTE reconoce que no deberá solicitar la ejecución de operación alguna en la que mantenga simultáneamente el carácter de comprador y vendedor y, en caso de presentarse injustificadamente una operación con esa característica, la CASA DE BOLSA podrá ordenar su cancelación, o realizar actos tendientes a mitigar o subsanar la falta, en cuyo caso el CLIENTE se obliga a reembolsar cualquier cantidad erogada o pérdida generada con motivo del incumplimiento del CLIENTE a lo establecido en el presente párrafo.

Los cargos a que se refiere la presente cláusula se harán sobre los recursos líquidos disponibles en la Cuenta que corresponda, considerándose como recursos líquidos disponibles, tanto el efectivo en Pesos como las acciones de las sociedades de inversión e instrumentos de deuda que la CASA DE BOLSA utilice comúnmente con el fin de no mantener efectivo en los derechos del cliente, así como cualquier otro instrumento que se utilice para el mismo depósito en los términos indicados en el penúltimo párrafo de la Cláusula Décima.

En ese sentido, si al momento en que deba efectuarse el cargo correspondiente no se encontrare efectivo suficiente acreditado en la Cuenta, pero se mantuvieren acciones de la sociedad de inversión antes señalada, o cualquier otro instrumento utilizado para los fines mencionados, el CLIENTE instruye expresamente a la CASA DE BOLSA a realizar las ventas o liquidaciones necesarias sobre dichas acciones o instrumentos, con el objeto de efectuar en la Cuenta los cargos que correspondan.

En caso de que la CASA DE BOLSA o cualquier otro tercero realice erróneamente un depósito de recursos en cualquiera de las Cuentas abiertas al amparo de este Contrato, el CLIENTE autoriza irrevocablemente a la CASA DE BOLSA a retirar los dichos recursos y entregarlos a quien corresponda, sin necesidad de notificación previa o autorización adicional por parte del CLIENTE.

Por su parte, el CLIENTE reconoce la obligación que mantiene de informar a la CASA DE BOLSA cualquier depósito o transferencia no reconocidos en su Cuenta, en cuanto dicha situación sea de su conocimiento.

Asimismo, en caso de que el CLIENTE disponga o haga uso de los recursos depositados erróneamente en su Cuenta, de conformidad con esta cláusula, deberá reembolsar dichos recursos a entera satisfacción de la CASA DE BOLSA.

**QUINCUAGÉSIMA TERCERA.- Documentos No Negociables.** Los recibos, comprobantes, estados de cuenta y demás documentos que la CASA DE BOLSA expida a favor del CLIENTE para acreditar la recepción o transferencia de Valores y efectivo, se expedirán invariablemente a nombre del CLIENTE y en ningún caso serán negociables.

**QUINCUAGÉSIMA CUARTA.- Destino Preferente.** Sin perjuicio de lo dispuesto en la Cláusula Séptima, y de conformidad con la Ley del Mercado de Valores, las partes reconocen que todos los Valores y efectivo propiedad del CLIENTE registrados en cualquier Cuenta abierta al amparo del presente Contrato, se entienden especial y preferentemente destinados al pago de las remuneraciones, intereses, gastos o cualquier otro adeudo en favor de la CASA DE BOLSA con motivo de lo estipulado en este Contrato, por lo que el CLIENTE no podrá retirar dichos Valores o efectivo sin satisfacer los adeudos a su cargo.

**QUINCUAGÉSIMA QUINTA.- No Ejercicio de Derechos.** Ninguna omisión o demora por parte de la CASA DE BOLSA en ejercer cualquiera de sus derechos, facultades o recursos contenidos en este Contrato implicará una renuncia a ello; ni el ejercicio individual o parcial de dichos derechos, facultades o recursos precluirá cualquier otro derecho de exigibilidad de éstos o el ejercicio de otros derechos, facultades o recursos conforme a este Contrato.

**QUINCUAGÉSIMA SEXTA.- Retiros de Efectivo.** Las partes convienen que cualquier retiro de efectivo ordenado por el CLIENTE se realizará mediante depósito o transferencia a la cuenta bancaria abierta a nombre del CLIENTE debidamente registrada ante la CASA DE BOLSA, estando la CASA DE BOLSA facultada para autorizar, a su completa discreción y sin responsabilidad, que el depósito se lleve a cabo en cuenta distinta o de titular distinto al CLIENTE, o que el retiro se efectúe mediante cheque librado a la orden del CLIENTE o de otra persona, requiriéndose previamente para todos los casos mencionados anteriormente, solicitud del CLIENTE dada a la CASA DE BOLSA por escrito, que incluya la información que requiera la CASA DE BOLSA al efecto.

**QUINCUAGÉSIMA SÉPTIMA.- Aplicabilidad.** Las estipulaciones contenidas en este Contrato serán aplicables en lo conducente a

14

cualquier operación o acto encomendado por el CLIENTE a la CASA DE BOLSA, respecto de cualquier instrumento bursátil o extrabursátil con el que la CASA DE BOLSA pueda operar conforme a las leyes o disposiciones aplicables en vigor o que se establezcan en el futuro.

**QUINCUAGÉSIMA OCTAVA.- Duración, Transferencia, Suspensión y Terminación .** Es voluntad de las partes que el perfeccionamiento de la celebración del presente Contrato y el inicio de los derechos y obligaciones recíprocas derivados de éste, salvo por lo que respecta a la apertura al menos una Cuenta, se sujete a que el CLIENTE efectúe el primer depósito de recursos en la Cuenta. Iniciada su vigencia, la duración del presente Contrato es indefinida, pudiendo cualquiera de las partes darlo por terminado con el simple aviso a la contraparte en forma fehaciente por cualquiera de los medios acordados por las partes, con al menos cinco Días Hábiles de anticipación a la fecha de terminación deseada o, en su caso, los que sean necesarios para realizar las liquidaciones pendientes, en el entendido que la terminación no surtirá efectos en tanto no se cumpla con lo siguiente: (i) sean liquidadas las operaciones pendientes, (ii) se cubran en su totalidad los adeudos a cargo del CLIENTE, y (iii) no se mantengan recursos ni Valores acreditados en ninguna Cuenta abierta al amparo del Presente. Lo anterior resultará también aplicable en caso de que el CLIENTE solicite a la CASA DE BOLSA traspasar sus valores a otra casa de bolsa.

La CASA DE BOLSA podrá suspender cualquiera de sus servicios o efectuar la inactivación de cualquier Cuenta de forma inmediata, cuando sea solicitado por autoridad competente o exista algún incumplimiento por parte del CLIENTE, incluyendo incumplimientos sobre entrega o actualización de información solicitada por esta CASA DE BOLSA.

En caso de que la CASA DE BOLSA decida dar por terminado el presente Contrato, se suspenderá inmediatamente la prestación de cualquier Servicio de Inversión, obligándose el CLIENTE a retirar sus Valores o efectivo instruyendo a la CASA DE BOLSA para tales efectos a más tardar el día en que surta efectos la terminación, pero en todo caso con la antelación necesaria según la liquidación de las operaciones que se deban celebrar para este fin. En caso contrario, la CASA DE BOLSA podrá proceder a inactivar la Cuenta o traspasar los Valores y/o efectivo de que se trate a una cuenta concentradora administrada por la CASA DE BOLSA, debiendo el CLIENTE ordenar la venta y/o retiro de los recursos, por lo que no serán admitidas instrucciones para la celebración de operaciones distintas a las señaladas previamente, sin responsabilidad para la CASA DE BOLSA.

A partir de que se comunique la decisión de dar por terminado el Contrato, la CASA DE BOLSA, sin su responsabilidad, se abstendrá de ejecutar cualquier instrucción del CLIENTE que no sea aquella que tenga por efecto retirar los Valores o el efectivo, o bien proceder a la venta de los Valores con el único fin de retirar el producto que de los mismos se obtenga, previo pago de cualquier adeudo a cargo del CLIENTE.

Sin perjuicio de lo anterior, y siempre que se trate de cualquier Cuenta adicional abierta al amparo del presente Contrato, el CLIENTE podrá solicitar su cancelación a la CASA DE BOLSA, sin que ello implique terminación al Contrato, siempre que en dicha Cuenta: (i) no existan operaciones pendientes de liquidar, (ii) no existan montos adeudados a cargo del CLIENTE, y (iii) no se mantengan recursos ni Valores acreditados en la misma.

Si en términos del artículo 212 Bis 1 de las Disposiciones, la CASA DE BOLSA recibe una solicitud de otra casa de bolsa para el traspaso de los recursos en la Cuenta y cancelación de este Contrato, el CLIENTE reconoce y acepta que la CASA DE BOLSA podrá requerir al CLIENTE confirmación sobre la procedencia de dicha solicitud, previo a la ejecución de la misma.

**QUINCUAGÉSIMA NOVENA.- Modificaciones.** En el evento de modificaciones o adiciones al clausulado del presente Contrato, así como cualquier convenio, contrato o acto jurídico que se derive del mismo, la CASA DE BOLSA podrá enviar al CLIENTE, debidamente suscrito por su representante legal, el convenio modificatorio relativo, cuyos términos serán objetados por el CLIENTE dentro de los veinte Días Hábiles siguientes a la fecha de su recepción. De no expresar objeciones dentro del plazo establecido, el CLIENTE acepta

que, en términos de la Ley del Mercado de Valores el convenio se tendrá por aceptado y surtirá plenos efectos legales, aún sin recabar la firma del CLIENTE.

En adición a lo anterior, la CASA DE BOLSA podrá comunicar al CLIENTE modificaciones al presente Contrato a través de alguna Plataforma que utilice el CLIENTE, en la que el mismo CLIENTE podrá manifestar su consentimiento a las modificaciones relativas.

Así mismo, si previo a la conclusión del plazo establecido en el párrafo anterior el CLIENTE realiza cualquier acto y/o gira cualquier instrucción de acuerdo a los términos del convenio en cuestión, el mismo se tendrá por aceptado por el CLIENTE y a partir de ese momento surtirá plenos efectos legales, sin necesidad de que concluya el plazo señalado.

Los convenios a los que se refiere esta cláusula podrán hacerse del conocimiento del CLIENTE a través de cualquiera de los medios de comunicación pactados en este Contrato, y observando el plazo y las modalidades para la manifestación del consentimiento a que se refiere la presente. En el caso de Contratos con más de un titular, el convenio podrá hacerse llegar a cualquiera de los titulares.

Ante modificaciones o actualizaciones de la información manifestada en la Carátula, la CASA DE BOLSA podrá determinar que deba suscribirse el Contrato, incluyendo Carátula y clausulado, o únicamente la Carátula del mismo, en la que se señalará la versión del clausulado de este Contrato vigente al momento, la cual, ya sea por suscripción expresa previa o por consentimiento de las partes en términos de los primeros tres párrafos de esta cláusula, ya estará surtiendo plenos efectos legales y se incorporará a dicha Carátula por referencia.

Sin perjuicio de lo anterior, la CASA DE BOLSA podrá determinar que cualquier modificación instruida válidamente por el CLIENTE surta efectos desde la aplicación de la misma en sus registros y sistemas de la propia CASA DE BOLSA, y/o no sea necesaria la suscripción del CLIENTE de manera adicional a la solicitud de las mismas, informándolo así al CLIENTE en el envío de la confirmación correspondiente.

La confirmación mencionada en el párrafo anterior podrá hacerse llegar al CLIENTE por cualquier medio de comunicación pactado en el presente Contrato, incluso por vía telefónica. En el caso de Contratos con más de un titular, la confirmación podrá hacerse llegar a cualquiera de los titulares. En uso de Plataformas u otros Medios de Acceso que cuenten con la funcionalidad necesaria al efecto, la CASA DE BOLSA podrá emitir la confirmación correspondiente mediante la información que al efecto muestre a través de la Plataforma o Medio de Acceso.

