**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 15 / Chapter 11 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., | Case No. 22-10630 (JTD)<br>Case No. 22-10696 (JTD) |
| | **Hearing Date: Sept. 19, 2022 at 10:00 a.m. (ET)**<br>**Obj. Deadline: August 26, 2022 at 4:00 p.m. (ET)** |
| Putative Debtor.[1] | |

**OBJECTION OF THE AD HOC GROUP TO THE (I) VERIFIED PETITION FOR
RECOGNITION OF FOREIGN MAIN PROCEEDING AND (II) MOTION OF THE
PUTATIVE DEBTOR TO DISMISS THE INVOLUNTARY CHAPTER 11 PETITION**

The ad hoc group (the "Ad Hoc Group") of certain unaffiliated (i) beneficial holders, and/or investment advisors or managers of beneficial holders (the "Noteholders") of the outstanding unsecured notes (the "Notes") issued by Crédito Real, S.A.B. de C.V., Sociedad Financiera de Objeto Multiple, Entidad No Regulada ("Crédito Real" or the "Putative Debtor") and (ii) lenders (collectively, the "Unsecured Lenders") under the Putative Debtor's prepetition unsecured credit facilities (the "Unsecured Bank Debt"), including the members of the Ad Hoc Group who are the petitioning creditors (the "Petitioning Creditors") that filed the involuntary chapter 11 petition (the "Involuntary Petition" and, the involuntary chapter 11 case commenced by the filing thereof, the "Involuntary Case") against the Putative Debtor, by and through its undersigned counsel, hereby submits this objection (the "Objection") to (i) the *Verified Petition for Recognition of Foreign Main Proceeding* [Case No. 22-10630 (JTD), Docket No. 2] (the "Verified Petition"), and (ii) the *Motion of the Putative Debtor to Dismiss the Involuntary Chapter 11 Petition* [Case No. 22-10696

---

[1]    The Putative Debtor's corporate headquarters is located at Avenida Insurgentes Sur No 730, 20th Floor, Colonia Del Valle Norte, Alcadía Benito Juárez, 03103, Mexico City, Mexico.

(JTD), Docket No. 5] (the "<u>Motion</u>").[2]  In support of this Objection, the Ad Hoc Group relies on (i) the *Declaration of Jorge Villen in Support of the Objection of the Ad Hoc Group to the (I) Verified Petition for Recognition of Foreign Main Proceeding and (II) Motion of the Putative Debtor to Dismiss the Involuntary Chapter 11 Petition* (the "<u>Villen Declaration</u>"), (ii) the *Declaration of Alejandro Sainz in Support of the Objection of the Ad Hoc Group to the (I) Verified Petition for Recognition of Foreign Main Proceeding and (II) Motion of the Putative Debtor to Dismiss the Involuntary Chapter 11 Petition* (the "<u>Sainz Declaration</u>"), and (iii) the *Declaration of Luis Manuel Camp Méjan Carrer* (the "<u>Méjan Declaration</u>"), each of which was filed contemporaneously herewith, and respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>[3]

1.      By the Motion and the Verified Petition, the Putative Debtor seeks to have this Court dismiss the Involuntary Case and defer to a procedurally and substantively flawed Mexican Liquidation that fails to satisfy the requirements for recognition under chapter 15 of the Bankruptcy Code, and that is of a type that has never been recognized by any court in the United States.  The goal of the Putative Debtor is clear: to hide behind a rarely-used Mexican liquidation proceeding that lacks transparency and deprives creditors of basic procedural and substantive fairness and thereby contravenes United States public policy, and to divert value away from its unsecured creditors in flagrant violation of the applicable United States-law governed documents, solely in an effort to shield its officers and directors from criminal and civil liability.  The Mexican Liquidation and subsequent request for chapter 15 recognition is nothing more than a sham process concocted by the individual controlling the Putative Debtor and is currently being undone through

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Verified Petition or the Motion, as applicable.

[3]   Capitalized terms used in this preliminary statement but not otherwise defined herein shall have the meanings ascribed to them below.

appeals and constitutional challenges in the Mexican judicial system. The Putative Debtor's attempts to thwart its creditors' efforts to enforce their rights in the Involuntary Case should not be permitted, and for the reasons set forth below, the Court should deny the Motion and the Verified Petition.

2.      First, the Mexican Liquidation cannot meet the definitional requirements for a foreign proceeding within the meaning of Bankruptcy Code section 101(23) and binding Third Circuit precedent. The Mexican Liquidation is not a "proceeding," is not "collective in nature," is not an insolvency proceeding, and does not subject the assets and affairs of the Putative Debtor to "control or supervision by a foreign court." The Mexican Liquidation is not governed by a statutory framework that imposes any material constraints on the Putative Debtor or the Mexican Liquidator, or that adequately regulates the final distribution of the Putative Debtor's assets. Nor is the Mexican Liquidation collective in nature because it does not contemplate meaningful participation by creditors. To the contrary, creditors effectively lack standing to appear and participate in the Mexican Liquidation. There is very limited ability for creditors to access information regarding the Mexican Liquidation, no notice is given to creditors of actions taken by the Mexican Court or the Mexican Liquidator, and creditors are thereby deprived of basic procedural due process. In fact, corporate dissolution and liquidation proceedings like the Mexican Liquidation were never intended to be used for anything other than straightforward liquidations involving few assets and no significant disputes, and thus, do not have detailed procedures for the participation of creditors or the liquidation and distribution of assets. Moreover, the Mexican Liquidation is a proceeding under the *Ley General de Sociedades Mercantiles* (the "Mexican Corporations Law") rather than under the *Ley de Concursos Mercantiles* (the "Concurso Law")— the well-established insolvency law in Mexico—and, as such, fails to provide the procedural and

substantive protections that creditors benefit from in a Mexican insolvency proceeding. Finally, the Mexican Liquidation grants substantial discretion to the Mexican Liquidator, without any judicial oversight.

3.     Second, recognition of the Mexican Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code would be manifestly contrary to United States public policy because it is procedurally unfair in several respects, including with respect to the lack of standing, lack of due process, and lack of information afforded to creditors. In addition, the Mexican Liquidation suffers from substantive flaws that threaten to violate fundamental rights and protections afforded to creditors under United States law. In particular, the Mexican Liquidation is not governed by any rules related to the priority or ranking of claims, which, when combined with the lack of meaningful oversight over the Mexican Liquidator, gives rise to the risk that distributions may be made in violation of the absolute priority rule or principles of equal treatment of creditors with oversight or approval by any court. In fact, the Putative Debtor is presently paying local creditors, whether secured or unsecured, in flagrant violation of the absolute priority rule and equal treatment. Moreover, the Mexican Liquidation fails to provide creditors with the right to bring avoidance actions, and was commenced in knowing violation of the automatic stay that was imposed under Bankruptcy Code section 362 upon the commencement of the Involuntary Case. These concerns are heightened by the fact that (i) Mr. Angel Francisco Romanos Berrondo ("Mr. Romanos")—the chair of the Putative Debtor's board, the founder of the Putative Debtor, and a significant shareholder—orchestrated major transfers of assets that can and should be avoided under United States law and (ii) Mr. Romanos commenced the Mexican Liquidation in his personal capacity as a shareholder to evade the transparency and judicial oversight that accompany true insolvency proceedings and to protect himself from personal liability. This Court

4

should not defer to a deeply flawed Mexican Liquidation that only facilitates Mr. Romanos' attempt to avoid accountability for his misconduct and the Putative Debtor's accounting fraud, and deprive United States creditors of basic fairness and due process.

4.      Third, there is no basis for dismissing the Involuntary Case under either Bankruptcy Code section 305(a)(1) or Bankruptcy Code section 1112(b).  With respect to dismissal under Bankruptcy Code section 305(a)(1), the Putative Debtor's assertions fail on the grounds that the Mexican Court and the Mexican Liquidator do not protect the interests of creditors, and the Mexican Liquidation is not the type of proceeding to which courts in the United States have ever deferred.  For that reason, the Putative Debtor's attempt to argue that the existence of the Mexican Liquidation weighs in favor of dismissal cannot withstand scrutiny—the Mexican Liquidation simply is not an insolvency proceeding that warrants deference by the Court, and in fact, if the Court were to defer to the Mexican Liquidation, creditors would be left without a forum in which they can meaningfully participate in proceedings or enforce their rights.  Moreover, the Putative Debtor's assertion that permitting the Involuntary Case to proceed would be administratively inefficient ignores the fact that the Mexican Liquidation was commenced after the filing of the Involuntary Petition and in knowing violation of the automatic stay.  Thus, any conflict or inefficiency is a result of the misconduct of Mr. Romanos and the Putative Debtor, rather than the Petitioning Creditors.  In addition, the facts and circumstances of this case make clear that the Involuntary Case was commenced for the legitimate purpose of preventing the depletion of assets by the Putative Debtor and Mr. Romanos —exactly what Mr. Romanos has orchestrated.  In fact, just as the Ad Hoc Group and the Petitioning Creditors feared, Mr. Romanos has destroyed the value of a valuable operating business to the detriment of the Putative Debtor's estate and its creditors solely for the purpose of avoiding personal liability.  Finally, with respect to dismissal

under Bankruptcy Code section 1112(b), it is plain that dismissal should not be granted because permitting the Involuntary Case to proceed will serve the interests of creditors by providing creditors with the rights and remedies necessary to recover assets and fund distributions, and that absent the Involuntary Case, unsecured creditors, including the Noteholders and the Unsecured Lenders, face a significant risk that they will receive little or nothing on account of their claims.

5.      Fourth, despite the Putative Debtor's assertions to the contrary, the Court has personal jurisdiction over the Putative Debtor based on the Putative Debtor's substantial contacts with and business dealings in the United States.  Among other things, the Putative Debtor has purposefully availed itself of financial markets in the United States to raise financing on multiple occasions.  Indeed, the Putative Debtor has issued approximately US$1.758 billion in Notes pursuant to transactions involving United States financial markets and financial institutions located in this country.  Moreover, the Putative Debtor has obtained Unsecured Bank Debt in the total aggregate amount of approximately US$320 million under credit facilities involving financial institutions located in the United States, including the United States International Development Financing Corporation, which is an agency of the United States government.  In addition, as the Putative Debtor acknowledges in the Motion, it directly owns equity interests in Crédito USA, with an estimated value of approximately US$85 million, and through Crédito Real and its other subsidiaries, the Putative Debtor conducts business throughout the United States.  These contacts are sufficient for the Court to exercise personal jurisdiction over the Putative Debtor, and doing so is otherwise fair and reasonable.

6.      Finally, the Putative Debtor's attempt to create a heightened standard for evidencing the holdings of the Petitioning Creditors is without merit and should be rejected.  Contrary to the

Putative Debtor's assertions, the Petitioning Creditors have adequately evidenced their holdings and have standing to file the Involuntary Petition.

7.      Based on the foregoing, the Ad Hoc Group and the Petitioning Creditors submit that the Motion and the Verified Petition should be denied, and that the Court should enter an order for relief in the Involuntary Case.

