**<u>EXHIBIT B</u>**

Juan P. Morillo (*pro hac vice*)
Gabriel F. Soledad
Daniel Pulecio-Boek
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100
Email:  juanmorillo@quinnemanuel.com
Email:  gabrielsoledad@quinnemanuel.com
Email:  danielpulecioboek@quinnemanuel.com

Eric Winston (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  ericwinston@quinnemanuel.com

Scott C. Shelley
Samantha Gillespie (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
Email:  scottshelley@quinnemanuel.com
Email:  samanthagillespie@quinnemanuel.com

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al*. | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |

## SUPPLEMENTAL DECLARATION OF ALFONSO LÓPEZ-MELIH

I, Alfonso López-Melih, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.       I submit this declaration ("Supplemental Declaration") to supplement the declaration I previously provided on April 20, 2018 (the "Initial Declaration") in support of petitions and motions to the U.S. Bankruptcy Court for the Southern District of New York by Alonso del Val-Echeverria as foreign representative ("Foreign Representative") of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora Oro Negro") and Perforadora Oro Negro, S. de R.L. de C.V. ("Perforadora Oro Negro") (respectively, the "Integradora Verified Petition" and the "Perforadora Verified Petition", and together, the "Verified Petitions").

2.       This Supplemental Declaration addresses whether the preliminary stage of a Mexican *concurso mercantil* proceeding under the Mexican Business Reorganization Act (in Spanish, *Ley de Concursos Mercantiles*, the "LCM") is part of the *concurso mercantil* proceeding.[1]

3.       Under Mexican law, statutes are the primary source of legal authority.  Case law is generally not binding and is usually only an aid to interpret and apply statutes.  As such, this Supplemental Declaration focuses on analyzing the relevant provisions of the LCM and cites to some cases to further illustrate the meaning of the LCM.  Where relevant, this Declaration cites the entire applicable LCM provision and provides an English translation of same.

### Preliminary Stage of a *Concurso Mercantil*

4.       As I explained in my Initial Declaration, under the LCM, a *concurso mercantil* proceeding is comprised of two stages:  (a) the preliminary stage, which commences with the request of a debtor, its creditors or the Mexican Attorney General's Office (in Spanish, *Ministerio Publico*)

---

[1]      *Ley de Concursos Mercantiles* [LCM] [Business Reorganization Act], Diario Oficial de la Federación [DO], 31 de Diciembre de 1969 (Mex.).

to initiate a *concurso mercantil* proceeding and during which the court determines whether the debtor is insolvent; and (b) if the court determines that the debtor is insolvent, the *concurso* stage, which is also comprised of two stages:[2]   (i) the conciliation (in Spanish, *conciliación*), which provides an opportunity for the debtor to reach an agreement with its creditors to repay debts; and (ii) the liquidation (in Spanish, *quiebra*), which involves the sale of the debtor's assets to repay debts.[3]

5.       There is no doubt that the preliminary stage is part of a Mexican *concurso mercantil* proceeding for two primary reasons.  First, Mexico designed the LCM with the purpose of including the preliminary stage as part of the *concurso*.  Second, numerous provisions of the LCM demonstrate that once a debtor, its creditors or the Mexican government file for *concurso*, the debtor is subject to the supervision of the Mexican court for the purpose of successfully accomplishing a reorganization. Equally important, a debtor's creditors directly participate in the preliminary stage and as such, its outcome depends, in large part, on them.  Indeed, the key difference between the preliminary stage and the *concurso* stage is not how much supervision or control the court can exert over the debtor as that remains virtually the same throughout the entire *concurso mercantil* proceeding.  The key difference is the purpose of each stage, *i.e.*, in the preliminary stage, the debtor, its creditors and the court focus on ensuring that the debtor is insolvent and requires a reorganization of its debts, whereas during the *concurso* stage all these constituents focus on reaching a restructuring agreement and preventing liquidation.

---

[2]     *See id.* Art. 2 ("*El concurso mercantil consta de dos etapas sucesivas, denominadas conciliación y quiebra.*") [The *concurso mercantil* consists of two successive stages, called conciliation and liquidation."].

[3]     *See id.* Art. 3 ("*La finalidad de la conciliación es lograr la conservación de la empresa del Comerciante mediante el convenio que suscriba con sus Acreedores Reconocidos.  La finalidad de la quiebra es la venta de la empresa del Comerciante, de sus unidades productivas o de los bienes que la integran para el pago a los Acreedores Reconocidos.*") ["The purpose of the conciliation is to achieve the preservation of the Merchant's company through the agreement signed with its Recognized Creditors.  The purpose of the liquidation is the sale of the Merchant's company, of its productive units or of the goods that compose it for payment to the Recognized Creditors."].

6.      As to the purpose of the LCM, the exposition of motives (*exposición de motivos*) for its 2007 amendment (the exposition of motives is a document prepared by Mexican legislators prior to analyzing and voting on new legislation setting forth the purpose of such legislation) is particularly relevant.  Specifically, it states that the LCM "divides the *concurso mercantil* into a preliminary stage and two named stages, each with different objectives, duration and decisions. These are:  the preliminary [stage] of verification, the [stage] of conciliation and the [stage] of liquidation."  The exposition of motives to the 2007 LCM amendment in Spanish, with an English translation, is attached here as Exhibit 1.

7.      As to the LCM's provisions, numerous provisions demonstrate that once a debtor, its creditors or the Mexican government file for *concurso*, the debtor is subject to the supervision of the Mexican court for the purpose of successfully accomplishing a reorganization, which reflects that the preliminary stage is indeed part of a Mexican *concurso mercantil* proceeding.  For example:

a.   When a debtor files for *concurso*, it must provide to the court, *inter alia*, a list of all its creditors and debtors and an inventory of all its assets and any other rights it holds, and thus any decisions by the court during this stage necessarily involve all the debtor's creditors;[4]

---

[4]      *See id*. Art. 20 ("*El Comerciante que considere que ha incurrido en el incumplimiento generalizado de sus obligaciones en términos de cualquiera de los supuestos establecidos en el artículo 10 de esta Ley, podrá solicitar que se le declare en concurso mercantil, el cual, en caso de ser fundado, se abrirá en etapa de conciliación, salvo que el Comerciante expresamente pida que el concurso mercantil se abra en etapa de quiebra. La solicitud de declaración de concurso mercantil del propio Comerciante deberá ser presentada en los formatos que al efecto dé a conocer el Instituto, la cual deberá contener al menos el nombre completo, denominación o razón social del Comerciante, el domicilio que señale para oír y recibir notificaciones, así como en su caso el domicilio social, el de sus diversas oficinas y establecimientos, incluyendo plantas, almacenes o bodegas, especificando en caso necesario en dónde tiene la administración principal de su empresa o en caso de ser una persona física, el domicilio donde vive y además, a ella deberán acompañarse los anexos siguientes: . . . III. Una relación de sus acreedores y deudores que indique sus nombres y domicilios, la fecha de vencimiento del crédito o créditos de cada uno de ellos, el grado con que estima se les debe reconocer, indicando las características particulares de dichos créditos, así como de las garantías, reales o personales, que haya otorgado para garantizar deudas propias y de terceros; IV. Un inventario de todos sus bienes inmuebles y muebles, títulos valores, géneros de comercio y derechos de cualquier otra especie.*") ["The Merchant that believes it has committed a general breach of his obligations in terms of any of the circumstances established in article 10 of this Law may request to declare *concurso mercantil*, which, if it is founded, it [the case] will be opened in the

---

b. During the preliminary stage, it is common for the court to issue injunctions, which the court crafts at its discretion, enjoining the debtor from certain actions (for example, paying creditors) or enjoining the debtor's creditors or customers from cancelling their contracts with the debtor or from executing on the debtor's assets.[5] The court issues these injunctions in the interest of all the constituents in a *concurso mercantil* proceeding, *e.g.*, the debtors, the creditors and the debtors' employees;[6]

---

conciliation stage, unless the Merchant expressly requests that the proceeding be opened in the liquidation stage. The request for declaration of *concurso mercantil* by the Merchant itself must be presented in the forms that the Institute makes known, which must contain at least the full name, denomination or business name of the Merchant, the address indicated for hearing and receiving notifications, as well as, where appropriate, the registered office, of its various offices and establishments, including plants or warehouses, specifying where necessary where the main administration of the company is located, or if it is an individual, the address where he lives, and in addition, to it the following annexes accompany the request: . . . III. A list of its creditors and debtors that indicates their names and addresses, the expiration date of the credit of each one of them, the degree to which it is estimated they should be recognized, indicating the particular characteristics of said credits, as well as the guarantees, real or personal, that you have granted to guarantee your own debts and those of third parties; IV. An inventory of all its real and personal property, securities, merchandise and rights of any other kind."].

[5]    *See id.* Art. 26 (second paragraph) ("*El juez, a solicitud del Comerciante, o de oficio, dictará las providencias precautorias que considere necesarias a fin de evitar que se ponga en riesgo la viabilidad de la empresa con motivo de la demanda o de otras que se presenten durante la visita, o que se agrave dicho riesgo, para lograr salvaguardar el interés público previsto en el artículo primero de la presente Ley.*") ["The judge, at the request of the Merchant, or ex officio, shall issue the precautionary measures that he/she deems necessary in order to avoid jeopardizing the viability of the company due to the *concurso* filing or of complaints that come up during the investigation, or to avoid increasing such risk, in order to safeguard the public interest contemplated by the first article of the present Law."]; *see also id.* Art. 37 (second paragraph) ("*El juez podrá dictar las providencias precautorias que estime necesarias, en cualquier etapa del procedimiento concursal, una vez que reciba la solicitud, o bien de oficio.*") ["The judge may issue the precautionary measures he deems necessary, at any stage of the *concurso* proceedings, once he receives the request, or ex officio."].

[6]    *See id.* Art. 1 ("*La presente Ley es de interés público y tiene por objeto regular el concurso mercantil. Es de interés público conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios. Con el fin de garantizar una adecuada protección a los acreedores frente al detrimento del patrimonio de las empresas en concurso, el juez y los demás sujetos del proceso regulado en esta Ley deberán regir sus actuaciones, en todo momento, bajo los principios de trascendencia, economía procesal, celeridad, publicidad y buena fe.*") ["This Law is in the public interest and its purpose is to regulate c*oncurso mercantil* proceedings. It is in the public interest to preserve companies and prevent generalized breach of payment obligations from jeopardizing the company's viability and that of others with which they have a business relationship. In order to guarantee adequate protection for creditors against a decrease of the assets of the companies in *concurso*, the judge and the others subject to the regulated process per this Law must govern their actions, at all times, under the principles of importance, procedural economics, speed, notice and good faith."].

c.  The *visitador*, who is responsible for examining the debtor's finances in the preliminary stage and providing a report to the court on whether the debtor is insolvent, may also request injunctions;[7]

d.  Any injunctions issued by the court during the preliminary stage will last for as long as the court so determines;[8]

e.  Any party affected in any way by an injunction may challenge it, including via an *amparo*, which is a constitutional challenge against a court order on the grounds that the order violates rights set forth in the Mexican Constitution;[9] and

f.  A debtor seeking to obtain financing for business expenses and other costs during any stage of the *concurso* (what is known internationally as "debtor-in-possession financing"), including during the preliminary stage, must seek leave from the court prior to obtaining such financing.[10]

---

[7]  *See id*. Art. 30(I) ("*En su caso, sugiera al juez las providencias precautorias que estime necesarias para la protección de la Masa, en los términos del artículo 37 de la misma.*") ["In his case, [the *visitador* may] suggest to the judge the precautionary measures he deems necessary for the protection of the Estate, in the terms of article 37 of the same [law].""]; *see also id*. Art. 31 (first paragraph) ("*Además de las providencias precautorias a que hace referencia el artículo 25, el visitador podrá solicitar al juez en el transcurso de la visita la adopción, modificación o levantamiento de las providencias precautorias a las que se refiere este artículo, con el objeto de proteger la Masa y los derechos de los acreedores, debiendo fundamentar en todos los casos las razones de su solicitud.*") ["In addition to the precautionary measures referred to in article 25, the *visitador* may request of the judge during the examination period, the adoption, modification or lifting of the precautionary measures referred to in this article, in order to protect the mass and the rights of the creditors, in each case having to justify the reasons for his request."].

[8]  *See id*. Art. 38 ("*Las providencias precautorias subsistirán hasta que el juez ordene su levantamiento. El Comerciante podrá evitar la aplicación de las providencias precautorias o bien solicitar que se levanten las que se hubieren dictado, previa garantía constituida a satisfacción del juez.*") ["The precautionary measures will survive until the judge orders their lifting.  The Merchant may avoid the application of precautionary orders, or seek that those that have been ordered be lifted, having provided a guaranty that satisfies the judge."].

[9]  *See* Suprema Corte de Justicia de la Nación [Supreme Court of Justice of the Nation], Seminario Judicial de la Federación y su Gaceta, Décima Época, Libro 24, Tomo II, Noviembre de 2015, Página 1692 (Mex.) (interpreting article 37 of the LCM, which refers to the preliminary stage, holding that any party affected by an injunction has the same rights as any other party in the *concurso*, including rights to file reconsideration motions and *amparos*).

[10]  *See* LCM Art. 37 (second and third paragraphs) ("*Desde la solicitud de concurso mercantil o bien, una vez admitida a trámite, el Comerciante podrá solicitar al juez su autorización para la contratación inmediata de créditos indispensables para mantener la operación ordinaria de la empresa y la liquidez necesaria durante la tramitación del concurso mercantil.  Para la tramitación de los referidos créditos, el juez podrá autorizar la constitución de garantías que resultaren procedentes, si así fuera solicitado por el Comerciante.  Presentada la petición del Comerciante y dada*

8.      Equally important, the creditors of a debtor play a key role in the preliminary stage and the outcome of the preliminary stage depends, in large part, on them.  This also reflects that the preliminary stage is indeed part of a Mexican *concurso mercantil* proceeding.  For example:

a.   As a starting matter, the entire *concurso mercantil* proceeding is public, and as such, any party may access its filings and orders;[11]

b.   A creditor of a debtor may also initiate a *concurso mercantil* proceeding for the debtor and seek injunctions during the preliminary stage;[12]

c.   A debtor may only withdraw its request to initiate a *concurso mercantil* proceeding with the consent of its creditors;[13] and

---

*la urgencia y necesidad del financiamiento, el juez, previa opinión del visitador, resolverá respecto la autorización del financiamiento con el objetivo antes aludido, procediendo a dictar los lineamientos en los que quedará autorizado el crédito respectivo y su pago ordinario durante el concurso mercantil, tomando en consideración su prelación preferente en los términos del artículo 224 de la Ley.*") ["From the request for *concurso mercantil*, or rather once the filing is admitted, the Merchant can request the judge's authorization for the immediate contracting of credit necessary to maintain the ordinary operation of the business and the liquidity necessary during the process of the *concurso mercantil*. For the transaction of said credit, the judge can authorize the creation of guaranties that are necessary, if this is requested by the Merchant.  [With] the petition presented by the Merchant, and given the urgency and necessity of [obtaining] financing, the judge, before the opinion of the *visitador* [is complete], with resolve the issue of authorization of the financing for the purpose above described, proceeding to dictate the guidelines within which the respective credit is authorized, and its regular payment during the *concurso mercantil*, taking into consideration its preferred [payment] priority in terms of article 227 of the Law [LCM]."].

[11]    *See id.* Art. 7 (second paragraph) (*El procedimiento de concurso mercantil es público, por lo que cualquier persona puede solicitar acceso a la información sobre el mismo, a través de los mecanismos de acceso a la información con que cuente el Poder Judicial de la Federación.*") ["The bankruptcy proceeding is public, so anyone can request access to information about it, through the mechanisms of access to information assured by the Judicial Branch of the Federation."].

[12]    *See id.* Art. 21 ("*Podrán demandar la declaración de concurso mercantil cualquier acreedor del Comerciante o el Ministerio Público.*") ["Any creditor of the Merchant or the Attorney General may demand the declaration of *concurso mercantil*."]; *see also id.* Art. 25. ("*El acreedor que demande la declaración de concurso mercantil de un Comerciante, podrá solicitar al juez la adopción de providencias precautorias o, en su caso, la modificación de las que se hubieren adoptado.  La constitución, modificación o levantamiento de dichas providencias se regirán por lo dispuesto al efecto en el Código de Comercio.*") ["The creditor who demands the declaration of *concurso mercantil*  of a Merchant, may request of the judge the adoption of precautionary measures or, as the case may be, the modification of those that have been adopted.  The constitution, modification or lifting of said orders will be governed by the provisions of the Commercial Code."].

[13]    *See id.* Art. 28. ("*El Comerciante que haya solicitado su declaración de concurso mercantil o, en su caso, los acreedores o el Ministerio Público que lo hayan demandado, podrán desistir de su solicitud o demanda, siempre que exista el consentimiento expreso de todos ellos.  El Comerciante o los acreedores demandantes sufragarán los gastos del proceso, entre otros, los honorarios del visitador y, en su caso, del conciliador.*") ["The Merchant who has requested its declaration of *concurso mercantil* or, when applicable, the creditors or the Attorney General that have demanded it, may

    d.  Creditors may review the *visitador*'s report and challenge it.[14]

Dated: __05 / 14 / 2018__     Signature: _____

                                                         Alfonso López-Melih

---

desist from their request or demand, provided that there is the express consent of all of them.  The Merchant or the creditor plaintiffs will bear the expenses of the process, [including] among others, the fees of the *visitador* and, when applicable, the conciliator."].