Cualquier solicitud de modificaciones, junto con la confirmación correspondiente, conformará de manera plena el acuerdo de voluntades entre el CLIENTE y la CASA DE BOLSA respecto de la información ahí contenida.

El CLIENTE reconoce que su información o documentos de carácter personal, deben coincidir sin importar que éste mantenga distintos contratos celebrados con la CASA DE BOLSA, o incluso con otras entidades pertenecientes al mismo Grupo Empresarial del que forma la CASA DE BOLSA. En este sentido, reconoce, acepta y autoriza a la CASA DE BOLSA a homologar y/o compartir dicha información o documentos entre los distintos contratos que en su caso mantenga con la CASA DE BOLSA, así como con otras entidades pertenecientes al mismo Grupo Empresarial del que forma parte la CASA DE BOLSA, incluyendo la recepción de la información o documentos de dichas entidades, y a actualizar los registros y expedientes correspondientes para todos los efectos legales a que haya lugar, entendiéndose actualizados los términos de su identificación como parte en el presente Contrato, incluyendo, sin excluir cualquier otro, su domicilio y datos de contacto.

**SEXAGÉSIMA.- Cargas Fiscales.** Las partes aceptan y reconocen que todas las contribuciones, derechos, impuestos y demás cargas fiscales que se generen o lleguen a generarse con motivo de la celebración de las operaciones a las que se refiere el presente instrumento, podrán estar sujetas a la retención al CLIENTE con cargo

15

a la Cuenta correspondiente, y pago de los mismos por la CASA DE BOLSA a nombre del CLIENTE de conformidad con las leyes y disposiciones fiscales que, en su caso, les sean aplicables.

Por su parte, en caso de Cuentas con dos o más titulares y de así permitirlo la normatividad fiscal aplicable, la CASA DE BOLSA podrá dar al CLIENTE la opción de determinar a quien o quienes de entre los titulares correspondería la acumulación o carga fiscal de intereses o cualquier otro concepto, en la medida admitida por dicha normatividad fiscal aplicable de tiempo en tiempo.

El CLIENTE reconoce expresamente que sin importar cualquier determinación efectuada en el presente Contrato o cualquier documento relacionado con éste, o con su relación con la CASA DE BOLSA, en todo momento regirán las reglas fiscales prevalecientes y que resulten aplicables.

**SEXAGÉSIMA PRIMERA.-** En caso de que el CLIENTE, ya sea persona física o moral, sea de nacionalidad extranjera, éste acepta considerarse como nacional mexicano respecto a todos y cada uno de los Valores, operaciones e instrumentos que se adquieran o que se celebren al amparo en relación con este Contrato, y en no invocar la protección de su gobierno por lo que se refiere a dichos Valores, operaciones e instrumentos; asimismo, adquiere la obligación de no invertir en Valores no permitidos así como a no exceder los porcentajes de participación y control autorizados en su carácter de extranjero.

**SEXAGÉSIMA SEGUNDA.- Ley Aplicable y Jurisdicción.** Para la interpretación, cumplimiento y ejecución del presente Contrato, las partes se someten a las leyes vigentes de los Estados Unidos Mexicanos y a la jurisdicción de los tribunales competentes, sean locales o federales, con sede en la Ciudad de México, Distrito Federal, renunciando a cualquier otra jurisdicción, fuero o competencia, que pudiera corresponderles por razón de su domicilio o por cualquier otra causa.

**SEXAGÉSIMA TERCERA.- Controversias.** En el supuesto de que el CLIENTE inicie un juicio en contra de la CASA DE BOLSA y en sentencia firme se declaren infundadas sus pretensiones, el CLIENTE se obliga a pagar a la CASA DE BOLSA, además de los gastos y costas que determine la autoridad judicial correspondiente, cualesquier otros gastos incurridos por, o generados contra la CASA DE BOLSA con motivo del juicio, incluidos honorarios de abogados y peritos. Asimismo, el CLIENTE se obliga a sacar en paz y a salvo, e indemnizar a la CASA DE BOLSA por reclamaciones de terceros por actos responsabilidad del propio CLIENTE, lo anterior, cuando la CASA DE BOLSA hubiere actuado por instrucciones del CLIENTE.

En el caso de que le fuera fincada cualquier responsabilidad a la CASA DE BOLSA relacionada con el presente Contrato, las partes convienen que los daños y perjuicios reclamables por el CLIENTE tendrán como máximo, el monto al que asciendan las comisiones por intermediación en el mercado de valores o comisión por manejo de cuenta, generadas por las operaciones efectuadas en las Cuentas abiertas al amparo del presente Contrato durante los 12 meses anteriores a la fecha de cálculo, y no serán capitalizables.

Sin perjuicio de cualquier otra vía para resolver controversias derivadas del presente Contrato, la Comisión Nacional para la Protección y Defensa de los Usuarios de Servicios Financieros (www.condusef.gob.mx,                Tel:        018009998080, asesoria@condusef.gob.mx) podrá conocer de cualquier controversia entre el CLIENTE y la CASA DE BOLSA derivado del presente Contrato, por lo que el CLIENTE, en términos de la Ley de Protección y Defensa al Usuario de Servicios Financieros, podrá iniciar el procedimiento de reclamación respectivo.

Los párrafo primero y segundo anteriores continuarán vigentes a la terminación del presente Contrato.

**SEXAGÉSIMA CUARTA.- Títulos.** Las partes manifiestan expresamente que los títulos establecidos al inicio de cada capítulo, así como de cada cláusula son meramente para efectos de identificación, por lo que de ninguna manera podrán ser consideradas como elemento de restricción o limitación respecto del contenido o de sus efectos o alcances legales.

**SEXAGÉSIMA QUINTA.-** El presente Contrato sustituye todo Contrato de Intermediación Bursátil o de Comisión Mercantil celebrado con anterioridad entre el CLIENTE y la CASA DE BOLSA respecto de cualquier Cuenta abierta a su amparo y las operaciones efectuadas a la misma.

**POLÍTICAS OPERATIVAS FUNDAMENTALES DE LA CASA DE BOLSA**

**1.** La CASA DE BOLSA sólo reconocerá y aceptará del CLIENTE depósitos o transferencias efectuadas en aquellas cuentas que mantenga la CASA DE BOLSA en instituciones de crédito, o en su cuenta única de efectivo en el Sistema de Pagos Electrónicos Interbancarios (SPEI), y que señale en cada Confirmación de Apertura de Cuenta, incluyendo en dicho documento los números de referencia que deberá señalar el CLIENTE en los depósitos o transferencias que realice, a efecto de ser identificables por la CASA DE BOLSA.

En consecuencia, la CASA DE BOLSA no recibirá del CLIENTE dinero en efectivo ni reconocerá depósito alguno realizado en formas o medios distintos a los señalados. En el supuesto de efectuarse depósito con cheque, el mismo deberá girarse a nombre de "GBM Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa", siendo responsabilidad única y exclusiva del CLIENTE el efectuar su depósito en la cuenta correspondiente.

El personal de la CASA DE BOLSA, incluyendo cualquier Apoderado Autorizado, no se encuentra facultado para realizar excepciones a lo establecido en el presente numeral.

**2.** La CASA DE BOLSA no estará obligada a cumplir con las instrucciones del CLIENTE, cuando los depósitos no se efectúen a las cuentas señaladas en términos del numeral anterior. Cuando por alguna circunstancia el CLIENTE no pueda ingresar el número de referencia, éste se obliga a notificar a la CASA DE BOLSA del depósito realizado, mediante el envío por algún medio acordado en el presente del comprobante de depósito, el mismo día en que haya sido realizado, antes de las 13:30 hrs. En caso contrario, la CASA DE BOLSA no estará obligada a referir tal depósito a la Cuenta que corresponda, sino en la fecha en que reciba la notificación correspondiente, no asumiendo responsabilidad respecto de tal depósito hasta su cabal identificación.

**3.** Tratándose de Valores, la CASA DE BOLSA sólo reconocerá recibidos del CLIENTE aquellos que le sean entregados por conducto de Indeval y excepcionalmente los títulos físicos sujetos a la verificación de su autenticidad y vigencia. El depósito inicial de Valores en el Indeval que realice la CASA DE BOLSA por cuenta del CLIENTE, se sujetará en todo caso a los endosos y las formalidades establecidas en la Ley del Mercado de Valores. El estado de cuenta correspondiente hará las veces de reconocimiento de depósito y resguardo de los Valores propiedad del CLIENTE.

**4.** Ningún Apoderado Autorizado se encuentra facultado por la CASA DE BOLSA para expedir certificación, aclaración, estados de cuenta o constancia alguna relativa a las operaciones celebradas con el CLIENTE, ni para expedir recibos de Valores, cheques o efectivo, y en particular para garantizar rendimientos sobre sus inversiones y, por tanto, la CASA DE BOLSA desconoce la validez de este tipo de documentos.

Las Políticas Operativas de la CASA DE BOLSA, podrán ser modificadas sin previo aviso, y se encontrarán publicadas en la página de internet: www.gbm.com.mx en su versión vigente en cada momento para su consulta por el CLIENTE. Lo anterior, sin prejuicio que la CASA DE BOLSA podrá notificar las modificaciones efectuadas a sus Políticas Operativas, mediante aviso que en su caso incluya en el estado de cuenta, o por cualquier otro medio de comunicación pactado en este Contrato.

Leído que fue por las partes el presente Contrato y enteradas de su contenido y alcance jurídico, lo celebran en la Ciudad de México, Distrito Federal, en la Fecha de Celebración señalada en la Carátula,

16

incluyendo sus modificaciones, para todos los efectos legales a que haya lugar.

**LA CASA DE BOLSA**

**EL CLIENTE**

_____
**JESUS NAVA MORENO**

17

----- Yo, CARLOS ROBERTO GARCÍA ANGELES, CORREDOR PÚBLICO NÚMERO SETENTA Y SIETE EN LA

PLAZA DEL DISTRITO FEDERAL. --------------------------------------------------------------------------------------------------------

----- C E R T I F I C O: Que el documento, que obra en dieciocho páginas útiles, es una impresión fiel de la

información que tuve a la vista en la red mundial de comunicaciones denominada "Internet", en la dirección

electrónica https://gbm.com/plus/ de Grupo Bursátil Mexicano, con el cual la cotejé, según consta en el **ACTA**

**NÚMERO SEIS MIL QUINIENTOS OCHENTA Y TRES** y que agregué al archivo con la letra **"A"** de esta misma

fecha. ------------------------------------------------------------------------------------------------------------------- DOY FE. ---

----- En la Ciudad de México, a los once días del mes de agosto de dos mil veintidós. ----------------------------------







**SPEI**
SISTEMA DE PAGOS
ELECTRÓNICOS
INTERBANCARIOS

*Pagos más rápidos y seguros*

|  |  |
|---|---|
| Fecha de consulta | 11 de agosto de 2022 |
| Hora de consulta | 15:36:47 horas |

## COMPROBANTE ELECTRÓNICO DE PAGO

| | | | |
|---|---|---|---|
| Fecha de operación en el SPEI® | 26 de enero de 2022 | Monto | $ 15,000.00 |
| Fecha de abono en la cuenta beneficiaria* | 26 de enero de 2022 | IVA | $ 0.00 |
| Hora de abono en la cuenta beneficiaria* | 13:51:16 horas | Referencia numérica | 78601 |
| Concepto del pago | AKJ78601 | Clave de rastreo | BNET01002201260044038979 |

### Ordenante

| | |
|---|---|
| Institución emisora del pago | BBVA MEXICO |
| Titular de la cuenta | JESUS NAVA MORENO |
| RFC/CURP | NAMJ721014I27 |
| CLABE, Tarjeta de débito, Número de celular | 012180014753092476 |

### Beneficiario

| | |
|---|---|
| Institución receptora del pago | GBM |
| Titular de la cuenta | JESUS NAVA MORENO |
| RFC/CURP | NAMJ721014I27 |
| CLABE, Tarjeta de débito, Número de celular | 601180400006462545 |

*La hora de abono corresponde al huso horario que rige en la Ciudad de México.