## BACKGROUND

8.      On February 9, 2022, the Putative Debtor defaulted under its 2.875% senior unsecured notes due 2022 (the "Swiss Notes") as a result of its failure to make a US$181 million payment at maturity.  The Putative Debtor's default under the Swiss Notes triggered cross-defaults under substantially all of the Putative Debtor's secured and unsecured debt documents, except for the 9.125% perpetual notes (the "Perpetual Notes").[4]

9.      On February 9, 2022, the Putative Debtor also announced the appointment of five new members (the "New Directors") to its board of directors (the "Board"), four of which allegedly were independent, and purportedly brought the size of the Board to nine members.  At the same time, the Putative Debtor also announced the resignation of five directors and five alternate directors.  Also on February 9, 2022, the Putative Debtor announced that it engaged DLA Piper LLP ("DLA") as its counsel and FTI Consulting, Inc. ("FTI") as its restructuring advisor.  In late February 2022, the Putative Debtor retained Jefferies Group LLC ("Jefferies") as its financial advisor.[5]

10.     In mid-February 2022, the Ad Hoc Group retained both Houlihan Lokey and Blink Capital Solutions as financial advisor, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as

---

[4]     Villen Declaration ¶ 6.

[5]     *Id.* ¶ 7.

its United States legal counsel, and Sainz Abogados as its Mexican legal counsel (collectively, the "Ad Hoc Group Advisors").  Following the retention of the Ad Hoc Group Advisors, the Ad Hoc Group began engaging in discussions with the Putative Debtors regarding a potential restructuring transaction, including the potential for certain members of the Ad Hoc Group to provide debtor-in-possession financing ("DIP Financing") in connection with a voluntary chapter 11 filing.[6]

11.     In February 2022, the Putative Debtor also began providing a series of preferential guarantees to its secured bank lenders, including pledge and trust relocation agreements, which prejudiced other creditors of the Putative Debtor.[7]

12.     On April 4, 2022, the Putative Debtor announced several management changes, including the appointment of Mr. Felipe Guelfi Regules ("Mr. Guelfi") as acting CEO and Chief Transformation Officer, replacing Carlos Ochoa Valdes as CEO.[8]

13.     Also on April 4, 2022, the Putative Debtor provided an initial DIP Financing budget, investor presentation and business plan to the Ad Hoc Group Advisors, which made apparent to the Ad Hoc Group Advisors, for the first time, the existence of certain accounting irregularities relating to the Putative Debtor's business.  Such accounting irregularities included the inclusion of future unearned interest in the Putative Debtor's historically reported payroll loan balances.  Later, the Putative Debtor publicly acknowledged these irregularities in articles published by the Wall Street Journal.[9]

14.     On April 22, 2022, the Putative Debtor failed to make the required principal payment on a US$50 million loan from BNP Paribas.[10]

---

[6]     *Id.* ¶ 8.

[7]     *Id.* ¶ 9.

[8]     *Id.* ¶ 10.

[9]     *Id.* ¶ 11.

[10]    *Id.* ¶ 12.

15.     On May 6, 2022, the Putative Debtor failed to make the required principal payment on a US$14 million loan from BBVA Bancomer.[11]

16.     On May 13, 2022, the Putative Debtor failed to make the required principal payment on a US$10 million loan from Santander México, S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander México").[12]

17.     On May 17, 2022, the Putative Debtor's advisors and then CEO, Mr. Guelfi, met with the Ad Hoc Group Advisors and certain members of the Ad Hoc Group at Akin Gump's offices in New York City to discuss the terms of the DIP Financing and the Putative Debtor's expected voluntary chapter 11 filing in the United States Bankruptcy Court for the District of Delaware. This was the second time representatives of the Putative Debtor traveled to New York to meet with certain members of the Ad Hoc Group and the Ad Hoc Group Advisors to discuss a potential restructuring transaction.  The Putative Debtor and its U.S.-based advisors also held numerous meetings by telephone or videoconference with certain members of the Ad Hoc Group, the Ad Hoc Group's advisors and other potential U.S.-based sources of DIP Financing.[13]

18.     On June 1, 2022, the Putative Debtor announced that the Mexican Stock Exchange (the "BMV") had temporarily suspended the trading of its stock due to the Putative Debtor's failure to release its 2021 audited information and information for 4Q21 and 1Q22.[14]

19.     On or about June 3, 2022, the Ad Hoc Group and the Putative Debtor reached an agreement in principle on the terms of DIP Financing that would have been provided by the Ad Hoc Group and a co-financing party in connection with voluntary chapter 11 cases to be

---

[11]   *Id.* ¶ 13.

[12]   *Id.* ¶ 14.

[13]   *Id.* ¶ 15.

[14]   *Id.* ¶ 16.

commenced by the Putative Debtor and certain of its affiliates in this Court.  Thereafter, the Ad

Hoc Group Advisors and the Putative Debtors' advisors worked to document the DIP Financing.

As part of the negotiation process, the Ad Hoc Group, the co-financing party, and the Putative

Debtor exchanged various iterations of a DIP financing term sheet, a DIP order, and various first

day motions.[15]

20.     On June 7, 2022, the Putative Debtor issued a press release announcing that it was

continuing to advance an orderly restructuring process that may include a chapter 11 filing in the

United States.[16]

21.     Also on June 7, 2022, the Putative Debtor's advisors provided the Ad Hoc Group

Advisors with information regarding two independent members (the "Independent Directors") of

the Board that purportedly had already been added to the Board.[17]

22.     On the morning of June 9, 2022, the Ad Hoc Group Advisors, the advisors to the

co-financing party, and the Putative Debtor's advisors held a virtual meeting to finalize the terms

of the DIP Financing in preparation for what was expected to be an imminent voluntary chapter 11

filing in this Court.  Later that afternoon, Mr. Romanos, the chair of the Putative Debtor's Board

and founder of the Putative Debtor, terminated the retention of DLA, Jefferies, and FTI by the

Putative Debtor, as well as the engagement letters for all of the creditor advisors, including the Ad

Hoc Group Advisors and the advisors to an ad hoc group of secured bank lenders, just days before

the expected voluntary chapter 11 filing.  Upon information and belief, Mr. Romanos' decision to

terminate the various advisors was caused by, among other things, Putative Debtor's repeated

---

[15]    *Id.* ¶ 17.

[16]    *Id.* ¶ 18.

[17]    *Id.* ¶ 19.

requests to grant additional collateral to certain secured bank lenders, which requests were not consistent with applicable law or sound economic decision making.[18]

23.     Following a comprehensive review of the Mexican Movable Guarantees Sole Registry, the Mexican registry for security interests in movable assets, the Ad Hoc Group Advisors determined that the Putative Debtor had commenced a series of non-possessory pledges of assets to certain of the secured bank lenders, including collection rights under previously unencumbered payroll loans. The Mexican Movable Guarantees Sole Registry records demonstrate that the Putative Debtor began pledging additional assets to the secured bank lenders on February 11, 2022, and then pledged additional unencumbered assets until at least June 20, 2022, following the Putative Debtor's decision to terminate the Putative Debtor's advisors, as well as the engagement letters for the Ad Hoc Group Advisors and the advisors to the ad hoc group of secured bank lenders.[19]

24.     On June 17, 2022, the Putative Debtor announced that all members of the Board had resigned, leaving Mr. Romanos as the sole member. At that time, it also became apparent that none of the New Directors or the Independent Directors had ever officially joined the Board.[20]

25.     On June 20, 2022, certain members of the Ad Hoc Group and Ad Hoc Group Advisors met with Mr. Guelfi and Oliver Fernandez, the owner of Crédito Maestro, Crédito Real's largest originator, in New York, New York to discuss whether a restructuring of the Putative Debtor could still be achieved. At that time, the Ad Hoc Group and the Ad Hoc Group Advisors learned

---

[18]    *Id.* ¶ 20.
[19]    *Id.* ¶ 21.
[20]    *Id.* ¶ 22.

11

that certain secured bank lenders had commenced criminal actions in Mexico against the Putative Debtor's executives, including Mr. Romanos.[21]

26.    On June 22, 2022, the Petitioning Creditors filed the Involuntary Petition in the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court") commencing the Involuntary Case against the Putative Debtor.  Shortly thereafter, the Putative Debtor issued a press release acknowledging the commencement of the Involuntary Case.[22]

27.    On June 27, 2022, certain of the Ad Hoc Group Advisors met with Mr. Romanos, Mr. Romanos' financial advisor, and certain other individuals in Mexico City, Mexico to discuss whether a consensual restructuring process could be achieved.[23]

28.    On June 28, 2022, in violation of the automatic stay, Mr. Romanos filed a lawsuit (the "Lawsuit") in his personal capacity as a shareholder against the Putative Debtor in the 52nd Court in Civil Matters in Mexico City (the "Mexican Court"), which is a provincial non-bankruptcy court, through an expedited mercantile proceeding (the "Mexican Liquidation").  The Lawsuit demanded (i) the dissolution of the Putative Debtor as of April 30, 2022 based on certain articles of the General Law of Business Organizations, (ii) the judicial liquidation of the Putative Debtor, (iii) the appointment of a judicial liquidator, and (iv) the registration and publication of the dissolution and liquidation of the Putative Debtor.[24]

29.    On June 30, 2022, the Mexican Liquidation was admitted through an expedited proceeding.[25]  No parties received formal notice of the Lawsuit prior to that time, including the

---

[21]    *Id.* ¶ 23.
[22]    *Id.* ¶ 24.
[23]    *Id.* ¶ 25.
[24]    *Id.* ¶ 26.
[25]    Motion ¶ 28.

Petitioning Creditors and the Ad Hoc Group.  By admitting the Lawsuit, the Mexican Court acknowledged receipt of the filings in support of the Lawsuit and issued a summons directing the Putative Debtor to respond.[26]

30.    Upon receipt of the summons on July 11, 2022, Mr. Guelfi, the then CEO of the Putative Debtor, agreed to and accepted the claims set forth in the Lawsuit in contravention of the rights of the Putative Debtor's creditors and shareholders.  By agreeing and accepting the claims set forth in the Lawsuit, Mr. Guelfi, a direct subordinate of Mr. Romanos, functionally supported the relief sought by Mr. Romanos at a time when Mr. Romanos controlled the Putative Debtor.  Mr. Guelfi did not act as an independent officer and fiduciary of the Putative Debtor, but instead capitulated to Mr. Romanos' request to dissolve the Putative Debtor.  Upon information and belief, none of the Putative Debtor's creditors or shareholders had an opportunity to be heard in connection with the Lawsuit, and the Putative Debtor did not submit the matter for a vote at a shareholder meeting.[27]

31.    On July 13, 2022, the Mexican Court issued a judgment (the "Judgment") granting the relief requested by the Lawsuit by declaring the Putative Debtor's dissolution and putting the Putative Debtor into the Mexican Liquidation.  The Judgment also appointed Mr. Fernando Alonso-de-Florida Rivero as the liquidator (the "Mexican Liquidator").  The Mexican Court made the Judgment public on July 14, 2022.  Prior to the issuance of the Judgment, the Putative Debtor's creditors received no notice of the Lawsuit and had no opportunity to appear and be heard before the Mexican Court regarding the commencement of the Mexican Liquidation.  Upon entry of the

---

[26]    Villen Declaration ¶ 27.

[27]    *Id.* ¶ 28.