[14]  *See id.* Art. 29 ("*Al día siguiente de que el juez admita la demanda, deberá remitir copia de la misma, más no de sus anexos, al Instituto, ordenándole que designe un visitador dentro de los cinco días siguientes a que reciba dicha comunicación.  De igual forma y en el mismo plazo deberá hacerlo del conocimiento de las autoridades fiscales competentes para los efectos que resulten procedentes, girándose de inmediato los oficios respectivos.  Lo anterior, sin perjuicio de que los anexos respectivos de la demanda, deberán quedar a disposición del Instituto, de los acreedores y de las autoridades fiscales y administrativas competentes, en el juzgado.*") ["On the day after the judge accepts the demand, he should remit a copy of the same, without annexes, to the Institute, ordering it to designate a *visitador* within the five days after it receives said communication.  In the same way and in the same period, he should notify the competent prosecuting authorities for the resultant effects of the proceeding, providing to them the respective orders.  The foregoing, without prejudice to the fact that the respective appendices to the petition must remain at the disposition of the Institute, of the creditors and of the competent fiscal and administrative authorities, in the court."]; *see also id.* Art. 41 ("*El juez al día siguiente de aquel en que reciba el dictamen del visitador, lo pondrá a la vista del Comerciante, del acreedor o acreedores demandantes y del Ministerio Público en caso de que éste haya demandado el concurso mercantil, para que dentro de un plazo común de cinco días presenten sus alegatos por escrito, y para los demás efectos previstos en esta Ley.*") ["The judge, on the day after he receives the opinion of the *visitador*, will put on notice the Merchant, the creditor plaintiffs or the Attorney General in the event that he has demanded the insolvency proceeding, so that within a common period of five days they present their arguments in writing, and for the other purposes provided by this Law."].

# Exhibit 1

# LEY DE CONCURSOS MERCANTILES

## " EXPOSICION DE MOTIVOS "

**Fecha de publicación**: 5/12/00
**Disposición legal**: LEY
**Periódico oficial**: 8-I
**Entidad**: SECRETARIA DE GOBERNACION
**CAMARA DE ORIGEN**: SENADORES EXPOSICION DE MOTIVOS México D.F. a 23 de noviembre de 1999. INICIATIVA PRESENTADA POR SENADORES: (GRUPOS PARLAMENTARIOS PRD, PRI e INDEPENDIENTE) CC. SECRETARIOS DE LA CÁMARA DE SENADORES PRESENTE

Los que suscriben Senadores de la República de la LVII Legislatura del H Congreso de la Unión, integrantes de los Grupos Parlamentarios del Partido de la Revolución Democrática, del Partido Revolucionario Institucional, y el senador independiente Adolfo Aguilar Zinser, con fundamento en lo dispuesto por la fracción II del artículo 71 de la Constitución Política de los Estados Unidos Mexicanos así como por la fracción II del articulo 55 del Reglamento para el Gobierno Interior del Congreso General, sometemos a consideración de esta H. Asamblea, la siguiente Iniciativa de Ley de Concursos Mercantiles, con arreglo a la siguiente:

## EXPOSICION DE MOTIVOS

Importancia de la legislación concursal.

Las condiciones sociales y económicas que prevalecían en México en la década de los años cuarenta se han transformado radicalmente. Nuestra población se ha multiplicado en cinco veces el producto interno bruto ha crecido en más de quince veces la participación de los sectores industrial y de servicios se ha incrementado significativamente y la del sector primario se ha reducido. El crecimiento demográfico y la marcha del campo hacia la ciudad han sido de gran magnitud Los avances en las telecomunicaciones y los medios de transporte se han dado a pasos agigantados, en ese entonces inimaginables.

La forma de hacer negocios también es distinta. Anteriormente la mayoría de las empresas comerciales eran unipersonales o familiares y relativamente fáciles de

administrar. Hoy en día las relaciones comerciales son más complejas y sujetas a un mayor número de factores, algunos de carácter internacional que afectan la vida económica de las naciones individualmente consideradas - aunque de distinta forma y grado -, y otros que son propios de las realidades nacionales; que inciden sobre la marcha de la empresa. Los ciclos de los productos se han hecho más cortos, y las empresas están expuestas a cambios más frecuentes. y en ocasiones más pronunciados, en las condiciones de los mercados financieros. Todo ello obliga a las empresas a transformarse más rápidamente.

La economía, de ser típicamente regional fue integrándose hacia una economía nacional, hasta entrar en una etapa de inserción en la economía mundial. Paralelamente, los mercados de dinero y bursátil, que hace medio siglo eran prácticamente inexistentes. han adquirido una gran preponderancia como medio de financiamiento del desarrollo. Nuestro país se ha integrado a la economía mundial en respuesta a los beneficios que ofrece el proceso de globalización, no sólo en lo que se refiere al intercambio de bienes y servicios con el exterior, sino que también se ha integrado a los crecientes flujos financieros y de inversión.

Las cadenas productivas se integran vertical y horizontalmente, nacional e internacionalmente, tecnológica y sectorialmente. La mayor competitividad obliga a unas empresas a responder ágilmente a los nuevos nichos de mercado y a abandonar aquéllos donde se dejan de tener ventajas competitivas. A medida que la sociedad se moderniza, aumenta el número de empresas, y de la misma manera los factores que hacer variar su competitividad, rentabilidad y permanencia en el mercado.

Existe, sin embargo, un serio problema cuando se dan condiciones que llevan a un empresario, de manera rápida e irremediable, a enfrentar problemas económicos y financieros: incluso cuando ello sea motivado por un error de cálculo o previsión cometido por un empresario honesto, competente y próspero. La empresa, considerada como la organización de trabajo, bienes materiales e intangibles destinados a producir u ofrecer profesionalmente bienes y servicios al mercado, con fines lucrativos, puede tener éxito o bien encontrarse en serias dificultades que amenacen su supervivencia. La quiebra de una empresa no trata de un incumplimiento singular y concreto de una obligación, sino de un incumplimiento general, que afecta a todos las que tienen relación con la empresa e igualmente afecta la supervivencia económica de los trabajadores que laboran, en ella, de manera que su quiebra repercute en todo su entorno social.

Además cuando una empresa se ve imposibilitada a cumplir de manera generalizada en sus obligaciones liquidas frente a una pluralidad de acreedores, se corre el riesgo de

que se dé una situación en que el cobro a través de la acción individual por parte de sus acreedores resulte en un detrimento del valor total de la empresa. En este caso la acción individual también puede afectar la prelación que existía entre los acreedores, resultando en inequidades. Este es el momento en que el derecho concursal debe dirigir su normatividad para tratar de evitar que la empresa fracase, que se desperdicie el esfuerzo creativo ya realizado por el empresario, y que no se lastime al conglomerado social que, en alguna medida, se beneficia con el propio funcionamiento de la empresa. La posible quiebra es, entonces. un fenómeno económico, y el propósito de la legislación concursal es precisamente atender los males sociales derivados de ese singular fenómeno.

En lo que hace al marco jurídico que regula las relaciones comerciales entre particulares, debe tenerse en cuenta que en el pasado los tribunales mexicanos y sus leyes procesales se crearon para resolver problemas de sociedades establecidas en ciudades más pequeñas, en las cuales todos los actores se conocían y encontraban todos los días en los lugares públicos y de trabajo. En tales condiciones sociales era factible suponer en el juez conocimientos básicos y la inmediatez con la empresa, necesarios para resolver muchos de los problemas que produce la falta de liquidez. Además de que los casos de cesación de pagos eran menos en una sociedad que mostraba menor grado de desarrollo. Hoy en día, la vida en las ciudades no permite a los jueces conocer personalmente a las partes involucradas, el número de negocios que se les someten es aplastante, el tamaño y la complejidad de las empresas comerciales requiere que sean manejadas por equipos de especialistas en administración, contabilidad y en los diversos campos de la actividad comercial, industrial o de servicios de que se trate.

Por todo lo anterior, el marco jurídico no puede permanecer al margen del avance de la sociedad. Para impulsar un crecimiento económico sano y sostenido, que ofrezca oportunidades de desarrollo a toda la población. una condición necesaria es la de contar con un marco jurídico apropiado que ofrezca certidumbre y confianza en la solución, de conflictos entre particulares, facilite la reasignación eficiente de los recursos productivos en la economía y contribuya a que la salida de empresas de los mercados afecte lo menos posible su entorno social y económico. El marco jurídico que regula la actividad económica en este sentido ha venido modernizándose durante los últimos años. No sólo se han establecido acuerdos comerciales con los principales países del mundo, también se expidió la Ley Federal de Competencia. y se han realizado avances importantes en la forma de resolver conflictos entre los particulares, destacando entre ellos la Ley de Arbitrajes.

La legislación concursal también desempeña un papel estratégico. Su propósito es el de ordenar los procesos de reestructuración de empresas, buscando en primer término aprovechar la experiencia y conocimientos del empresario falimentario y, por otra parte, procurar que los acreedores, ya sea comerciales o financieros, también puedan continuar operando. Cuando una instancia no puede concluir exitosamente, el Estado puede desempeñar una función central coordinando los esfuerzos, proveyendo un foro donde la información fluya y que las empresas viables puedan aprovechar para reestructurarse, seguir operando y mantener el empleo. Por otra parte cuando es el caso que las empresas han dejado de ser viables, el Estado desempeña un papel fundamental en la reasignación de factores productivos, de modo que los trabajadores puedan encontrar nuevas fuentes de empleo productivo y bien remunerado en tanto que los bienes sean aprovechados por otras empresas más productivas. En este proceso, los acreedores y los comerciantes obtienen el mayor valor de la empresa o de los bienes que la integran y con oportunidad pueden retomar otros negocios y actividades que contribuyan al bienestar general de la sociedad.

Así, la situación de una empresa que enfrenta problemas económicos o financieros que amenacen su supervivencia se constituye en un objeto de interés público, el cual requiere una participación congruente con la realidad económica, apoyándose en las instituciones para la impartición de justicia y, por otra parte, en la experiencia y conocimientos que agentes independientes puedan aportar a este tipo de procesos. En buena medida a ello responde la preocupación, no sólo de México sino de países con más alto grado de desarrollo económico, como Alemania, España, Francia, Inglaterra y Holanda, y de países con similar estructura económica. como Argentina, Brasil, Chile, Indonesia, Perú y Colombia, para revisar, actualizar y modernizar el marco jurídico de la quiebra de una empresa.

Ley de Quiebras y de Suspensión de Pagos

La legislación concursal vigente data de 1942, cuando fue expedida la Ley de Quiebras y de Suspensión de Pagos. Nuestra regulación en materia concursal ha evolucionado en respuesta a las diversas realidades políticas, económicas y sociales. El primer ordenamiento en esta materia fue la ley de Bancarrota de 1853 influenciada por el Código de Comercio Francés de 1808 y el español de 1829 que regulaban la cesación de pagos de un comerciante por falta de liquidez. El siguiente antecedente, con el que la materia concursal adquirió carácter federal, fue el Código de Comercio de 1854, pero éste tuvo una vigencia efímera a debido a las Ordenanzas de Bilbao que se pusieron en vigor después del triunfo de la Revolución de Ayutla. Posteriormente el régimen concursal se modifico con las reformas al Código de Comercio en 1884 y 1890. No fue sin embargo sino hasta el inicio de la década de los cuarenta que se

consideró apropiado contar con una ley especial en la materia principalmente en respuesta a la necesidad de reconocer el avance de la materia mercantil. La ley vigente fue elaborada con indudable tecnicismo por uno de los mercantilistas más destacados de la época, Don Joaquín Rodríguez y Rodríguez, quien además recibió la influencia de la mejor doctrina española en la materia.

El ordenamiento en vigor reconoció que la quiebra es un fenómeno económico en que el Estado tiene un interés fundamental, que no solamente debe preocupar a los acreedores y que la empresa representa un valor objetivo de organización económico y social por lo que la conservación de la empresa es norma directiva fundamental de la legislación en esta materia. También reconoció que debe procurarse la simplificación del procedimiento, sin pérdida de la garantía de seguridad jurídica y que debe protegerse la integridad del procedimiento entre las personas que manejan la quiebra. Los autores de esta Iniciativa rinden homenaje a quienes intervinieron en la elaboración de la Ley de Quiebras y de Suspensión de Pagos que entró en vigor el 20 de abril de 1943. pues diseñaron un mecanismo acorde a las condiciones económicas y sociales de la época. Sin embargo conforme fueron transformándose las instituciones nacionales y las condiciones comerciales. Este ordenamiento fue presentando diversos problemas que fueron disminuyendo la eficacia en su aplicación. Ya en 1968. los renombrados mercantilistas Roberto Mantilla Molina y Jorge Barrera Graf dirigieron un anteproyecto para una nueva Ley de Quiebras. Esta propuesta se orientó a atender los problemas derivados de la figura de suspensión de pagos, resolver la dilación en los procedimientos, problemas en la integración y funcionamiento de los órganos de la quiebra y a revisar las disposiciones de índole penal. Este proyecto sustituía a la suspensión de pagos por una moratoria judicial acotada a sesenta días, proponía un registro de profesionales autorizados para fungir como síndicos, depuraba y simplificaba trámites procesales, reemplazaba a los órganos concúrsales de la intervención y la junta de acreedores por un Comisario, y agilizaba el reconocimiento de créditos suprimiendo la necesidad de abrir debate contradictorio para cada uno de dichos créditos. Posteriormente el 13 de enero de 1987 se realizó una reforma al ordenamiento actualmente en vigor con el fin de atender los problemas relativos al órgano de la sindicatura. Concretamente se propuso en la exposición de motivos correspondiente la asignación de la sindicatura en procedimientos concursales de comerciantes privados a las cámaras de comercio o de industria; y tratándose de entidades paraestatales, empresas del sector social y otras empresas. La asignación de a sindicatura a la sociedad nacional de crédito que designara la Secretaria de Hacienda y Crédito Público.

En 1987 Salvador Rocha Díaz, prepara un a propuestas de la Ley de Apoyo Rehabilitación y Quiebra de las Empresas en el cual se proponía una instancia extrajudicial de apoyo a los comerciantes en crisis, se eliminaba la figura de la junta de

acreedores se fortalecían las facultades de la intervención. También se proponía la sustitución de la suspensión de pagos por una moratoria legal con plazo fatal de un año, la cual sólo podía ser ampliada por unanimidad de los acreedores concurrentes o en caso contrario se declaraba en quiebra al comerciante. Se suprimía el debate contradictorio para agilizar el reconocimiento de créditos y se dejaba a la intervención la tarea de establecer el monto, graduación y prelación que correspondía a cada crédito. Otra innovación era la simplificación de los requisitos para la aprobación del convenio y se dejaba al síndico la tarea de proponer un plan de rehabilitación que permitiera al fallido la reestructuración de sus pasivos. el cual de ser aprobado por el juez seria oponible a todos los acreedores.

Más recientemente, en 1994 la fracción parlamentaria del PAN sometió a la consideración de la H Cámara de Diputados un proyecto de Ley de Rehabilitación y Quiebras de Empresarios Mercantiles, cuya autoría principalmente se debió al C. Dip. Daniel de la Garza Gutiérrez. En esta iniciativa se pueden apreciar destacadas contribuciones tendientes a afianzar la seguridad jurídica de las partes mediante la simplificación de trámites judiciales, especialmente para propiciar un reconocimiento de créditos más expedito y menos contencioso. Se redefinían las funciones de los órganos de la quiebra y se establecían requisitos para propiciar la profesionalización de la sindicatura. Se sustituía la suspensión de pagos por una instancia de conciliación y otra de cesación de pagos y se limitaba la intervención del juzgador a aspectos estrictamente jurisdiccionales.

## La Iniciativa, la Comisión Redactora y las fuentes.

La Iniciativa de Ley de Concursos Mercantiles que hoy se somete a la consideración de la H. Cámara de Senadores, se preparó gracias al esfuerzo de legisladores del PRD, PRI e independientes que, con la colaboración de servidores del Poder Ejecutivo Federal, en su conjunto integraron la Comisión redactora.

A efecto de elaborar una Iniciativa para una nueva Ley de Quiebras, se consideró indispensable tomar como puntos de referencia, por una parte. el ordenamiento en vigor la iniciativa que ahora se presenta conserva un núcleo fundamental de los principios de ese cuerpo legal, adoptando, aumentando y modificando lo necesario para formular uno más acorde con la sociedad y las practicas contemporáneas.

La Comisión consideró que existían razones de fondo para proponer la elaboración de una nueva ley en vez de proponer reformas a la vigente, en lo que se encontraban acordes muchos de los maestros de derecho mercantil que se han dedicado

específicamente a esta materia y que inclusive han elaborado anteproyectos al respecto. Ello sin que dejaran de conservarse en el anteproyecto las mejores disposiciones de la ley vigente, aun cuando con una sistemática diversa. Las diferencias entre la ley vigente y la iniciativa reconocen la evolución de las prácticas comerciales, el desarrollo de nuevas instituciones mercantiles y los profundos cambios en la composición de la sociedad mexicana desde 1943 a la fecha.

Los borradores sucesivos fueron analizados y comentados por diversas representaciones empresariales y laborales. Juristas reconocidos, agrupaciones de abogados, jueces y practicantes quienes realizaron contribuciones sobre aspectos procesales, constitucionales, laborales, mercantiles y penales del anteproyecto. Se organizaron foros públicos para la presentación de algunos borradores en el Distrito Federal, Monterrey y Guadalajara con el fin de recoger las inquietudes de abogados, empresarios, académicos y colegios de profesionistas. Así, la Iniciativa que hoy se presenta recoge las atinadas recomendaciones de este numeroso grupo de ciudadanos.