Número de Serie del Certificado de Seguridad de la institución receptora del pago
00001000000506709574



Cadena Original (información del pago):
II1I26012022I26012022I13511I6I90601IBBVA MEXICOIJESUS NAVA MORENOI40I012180014753092476INAMJ721014I27IGBMIJESUS NAVA MORENOI40I601180400006462545INAMJ721014I27IAKJ78601I0.00I15000.00INAINAI0I0INAI0I0.00I00001000000506709574II

Sello Digital (firma provista por la institución receptora del pago):
A/Q0IBqv3dNwd6JLcK0Hj3eBOA2ywrkwkPyomIaUkyVTc+J0WlpVMKZuUtIe8AtJE2G/JElYuVOrbCFgfkwuGt8IrNfzVJLJnUTOjoFEyvwq8I+1oZxHkUI2ozHar40SHOeq/4agG+NBgswsZh0BdIQU0j4Mt8zOc1c2e3vBzE7vQGXJg/1HzUMHDbQMm0/fwRGbuE9RIOyQ9RB0PfKB8UMIyfOV+eY96swmkuhmdRAbb0vOtSZ4TzidV3I7K5J2xiBF6K6Ie6oX8eSuIU1xiU95Pjx6OyyNI0GIqq3Zzh8UjRQjt7whInUv5acbHcsFc3E1mInUZXQzUe5H1ivDOg==

La información contenida en el presente documento corresponde a la Confirmación de Abono generada y firmada electrónicamente por la entidad receptora del pago (Participante Emisor de la Confirmación de Abono) bajo su estricta responsabilidad, conforme a lo establecido en la regla 20a. de la Circular 14/2017 emitida por el Banco de México, por lo que este último no tiene responsabilidad alguna sobre tal información.

El presente Comprobante Electrónico de Pago se emite con fines informativos y está dirigido únicamente a los usuarios del SPEI® que proporcionaron electrónicamente la información confidencial cuyo acceso y uso fueron previamente pactados, ya sea con el Participante Emisor o con el Participante Receptor de la Orden de Transferencia Aceptada de su interés.

Para mayor información o aclaraciones respecto de este Comprobante Electrónico de Pago y/o de la Orden de Transferencia Aceptada que le dio origen, el usuario deberá consultar a la entidad que le haya proporcionado el servicio de transferencia electrónica vía SPEI® o a la entidad que lleve la cuenta en la que se depositaron los recursos, según corresponda.

----- Yo, CARLOS ROBERTO GARCÍA ANGELES, CORREDOR PÚBLICO NÚMERO SETENTA Y SIETE EN LA

PLAZA DEL DISTRITO FEDERAL. -------------------------------------------------------------------------------------------------

----- C E R T I F I C O: Que el documento, que obra en una página útil, es una Impresión fiel de la información que

tuve a la vista en la red mundial de comunicaciones denominada "Internet", en la dirección electrónica

https://www.banxico.org.mx/ de Banco de México, con el cual la cotejé, según consta en el **ACTA NÚMERO SEIS**

**MIL QUINIENTOS OCHENTA Y TRES** y que agregué al archivo con la letra **"D"** de esta misma fecha. -- DOY FE. ---

----- En la Ciudad de México, a los once días del mes de agosto de dos mil veintidós. -------------------------------------











JESUS NAVA MORENO

AV JUAREZ SUR 424
COL. San Lorenzo
DEL./POB. Texcoco,Edo Mexico,Mexico
CP 56140 CR 56101

Contrato: AK478601
RFC:NAMJ721014J27

Ejecutivo:
EMMANUEL ANTONIO JONAPA

Periodo:
DEL 1 AL 30 DE JUNIO DE 2022

Teléfono Dir.
(01) 54 80 58 00

Hoja: 1 de 5

**GBM**

## RESUMEN DEL PORTAFOLIO

| PORTAFOLIO | SALDO ANTERIOR | SALDO ACTUAL | % DE APORTACIÓN |
|---|---|---|---|
| DEUDA | 0.00 | 0.00 | 0.00 |
| RENTA VARIABLE | 71,012.40 | 71,012.40 | 100.00 |
| VALORES EN CORTO / PRÉSTAMO DE VALORES | 0.00 | 0.00 | 0.00 |
| FONDO DE FONDOS | 0.00 | 0.00 | 0.00 |
| GARANTÍAS | 0.00 | 0.00 | 0.00 |
| OTRAS INVERSIONES | 0.00 | 0.00 | 0.00 |
| CREDITOS DE MARGEN | 0.00 | 0.00 | 0.00 |
| EFECTIVO | 3.30 | 3.30 | 0.00 |
| DERIVADOS | 0.00 | 0.00 | 0.00 |
| **VALOR DEL PORTAFOLIO** | **71,015.70** | **71,015.70** | **100.00** |
| VALOR TOTAL DE LAS GARANTIAS | 0.00 | 0.00 | |

| MOVIMIENTOS | DEL 1 AL 30 DE JUNIO DE 2022 |
|---|---|
| ENTRADAS DE EFECTIVO | 0.00 |
| SALIDAS DE EFECTIVO | 0.00 |
| SUBTOTAL EFECTIVO | 0.00 |
| DEPOSITO DE VALORES | 0.00 |
| RETIRO DE VALORES | 0.00 |
| SUBTOTAL VALORES | 0.00 |
| DERECHOS PATRIMONIALES | 0.00 |
| COMISIONES | 0.00 |
| SALDO NETO DE MOVIMIENTOS | 0.00 |

AVISOS

## COMPOSICIÓN DEL PORTAFOLIO



■ RENTA VARIABLE



LIC. CARLOS ROBERTO GARCIA ANGELES
CORREDOR PÚBLICO No. 77 PLAZA DEL DISTRITO FEDERAL
ESTADOS UNIDOS MEXICANOS

JESUS NAVA MORENO

Contrato: AKI78601
RFC: NAM721014127

Periodo:
DEL 1 AL 30 DE JUNIO DE 2022

Hoja: 2 de 5

 **GBM**

## DESGLOSE DEL PORTAFOLIO

### RENTA VARIABLE

| ACCIONES EMISORA | NO. TÍTULOS MES ANTERIOR | NO. TÍTULOS MES ACTUAL | Tít OTORGADOS EN PRÉSTAMO | COSTO PROMEDIO | COSTO TOTAL | PRECIO DE MERCADO | PRECIO DE MERCADO MES ANTERIOR | VALOR A MERCADO | PLUSVALIA (MINUSVALIA) | % DE LA CART. |
|---|---|---|---|---|---|---|---|---|---|---|
| CREAL * | 200,600 | 200,600 | 0 | 0.765495 | 153,558.24 | 0.354000 | 0.354000 | 71,012.40 | (82,545.84) | 100.00 |
| Total: ACCIONES | | | | | | | | 71,012.40 | -82,545.84 | 100.00 |
| TOTAL: RENTA VARIABLE | | | | | | | | 71,012.40 | -82,545.84 | 100.00 |

| EFECTIVO | VALOR | % DE CART. |
|---|---|---|
| EFECTIVO MISMO DÍA | 3.30 | 0.00 |
| EFECTIVO 24 HORAS | 0.00 | 0.00 |
| EFECTIVO 48 HORAS | 0.00 | 0.00 |
| EFECTIVO 72 HORAS | 0.00 | 0.00 |
| EFECTIVO MAYOR A 72 HORAS | 0.00 | 0.00 |
| TOTAL EN EFECTIVO | 3.30 | 0.00 |



JESUS NAVA MORENO

Contrato: AK0788601
RFC:NAMJ721014I27

Periodo:
DEL 1 AL 30 DE JUNIO DE 2022

Hoja: 3 de 5

# GBM



## DESGLOSE DE MOVIMIENTOS

| FECHA OPER/LIQ | No. FOLIO | DESCRIPCIÓN OPERACIÓN | EMISORA | NÚMERO TÍTULOS | PRECIO UNITARIO | TASA REND. | PLAZO | COMISIÓN | INTERÉS | IMPUESTO | NETO | SALDO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01 | 0 | Efectivo Inicial del Mes | Efec Ini | 0 | 0.000000 | | | 0.00 | 0.00 | 0.00 | 3.30 | 3.30 |

## RENDIMIENTO DEL PORTAFOLIO

| Periodo | Global Bruto | | Global Neto | |
|---|---|---|---|---|
| | pesos | porcentaje | pesos | porcentaje |
| Del 01/07/2021 al 30/07/2021 | (27,657.14) | (7.45) | (27,657.14) | (7.45) |
| Del 02/08/2021 al 31/08/2021 | (14,016.63) | (4.02) | (14,016.63) | (4.02) |
| Del 01/09/2021 al 30/09/2021 | (56,332.20) | (16.43) | (56,332.74) | (16.43) |
| Del 01/10/2021 al 29/10/2021 | (23,918.55) | (8.21) | (23,923.27) | (8.21) |
| Del 01/11/2021 al 30/11/2021 | 53,788.51 | 19.72 | 53,746.22 | 19.71 |
| Del 01/12/2021 al 31/12/2021 | 17,894.37 | 5.48 | 17,881.91 | 5.48 |
| Del 03/01/2022 al 31/01/2022 | (102,510.45) | (29.56) | (102,510.58) | (29.56) |
| Del 01/02/2022 al 28/02/2022 | (134,370.56) | (52.32) | (134,371.04) | (52.32) |
| Del 01/03/2022 al 31/03/2022 | 15,131.31 | 11.70 | 15,131.08 | 11.70 |
| Del 01/04/2022 al 29/04/2022 | (56,921.30) | (37.16) | (56,921.87) | (37.16) |
| Del 02/05/2022 al 31/05/2022 | (46,641.35) | (41.78) | (46,641.51) | (41.78) |
| Del 01/06/2022 al 30/06/2022 | 0.00 | 0.00 | 0.00 | 0.00 |

La moneda utilizada en el cálculo del rendimiento es en pesos mexicanos.

## COMPOSICIÓN FISCAL INFORMATIVA

| NOMBRE | ISR RETENIDO POR INTERESES | DIVIDENDOS | DIVIDENDOS ACUMULABLES | ISR ACREDITABLE POR DIVIDENDOS ACUMULADOS | ISR DIVIDENDOS DEFINITIVO | ISR CAPITALES DEFINITIVO |
|---|---|---|---|---|---|---|
| JESUS NAVA MORENO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTALES: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total de ISR Retenido: 0.00 % (proporción del valor del portafolio a cierre del mes)
La retención del Impuesto sobre la Renta (ISR) se realiza de conformidad con disposiciones fiscales vigentes establecidas en la Ley del Impuesto sobre la Renta (LISR) y demás disposiciones fiscales que sean aplicables; atendiendo a la residencia fiscal del inversionista.