Judgment, the Mexican Court ceased to have any obligation to exercise oversight over the Mexican Liquidation. [28]

32.     On July 14, 2022, the Putative Debtor filed the Motion in the SDNY Bankruptcy Court and the Verified Petition in this Court.

33.     On July 15, 2022, Mr. Guelfi and general counsel Rodrigo Ruanova Morrett resigned from the Putative Debtor's management team.[29]  However, on July 19, 2022, the Putative Debtor issued a press release clarifying that the Mexican Liquidator had terminated the employment of Mr. Guelfi and Rodrigo Ruanova Morrett.[30]

34.     On July 19, 2022, one of the Petitioning Creditors filed for an *amparo* proceeding in the Eighth District Court for Civil Matters in Mexico City, Mexico, to challenge the constitutionality of the actions taken by the Mexican Court in connection with the Lawsuit and the Mexican Liquidation.[31]  The Eighth District Court for Civil Matters is a Mexican federal court that has the authority to review, stay or overturn the actions taken by the Mexican Court.  The *amparo* proceeding is still pending.

35.     On August 2, 2022, the SDNY Bankruptcy Court entered an order transferring the venue of the Involuntary Case to this Court.[32]

---

[28]   *Id.* ¶ 29.

[29]   *Id.* ¶ 30.

[30]   *Id.* ¶ 31.

[31]   *Id.* ¶ 32.

[32]   *Agreed Order Granting Motion of the Putative Debtor to Transfer Venue of the Involuntary Chapter 11 Case to the United States Bankruptcy Court for the District of Delaware* [*In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, No. 22-10842 (DSJ), (Bankr. S.D.N.Y. Aug. 1, 2022), Docket No. 18].

36.     On August 10, 2022, the Putative Debtor issued a press release representing that it no longer had any outstanding debt with Banco Mercantil del Norte, S.A., Institución de Banca Múltiple, Grupo Financiero Banorte ("<u>Banorte</u>") or any of its subsidiaries.[33]

37.     On August 12, 2022, one of the Putative Debtor's shareholders filed an appeal of the Judgment with the Mexican Court.[34]

38.     On that same date, the Judicial Council of Mexico City transferred the judge who had admitted the Lawsuit and issued the Judgment, Judge Helio Victorio Guzman, to the 33rd Court for Oral Process in Mexico City, Mexico.  The appeal has been assigned to Judge Verónica Guzmán Gutiérrez of the Mexican Court.  The appeal is currently pending before the Mexican Court.[35]

39.     On August 17, 2022, Judge Verónica Guzmán Gutiérrez admitted the appeal, which had the effect of suspending the Mexican Liquidation pending resolution of the appeal.[36][37]

40.     Also on August 17, 2022, the Putative Debtor issued a press release stating that it no longer had any outstanding debt with Santander México or any of its subsidiaries.[38]

---

[33]   Villen Declaration ¶ 33.

[34]   *Id.* ¶ 34.

[35]   *Id.*

[36]   *Id.* ¶ 35.

[37]   On August 25, 2022, the Putative Debtor filed (i) the *Statement Notifying the Court of Developments in the Mexican Liquidation Proceeding Pursuant to 11 U.S.C. § 1518 and 28 U.S.C. § 1746* [Case No. 22-10630 (JTD), Docket No. 42] (the "<u>Statement</u>") and (ii) the *Supplemental Declaration of Juan Pablo Estrada Michel* [Case No. 22-10630 (JTD), Docket No. 43] (the "<u>Supplemental Declaration</u>"), each of which address developments relating to the *amparo* proceeding and the appeal referenced herein.  The Ad Hoc Group reserves all of its rights to file a supplemental response addressing the issues raised by the Statement and the Supplemental Declaration.

[38]   *Id.* ¶ 36.

**OBJECTION**

**I.   THE COURT SHOULD DENY RECOGNITION OF THE MEXICAN LIQUIDATION UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

41.     The Court should deny recognition of the Mexican Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code.  As discussed in further detail below, the Foreign Representative cannot satisfy his burden of establishing that the Mexican Liquidation is a "foreign proceeding" within the meaning of Bankruptcy Code section 101(23) due to the numerous procedural and substantive deficiencies associated with the Mexican Liquidation.  In addition, recognition of the Mexican Liquidation Proceeding would be manifestly contrary to United States public policy, and thus, the Court should deny recognition under Bankruptcy Code section 1506.

**A.   The Mexican Liquidation is Not a Foreign Proceeding Within the Meaning of Bankruptcy Code Section 101(23)**

42.     "As a threshold matter, the appointed foreign representative of a foreign debtor seeking recognition must establish that the proceeding is a 'foreign proceeding' under the meaning of section 101(23).  The foreign representative thus carries the burden of proving each of the seven criteria."  *Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Menachem Ltd.),* 480 B.R. 129, 135-36 (S.D.N.Y 2012); *see also In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 327 (Bankr. D. Del. 2010), *on reconsideration in part* (Jan. 21, 2011), *subsequently aff'd*, 728 F.3d 301 (3d Cir. 2013). "Failure to meet the burden of proof on any one of the definitional elements requires denial of the petition."  *In re Ashapura Menachem Ltd.*, 480 B.R. at 136.

43.     For an alleged proceeding to qualify as a foreign proceeding under Bankruptcy Code section 101(23), it must be "(i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is

16

for the purpose of reorganization or liquidation." *In re ABC Learning Ctrs. Ltd.*, 728 F.3d at 309; *see also In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)).

## 1.   The Mexican Liquidation is Not a Proceeding

44.     "In the context of corporate insolvencies, the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *In re ABC Learning Ctrs. Ltd.,* 445 B.R. at 328 (quoting *In re Betcorp Ltd.*, 400 B.R. at 277).  Here, the Mexican Corporations Law, which governs the Mexican Liquidation, does not provide for a statutory framework that imposes meaningful constraints on the Putative Debtor or the Mexican Liquidator, or that adequately regulates the final distribution of the Putative Debtor's assets.  *See* Sainz Declaration ¶¶ 52, 57-58.  Indeed, the Mexican Corporations Law does not prescribe any rules related to priority or ranking of claims and does not address the discharge of claims.  *See* Méjan Declaration ¶ 26; Sainz Declaration ¶¶ 59-60.

45.     Relative to a more typical Mexican *concurso mercantil* proceeding, the deficiencies of the Mexican Liquidation are overwhelming.  Unlike in a *concurso mercantil* proceeding, creditors have no statutory rights in the Mexican Liquidation to: (i) file proofs of claim; (ii) negotiate a plan of reorganization or liquidation with the Putative Debtor; (iii) appoint an intervenor, examiner or trustee to supervise the dissolution; (iv) review past operations performed by the company within a statutory look back period; (v) initiate any actions against the Putative Debtor for fraudulent conveyance, breach of fiduciary duty, or otherwise; (vi) contest the validity or priority of claims; or (vi) demand to segregate any assets in possession of the Putative Debtor. *See* Sainz Declaration ¶ 58; Méjan Declaration ¶ 16, 17.  In addition, the Putative Debtor has substantial contractual obligations to third parties, yet the Mexican Liquidation does not regulate the treatment of such contractual obligations.  *See* Sainz Declaration ¶ 59; Méjan Declaration ¶¶

16, 25. Further, the Mexican Corporations Law also fails to include any provisions that would harmonize the Mexican Liquidation with foreign insolvency proceedings such as a chapter 15 case. *See* Sainz Declaration ¶ 51. Accordingly, the Mexican Liquidation cannot be construed as a "proceeding" for purposes of Bankruptcy Code section 101(23).

### 2.      The Mexican Liquidation is Not Collective in Nature

46.      The Mexican Liquidation also is not "collective in nature" as is required under Bankruptcy Code section 101(23). A "collective" proceeding is one that "considers the rights and obligations of all creditors." *In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 9953792, at *14 (Bankr. D. Del. Apr. 30, 2014) (citation omitted), *aff'd,* 538 B.R. 692 (D. Del. 2015); *see also In re Ashapura Minechem Ltd.*, 480 B.R. at 136 (noting that a "collective" proceeding is one that "contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action."). For a process to be considered "collective," it must be "instituted for the benefit of creditors generally rather than for a single creditor or class of creditors." *In re British Am. Ins. Co.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010). Moreover, a "collective" proceeding must "provide an orderly liquidation procedure under which all creditors are treated equally." *In re ABC Learning Ctrs. Ltd.*, 728 F.3d at 310 (citing *In re Schimmelpenninck*, 183 F.3d 347, 351 (5th Cir. 1999) (quoting H.R. Rep. No. 95-595, 1st. Sess., at 340 (1977)) ("Ultimately, the interests of all creditors, foreign and domestic, are to be put on a level playing-field, with like-situated claimants being treated equally.")).

47.      The Mexican Liquidation fails to satisfy this standard because it does not contemplate meaningful participation by all creditors in any manner. *See* Sainz Declaration ¶¶ 51, 61; Méjan Declaration ¶ 16. Among other things, creditors effectively lack standing to appear or

to file any document in a dissolution and liquidation governed by the Mexican Corporations Law such as the Mexican Liquidation. *See* Sainz Declaration ¶ 54. In addition, the Mexican Liquidation fails to provide due process to creditors, because creditors do not receive notice or service of process of actions taken by the Mexican Liquidator in the Mexican Liquidation. *See id.* In fact, the Mexican Liquidation is not required to be a public proceeding under the Mexican Corporations Law, and creditors do not have access to docket filings. *See id.* The only recourse available to creditors is to challenge a liquidation under the Mexican Corporations Law is to file a constitutional challenge in a higher court (known as an *amparo*) after an action is taken on the grounds that their rights under the Mexican constitution have been violated. *See* Sainz Declaration ¶ 55.

48.     Moreover, the Mexican Corporations Law is intended to provide only a basic mechanism by which a corporation can dissolve, but does not establish detailed procedures regarding the liquidation and distribution of assets. *See* Sainz Declaration ¶¶ 10-11. Dissolution and liquidation pursuant to the Mexican Corporations Law is not intended for large complex corporations with significant capital structures, but instead for corporate subsidiaries or affiliates that are not subject to litigious or controversial disputes. *See* Sainz Declaration ¶ 10; Méjan Declaration ¶¶ 20-23.

49.     The deficiencies of the Mexican Liquidation are particularly pronounced here. Under the facts and circumstances of this case, there is no basis to conclude that the Mexican Liquidation was commenced for the benefit of creditors generally. Instead, the Mexican Liquidation was commenced by Mr. Romanos for the purpose of avoiding personal criminal and civil liability and evading the jurisdiction of bankruptcy courts in the United States (as well as the transparency and creditor rights and protections that accompany bankruptcy proceedings in the

United States) after the Petitioning Creditors filed the Involuntary Petition.  A court of equity should not permit such fraudulent conduct to succeed because it could result in Mr. Romanos escaping from liability for his actions that have harmed the Putative Debtor's creditors, and given the lack of an absolute priority rule in the Mexican Liquidation, may even allow him to receive a distribution on account of his equity interests in the Putative Debtor.  Further, as noted above, Mexican Liquidator has utilized his discretion to make payments to local creditors while other similarly situated creditors have received nothing.