La Iniciativa, como ya se señaló, también se benefició de la inspiración y la ayuda que suministra el derecho comparado; especialmente en las tendencias más modernas que se pueden apreciar en las reformas recientes a la legislación concursal de un sinnúmero de países. Finalmente, la enorme experiencia adquirida en la aplicación del ordenamiento en vigor permitió conocer la naturaleza de las relaciones mercantiles entre particulares que se suscitan en la práctica mexicana y que la iniciativa está llamada a regir.

## Criterios e ideas generales.

El primer tema que ocupó a los autores de la Iniciativa fue el identificar los objetivos centrales del derecho concursal, a efecto de que sus disposiciones guardaran plena congruencia con ellos y constituyeran medios idóneos para obtenerlos. El objetivo central fue fácilmente identificado, Proporcionar la normatividad pertinente para maximizar el valor de una empresa en crisis mediante su conservación, con lo cual se protege el empleo de sus elementos Humanos se evita la repercusión económica negativa a la sociedad, producida por la perdida de una empresa que le proporciona bienes o servicios, y se recupera el esfuerzo empresarial que dicha empresa representó para su titular. En caso de que fuese imposible conservar la empresa en manos de sus dueños. Iniciativa debía contener las normas que permitieran preservar el valor económico de la empresa o de los bienes y derechos que la integran mediante un procedimiento de liquidación ordenada que maximizara el producto de la enajenación y diera trato equitativo al comerciante y sus acreedores.

Para que la legislación concursal resulte eficaz es necesario que se caracterice por ser predecible equitativa y transparente. La predecibilidad se consigue estableciendo reglas claras y precisas que permitan su aplicación de manera consistente y por lo tanto, ofrezcan certeza y desincentiven los litigios. La equidad, por su parte no se alcanza dando un trato igual a los distintos acreedores, sino reconociendo las diferencias y, sobre todo, evitando el fraude y el favoritismo. Por, último la transparencia obliga a proveer de información suficiente a los diferentes participantes para que todos puedan ejercer sus derechos, y obliga también a que los procedimientos judiciales sean abiertos y que las decisiones se fundamenten y se hagan del conocimiento del público.

Las características anteriores permiten establecer los incentivos apropiados para que acreedores y deudores potenciales puedan tomar las mejores decisiones y éstas contribuyan a elevar la eficiencia del sistema productivo. Además, una vez que la empresa ha incurrido en incumplimiento generalizado de sus obligaciones, la ley debe contribuir a que las partes puedan alcanzar acuerdos privados con la menor participación del Estado o si ello no es posible, se ejecuten expedita y ordenadamente los derechos, en las mejores condiciones posibles.

Concretamente, los criterios más importantes que orientaron el desarrollo de la Iniciativa fueron los siguientes:

a) Maximizar el valor social de la empresa;

b) Conservar el equilibrio entre deudor y acreedores, para que ambos sean plenamente respetados;

c) Inducir el flujo de información relevante que permita a los interesados participar constructivamente;

d) Respetar en lo posible las relaciones contractuales preexístentes;

e) Adecuar los incentivos para facilitar un arreglo voluntario entre los deudores y acreedores;

f) Propiciar las soluciones extrajudiciales;

g) Apoyar a los jueces en aspectos técnicos y administrativos del procedimiento, para que puedan enfocar sus esfuerzos a las tareas jurisdiccionales y

h) Simplificar los tramites judiciales y procedimientos administrativos para hacerlos más transparentes y expeditos, reduciendo oportunidades e incentivos para litigios frívolos.

**Descripción de la Iniciativa de Ley de Concursos Mercantiles.**

A continuación se presenta una descripción de los principales elementos de la Ley de Concursos Mercantiles que se somete a la consideración del H. Congreso de la Unión.

La Iniciativa regula los concursos de las personas que, de acuerdo con nuestras leyes, tienen el carácter de comerciantes. Se aclara que puede ser sometido a concurso el patrimonio fideicomitido, cuando se afecte a actividades empresariales. Se conservan las disposiciones relativas al concurso de los socios ilimitadamente responsables, la sucesión del comerciante y las sucursales de empresas extranjeras y se perfeccionan las referentes a las sociedades irregulares.

Se incorporan igualmente disposiciones legales relativas al concurso mercantil de sociedades controladoras y controladas, que no se encontraban en la Ley vigente.

Por otra parte, después de un análisis cuidadoso de las disposiciones aplicables a las aseguradoras y afianzadoras, se suprime la normatividad relativa al concurso de estas instituciones, y se deja que sus procedimientos concursales sigan siendo regulados por sus leyes especiales y otras disposiciones aplicables actualmente en vigor.

Asimismo, se adecuan en función del procedimiento concursal planteado en la Iniciativa, los capítulos especiales para el caso de los concesionarios públicos, las instituciones de crédito y las organizaciones auxiliares del crédito. En estos casos, era indispensable reconocer la naturaleza particular de estas empresas y el interés público que representan. La Iniciativa armoniza el concurso de estas instituciones con las disposiciones especiales que las rigen, y establece la debida participación de las entidades que las autorizan, regulan y supervisan.

Tal y como se establecía desde la exposición de motivos de la Ley de Quiebras y de Suspensión de Pagos, la Comisión reconoció que el concurso mercantil es un fenómeno económico que no sólo interesa a los particulares que en él intervienen sino que se trata de una manifestación económico jurídica en la que el Estado tiene un interés preponderante y fundamental por lo que en consecuencia propuso, en congruencia con lo que establece la fracción I del artículo 104 constitucional que fuera competencia de los tribunales federales conocer del concurso mercantil de los comerciantes.

Una preocupación de la Comisión redactora de la Iniciativa fue la de reorganizar las funciones del juez, del síndico y de la intervención de tal manera que éstas se puedan desarrollar en forma más independiente, disponiendo cada uno de los órganos de plazos determinados para el desempeño de sus funciones, con el objeto de dar mayor transparencia a los procedimientos concursales y evitar que se prolonguen demasiado tiempo.

Se buscó, primeramente, redefinir la función del juez dentro de los procedimientos concursales. La Comisión llegó a la conclusión de que los más importantes problemas que se presentan en una empresa en estado de falta de liquidez, son de naturaleza comercial y administrativa y pueden solucionarse por expertos en esas materias comerciales. Sólo un número limitado de cuestiones, relativas a las relaciones del comerciante con terceros y a la protección de sus derechos, requiere necesariamente la intervención de la autoridad judicial y el cumplimiento de las formalidades esenciales del procedimiento.

La Iniciativa mantiene a juez como órgano central y rector de la quiebra, pero reconoce que la especialización en las ramas del derecho privado y de procedimientos que tienen los jueces y los abogados litigantes no los prepara en nuestros días para resolver sobre materias en las que no están necesariamente instruidos. Para resolver adecuadamente sobre problemas financieros, del tiempo, de personal competente y de los medios materiales, que resultan indispensables para superar la obvia crisis que confronta una empresa que se ha visto imposibilitada para hacer frente a sus obligaciones de manera generalizada, es necesario contar con la participación de especialistas que asistan a la autoridad judicial en sus resoluciones.

Se percibieron entonces, como graves, los inconvenientes de seguir el sistema tradicional de dejar al juez la responsabilidad de todas las decisiones, no solamente las jurisdiccionales que corresponde a su función natural, sino las decisiones administrativas, industriales, comerciales, económicas y financieras que resultan necesarias para la rehabilitación o, en su caso, liquidación de la empresa fallida. Es inútil insistir en que, ni en México ni en ningún otro país, el juez dispone de los apoyos indispensables para atender todos los problemas de naturaleza no jurisdiccional que se presentan en los procedimientos concursales. Por ello, la tendencia moderna ha sido la de reservar al juez solamente los problemas jurídicos que en los procedimientos jurídicos que en los procedimientos concursales se presenten. Y a otros órganos de la quiebra la responsabilidad administrativa: el juez debe intervenir en las controversias jurisdiccionales, en relación con una cuestión administrativa o financiera pero no pueden tener la responsabilidad de tomar decisiones en tales materias.

Las razones arriba apuntadas llevaron a la Comisión que redactó la Iniciativa a elaborar un a cuidadosa distinción entre aquellas cuestiones que por afectar los derechos del comerciante y de otras partes interesadas, o suponer un litigio entre ellas, son de naturaleza judicial y aquellas otras de carácter comercial, contable, financiero o administrativo y que deben ser resueltas por especialistas en esos ramos. La Iniciativa que se propone hace una consecuente distinción entre las tareas y atribuciones judiciales y las que son propiamente comerciales. Cuando fue necesario, como en el caso de la declaración de concurso y la visita de inspección, la resolución compete al juez, pero el peso fundamental, del análisis contable, financiero o administrativo que ilustra al juez para que éste pueda mejor proveer, corresponde al especialista.

Los órganos de la quiebra no se han integrado o no han funcionado en la forma prevista en la ley. Se consideró con especial atención, por juzgarlo el más delicado, el de la sindicatura. La Comisión redactora pensó que encomendarlo a las cámaras de comercio o de industria o a las instituciones de crédito es una medida excelente en teoría, pero que, hasta ahora, ha fracasado en la práctica. Se considera, en abstracto, que ésta era una la solución óptima, pues si la quiebra interesa a la generalidad del comercio, nada mejor que encomendar la sindicatura a la institución que tiene la función de representar sus intereses generales, es decir, a las mencionadas cámaras; pero la organización y estructura de la mayoría de ellas no permite, en la actualidad, que atiendan adecuadamente las complejas funciones de una sindicatura. Sólo en contados casos han aceptado la sindicatura las cámaras y las instituciones de crédito han aceptado la sindicatura y, por esa falta de interés, han tendido a delegar esta importante responsabilidad en terceras personas, que son quienes en realidad han desempeñado las sindicaturas. Actualmente, se carece de un sistema que asegure una sindicatura profesional, competente y con la colaboración humana y económica adecuadas para resolver la crisis de la empresa fallida.

Según las fases del procedimiento concursal, la Iniciativa atribuye facultades a tres clases de especialistas: los visitadores, conciliadores y síndicos. Las atribuciones de los especialistas son importantes y delicadas. Los especialistas deben tener solvencia moral, conocimientos y experiencia en el ramo de la actividad que corresponde a sus atribuciones. Los profesionistas cuya preparación les permite atender estas funciones forman un grupo en donde fácilmente pueden reclutarse estos especialistas, tales son los licenciados en derecho, los licenciados en administración de empresas. los licenciados en economía, los contadores y los especialistas en ingeniería financiera. Tales profesionistas son los más indicados, en la actual situación de nuestra sociedad, para que acepten y desempeñen las funciones que típicamente se han reservado a las sindicaturas, más aquéllas que les atribuye la Iniciativa

Para asegurar que se contara con las personas que tienen los requisitos necesarios para llevar a cabo su tarea con competencia y honestidad, así como la transparencia en su designación la Iniciativa propone la creación del Instituto Federal de Especialistas de Concursos Mercantiles, como un órgano dependiente del Consejo de la Judicatura Federal y cuya función principal será la de autorizar a las personas que acreditan cubrir los requisitos necesarios, para prestar servicios de visitadores, conciliadores o síndicos. También, entre otras funciones, tendrá la de la solicitud del juez del concurso, designar por sorteo de entre las personas acreditadas, a quienes prestarán las funciones de visitadores, conciliadores y síndicos. De esta manera se prevé contar con un medio transparente de selección de los especialistas que actuarán en los procedimientos concursales. Se atribuye así a dicho Instituto la concentración de las listas de síndicos, y de los legajos de cada una de las personas que en ellas figuren, para centralizar los datos de toda la República, y facilitar la depuración de las listas, así como la publicidad de ellas y de algunos de los actos que conciernan a las funciones que la Iniciativa les encomienda.

Con esta reforma se procura aliviar la tarea del juez en los procedimientos concursales sin privarlo de su función primordial, y permitir que la labor de los especialistas produzca resultados inmediatos y reales en la solución de los problemas de una empresa en crisis.

Al diseñar la estructura interna del Instituto se buscó, en todo momento, procurar que cuente con la mayor autonomía técnica y operativa posible. Asimismo, se buscó mantenerla al margen de su intervención directa en los procedimientos concursales y que los miembros de su Junta Directiva fueran personas de reconocido prestigio en las materias relevantes (administrativa, contable, financiera, económica y jurídica) para la acreditación, designación y supervisión de los especialistas en el proceso concursal. Finalmente, para propiciar su memoria institucional, se decidió que su Junta fuera integrada por cinco miembros que serian designados de manera escalonada.

La Iniciativa hace un énfasis particular en asegurar que todas y cada una de las partes en un procedimiento concursal tengan información suficiente para tomar sus decisiones. Con este propósito, se establece como requisito el uso, en diversas instancias del procedimiento de formatos preestablecidos de libre reproducción que permitan asegurar que todos los datos relevantes se presentan de manera clara y ordenada. Esta práctica que ha dado buenos resultados en otros países propicia la estandarización y eficiencia de los procedimientos. La responsabilidad de emitir y actualizar estos formatos corresponderá al Instituto.

Algunos aspectos específicos del procedimiento concursal requieren de una regulación más detallada y sobre todo flexible de las que es conveniente incluir en una ley. Tal es el caso, por ejemplo del régimen de honorarios de los especialistas o de los medios idóneos para dar publicidad a las subastas en el concurso. Por un lado es imposible prever en el acto legislativo todos los posibles casos que la práctica va revelando, y que requieren un tratamiento especial. Por otro lado, en la medida en que los mercados y las prácticas comerciales evolucionan, es necesario adaptar correspondientemente algunas disposiciones.

Se atribuye al Instituto la obligación de emitir y actualizar las reglas, siempre que sean de aplicación general. El esfuerzo continuo de profesionales dedicados de tiempo completo al perfeccionamiento de aspectos netamente técnicos y operativos del procedimiento concursal contribuirá a mantener la eficacia y vigencia del conjunto de preceptos que componen la Iniciativa.

Los ordenamientos jurídicos que regulan al singular fenómeno de la quiebra han tenido una lenta transformación, y es hasta en los últimos años cuando los nuevos fenómenos económicos han motivado un importante esfuerzo de estudio y reflexión, los cuales deben conducir a un marco jurídico que contribuya eficazmente a la solución de los múltiples problemas que presenta.

Los redactores del ordenamiento en vigor, reconocieron las ventajas de establecer como criterio detonador de la declaración de quiebra de un comerciante al de incumplimiento generalizado de pagos. Esta decisión legislativa se sustentó en la reflexión de que dicho incumplimiento de pagos es un fenómeno financiero, de falta de liquidez que impide el cumplimiento puntual y cabal de las obligaciones, y que no debe identificarse con el fenómeno de insolvencia que resulta de la insuficiencia de bienes de activo en comparación al monto del pasivo de la empresa, y que era la iliquidez el fenómeno objetivo que debería marcar el inicio de la materia concursal, a efecto de evitar que el empresario recurriera a procedimientos económicos negativos para ocultar su iliquidez, lo que normalmente producía un mayor deterioro de la empresa.

Sin embargo, la Comisión también reconoció los inconvenientes de que la declaración de concurso de un comerciante se sustentara exclusivamente en un supuesto de iliquidez o de insolvencia, pues, como ya se ha mencionado, uno de los propósitos centrales de la legislación concursal es atender los males sociales derivados de un incumplimiento generalizado de las obligaciones del empresario. A fin de proteger el valor económico y social de una empresa en crisis, es necesario contar con un procedimiento colectivo que permita maximizar dicho valor y, al mismo tiempo dar un trato equitativo a los acreedores. De ahí que la Iniciativa prevea en concordancia con

las tendencias internacionales más recientes en la materia, que la declaración de concurso mercantil de un comerciante pueda proceder cuando éste no cuente con activos líquidos suficientes para hacer frente a sus obligaciones vencidas o cuando el incumplimiento de sus obligaciones con varios acreedores rebase de un porcentaje significativo. A este respecto, es pertinente mencionar la importancia de que las empresas que atraviesan por problemas económicos o financieros que les imposibiliten dar cumplimiento a sus obligaciones, puedan incorporarse tempranamente a un procedimiento concursal, con el objetivo de proteger en la medida de lo posible su valor para la sociedad como fuente de creación de empleos productivos y como generadora de satisfactores y riqueza para la sociedad.

Es en este sentido, justamente, que la Comisión redactora pensó que deben dirigirse las preocupaciones actuales, para que el valor social de la empresa se convierta en el objetivo central. No es lo trascendente determinar si debe ser declarada en concurso la empresa que carece de los recursos líquidos para cumplir puntualmente con sus obligaciones a su vencimiento (fenómeno de iliquidez), o aquélla cuyo activo total es inferior a su pasivo total (fenómeno de insolvencia). pues la importancia radica en buscar su viabilidad económica, cuando ello es posible, mediante un convenio entre el comerciante y sus acreedores.

La iniciativa de la declaración corresponde al propio comerciante, a los acreedores y al Ministerio Público. El deudor común tiene la obligación de solicitar su concurso; sin embargo no se le impone un término para hacerlo, ni se le sanciona por el incumplimiento. Lo anterior con la finalidad de facilitar la prolongación de las negociaciones en búsqueda de un convenio de reestructuración. La experiencia ha demostrado que es una carga innecesaria exigir al comerciante, abrumado por sus dificultades financieras, la presentación de documentos contables que el conciliador o el síndico podrán verificar cuando procedan al cumplimiento de sus funciones.

Durante el periodo previo a la declaración y constitución del concurso entran en conflicto dos valores diferentes: la necesidad de respetar la garantía de audiencia del comerciante, cumpliendo con las formalidades esenciales del procedimiento y la necesidad de adoptar medidas urgentes para evitar que un comerciante en estado de falta de liquidez por negligencia, desesperación o mala fe, recurra a expedientes ruinosos o fraudulentos en detrimento de la conservación de la empresa y de los intereses de los acreedores. Para conciliar esos valores contrarios se proponen en la Iniciativa la asistencia de un visitador, la posibilidad de adoptar medidas provisionales y un procedimiento básicamente escrito en el cual se respeten las formalidades esenciales del procedimiento.