CANTIDAD          1
Total de Comisiones Cobradas: 0.00 (proporción del valor del portafolio a cierre del mes)

Las comisiones se calculan multiplicando el importe de la operación (compra/venta) de valores, por el porcentaje acordado con la Casa de Bolsa para cada una de las operaciones respectivas, o bien conforme al importe acordado como "management fee" aplicado al valor de la cartera en portafolio.
Si requiere información adicional, no dude en consultar a su asesor, quien le proporcionará todos los detalles que necesite

## DESGLOSE DE COMISIONES COBRADAS*

| Concepto | Importe |
|---|---|
| Comisiones y gastos de Intermediación | 0.00 |
| Comisiones y gastos por Servicios | 0.00 |
| Comisiones y gastos administrativos | 0.00 |
| Totales: | 0.00 |

* En el periodo pueden haber cargos por concepto de comisiones y gastos afectos a diversas tasas del I.V.A. o, en su caso, exentos

## CONSTANCIA INFORMATIVA



JESUS NAVA MORENO

Contrato: AKU78601
RFC:NAM721014127

Periodo:
DEL 1 AL 30 DE JUNIO DE 2022

Hoja: 4 de 5



# GBM

## CAPITALES

| EMISORA | NO. TÍTULOS | COSTO PROMEDIO FISCAL | COSTO TOTAL FISCAL | PRECIO DE MERCADO | VALOR A MERCADO | PLUSVALÍA MINUSVALÍA FISCAL | GANANCIA PÉRDIDA FISCAL REALIZADA EN EL MES | GANANCIA PÉRDIDA FISCAL REALIZADA ACUMULADA |
|---|---|---|---|---|---|---|---|---|
| ATOS * | 0 | 0.000000 | 0.00 | 21.945515 | 0.00 | 0.00 | 0.00 | ¹ (29,161.85) |
| AXTEL CPO | 0 | 0.000000 | 0.00 | 1.530000 | 0.00 | 0.00 | 0.00 | (8,183.20) |
| BOLSA A | 0 | 0.000000 | 0.00 | 35.690000 | 0.00 | 0.00 | 0.00 | 846.87 |
| CEMEX CPO | 0 | 0.000000 | 0.00 | 7.830000 | 0.00 | 0.00 | 0.00 | 403.13 |
| CREAL * | 200,600 | 0.770418 | 154,545.83 | 0.354000 | 71,012.40 | (83,533.43) | 0.00 | (208,346.02) |
| HCITY * | 0 | 0.000000 | 0.00 | 4.040000 | 0.00 | 0.00 | 0.00 | 336.90 |
| NEMAK A | 0 | 0.000000 | 0.00 | 3.980000 | 0.00 | 0.00 | 0.00 | 652.91 |

GANANCIA O PÉRDIDA FISCAL ACUMULADA ¹ (243,451.26)

1.- Base de cálculo del ISR o pérdida realizada acumulada.
Nota: Cifras determinadas conforme a la legislación fiscal vigente.





JESUS NAVA MORENO

Contrato: AKJ78601
RFC: NAMJ721041Z7

Hoja: 5 de 5



**GBM**

Período:
DEL 1 AL 30 DE JUNIO DE 2022

## EN CASO DE ACLARACIONES:

Si tiene alguna duda y/o aclaración respecto a este estado de cuenta, favor de comunicarse directamente con su ejecutivo dentro de los 60 DIAS posteriores a la fecha de recepción.

## PARA CONSULTAS Y RECLAMACIONES:

En el caso de que tenga la necesidad de una consulta o reclamación, favor de comunicarse con el Titular de la Unidad Especializada de Consultas y Reclamaciones: Lic. Olivia Montiel Nopal.

Av. de los Insurgentes Sur número 1605, Piso 31, Col. San José Insurgentes, 03900, México, Ciudad de México, 5480 5848, une@gbm.com.mx

En el horario de atención de 9:00 a 15:00 horas los lunes a jueves y de 9:00 a 15:00 horas los viernes.

## CLAVE BANCARIA ESTANDARIZADA:

Le recordamos que para su seguridad y comodidad tenemos la opción de recibir sus transferencias electrónicas directamente a su Contrato a través del Sistema de Pagos Electrónicos Interbancarios (SPEI). Sólo deberá de instruir al emisor del pago, el nombre de cuenta Clave Bancaria Estandarizada (CLABE) asignado exclusivamente a su Contrato, la institución receptora Casa de Bolsa y el nombre del titular del contrato de Intermediación Bursátil.

Institución: GBM    CLABE: 60118040000646254S

Si alguna de estas transacciones se solicita que realices depósitos o transferencias a una cuenta diferente, no lo hagas y denuncia este hecho en gbmprotección@gbm.com.mx

## *INFORMACION SOBRE FONDOS DE INVERSION:

La composición de las carteras, clasificaciones y calificaciones de los fondos de inversión distribuidos por Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa, se publican en la siguiente página de internet: http://www.gbmfondos.com.mx/informacion-para-inversionistas

### Definiciones:
Fondo de Inversión de Deuda: Sociedad de Inversión en Instrumentos de Deuda
Fondo de Inversión de Renta Variable: Sociedad de Inversión en Instrumentos de Renta Variable

### Clasificación de Fondos de Inversión:
Discrecional: Especializada en Inversiones en Dólares
Corto Plazo
Discrecional

| FONDO | CALIFICACIÓN |
|---|---|
| GBMF2 | AAA/S1(mex) |
| GBMF3 | AAA/S1(mex) |
| GBMPAT | AAA/S4(mex) |
| GBMM3 | AAA/S4(mex) |
| GBMGUB | AAA/S1(mex) |

### Clasificación de Fondos de Inversión de Deuda:

| FONDO | CALIFICACIÓN |
|---|---|
| GBMMETO | A Buena |
| GBMGUB1 | B Mínima |
| MPAGORF | AAA/S5(mex) |

## DATOS REFERENCIADOS:

La recordamos que las inversiones en acciones de las sociedades de inversión no garantizan rendimientos futuros, ni sus sociedades operadoras son responsables de las pérdidas que el inversionista pueda sufrir como consecuencia de dichas inversiones o asumen el riesgo de las variaciones en el diferencial del precio a favor de los clientes.

## PRIVACIDAD:

De conformidad a lo estipulado en la Ley Federal de Protección de Datos Personales en Posesión de los Particulares y como parte del compromiso de GBM por preservar la privacidad de la información, hacemos de su conocimiento que el aviso de privacidad respecto al tratamiento de sus datos, se encontrará publicado en la página web de esta Casa de Bolsa, www.gbm.com.

## NOTAS ACLARATORIAS:

1. La devolución efec.- significa efectivo.
4. El rubro "Derechos Patrimoniales" en la tabla de Movimientos engloba los conceptos relacionados a dividendos, intereses, reembolsos de capital y cualquier derecho por valores adquiridos.

## INFORMACION DE SU CONTRATO:

Actualmente los acreditantes que figuran en su contrato son:

## SPEI:

El Banco de México no será responsable por los daños y perjuicios, incluso financieros, que se pudieran causar a Grupo Bursátil Mexicano, S.A. de C.V., a sus clientes.

LIC. CARLOS ROBERTO GARCIA ANGELES

----- Yo, CARLOS ROBERTO GARCÍA ANGELES, CORREDOR PÚBLICO NÚMERO SETENTA Y SIETE EN LA PLAZA DEL DISTRITO FEDERAL. -------------------------------------------------------------------------------------------------------

----- C E R T I F I C O: Que el documento, que obra en cinco páginas útiles, es una impresión fiel de la información que tuve a la vista en la red mundial de comunicaciones denominada "Internet", en la dirección electrónica https://gbm.com/plus/ de Grupo Bursátil Mexicano, con el cual la cotejé, según consta en el **ACTA NÚMERO SEIS MIL QUINIENTOS OCHENTA Y TRES** y que agregué al archivo con la letra **"C"** de esta misma fecha. -- DOY FE. ---

----- En la Ciudad de México, a los once días del mes de agosto de dos mil veintidós. --------------------------------------







**NO NEGOCIABLE**

Con fundamento en lo dispuesto por la Ley del Mercado de Valores y en uso de las facultades que el art. **290** fracción **II**, de la mencionada Ley concede a **S.D. INDEVAL INSTITUCIÓN PARA EL DEPOSITO DE VALORES, S.A. de C.V.**, se hace constar que al cierre del día **11 de agosto de 2022** en la bóveda de esta institución se mantiene en custodia a nombre de ***GRUPO BURSATIL MEXICANO, S. A. DE C. V., CASA DE BOLSA, acciones*** emitidas por ***CREDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.,*** de conformidad a la siguiente información:

| Cuenta | T.V. | Emisora | Serie | Cupón | Posición |
|--------|------|---------|-------|-------|----------|
| 010121503 | 0 | CREAL | * | 0000 | 69,042,719 |

Esta constancia se expide a solicitud del ***Depositante*** el día ***12 de agosto de 2022.***

**ATENTAMENTE.**

**Lic. Luis Enrique Flores Torres**
**Gerente de Ejercicio de Derechos Nacionales**







JESUS NAVA MORENO

AV JUAREZ SUR 424
COL. San Lorenzo
DEL/POB. Texcoco, Edo Mexico, Mexico
CP 56140 CR 56101

Contrato: AKJ78601
RFC: NAMJ721014J27

Ejecutivo
Equipo de Atención a Inversionistas

Teléfono Dir.
(01) 54 80 58 00

**GBM**
GRUPO BURSÁTIL MEXICANO

Hoja 1 de 11

Periodo
DEL 1 AL 31 DE ENERO DE 2022

## RESUMEN DEL PORTAFOLIO

| PORTAFOLIO | SALDO AL 31-DIC-21 | SALDO AL 31-ENE-22 | % DE PORTAFOLIO |
|---|---|---|---|
| DEUDA | 0.00 | 0.00 | 0.00 |
| RENTA VARIABLE | 344,292.75 | 256,816.84 | 100.00 |
| VALORES EN CORTO / PRÉSTAMO DE VALORES | 0.00 | 0.00 | 0.00 |
| FONDO DE FONDOS | 0.00 | 0.00 | 0.00 |
| GARANTÍAS | 0.00 | 0.00 | 0.00 |
| OTRAS INVERSIONES | 0.00 | 0.00 | 0.00 |
| CREDITOS DE MARGEN | 0.00 | 0.00 | 0.00 |
| EFECTIVO | 36.87 | 2.20 | 0.00 |
| DERIVADOS | 0.00 | 0.00 | 0.00 |
| **VALOR DEL PORTAFOLIO** | **344,329.62** | **256,819.04** | **100.00** |

VALOR TOTAL DE LAS GARANTIAS          0.00          0.00

## COMPOSICIÓN DEL PORTAFOLIO



■ RENTA VARIABLE

### MOVIMIENTOS

| | DEL 1 AL 31 DE ENERO DE 2022 |
|---|---|
| ENTRADAS DE EFECTIVO | 15,000.00 |
| SALIDAS DE EFECTIVO | 0.00 |
| **SUBTOTAL DE EFECTIVO** | **15,000.00** |
| DEPOSITO DE VALORES | 0.00 |
| RETIRO DE VALORES | 0.00 |
| **SUBTOTAL VALORES** | **0.00** |
| DERECHOS PATRIMONIALES | 1.72 |
| COMISIONES | 1,021.08 |
| **SALDO NETO DE MOVIMIENTOS** | **13,980.64** |

### AVISOS

Le recordamos que en el mes de febrero de 2022 recibirá en su correo electrónico registrado las constancias fiscales por los ingresos y retenciones del ejercicio 2021. Asimismo, podrá consultarlas directamente en su portal electrónico.