50.    Moreover, none of the Putative Debtor's creditors were afforded notice or an opportunity to be heard in connection with the Mr. Romanos' unilateral decision to institute the Mexican Liquidation.  Instead, the Mexican Liquidation was commenced secretly and disclosed only after the Mexican Court issued its Judgment accepting the proceeding and appointing the Mexican Liquidator.  Neither the Putative Debtor's board of directors, nor its management, made the decision to commence the Mexican Liquidation.  Instead, Mr. Romanos, acting in his capacity as a shareholder, commenced the Mexican Liquidation, and subsequently obtained the consent of Mr. Guelfi, who, as the Putative Debtor's CEO at the time, ultimately reported to Mr. Romanos.  This Court should not treat an action commenced by a single shareholder for the purpose of avoiding personal liability as a "collective" proceeding, particularly when the Putative Debtor's "consent" to such proceeding was undoubtedly obtained as a result of Mr. Romanos' control over Mr. Guelfi.

### 3.    The Mexican Liquidation is Not an Insolvency Proceeding

51.    In order to qualify as a foreign proceeding, courts have held that "the proceeding must be authorized or conducted under a law related to insolvency or the adjustment of debts."  *In*

*re Irish Bank Resolution Corp. Ltd.*, 2014 WL 9953792, at \*15.  Here, the Mexican Liquidation is not being conducted under a law related to insolvency or the adjustment of debts.

52.     In Mexico, the Concurso Law is the specialized legislation that governs insolvency proceedings.  *See* Sainz Declaration ¶¶ 18-21.  The Concurso Law is designed to preserve the value of a company as a going concern while stakeholders negotiate a plan of reorganization with the debtor.  *Id*.  If the company fails to reach an agreement with its stakeholders during the conciliation stage, then the Concurso Law provides for a liquidation stage whereby the company's assets are liquidated under judicial supervision and its proceeds are used to pay creditors.  *See* Sainz Declaration ¶¶ 40-43.

53.     In contrast, a corporate dissolution and liquidation under the Mexican Corporations Law such as the Mexican Liquidation does not constitute an insolvency proceeding.  *See* Méjan Declaration ¶ 15.  A liquidation under the Mexican Corporations law is not intended to serve any of the public policy considerations that are applicable to insolvency proceedings under the Concurso Law, such as (i) preserving the business, (ii) preventing debt defaults from jeopardizing the viability of the business, (iii) protecting contract counterparties, and (iv) providing appropriate protections to the rights of creditors.  *See* Méjan Declaration ¶ 19.  Instead, a liquidation under the Mexican Corporations Law such as the Mexican Liquidation is intended to provide a simple, expedited dissolution and liquidation process for businesses in certain limited circumstances.  *See* Sainz Declaration ¶ 11.  Such a dissolution and liquidation is not a restructuring or insolvency process, but rather a simplified means to end the existence of a business that is generally approved by the corporation's shareholders.  *See* Sainz Declaration ¶¶ 11-17.

54.     It is telling that the Putative Debtor did not file for a *concurso mercantil* pursuant to the Concurso Law, which is the internationally recognized insolvency proceeding under

Mexican law.  Upon information and belief, the Putative Debtor is ineligible for admission to a *concurso mercantil* because it is unable to meet the requirement to provide audited financial statements for the past three years.  *See* Sainz Declaration ¶ 19.  In particular, the Putative Debtor appears to be unable to provide audited financial statements for the year 2021, the fourth quarter of 2021, and the first quarter of 2022,[39] and has admitted that its financial statements going back several years are marred by improprieties that are the subject of ongoing investigations.[40]  However, rather than commencing the Mexican Liquidation for the benefit of Mr. Romanos, the Putative Debtor should have commenced voluntary chapter 11 cases in this Court as planned—and as the Putative Debtor was on the eve of doing when Mr. Romanos abruptly terminated the Putative Debtor's advisors and the engagement letters of all of the creditor advisors—in order to provide an orderly, efficient and transparent restructuring process that would have benefitted the Putative Debtor's estate and all of its creditors.

> **4.    The Mexican Liquidation Does Not Subject the Putative Debtor's Assets and Affairs to Meaningful Control or Supervision by the Mexican Court**

55.    The Mexican Liquidation does not subject the Putative Debtor's assets and affairs to control or supervision by the Mexican Court.  While the Mexican Liquidation is administered

---

[39]    Villen Declaration ¶ 16.

[40]    In response to a Wall Street Journal article dated July 6, 2022, "Deloitte Was a Common Factor at Troubled Mexican Shadow Banks," the Putative Debtor's former CEO, Mr. Guelfi, sent a written statement to the Wall Street Journal, a copy of which is attached to the Villen Declaration as Exhibit A, that included the following admissions: "As newcomers to the managing and accounting of the firm, it was a surprise for us (as well as the advisors and many of the stakeholders) that the Company had been using for several years the accounting criteria of 'capitalizing interest' whereby at the time of booking a new payroll deduction loan, the interest for the life of the loan was booked as well as accounts receivable and recognized as income.  This has recently been informed and denounced to the authorities and the regulator.  In fact, an investigation has been launched to understand the extent and details of the impact of such accounting policies.  To the best of our knowledge this problem is isolated to the Payroll business in Mexico and the Company didn't apply these accounting policies in other products or geographies.  The Company can assure these accounting policies and methodologies were stopped since April 2022.  We would go as far as to say that NPLs in general are fairly reported in general and the portfolios are in regular terms of business (with the exception of SMEs and corporate loans), with payroll deduction loans having particularly good collections this year."

by the Mexican Liquidator, no court is required to exercise control or supervision over the Mexican Liquidator's performance of his duties with respect to the assets and affairs of the Putative Debtor. The Mexican Liquidator has the unilateral authority to liquidate the Putative Debtor's assets in his sole discretion without any significant judicial guardrails or oversight.  In fact, under the Mexican Corporations Law, the Mexican Liquidator does not even have an obligation to maximize the value of the Putative Debtor's assets for the benefit of creditors.  *See* Sainz Declaration ¶ 60.  Based on the publicly available information, the Mexican Liquidator has been using his unfettered discretion to pay local secured and unsecured creditors, and in doing so, has potentially given away value over and above the amount of their debts.

> **B.** **Recognition of the Mexican Liquidation Would Be Manifestly Contrary to the Public Policy of the United States**

56.    The Court should deny the Verified Petition because it would be manifestly contrary to the public policy of the United States to recognize the Mexican Liquidation as a foreign main proceeding.  Bankruptcy Code section 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Bankruptcy Code section 1506 has been described as a "safety valve" that offers "specific protections" to creditors in chapter 15 proceedings.  *Vitro S.A.B. de C.V. v. ACP Master Ltd.* (*In re Vitro, S.A.B. de C.V.),* 473 B.R. 117, 123 (Bankr. N.D. Tex. 2012) (internal citations omitted) ("Vitro I"), *aff'd on other grounds*, 701 F.3d 1031 (5th Cir. 2012).

57.    Courts rely on Bankruptcy Code section 1506 to deny recognition in circumstances where fundamental policies of the United States are threatened.  *See, e.g., Vitro I,* 473 B.R. at 132-33 (denying comity where Mexican insolvency plan violated the absolute priority rule and proposed releases of U.S. creditors' claims against non-debtor third parties); *In re Qimonda AG,*

23

462 B.R. 165, 184-85 (Bankr. E.D. Va. 2011), *aff'd on other grounds sub nom. Jaffe v. Samsung Elecs. Co.,* 737 F.3d 14 (4th Cir. 2013) (refusing to grant comity to a German insolvency law that would require a debtor's patent licensees to negotiate new licensing agreements at more favorable rates); *In re Sivec SRL,* 476 B.R. 310, 320-26 (Bankr. E.D. Okla. 2012) (declining to extend comity where the foreign proceeding eliminated creditors' rights to setoff and recoupment); *In re Toft,* 453 B.R. 186, 196-98 (Bankr. S.D.N.Y. 2011) (declining to defer to a foreign proceeding that would have severely impacted the fundamental U.S. public policy related to privacy rights); *In re Gold & Honey, Ltd.,* 410 B.R. 357, 368-72 (Bankr. E.D.N.Y. 2009) (holding that an Israeli receivership proceeding was contrary to U.S. public policy because the proceeding, which was initiated after chapter 11 proceedings began in the United States, seized the debtor's assets in violation of a bankruptcy court order).

58.      In determining whether to deny recognition under Bankruptcy Code section 1506, "courts have focused on two factors: (1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import' of a U.S. statutory or constitutional right, such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out . . . the most fundamental policies and purposes' of these rights." *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 568-69 (E.D. Va. 2010) (citations omitted).  In considering whether an act is manifestly contrary to the public policy of the United States, courts consider whether the act complained of violates a fundamental United States statutory or constitutional right.  *Vitro I,* 473 B.R. at 123-24.

59.      Here, the Mexican Liquidation is procedurally unfair in numerous respects and severely infringes upon the constitutionally-protected due process rights of the Putative Debtor's

creditors.  As discussed above, creditors effectively do not have standing to participate in the Mexican Liquidation and, thus, have no opportunity to be heard or to object to any actions taken by the Mexican Liquidator.  *See* Sainz Declaration ¶ 54.  In addition, creditors received no prior notice of or service of process regarding the commencement of the Mexican Liquidation and had no opportunity to object to its commencement, which are fundamental rights afforded to creditors under both United States and Mexican insolvency laws.  *Id*.  Further, creditors do not have access to docket filings because the Mexican Dissolution is not public, even though the Company is a publicly-held company.  *Id.*  The only means that creditors have to protect their interests and their contractual and due process rights in connection with the Mexican Liquidation is to file an *amparo* seeking to challenge the constitutionality of the Mexican Liquidation after actions have already been taken.  *See* Sainz Declaration ¶ 56.

60.    In addition to these procedural deficiencies, the Mexican Liquidation suffers from substantive flaws that threaten to violate fundamental rights and protections under United States law.  As discussed above, the Mexican Liquidation is not governed by any rules related to priority or ranking of claims and does not address the discharge of claims.  *See* Méjan Declaration ¶ 26; Sainz Declaration ¶¶ 59-60.  As a result, there is a risk that the Mexican Liquidator could make a distribution to Mr. Romanos or other shareholders prior to unsecured creditors, including the Noteholders and the Unsecured Lenders, receiving payment in full on account of their claims.  A fundamental safeguard under United States bankruptcy law is that providing a distribution to shareholders ahead of unsecured creditors violates the absolute priority rule, and such a result is "demonstrably different than would occur in Chapter 11."  *Vitro* I, 473 B.R. at 132.  Similarly, the Mexican Liquidator may continue to make payments to local secured and unsecured creditors while other similarly situated creditors receive noting in violation of the policy of equal treatment

of creditors.  *See In re ABC Learning Ctrs. Ltd.*, 728 F.3d at 310 (internal citation and quotation omitted).  Moreover, in the Mexican Liquidation, creditors have no right to bring avoidance actions—a circumstance that abrogates one of the most significant rights of creditors in United States bankruptcy proceedings, and that may serve as the primary source of any recovery to unsecured creditors in this case given the grants of unencumbered collateral that followed the conclusion of the consensual process.