El juez, al admitir una demanda de concurso deberá solicitar al Instituto Federal de Especialistas de Concursos Mercantiles el nombramiento de un visitador y posteriormente ordenarla visita al comerciante. La finalidad de la visita es doble, por un lado proporcionar al juez la evidencia especializada que necesita para tomar su determinación acerca de si el comerciante se encuentra en los supuestos del incumplimiento generalizado de pagos y, en su caso sugerir al juez la adopción de las medidas provisionales necesarias para la preservación de la empresa y de los bienes de la masa.

En un procedimiento escrito y rápido, el comerciante tendrá la oportunidad de demostrar que tiene la liquidez necesaria para hacer frente a sus obligaciones. Se elimina la prueba de testigos. ya que la liquidez o iliquidez no es una cuestión que deba demostrarse con este medio de prueba. Igualmente se elimina la recepción de la prueba de peritos en la forma tradicional establecida para los juicios ordinarios, ya que el juez contará con el dictamen del visitador; lo que no significa que se prive al comerciante del derecho de exhibir al juez opiniones escritas de expertos, cuando estime que así le conviene. La sentencia de concurso es apelable. De manera semejante a la legislación vigente, se prevé un proceso completo de conocimiento durante la apelación y la posibilidad de que se resarza al comerciante de los daños y perjuicios que se le ocasionen con una declaración de concurso producto de una demanda formulada con negligencia o con la mala fe.

Otro tema de singular importancia, que también ocupó la atención de la Comisión en primerísimo lugar, es el relativo a las medidas de prevención de la quiebra.

La ley vigente contempla dos figuras concúrsales: la suspensión de pagos y la quiebra. La suspensión de pagos fue concebida como un beneficio para el comerciante fallido al constituir un medio para prevenir su posible quiebra. En la práctica, el comerciante cuya declaración de quiebra ha sido demandada por alguno de sus acreedores, independientemente de que obre de buena o mala fe o de que se encuentre en los supuestos para la declaración de quiebra, se acoge al beneficio de la suspensión de pagos, debiendo los jueces concederla en un breve plazo. Además, aunque el ordenamiento en vigor también señala claramente los requisitos que debe satisfacer la declaración de quiebra de un comerciante, ello no lo impide que pueda gozar de beneficio. Esto explica por qué el número de juicios de suspensión de pagos y de quiebra es relativamente reducido y también porqué la mayoría de dichos juicios termiran en su paralización.

Así, la suspensión de pagos en ocasiones ha sido utilizada por comerciantes poco escrupulosos, como un medio de aplazar indefinidamente la declaración de quiebra, y

continuar manejando su negociación, aun en casos de flagrante insolvencia. Más aun en la suspensión de pagos un comerciante adquiere un excesivo poder de negociación frente a sus acreedores, pues se suspende el pago de sus créditos y demás obligaciones. De ahí que algunos comerciantes, incluso aquellos con capacidad de pago y acreditada solvencia tengan un fuerte incentivo para solicitar su suspensión de pagos justamente como un mecanismo para evitar el cumplimiento de sus obligaciones laborales, fiscales con proveedores y de cualquier otra índole.

En la práctica todo ello ha incidido en una falta de seguridad jurídica tanto para los oferentes de recursos prestables como para sus demandantes y. por tanto en un encarecimiento del crédito, ya sea a través de mayores primas por riesgo o en términos y condiciones más onerosos en la forma de moratorios, plazos, avales, garantías y penas convencionales. Así se ve limitado el acceso al crédito para los empresarios honestos, previsores y prósperos. Quienes requieren de recursos para emprender proyectos de inversión, incursionar en nuevos mercados o reorientar sus esfuerzos a otras actividades productivas. De esta manera, se merma la capacidad de nuestra sociedad para generar el ahorro suficiente para promover la inversión productiva y en consecuencia se limitan las posibilidades de crecimiento económico, presente y futuro de la sociedad.

Con base en las consideraciones anteriores, se consideró indispensable que el concurso mercantil fuera un procedimiento unitario en el que subsistiese un procedimiento que tendiera a prevenir la quiebra del comerciante, pues el lograr evitarla, en los casos en que el comerciante de buena fe se ve obligado a incumplir en sus obligaciones, no sólo redunda en beneficio del propio comerciante, sino también en el de sus acreedores, al suprimir o reducir los gastos y complicaciones que ocasiona la quiebra formal. Lo que a todo trance debe evitarse es que, so pretexto de buscar un convenio con los acreedores, se obtenga un arma para paralizar los juicios en contra del comerciante, y permitir que éste, cuando no actúa de buena fe, maneje su negociación como sino hubiere incurrido en incumplimiento general, con riesgo de crear una situación cada vez más grave para todos.

Por ello, la Comisión redactora de la Iniciativa optó por proponer que el concurso mercantil tuviera dos etapas: la conciliación y la quiebra. La finalidad de la conciliación será maximizar el valor social de la empresa fallida mediante un convenio entre el Comerciante y sus acreedores. Por su parte, la finalidad de la quiebra será que, cuando no sea posible alcanzar un arreglo durante la etapa de conciliación. se preserve el valor de la empresa mediante su liquidación ordenada para que del producto de ésta se proceda al reparto correspondiente entre el Comerciante y sus acreedores.

Se decidió que la etapa de conciliación operase ipso facto e ipso jure solamente por la voluntad del empresario mercantil, pero limitada a un plazo fatal de seis meses, y con la posibilidad de una sola aplicación con un máximo de otros tres meses, que podrá concederla el juez cuando en ello consientan el Comerciante y una mayoría de sus acreedores, esta primera etapa del concurso mercantil permitirá dilucidar en un plazo razonable pero perentorio, si la empresa podrá seguir operando en manos de sus dueños mediante un acuerdo con sus acreedores. De no lograse esto al vencer el plazo indicado y. en su caso, la prórroga que se hubiere concedido, se procede entonces a la declaración de quiebra del comerciante. El carácter perentorio que se da a la etapa de conciliación, tiene como propósito generar un poderoso incentivo para que las partes en conflicto con la asistencia de un conciliador imparcial que actuará como amigable componedor entre ellas, procuren por todos los medios a su alcance subsanar sus diferencias so pena de enfrentar mayores quebrantos de no poder preservarse la marcha de la empresa en las manos de sus dueños originales. Resulta. pues indispensable que el procedimiento para prevenir la quiebra termine en un plazo breve y que se estructure de modo que por su simplicidad pueda marchar con rapidez y economía.

Se propone entonces la conciliación, como otro derecho más a favor de los empresarios mercantiles que enfrentan problemas económicos o financieros, a fin de que dispongan de un período dentro del cual mantendrán la administración del negocio y ningún crédito les podrá ser exigido. La presencia de un conciliador profesional e independiente y las disposiciones que favorecen la generación y difusión de información relevante, propiciarán mejores condiciones para un acuerdo.

De esta manera, con la etapa de conciliación se instituye obligatoriamente una nueva figura de suspensión de pagos, pero temporalmente acotada, con el propósito de proporcionar al comerciante y todos sus acreedores un espacio para que puedan subsanar sus diferencias mediante la celebración de un convenio. Con estas características, la etapa de conciliación contribuirá a dotar de mayor transparencia, certidumbre y predicibilidad al procedimiento concursal y a adecuar los incentivos entre los propios acreedores, y entre estos últimos y el comerciante. Se espera, entonces, que la conciliación sustituya ventajosamente a la actual suspensión de pagos.

Una economía de mercado se sustenta en transacciones voluntarias entre particulares que reconocen la posibilidad de que los negocios no resulten de la manera originalmente prevista. Los acreedores del comerciante, por lo general, otros comerciantes, conociendo las circunstancias que llevaron a la empresa a la imposibilidad de cumplir con sus obligaciones pueden decidir refrendar su confianza en

la empresa del comerciante reconociendo el valor que esta les aporta y permitiendo mediante un acuerdo con él, llevar a mínimo posible las perdidas en que pudieron haber incurrido.

La etapa de conciliación está orientada a crear las mejores condiciones para que se puedan materializar en un convenio cualquier oportunidad de arreglo favorable a todos los participantes. Si bien la naturaleza de un convenio es conseguir y reflejar un concurso de voluntads, se permite que un convenio mayoritario sea impuesto a una minoría disidente protegiendo debidamente sus derechos para evitar que una minoría caprichosa o desinteresada impida una solución preferible para todos. La intención es que todos los acreedores reciban al menos lo que les correspondería en el mejor caso de enajenación en quiebra y ello se logra al asegurar a los disidentes las mejores condiciones aceptadas por los acreedores de su grado que suscriban el convenio.

El convenio es, fundamentalmente un arreglo entre comerciantes, que se debe beneficiar de todos los medios accesibles a las transacciones modernas. Hoy en día se realizan negociaciones complejas y se suscriben contratos de todo tipo entre comerciantes que se encuentran en distintos continentes. Siendo el convenio un refrendo del negocio del comerciante con sus acreedores, es natural que su preparación se ajuste a las prácticas comerciales de los mercados en que operan el comerciante y sus acreedores.

En este contexto, la Comisión consideró conveniente permitir la mayor flexibilidad en la formulación del convenio, cuidando las mínimas formalidades necesarias para la seguridad jurídica de las partes. En consecuencia, no se regula la formulación y negociación de proyectos o propuestas de convenios, ni se exige que los acreedores se congreguen a discutir o a votar. Se prevén, sin embargo las instancias mínimas de notificación y acceso que permiten a todos los interesados ejercer sus derechos y participar en defensa de sus intereses. Hay un énfasis particular en asegurar que las partes tengan información suficiente para tomar sus decisiones, y se establecen mecanismos novedosos para su difusión.

Toda vez que un convenio no puede afectar a los créditos garantizados en cuanto a sus garantías, sin consentimiento del acreedor correspondiente, sería natural limitar la votación del convenio a los acreedores comunes. Sin embargo, la experiencia ha demostrado que la participación de los acreedores garantizados puede resultar sumamente valiosa para la consecución de un arreglo con el comerciante.

Adicionalmente, es frecuente que un número reducido de acreedores con o sin garantías reales, asuma una participación más activa que los demás en la negociación de un convenio. En la practica diversos acreedores se mantiene al margen de los detalles de la preparación de un convenio, por el monto de sus créditos, su desconocimiento del negocio del comerciante, los gastos y tiempos que implica su participación o cualesquiera otras razones. En estas condiciones, es conveniente permitir que el conjunto de acreedores que tenga mayores facilidades para hacerlo asuma el liderazgo del convenio permitiendo a los demás reaccionar posteriormente cuando así convenga a sus intereses.

Así, la Comisión buscó un mecanismo que permitiera llegar rápidamente a un consenso, fomentando la participación de los acreedores garantizados, preservando sus garantías y protegiendo debidamente los derechos e intereses de los acreedores comunes.

Esto se logro con la convinación de dos elementos la formula para la votación mayoritaria del convenio y disposiciones para proteger a las minorías disidentes de acreedores comunes.

En cuanto a la mayoría necesaria para la aprobación del convenio se estableció que la base sobre la cual se determine sea la suma del total de los créditos comunes y de aquellos garantizados que decidan aprobarlo. Es decir, los montos de los créditos garantizados que participen en el convenio se consideran al mismo tiempo como votos favorables y como parte del padrón total, sumados a la totalidad de los créditos comunes. Así, para determinar si se cumple la mayoría necesaria, se sumarán los montos de los acreedores comunes y garantizados que aprueban la propuesta. Esta cantidad se dividirá entre la suma de los montos de todos los acreedores comunes y de los montos de aquellos garantizados que la aprobaron. Si este cociente resulta mayor a un medio, se cumple la mayoría requerida.

De esta manera, la participación de los acreedores garantizados puede contribuir para alcanzar la mayoría requerida. Para evitar que una mayoría lograda de esta manera imponga condiciones desventajosas a la mayoría de los acreedores comunes, se permite a éstos vetar la propuesta. Así, quienes estén en desacuerdo con la propuesta tendrán la debida oportunidad de objetarla, pero el convenio puede prosperar si se abstienen de manifestar su desacuerdo.

Siendo el convenio obligatorio para los acreedores ausentes y disidentes es indispensable establecer disposiciones de protección a las minorías que preservando la

flexibilidad del proceso, impidan que el convenio se abuse para atropellar a los disidentes. Así, se limita lo que se puede imponer a los acreedores disidentes, con respecto al monto reconocido y convertido a UDIs, a una quita, espera o combinación de ambas, igual a la más favorable de las que hayan aceptado quienes suscribieron el convenio, siempre y cuando una proporción suficiente de quienes suscribieron el convenio haya recibido tales condiciones. De este grupo de referencia se excluyen quienes tengan vínculos familiares o patrimoniales relevantes con el comerciante.

El sistema propuesto permite a la vez respetar los derechos de las partes y explotar al máximo las oportunidades de materializar un convenio.

La aplicación de la Ley de Quiebras y de Suspensión de Pagos, en la práctica. Ha demostrado que el procedimiento de reconocimiento de créditos ha sido desvirtuado, convirtiéndolo en contencioso relativo a todos y cada uno de los créditos del comerciante. Esto se agrava con el requisito de la junta previa de acreedores para el debate contradictorio de todos y cada uno de los créditos. Cualquier obstáculo al reconocimiento detiene todo el procedimiento concursal, lo que impide dar una solución oportuna a los problemas de la empresa.

En la Iniciativa se adopta un procedimiento flexible, paralelo a los esfuerzos de conciliación y en su caso, de enajenación de la empresa. El procedimiento concursal no se paraliza en el reconocimiento de créditos, sino que continúa automáticamente su curso. Esto elimina los incentivos a dilatar frívolamente el reconocimiento y, por el contrario, concilia los intereses del comerciante y de todos sus acreedores en su pronta conclusión.

No se exige que los acreedores presenten su solicitud de reconocimiento; aunque conviene que lo hagan. Se establece un período corto para que el conciliador publique, con base en la contabilidad del comerciante y en los documentos que, en su caso, le hayan sido presentadas por los acreedores en sus solicitudes; una lista provisional de acreedores señalando el monto, graduación y prelación que, a juicio del especialista corresponde a cada crédito con el fin de que los interesados puedan hacer sus observaciones. A continuación, el conciliador deberá proporcionar la lista definitiva, acompañada de las explicaciones y documentos adecuados, que aportarán al juez los elementos en que deba basar su sentencia de reconocimiento, graduación y prelación de créditos, lo que debe ocurrir con tiempo suficiente para celebrar el convenio antes de que termine plazo establecido para la conciliación. La sentencia de reconocimiento, graduación y prelación de créditos es apelable en el efecto devolutivo. Al igual que en la ley vigente, para la apelación se prevé un proceso completo de conocimiento.

Durante la etapa de conciliación, como un beneficio para el comerciante, se le permite mantener la administración de su empresa. Sin embargo, para la protección de la empresa y de sus acreedores, se prevé que el conciliador vigile las operaciones del comerciante y que apruebe todas aquellas que excedan de la marcha ordinaria de la negociación.

Por otra parte, la Iniciativa contempla la posibilidad de que el Conciliador pueda solicitar al juez la remoción del comerciante en la administración de su empresa cuando este obstaculice o entorpezca la labor del Conciliador. Para la protección del comerciante la resolución del juez se substanciara por la vía incidental entre el Conciliador y el Comerciante.

Finalmente en caso de que se llegara a la etapa de quiebra el comerciante será desapoderado de sus bienes y derechos, debiendo el instituto designar a un síndico quien procederá a la ocupación de los bienes del quebrado y tendrá como mandato proceder a la enajenación de la masa.

Otro tema que la Comisión consideró fue la necesidad de evitar las injusticias y problemas que se presentaban a los acreedores interesados frente a los acreedores desinteresados. Es casi inevitable que una empresa fallida tenga una multiplicidad de acreedores de diversa naturaleza, con distinto monto de créditos y con desigual interés en el procedimiento concursal. Algunos acreedores tienen manifiesto interés en el procedimiento concursal, en su rápida conclusión y en la recuperación de sus créditos, pero deben sufrir el lastre de los acreedores desinteresados.

Con esta visión se optó por la supresión de la junta de acreedores, puesto que su convocatoria integración y operación era uno de los mayores obstáculos en el trámite ágil de los procedimientos concursales. La junta de acreedores, que en la ley vigente sólo tiene una función verdaderamente decisoria en caso de propuesta de convenio, ha mostrado tan poca utilidad que en muchos procedimientos de quiebra no llega nunca a reunirse.

Estrechamente relacionado con lo anterior, y que también fue objeto de amplia discusión, fue el tema relativo a la función de la intervención. En la aplicación reiterada del ordenamiento en vigor, los interventores nombrados por el juez en la sentencia declarativa de la quiebra, en cumplimiento de lo dispuesto en la Ley, por regla general no muestran interés alguno en la marcha de los procedimientos sino que suelan ser

más celosos de sus atribuciones quienes llegan a ser nombrados, en raras ocasiones, por los propios acreedores.