LIC. CARLOS ROBERTO GARCIA ANGELES
ESTADOS UNIDOS MEXICANOS
CORREDOR PUBLICO No. 77 PLAZA DEL DISTRITO FEDERAL

NOMBRE:
JESUS NAVA MORENO

Contrato
AK078601

Periodo
DEL 1 AL 31 DE ENERO DE 2022

Hoja: 2 de 11

**GBM**
GRUPO BURSÁTIL MEXICANO



# DESGLOSE DEL PORTAFOLIO
## RENTA VARIABLE

### ACCIONES

| EMISORA | NO.TÍTULOS MES ANTERIOR | NO.TÍTULOS MES ACTUAL | TÍT OTORGADOS EN PRÉSTAMO | COSTO PROMEDIO | COSTO TOTAL | PRECIO DE MERCADO | PRECIO DE MERCADO MES ANTERIOR | VALOR A MERCADO | PLUSVALÍA (MINUSVALÍA) | % DE LA CART. |
|---|---|---|---|---|---|---|---|---|---|---|
| CREAL ° | 35,140 | 40,915 | 0 | 7.463400 | 305,365.01 | 5.510000 | 8.210000 | 225,441.65 | (79,923.36) | 87.78 |
| NEMAK A | 4 | 41 | 0 | 5.715698 | 234.34 | 5.400000 | 6.080000 | 221.40 | (12.94) | 0.09 |
| **Total: ACCIONES** | | | | | | | | 225,663.05 | -79,936.30 | 87.87 |

### ACCIONES DEL SIC

| EMISORA | NO.TÍTULOS MES ANTERIOR | NO.TÍTULOS MES ACTUAL | TÍT OTORGADOS EN PRÉSTAMO | COSTO PROMEDIO | COSTO TOTAL | PRECIO DE MERCADO | PRECIO DE MERCADO MES ANTERIOR | VALOR A MERCADO | PLUSVALÍA (MINUSVALÍA) | % DE LA CART. |
|---|---|---|---|---|---|---|---|---|---|---|
| ATOS ° | 1,703 | 1,102 | 0 | 40.358365 | 44,474.92 | 28.270224 | 32.747520 | 31,153.79 | (13,321.13) | 12.13 |
| **Total: ACCIONES DEL SIC** | | | | | | | | 31,153.79 | -13,321.13 | 12.13 |

| **TOTAL RENTA VARIABLE** | | | | | | | | **256,816.84** | **-93,257.43** | **100.00** |





NOMBRE:
JESUS NAVA MORENO

Contrato
AK078601

Periodo
DEL 1 AL 31 DE ENERO DE 2022

Hoja: 3 de 11

GBM

GRUPO
BURSÁTIL
MEXICANO

| EFECTIVO | VALOR | % DE CART. |
|---|---|---|
| EFECTIVO MISMO DIA | 2.20 | 0.00 |
| EFECTIVO 24 HORAS | 0.00 | 0.00 |
| EFECTIVO 48 HORAS | 0.00 | 0.00 |
| EFECTIVO 72 HORAS | 0.00 | 0.00 |
| EFECTIVO MAYOR A 72 HORAS | 0.00 | 0.00 |
| TOTAL EN EFECTIVO | 2.20 | 0.00 |



**NOMBRE:** JESUS NAVA MORENO

**Contrato** AK078601

**Periodo** DEL 1 AL 31 DE ENERO DE 2022

**GBM**

Hoja: 4 de 11

GRUPO BURSÁTIL MEXICANO

## DESGLOSE DE MOVIMIENTOS

| FECHA OPER/LIQ | N° FOLIO | DESCRIPCIÓN OPERACIÓN | EMISORA | NÚMERO TÍTULOS | PRECIO UNITARIO | TASA REND. | PLAZO | COMISIÓN | INTERÉS | IMPUESTO | NETO | SALDO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01 | | Efectivo Inicial del Mes | Efec ini | 0 | 0.000000 | | | 0.00 | 0.00 | 0.00 | 36.87 | 36.87 |
| 03/03 | 143311487 | Compra en Reporto | BI 220127 | 2,410 | 9.962737 | 1.00 | 1 | 0.00 | 0.00 | 0.00 | 24,010.20 | -23,973.32 |
| 03/05 | 244958939 | Venta de Acciones. | ATOS* | 1 | 36.000000 | | | 0.07 | 0.00 | 0.01 | 35.92 | -23,937.41 |
| 03/05 | 244961739 | Venta de Acciones. | ATOS* | 10 | 36.000000 | | | 0.72 | 0.00 | 0.11 | 359.16 | -23,578.24 |
| 03/05 | 244962141 | Venta de Acciones. | ATOS* | 10 | 35.420000 | | | 0.72 | 0.00 | 0.12 | 359.16 | -23,219.08 |
| 03/05 | 244977332 | Venta de Acciones. | ATOS* | 682 | 8.120000 | | | 48.31 | 0.00 | 7.73 | 24,100.40 | 881.32 |
| 03/05 | 244978461 | Compra de Acciones. | CREAL* | 97 | 7.930000 | | | 1.58 | 0.00 | 0.25 | 789.47 | -2,791.85 |
| 03/05 | 244978609 | Compra de Acciones. | CREAL* | 300 | 7.930000 | | | 4.76 | 0.00 | 0.76 | 2,384.52 | -3,087.51 |
| 03/05 | 244987860 | Compra de Acciones. | CREAL* | 100 | 7.930000 | | | 1.59 | 0.00 | 0.25 | 794.84 | -5,472.03 |
| 03/05 | 244987988 | Compra de Acciones. | CREAL* | 300 | 7.930000 | | | 4.76 | 0.00 | 0.76 | 2,384.52 | -11,355.54 |
| 03/05 | 244988433 | Compra de Acciones. | CREAL* | 400 | 7.930000 | | | 6.34 | 0.00 | 1.02 | 3,179.36 | -13,420.42 |
| 03/05 | 244988571 | Compra de Acciones. | CREAL* | 300 | 7.930000 | | | 4.76 | 0.00 | 0.76 | 2,384.52 | -16,599.78 |
| 03/05 | 244988830 | Compra de Acciones. | CREAL* | 300 | 7.930000 | | | 4.76 | 0.00 | 0.76 | 2,384.52 | -17,402.57 |
| 03/05 | 244988433 | Compra de Acciones. | CREAL* | 300 | 7.930000 | | | 4.76 | 0.00 | 0.76 | 2,384.52 | -20,581.93 |
| 03/05 | 244988871 | Compra de Acciones. | CREAL* | 400 | 7.930000 | | | 6.34 | 0.00 | 1.02 | 3,179.36 | -20,573.98 |
| 03/05 | 244988740 | Compra de Acciones. | CREAL* | 100 | 7.930000 | | | 1.59 | 0.00 | 0.25 | 794.84 | -21,368.82 |
| 03/05 | 244988702 | Venta de Acciones. | CREAL* | 100 | 7.970000 | | | 1.59 | 0.00 | 0.25 | 794.84 | -22,163.66 |
| 03/05 | 244988963 | Venta de Acciones. | CREAL* | 1 | 7.970000 | | | 0.02 | 0.00 | 0.02 | 7.95 | -22,958.50 |
| 03/05 | 244989387 | Compra de Acciones. | CREAL* | 100 | 7.930000 | | | 1.59 | 0.00 | 0.25 | 794.84 | -23,999.74 |
| 03/05 | 244989813 | Compra de Acciones. | CREAL* | 100 | 7.930000 | | | 1.59 | 0.00 | 0.25 | 794.84 | -23,999.74 |
| 03/04 | 143390830 | Vencimiento de Reporto | BI 220127 | 2,410 | 9.963014 | 1.00 | 1 | 2.08 | 0.00 | 0.33 | 1,041.24 | 11.07 |
| 10/12 | 245592476 | Venta de Acciones. | CREAL* | 2,410 | 7.950000 | | | 0.67 | 0.00 | 0.05 | 24,010.20 | 11.07 |
| 10/12 | 245594438 | Compra de Acciones. | NEMAK A | 10,000 | 5.970000 | | | 198.75 | 0.00 | 31.80 | 79,269.45 | 79,280.52 |
| 10/12 | 245594441 | Compra de Acciones. | NEMAK A | 1,090 | 5.970000 | | | 16.27 | 0.00 | 2.60 | 6,526.17 | 72,754.35 |
| 10/12 | 245594440 | Compra de Acciones. | NEMAK A | 1,100 | 5.970000 | | | 16.48 | 0.00 | 2.72 | 6,356.04 | 66,398.16 |
| 10/12 | 245594443 | Compra de Acciones. | NEMAK A | 600 | 5.970000 | | | 16.42 | 0.00 | 2.63 | 1,596.19 | 64,958.11 |
| 10/12 | 245594441 | Compra de Acciones. | NEMAK A | 193 | 5.970000 | | | 8.96 | 0.00 | 1.43 | 3,592.39 | 60,779.73 |
| 10/12 | 245594624 | Compra de Acciones. | NEMAK A | 85 | 5.970000 | | | 2.88 | 0.00 | 0.46 | 1,155.55 | 59,624.18 |
| 10/12 | 245595352 | Compra de Acciones. | NEMAK A | 273 | 5.970000 | | | 4.07 | 0.00 | 1.01 | 1,634.54 | 57,989.57 |
| 10/12 | 245595555 | Compra de Acciones. | CREAL* | 10 | 5.970000 | | | 0.20 | 0.00 | 0.65 | 78.53 | 55,445.03 |
| 10/12 | 245595890 | Compra de Acciones. | NEMAK A | 174 | 7.830000 | | | 2.60 | 0.00 | 0.03 | 1,041.79 | 55,366.50 |
| 10/12 | 245595892 | Compra de Acciones. | NEMAK A | 8,000 | 5.970000 | | | 11.40 | 0.00 | 0.42 | 47,895.50 | 54,324.71 |
| 10/12 | 245615021 | Compra de Acciones. | CREAL* | 845 | 7.830000 | | | 12.61 | 0.00 | 19.10 | 5,059.28 | 6,429.21 |
| 10/12 | 245615128 | Compra de Acciones. | CREAL* | 100 | 7.830000 | | | 1.96 | 0.00 | 2.02 | 785.27 | 1,366.93 |
| 10/12 | 245677232 | Compra de Acciones. | CREAL* | 74 | 7.550000 | | | 1.45 | 0.00 | 0.31 | 581.00 | 581.66 |
| 10/12 | 245677235 | Compra de Acciones. | CREAL* | 18 | 5.970000 | | | 0.35 | 0.00 | 0.23 | 148.89 | 0.56 |
| 13/17 | 246057140 | Venta de Acciones. | NEMAK A | 18 | 5.970000 | | | 0.34 | 0.00 | 0.06 | 136.29 | 149.45 |
| 13/17 | 246057143 | Venta de Acciones. | NEMAK A | 58 | 5.970000 | | | 0.87 | 0.00 | 0.05 | 345.26 | 5.15 |
| 13/17 | 246057144 | Venta de Acciones. | NEMAK A | 29 | 5.970000 | | | 89.55 | 0.00 | 0.14 | 11.91 | 350.41 |
| 13/17 | 246057145 | Venta de Acciones. | NEMAK A | 6,000 | 5.970000 | | | 22.39 | 0.00 | 14.33 | 35,716.63 | 36,239.16 |
| 13/17 | 246057148 | Venta de Acciones. | NEMAK A | 200 | 5.970000 | | | 2.99 | 0.00 | 0.48 | 1,190.54 | 37,429.70 |
| 13/17 | 246057149 | Venta de Acciones. | NEMAK A | 1,500 | 5.970000 | | | 22.39 | 0.00 | 3.58 | 8,929.03 | 46,358.73 |
| 13/17 | 246057153 | Venta de Acciones. | NEMAK A | 200 | 5.970000 | | | 1.49 | 0.00 | 0.24 | 986.27 | 47,558.00 |
| 13/17 | 246058311 | Venta de Acciones. | NEMAK A | 542 | 5.970000 | | | 8.09 | 0.00 | 1.29 | 3,226.36 | 50,180.35 |
| 13/17 | 246058965 | Venta de Acciones. | NEMAK A | 271 | 5.970000 | | | 4.04 | 0.00 | 0.65 | 1,613.18 | 51,793.53 |
| 13/17 | 246058967 | Compra de Acciones. | CREAL* | 2 | 5.970000 | | | 0.03 | 0.00 | 0.00 | 11.91 | 51,805.43 |
| 13/17 | 246059007 | Compra de Acciones. | CREAL* | 70 | 7.270000 | | | 1.27 | 0.00 | 0.20 | 510.38 | 51,287.77 |
| 13/17 | 246059674 | Compra de Acciones. | CREAL* | 130 | 7.270000 | | | 2.36 | 0.00 | 0.38 | 947.84 | 50,339.93 |
| 13/17 | 246060689 | Compra de Acciones. | CREAL* | 5 | 7.270000 | | | 0.09 | 0.00 | 0.01 | 36.46 | 50,303.47 |
| 13/17 | 246061008 | Compra de Acciones. | CREAL* | 66 | 7.270000 | | | 1.19 | 0.00 | 0.19 | 481.21 | 49,822.26 |
| 13/17 | 246061009 | Compra de Acciones. | CREAL* | 234 | 7.270000 | | | 4.25 | 0.00 | 0.68 | 1,706.11 | 48,116.15 |
| 13/17 | 246061097 | Compra de Acciones. | CREAL* | 1 | 7.270000 | | | 0.02 | 0.00 | 0.00 | 7.29 | 48,108.86 |
| 13/17 | | Compra de Acciones. | CREAL* | 70 | 7.270000 | | | 1.27 | 0.00 | 0.20 | 531.38 | 47,598.48 |
| 13/17 | | Compra de Acciones. | CREAL* | 330 | 7.270000 | | | 6.00 | 0.00 | 0.96 | 2,406.06 | 45,196.42 |
| 13/17 | | Compra de Acciones. | CREAL* | 71 | 7.270000 | | | 1.29 | 0.00 | 0.21 | 517.67 | 44,674.76 |