61.     Furthermore, the commencement of the Mexican Liquidation six days after the filing of the Involuntary Petition was in direct violation of the automatic stay.  *See* 11 U.S.C. § 362(a).  Courts recognize that the filing of an involuntary petition under Bankruptcy Code section 303 immediately invokes the automatic stay.  *Interpool, Ltd. v. Certain Freights of the M/Vs Venture Stare*, 878 F.2d 111, 112 n. 4 (3d Cir. 1989) (citation omitted); *In re Betteroads Asphalt LLC*, 594 B.R. 516, 542 (Bankr. D.P.R. 2018) ("Once the involuntary bankruptcy petition is filed, a bankruptcy estate is created under 11 U.S.C. § 541(a) and the provisions of the automatic stay come into effect."); *In re Grossinger*, 268 B.R. 386, 387 (Bankr. S.D.N.Y. 2001) (". . . [T]he mere filing of an involuntary petition invokes the automatic stay.").  By commencing the Mexican Liquidation, Mr. Romanos evidenced a blatant disregard for a fundamental provision of the Bankruptcy Code and the Involuntary Case commenced in the United States, and he thereby hindered the Court's ability to enforce a fundamental protection granted under United States bankruptcy law.

62.     These flaws of the Mexican Liquidation are further intensified by the lack of oversight over the liquidation process.  The Mexican Liquidator is not a judicial officer.  Mr. Alonso is an attorney in private practice, and he acts with virtually unfettered discretion and minimal oversight in his capacity as the Mexican Liquidator in the Mexican Liquidation.  Indeed,

the Mexican Court does not exercise oversight over the activities of the Mexican Liquidator, and the Mexican Liquidator is not required to obtain the Mexican Court's approval of any actions taken or distributions made by the Mexican Liquidator.

63.     Finally, as a matter of public policy, the United States should discourage foreign corporations from using chapter 15 as a means to evade the meaningful judicial oversight that goes hand in hand with true insolvency proceedings.  Mr. Romanos commenced the Mexican Liquidation to avoid judicial scrutiny of the fraudulent transfers he authorized and the significant accounting improprieties that occurred under his leadership.  While bad acts alone may be insufficient for a court to deny recognition under Bankruptcy Code section 1506, Mr. Romanos' misconduct should be considered along with all of the other factors weighing against recognition. In commencing the Mexican Liquidation, Mr. Romanos acted solely for his own benefit, destroying a valuable operating business to the detriment of the Putative Debtor, its creditors, and hundreds of employees.  This legal tactic, designed to frustrate creditors and protect an insider at their expense, should not be validated by this Court.  Accordingly, the Court should deny recognition because it would be manifestly contrary to public policy of the United States to recognize this Mexican Liquidation proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

## II.     THE COURT SHOULD NOT DISMISS THE INVOLUNTARY CHAPTER 11 CASE UNDER BANKRUPTCY CODE SECTION 305(a)(1)

64.     The Court should not dismiss the Involuntary Case under Bankruptcy Code section 305(a)(1).  While the interests of Mr. Romanos may be better served by dismissal, the Putative Debtor's creditors would benefit from a chapter 11 case in the United States and the due process, transparency, and rights and protections afforded thereby.

65.    Courts consider whether to dismiss a chapter 11 case under Bankruptcy Code section 305(a)(1) on a case-by-case basis.  *Matter of Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983) (citation omitted).  In doing so, courts typically consider the following factors:

> (1) whether another forum is available to protect the interests of both parties or there is already a pending proceeding; (2) economy and efficiency of administration; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007) (citation omitted); *see also In re Board of Directors of Multicanal S.A.*, 314 B.R. 486, 522-23 (Bankr. S.D.N.Y. 2004); *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203-04 (Bankr. D. Del. 2009) (listing the same factors).  In considering a request to abstain in favor of a foreign proceeding, the court "must satisfy itself that the foreign forum will determine and adjust the parties' rights in a fair and equitable manner."  *In re Compania de Alimentos Fargo, S.A.,* 376 B.R. at 434; *JPMorgan Chase Bank v. Altos Hornos de Mexico. S.A. de C.V.,* 412 F.3d 418, 424 (2d Cir. 2005) ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States.").  Courts have held that "abstention under Bankruptcy Code section 305(a)(1) is a form of extraordinary relief."  *In re EHT US1, Inc.*, 630 B.R. 410, 433 (Bankr. D. Del. 2021).  In addition, "the party seeking abstention bears the burden of proof and it is substantial."  *Id.*

A.     **The Mexican Court and the Mexican Liquidation Fail to Protect the Interests of Creditors**

66.     Contrary to the assertions of the Putative Debtor, the Mexican Court and the Mexican Liquidation do not protect the interests of creditors, and the Mexican Liquidation is not the type of insolvency proceeding to which courts in the United States have ever deferred. Accordingly, the Putative Debtor's contention that the Court should dismiss the Involuntary Case in order to defer to the Mexican Court and the Mexican Liquidation should be rejected.

67.     First, as discussed in detail above, the Mexican Liquidation fails to adequately protect the interests of the Putative Debtor's creditors.  Among other things, in the Mexican Liquidation, creditors (i) lack standing to appear or to file any documents, (ii) are denied due process because they do not receive notice or service of process of actions taken by the Mexican Liquidator, and (iii) cannot access information on the docket because the Mexican Liquidation is not a public proceeding.  Moreover, the Mexican Liquidation does not provide for any ranking or priority of claims, and does not permit creditors to assert avoidance actions or other valuable litigation claims.  Indeed, Mr. Romanos' decision to pursue the Mexican Liquidation appears to be tactical one, with the goal of preventing the avoidance of payments made to the secured bank lenders that Mr. Romanos has made every effort to satisfy in order to avoid personal liability.  No serious argument can be made that the Mexican Liquidation protects the interests of creditors relative to a chapter 11 proceeding in the United States or a *concurso mercantil* proceeding in Mexico.  Indeed, as discussed above, liquidations under the Mexican Corporations Law such as the Mexican Liquidation are not intended for complex liquidations and are not intended to operate as collective proceedings in which all parties can actively participate.

68.     Second, the Putative Debtor's contention that the existence of a foreign proceeding weighs in favor of dismissal of the Involuntary Case is grossly misleading at best.  In advancing

29

this argument, the Putative Debtor relies on various cases addressing foreign proceedings under the well-established insolvency laws of various foreign jurisdictions. *See* Motion ¶ 47. However, the Putative Debtor fails to disclose that (i) the Mexican Liquidation is not an insolvency proceeding under applicable Mexican law, and (ii) no court in the United States has ever recognized or deferred to a dissolution and liquidation proceeding under the Mexican Corporations Law like the Mexican Liquidation. Accordingly, there is no merit to the Putative Debtor's suggestion that the existence of the Mexican Liquidation should weigh in favor of dismissal of the Involuntary Case.

69.     Third, contrary to the Putative Debtor's assertions, there is a sound basis for concluding that the Mexican Liquidation contravenes the public policy of the United States, and thus, the Involuntary Case should not be dismissed. As discussed above, the Mexican Liquidation is both procedurally unfair to creditors and runs afoul of significant statutory rights under United States law. Moreover, Mr. Romanos commenced the Mexican Liquidation six days after the filing of the Involuntary Petition with full knowledge of the Involuntary Case and in violation of the automatic stay. *See* Villen Declaration ¶¶ 24, 26. In addition, the Putative Debtor's attempt to argue that courts have regularly recognized that insolvency proceedings in Mexico are fair and equitable is once again grossly misleading. *See* Motion ¶ 50. Unlike a *concurso mercantil*, the Mexican Liquidation is not an insolvency proceeding, and no court in the United States has ever recognized or deferred to a proceeding under Mexican law like the Mexican Liquidation.

70.     Finally, the Putative Debtor's assertion that the commencement of the Mexican Liquidation was foreseeable must be rejected. *See* Motion ¶ 51. As recently as June 2022, the Ad Hoc Group was in discussions with the Putative Debtor regarding the commencement of voluntary chapter 11 cases in this Court. Moreover, the Putative Debtor cites to disclosures regarding

potential insolvency proceedings in Mexico, such as a *concurso mercantil*, in the offering memorandum for the Notes that are governed by New York law.  However, here, the Putative Debtor has commenced a dissolution and liquidation proceeding under the Mexican Corporations Law that was never intended to be (and has never been) used in the context of a complex corporate liquidation, and that was never envisioned as part of the discussions between the Putative Debtor and the Ad Hoc Group.

### B.    The Involuntary Case Would Not Be Administratively Inefficient

71.    The Putative Debtor's assertion that the Involuntary Case should be dismissed because allowing the chapter 11 case to proceed would be administratively inefficient is without merit.  *See* Motion ¶¶ 52-57.  As an initial matter, the Court should reject any argument by the Putative Debtor that the Involuntary Case should be dismissed based on the existence of the Mexican Liquidation.  As discussed above, the Involuntary Case was commenced prior to the Mexican Liquidation—indeed, Mr. Romanos filed the Mexican Liquidation almost a week after the filing of the Involuntary Petition in knowing violation of the automatic stay imposed under Bankruptcy Code section 362.  Accordingly, the Court should not allow the Putative Debtor to attack the merits of the Involuntary Case based on Mr. Romanos' misconduct and lack of respect for the automatic stay and United States law.

72.    Moreover, the Putative Debtor's assertion that the Involuntary Case should be dismissed because the Putative Debtor's managers and employees are located in Mexico rings hollow.  As the Putative Debtor acknowledges in the Motion, the Putative Debtor no longer has a board of directors or executive management.  *See* Motion ¶ 10.[41]  In addition, it does not appear

---

[41]    The Ad Hoc Group anticipates that a chapter 11 trustee, or, at a minimum, an independent director, would need to be appointed in the event that the Court denies the Verified Petition and the Motion and enters an order for relief in the Involuntary Case.

likely that any of the Putative Debtor's other employees would be required to travel to the United States on a regular basis for hearings in connection with the Involuntary Case, and where such participation is necessary, any burdens may be alleviated through virtual participation in any hearings—which has become widespread in this jurisdiction and others.

73.    Finally, the Putative Debtor's attempt to argue that the Involuntary Case would be futile cannot withstand scrutiny.  The Putative Debtor relies primarily upon the decision in *Multicanal S.A.  See In re Board of Directors of Multicanal S.A.*, 314 B.R. 486.  However, the Putative Debtor fails to acknowledge the fundamental differences between this case and the facts and circumstances underlying *Multicanal S.A.*  Significantly, in *Multicanal S.A.*, the alleged debtor in the involuntary case had been pursuing a restructuring process in Argentina for more than a year, and had already solicited votes and obtained court approval of the restructuring transaction in Argentina before certain creditors filed involuntary petitions.  *See id.* at 492-500.  By contrast, here, the Putative Debtor did not commence the Mexican Liquidation until after the Involuntary Petition was filed.  As a result, the Mexican Liquidation is substantially less progressed, and any conflict and inefficiency is a result of the Putative Debtor's actions.  Moreover, the Putative Debtor provides no valid basis for concluding that a Mexican court would decline to enforce any orders of this Court.  Further, the Putative Debtor's alleged concerns regarding the ability to restructure the claims of Mexican creditors in the Involuntary Case appears unfounded—indeed, based on the available information, the vast majority of the Putative Debtor's most significant creditors, including BBVA Bancomer, Santander México and Banorte, appear to have significant business operations in the United States that would render them subject to the Court's jurisdiction.