Sobre el papel de los interventores, hay dos tendencias en el derecho moderno: una, eliminar la figura de la intervención por innecesaria, pues los acreedores pueden individualmente atender la vigilancia de la actuación del síndico, la agilidad del proceso y la defensa de sus intereses, sin necesidad de un órgano de la quiebra que los represente; y otra, conservar la intervención y asignarle un área de responsabilidad precisamente en donde se encuentran los intereses de los acreedores. En apoyo de la supresión de la junta de acreedores como órgano y permanente, la Comisión se definió por la segunda tendencia al proponer que la intervención subsista como un órgano necesario y permanente la Comisión se definió por la segunda tendencia al proponer que la intervención subsista como un órgano del procedimiento concursal, pero con carácter contingente. La iniciativa prevé que cualquier acreedor o grupo de acreedores que represente por lo menos el diez por ciento del pasivo concursal, podrá designar, a su costa un interventor que vigile sus intereses y los represente en las negociaciones entre el comerciante y sus acreedores.

El principio del estricto cumplimiento de los contratos libremente convenidos es el pilar de una sociedad libre y democrática. Es la base de la seguridad jurídica que es el presupuesto del desarrollo económico de cualquier sociedad. Esta Iniciativa lo reconoce al establecer que con las excepciones que contiene el proyecto, continuarán aplicándose las disposiciones sobre obligaciones y contratos, así como las estipulaciones de las partes.

Entre los puntos en que la Iniciativa se separa de las disposiciones de la ley en vigor, se encuentran los relativos a la conversión de las deudas a Unidades de Inversión y las disposiciones expresas sobre deudas en moneda extranjera. Así como las relativas a los reportos, préstamos de valores, contratos diferenciales o de futuros y otras operaciones financieras derivadas, para adecuarías a las prácticas contemporáneas del mercado.

Se dispuso la no acumulación de los litigios arbitrales o judiciales entre el comerciante y terceros. Para protección de los intereses de la masa, se atribuye al conciliador o al síndico, según sea el caso, el derecho de participar en dichos litigios. Se tomará en cuenta la resolución final, cuando establezca créditos a cargo del comerciante, para los efectos de reconocimiento, graduación y pago. Si el litigio se resuelve estableciendo derechos a favor del comerciante, corresponderá ejecutar esa resolución para beneficio de la masa; en caso contrario, la ejecución servirá al tercero para obtener la separación de bienes a que tenga derecho. Con esta solución se racionaliza el uso de

los recursos del Poder Judicial al terminar con la práctica de abrumar al juez del concurso con una avalancha de expedientes, muchos de ellos en estado avanzado y cuyo conocimiento y decisión le resultará especialmente difícil, cuando no imposible. Esta solución, también respeta las estipulaciones de selección de foro y de resolución de controversias libremente convenidas entre las partes antes de la constitución del estado de concurso.

Un tema que mereció especial atención de la Comisión fue el tratamiento de los acreedores laborales y fiscales. En primer lugar, se reconoció la jerarquía que dichos acreedores deben mantener en un juicio concursal. En segundo lugar, se busco que su tratamiento fuera congruente con el interés de ampliar en la mayor medida posible las posibilidades de un convenio entre el comerciante y sus demás acreedores.

Con base en estas dos premisas se decidió que a partir de la sentencia de concurso mercantil se suspendan todos los procedimientos de ejecución de los acreedores fiscales y laborales, salvo para el caso de los créditos laborales consignados en la fracción XXIII del apartado A del articulo 123 constitucional pero ampliado estos a los salarios devengados de los últimos dos años para proteger los derechos de los acreedores laborales.

En segundo lugar, se dispuso que con el propósito de que las resoluciones de la autoridad laboral puedan adecuarse a la materia concursal, el conciliador o el síndico en su caso, puedan sustituir las garantías embargadas por la autoridad laboral mediante una fianza que a satisfacción de esta última satisfaga su pretensión.

En lo que hace a los créditos fiscales, con el fin de facilitar un convenio entre el comerciante y sus acreedores, se establece que la autoridad fiscal cancelará las multas, recargos y otros accesorios que se hubieren causado a partir de la sentencia de declaración de concurso mercantil. Adicionalmente, se faculta al comerciante y al conciliador a llegar a convenios particulares con los trabajadores y a negociar con las autoridades fiscales condonaciones y autorizaciones, con el propósito de que pueda ofrecer a sus demás acreedores un convenio más atractivo. Por otra parte, a fin de que ello no diera lugar a incentivos inapropiados para algunos contribuyentes se decidió que para efectos del pago de los créditos, fiscales en caso de que no hubiere convenio, la autoridad fiscal podrá incluir, en la determinación del monto de sus créditos, a dichos accesorios.

El tratamiento a los créditos garantizados es otro de los aspectos más importantes de cualquier procedimiento concursal. Por un lado, para asegurar la disponibilidad de este

tipo de créditos. el concurso debe respetar en lo esencial sus privilegios y beneficios. Por otro lado, es necesario evitar que la ejecución desordenada de las garantías obstaculice la instancia de preservación de valor que ofrece el concurso.

La Iniciativa respeta, pues, los diferentes tipos de garantía real, pero ordena la participación de sus titulares en el procedimiento. Como es natural, cuando el valor de la garantía es superior al adeudo al inicio del concurso, los créditos garantizados siguen devengando intereses ordinarios hasta donde alcance dicho valor. Si el valor de la garantía es inferior al del adeudo, la diferencia se considera como crédito común, por lo que deja de causar intereses y se convierte a unidades de inversión.

Durante el período de conciliación, se impide la separación de los bienes que sean objeto de alguna garantía pero se establece la obligación al comerciante y al conciliador de vigilar su debida conservación. Terminada la conciliación, los acreedores con garantía real y con privilegio especial recuperan la facultad de proceder a la ejecución de sus garantías, salvo que hubieren convenido en ser partes en el convenio o se le paguen sus créditos hasta el valor de los bienes objeto de la garantía o privilegio.

Los titulares de los créditos con garantía real participan como tales en las decisiones que la ley atribuye. Sin embargo, como se ha señalado, en los casos en que la garantía no cubra el monto total del crédito al iniciar el concurso, el faltante recibe el tratamiento de un crédito común, por lo que resulta necesario permitir la participación del acreedor por dicho faltante en las decisiones de los acreedores comunes.

Para evitar condicionar el avance del procedimiento a una valuación de todos y cada uno de los bienes que sean objeto de una garantía real, se optó por dar la opción a los acreedores garantizados que consideren que el valor de sus garantías es insuficiente para cubrir la totalidad del adeudo reconocido al inicio del concurso de atribuir un valor a sus garantías de manera que puedan participar como acreedores comunes por el monto faltante. Para evitar abusos, el acreedor que ejerce esta opción está obligado a renunciar, en favor de la masa, a cualquier excedente entre el valor de la garantía que finalmente se realice y el monto que le atribuyó para las votaciones. La diferencia entre el adeudo reconocido y el valor atribuido por el acreedor a su garantía recibe el tratamiento de un crédito común.

En cuanto al mecanismo de liquidación judicial de los bienes del quebrado, hipótesis que se dará solamente cuando haya sido materialmente imposible rehabilitar la

empresa, se mantienen prácticamente las mismas disposiciones de la Ley de Quiebras y de Suspensión de Pagos.

Al igual que la conciliación la quiebra tiene como objetivo preservar el valor de la empresa para repartirlo, conforme a sus respectivos derechos, entre el comerciante y los diferentes tipos de acreedores.

El síndico toma posesión de la empresa con el mandato de enajenarla de la manera que se obtenga el máximo valor posible. Según el caso, esto puede lograrse mediante una reorientación administrativa, operativa o financiera de la empresa, vendiendo la empresa entera o algunas de sus partes a otro comerciante que pueda materializar más valor, o bien disolviéndola y vendiendo los bienes separados al mejor postor. Cuando el negocio o cualquiera de sus partes sea viable como empresa en marcha, el síndico deberá hacer los arreglos necesarios para venderla como tal, ya que esto permitirá el valor máximo.

La mejor manera de enajenar los activos varia enormemente de una empresa a otra. En algunos casos por ejemplo, al medio idóneo será una venta publica en la localidad del comerciante, con un mínimo de formalidades. En otros casos puede ser apropiado realizar una licitación internacional, posponer la enajenación de la empresa mientras se completa su reestructuración, transferir los activos a una nueva sociedad y vender las acciones o negociar una venta privada con el único comprador posible.

Así por un lado conforme al objetivo de lograr el máximo valor de realización de la masa, es conveniente dar oportunidad a que la empresa entera. alguna parte de ella o cualquier conjunto de bienes de la misma, se enajenen mediante el mecanismo que mejor se adapte a las circunstancias particulares de la empresa, y a las mejores prácticas comerciales en los mercados relevantes.

Por otro lado, atendiendo a la intención de que todo el procedimiento concursal sea transparente y confiable, se reconoce que la enajenación de la masa puede ser vulnerable a abusos y prácticas irregulares, por lo que es necesario establecer en la Ley los incentivos y controles necesarios para asegurar que nadie se aproveche indebidamente del procedimiento, propiciando la participación constructiva y la vigilancia mutua de todos los interesados.

La solución adoptada por la Comisión consiste en permitir al síndico proponer al juez cualquier mecanismo de enajenación consistente con su mandato de lograr el máximo

valor, explicando y justificando debidamente su propuesta, que se hace del conocimiento del comerciante y sus acreedores. Si, pasado un plazo razonable, no manifiestan su desacuerdo con la propuesta el comerciante o una proporción significativa de los acreedores, el juez autoriza al síndico a proceder conforme a la misma. Si la propuesta es objetada, la enajenación del conjunto de bienes de que se trate se realiza mediante un mecanismo de subasta pública, cuidadosamente regulado en la propia Ley.

De esta manera, se permite al síndico la oportunidad de convencer a los interesados de proceder conforme a un mecanismo de enajenación ad hoc. En caso de persistir cualquier causa de desconfianza, se recurre necesariamente al sistema preestablecido que asegura la transparencia y minimiza la posibilidad de sospechas e impugnaciones.

Conservando la efectividad de las garantías y el respeto a los derechos del acreedor garantizado, se propone un mecanismo para impedir la separación prematura de activos indispensables que sean objeto de una garantía, en los casos en que su enajenación resulte conveniente para la masa.

Para la determinación de los repartos, la Iniciativa mantiene, en lo fundamental, los grados y prelaciones establecidas en la ley vigente, realizando sólo los cambios mínimos necesarios para adecuarlos a las nuevas disposiciones.

El régimen penal de las quiebras se muestra poco eficaz y raras veces llegan a aplicarse las sanciones previstas para los casos de quiebra culpable o fraudulenta; sin contar con los casos de los quebrados que se sustraen a la acción de la justicia mediante la fuga. Ello se debe en gran parte a que los tribunales han considerado necesario para incoar el proceso penal, el que se haya agotado los medios de impugnación en contra de la sentencia declarativa de la quiebra. Se elimina sin embargo, la necesidad de clasificación, por el juzgador de concurso.

El principio de que el acreedor tiene un derecho de prenda sobre el patrimonio del deudor, conforme al cual el deudor responde del cumplimiento de sus obligaciones con todos sus bienes, justifica que se sancione penalmente al deudor comerciante que, dolosamente. se coloca en una situación de incumplimiento generalizado de sus obligaciones.

Es imposible enumerar exhaustivamente las múltiples y diversas conductas mediante las cuales el deudor comerciante puede lograr su finalidad de burlar a sus acreedores.

La Iniciativa busca englobarlas a todas, y no dejar impune a ninguna, mediante un tipo que se refiere, genéricamente, a toda conducta dolosa que cause o agrave la situación de incumplimiento generalizado de las obligaciones líquidas y exigibles. En esa definición quedan comprendidas todas las ocultaciones, simulaciones, falsificaciones y engaños que pueda realizar el deudor comerciante.

La Iniciativa instruye al juez para que, al individualizar la pena, entre el mínimo de un año de prisión y el máximo de cinco años. tenga en cuenta la cuantía del perjuicio inferido a los acreedores y el número de éstos.

La Iniciativa se preocupa, en primer lugar, por motivar al deudor para que dé cumplimiento a sus obligaciones. Por esta razón, propone que los delitos en situación de concurso se persigan por querella del acreedor, a fin de abrir la puerta al perdón del ofendido.

No pesa responsabilidad penal, desde luego, sobre el comerciante a quien sobrevinieren infortunios que, sin intervención de su voluntad, reduzcan su capital al extremo de tener que incumplir en sus pagos. Esta hipótesis conforma lo que la Ley de Quiebras y de Suspensión de Pagos vigente llama quiebra fortuita. La Iniciativa estima inútil ocuparse de conductas que no constituyen delito.

La Iniciativa independiza, hasta un cierto punto, el procedimiento concursal del procedimiento penal. El primero tiene como finalidad maximizar el valor del patrimonio del concursado y lograr el pago de los acreedores. El segundo busca sancionar las conductas delictuosas del deudor. Los intereses de la justicia exigen que ambos procedimientos avancen sin estorbarse. Desaparece, por ello, la institución de la calificación de la quiebra que solo servia como escudo de protección de delincuentes.

La Iniciativa propone que los delitos en situación de concurso, cometidos por el deudor, podrán perseguirse sin esperar a la conclusión del procedimiento de concurso mercantil y sin perjuicio de la continuación de éste, que las decisiones del juez que concede del procedimiento de concurso mercantil no vinculan a la jurisdicción penal y que no será necesaria la calificación de concurso para perseguir estos delitos.

Tramitándose el procedimiento concursal y el procedimiento penal en forma independiente, cualquiera de ellos puede terminar antes que el otro. No debemos temer a la contradicción de las sentencias, pues no lo habrá. No puede haberlas pues, como arriba dijimos, el juez concursal busca únicamente, el cumplimiento, total o

parcial de obligaciones. Él es el único competente para resolver sobre reparación del daño. En tanto que al juez penal le compete decidir si se ha cometido o no delito y, en su caso, sancionarlo.

Resta, no obstante, una relación entre ambos procedimientos. Se tipifica una conducta propia del comerciante declarado, por sentencia firme, en concurso mercantil. Esta característica personal es uno de los elementos del tipo, luego entonces los procedimientos penales. en este caso, únicamente podrán iniciarse cuando el juez de lo concursal haya declarado al comerciante en concurso mercantil, y esta declaración reviste el carácter de un requisito de procedibilidad.

Se sanciona al comerciante contra el cual se siga un procedimiento concursal, en dos hipótesis: cuando haya llevado su contabilidad en forma que no permita conocer su verdadera situación financiera o la haya alterado, falsificado o destruido, o cuando requerido por el juez del procedimiento concursal, no ponga su contabilidad, dentro del plazo que para ello se le considere, a disposición de la persona que el juez designe.

Durante las últimas dos décadas, la economía nacional se ha caracterizado por su inserción creciente a los flujos internacionales de comercio y de capitales. Las empresas mexicanas han acrecentado significativamente su participación en el comercio exterior, se han beneficiado de las fuentes de financiamiento que les proporciona su acceso a los mercados internacionales de capitales y cada vez un mayor número de ellas se aventura a extender sus operaciones a otras latitudes. Asimismo, ocurre con las empresas extranjeras que han visto en nuestro país un clima propicio para ampliar sus oportunidades comerciales y de inversión. No debe sorprender entonces que en este contexto de globalización las dificultades económicas y financieras por la que pudiera atravesar una negociación tengan una incidencia no solo sobre aquellos que comparten su ubicación geográfica sino también sobre aquellas que están localizadas en otras partes del mundo.

En virtud de lo anterior, las diferencias en los procedimientos concúrsales de las naciones afectan de manera importante a las empresas que tienen activos y pasivos en varios países. Desde una perspectiva práctica, esa diversidad propicia una mayor incertidumbre tanto para el empresario en crisis como para sus acreedores y por lo tanto actúa en detrimento de una aplicación efectiva de la legislación concursal especialmente en naciones como la nuestra donde es cada vez mas frecuente que las operaciones de las empresas trasciendan las fronteras nacionales.

Atendiendo a estas tendencias, la comunidad internacional desarrolló en el seno de la Comisión para la Legislación sobre Comercio Internacional de las Naciones Unidas. una Ley Modelo que busca dar congruencia a los procedimientos de índole concursal entre los países. Esta Ley fue negociada entre más de 40 países con los sistemas legales más variados. Una de las características más importantes de la Ley Modelo es que tiene por objetivo propiciar una cooperación efectiva y acotada entre los procedimientos concúrsales de las naciones. Mediante ordenamientos comparables con todos los sistemas legales y que, por lo tanto, la hacen fácilmente adaptable al marco jurídico de cada nación. Concretamente, facilita la cooperación entre procedimientos legales que se llevan en una nación y los que ocurren fuera de ella. De esta manera, el país que adopta la Ley Modelo, además de reconocer la importancia de sus transacciones transfronterizas, facilita el reconocimiento de un procedimiento extranjero y la cooperación y coordinación entre los tribunales y los órganos de la quiebra en distintos países.

Con base en las consideraciones anteriores la Comisión redactora reconoció la necesidad de seguir avanzando en la modernización de ordenamientos jurídicos que regulan la actividad comercial y financiera de nuestro país, incorporando a la Iniciativa de Ley de Concursos Mercantiles un capitulo de cooperación internacional de procedimientos, para lo cual se realizaron las adecuaciones necesarias a la Ley Modelo de la Comisión para la Legislación sobre Comercio Internacional de las Naciones Unidas. Con ello, México se colocará a la vanguardia de los esfuerzos de la comunidad internacional para modernizar su marco jurídico en materia concursal en respuesta a los retos de la globalización. No podemos concluir la presentación de esta Iniciativa sin insistir en la urgencia de una nueva legislación en la materia, puesto que la realidad social ha rebasado a la normatividad existente Cuando un ordenamiento constituye un obstáculo para la solución de los problemas que presenta la realidad socioeconómica que se pretende regular la realidad se impone y busca las soluciones aun al margen del derecho con grave detrimento de la vida jurídica; se aprovechan y manipulan las disposiciones que resultan inconvenientes a la solución de los problemas en muchos casos con predominio del interés particular sobre el colectivo, y se ignoran y desprecian las normas que impiden las soluciones.