LIC. CARLOS ALBERTO GARCÍA ÁNGELES — CORREDOR PÚBLICO No. 29 — PLAZA DEL DISTRITO FEDERAL — ESTADOS UNIDOS MEXICANOS

| NOMBRE: | Contrato | Período | | GBM |
|---|---|---|---|---|
| JESUS NAVA MORENO | AK078601 | DEL 1 AL 31 DE ENERO DE 2022 | | GRUPO BURSÁTIL MEXICANO — Hoja: 5 de 11 |

| FECHA OPER/LIQ | N° FOLIO | DESCRIPCIÓN OPERACIÓN | EMISORA | NÚMERO TÍTULOS | PRECIO UNITARIO | TASA REND. | PLAZO | COMISIÓN | INTERÉS | IMPUESTO | NETO | SALDO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13/17 | 246061099 | Compra de Acciones. | CREAL * | 6,127 | 7.2700000 | | | 111.36 | 0.00 | 17.82 | 44,672.47 | 2.29 |
| 13/17 | 246066281 | Venta de Acciones. | NEMAK A | 4,000 | 5.9500000 | | | 59.50 | 0.00 | 9.52 | 23,710.98 | 23,713.27 |
| 13/17 | 246066381 | Compra de Acciones. | CREAL * | 67 | 7.3000000 | | | 1.22 | 0.00 | 0.20 | 490.52 | 23,242.75 |
| 13/17 | 246066184 | Compra de Acciones. | CREAL * | 33 | 7.3000000 | | | 0.60 | 0.00 | 0.10 | 241.60 | 23,001.15 |
| 13/17 | 246067092 | Compra de Acciones. | CREAL * | 1 | 7.3000000 | | | 0.02 | 0.00 | 0.00 | 7.32 | 22,993.83 |
| 14/18 | 246174417 | Compra de Acciones. | ATOS * | 153 | 29.0100000 | | | 1.10 | 0.00 | 1.78 | 4,451.40 | 18,542.43 |
| 14/18 | 246194279 | Venta de Acciones. | ATOS * | 7 | 29.9900000 | | | 0.52 | 0.00 | 0.08 | 209.32 | 18,751.75 |
| 14/18 | 246195370 | Venta de Acciones. | ATOS * | 7 | 29.9900000 | | | 0.52 | 0.00 | 0.08 | 209.32 | 18,961.07 |
| 14/18 | 246196834 | Venta de Acciones. | ATOS * | 4 | 29.9900000 | | | 0.30 | 0.00 | 0.05 | 119.61 | 19,080.68 |
| 14/18 | 246195554 | Venta de Acciones. | ATOS * | 10 | 29.9900000 | | | 0.75 | 0.00 | 0.12 | 299.03 | 19,379.72 |
| 14/18 | 246197589 | Venta de Acciones. | ATOS * | 1 | 29.9900000 | | | 0.08 | 0.00 | 0.01 | 29.90 | 19,409.62 |
| 14/18 | 246200942 | Compra de Acciones. | NEMAK A | 2,989 | 5.6900000 | | | 42.52 | 0.00 | 6.80 | 17,056.73 | 2,352.89 |
| 14/18 | 246206720 | Venta de Acciones. | ATOS * | 2 | 29.9900000 | | | 0.15 | 0.00 | 0.02 | 59.81 | 2,412.69 |
| 14/18 | 246206720 | Venta de Acciones. | ATOS * | 10 | 29.9900000 | | | 0.75 | 0.00 | 0.12 | 299.03 | 2,711.72 |
| 14/18 | 246215746 | Venta de Acciones. | ATOS * | 2 | 29.8500000 | | | 0.15 | 0.00 | 0.02 | 59.53 | 2,771.25 |
| 14/18 | 246216238 | Venta de Acciones. | ATOS * | 20 | 29.8500000 | | | 1.49 | 0.00 | 0.24 | 595.27 | 3,366.52 |
| 14/18 | 246227945 | Venta de Acciones. | ATOS * | 3 | 29.8500000 | | | 0.22 | 0.00 | 0.04 | 89.29 | 3,455.81 |
| 14/18 | 246229613 | Venta de Acciones. | ATOS * | 10 | 29.8500000 | | | 0.75 | 0.00 | 0.12 | 299.63 | 3,755.44 |
| 14/18 | 246232552 | Venta de Acciones. | ATOS * | 15 | 29.8500000 | | | 1.12 | 0.00 | 0.18 | 446.45 | 4,199.89 |
| 14/18 | 246232564 | Compra de Acciones. | ATOS * | 44 | 29.0200000 | | | 3.19 | 0.00 | 0.51 | 1,280.58 | 2,919.31 |
| 14/18 | 246243711 | Compra de Acciones. | NEMAK A | 35 | 5.8100000 | | | 0.51 | 0.00 | 0.08 | 203.66 | 2,715.65 |
| 14/18 | 246243712 | Venta de Acciones. | NEMAK A | 600 | 5.8100000 | | | 8.72 | 0.00 | 1.39 | 3,475.89 | 6,191.54 |
| 14/18 | 246243715 | Venta de Acciones. | NEMAK A | 1,100 | 5.8100000 | | | 15.98 | 0.00 | 2.56 | 6,372.47 | 12,564.01 |
| 14/18 | 246243907 | Compra de Acciones. | CREAL * | 300 | 7.2400000 | | | 5.43 | 0.00 | 0.87 | 2,178.30 | 10,385.71 |
| 14/18 | 246243929 | Venta de Acciones. | NEMAK A | 30 | 5.8100000 | | | 0.44 | 0.00 | 0.07 | 173.79 | 10,559.51 |
| 14/18 | 246244070 | Venta de Acciones. | NEMAK A | 20 | 5.8100000 | | | 0.34 | 0.00 | 0.05 | 115.86 | 10,675.37 |
| 14/18 | 246244510 | Venta de Acciones. | NEMAK A | 22 | 5.8100000 | | | 0.32 | 0.00 | 0.05 | 127.45 | 10,802.82 |
| 14/18 | 246244618 | Venta de Acciones. | NEMAK A | 49 | 5.8100000 | | | 0.71 | 0.00 | 0.11 | 283.86 | 11,086.68 |
| 14/18 | 246244628 | Venta de Acciones. | NEMAK A | 43 | 5.8100000 | | | 0.62 | 0.00 | 0.10 | 249.11 | 11,335.79 |
| 14/18 | 246244687 | Venta de Acciones. | NEMAK A | 37 | 5.8100000 | | | 0.54 | 0.00 | 0.09 | 214.35 | 11,550.13 |
| 14/18 | 246244757 | Venta de Acciones. | NEMAK A | 60 | 5.8100000 | | | 0.87 | 0.00 | 0.14 | 347.59 | 11,897.72 |
| 14/18 | 246244778 | Compra de Acciones. | NEMAK A | 74 | 5.8100000 | | | 1.34 | 0.00 | 0.21 | 537.31 | 11,360.41 |
| 14/18 | 246244819 | Compra de Acciones. | NEMAK A | 1,356 | 5.8100000 | | | 24.54 | 0.00 | 0.31 | 9,511.21 | 9,514.50 |
| 14/18 | 246244844 | Venta de Acciones. | NEMAK A | 21 | 5.8100000 | | | 0.31 | 0.00 | 0.05 | 121.66 | 1,636.16 |
| 14/18 | 246244870 | Venta de Acciones. | NEMAK A | 31 | 5.8100000 | | | 0.45 | 0.00 | 0.07 | 179.59 | 1,815.74 |
| 14/18 | 246244881 | Compra de Acciones. | CREAL * | 225 | 7.2400000 | | | 4.07 | 0.00 | 0.65 | 1,633.72 | 182.02 |
| 14/18 | 246244894 | Venta de Acciones. | NEMAK A | 39 | 5.8100000 | | | 0.58 | 0.00 | 0.23 | 229.53 | 407.65 |
| 14/18 | 246244903 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 987.37 |
| 14/18 | 246244919 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 1,566.58 |
| 14/18 | 246244933 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 2,145.90 |
| 14/18 | 246244945 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 2,725.21 |
| 14/18 | 246244972 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 3,304.53 |
| 14/18 | 246244993 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 3,883.84 |
| 14/18 | 246245029 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 4,463.16 |
| 14/18 | 246245388 | Venta de Acciones. | NEMAK A | 36 | 5.8100000 | | | 0.52 | 0.00 | 0.08 | 208.55 | 4,671.71 |
| 14/18 | 246245437 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 5,251.03 |
| 14/18 | 246246463 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 5,830.34 |
| 14/18 | 246246479 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 6,410.66 |
| 14/18 | 246246519 | Venta de Acciones. | NEMAK A | 100 | 5.8100000 | | | 1.45 | 0.00 | 0.23 | 579.32 | 6,988.97 |
| 14/18 | 246246548 | Venta de Acciones. | NEMAK A | 62 | 5.8100000 | | | 0.90 | 0.00 | 0.14 | 359.18 | 7,348.15 |
| 14/18 | 246245388 | Compra de Acciones. | CREAL * | 300 | 7.2400000 | | | 5.43 | 0.00 | 0.87 | 2,178.30 | 5,169.85 |
| 14/18 | 246245437 | Compra de Acciones. | CREAL * | 200 | 7.2400000 | | | 3.62 | 0.00 | 0.58 | 1,452.20 | 2,717.65 |
| 14/18 | 246246463 | Compra de Acciones. | CREAL * | 100 | 7.2400000 | | | 1.81 | 0.00 | 0.29 | 726.10 | 2,991.55 |
| 14/18 | 246246479 | Compra de Acciones. | CREAL * | 100 | 7.2400000 | | | 1.81 | 0.00 | 0.29 | 726.10 | 2,265.45 |
| 14/18 | 246246519 | Compra de Acciones. | CREAL * | 100 | 7.2400000 | | | 1.81 | 0.00 | 0.29 | 726.10 | 1,539.35 |
| 14/18 | 246246548 | Compra de Acciones. | CREAL * | 112 | 7.2400000 | | | 2.03 | 0.00 | 0.32 | 813.23 | 813.23 |
| 17/17 | 154071583 | Compra en Reporto | BI 120127 | 2,302 | 9.9849120 | 1.00 | 1 | 0.00 | 0.00 | 0.00 | 22,985.27 | 0.02 |
| 17/19 | 154071584 | Vencimiento de Reporto | BI 120127 | 2,300 | 9.9851890 | 1.00 | 1 | 0.00 | 0.00 | 0.00 | 22,985.25 | -22,985.25 |
| 18/20 | 246402424 | Venta de Acciones. | ATOS * | 10 | 31.6000000 | | | 0.79 | 0.00 | 0.13 | 315.08 | -22,932.19 |
| 18/20 | 246448176 | Compra de Acciones. | CREAL * | 47 | 7.2400000 | | | 0.85 | 0.00 | 0.14 | 341.27 | 347.28 |
| | | | | | | | | | | | | 6.01 |