**C.    The Involuntary Case was Filed for a Legitimate Bankruptcy Purpose**

74.    The Putative Debtor's allegation that there is no legitimate bankruptcy purpose underlying the filing of the Involuntary Case is without merit and must be rejected.  Once again,

the Putative Debtor seeks to mislead the Court by suggesting that the Involuntary Petition was filed to create negotiating leverage for the Ad Hoc Group. *See* Motion ¶ 58. In reality, the Petitioning Creditors filed the Involuntary Case in response to the erratic actions of the Putative Debtor and Mr. Romanos, which destroyed the value of the Putative Debtor's operating business by effectuating a fire sale and transferring away previously unsecured assets causing tremendous harm to the Noteholders and the Unsecured Lenders. Thus, not only does the Involuntary Case serve a legitimate bankruptcy purpose, but, in fact, it serves precisely the purpose for which involuntary chapter 11 filings were intended—protecting creditors from the depletion of assets by a debtor, which is exactly what occurred. *See Marciano v. Chapnick (In re Marciano)*, 708 F.3d 1123, 1128 (9th Cir. 2013) (citation omitted); *In re Meltzer*, 516 B.R. 504, 514 (Bankr. N.D. Ill. 2014). Maintaining the Involuntary Case would continue to serve that purpose and also advance the purpose of providing creditors with a transparent and efficient forum in which to enforce their rights, maximize their recoveries, and pursue potentially valuable claims and causes action against the Putative Debtor and its directors and officers, as well as other parties that have received avoidable transfers.

## III. THE COURT SHOULD NOT DISMISS THE INVOLUNTARY PETITION FOR CAUSE UNDER BANKRUPTCY CODE SECTION 1112(b)

75. Dismissal under section 1112(b) is not warranted. The Putative Debtor's contention that a chapter 11 plan cannot be effectuated is conclusory and without merit. To the contrary, permitting the Involuntary Case to proceed will provide the Putative Debtor's creditors with the rights and remedies necessary to recover the assets to ultimately fund distributions to creditors under a plan. Indeed, absent the Involuntary Case, it appears likely that unsecured creditors, including the Noteholders and the Unsecured Lenders, will receive little or no recovery on account of their claims, while the Putative Debtor's directors and officers will avoid liability for their

misconduct and even potentially receive a distribution from the Putative Debtor.  This unfortunate potential outcome is a function of the lack of due process and other basic rights afforded to creditors in the Mexican Liquidation.  By contrast, this Court is uniquely situated to preside over the Involuntary Case and resolve the disputes that will permit creditors to obtain the greatest possible recovery from the Putative Debtor's estate.

## IV.    THE COURT HAS PERSONAL JURISDICTION OVER THE PUTATIVE DEBTOR

76.    A bankruptcy court's exercise of extraterritorial jurisdiction "is consistent with constitutional due process standards where the bankruptcy court has established its authority to assert *in personam* jurisdiction over the debtor," "even absent the consent of that debtor."  *GMAM Investment Funds Tr. I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 251 (S.D.N.Y. 2004).  The due process test for personal jurisdiction has two related components: the minimum contacts inquiry and the reasonableness inquiry.  *Id.* at 257 (internal quotation marks omitted) (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).

77.    Under the minimum contacts analysis, "[a] court is said to have specific jurisdiction over a foreign defendant who purposefully directs his activities at residents of the forum and where the underlying cause of action arises out of or relates to those activities."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)).  Even "a single transaction with the forum will suffice," given that the act is one "by which the [party] purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. at 117. (quoting *Hanson v. Denckla*, 357 U.S. 235 (1958)); *see also*

*Astropower Liquidating Tr. v. Xantrex Tech., Inc.* (*In re AstroPower Liquidating Tr.*), 335 B.R. 309, 318 (Bankr. D. Del. 2005) ("A single transaction with the forum plaintiff will suffice."). Importantly, "the proper due process inquiry is not whether the defendant has ties to the state where the court sits, but whether the defendant has sufficient minimum contacts with the United States." *Guliano v. Harco, Inc.* (*In re NWL Holdings, Inc.*), No. 08-12847 MFW, 2011 WL 767777, at *3 (Bankr. D. Del. Feb. 24, 2011) (citation omitted); *see also Bickerton v. Bozel S.A.* (*In re Bozel S.A.*), 434 B.R. 86, 99 (Bankr. S.D.N.Y. 2010) ("[I]t is well established that in the context of bankruptcy proceedings, the minimum contacts analysis should evaluate the defendant's contacts with the United States as a whole, not merely contacts with the forum state.") (citation omitted); *Klingher v. Salci* (*In re Tandycrafts, Inc.*), 317 B.R. 287, 289 (Bankr. D. Del. 2004); *Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. at 117; *In re Xacur*, 219 B.R. 956, 967 (Bankr. S.D. Tex. 1998).

78.    Alternatively, "[a] court may establish general jurisdiction over a defendant in any action, regardless of whether the suit arises out of the defendant's contacts with the forum jurisdiction, if the defendant's contacts with the forum are 'continuous and systematic,' whereby establishing personal jurisdiction would not offend Due Process." *In re Bozel S.A.*, 434 B.R. at 98 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9 (1984)); *see also Claridge Associates, LLC v. Schepis* (*In re Pursuit Capital Mgmt., LLC*), 595 B.R. 631, 647 (Bankr. D. Del. 2018) ("A court may exercise general jurisdiction when a plaintiff's claim arises out of a defendant's 'continuous and systematic' contacts with the relevant forum.") (quoting *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (en banc)).

79.    Due process also requires courts "to consider the reasonableness of subjecting the defendant to personal jurisdiction to ensure that it comports with 'traditional notions of fair play and substantial justice.'" *In re Bozel S.A.*, 434 B.R. at 100 (quoting *Burger King Corp.*, 471 U.S.

at 476 (citation omitted)); *see also In re NWL Holdings, Inc.*, 2011 WL 767777, at *2 ("Due Process Clause … imposes 'a general fairness test' which is interpreted by the Supreme Court in *International Shoe* to require that 'certain minimum contacts exist between the non-resident defendant and the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'") (quoting *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir.1985)).  However, where, as here, minimum contacts are established, the burden shifts and a party seeking to defeat jurisdiction "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King Corp.*, 471 U.S. at 477.

80.    The Putative Debtor argues that this Court should decline to exercise jurisdiction because it is neither fair nor reasonable.  *See* Motion at ¶ 27.  In doing so, the Putative Debtor grossly understates its significant contacts with the United States as well as the substantial harm caused to financial institutions in the United States (and elsewhere) by its own conduct.  This Court should deny the Motion and assert *in personam* jurisdiction over the Putative Debtor to allow creditors to enforce their rights and seek a recovery from the Putative Debtor in an orderly, fair, and transparent insolvency proceeding.  *See In re Globo Comunicacoes e Participacoes*, 317 B.R. at 253 (noting that exercise of court's "jurisdictional power may be necessary to vindicate the rights of [the putative debtor's] domestic creditors").  Put simply, the Putative Debtor cannot demonstrate that "this is the 'rare case' in which [the] inconvenience" of defending against a lawsuit is "so substantial as to achieve constitutional magnitude."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 645 (S.D.N.Y. 2017) (quoting *Burger King*, 471 U.S. at 484) (citation omitted)).

**A.      The Putative Debtor Has Extensive Contacts with the United States and Delaware**

81.     The Putative Debtor's use of the financial markets in the United States establishes the requisite minimum contacts for this Court to assert jurisdiction over the Putative Debtor in connection with the Involuntary Petition.  *See In re Globo Comunicacoes e Participacoes*, 317 B.R. at 258 ("The Bankruptcy Court may also choose to evaluate the degree to which Globopar purposefully availed itself of the United States as a forum to raise capital from domestic banks and financiers, and whether this purposeful availment is sufficiently extensive that Globopar should reasonably anticipate that it might be held to account, and have all of its assets reorganized, in a United States bankruptcy court.") (citation omitted).

82.     The Putative Debtor has purposefully availed itself of the financial markets of the United States and issued debt that was marketed to investors based in the United States.  Most recently, the Putative Debtor sought to raise DIP Financing to provide funding for voluntary chapter 11 cases that the Putative Debtor and certain of its affiliates planned to file in this Court by soliciting DIP Financing proposals from financial institutions located in the United States through the Putative Debtor's former U.S.-based lawyers, investment bankers and financial advisors.  *See* Villen Declaration ¶¶ 8, 11, 17.  In fact, the Putative Debtor's former executives, including the Putative Debtor's former CEO, Mr. Guelfi, traveled to New York City earlier this year to meet with certain members of the Ad Hoc Group and other U.S.-based financial institutions regarding a potential restructuring transaction and related financing matters.  *Id.* ¶ 17.  In addition, Mr. Guelfi attended an in-person meeting with certain members of the Ad Hoc Group and the Ad Hoc Group's advisors at Akin Gump's offices in New York City on May 17, 2022. *Id.*  The Putative Debtor and its former U.S.-based advisors also held numerous meetings by telephone or videoconference with certain members of the Ad Hoc Group, the Ad Hoc Group's advisors and

37

other potential sources of DIP Financing.   Indeed, prior to Mr. Romanos' termination of the Putative Debtor's former U.S.-based advisors, the Ad Hoc Group and the Putative Debtor were in the late stages of preparing for the commencement of voluntary chapter 11 cases in this Court with the support of the Ad Hoc Group as providers of DIP Financing to fund the proceeding.

83.    The Putative Debtor also previously obtained financing pursuant to transactions involving the United States financial markets and financial institutions located in this country.   In particular, the Putative Debtor issued Notes in the total aggregate principal amount of US$1.758 billion under five separate indentures (the "Indentures") under which The Bank of New York Mellon, a New York banking corporation organized under the laws of New York ("BNYM"), acts as indenture trustee.   Moreover, as reflected in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 27] filed by the Ad Hoc Group, the holders of the Notes issued under the Indentures include financial institutions located in the United States.   In addition, the Putative Debtor obtained Unsecured Bank Debt in the total aggregate principal amount of over US$320 million under (i) three separate credit agreements (the "CS Credit Agreements") under which Credit Suisse Securities (USA) LLC, a U.S.-registered broker-dealer incorporated in the State of Delaware, served as the lead arranger and Credit Suisse AG, Cayman Islands Branch, an entity with a place of business located in New York, New York, served as the administrative agent; and (ii) a finance agreement (the "DFC Finance Agreement" and, together with the Indentures and the CS Credit Agreements, the "Unsecured Debt Documents") between the Putative Debtor and the United States International Development Finance Corporation, an agency of the United States. The Putative Debtor's decision to enter into the Unsecured Debt Documents and obtain over US$320 million in financing—including from an agency of the United States government— provides more than a sufficient basis for the Court to exercise jurisdiction over the Putative Debtor.