# Exhibit 1-T

# BANKRUPTCY LAW

## " STATEMENT OF GROUNDS "

**Publication date**: 12/5/00
**Legal provision**: LAW
**Official gazette**: 8-I
**Body**: MINISTRY OF THE INTERIOR
**CHAMBER OF ORIGIN**: SENATORS STATEMENT OF GROUNDS Mexico F.D. November 23, 1999. BILL SUBMITTED BY SENATORS: (PRD, PRI PARLIAMENTARY GROUPS and INDEPENDENT) CC. CLERKS OF THE CHAMBER OF SENATORS BY HAND

Those who sign, Senators of the Republic of the LVII Legislature of the H Congress of the Union, members of the Parliamentary Groups of the Democratic Revolution Party (PRD for its acronym in Spanish), the Institutional Revolutionary Party (PRI for its acronym in Spanish), and the independent senator Adolfo Aguilar Zinser, based on provisions of the Section II of Article 71 of the Political Constitution of the United Mexican States as well as by Section II of Article 55 of the Interior Government for the General Congress Regulations, submit for consideration of this H. Assembly the following Bankruptcy Law, according to the following:

## STATEMENT OF GROUNDS

Importance of the bankruptcy legislation.

Social and economic conditions that prevailed in Mexico in the decade of the forties have been radically transformed. Our population has multiplied by five times the gross domestic product has grown by more than fifteen times the participation of the industrial and service sectors has increased significantly and the primary sector has been reduced. The demographic growth and the march of the countryside towards the city have been of great magnitude. The progress in telecommunications and the means of transport has taken giant steps, at that time unimaginable.

The way of doing business is also different. In the past most of the commercial companies were sole or family proprietorship and relatively easy to manage. Today, commercial relations are more complex and subject to a greater number of factors, some of an international nature that affect the economic life of the nations individually considered - although of different form and degree - and others are specific to the national realities; that affect the progress of the company. Product cycles have become shorter, and companies are

exposed to more frequent changes and sometimes wider in the conditions of the financial markets. All this forces companies to transform more quickly.

The economy, of being typically regional was integrated into a national economy, until entering a stage of insertion in the world economy. In parallel, the money and stock markets, which half centuries ago were practically non-existent have acquired a great preponderance as a means of financing development. Our country has been integrated into the world economy in response to the benefits offered by the globalization process, not only in terms of the exchange of goods and services with foreign countries, but has also been integrated into the growing financial and investment flows.

The productive chains are integrated vertically and horizontally, nationally and internationally, technologically and by sector. The greater competitiveness forces some companies to respond nimbly to the new market niches and to abandon those where they no longer have competitive advantages. As society is modernized, the number of companies increases, and in the same way those factors that make their competitiveness, profitability and permanence in the market vary.

There is, however, a serious problem when there are conditions that lead an entrepreneur, quickly and irremediably, to face economic and financial problems, even when this is motivated by an error of calculation or foresight committed by an honest, competent and prosper entrepreneur. The company, considered as the organization of work, material and intangible goods intended to produce or offer professionally goods and services to the market, for profit, can be successful or be in serious difficulties that threaten their survival. Bankruptcy of a company is not about a singular and concrete breach of an obligation, but a general breach, which affects all those that have a relation with the company and also affects the economic survival of the employees who work in it, so that its bankruptcy affects its entire social environment.

In addition, when a company is unable to comply in a generalized manner in its liquid obligations with a plurality of creditors, there is a risk that a situation will arise in which the collection through individual action by its creditors will result in a detriment to the total value of the company. In this case the individual action can also affect the priority that existed among creditors, resulting in inequities. This is the moment in which the bankruptcy law should direct its regulations to try to prevent the company from failing, to waste the creative effort already made by the entrepreneur, and not to hurt the social conglomerate that, to some extent, benefits with the own functioning of the company. The possible bankruptcy is then an economic phenomenon, and the purpose of bankruptcy legislation is precisely to address the social ills derived from this singular phenomenon.

Regarding the legal framework that regulates commercial relationships between individuals, it should be taken into account that, in the past, Mexican courts and their procedural laws were created to solve problems of companies established in smaller cities, in which all parties met and found all the days in the public and work places. In such social conditions it was feasible to assume in the judge basic knowledge and immediacy with the company, necessary to solve many of the problems caused by the lack of liquidity. In addition that cessation of payments were less in a society that showed less degree of development. Today, life in cities does not allow judges to know personally the parties involved, the number of businesses submitted to it is overwhelming, the size and complexity of commercial enterprises requires that they be handled by teams of specialists in administration, accounting and in the various fields of commercial, industrial or service activity in question.

For all the above, the legal framework cannot remain outside the progress of society. To promote a healthy and sustained economic growth that offers development opportunities to the entire population, a necessary condition is to have an appropriate legal framework that offers certainty and confidence in the solution of conflicts between individuals, facilitates the efficient reassignment of productive resources in the economy and contributes that the exit of companies from markets affects the less possible their social and economic environment. The legal framework that regulates economic activity in this sense has been modernized during the last years. Not only commercial agreements have been established with the main countries of the world, but the Federal Competition Law was also issued, and important advances have been made in the way of resolving conflicts among individuals, highlighting among them the Arbitration Law.

Bankruptcy legislation also plays a strategic role. Its purpose is to order the processes of restructuring companies, seeking in the first place to take advantage of the experience and knowledge of the entrepreneur in bankruptcy and, on the other hand, to ensure that creditors, whether commercial or financial, can also continue to operate. When an instance can not successfully conclude, the State can play a central role coordinating efforts, providing a forum where information flows and viable companies can take advantage of to restructure, continue operating and maintain employment. On the other hand, when it is the case that the companies are no longer viable, the State plays a fundamental role in the reallocation of productive factors, so that employees can find new sources of productive and well-remunerated employment and the assets are taken for use by other more productive companies. In this process, creditors and tradesmen obtain the greatest value from the company or from the assets that make it up and, with opportunity they can resume other businesses and activities that contribute to the general welfare of the company.

Thus, the situation of a company facing economic or financial problems that threaten its survival constitutes an object of public interest, which requires a participation consistent with the economic reality, relying on institutions for the administration of justice and, on the

other hand, in the experience and knowledge that independent agents can contribute to this type of processes. To a large extent, this is the concern of not only Mexico but also countries with a higher degree of economic development, such as Germany, Spain, France, England and the Netherlands, and countries with a similar economic structure as Argentina, Brazil, Chile, Indonesia, Peru and Colombia, to review, update and modernize the legal framework of the bankruptcy of a company.

Bankruptcy & Payment Suspension Law

The current bankruptcy legislation comes from 1942, when the Bankruptcy & Payment Suspension Law was issued. Our regulation in bankruptcy matters has evolved in response to the different political, economic and social realities. The first order in this matter was the bankruptcy law of 1853 influenced by the French Commercial Code of 1808 and the Spanish of 1829 that regulated cessation of payments of a tradesmen due to lack of liquidity. The next precedent, with which the insolvency matter acquired federal character, was the Commercial Code of 1854, but this had an ephemeral validity due to the Ordinances of Bilbao that were put into effect after the triumph of the Ayutla Revolution. Later, the bankruptcy regime was amended with reforms to the Commercial Code in 1884 and 1890. It was not until the beginning of the forties that it was considered appropriate to have a special law on the matter, mainly in response to the need to recognize the progress of commercial matters. The current law was drafted with undoubted technicality by one of the most prominent mercantilists of the time, Mr. Joaquin Rodriguez y Rodriguez, who also received the influence of the best Spanish doctrine on the subject matter.

The law in force recognized that bankruptcy is an economic phenomenon in which the State has a fundamental interest, which should not only concern creditors and that the company represents an objective value of economic and social organization, so that the company's conservation is the fundamental directive norm of the legislation in this subject matter. It also acknowledged that simplification of the procedure should be sought, without loss of the guarantee of legal security and that integrity of the procedure should be protected among the people who handle the bankruptcy. Authors of this Bill pay tribute to those who intervened in the making of the Bankruptcy & Payment Suspension Law that came into force on April 20, 1943, because they designed a mechanism according to the economic and social conditions of the time. However, as national institutions and commercial conditions were transformed, this law was presenting diverse problems that were diminishing the effectiveness in its application. As early as 1968, the renowned mercantilists Roberto Mantilla Molina and Jorge Barrera Graf directed a preliminary draft for a new Bankruptcy Law. This bill was oriented to address the problems arising from the suspension of payments figure, resolve delay in the procedures, problems in the integration and operation of the bankruptcy organs and to review the provisions of criminal law. This project replaced the suspension of payments by a judicial moratorium limited to sixty days, proposed a registry

of professionals authorized to act as receiver, purged and simplified procedural procedures, replaced the bodies of intervention and the creditors' meeting by a Trustee in Bankruptcy, and expedited recognition of credits suppressing the need to open a contradictory debate for each of these credits. Subsequently, on January 13, 1987, a reform was made to the law currently in force in order to address the problems related to the receivership body. Specifically, it was proposed in the corresponding statement of grounds the assignment of the receiver in bankruptcy proceedings of private tradesmen to the chambers of commerce or industry; and dealing with state-owned entities, companies in the social sector and other companies, assignment of the receivership to the national credit company designated by the Ministry of Finance and Public Credit.

In 1987 Salvador Rocha Díaz, prepares a proposal for the Law of Support, Rehabilitation and Bankruptcy of Companies in which an out-of-court instance of support for tradesmen in crisis is proposed, the figure of the creditors' meeting was eliminated, the powers of the intervention are strengthened. Substitution of the payment suspension for a legal moratorium with a fatal term of one year was also proposed, which the concurrent creditors could only extend unanimously or, otherwise, the tradesman was declared bankrupt. The contradictory debate was suppressed in order to speed up the recognition of credits and the intervention was left with the task of establishing the amount, graduation and priority that corresponded to each credit. Another innovation was simplification of requirements for the approval of the agreement and the task of proposing a rehabilitation plan that would allow the bankrupt to restructure its liabilities was for the receiver, such task if approved by the judge would be enforceable against all creditors.

More recently, in 1994 the parliamentary group of PAN submitted to the consideration of the Chamber of Deputies a Bill on Rehabilitation and Bankruptcy of Commercial Entrepreneurs, whose authorship was mainly due to Mr. Daniel de la Garza Gutiérrez. In this bill important contributions tending to strengthen the legal security of the parties through the simplification of judicial procedures can be seen, especially to promote recognition of more expeditious and less contentious credit. Functions of the bankruptcy bodies are redefined and requirements are established to promote professionalization of the receivership. Suspension of payments was replaced by an instance of conciliation and another of cessation of payments and the intervention of the judge was limited to strictly jurisdictional aspects.

**The Bill, the Drafting Commission and the sources.**

The Bankruptcy Bill submitted today for consideration of this H. Senate, was prepared thanks to the efforts of PRD, PRI and independent legislators that, with collaboration of the Federal Executive Branch officers, as a whole integrated the Drafting Commission.

In order to elaborate a Bill for a new Bankruptcy Law, it was considered indispensable to take as reference points, on the one hand, the current law, the bill submitted preserves a fundamental core of the principles of that legal body, adopting, increasing and modifying what is necessary to formulate one more in line with the society and contemporary practices.

The Commission considers that there are substantive reasons to propose the elaboration of a new law instead of proposing reforms to the currently in force, in such manner many of the commercial law teachers who have devoted themselves specifically to this matter and who have prepared preliminary drafts in this regard were in line. The above without losing the best provisions of the current law in the preliminary draft, even though with a diverse system. Differences between the current law and the bill recognize the evolution of commercial practices, the development of new commercial institutions and the profound changes in the composition of Mexican society from 1943 to the present.

Successive drafts were analyzed and commented on by various business and labor representations. Recognized jurists, groups of lawyers, judges and practitioners who made contributions on procedural, constitutional, labor and commercial and criminal aspects of the preliminary draft. Public forums were organized for presentation of some drafts in the Federal District, Monterrey and Guadalajara in order to gather concerns of lawyers, entrepreneurs, academics and professional associations. Thus, the Bill submitted today contains the pertinent recommendations of this large group of citizens.

The Bill, as already noted, also benefits from inspiration and help that comparative law provides; especially in the most modern trends that can be seen in recent reforms to the bankruptcy legislation of a number of countries. Finally, the enormous experience acquired in the application of the current law allowed knowing the nature of the commercial relations between individuals that arise in Mexican practice and that the Bill is called to rule.

**Criteria and general ideas.**

The first issue that occupied the authors of the Bill was to identify the central objectives of the bankruptcy law, in order that its dispositions would keep full congruence with them and would constitute suitable means to obtain them. The central objective was easily identified, providing the relevant regulations to maximize the value of a company in crisis through its conservation, which protects the employment of its human elements, the negative economic impact to society caused by the loss of a company that provides goods or services is avoided and recovers the business effort that said company represents for its owner. In case it was impossible to keep the company in the hands of its owners, the Bill should contain the norms that allowed to preserve the economic value of the company or of the goods and rights that

integrate it by means of a procedure of ordered liquidation maximizing the product of the alienation and gave fair treatment to the tradesman and its creditors.

In order for the bankruptcy legislation to be effective, it must be characterized to be fair and transparent. Predictability is achieved by establishing clear and precise rules that allow its application in a consistent manner and therefore, offer certainty and discourage litigation. Equity, on the other hand, is not achieved by giving equal treatment to different creditors, but by recognizing differences and, above all, avoiding fraud and favoritism. Finally, transparency obliges to provide sufficient information to the different participants so that everyone can exercise their rights, and also requires that judicial procedures are open and that decisions are supported on and made known to the public.

The above features allow to establish the appropriate incentives so that creditors and potential debtors can make the best decisions and these contribute to increase the efficiency of the productive system. In addition, once the company has incurred in a general breach of its obligations, the law must contribute for the parties to reach private agreements with the least participation of the State or if this is not possible, the rights are executed expeditiously and orderly, in the best possible conditions.

Specifically, the most important criteria that guided the development of the Bill were the following:

a)  Maximize the social value of the company;

b)  Keep the balance between debtor and creditors, so that both are fully respected;

c)  Induce the flow of relevant information that allows interested parties to participate constructively;

d)  Respect as far as possible the preexisting contractual relationships;

e)  Adjust incentives to facilitate a voluntary arrangement between debtors and creditors;

f)  Foster out-of-court solutions;

g)  Support judges in technical and administrative aspects of proceedings, so that they can focus their efforts on the jurisdictional tasks and

h)  Simplify judicial procedures and administrative procedures to make them more transparent and expeditious, reducing opportunities and incentives for frivolous litigation.

## Description of the Bankruptcy Bill.

The following is a description of the main elements of the Bankruptcy Law submitted for consideration of the H. Congress of the Union.

The Bill regulates the bankruptcy of people who, according to our laws, have the character of tradesmen. It is clarified that the trust assets may be submitted for bankruptcy, when it is for business activities. Provisions relating to bankruptcy of partners with unlimited liability, inheritance of tradesman and branches of foreign companies are preserved and those relating to irregular companies are improved.

Legal provisions related to bankruptcy of controlling and controlled companies, which were not included in the current Law, are also incorporated.

On the other hand, after a careful analysis of provisions applicable to insurance and bonding companies, regulations regarding bankruptcy of these institutions are suppressed, and their bankruptcy proceedings are allowed to continue to be regulated by their special laws and other provisions currently applicable to them.

Likewise, the special chapters for the case of public concessionaires, credit institutions and auxiliary credit organizations are adapted according to the bankruptcy procedure proposed in the Bill. In these cases, it was essential to recognize the particular nature of these companies and the public interest they represent. The Bill harmonizes the competition of these institutions with the special provisions that govern them, and establishes the due participation of the entities that authorize, regulate and supervise them.

As established from the statement of grounds of the Bankruptcy & Payment Suspension Law, the Commission acknowledged that the bankruptcy is an economic phenomenon that not only interests to individuals involved but is a legal-economic manifestation in which the State has a preponderant and fundamental interest so therefore, it has proposed, consistent with provisions of Section 1 of the constitutional Article 104 that it was competence of the federal courts to hear the bankruptcy of tradesmen.

A concern of the drafting Commission of the Bill was to reorganize the functions of the judge, the receiver and the intervention in such a way that they can be developed in a more independent manner, each of the bodies having specific deadlines for performance of their functions, in order to make the bankruptcy proceedings more transparent and prevent them from being prolonged too long.

First, it seeks to redefine the function of the judge within the bankruptcy proceedings. The Commission reached the conclusion that the most important problems that arise in a company in a state of lack of liquidity are of a commercial and administrative nature and can be solved by experts in these commercial matters. Only a limited number of issues, relating to relations of the tradesman with third parties and the protection of their rights, necessarily require the intervention of the judicial authority and compliance with the essential procedural formalities.

The Bill keeps the judge as the central organ and director of the bankruptcy, but recognizes that the specialization in the branches of private law and procedures that judges and litigating attorneys have, does not prepare them in our days to resolve on matters in courts for which they are not necessarily prepared. To adequately resolve financial problems, time, competent personnel and material means, which are essential to overcome the obvious crisis faced by a company that has been unable to meet its obligations in a generalized manner, it is necessary to have the participation of specialists who assist the judicial authority in its resolutions.