NOMBRE:
JESUS NAVA MORENO

Contrato
AK078601

Periodo
DEL 1 AL 31 DE ENERO DE 2022

GBM
GRUPO BURSÁTIL MEXICANO

Hoja: 6 de 11

| FECHA OPER/LIQ | N° FOLIO | DESCRIPCIÓN OPERACIÓN | EMISORA | NÚMERO TÍTULOS | PRECIO UNITARIO | TASA REND. | PLAZO | COMISIÓN | INTERÉS | IMPUESTO | NETO | SALDO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26/26 | 63684673 | DEPOSITO DE EFECTIVO | Efec* | 0 | 0.000000 | | | 0.00 | 0.00 | 0.00 | 15,000.00 | 15,006.01 |
| 26/28 | 247600619 | Compra de Acciones. | CREAL* | 224 | 6.670000 | | | 3.74 | 0.00 | 0.60 | 1,498.41 | 13,507.60 |
| 26/28 | 247600625 | Compra de Acciones. | CREAL* | 54 | 6.670000 | | | 0.90 | 0.00 | 0.14 | 361.22 | 13,146.37 |
| 26/28 | 247600759 | Compra de Acciones. | CREAL* | 200 | 6.670000 | | | 3.34 | 0.00 | 0.53 | 1,337.87 | 11,808.51 |
| 26/28 | 247600947 | Compra de Acciones. | CREAL* | 24 | 6.670000 | | | 0.40 | 0.00 | 0.06 | 160.54 | 11,647.96 |
| 26/28 | 247600950 | Compra de Acciones. | CREAL* | 176 | 6.670000 | | | 2.93 | 0.00 | 0.47 | 1,177.32 | 10,470.64 |
| 26/28 | 247601008 | Compra de Acciones. | CREAL* | 224 | 6.670000 | | | 3.74 | 0.00 | 0.60 | 1,498.41 | 8,972.22 |
| 26/28 | 247601012 | Compra de Acciones. | CREAL* | 776 | 6.670000 | | | 12.94 | 0.00 | 2.07 | 5,190.93 | 3,781.29 |
| 26/28 | 247601290 | Compra de Acciones. | CREAL* | 224 | 6.670000 | | | 3.74 | 0.00 | 0.60 | 1,498.41 | 2,282.88 |
| 26/28 | 247601391 | Compra de Acciones. | CREAL* | 341 | 6.670000 | | | 5.69 | 0.00 | 0.91 | 2,281.07 | 1.82 |
| 26/27 | 162780315 | Compra en Reporto | BI 220407 | 1,518 | 9.882123 | 1.00 | 1 | 0.00 | 0.00 | 0.00 | 15,001.06 | -14,999.25 |
| 28/28 | 162780316 | Vencimiento de Reporto | BI 220407 | 1,518 | 9.882397 | 1.00 | 1 | 0.00 | 0.42 | 0.03 | 15,001.45 | 2.20 |



NOMBRE:
JESUS NAVA MORENO

Contrato
AK078601

Periodo
DEL 1 AL 31 DE ENERO DE 2022



Hoja: 7 de 11

GBM
GRUPO
BURSÁTIL
MEXICANO

## RENDIMIENTO DEL PORTAFOLIO

| Periodo | Global Bruto pesos | porcentaje | Global Neto pesos | porcentaje |
|---|---|---|---|---|
| Del 02/02/2021 al 26/02/2021 | 11,009.91 | 3.89% | 11,009.91 | 3.89% |
| Del 01/03/2021 al 31/03/2021 | (31,705.49) | (9.85)% | (31,705.49) | (9.85)% |
| Del 05/04/2021 al 30/04/2021 | 22,265.11 | 7.61% | 22,265.11 | 7.61% |
| Del 03/05/2021 al 31/05/2021 | 42,267.69 | 13.21% | 42,267.69 | 13.21% |
| Del 01/06/2021 al 30/06/2021 | 27,976.66 | 7.97% | 27,976.66 | 7.97% |
| Del 01/07/2021 al 30/07/2021 | 27,657.14) | (7.45)% | 27,657.14) | (7.45)% |
| Del 02/08/2021 al 31/08/2021 | (14,016.63) | (4.02)% | (14,016.63) | (4.02)% |
| Del 01/09/2021 al 30/09/2021 | (56,312.24) | (16.49)% | (56,312.24) | (16.49)% |
| Del 01/10/2021 al 29/10/2021 | (23,918.55) | (8.21)% | (23,923.27) | (8.21)% |
| Del 01/11/2021 al 30/11/2021 | 53,788.51 | 19.72% | 53,746.22 | 19.71% |
| Del 01/12/2021 al 31/12/2021 | 17,894.37 | 5.48% | 17,881.91 | 5.48% |
| Del 03/01/2022 al 31/01/2022 | (102,510.45) | (29.56)% | (102,510.58) | (29.56)% |

La moneda utilizada en el cálculo del rendimiento es en pesos mexicanos.

## COMPOSICIÓN FISCAL INFORMATIVA.

| NOMBRE | ISR RETENIDO POR INTERESES | DIVIDENDOS | DIVIDENDOS ACUMULABLES | ISR ACREDITABLE POR DIVIDENDOS ACUMULABLES | ISR DIVIDENDOS DEFINITIVO | ISR CAPITALES DEFINITIVO |
|---|---|---|---|---|---|---|
| JESUS NAVA MORENO | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTALES: | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total de ISR Retenido: 0.00 % (proporción del valor del portafolio a cierre del mes)
La retención del Impuesto sobre la Renta (ISR) se realiza de conformidad con disposiciones fiscales vigentes establecidas en la Ley del Impuesto sobre la Renta (LISR) y demás disposiciones fiscales que sean aplicables; atendiendo a la residencia fiscal del inversionista.

CANTIDAD    1

Total de Comisiones Cobradas: 0.40% (proporción del valor del portafolio a cierre del mes)

Las comisiones se calculan multiplicando el importe de la operación (compra/venta) de valores, por el porcentaje acordado con la Casa de Bolsa para cada una de las operaciones respectivas, o bien conforme al importe acordado como "management fee" aplicado al valor de la cartera en portafolio.
Si requiere información adicional, no dude en consultar a su asesor, quien le proporcionará todos los detalles que necesite

## DESGLOSE DE COMISIONES COBRADAS °

| Concepto | Importe | IVA |
|---|---|---|
| Comisiones y gastos de Intermediación | 1,021.08 | 163.37 |
| Comisiones y gastos por Servicios | 0.00 | 0.00 |
| Comisiones y gastos administrativos | 0.00 | 0.00 |
| Totales: | 1,021.08 | 163.37 |

° En el periodo pueden haber cargos por concepto de comisiones y gastos afectos a diversas tasas de I.V.A. o, en su caso, exentos



**GBM**

Hoja: 8 de 11

GRUPO BURSÁTIL MEXICANO

NOMBRE:
JESUS NAVA MORENO

Contrato
AKJ78601

Periodo
DEL 1 AL 31 DE ENERO DE 2022

## CONSTANCIA INFORMATIVA

### CAPITALES

| EMISORA | NO. TÍTULOS | COSTO PROMEDIO FISCAL | COSTO TOTAL FISCAL | PRECIO DE MERCADO | VALOR A MERCADO | PLUSVALÍA MINUSVALÍA FISCAL | GANANCIA PÉRDIDA FISCAL REALIZADA EN EL MES | GANANCIA PÉRDIDA FISCAL REALIZADA ACUMULADA |
|---|---|---|---|---|---|---|---|---|
| ATOS* | 1,102 | 40.640572 | 44,785.91 | 28.270224 | 31,153.79 | (13,632.12) | (6,620.17) | (6,620.17) |
| CREAL* | 40,915 | 7.494527 | 306,638.56 | 5.510000 | 225,441.65 | (81,196.91) | 2,727.11 | 2,727.11 |
| NEMAK A | 41 | 5.715699 | 234.34 | 5.400000 | 221.40 | (12.94) | (246.74) | (246.74) |

GANANCIA O PÉRDIDA FISCAL ACUMULADA 1     (4,139.80)

1.- Base de cálculo del ISR o pérdida realizada acumulada.

Nota: Cifras determinadas conforme a la legislación fiscal vigente.





**GBM**

GRUPO
BURSÁTIL
MEXICANO

Hoja: 9 de 11

NOMBRE:
JESUS NAVA MORENO

Contrato
AK078601

Periodo
DEL 1 AL 31 DE ENERO 2022

## Detalle de Depósitos Liquidados por SPEI

| DENOMINACIÓN DEL EMISOR | FECHA Y HORA, DE LIQUIDACIÓN | CLABE DEL REMITENTE | MONTO | REMITENTE | CLAVE DE RASTREO | REFERENCIA NUMÉRICA | CONCEPTO DE PAGO |
|---|---|---|---|---|---|---|---|
| BBVA BANCOMER | 26-01-2022 13:51:13 | 012180014753092476 | 15,000.00 | JESUS NAVA MORENO | BNET01002201260044038979 | 78601 | AK078601 |

LIC. CARLOS ROBERTO GARCIA ANGELES
CORREDOR PÚBLICO No. 77 PLAZA DEL DISTRITO FEDERAL
ESTADOS UNIDOS MEXICANOS



**GBM**

GRUPO
BURSÁTIL
MEXICANO

Hoja: 10 de 11

NOMBRE:
JESUS NAVA MORENO

Contrato
AK/78601

Periodo
DEL 1 AL 31 DE ENERO DE 2022

**DATOS FISCALES**

CADENA ORIGINAL DEL COMPLEMENTO DE CERTIFICACION DIGITAL DEL SAT:
||1.1|975C3330-02FF-F841-A827-9806A1BAE7D8|2022-02-03T00:50:23|SCD11010565S4||HHUr/uwCuUCkWsE8T4e7Ma2Yyfj65to7s7FL8JWiUhTK1B2XyOHhS1k3krKXNpl11XAf7eacMU0nf2k2S12HWmj4vcICkUGjBYqPAB3ZhaoyTVMk
bXEsvqCc<cEhCbHiQEX<jyoULbigiriQLOBc11HKvk5seGsmzeqtzudk62V+Uf5/5/nVhdtAcQnp4QPrgRYDWHpcHUbyshLBs+OTEmUof6GXGcZBp3vQmSmti7nfJNXETdL3vZQhc0Q2wwSYcsxv2H42OUOd8RnI8TOIvTM54VY5CnJ387ELle
Ap9V/zop83LpBF7SIWgNo5WWOyN8F03+kK4d1i0H4icPvrTqA==|00001000000502000436||