84.     In addition, the terms of the Unsecured Debt Documents support the Court's exercise of jurisdiction over the Putative Debtor.  First, BNYM serves as the paying agent under at least one of the Indentures, and as the Putative Debtor acknowledges in the Motion, the Putative Debtor is required to maintain a bank account with Citibank, N.A. in New York under the Indentures, which bank account currently has a balance of approximately US$1.3 million.  *See* Motion at ¶ 15.  Recently, the United States District Court for the Southern District of New York (the "SDNY District Court") found that a foreign entity can become subject to the jurisdiction of courts in the United States by transferring funds in United States currency through bank accounts located in the United States.  *See Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 70 (S.D.N.Y. 2016).  Indeed, in *Arcapita*, the SDNY District Court held that a single transaction involving the transfer of United States currency through a correspondent bank based in the United States was sufficient for the bankruptcy court to exercise jurisdiction over a foreign entity, even where both the transferor and the transferee were located outside of the United States at the time of the transaction.  *See id*; *see also In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022).

85.     Moreover, each of the Unsecured Debt Documents is governed by New York law and provides that the Putative Debtor has consented to the jurisdiction of the state and federal courts located in New York, New York.  The Putative Debtor contends that such provisions are insufficient to establish jurisdiction for chapter 11 cases.  However, the Putative Debtor fails to recognize that courts have held that such contract provisions constitute important intangible property rights that may permit a court to take jurisdiction over chapter 11 cases commenced by a foreign debtor.  *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 40 (Bankr. S.D.N.Y. 2020) ("This Court has previously held that a debtor's contract rights, including rights pursuant to debt that

contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a)."); *see also In re Trump Entm't Resorts, Inc.*, 534 B.R. 93, 102 (Bankr. D. Del. 2015) ("Courts have construed property of the estate to include both tangible and intangible property, including rights arising out of ordinary contractual relationships, and have even gone so far as to find that the expectation of continuity of business relationships qualifies as property of the estate.") (citation omitted).  Indeed, "a valid forum selection clause is sufficient to establish personal jurisdiction over a defendant who otherwise lacks contacts with the forum."  *In re AstroPower Liquidating Tr.*, 335 B.R. at 319-20 (citing *Burger King*, 471 U.S. at 473 n. 15 (citation omitted)).

86.    Aside from the Unsecured Debt Documents, the Putative Debtor has other substantial contacts with the United States that are sufficient to provide the Court with jurisdiction over the Putative Debtor.  As the Putative Debtor acknowledges in the Motion, the Putative Debtor is the direct owner of the equity interests of a Crédito Real USA, Inc. ("Crédito USA"), a Delaware corporation.  Motion ¶ 14.  Indeed, the Putative Debtor ascribes a value of approximately US$85 million to its equity interests in that entity.  *Id.*  Through Crédito USA, the Putative Debtor also indirectly owns other subsidiaries in the United States, including (i) Crédito Real USA Finance, LLC ("CRUSAFIN"), which operates out of Florida and manages a car loan portfolio, (ii) Crédito Real USA Business Capital, LLC, which operates out of Texas and manages an SME loan portfolio, and (iii) Camino Financial, Inc., which operates out of California and manages a consumer loan portfolio.  *Id.*  As an example of the scope of the operations of these subsidiaries in the United States, CRUSAFIN's website advertises that it works with car dealers to provide financing to customers across the country, as reflected below:[42]

---

[42]    https://www.crealusa.com/finance/markets-we-serve.



Crédito Real USA Finance has provided subprime auto financing to dealerships since 2007, with the goal of converting dealers' hard-to-place customers into funded deals. We serve Franchise and Independent Dealer Partners selling both new and pre-owned automobiles across the country.

Moreover, as the Putative Debtor acknowledges in the Motion, its business operations in the United States are "controlled out of Mexico." *Id.*

87.    Based on the foregoing, the Putative Debtor's contention that the Court cannot exercise personal jurisdiction over it should be rejected.  The Putative Debtor has purposefully availed itself of financial markets in the United States and has other extensive business contacts with jurisdictions throughout the country.

**B.    The Court's Exercise of Jurisdiction Over the Putative Debtor Comports with Fair Play and Substantial Justice**

88.    Under the reasonableness prong of the personal jurisdiction standard, courts must evaluate the following factors in cases involving a foreign defendant: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction; and (5) the federal government's interest in its foreign relations policies.  *In re Globo Comunicacoes e Participacoes*, 317 B.R. at 257-58 (quoting *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 113, 115 (1987)).  As stated above, because the Putative Debtor has minimum contacts with the United

States, the burden has shifted and the Putative Debtor "must present a compelling case" that this Court's exercise of jurisdiction would be unreasonable. *Burger King Corp*., 471 U.S. at 477. However, each reasonableness factor weighs in favor of the Court's exercise of jurisdiction of the Putative Debtor, and the Putative Debtor cannot present a compelling case otherwise.

> **1.      Subjecting the Putative Debtor to a Chapter 11 Proceeding in the United States Would Not Present an Unfair Burden to the Putative Debtor**

89.    The Court's exercise of personal jurisdiction over the Putative Debtor would not unfairly burden the Putative Debtor.  As an initial matter, courts have found that the exercise of personal jurisdiction over a foreign defendant may be appropriate even when it could cause a significant burden to the defendant. *See, e.g.*, *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 403 (S.D.N.Y. 2002), *aff'd sub nom, First Capital Asset Mgmt, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) (finding personal jurisdiction over Swiss defendant despite "significant" burden) (citation omitted).  Here, however, there is no basis for concluding that exercising personal jurisdiction over the Putative Debtor to permit the Involuntary Case to proceed in this Court would result in any significant burden much less an unfair burden.

90.    First, the Putative Debtor's assertion that the Court's exercise of jurisdiction over the Putative Debtor would create an unfair burden due to the location of its offices, operations and employees cannot withstand scrutiny.  At present, the Putative Debtor has no management, board of directors or employees that are likely to be required to travel to the United States in connection with the Involuntary Case.  Moreover, even if it were necessary to travel to the United States, no serious argument can be made that it is overly difficult or burdensome to travel from the Mexico City, Mexico to Delaware or elsewhere in this country.  In addition, the Putative Debtor's legal counsel is based in the United States and regularly appears on behalf of clients in chapter 11 proceedings before this Court.  Further, as the Second Circuit noted twenty years ago, "[e]ven if

forcing the [Putative Debtor] to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide [the Putative Debtor] only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-130 (2d Cir. 2002) (quoting *Metropolitan Life*, 84 F.3d at 574); *see also Zazzali v. 1031 Exchange Group LLC (In re DBSI, Inc.)*, 467 B.R. 309, 315 (Bankr. D. Del. 2012) ("[I]n this age of instant communication and transportation, [] the burdens of litigating in a distant forum have lessened.") (internal quotation marks and citation omitted).  The Second Circuit's ruling rings even more true today, given the rise of virtual proceedings resulting from the COVID-19 pandemic.

91.    The Putative Debtor's complaints about the alleged burden and inconvenience of allowing the Involuntary Case to proceed in this Court also ring hollow in light of the fact that in June 2022, the Putative Debtor was preparing to file a voluntary petition for chapter 11 relief with this Court in order to avail itself of the benefits and protections afforded to debtors under the Bankruptcy Code.  *See* Villen Declaration ¶ 17.  As discussed above, from February 2022 until June 2022, the Putative Debtor, with the assistance of legal counsel and financial advisors located in the United States, engaged in discussions with the Ad Hoc Group regarding a potential restructuring of the Company, and even negotiated the terms of DIP Financing and prepared first day motions to be filed in this Court.  Now, however, the Putative Debtor argues that subjecting the Putative Debtor to chapter 11 proceedings in this Court would be an unfair burden, with scarcely any reference at all relating to its previous plans to file voluntary chapter 11 proceedings in the United States.

92.     Finally, the Putative Debtor's contention that proceeding with the Involuntary Case in the United States would needlessly dissipate estate assets because the Putative Debtor is already liquidating under Mexican law must be rejected.  As discussed in further detail herein, the Mexican Liquidation is a deficient proceeding that fails to provide adequate rights and protections to creditors, and that the Court should decline to recognize.  Notwithstanding the Putative Debtor's assertions to the contrary, the Involuntary Case represents the only viable means by which creditors can enforce their rights against the Putative Debtor and obtain a recovery on account of their claims in a transparent and efficient process.  Further, the Mexican Liquidation was commenced after the filing of the Involuntary Petition and, thus, in violation of the automatic stay.  For that reason, the Court should reject the Putative Debtor's assertions that the Involuntary Case should be denied on the grounds that Mexican Court presiding over the Mexican Liquidation may not give effect to this Court's orders.  To the contrary, the Putative Debtor should terminate the Mexican Liquidation in favor of proceeding with the Involuntary Case in this Court.

### 2.     The United States Has a Strong Interest in Presiding Over the Putative Debtor's Restructuring

93.     Courts have found that the United States has a strong interest in presiding over matters involving a foreign entity where there are claims that will be asserted under the Bankruptcy Code.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 645; *see also Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. at 71 ("[T]he United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable." (citation omitted); *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013) ("Additionally, because this case was brought under federal law, the judicial system has a strong federal interest in resolving the issue here."); *Charan Trading Corp. v. Uni-*

*Marts, LLC (In re Uni-Marts, LLC)*, 399 B.R. 400, 409 (Bankr. D. Del. 2009) ("The United States has an interest in the efficient and orderly administration of the Debtor's estate."). Here, as discussed above, the Putative Debtor and its directors and officers have taken actions that have harmed creditors in the United States. It is a virtual certainty that such actions will be the subject of litigation claims asserted under the Bankruptcy Code in the Involuntary Case, including, among others, claims for avoidance of preferential and fraudulent transfers, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. Indeed, absent the ability to assert claims under the Bankruptcy Code, the Putative Debtor's unsecured creditors, including the Noteholders and the Unsecured Lenders, may be unable to obtain any effective relief against the Putative Debtor or its directors and officers or achieve any meaningful recovery on account of their claims. Accordingly, the United States has a strong interest in presiding over the Putative Debtor's restructuring due to both (i) the harm caused to financial institutions in the United States by the Putative Debtor, and (ii) the need to resolve litigation claims asserted under the Bankruptcy Code.

94.     Moreover, the Putative Debtor's suggestion that the Court should dismiss the Involuntary Case and defer to the Mexican Liquidation must be rejected. As discussed above, the Mexican Liquidation is a flawed proceeding that (i) fails to protect the rights of creditors or even to provide creditors with basic due process rights, (ii) was commenced against the Putative Debtor for the purpose of protecting Mr. Romanos from potential civil and criminal liability in Mexico and consented to by the Putative Debtor's chief executive officer without any apparent board, shareholder, or other corporate approvals, and (iii) is of a type that has never been recognized by a court in the United States as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

### 3.    The Involuntary Case is Likely the Only Possible Means for the Putative Debtor's Creditors to Obtain Any Relief

95.    Notwithstanding the Putative Debtor's assertions to the contrary, the Involuntary Case likely provides the only means for the unsecured creditors of the Putative Debtor's estate to obtain effective relief and to obtain the greatest possible recovery on account of their claims.