Disadvantages of following the traditional system of leaving the judge responsible for all decisions, not only the jurisdictional ones that correspond to their natural function, but the administrative, industrial, commercial, economic and financial decisions that result, necessary for rehabilitation or, where appropriate, liquidation of the failed company were perceived as serious. It is useless to insist that, neither in Mexico nor in any other country, judge has the necessary support to deal with all the problems of a non-jurisdictional nature that arise in bankruptcy proceedings. For that reason, the modern tendency has been to reserve to the judge only the legal problems that in the legal proceedings that in the bankruptcy proceedings are presented. And to other bodies of bankruptcy the administrative responsibility: the judge must intervene in the jurisdictional controversies related to an administrative or financial question but they cannot have the responsibility to make decisions in such matters.

Reasons outlined above led the Commission that drafted the Bill to draw up a careful distinction between those issues which, since they affect the rights of the tradesman and other interested parties, or involve litigation between them, are judicial in nature and those of a commercial, accounting, financial or administrative character and which must be resolved by specialists in these fields. The proposed Bill makes a consistent distinction between judicial tasks and attributions and those that are properly commercial. When it was necessary, as in the case of the declaration of bankruptcy and the inspection visit, the resolution is responsibility of the judge, but the fundamental weight of the accounting, financial or administrative analysis that illustrates the judge so that it can better provide, corresponds to the specialist.

The bodies of bankruptcy have not been integrated or have not functioned in the manner provided by law. Receivership was considered with special attention, judging it as the most delicate. The drafting Commission thought that entrust it to the chambers of commerce or industry or to credit institutions is an excellent measure in theory, but up to now, it has failed in practice. It is considered, in the abstract, that this was an optimal solution, because if the bankruptcy interests the generality of the trade, there is nothing better than entrusting the receivership to institution that has the function of representing its general interests, that is, those mentioned chambers; but the organization and structure of most of them does not allow, today, to adequately address the complex functions of a receivership. Only in a few cases chambers and credit institutions have accepted the receivership and, due to this lack of interest, have tended to delegate this important responsibility to third parties, who are the ones who have actually carried out the receivership. Currently, there is a lack of a system that ensures a professional and competent receivership and with the adequate human and economic collaboration to solve the crisis of the failed company.

According to the stages of the bankruptcy proceeding, the Bill attributes powers to three classes of specialists: visitors, conciliators and receivers. Attributions of specialists are important and delicate. Specialists must have moral solvency, knowledge and experience in the branch of the activity that corresponds to their attributions. Professionals whose preparation allows them to attend these functions form a group in which these specialists can easily be recruited, such as graduates in law, graduates in business administration, graduates in economics, accountants and financial engineering specialists. Such professionals are the most indicated, in the current situation of our society, to accept and perform the functions that typically have been reserved for the receivership, plus those attributed to them by the Bill.

To ensure that there are people who have the necessary requirements to carry out their task with competence and honesty, as well as transparency in their designation, the Bill proposes the creation of the Federal Institute of Bankruptcy Specialists, as an entity dependent on the Federal Judiciary Council and whose main function will be to authorize people who prove to meet the necessary requirements, to provide services of visitors, conciliators or receivers. Also, among other functions, will have the request of the bankruptcy judge, designate by draw among the accredited individuals, who will serve as visitors, conciliators and receivers. In this way, it is expected to have a transparent means of selecting the specialists who will act in the bankruptcy proceedings. It is attributed to this Institute the concentration of the lists of receivers, and of the files of each one of the individuals that appear in them, to centralize the data of all the Republic, and to facilitate the verification of the lists, as well as the publicity of them and of some of the acts that concern to functions entrusted to them by the Bill.

This reform seeks to relieve the judge's task in the bankruptcy proceedings without depriving it of its primary function, and allowing the work of the specialists to produce

immediate and real results in the solution of the problems of a company in crisis.

When designing the internal structure of the Institute, it was sought, at all times, to ensure that it has the greatest possible technical and operational autonomy. Likewise, it was sought to maintain it outside of its direct intervention in the bankruptcy proceedings and that members of its Board of Directors were people of recognized prestige in the relevant matters (administrative, accounting, financial, economic and law) for accreditation, designation and supervision of specialists in the bankruptcy process. Finally, to foster its institutional memory, it was decided that its Board would be composed of five members that would be appointed in a staggered manner.

The Bill makes a particular emphasis on ensuring that any and all parties to a bankruptcy proceedings has sufficient information to make its decisions. For this purpose, the use, in various instances of the proceedings of pre-established formats of free reproduction that allow ensuring that all relevant data are presented in a clear and orderly manner is established as a requirement. This practice that has given good results in other countries favors the standardization and efficiency of the procedures. The responsibility for issuing and updating these formats will correspond to the Institute.

Some specific aspects of the bankruptcy proceedings require a more detailed and above all flexible regulation than it is convenient to include in a law. Such is the case, e.g. the regime of fees for the specialists or of the suitable means to give publicity to the auctions in the bankruptcy. On the one hand it is impossible to foresee in the legislative act all the possible cases that the practice is revealing and that require special treatment. On the other hand, to the extent that markets and commercial practices evolve, it is necessary to adapt some provisions accordingly.

The Institute is responsible for issuing and updating the rules, as long as they are of general application. The continuous effort of full-time dedicated professionals to perfect the technical and operational aspects of the bankruptcy proceedings will contribute to maintaining the effectiveness and validity of the set of provisions that make up the Bill.

The legal systems that regulate the singular phenomenon of bankruptcy have had a slow transformation, and it is until the last years when the new economic phenomena have motivated an important effort of study and reflection, which must lead to a legal framework that effectively contributes to solution of multiple problems that it has.

Drafters of the law in force recognized the advantages of establishing as a detonator criterion for the bankruptcy declaration of a tradesman to the generalized failure to pay. This

legislative decision is based on the reflection that such non-payment is a financial phenomenon, lack of liquidity that prevents full and timely compliance with obligations, and that should not be identified with the insolvency phenomenon that results from the insufficiency of goods, assets in comparison to the amount of the company's liabilities, and that illiquidity was the objective phenomenon that should mark the beginning of the bankruptcy subject matter, in order to prevent entrepreneur resorting negative economic procedures to hide its illiquidity, which usually produces a greater deterioration of the company.

However, the Commission also acknowledged the disadvantages that the declaration of insolvency of a tradesman was based exclusively on a case of illiquidity or insolvency, since, as already mentioned, one of the central purposes of the bankruptcy legislation is to take care of the social ills resulting from a generalized breach of the entrepreneur's obligations. In order to protect the economic and social value of a company in crisis, it is necessary to have a collective procedure that allows maximizing this value and, at the same time, gives an equitable treatment to creditors. Hence the Bill foresees in concordance with the most recent international tendencies in the subject matter, that the bankruptcy declaration of a tradesman can proceed when it does not have sufficient liquid assets to face its expired obligations or when the breach of its obligations with several creditors exceed a significant percentage. In this regard, it is pertinent to mention the importance of companies that are experiencing economic or financial problems that make it impossible for them to comply with their obligations, can be incorporated early in a bankruptcy proceeding, with the aim of protecting their value for society, as much as possible, as a source of creation of productive jobs and as a generator of satisfactions and wealth for society.

Precisely in this sense, the drafting Commission thought that the current concerns should be addressed, so that the social value of the company becomes the central objective. It is not important to determine whether the company that lacks of liquid resources to comply punctually with its obligations at maturity (illiquidity phenomenon), or whose total assets is less than its total liabilities (insolvency phenomenon) is declared in bankruptcy, since the importance lies in looking for its economic viability, when it is possible, by means of an agreement between the tradesman and its creditors.

The initiative for declaration corresponds to tradesman itself, to creditors and to the Public Prosecutor. The common debtor is required to ask for its bankruptcy; however, no term is imposed to do so, nor is sanctioned for non-compliance. The foregoing in order to ease the prolongation of negotiations in pursue of a restructuring agreement. Experience has shown that it is an unnecessary burden to demand from tradesman, overwhelmed by financial difficulties, the presentation of accounting documents that conciliator or receiver can verify when they proceed to fulfill their functions.

During the period prior to the declaration and constitution of the bankruptcy, two different values come into conflict: the need to respect the guarantee of audience of the tradesman, complying with the essential formalities of the proceedings and the need to adopt urgent measures to prevent a tradesman in lack of liquidity due to negligence, despair or bad faith, resort to ruinous or fraudulent files to the detriment of the company's conservation and the interests of creditors. To reconcile these contrary values, the Bill proposes the assistance of a visitor, the possibility of adopting provisional measures and basically written proceedings in which the essential formalities of the proceedings are respected.

Judge, upon admitting an action for bankruptcy, should request the Federal Institute of Bankruptcy Specialists to appoint a visitor and then order the visit to the tradesman. The purpose of the visit is twofold, on the one hand to provide judge with the specialized evidence it needs to make its determination as to whether the tradesman is in assumptions of general non-payment and, if appropriate, to suggest judge the adoption of the provisional measures necessary for preservation of the company and the assets of the estate.

In written and fast proceedings, the tradesman will have the opportunity to demonstrate that it has the necessary liquidity to face its obligations. The witness evidence is eliminated since liquidity or illiquidity is not a question that must be demonstrated with this means of proof. Likewise, reception of the expert test in the traditional way established for ordinary trials is eliminated, since judge will have the opinion of visitor; this does not mean that the tradesman is deprived of the right to show judge written opinions of experts, when it considers that this is convenient for it. The bankruptcy judgment allows filing of an appeal. Similar to the current legislation, a complete process of knowledge is provided during the appeal and the possibility that the tradesman is compensated for damages that may be caused by a declaration of bankruptcy proceedings from an action made with negligence or with bad faith.

Another issue of singular importance, which also occupied the attention of the Commission in the first place, is that relating to the measures for prevention of bankruptcy.

The current law contemplates two insolvency figures: suspension of payments and bankruptcy. The suspension of payments was conceived as a benefit for the failed tradesman by providing a means to prevent possible bankruptcy. In practice, the tradesman whose declaration of bankruptcy has been sued by one of its creditors, regardless of whether it acts in good or bad faith or is in the cases for the declaration of bankruptcy, accepts the benefit of the suspension of payments, judges must grant it in a short time. In addition, although the current ordinance also clearly indicates requirements that must be met by the bankruptcy declaration of a tradesman, this does not prevent it from the benefit. This explains why the number of lawsuits for suspension of payments and bankruptcy is relatively small and also why most of these lawsuits end in their paralysis.

Thus, suspension of payments has sometimes been used by unscrupulous tradesmen, as a means of indefinitely postponing the declaration of bankruptcy, and continues managing their negotiation, even in cases of flagrant insolvency. Even in suspension of payments a tradesman acquires an excessive power of negotiation in front of its creditors, because payment of its credits and other obligations is suspended. Hence, some tradesmen, even those with payment capacity and accredited solvency have a strong incentive to request their suspension of payments just as a mechanism to avoid compliance with their labor, tax obligations with suppliers and any other nature.

In practice, all this has affected a lack of legal security for both lenders of loanable resources and their claimants therefore, in an increase in the credit price, either through higher risk premiums or in more onerous terms and conditions in the form of default, terms, guarantors, guarantees and conventional penalties. Thus, access to credit is limited for honest, forward looking and prosperous entrepreneurs. Those who require resources to undertake investment projects, venture into new markets or reorient their efforts to other productive activities. In this way, the capacity of our society to generate sufficient savings to promote productive investment is diminished and consequently the possibilities of present and future economic growth of society are limited.

Based on the foregoing considerations, it was considered essential that the insolvency proceedings be a unitary proceeding in which a proceeding subsists that would tend to prevent the bankruptcy of the tradesman, because if such is avoided, in cases where the tradesman in good faith is bound to default on its obligations, not only benefits the tradesman itself, but also that of its creditors, by suppressing or reducing the expenses and complications caused by the formal bankruptcy. What should be avoided at all costs is that, under the pretext of seeking an agreement with creditors, a weapon is obtained to paralyze the lawsuits against the tradesman, and allow it, when not acting in good faith, to handle its negotiation as would have incurred in general non-compliance, with the risk of creating a situation that is increasingly serious for all.

Therefore, the drafting Commission of the Bill chose to propose that the insolvency proceedings had two stages: conciliation and bankruptcy. The purpose of the conciliation will be to maximize the social value of the failed company through an agreement between Tradesman and its creditors. For its part, the purpose of the bankruptcy will be that, when it is not possible to reach an agreement during the conciliation stage the value of the company is preserved through its orderly liquidation so that from the product of it proceeds to the corresponding distribution between the Tradesman and its creditors.

It was decided that the conciliation stage operated *ipso facto* and *ipso jure* only by the will of the commercial entrepreneur, but limited to a fatal term of six months, and with the possibility of a single application with a maximum of another three months, which could be

granted by the judge when the Tradesman and a majority of its creditors consent, this first stage of the insolvency proceedings will allow to clarify in a reasonable but peremptory period, if the company could continue operating in the hands of its owners through an agreement with their creditors. If this is not achieved by the deadline indicated and, if any, the extension that has been granted then proceeds to the declaration of bankruptcy of the tradesman. The peremptory character that is given to the conciliation stage has the purpose of generating a powerful incentive for the parties in conflict with the assistance of an impartial conciliator to act as a friendly conciliator among them, to try by all means, at their disposal, to correct their differences under penalty of facing greater losses of not being able to preserve the progress of the company in the hands of its original owners. It is therefore essential that proceedings to prevent bankruptcy ends in a short period of time and that it be structured so that, due to its simplicity, it can move quickly and economically.

Conciliation is then proposed, as another right more in favor of commercial entrepreneurs who face economic or financial problems, so that they have a period within which they will maintain the management of the business and no credit could be demanded to them. The presence of a professional and independent conciliator and the provisions that favor the generation and dissemination of relevant information will lead to better conditions for an agreement.

Thus, with the conciliation stage, a new figure of suspension of payments is temporarily instituted, but temporarily limited, with the purpose of providing tradesman and all its creditors with a space so that they can correct their differences through the conclusion of an agreement. With these features, the conciliation stage will contribute to providing greater transparency, certainty and predictability to the bankruptcy proceedings and to adapt the incentives among the creditors themselves, and between the latter and the tradesman. It is expected, then, that the conciliation will advantageously replace the current suspension of payments.

A market economy is based on voluntary transactions between individuals that recognize the possibility that the businesses do not turn out in the way originally planned. Creditors of tradesman, usually other tradesmen, knowing the circumstances that led the company to the impossibility of fulfilling their obligations may decide to endorse their trust in the company of the tradesman recognizing the value that this provides and allowing through an agreement with it, to minimize the losses that may have been incurred.

The conciliation stage is aimed to create the best conditions so that any opportunity for a favorable arrangement for all participants can materialize in an agreement. While the nature of an agreement is to achieve and reflect a contest of wills, a majority agreement is allowed to be imposed on a dissident minority by duly protecting their rights to prevent a capricious or disinterested minority from preventing a preferable solution for all. The intention is for all

creditors to receive at least what corresponds to them in the best case of alienation in bankruptcy and this is achieved by assuring dissidents the best conditions accepted by creditors of their degree who sign the agreement.

The agreement is essentially an arrangement between tradesmen, who must benefit from all means accessible to modern transactions. Nowadays, complex negotiations are carried out and contracts of all kinds are signed among tradesmen located in different continents. Since the agreement is an endorsement of the tradesman's business with its creditors, it is natural that its preparation is in line with the commercial practices of the markets in which the tradesman and its creditors operate.

In this context, the Commission considered it convenient to allow greater flexibility in the formulation of the agreement, taking care of the minimum formalities necessary for the legal security of the parties. Consequently, the formulation and negotiation of projects or proposals for agreements is not regulated, nor is it required that creditors meet to discuss or vote. However, the minimum notification and access instances are allowed, which allow all interested parties to exercise their rights and participate in defense of their interests. There is a particular emphasis on ensuring that the parties have sufficient information to make their decisions, and novel mechanisms are established for their dissemination.

Since an agreement cannot affect the guaranteed credits in terms of their guarantees, without the consent of the corresponding creditor, it would be natural to limit the vote of the agreement to the common creditors. However, experience has shown that the participation of secured creditors can be extremely valuable for the achievement of an arrangement with the tradesman.

Additionally, it is common for a small number of creditors with or without real guarantees to assume a more active participation than others in the negotiation of an agreement. In practice, several creditors remain outside the details of an agreement preparation, due to the amount of their credits, their ignorance of the business of the tradesman, the expenses and times involved in their participation or any other reasons. In these conditions, it is convenient to allow the group of creditors that has greater facilities to do so to assume the leadership of the agreement allowing the others to react later when it suits their interests.

Thus, the Commission sought a mechanism that would allow a consensus to be reached quickly, encouraging the participation of secured creditors, preserving their guarantees and duly protecting the rights and interests of common creditors.

This was achieved with combination of two elements, the formula for the majority vote of

the agreement and provisions to protect dissident minorities from common creditors.

Regarding the majority necessary for approval of the agreement, it was established that the base on which it is determined is the sum of the total of common credits and of those guaranteed that decide to approve it. That is to say, the amounts of the guaranteed credits that participate in the agreement are considered at the same time as favorable votes and as part of the total register, added to the totality of the common credits. So to determine if the necessary majority is met, the amounts of the common and guaranteed creditors that approve the proposal will be added. This amount will be divided between the sum of the amounts of all common creditors and the amounts of those guaranteed that approved it. If this quotient is greater than a half, the required majority is fulfilled.

In this way, the participation of secured creditors can contribute to achieve the required majority. To prevent a majority obtained in this way from imposing disadvantageous conditions on most common creditors, these are allowed to veto the proposal. Thus those who disagree with the proposal will have the opportunity to challenge it, but the agreement can prosper if they refrain from expressing disagreement.