**Sello Digital del Emisor:**
jbHUr/uwCuUCkWsE8T4e7Ma2Yyfj65to7s7FL8JWiUhTK1B2XyOHhS1k3krKXNpl11XAf7eacMU0nf2k2S12HWmj4vcICkUGjBYqPAB3ZhaoyTVMkbXEsvqCc<cEhCbHiQEX<jyoULbigiriQLO
Bc11HKvk5seGsmzeqtzudk62V+Uf5/5/nVhdtAcQnp4QPrgRYDWHpcHUbyshLBs+OTEmUof6GXGcZBp3vQmSmti7nfJNXETdL3vZQhc0Q2wwSYcsxv2H42OUOd8RnI8TOIvTM54VY5CnJ38
7EUeAp9V/zop83LpBF7SIWgNo5WWOyN8F03+kK4d1i0H4icPvrTqA==

**Sello Digital del SAT:**
DwMRu2PJ0BpS0CriyARtweETUKOyY5HQifFEFFnzKdRy6EgK2dYauumzX1KMthwfO9Y8HUzxHqP3xPXV8uP0LLeZ+tAcYqrhyFCsGbpFaWgGGiw5W9GGPhBxATSsjXhP64H24A6FxfN/84
3XAXAvJ8RbhOcoqPWE4haQrwkl/nGChGcd0vDIcHf16/RAGPWQNYMkmR4tCqwvH536fJV1/MgMirC8ZOheM4SQHuGq7iZPoe7XiPcNnbkgRm8Shx4SnvEvotLzIXb7+aIYRnNSDibAQkVAZOvC
SWNsnHueH9JKin6hCvgstU5/ZCoRbNxd3ydQ0X5Q1H6gKuwd+pbc2aw==

Emisor: GRUPO BURSATIL MEXICANO S.A. DE C.V., CASA DE BOLSA   RFC: GGB800116ZD0
Dirección Fiscal: Av. De los Insurgentes Sur No. 1605 No. Int. 31 San José Insurgentes Cuidad de México México CP: 03900

Régimen Fiscal: 601 - General de Ley Personas Morales; Lugar de Expedición: 03900, Método de Pago: PUE - Pago en una sola exhibición;
Unidad de medida: E48 - Unidad de servicio; No de identificación: 84121500 - Instituciones bancarias
Forma de Pago: 03 - Transferencia electrónica de fondos
Uso del CFDI: G03 - Gastos en general

Esta representación impresa de CFDI no ampara retenciones

Folio Fiscal (UUID): 975C3330-02FF-F841-A827-9806A1BAE7D8
Número de certificado del Emisor: 00001000000505356191
Número de certificado del SAT: 00001000000502000436
Fecha de Expedición: 2022-02-02T02:37:26
Fecha de Timbrado: 03/02/2022 12:50:22 a. m.

Este Documento es una Representación impresa de un CFDI





# GBM



## EN CASO DE ACLARACIONES:

El Ejecutivo Edson Gabriel Navarro de la Rosa es el asignado a su contrato, sin embargo, usted puede ser atendido por cualquiera de nuestros ejecutivos del equipo de Atención a Inversionistas en los siguientes teléfonos:
55 5480 5846 o al 800 426 4663
O bien, si prefiere escribir a: homebroker@gbm.com.mx

## PARA CONSULTAS Y RECLAMACIONES:

En el caso de que tenga la necesidad de una consulta o reclamación, favor de comunicarse con el Titular de la Unidad Especializada de Consultas y Reclamaciones:
Lic. Olivia Montiel Nopal
Av. de los Insurgentes Sur número 1605, Piso 31, Col. San José Insurgentes, 03900, México, Ciudad de México.
54805848
une@gbm.com.mx
En el Horario de Atención de 9:00 a 18:00 horas de lunes a jueves y de 9:00 a 15:00 horas los viernes.

## CLAVE BANCARIA ESTANDARIZADA:

Le recordamos que para su seguridad y comodidad tenemos la opción de recibir sus transferencias electrónicas directamente a su Contrato a través del Sistema de Pagos Electrónicos Interbancario (SPEI). Sólo deberá de instruir al emisor del pago el número de cuenta Clave Bancaria Estandarizada (CLABE) asignada exclusivamente a su Contrato, la institución receptora Casa de Bolsa y el nombre del titular del contrato de intermediación Bursátil.
Los datos necesarios para hacer la transacción son los siguientes:

Institución: GBM        CLABE: 601180400005462545

Si alguno de nuestros asesores te solicita realizar depósitos o transferencias a una cuenta diferente, no lo hagas y denuncia este hecho en denunciamos@gbm.com.mx

## INFORMACION SOBRE FONDOS DE INVERSION:

La composición de las carteras, clasificaciones y calificaciones de los fondos de inversión distribuidos por Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa, se publican en la siguiente página de internet:
http://www.gbmfondos.com.mx/informacion-para-inversionistas

### Definiciones:
Fondo de Inversión de Deuda: Sociedad de Inversión en Instrumentos de Deuda
Fondo de Inversión de Renta Variable: Sociedad de Inversión en Instrumentos de Renta Variable

### Clasificación de Fondos de Inversión:

(listado de claves de fondos)

### Calificación de Fondos de Inversión de Deuda:

| FONDO | CALIFICACION | FONDO | CALIFICACION |
|---|---|---|---|
| GBMF2 | AAA3/f3(mex) | GBMRETO | AAAf/S5(mex) |
| GBMF3 | AAAf/f4(mex) | MPADORF | AAAf/S5(mex) |
| GBMT | AAAf/f3(mex) | | |
| GBMAG | AAAf/f1(mex) | | |
| GBMGOVL | AAAf/S2(mex) | | |

Todos los Fondos de Inversión de Deuda de GBM son calificados mensualmente por Fitch México, S.A. de C.V., considerando dos aspectos: Buena administración; cumplimiento de compromiso de pago, y calidad crediticia de los activos que administra:
AA Alta         A Buena
BB Baja         B Mínima

Riesgo de mercado: sensibilidad del valor de las inversiones ante los cambios en las variables económicas.
1 Extremadamente baja        5 Moderada Alta
2 Baja                        6 Alta
3 Baja Moderada               7 Muy Alta
4 Moderada

Para ver la calificación actual de cada fondo en otra fuente, lo referimos a la página de Fitch México:
http://www.fitchmexico.com

Para conocer los fondos de inversión que se encuentran sub-valuados, lo invitamos a visitar la liga:
https://gbmfondos.com.mx/home/pdf/soluciones/fiscas/razon/subvaluacion-GBM-Fondos.pdf

Le recordamos que las inversiones en acciones de las sociedades de inversión no garantizan rendimientos futuros, ni sus sociedades operadoras son responsables de las pérdidas que el inversionista pueda sufrir como consecuencia de dichas inversiones o aumenten el riesgo de las variaciones en el diferencial del precio a favor de los clientes.

## DATOS REFERENCIADOS:

1. En caso de que existan valores bajo la garantía llamada Prenda Bursátil con Transmisión de Propiedad ', este valor será únicamente de carácter informativo, ya que el mismo se encuentra sujeto al pago oportuno de los préstamos. En el supuesto antes señalado, valor real es el que se calcula restando el monto de los valores otorgados en Prenda Bursátil con Transmisión de Propiedad.
2. La propiedad de los valores otorgados en prenda bajo esta modalidad se restituye al cliente al efectuar el pago correspondiente.
3. Este dato incluye, en su caso, el número de títulos otorgados en préstamo.
4. Para calcular el valor de los fondos en dólares se usa el Tipo de Cambio VALMER AL 31-ENE-22

## PRIVACIDAD:

De conformidad a lo estipulado en la Ley Federal de Protección de Datos Personales en Posesión de los Particulares y como parte del compromiso de GBM por preservar la privacidad de la información, hacemos de su conocimiento que el aviso de privacidad respectivo mediante el cual, entre otros puntos, se informa la finalidad del tratamiento de sus datos, se encontrará publicado en la página web de esta Casa de Bolsa, http://www.gbm.com

## NOTAS ACLARATORIAS:

1. La abreviación efec '. significa efectivo.
2. Todos los importes y cálculos están expresados en Moneda Nacional
3. Si desea consultar la totalidad del folio de este comprobante fiscal digital por internet podrá ingresar a la página del Servicio de Administración Tributaria (SAT) en la sección http://www.verificacfdi.facturaelectronica.sat.gob.mx
4. El rubro "Derechos Patrimoniales" en la tabla de Movimientos engloba los conceptos relacionados a dividendos, intereses, reembolsos de capital y cualquier derecho por valores adquiridos.

## INFORMACION DE SU CONTRATO:

1. Actualmente los cotitulares que figuran en su contrato son:

## SPEI:

El Banco de México no será responsable por los daños y perjuicios. Incluso financieros, que se pudieran causar a Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa o a terceros, cuando por caso fortuito o fuerza mayor esta última no pueda tener acceso al SPEI o se presente una interrupción en la operación del citado sistema

Por caso fortuito o fuerza mayor se entenderá todo acontecimiento o circunstancia inevitable más allá del control razonable del propio Banco de México que le impida el cumplimiento de sus obligaciones. En tales casos, Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa se obliga a realizar las gestiones necesarias, así como, atender las instrucciones que, en su caso, le indique el Banco de México para estar en posibilidad de establecer a la brevedad posible la comunicación con el SPEI, aceptando en todo momento los procedimientos previstos en las disposiciones aplicables.

Asimismo, el Banco de México no asume responsabilidad alguna respecto de las fallas que puedan sufrir los equipos, programas o sistemas que utilice Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa utilice para la operación del SPEI, de las fallas que afecten el buen funcionamiento de los mismos, así como tampoco respecto de los daños y perjuicios, incluso financieros, que se causen con motivo de dichas fallas.

----- Yo, CARLOS ROBERTO GARCÍA ANGELES, CORREDOR PÚBLICO NÚMERO SETENTA Y SIETE EN LA

PLAZA DEL DISTRITO FEDERAL. -----------------------------------------------------------------------------------

----- C E R T I F I C O: Que el documento, que obra en once páginas útiles, es una impresión fiel de la información

que tuve a la vista en la red mundial de comunicaciones denominada "Internet", en la dirección electrónica

https://gbm.com/plus/ de Grupo Bursátil Mexicano, con el cual la cotejé, según consta en el **ACTA NÚMERO SEIS**

**MIL QUINIENTOS OCHENTA Y TRES** y que agregué al archivo con la letra **"B"** de esta misma fecha. -- DOY FE. ---

----- En la Ciudad de México, a los once días del mes de agosto de dos mil veintidós. --------------------------------------




# GBM

**Grupo Bursátil Mexicano**

Ciudad de México, a 12 de agosto de 2022.

A quien corresponda:

Por medio del presente informo, que el señor JESUS NAVA MORENO, tiene un contrato de intermediación bursátil con Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa (GBM), al amparo de éste mantiene la Cuenta AKJ78601.

De igual manera se señala que la Cuenta antes mencionada, mantiene al día de la fecha de la presente carta la siguiente posición.

| Volumen | Emisora |
|---------|---------|
| 200,600 | CREAL * |

Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa no se hace responsable por el uso indebido, pérdida, daño parcial o daño total de este documento, ni de los efectos que ello pudiere generar.

Atentamente.

Natalia Saldate Durón
Directora de Control Interno y Representante Legal

Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa
Avenida de los Insurgentes 1605, Piso 31,
Colonia San José Insurgentes, Benito Juárez,
Código Postal 03900, Ciudad de México, México
5480 5800
www.gbm.com

Grupo Bursátil Mexicano, S.A. de C.V. Casa de Bolsa
www.gbm.com.mx



NÚMERO 22
OFICIALÍA DE PARTES COMÚN
PARA JUZGADOS Y SALAS