96.    The Putative Debtor blatantly mischaracterizes the nature of the Mexican Liquidation to create the false impression that such proceedings provide an effective forum to resolve claims and where the rights of creditors are adequately protected.  In reality, the Mexican Liquidation is deeply flawed.  As discussed in detail above, the Mexican Liquidation fails to provide creditors with adequate notice and due process rights—indeed, the Mexican Liquidation was commenced without any prior notice to creditors at all.  Moreover, the Mexican Liquidation does not afford creditors with any meaningful transparency regarding the actions of the Mexican Liquidator, and does not provide a mechanism for avoiding potential preference or fraudulent transfer claims to maximize the value of the estate for the benefit of unsecured creditors.  Finally, the Mexican Liquidation is not governed by the absolute priority rule or any other similar principle for distributions, but instead, the Mexican Liquidator is permitted to make payments to creditors or shareholders without any meaningful constraints (and has been doing so).

97.    Against this backdrop, any suggestion that the Mexican Liquidation will provide the Putative Debtor's unsecured creditors with effective relief is untenable and must be rejected. From the perspective of the Putative Debtor's unsecured creditors, it is imperative that the Involuntary Case proceed in this Court, and that the Mexican Liquidation—which was commenced by Mr. Romanos with full knowledge of the Involuntary Case and in violation of the automatic stay—be terminated.

46

###### 4.     Mexico's Interests Are Best Served by This Court's Exercise of Jurisdiction over the Putative Debtor

98.     The Putative Debtor's contention that the procedural and substantive policies of Mexico would be served if this Court declined to exercise jurisdiction over the Putative Debtor must be rejected.  *See* Motion at ¶¶ 35-36.  The Putative Debtor erroneously asserts that Mexico's interests would be served by dismissal because the Mexican Court is already presiding over the Mexican Liquidation Proceeding, but fails to acknowledge the harm that such proceedings have caused to the interests of Mexico.  *Id.*

99.     Like any other government, Mexico has a significant interest in promoting foreign investment in Mexican businesses.  Moreover, as demonstrated by the successful reorganization of *Grupo Aeromexico*, the flag carrier airline of Mexico, Mexican companies have benefitted from American investors' willingness to provide financing to distressed Mexican companies in connection with chapter 11 cases in the United States.  *See In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20-11563 (Bankr. S.D.N.Y. 2020).  However, if the Putative Debtor is permitted to proceed with the Mexican Liquidation, there is a significant risk that foreign investors will be less willing to provide financing to Mexican companies due to the risk that the company could seek to circumvent a meaningful restructuring process by availing itself of the type of corporate dissolution proceedings that the Putative Debtor has commenced, which, as discussed above, fail to provide adequate protections to creditors.

100.     In addition, Mexico has an interest in preserving actual and perceived fairness of its own legal system.  This interest would not be served if the Court declined to exercise jurisdiction over the Putative Debtor.  To the contrary, if the Involuntary Case were dismissed in favor of the Mexican Liquidation, Mexico's interest in maintaining a fair legal system would be harmed as a result of the Putative Debtor's use of the Mexican Liquidation to avoid accountability for the

actions of its directors and officers and to undermine creditors' expectations.  As discussed in detail above, the Mexican Liquidation is not an insolvency proceeding, but rather a dissolution and liquidation proceeding under Mexican corporate law.  Mexico has a well-established insolvency process in the form of the Concurso Law and has also recently established specialized federal bankruptcy courts (the "<u>Mexican Commercial Bankruptcy Courts</u>").  By sidestepping *concurso mercantil* proceedings and the Mexican Commercial Bankruptcy Courts, as well as voluntary chapter 11 cases in the United States that were on the verge of being filed, the Putative Debtor has created uncertainty as to whether other Mexican companies will do the same in the future.  As a result, if the Mexican Liquidation continues, creditors will no longer have confidence that Mexican companies will pursue an orderly and transparent restructuring process in the event that there is a downturn in the company's business.

101.     Furthermore, there are currently two pending legal actions in Mexico challenging the validity of the Mexican Liquidation.  After the Mexican Court issued the Judgment putting the Putative Debtor into the Mexican Liquidation, one of the Petitioning Creditors and one of the Putative Debtor's shareholders commenced two separate legal actions.  First, one of the Petitioning Creditors filed an *amparo* proceeding to challenge the constitutionality of the actions taken by the Mexican Court in connection with the Mexican Liquidation.  Second, one of the Putative Debtor's shareholders filed an appeal of the Judgment with the Mexican Court.  The *amparo* proceeding is currently pending before the Eighth District Court for Civil Matters in Mexico City, Mexico.  On August 17, 2022, the Mexican Court admitted the appeal, which had the effect of suspending the Mexican Liquidation pending the resolution of the appeal.  In addition, the judge that previously admitted the Lawsuit and entered the Judgment was transferred to another court by the Judicial

Council of Mexico City, and as a result, Judge Verónica Guzmán Gutiérrez of the Mexican Court

will now preside over the appeal of the Judgment.

102.     In light of the fact that there are two pending actions in Mexican courts challenging

the propriety of the Mexican Liquidation, a valid proceeding may not even exist for the Court to

defer to or to recognize under chapter 15 of the Bankruptcy Code.  Accordingly, the Involuntary

Case may be the only means for the unsecured creditors of the Putative Debtor's estate to obtain

effective relief if the legal challenges to the Mexican Liquidation prove to be successful and the

interests of Mexico would be best served by allowing the Involuntary Case to remain pending so

that the Putative Debtor's stakeholders may seek redress in a valid judicial proceeding.

103.     Given the Putative Debtor's extensive contacts with the United States and the

Putative Debtor's failure to establish a compelling case that this Court's exercise of jurisdiction

would not be fair and reasonable, the Court should deny the Motion and exercise personal

jurisdiction over the Putative Debtor.

## V.     THE PETITIONING CREDITORS HAVE STANDING TO FILE THE INVOLUNTARY PETITION

104.     The Putative Debtor seeks to create a heightened standard of proof regarding the

Petitioning Creditors' claims in an effort to obtain dismissal of the Involuntary Case.  Neither the

Bankruptcy Code nor the Bankruptcy Rules provide that a petitioning creditor must "provid[e]

evidence of the chain of ownership of such bonds, running up from the holder of the global note

to the DTC participant and on to the purported beneficial holder" to evidence a petitioning

creditor's claim in support of an involuntary petition, as the Putative Debtor wrongly alleges.  *See*

Motion at ¶ 41.  Accordingly, the Putative Debtor's objection to the standing of the Petitioning

Creditors should be overruled.

105.    In the Motion, the Putative Debtor cites a single case in support of its erroneous contention.  *See Dussault v. Republic of Argentina*, No. 04 Civ. 2710 (TPG), 2006 U.S. Dist. LEXIS 6477, (S.D.N.Y. Feb. 21, 2006).  However, the *Dussault* court's decision does not announce the standard alleged by the Putative Debtor, does not concern the filing of an involuntary petition, and does not even reference the requirements of the Bankruptcy Code or the Bankruptcy Rules. *See id.* at *6.  In fact, in *Dussault*, the court held that a letter from the plaintiff noteholder's bank was "otherwise valid" but did not meet the court's standards for proof of ownership of certain bonds because the "letter was written nearly five months before plaintiffs filed their summary judgment motion."  *Id.* at *6-7.  The court found only that the plaintiff noteholder would need to provide more recent evidence of its holdings.  *Id.* ("Moreover, the letter was written just a week after plaintiffs purchased the beneficial interests.  A certification issued mere days after purchase cannot suffice to prove current ownership five months later.").  The Putative Debtor's attempt to construe the *Dussault* court's ruling as requiring holders to provide evidence of the chain of ownership running from the holder of the global note through the DTC participant and on to the beneficial holder represents a gross misreading of the decision.

106.    Generally, courts have held that a bondholder may establish its holdings through a declaration asserting ownership of the bond.  *See, e.g., id.*; *Mazzini v. Republic of Argentina*, No. 03-CV-8120 (TPG), 2005 WL 743090, at *4 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x 907 (2d Cir. 2008); *see also NML Capital v. Republic of Argentina*, No. 14 Civ 8988 (TPG), 2015 U.S. Dist. LEXIS 73521, at *64-5 (S.D.N.Y. June 5, 2015) (citing Fed. R. Civ. P. 56(c)(1)).  Courts have also held that account statements, bank statements, or broker certifications demonstrating ownership of bonds are sufficient to constitute evidence of beneficial ownership.  *See, e.g., Capital Ventures Int'l. v. Republic of Argentina*, No. 05 Civ. 4085 (TPG), 2006 WL 1379607, at *2

(S.D.N.Y. May 18, 2006) ("The court has generally required account statements and/or certifications from brokers and banks to make a finding of current ownership of beneficial interests."); *Colella v. Republic of Argentina*, No. 04 Civ. 2710 (TPG), 2006 WL 399449, at *2 (S.D.N.Y. Feb. 21, 2006) ("Plaintiffs have presented a facially valid bank statement from Banca di Roma demonstrating what beneficial interests they purchased and when. The court is satisfied with this measure of proof."); *Greylock Global Distressed Debt Master Fund, Ltd. v. Republic of Argentina*, No. 05 Civ. 4246 (TPG), 2006 WL 397908, at *2 (S.D.N.Y. Feb. 17, 2006) (holding that account statements from broker are sufficient evidence of beneficial ownership); *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG), 2003 WL 22120745, at*2 (S.D.N.Y. Sept. 12, 2003) (finding that affidavits and statements of account constitute sufficient evidence of beneficial ownership). Courts "will also accept other evidence, so long as it specifically confirms that the bonds held in plaintiffs' accounts are the bonds they claim to own." *Mazzini*, 2005 WL 473090, at *4.

107.    Here, Institutional Multiple Investment Fund LLC and VP Fund Solutions (Liechtenstein AG) each sufficiently demonstrated their beneficial ownership of the Notes for purposes of filing the Involuntary Petition by submitting a declaration along with documentation confirming their holdings as of the time of the filing of the involuntary petition. *See* Involuntary Petition [Case No. 22-10696, Docket No. 1]. No further evidence is required under the law. However, to provide additional evidence of its beneficial ownership of the Notes, Institutional Multiple Investment Fund LLC has filed additional account statements with this Court contemporaneously herewith.

## **CONCLUSION**

WHEREFORE, the Ad Hoc Group and the Petitioning Creditors respectfully request that the Court (i) deny recognition of the Mexican Liquidation Proceedings as a foreign main

proceeding under chapter 15 of the Bankruptcy Code, (ii) deny the Motion and (iii) enter an order for relief in the Involuntary Case.

[*Remainder of Page Intentionally Left Blank*]

Dated: August 26, 2022

Respectfully submitted,

*/s/ Christopher M. Samis*

**POTTER ANDERSON & CORROON LLP**
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801-3700
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  csamis@potteranderson.com
Email:  kgood@potteranderson.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile:  (212) 872-1002
Email:  idizengoff@akingump.com
Email:  dbotter@akingump.com
Email:  aqureshi@akingump.com

-and-

James Savin (admitted *pro hac vice*)
Kevin Eide (admitted *pro hac vice*)
Alexander F. Antypas (admitted *pro hac vice*)
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Facsimile:  (202) 887-4288
Email:  jsavin@akingump.com
Email:  keide@akingump.com
Email:  aantypas@akingump.com

*Counsel to the Ad Hoc Group and the Petitioning Creditors*