Being the agreement mandatory for absent and dissenting creditors it is essential to establish protection provisions for minorities that, while preserving the flexibility of the process, prevent the agreement from being abused in order to run over the dissidents. This limits what can be imposed on dissenting creditors, with respect to the amount recognized and converted to UDIs, to a reduction, extension of time or combination of both, equal to the most favorable of those accepted by those who signed the agreement, provided that, when a sufficient proportion of those who signed the agreement have received such conditions. From this group of reference are excluded those who have relevant family or patrimonial relationships with the tradesman.

The proposed system allows both to respect the rights of the parties and to exploit to the fullest the opportunities to materialize an agreement.

The application of the Bankruptcy & Payment Suspension Law, in practice has shown that the credit recognition proceedings has been distorted, turning it into a dispute regarding any and all the tradesman's credits. This is aggravated by the requirement of the prior creditors' meeting for the contradictory debate of any and all of the credits. Any obstacle to recognition stops the entire insolvency proceeding, which prevents a timely solution to the company's problems.

In the Bill, a flexible procedure is adopted, parallel to the efforts of conciliation and, where

appropriate, to the alienation of the company. The bankruptcy proceedings are not paralyzed in the recognition of credits, but automatically continue its course. This eliminates the incentives to frivolously delay the recognition and, on the contrary, conciliates the interests of the tradesman and all its creditors in its early conclusion.

Creditors are not required to submit their application for recognition, although it is convenient that they do it. A short period is established for the conciliator to publish, based on the accounts of the tradesman and on the documents that, in its case, have been presented to it by creditors in their applications; a provisional list of creditors indicating the amount, graduation and priority that, in the opinion of the specialist, corresponds to each loan so that the interested parties can make their observations. Next, conciliator must provide the final list, accompanied by the appropriate explanations and documents, which will provide the judge with the elements to base its sentence of recognition, graduation and preference of credits, which must occur in time to execute the agreement before the deadline established for the conciliation ends. The recognition, graduation and preference of credits judgment allows filing of an appeal without suspension of judgment. As in the current law, a complete knowledge process is envisaged for the appeal.

During the conciliation stage, as a benefit to the tradesman, it is allowed to maintain management of its company. However, for protection of the company and its creditors, it is expected that the conciliator will monitor the operations of the tradesman and will approve all those that exceed the ordinary course of the negotiation.

On the other hand, the Bill contemplates the possibility that Conciliator may request the judge removal of the tradesman in the administration of its company when it hinders or interferes the work of Conciliator. For protection of the tradesman the resolution of the judge will be substantiated by incidental proceeding between Conciliator and Tradesman.

Finally, if the bankruptcy stage is reached, tradesman will be deprived of its assets and rights, and the institute must designate a receiver who will proceed to the occupation of the bankrupt's assets and will have as mandate to proceed to the alienation of the estate.

Another issue that the Commission considered was the need to avoid the injustices and problems that were presented to interested creditors in the face of disinterested creditors. It is almost inevitable that a failed company has a multiplicity of creditors of different nature, with different amounts of credit and with unequal interest in the bankruptcy proceedings. Some creditors have clear interest in the bankruptcy proceedings, in its quick conclusion and in the recovery of their credits, but they must suffer the burden of the disinterested creditors.

With this vision, suppression of the creditors' meeting was chosen, since its call, integration and operation was one of the biggest obstacles in the agile process of bankruptcy proceedings. The creditors' meeting, which in the current law only has a truly decisive function in case of an agreement proposal, has shown so little use that in many bankruptcy proceedings it never reaches a meeting.

Closely related to the above, and which was also subject of extensive discussion, was the matter related to the function of the intervention. In the repeated application of the current law, the court auditors appointed by the judge in the declaratory judgment of bankruptcy, in compliance with provisions of the Law, as a general rule, show no interest whatsoever in the progress of the proceedings, but tend to be more jealous of their attributions who come to be appointed, on rare occasions, by the creditors themselves.

On the role of court auditors, there are two tendencies in modern law: one, to eliminate the figure of intervention as unnecessary, since creditors can individually attend to the surveillance of the receiver's performance, the agility of the process and the defense of their interests, without the need for a body of bankruptcy to represent them; and another, keep the intervention and assign an area of responsibility precisely where the interests of the creditors are located. In support of suppression of the creditors' meeting as a permanent body, the Commission was defined by the second tendency to propose that the intervention subsist as a necessary and permanent body, Commission was defined by the second tendency to propose that the intervention subsist as an organ of the bankruptcy proceedings, but with a contingent character. The Bill provides that any creditor or group of creditors that represents at least ten percent of the bankruptcy liability may designate, at its expense, a court auditor to monitor their interests and represent them in negotiations between the tradesman and its creditors.

The principle of strict compliance with freely agreed contracts is the pillar of a free and democratic society. It is the basis of legal security that is the estimation of the economic development of any society. This Bill recognizes this by establishing that, with exceptions contained in the project, provisions on obligations and contracts, as well as stipulations of the parties, will continue to apply.

Among the points in which the Bill is separated from the provisions of the law in force, are those relating to the conversion of the debts to Investment Units (UDIS for its acronym in Spanish) and the express provisions on debts in foreign currency. As well as those relating to repurchase agreements, securities loans, differential or futures contracts and other derivative financial transactions, in order to adapt them to contemporary market practices.

The non-accumulation of arbitral or judicial litigation between the tradesman and third

parties was ordered. For protection of the estate interests, to conciliator or receiver, as the case may be, is attributed the right to participate in such litigation. The final resolution will be taken into account, when establishing credits in charge of the tradesman, for the purposes of recognition, graduation and payment. If the litigation is resolved by establishing rights in favor of the tradesman, it will correspond to execute that resolution for benefit of the estate; otherwise, the execution will serve the third party to obtain the separation of assets to which it is entitled. With this solution the use of the resources of the Judicial Branch is rationalized by ending the practice of overwhelming the bankruptcy judge with an avalanche of files, many of them in an advanced state and whose knowledge and decision will be especially difficult, if not impossible. This solution also respects the stipulations of forum selection and resolution of disputes freely agreed between the parties before the constitution of the bankruptcy status.

One issue that deserved special attention from the Commission was the treatment of labor and tax creditors. In the first place, the hierarchy that these creditors must maintain in a bankruptcy proceeding was recognized. In the second place, it was sought that its treatment was consistent with the interest of expanding as much as possible the possibilities of an agreement between tradesman and its other creditors.

Based on these two premises, it was decided that as from the bankruptcy judgment all the enforcement procedures of the tax and labor creditors be suspended, except in the case of the labor credits recorded in Section XXIII Sub-section A of Article 123 constitutional but expanded these to the salaries earned in the last two years to protect the rights of labor creditors.

In the second place, it was established that, with the purpose that resolutions of the labor authority can be adapted to the insolvency matter, conciliator or receiver, if any, could substitute the guarantees seized by the labor authority by means of a bond that to satisfaction of the latter satisfies its remedies sought.

Regarding tax credits, in order to facilitate an agreement between tradesman and its creditors, it is established that the tax authority will cancel the fines, surcharges and other accessories that would have been caused as of the declaration of bankruptcy. In addition, tradesman and conciliator are empowered to reach specific agreements with the employees and to negotiate with the fiscal authorities cancellations and authorizations, with the purpose of offering to its other creditors a more attractive agreement. On the other hand, in order to avoid inappropriate incentives for some taxpayers, it was decided that for purposes of payment of fiscal credits, if there was no agreement, the fiscal authority could include, in the determination of the amount of its credits, such accessories.

Treatment of guaranteed credits is another of the most important aspects of any insolvency proceedings. On the one hand, to ensure availability of this type of credit, the insolvency proceedings must respect in essence its privileges and benefits. On the other hand, it is necessary to avoid that the disorderly execution of the guarantees hinders the instance of preservation of value offered by the insolvency proceedings.

The Bill respects, then, the different types of real guarantees, but it orders the participation of its holders in the proceedings. Naturally, when the value of the guarantee is higher than debt at the beginning of the insolvency proceedings, the guaranteed credits continue accruing ordinary interest to the extent that value reaches. If the value of the guarantee is lower than debt, the difference is considered as common credit, so it stops causing interest and is converted into investment units.

During the conciliation period, the separation of goods that are the object of a guarantee is prevented, but the obligation to the tradesman and the conciliator to monitor their proper conservation is established. Once the conciliation is completed, creditors with collateral and special privileges recover the power to proceed with the execution of their guarantees, unless they have agreed to be parties to the agreement or their credits are paid up to the value of the assets subject of the guarantee or privilege.

Holders of credits with collateral participate as such in the decisions that the law attributes. However, as noted, in cases where guarantor does not cover the total amount of the credit at the beginning of the insolvency proceedings, the shortfall is treated as a common credit, so it is necessary to allow creditor to participate for such shortfall in the decisions of the common creditors.

To avoid conditioning the progress of the proceedings to a valuation of any and all assets subject to a collateral, we opted to give the option to the secured creditors who consider that the value of their guarantees is insufficient to cover the entire debt recognized at the beginning of the insolvency proceedings to attribute a value to its guarantees so that they can participate as common creditors for the shortfall. To avoid abuses, creditor who exercises this option is bound to renounce, in favor of the estate, any surplus between the value of the guarantee that is finally made and the amount attributed for the voting. Difference between the recognized debt and the value attributed by creditor to its guarantee is treated as a common credit.

As for the mechanism of judicial liquidation of the bankrupt assets, a hypothesis that will only appear when it has been materially impossible to rehabilitate the company, same provisions of the Bankruptcy & Payment Suspension Law are practically maintained.

Like the conciliation, bankruptcy aims to preserve the value of the company to distribute it, according to their respective rights, between the tradesman and the different types of creditors.

Receiver takes possession of the company with the mandate to alienate it in a way that obtains the maximum possible value. Depending on the case, this can be achieved through an administrative, operational or financial reorientation of the company, selling the entire company or some of its parts to another tradesman that can materialize more value, or dissolving it and selling the separate goods to the highest bidder. When the business or any of its parts is viable as a going concern, receiver must make the necessary arrangements to sell it as such, since this will allow the maximum value.

The best way to alienate the assets varies greatly from one company to another. In some cases, for example, the appropriate means will be a public sale in the locality of the tradesman, with a minimum of formalities. In other cases it may be appropriate to make an international bid, postpone the alienation of the company while its restructuring is complete, transfer the assets to a new company and sell the shares or negotiate a private sale with the only possible buyer.

Therefore, on the one hand in accordance with the objective of achieving the maximum value by alienation of the estate, it is convenient to give opportunity to the entire company, any part of it or any set of assets of it, to be alienated by the mechanism that best suits the particular circumstances of the company, and the best commercial practices in the relevant markets.

On the other hand, based on the intention that the entire bankruptcy proceedings be transparent and reliable, it is recognized that the alienation of the estate may be vulnerable to abuses and irregular practices, so it is necessary to establish the necessary incentives and controls in the Law to ensure that no one takes undue advantage of the proceedings, encouraging the constructive participation and mutual vigilance of all parties concerned.

The solution adopted by the Commission consists of allowing receiver to propose to the judge any alienation mechanism consistent with its mandate to achieve the maximum value, explaining and justifying its proposal, which is made known to the tradesman and its creditors. If, after a reasonable period of time, tradesman or a significant proportion of creditors does not disagree with the proposal, the judge authorizes receiver to proceed in accordance with it. If the proposal is objected, alienation of the set of assets in question is carried out through a mechanism of public auction, carefully regulated in the own Law.

In this way, receiver is allowed the opportunity to convince the interested parties to proceed in accordance with an *ad hoc* alienation mechanism. If any cause of mistrust persists, a pre-established system is used that ensures transparency and minimizes the possibility of suspicions and challenges.

Keeping effectiveness of the guarantees and respect for the rights of the secured creditor, a mechanism is proposed to prevent the premature separation of indispensable assets that are the subject of a guarantee, in cases where their alienation is convenient for the estate.

For determination of distributions, the Bill maintains, basically, the degrees and priorities established in the current law, making only the minimum changes necessary to adapt them to the new provisions.

The criminal regime of bankruptcy is not very effective and sanctions provided for cases of negligent or fraudulent bankruptcy are rarely applied; without counting the cases of bankrupts that escape the action of justice through the escape. This is due in large part to the fact that courts have considered it necessary to initiate the criminal proceedings, which has exhausted the means of challenge against the bankruptcy declaratory. However, the bankruptcy judge eliminates the need for classification.

The principle that the creditor has a pledge right on the debtor's estate, according to which the debtor responds to fulfillment of its obligations with all its assets, it justifies criminal punishment for the tradesman debtor who, intentionally is placed in a situation of generalized non-compliance of its obligations.

It is impossible to enumerate exhaustively the multiple and diverse conducts by means of which the tradesman debtor can achieve its purpose of deceiving its creditors.

The Bill seeks to encompass all of them, and not to leave any of them unpunished, by means of a type that refers, generically, to any fraudulent conduct that causes or aggravates the situation of generalized non-compliance with liquid and enforceable obligations. In such definition are included all concealments, simulations, forgery and deceits that the tradesman debtor can make.

The Bill instructs judge so that, when individualizing the penalty, between the minimum of one year of imprisonment and the maximum of five years, it take into account the amount of the damage inferred to creditors and the number of these.

The Bill is concerned, first of all, to motivate debtor to comply with its obligations. For such reason, it proposes that the crimes in a situation of bankruptcy be pursued by the creditor's complaint, in order to open the door to forgiveness of the offended party.

No criminal liability, of course, for tradesman who suffers misfortunes that, without intervention of its will, reduce its capital to the point of having to default on its payments. This hypothesis constitutes what the current Bankruptcy & Payment Suspension Law calls unforeseen bankruptcy. The Bill considers useless to engage in behaviors that do not constitute a crime.

The Bill makes the insolvency proceedings and the criminal proceedings independent, up to a certain point. The first is intended to maximize the value of the bankrupt's assets and achieve the payment of creditors. The second seeks to sanction the delinquent behavior of debtor. Interest of justice demands both proceedings to move forward without hindering between them. Therefore, the institution of the bankruptcy rating disappears, that only served as a protection shield for criminals.

The Bill proposes that crimes in a situation of bankruptcy, committed by debtor, may be prosecuted without waiting for conclusion of the insolvency proceedings and, without prejudice to its continuation, that the judge decisions granting insolvency proceedings are not linked to the criminal jurisdiction and that the qualification of the insolvency proceedings will not be necessary to pursue such crimes.

When proceeding with the bankruptcy proceedings and the criminal proceedings in an independent manner, any of them may end before the other. We should not fear the contradiction of judgments, because there will not be. There cannot be any, because, as we said, the bankruptcy judge seeks only the total or partial fulfillment of obligations. It is the only one competent to resolve on damage repair. While the criminal judge is responsible for deciding whether or not a crime has been committed and, if applicable, punish it.

There is, however, a relationship between both proceedings. A proper behavior of the tradesman declared by final judgment in bankruptcy is criminalized. This personal characteristic is one of the elements of the type, then the criminal proceedings in this case, may only be initiated when the insolvency judge has declared the tradesman insolvent, and this declaration has the character of a procedural requirement.

The tradesman against whom a bankruptcy proceeding is filed is sanctioned in two hypotheses: when it has kept its accounting in a way that does not allow knowing its true financial situation or such has been altered, falsified or destroyed, or when required by the

bankruptcy proceedings judge, it does not make its accounting, within the term for such reason considered, available to the person that the judge designates.

During the last two decades, the national economy has been characterized by its growing insertion in international trade and capital flows. Mexican companies have significantly increased their participation in foreign trade, they have benefited from sources of financing provided by their access to international capital markets, and an increasing number of them venture to expand their operations to other latitudes. It also happens with foreign companies that have seen in our country a favorable climate to expand their commercial and investment opportunities. It should not be surprising that in this context of globalization, the economic and financial difficulties that a negotiation might face have an impact not only on those who share its geographical location but also on those located in other parts of the world.

By virtue of the foregoing, the differences in the insolvency proceedings of the nations greatly affect the companies that have assets and liabilities in several countries. From a practical perspective, this diversity leads to greater uncertainty both for the entrepreneur in crisis and for its creditors and therefore acts in detriment of an effective application of the bankruptcy law, especially in nations like ours where it is increasingly common that operations of companies transcend national borders.

In response to these trends, the international community developed within the Commission for Legislation on International Trade of the United Nations a Model Law that seeks to give congruence to bankruptcy proceedings between countries. This Law was negotiated between more than 40 countries with the most varied legal systems. One of the most important features of the Model Law is that it aims to promote effective and limited cooperation between the bankruptcy proceedings of nations. By means of regulations comparable to all legal systems and, therefore, make it easily adaptable to the legal framework of each nation. Specifically, it facilitates cooperation between legal procedures carried out in a nation and those that occur outside it. In this way, the country that adopts the Model Law, in addition to recognizing the importance of its cross-border transactions, facilitates the recognition of foreign proceedings and the cooperation and coordination between the courts and the organs of bankruptcy in different countries.

Based on the above considerations, the drafting Commission acknowledged the need to continue advancing in modernization of legal systems that regulate the commercial and financial activity of our country, incorporating a chapter on international cooperation of proceedings into the Bankruptcy Bill, for which the necessary adjustments to the Model Law of the Commission for Legislation on International Trade of the United Nations were made. With this, Mexico will be at the forefront of the efforts of the international community to modernize its legal framework in the field of bankruptcy in response to the globalization

challenges. We cannot conclude the submission of this Bill without insisting on the urgency of a new legislation in the subject matter, since the social reality has exceeded the existing normativity. When an law constitutes an obstacle for the solution of the problems presented by the socioeconomic reality that it is intended to regulate, reality is imposed and seeks solutions even outside the law with serious detriment of the legal context; provisions that are inconvenient to the solution of problems are exploited and manipulated in many cases with a predominance of the particular interest over the collective, and the rules that impede solutions are ignored and disregarded.