**<u>EXHIBIT B</u>**

**Stalking Horse PSA**

AMERICAS 119035839

RLF1 28498863v.1

**EXECUTION VERSION**

**PURCHASE AND SALE AGREEMENT**

by and between

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.,
CREDITO REAL USA, INC.**

and

**SCOT SEAGRAVE,**

as the Sellers,

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.,**

as Sellers' Representative,

**CREDITO REAL USA FINANCE, LLC,**

as the Company,

**BEPENSA CAPITAL INC.,**

as Buyer

and

**BEPENSA CAPITAL S.A. DE C.V.,**

as Buyer Parent

_____

Dated as of January 18, 2023

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................2
    Section 1.1   Certain Definitions.............................................................................2
    Section 1.2   Terms Generally...............................................................................16

ARTICLE II PURCHASE AND SALE OF THE ACQUIRED INTERESTS...........................18
    Section 2.1   Purchase and Sale of the Acquired Interests................................18
    Section 2.2   Payment of Purchase Price; Withholding ...................................18
    Section 2.3   Deposit ...........................................................................................18
    Section 2.4   Closing ...........................................................................................19
    Section 2.5   Closing Statement ..........................................................................20
    Section 2.6   Transfer Taxes ...............................................................................21

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY REGARDING THE COMPANY ENTITIES.................................................................21
    Section 3.1   Organization; Authority; Enforceability ......................................21
    Section 3.2   Non-contravention..........................................................................22
    Section 3.3   Capitalization .................................................................................22
    Section 3.4   Ownership ......................................................................................23
    Section 3.5   Government Authorizations............................................................23
    Section 3.6   Financial Statements ......................................................................23
    Section 3.7   Undisclosed Liabilities...................................................................24
    Section 3.8   Absence of Certain Changes .........................................................24
    Section 3.9   Tax Matters ....................................................................................25
    Section 3.10  Real Property .................................................................................27
    Section 3.11  [Reserved]......................................................................................27
    Section 3.12  Contracts ........................................................................................27
    Section 3.13  Insurance .......................................................................................29
    Section 3.14  Litigation........................................................................................29
    Section 3.15  Labor Matters................................................................................30
    Section 3.16  Employee Benefits .........................................................................31
    Section 3.17  Legal Compliance ..........................................................................33
    Section 3.18  Brokers' Fees .................................................................................34
    Section 3.19  Permits ...........................................................................................34
    Section 3.20  Intellectual Property; Data Privacy ..............................................34
    Section 3.21  Affiliate Transactions....................................................................35

ARTICLE IV REPRESENTATIONS AND WARRANTIES REGARDING EACH SELLER............................................................................................................36
    Section 4.1   Organization; Legal Capacity ......................................................36
    Section 4.2   Authorization; Enforceability .......................................................36
    Section 4.3   Title................................................................................................36
    Section 4.4   Brokers' Fees .................................................................................37

Section 4.5 Litigation ................................................................................37
Section 4.6 No Additional Representations and Warranties.............................37

ARTICLE V REPRESENTATIONS AND WARRANTIES REGARDING BUYER AND
BUYER PARENT .................................................................................38

Section 5.1 Organization; Legal Capacity .........................................................38
Section 5.2 Authorization ..............................................................................39
Section 5.3 Non-contravention ......................................................................39
Section 5.4 Government Authorizations...........................................................39
Section 5.5 Financial Capacity .......................................................................39
Section 5.6 Investment.................................................................................40
Section 5.7 Litigation....................................................................................40
Section 5.8 Brokers' Fees .............................................................................40
Section 5.9 Information .................................................................................40
Section 5.10 Sufficiency of Funds ...................................................................41
Section 5.11 No Outside Reliance ...................................................................41

ARTICLE VI COVENANTS ...............................................................................42

Section 6.1 Conduct of the Company ..............................................................42
Section 6.2 Exceptions (to Conduct of the Company).......................................46
Section 6.3 Access to Information; Confidentiality............................................46
Section 6.4 Consents and Approvals ...............................................................48
Section 6.5 Public Announcements .................................................................50
Section 6.6 Post-Closing Further Assurances...................................................50
Section 6.7 Directors' and Officers' Indemnity................................................50
Section 6.8 Tax Matters ................................................................................51
Section 6.9 Use of Names and Marks..............................................................52
Section 6.10 Release....................................................................................53
Section 6.11 Termination of Affiliate Arrangements .........................................53
Section 6.12 Bankruptcy Court Matters...........................................................54
Section 6.13 Employee Matters ......................................................................56
Section 6.14 Advise of Changes ....................................................................57
Section 6.15 RWI Insurance Policy .................................................................58
Section 6.16 Existing Credit Facility Amendment ............................................58
Section 6.17 Reorganization ..........................................................................59
Section 6.18 Preservation of Records..............................................................59
Section 6.19 Conflicts; Privileges...................................................................60

ARTICLE VII CONDITIONS TO CLOSING .........................................................61

Section 7.1 Conditions Precedent to Obligations of the Parties ........................61
Section 7.2 Conditions Precedent to Obligations of the Sellers and the Company
61
Section 7.3 Conditions Precedent to Obligations of Buyer ..............................62
Section 7.4 Frustration of Closing Conditions..................................................63

ARTICLE VIII INDEMNIFICATION AND REMEDIES ...........................................63

Section 8.1 Survival.....................................................................................63

2

Section 8.2    No Consequential Damages ........................................................63
Section 8.3    R&W Policy; Exclusive Remedy ................................................63

ARTICLE IX TERMINATION ....................................................................................64

Section 9.1    Termination Events ....................................................................64
Section 9.2    Effect of Termination ................................................................65

ARTICLE X MISCELLANEOUS ..................................................................................66

Section 10.1    Parties in Interest ....................................................................66
Section 10.2    Assignment ..............................................................................66
Section 10.3    Notices ....................................................................................66
Section 10.4    Amendments and Waivers ......................................................68
Section 10.5    Exhibits and Schedules ..........................................................69
Section 10.6    Headings ..................................................................................69
Section 10.7    Construction ............................................................................69
Section 10.8    Entire Agreement ....................................................................69
Section 10.9    Severability ..............................................................................69
Section 10.10            Expenses ......................................................................69
Section 10.11            No Recourse Against Non-Recourse Persons ..............70
Section 10.12            Specific Performance ..................................................70
Section 10.13            Governing Law; Exclusive Jurisdiction ......................71
Section 10.14            Waiver of Jury Trial ....................................................71
Section 10.15            Counterparts ................................................................71
Section 10.16            Currency Matters ........................................................71
Section 10.17            Disclosure Schedules ..................................................71
Section 10.18            Fiduciary Obligations ..................................................72
Section 10.19            Several Liability ..........................................................72
Section 10.20            Sellers' Representative ................................................72
Section 10.21            Guarantee ....................................................................74

3

## SCHEDULES

Schedule A    Buyer Disclosure Schedule
Schedule B    Seller Disclosure Schedule
Schedule C    Book Value Calculation Schedule
Schedule D    Required Regulatory Approvals

## EXHIBITS

Exhibit A    Director's List and Company Entities' List
Exhibit B    Form of Directors' Resignation Letter

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement is entered into as of January 18, 2023, among Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., a *sociedad anónima bursátil de capital variable, sociedad financiera de objeto múltiple, entidad no regulada,* organized and existing under the Laws of the United Mexican States ("Parent"), Credito Real USA, Inc., a corporation existing under the Laws of Delaware ("CRUSA Inc." and, together with Parent, the "CR Sellers" and each, a "CR Seller"), Scot Seagrave, an individual domiciled in the State of Florida ("Seagrave" and, together with Parent and CRUSA Inc., the "Sellers" and each, a "Seller"), Parent, solely in its capacity as the representative, agent and attorney-in-fact of the Sellers (the "Sellers' Representative"), Credito Real USA Finance, LLC, a limited liability company existing under the Laws of Florida (the "Company"), Bepensa Capital, Inc., a corporation organized and existing under the Laws of Florida ("Buyer") and Bepensa Capital S.A. de C.V., a *sociedad anónima de capital variable* organized and existing under the Laws of the United Mexican States ("Buyer Parent"). Each of the Sellers, the Company and Buyer is referred to individually as a "Party", and, collectively, as the "Parties".

W I T N E S S E T H:

**WHEREAS**, on July 14, 2022, Robert Wagstaff, in his capacity as the foreign representative duly appointed by Mr. Fernando Alonso-de-Florida Rivero, the court-appointed provisional liquidator (*Liquidator Judicial Provisional*) (the "Mexican Liquidator") of the Special Expedited Commercial proceeding (*Via Sumaria Especial Mercantil*) pending in the Mexican Liquidation Court for the dissolution and liquidation of Parent (the "Mexican Liquidation Proceeding") filed a petition for recognition of the Mexican Liquidation Proceeding as a foreign main proceeding under chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") commencing a chapter 15 case captioned *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, Case No. 22-10630 (JTD) (the "Chapter 15 Case");

**WHEREAS**, as of the date of this Agreement, (i) CRUSA Inc., a wholly-owned subsidiary of Parent, owns 95.28% of the total issued and outstanding Interests of the Company (the "Credito Real Interest"), and (ii) Seagrave owns 4.72% of the total issued and outstanding Interests of the Company (the "Seagrave Interest");

**WHEREAS**, after giving effect to the Reorganization, Parent will directly own the Credito Real Interest as a duly admitted Member of the Company;

**WHEREAS**, (a) The CR Sellers desire to sell the Credito Real Interest to Buyer, and (b) Seagrave desires to sell 50% of the Seagrave Interest to Buyer, and Buyer desires to purchase all the Credito Real Interest and 50% of the Seagrave Interest (such Interests, the "Acquired Interests"), subject to the terms and conditions set forth herein;

**WHEREAS**, the Parties intend for the sale and purchase of the Acquired Interests based on the terms set forth herein (the "Transaction"), to be effectuated pursuant to a Sale Order to be entered by the Bankruptcy Court; and

**WHEREAS**, in connection with the Mexican Liquidation Proceeding and subject to the terms and conditions in this Agreement, following entry of the Sale Order finding Buyer as the prevailing bidder at the Auction (if any), Sellers shall sell and transfer to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Acquired Interests owned by such Sellers, on the terms and subject to the conditions in this Agreement and as more specifically provided for in the Sale Order.

**NOW, THEREFORE**, in consideration of the payment by the Buyer to the Sellers of the Purchase Price, and in consideration of the premises and of the mutual covenants, representations, warranties and agreements contained herein, together with other good and valuable consideration, the sufficiency, adequacy and receipt of which is hereby acknowledged and agreed to, the Parties hereto, intending to be legally bound, agree as follows :

ARTICLE I

DEFINITIONS

Section 1.1    Certain Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Accounting Principles" means the Accounting Standards and, to the extent not inconsistent with the Accounting Standards, the principles, practices and methodologies used by the Company in the preparation of the Financial Statements.

"Accounting Standards" means the generally accepted accounting principles in the United States of America (GAAP).

"Acquired Interests" has the meaning set forth in the recitals to this Agreement.

"Action" means any action, suit or proceeding by or before any court or other Governmental Authority.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  As used in this definition, the term "controls" (including the terms "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of voting securities, by contract or otherwise.  With respect to any natural Person, "Affiliate" will also include such Person's immediate family members, and any Persons directly or indirectly controlled by such family member.  For the avoidance of doubt, from and after the Closing, no Company Entity shall be an "Affiliate" of any Seller or vice versa for purposes of this Agreement.

"Affiliate Arrangements" means any Contract between Seller or any of its Affiliates other than a Company Entity, on the one hand, and any Company Entity, on the other hand.

"Affiliation Statement Materials" has the meaning set forth in Section 6.9(b).

2

"Affordable Care Act" means the Affordable Care Act, as defined in Treasury Regulation section 54.4980H-1(a)(3).

"Agreement" means this Purchase and Sale Agreement, including all Exhibits and Schedules hereto (including the Disclosure Schedules), as the same may be amended, modified or supplemented from time to time in accordance with its terms.

"Allocation Schedule" shall have the meaning set forth in Section 6.8(a).

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through the Auction or an asset sale, share sale, merger, issuance, financing, recapitalization, amalgamation, liquidation or other similar transaction, of a material portion of the Acquired Interests, in one transaction or a series of transactions with one or more Persons other than Buyer or its Affiliates.

"Anti-Bribery Laws" means any and all Laws related to anti-bribery and anti-corruption (including the U.S. Foreign Corrupt Practices Act of 1977).

"Anti-Money Laundering Laws" means any and all Laws related to terrorism financing or money laundering (including the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), as amended by the USA PATRIOT Act).

"Auction" has the meaning set forth in Section 6.12(b).

"Audited Financial Statements" has the meaning set forth in Section 3.6(a).

"Back-Up Bidder" has the meaning set forth in Section 6.12(g).

"Balance Sheet Date" has the meaning set forth in Section 3.6(a).

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Base Purchase Price" means the Initial Purchase Price, *less* the value allocated to the remaining unpurchased Seagrave Interests.  For the avoidance of doubt, the Base Purchase Price shall equal $60,536,800.00.

"Benefit Plan" means each compensation or benefit plan, program, scheme, policy, practice, contract, agreement or other arrangement, including, without limitation, any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not such plan is subject to ERISA), and any bonus, incentive, deferred compensation, vacation, stock purchase, stock bonus, stock option, stock appreciation rights, stock-based rights, medical, dental, vision, profit sharing, insurance, employee counseling, employee assistance, wellness, legal services, retirement plan, supplemental retirement plan, pension plan (whether funded or unfunded), severance, retention, termination, employment, change-of-control or fringe benefit plan, program, spending or reimbursement account or agreement (other than any plan to which a Company Entity contributes or has an obligation to contribute pursuant to Law and that is sponsored or maintained by a Governmental Authority), whether or not in writing and whether or not funded, in each case, that

3

is sponsored, maintained or contributed to by a Company Entity or an ERISA Affiliate for the benefit of the current or former employees or natural independent contractors (or their respective beneficiaries) of the Company Entities or with respect to which the Company Entities have any Liability.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Motion" means a motion seeking Bankruptcy Court approval of the Bidding Procedures.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court in the Chapter 15 Case approving the Bidding Procedures dated December 15, 2022.

"Bidding Protections Motion" means a motion Parent will cause to be filed in the Chapter 15 Case seeking entry of the Bidding Protections Order, and otherwise in form and substance reasonably acceptable to Buyer setting forth the protections in Section 6.12(a)(i) of this Agreement, including the Expense Reimbursement and the Break-Up Fee.

"Bidding Protections Order" means an order of the Bankruptcy Court approving the Bidding Procedures Motion, including the protections set forth in Section 6.12(a)(i) hereof, and otherwise in form and substance reasonably acceptable to Buyer.

"Book Value" has the meaning determined pursuant to, and in accordance with, the Accounting Principles; provided, however, that, in all cases, "Book Value" shall be calculated after deducting Intangible Assets (if any) from Book Value. For the avoidance of doubt, Book Value is denominated in the Financial Statements as "Members' Equity" plus Net Income.

"Book Value Adjustment" means the amount equal to the Book Value Deficit or the Book Value Surplus, as the case may be.

"Book Value Calculation Schedule" means each matter set forth on Schedule C providing for an illustrative calculation on the mechanics agreed between Sellers and Buyer for the determination of Book Value of the Company at the Closing.  For the avoidance of doubt, the Book Value Calculation Schedule does not include, and shall not include, any Intangible Assets.

"Book Value Deficit" means 50% of the amount, if any, by which the Book Value of the Company at the Closing is less than the Target Book Value.

"Book Value Surplus" means 50% of the amount, if any, by which the Book Value of the Company at the Closing is more than the Target Book Value.

"Books and Records" has the meaning set forth in Section 6.18.

"Break-Up Fee" means an amount equal to $1,860,000.00.

4

"<u>Business Day</u>" means any day other than Saturday, Sunday or any other day on which banking institutions in Wilmington, Delaware, or Mexico City, Mexico are not open for the transaction of normal banking business.

"<u>Buyer</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Buyer 401(k) Plan</u>" has the meaning set forth in <u>Section 6.13(a)</u>.

"<u>Buyer Disclosure Schedule</u>" means the disclosure schedule delivered by Buyer to the Sellers' Representative on the date hereof and attached hereto.

"<u>Buyer Fundamental Representations</u>" means each of the following representations and warranties of Buyer: <u>Section 5.2</u> (*Authorization*), <u>Section 5.5</u> (*Financial Capacity*) and <u>Section 5.8</u> (*Brokers' Fees*).

"<u>Buyer Parent</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Buyer Released Claims</u>" has the meaning set forth in <u>Section 6.10(b)</u>.

"<u>Buyer Releasors</u>" has the meaning set forth in <u>Section 6.10(b)</u>.

"<u>Chapter 11 Case</u>" means the involuntary case captioned *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, Case No. 22-10696 (JTD) pending before the Bankruptcy Court.

"<u>Chapter 15 Case</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Closing Date</u>" means the date the Closing occurs pursuant to <u>Section 2.4</u>.

"<u>Closing Payment</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Company</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Company Continuing Employee</u>" has the meaning set forth in <u>Section 6.13(a)</u>.

"<u>Company Entities</u>" means the Company and each of the Persons set forth in <u>Section 3.3</u> of the Seller Disclosure Schedule.

"<u>Company Insurance Policies</u>" has the meaning set forth in <u>Section 3.13</u>.

"<u>Company Owned IP</u>" means all material Intellectual Property rights owned or purported to be owned by a Company Entity.

"<u>Company Policies</u>" has the meaning set forth in <u>Section 6.1(b)(xiv)</u>.

5

"Company Releasees" has the meaning set forth in Section 6.10.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated March 28, 2022, by and between CRUSA Inc. and GF Bepensa, S.A. de C.V.

"Consents" means consents, approvals, exemptions, waivers, authorizations, filings, registrations, clearances, terminations or expirations or waiting periods and notifications, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Consumer Protection Laws" means, collectively, the Consumer Financial Protection Act of 2010, Public Law 111-203, enacted as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; the enumerated consumer laws set forth in 12 U.S.C. Section 5481(12); the USA PATRIOT Act of 2001; the Telephone Consumer Protection Act, the CAN-SPAM Act, the Military Lending Act; the Servicemembers Civil Relief Act; the identity theft red flags provisions of the Fair Credit Reporting Act set forth in 15 U.S.C. Section 1681m(e); Section 5 of the Federal Trade Commission Act set forth in 15 U.S.C. Section 45; and all other federal, state and local consumer protection and unfair, deceptive or abusive trade practices Laws or Laws applicable to marketing (whether by email, text message, telemarketing or otherwise), consumer lending or financing, discriminatory lending, purchasing or servicing holding consumer assets, collecting consumer debts, processing consumer payments, consumer advertising and disclosures.

"Contract" means any written agreement, contract, subcontract, lease, license, sublicense or other legally binding commitment or undertaking.

"Contracting Party" has the meaning set forth in Section 10.11.

"Costa Rica Lease Agreement" means that certain Leasing Agreement dated as of November 15, 2021, by and between BCR Fondo de Inversion Inmobiliario, as lessor, and Crusafin Costa Rica, S.A., as lessee.

"COVID-19 Pandemic" means the novel coronavirus (SARS-CoV-2 or COVID-19), any evolutions or mutations thereof and any associated public health emergency, epidemic, pandemic or outbreak occurring on and prior to the Closing Date.

"Credito Real Interests" has the meaning set forth in the recitals to this Agreement.

"CR Seller" and "CR Sellers" have the meanings set forth in the preamble to this Agreement.

"CRSA" has the meaning set forth in Section 3.9(f)(v).

"CRUSA Inc." has the meaning set forth in the preamble to this Agreement.

"Cybersecurity Incident" means any ransomware or malware attack, denial-of-service attack, unauthorized access, or other cybersecurity, data or systems attack.

6

"Data Protection Laws" means any applicable data protection and data privacy laws and regulations in the United States, the European Union, or elsewhere in the world to which the Company Entities, Sellers or any of their Affiliates is subject.

"Deposit" has the meaning set forth in Section 2.3.

"Depositor LLC" has the meaning set forth in Section 3.9(f)(ii)(2).

"Disclosure Schedules" means the Buyer Disclosure Schedule and the Seller Disclosure Schedule.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity which is considered a single employer with any other entity under Section 4001(b)(1) of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"Escrow Account" means an interest-bearing account established by the Escrow Agent to hold the Deposit.

"Escrow Agent" means RLF, solely in its capacity as Escrow Agent under this Agreement.

"Escrow Agreement" means that certain Escrow Agreement, dated as of even date herewith, by and among Buyer, Parent and RLF.

"Existing Credit Facility" means that certain Loan and Security Agreement, dated as of May 3, 2017, among the Company, as borrower, Wells Fargo Bank, N.A., as agent, and the lenders party thereto, together with its related Credit Documents (as defined in the Existing Credit Facility), as amended, supplemented, restated or modified.

"Expense Reimbursement" means all actual, documented and necessary reasonable out of pocket costs, fees and expenses incurred by Buyer in connection with the Transaction contemplated hereby, including in the investigation, evaluation, negotiation, and documentation of the Transaction (other than any cost or expense related to or arising from any claims or disputes among Buyer or its Affiliates, on the one hand, and any Seller or its Affiliates, on the other hand, arising from Buyer's breach or failure to perform any of its agreements, covenants or obligations hereunder or under any other Transaction Document), up to an aggregate amount of $750,000.00.

"Fiduciary Duty" has the meaning set forth in Section 9.1(i).

"Final Order" means an order of the Bankruptcy Court that has not been reversed, stayed, modified, or amended, and as to which the time to file an appeal has expired and no such appeal or motion for rehearing or reconsideration, or petition for writ of certiorari is pending. For the avoidance of doubt, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedures or local rules of the Bankruptcy Court, relating to such Order may be filed after the time to file an appeal of the Order has expired shall not prevent such Order form being a Final Order.

"Finance Receivables Net" means any and all amounts owed to the Company by its customers for services rendered but not yet paid for.

"Financial Statements" has the meaning set forth in Section 3.6(a).

"Florida Lease Agreement" means that certain Lease Agreement dated as of October 10, 2014, by and between Fort Lauderdale Crown Center, Inc. (as landlord) and Credito Real USA Finance, LLC f/k/a AFS Acceptance, LLC (as tenant), as amended, for the lease of Suite 300 consisting of approximately 16,159 rentable square feet on the third floor in the building known as Crown Center, located at 1475 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

"Flow-Through Income Taxes" means U.S. federal income Taxes and any similar income Taxes imposed by any state or local Laws on the direct or indirect owners of any entity on a flow-through basis by allocating or attributing to such owners all or a portion of such entity's items of income, gain, loss, deduction and other relevant Tax attributes.

"Flow-Through Tax Returns" shall have the meaning set forth in Section 6.8(b).

"Fraud" means an actual, knowing and intentional fraud by a Party in the making of an affirmative representation or warranty expressly set forth (a) in the case of Fraud by a Seller, Article III or Article IV and solely as such representation or warranty relates to such Seller or the Company Entities (as qualified by the Seller Disclosure Schedule), (b) in the case of Fraud by the Company, Article III and solely as such representation or warranty relates to the Company (as qualified by the Seller Disclosure Schedule), (c) in the case of Fraud by Buyer, Article V (as qualified by the Buyer Disclosure Schedule) or (d) in the case of Fraud by any Party, in any ancillary certificate executed and delivered by such Party.

"Governing Documents" means (a) with respect to any corporation, its articles or certificate of incorporation and bylaws, shareholders agreement or documents of similar substance (including with respect to voting rights, governing matters or restriction on transfer of securities), (b) with respect to any limited liability company, its articles or certificate of organization or formation and its operating agreement or limited liability company agreement or documents of similar substance (including with respect to voting rights, governing matters or restriction on transfer of securities), (c) with respect to any limited partnership, its certificate of limited partnership and partnership agreement or documents of similar substance (including with respect to voting rights, governing matters or restriction on transfer of securities), and (d) with respect to any other entity (including a trust), governing or organizational documents of similar substance to any of the foregoing (including with respect to voting rights, governing matters or restriction on transfer of securities), in the case of each of clauses (a) through (d), as may be in effect from time to time.

"Governmental Authority" means any (a) national, state, regional, municipal or local government or political subdivision thereof, (b) any entity exercising executive, legislative, judicial, regulatory, tribunal, taxing or administrative functions of or pertaining to government (including any body, court, tribunal, commission, board, bureau or other authority thereof), (c) any arbitrator or arbitral body or panel, department, ministry, instrumentality, agency, court,

commission or body of competent jurisdiction or (d) non-governmental body or quasi-governmental exercising any executive, legislative, judicial, regulatory, tribunal, taxing, administrative, police, regulatory, importing or other governmental or quasi-governmental authority, in each case with competent jurisdiction.

"Governmental Order" means any order, ruling, writ, judgment, injunction, decree, stipulation, determination or award of any Governmental Authority (whether temporary preliminary, permanent or binding).

"Guarantee" has the meaning set forth in Section 10.21.

"Guaranteed Obligations" has the meaning set forth in Section 10.21.

"Guaranty" means that certain Guaranty dated as of September 6, 2018, by and between Parent (as guarantor) in favor of Wells Fargo Bank, N.A. (as Agent) made in connection with the Existing Credit Facility.

"Holding LP" has the meaning set forth in Section 3.9(f)(ii)(4).

"Indebtedness" means (without duplication) the aggregate amount of the following obligations: (a) any indebtedness for borrowed money, (b) any obligations evidenced by bonds, debentures, notes or other similar instruments, (c) any obligations in the nature of accrued fees, interest, premiums or penalties in respect of any of the foregoing, (d) obligations under any swap, collar, cap or other Contract the principal purpose of which is to benefit from or reduce or eliminate the risk of fluctuations in interest rates or currencies, and (e) any reimbursement obligations under letters of credit that have been drawn or similar facilities other than trade payables.

"Indemnified Persons" has the meaning set forth in Section 6.7.

"Initial Deposit" has the meaning set forth in Section 2.3.

"Initial Purchase Price" means $62,000,000.00.

"Intangible Assets" means assets that are considered to be intangible assets under GAAP, including customer lists, goodwill, computer software, copyrights, trade names, trademarks, patents, franchises, licenses, unamortized deferred charges, unamortized debt discounts and capitalized research and development costs.

"Intended Tax Treatment" shall have the meaning set forth in Section 6.8(a).

"Intellectual Property" means all intellectual property rights, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all (a) patents, patent applications, utility models, and applications for utility models, industrial designs and applications for industrial designs, including all continuations, divisionals, continuations-in-part, foreign counterparts, provisionals, and issuances of any of the foregoing, and all reissues, reexaminations, substitutions, renewals, extensions and related priority rights of any of the foregoing, (b) Trademarks, (c) copyrights, and all registrations, applications, renewals, extensions and reversions of any of the foregoing, and (d) trade secrets and proprietary rights in

9

technology, know-how, software, databases, inventions, formulas, algorithms, procedures, methods, processes, developments and research.

"Interests" means, with respect to any Person, shares, partnership interests, limited liability company interests or any other equity interest in such Person.

"Interim Period" has the meaning set forth in Section 6.1(a).

"Issuer Trust" has the meaning set forth in Section 3.9(f)(ii)(3).

"IT Systems" has the meaning set forth in Section 3.20(c).

"Knowledge" means (a) with respect to each of the Sellers, the actual knowledge of the individuals set forth on Section 1.1(a) of the Seller Disclosure Schedule, after reasonable inquiry, and (b) with respect to Buyer, the actual knowledge of any individual set forth on Section 1.1(b) of the Buyer Disclosure Schedule, after reasonable inquiry. With respect to Intellectual Property of the Sellers, "Knowledge" does not require any Person to conduct, have conducted, obtain, or have obtained any freedom-to-operate opinions or similar opinions of counsel or any patent, Trademark or other Intellectual Property rights clearance searches.

"Laws" means all applicable laws (including common law), statutes, constitutions, rules, regulations, codes, ordinances, rulings of any Governmental Authority or stock exchange with regulatory authority over the applicable Party and all applicable Governmental Orders.

"Lease Agreements" means, collectively, (a) the Costa Rica Lease Agreement and (b) the Florida Lease Agreement.

"Leased Real Property" means the real property leased pursuant to the Lease Agreements.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute, actual or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"Lien" has the meaning specified in section 101(37) of the Bankruptcy Code and shall include any mortgage, pledge, lien, security trust, encumbrance, charge, option, claim, assignment, hypothecation, title retention, contractual restriction, easement, right of occupation, right-of-way-covenant, conditional sale or other security agreement, encumbrance, restriction or other security interest, and shall include any and all federal, state, county or municipal Tax liens.

"Loan Amendment" has the meaning set forth in Section 6.16(a)(i).

"Loan Tape" means, as of the final day of the calendar month immediately preceding the Closing, a schedule of all Retail Installment Sale Contracts setting forth certain information regarding the Retail Installment Sale Contracts in the same format as previously delivered to Buyer for due diligence purposes.

"Marked Materials" has the meaning set forth in Section 6.9(a).

"<u>Material Adverse Effect</u>" means (a) with respect to the Company Entities, any material adverse effect on the financial condition or results of operations of the Company Entities, taken as a whole; <u>provided</u>, that none of the following shall constitute or be deemed to contribute to a Material Adverse Effect, or shall otherwise be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur: (i) changes generally affecting the industries or markets (including automobile markets) in which the Company Entities operate, whether international, national, regional, state, provincial or local, (ii) changes in markets (including automobile markets), funding rates, commodities, supplies or transportation or related products and operations, including those due to actions by competitors, financing sources or Governmental Authorities, (iii) changes in general political, health or social conditions, including the substitution of any Governmental Authority, pandemics, endemics, outbreaks or other generalized diseases, armed hostilities, national emergencies or acts of war (whether or not declared), sabotage or terrorism, changes in government, military actions or "force majeure" events, or any escalation or worsening of any of the foregoing, (iv) effects of weather, meteorological events, fires, floods, earthquakes or other natural disasters or natural occurrences, (v) changes in Law or regulatory policy or the interpretation or enforcement thereof, (vi) changes in economic, business or market conditions, including changes in currency, financial, securities or credit markets (including any disruption thereof, any decline in the price of any security or any market index and changes in prevailing interest rates or foreign exchange rates), (vii) the execution, announcement or performance of this Agreement or the consummation of the Transaction, including the impact thereof on relationships, contractual or otherwise, with customers, suppliers, distributors, partners, employees (including any employee departures or labor union or labor organization activity), financing sources or Governmental Authorities, or any communication by the Buyer or its Affiliates of their plans or intentions (including in respect of employees) with respect to the Company Entities or their respective business, (viii) changes in accounting requirements or principles, including Accounting Standards or any adoption, proposal, implementation or change in any Law or Permit or any interpretation or application thereof by any Governmental Authority, (ix) labor strikes, requests for representation, organizing campaigns, work stoppages, slowdowns or other labor disputes, (x) hacking or cybersecurity threats or attacks on the Company Entities business, (xi) actions or omissions expressly required or permitted to be taken or not taken by the Company Entities in accordance with this Agreement or the other Transaction Documents or requested, or consented to, by Buyer or any of its Subsidiaries or Affiliates, (xii) any breach, violation or non-performance of any provision of this Agreement by Buyer or any of its Subsidiaries or Affiliates, (xiii) changes in or effects on the assets or properties of the Company Entities which are cured (including the payment of money) by Seller or any Company Entity, (xiv) failure by Seller or any Company Entity to meet any projections or forecasts for any period, (xv) any fact or information that is set forth in or reasonably apparent from the Seller Disclosure Schedule, (xvi) deterioration, diminution or decline in financial condition of any client, debtor or other revenue counterparty, (xvii) any downgrade or any announcement or communication of an expected downgrade or change in outlook by a ratings agency relating to the long-term credit rating of any Company Entity or any debt issued by any Company Entity, (xviii) any loss of customers arising from general economic conditions affecting the markets generally or as a result of exercise by customers of their rights, and (xix) actions or omissions expressly required to be taken or not taken by the Company Entities in accordance with this Agreement or the other Transaction Documents or requested, or consented to, by Buyer or any of its Affiliates, except, in the case of clauses (i) through (vii), to the extent such change, development,

11

circumstance, fact, effect, condition or event has, or would reasonably be expected to have, a disproportionate impact on the Company Entities as compared to other Persons in their industries, (b) with respect to Buyer, any event, occurrence or circumstance that would legally prevent or prohibit Buyer from consummating the purchase of the Acquired Interests contemplated by this Agreement, and (c) with respect to each Seller, any event, occurrence or circumstance that would legally prevent or prohibit such Party from consummating the sale of the Acquired Interests contemplated by this Agreement.

"Material Contract" has the meaning set forth in Section 3.12(a).

"Material Permits" has the meaning set forth in Section 3.19.

"Mexican Liquidation Court" means the 52nd Civil State Court of Mexico City, in which the Mexican Liquidation Proceeding is pending.

"Mexican Liquidation Proceeding" has the meaning set forth in the recitals to this Agreement.

"Mexican Liquidator" has the meaning set forth in the recitals to this Agreement.

"Non-Recourse Persons" has the meaning set forth in Section 10.11.

"Open Source Material" means all software that is available under any license that meets (a) the Open Source Definition (www.opensource.org/osd.html) or (b) the Free Software definition (https://www.gnu.org/philosophy/free-sw.html.en) (including the GNU Affero General Public License (AGPL), GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL) the Sun Industry Standards License (SISL) and the Apache License).

"Ordinary Course of Business" means the ordinary course of business of the Company Entities including in response to, or during the course of, the COVID-19 pandemic.

"Outside Date" means the date that is 90 days following the Bankruptcy Court's entry of the Sale Order.

"Parent" has the meaning set forth in the preamble to this Agreement.

"Parties" has the meaning set forth in the preamble to this Agreement.

"Payoff Letter" means a customary and duly executed payoff letter in respect of the Existing Credit Facility, providing that, upon payment thereof, (a) all obligations of the Company Entities and any Seller and its respective Affiliates relating to the Indebtedness under the Existing Credit Facility, including any prepayment, termination or breakage fees or penalties paid or payable, shall be satisfied in full, (b) the Guaranty and all guarantees of the Company Entities in respect of such Indebtedness shall be automatically terminated, and (c) all Liens on the Acquired Interests and the assets of the Company Entities relating to or securing such Indebtedness shall be automatically discharged and released.

12

"Permits" means permits, licenses, concessions, approvals, Consents, Governmental Orders, exemptions, certificates, clearances, qualifications, filings and other authorizations obtained from any Governmental Authority or required to be issued or granted by or under the authority of any Governmental Authority, including any state consumer credit or lending, sales finance, collection agency, servicer or similar licenses issued or required by any applicable Governmental Authority, but does not include any notices of self-certifications required to be filed with any Governmental Authority.

"Permitted Liens" means any (a) construction, mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's and/or similar Liens, including all statutory Liens, arising or incurred in the Ordinary Course of Business or the validity or amount of which is being contested in good faith by appropriate proceedings, and for which adequate reserves are established in accordance with the Accounting Standards, (b) Liens for Taxes not yet due and payable or being contested in good faith through appropriate proceedings, for which adequate accruals or reserves are established in accordance with the Accounting Standards, (c) purchase money Liens and Liens securing rental payments under capital lease arrangements, (d) pledges or deposits under workers' compensation legislation, unemployment insurance Laws or similar Laws, (e) deposits in connection with leases, contracts or other agreements, including rent security deposits, (f) pledges or deposits to secure public or statutory obligations, judicial bonds or appeal bonds, (g) Liens disclosed in the Unaudited Financial Statements, (h) Liens arising under or created by any Material Contract or Transaction Document (other than as a result of a breach or default under such Material Contract or Transaction Document), (i) Liens created by licenses granted in the Ordinary Course of Business in any Intellectual Property, (j) Liens that will be released on or prior to the Closing Date without further Liability of any Company Entity, (k) Liens in connection with any Permit, (l) restrictions on the sales of securities under applicable securities Laws, (m) Recognized Liens, (n) with respect to the Leased Real Property, all exceptions, restrictions, easements, charges, covenants, rights of way, zoning ordinances and similar encumbrances which do not materially impair the current or permitted use, occupancy or value of such Leased Real Property, and (o) with respect to the Leased Real Property, any right, interest, lien, encumbrance, title exception or other Lien on the interest of the fee owner, lessor, or sublessor or any right in a lesser estate relating thereto.

"Person" means an individual, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization, or Governmental Authority.

"Personal Data" means any information in any form or format relating to an identifiable or identified natural person or that is otherwise regulated under any applicable data privacy or data protection Law.

"Post-Closing Covenant" has the meaning set forth in Section 8.1.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Pro Rata Share" has the meaning set forth in Section 2.2(a).

13

"Purchase Price" means an amount equal to: (a) the Base Purchase Price; plus (b)(i) the Book Value Surplus, if applicable, or minus (ii) the Book Value Deficit, if applicable.

"R&W Policy" has the meaning set forth in Section 6.15.

"Recognized Liens" means, as applicable, each Lien or security interest created pursuant to the Existing Credit Facility.

"Regulatory Approvals" means the requisite Consents of, declarations or filings with, or notices to the applicable Department of Financial Institution (or equivalent Governmental Authority) that have issued a motor vehicle sales finance license to any of the Company Entities in connection with the Transaction as set forth in Section 3.5(b) of the Seller Disclosure Schedule.

"Remedies Exception" means (a) applicable bankruptcy, liquidation, insolvency, reorganization, moratorium, and other Laws of general application, heretofore or hereafter enacted or in effect, affecting the rights and remedies of creditors generally, and (b) the exercise of judicial or administrative discretion in accordance with general equitable principles, particularly as to the availability of the remedy of specific performance or other injunctive relief.

"Reorganization" means the dividend of the Credito Real Interest to Parent.

"Representatives" means, with respect to any Person, the directors, officers, managers, members, employees, representatives, agents, consultants, attorneys, accountants, investment bankers or other advisors of such Person.

"Required Regulatory Approvals" means the Regulatory Approvals representing 80% of the Company's Retail Installment Sale Contracts portfolio as set forth in Schedule D.

"Retail Installment Sale Contract" means an installment sale contract or conditional sale agreement for the purchase of a vehicle, together with any assignment, reinstatement, extension or modification thereof.

"RLF" has the meaning set forth in Section 6.19.

"Sale Order" means an order of the Bankruptcy Court approving the Transaction, including the protections set forth in Section 6.12(a)(ii), and otherwise in form and substance reasonably acceptable to Buyer.

"Sanctions" has the meaning set forth in Section 3.17(c).

"Seagrave" has the meaning set forth in the preamble to this Agreement.

"Seagrave Interest" has the meaning set forth in the recitals to this Agreement.

"Second Deposit" has the meaning set forth in Section 2.3.

"Securities Act" has the meaning set forth in Section 5.6.

14

"Seller" and "Sellers" have the meanings set forth in the preamble to this Agreement.

"Seller 401(k) Plans" has the meaning set forth in Section 6.13(a).

"Seller Disclosure Schedule" means the disclosure schedule (together with all attachments and appendices thereto) delivered by Sellers' Representative to Buyer on the date hereof and attached hereto.

"Seller Group Parties" means (a) Sellers, (b) any Affiliate of a Seller, and (c) any Representative of (i) a Seller or (ii) any Affiliate of a Seller.

"Seller Marks" means the Trademarks as set forth on Section 6.9(a) of the Seller Disclosure Schedule.

"Seller Releasees" has the meaning set forth in Section 6.10(b).

"Seller Released Claims" has the meaning set forth in Section 6.10(a).

"Seller Releasors" has the meaning set forth in Section 6.10(a).

"Sellers Fundamental Representations" means each of the following representations and warranties of the Sellers: (i) Section 3.1 (*Organization; Authority; Enforceability*), Section 3.3(a) (*Capitalization*), Section 3.4 (*Ownership*), Section 3.18 (*Brokers' Fees*); and (ii) Section 4.2 (*Authorization; Enforceability*), the first two sentences of Section 4.3 (*Title*) and Section 4.4 (*Brokers' Fees*).

"Sellers' Representative" shall have the meaning given to it in the preamble to this Agreement.

"Sellers' Representative Group" has the meaning set forth in Section 10.20(b).

"Services LLC" has the meaning set forth in Section 3.9(f)(ii)(1).

"Straddle Period" means any Tax period that includes but does not end on the Closing Date.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Target Book Value" means, with respect to the Company, an amount equal to $57,253,373.

"Tax" means any and all federal, state, local, foreign and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs, or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, export and import fees and charges, registration fees, tonnage, vessel, or other taxes, charges, fees, duties, levies,

15

tariffs, imposts, tolls, customs, or other assessments of any kind whatsoever imposed by any Governmental Authority, together with any interests, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto.

"Tax Contest" means an audit, claim, dispute, controversy, hearing, or administrative, judicial, or other proceeding relating to Taxes or Tax Returns.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement, voucher or electronic equivalent, estimated Tax declaration or other document or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof, required to be filed with or supplied to any Governmental Authority.

"Trademarks" means all trademarks, service marks, trade dress, logos, brand names, trade names, domain names, corporate names, distinctive signs, any other indicia of source or origin, and all registrations and applications for registration, together with the goodwill symbolized by any of the foregoing.

"Transaction" has the meaning set forth in the recitals to this Agreement.

"Transaction Documents" means this Agreement, the Escrow Agreement and all other documents, certificates and agreements executed by the Parties in connection with the Transaction as of the date hereof or delivered or required to be delivered by any Party at the Closing pursuant to this Agreement.

"Transfer Taxes" means any and all transfer, sales, use, value-added, excise, stock, stamp, documentary, registration, filing, conveyance, recording and other similar Taxes, filing fees and similar charges, including all applicable real property or leasehold interest transfer or gains Taxes, including any interest, penalty or addition thereto but excluding any net income or gain Taxes.

"Unaudited Financial Statements" has the meaning set forth in Section 3.6(a).

"W&C" has the meaning set forth in Section 6.19.

"Wells Fargo Consent" means any Consent of Wells Fargo Bank, N.A., required pursuant to the Existing Credit Facility related to the execution and delivery by the Company and Sellers of this Agreement or the other Transaction Documents to which the Company or any Seller is or will be a party, or the consummation by the Company and the Sellers of the transactions contemplated by this Agreement and the Transaction Documents.

Section 1.2    Terms Generally.

(a)    The definitions in Section 1.1 shall apply equally to both the singular and plural forms and to correlative forms of the terms defined.

(b)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

16

(c)     The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(d)     The word "or" means (1) "either or both" ("X or Y" means "X or Y or both X and Y") or (2) "any or all" ("X, Y or Z" means "X, Y or Z, or all of X, Y and Z").

(e)     The words "hereby," "herewith," "hereto," "herein," "hereof" and "hereunder" and words of similar import refer to this Agreement (including the Exhibits and Schedules to this Agreement and the Disclosure Schedules) in its entirety and not to any part hereof unless the context shall otherwise require.

(f)     Unless otherwise specified herein, all references herein to Articles, Sections, Exhibits, Schedules and the Disclosure Schedules shall be deemed references to Articles, Sections and Exhibits of, and Schedules and the Disclosure Schedules to, this Agreement, and references to "paragraphs" or "clauses" shall be to separate paragraphs or clauses of the section or subsection in which the reference occurs.

(g)     Unless otherwise specified herein, any references to any Contract (including this Agreement or any of the other Transaction Documents) or Law shall be deemed to be references to such Contract or Law as amended, supplemented or modified from time to time in accordance with its terms and the terms hereof, as applicable, and in effect at any given time (and, in the case of any Law, to any successor provisions).

(h)     Unless otherwise specified herein, references to any Person include references to such Person's successors and permitted assigns, and in the case of any Governmental Authority, to any Person(s) succeeding to its functions and capacities.

(i)     Unless otherwise specified herein, any reference to any federal, state, local, or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder.

(j)     Whenever this Agreement refers to a number of days, that number refers to calendar days unless Business Days are specified.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.  References to "the date hereof" are to the date of this Agreement.

(k)     "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.

(l)     Currency amounts referenced in this Agreement, unless otherwise specified, are in U.S. Dollars.

(m)     Unless otherwise specified herein, all accounting terms used herein and not expressly defined herein shall have the meanings given to them under Accounting Standards.

(n)    Unless otherwise set forth herein or otherwise agreed by the Parties in writing, the phrase "made available," as applies to such performance by the Sellers, shall mean that the information referred to has been posted in the on-line "virtual data room" established by Parent.

ARTICLE II

PURCHASE AND SALE OF THE ACQUIRED INTERESTS

Section 2.1    Purchase and Sale of the Acquired Interests.  Subject to entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, Buyer agrees to purchase from each Seller, and each Seller agrees to sell, transfer, assign, convey and deliver to Buyer, all of the rights, title and interests in and to the Acquired Interests owned by such Seller immediately prior to the Closing, free and clear of all Liens (other than Permitted Liens), for the consideration specified in Section 2.2.  Buyer acknowledges and agrees that upon Closing, Sellers shall sell and convey to Buyer and Buyer shall accept the Acquired Interests "AS IS, WHERE IS" except to the extent expressly provided otherwise in this Agreement.

Section 2.2    Payment of Purchase Price; Withholding.

(a)    At Closing, Buyer shall pay by wire transfer in immediately available funds (i) an amount equal to the Closing Payment, to each Seller, based on such Seller's respective pro rata portion of the Acquired Interests (being, with respect to Parent, 97.58%, and, with respect to Seagrave, 2.42%) (with respect to each Seller, such Seller's "Pro Rata Share") in each case to an account of such Seller that has been designated by Sellers' Representative to Buyer in writing at least five Business Days prior to the Closing.

(b)    Buyer shall be entitled to deduct and withhold any Taxes required under Law to be deducted or withheld from the Closing Payment and any other amounts deliverable under this Agreement or any other Transaction Documents. To the extent that amounts are so withheld and remitted to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Sellers in respect of whom such deduction and withholding was made. Furthermore, Buyer and the applicable Seller(s) shall reasonably cooperate with each other to reduce the amount of withholding Taxes imposed on the payment of any amount to any Person pursuant to this Agreement and any other Transaction Document to the extent permitted by Law, including by reasonably cooperating to execute and file any forms or certificates reasonably required to claim an available reduced rate of, or exemption from, withholding Taxes.

Section 2.3    Deposit.

(a)    Promptly, but no later than two Business Days following the Parent's filing of the Bidding Protections Motion, Buyer shall immediately deposit an aggregate amount equal to five percent of the Base Purchase Price in cash into the Escrow Account (the "Initial Deposit"). Upon selection of the Buyer as the Successful Bidder pursuant to the Bidding Procedures, Buyer shall promptly deposit (and in any event within two Business Days thereof) an additional aggregate amount equal to five percent of the Base Purchase Price in cash into the Escrow Account, such

that the Deposit will equal ten percent of the Base Purchase Price (the "<u>Second Deposit</u>" and, together with the Initial Deposit, the "<u>Deposit</u>"). The Deposit shall be released and delivered (together with all accrued investment income thereon) by the Escrow Agent by wire transfer of immediately available funds to either Buyer or Sellers, as applicable, as follows:

        (i)     if the Closing occurs, the Deposit (and all accrued investment income thereon) shall be released to the Sellers (based on each Seller's Pro Rata Share) and applied against the Purchase Price.

        (ii)    if this Agreement is validly terminated by Sellers pursuant to <u>Section 9.1(h)</u>, the Deposit, together with all accrued investment income thereon, shall be released to Sellers (based on each Seller's Pro Rata Share) within five Business Days of such termination; or

        (iii)   if this Agreement is validly terminated for any reason (other than a termination pursuant to <u>Section 9.1(h)</u>, the Deposit, together with all accrued investment income thereon, shall be returned to Buyer within five Business Days of such termination.

      (b)    The Deposit shall be held by the Escrow Agent in the Escrow Account and shall be released by the Escrow Agent and delivered to either Buyer or the Sellers in accordance with this Agreement and the provisions of the Escrow Agreement.

      Section 2.4     <u>Closing</u>.

      (a)    Subject to the satisfaction or, when permissible, waiver of the conditions set forth in <u>Article VII</u>, the closing of the Transaction (the "<u>Closing</u>") shall take place (i) at the offices of White & Case LLP located at 200 South Biscayne Boulevard, Suite 4900, Miami, Florida commencing at 10:00 a.m. (EST) on the date that is the ninth Business Day following the satisfaction or waiver of the last of the conditions set forth in <u>Article VII</u> (other than any such conditions which by their terms are not capable of being satisfied until the Closing Date), <u>provided</u> that if the Closing Date would fall on any of the first ten Business Days of a calendar month, the Closing shall occur on the date that is the eleventh Business Day of the applicable calendar month, or (ii) on such other date on a Business Day or at such other time or place as the Parties may mutually agree upon in writing. The Closing shall be effective for all purposes under this Agreement at 12:01 p.m. (EST) on the Closing Date.

      (b)    At the Closing, Sellers' Representative shall deliver, or cause to be delivered, to Buyer the following:

        (i)     a copy of the duly signed resignation letters of the directors and managers of the Company Entities (whose names are set forth in <u>Exhibit A</u>) substantially in the form attached as <u>Exhibit B</u>;

        (ii)    all equity assignments and powers sufficient to transfer the Acquired Interests to Buyer, in form and substance reasonably satisfactory to Buyer;

(iii)     a copy of a resolution or written consent of the board of managers of the Company approving the sale of 50% of the Seagrave Interest in favor of Buyer, in form and substance reasonably satisfactory to Buyer;

(iv)     A properly completed IRS Form W-9 (with respect to a U.S. Seller) and a Form W-8 (with respect to a non-U.S. Seller); provided that failure to deliver such a form shall not be a condition to Closing (provided, that the sole remedy to the Buyer if a Seller fails to deliver such a form is to withhold in accordance with Section 2.2(b));

(v)     a copy of the certificate referred to in Section 7.3(d); and

(vi)     a copy of the Sale Order.

(c)     At the Closing, Buyer shall deliver, or cause to be delivered, to Sellers' Representative the following:

(i)     payment by wire transfer of immediately available funds of an aggregate amount equal to (A) the Closing Payment, minus (B) the Deposit, in accordance with Section 2.2(a);

(ii)     to the extent Buyer does not obtain the Wells Fargo Consent by the Closing, Buyer shall make all payments and satisfy any other obligations required by the Payoff Letter, including any prepayment, termination or breakage fees or penalties paid or payable related to the Existing Credit Facility as required by Section 6.16(a)(ii); and

(iii)     a copy of the certificate referred to in Section 7.2(c).

(d)     All proceedings to be taken, payments to be made and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken, executed and delivered simultaneously, and no proceedings shall be deemed taken, payments shall be deemed made nor any documents executed or delivered until all have been taken, paid, executed and delivered.

Section 2.5     Closing Statement.     At least eight Business Days prior to the Closing Date, Sellers' Representative shall provide Buyer with (a) a written statement (the "Closing Statement") setting forth Sellers' Representative's good faith calculation of (i) the Base Purchase Price, plus or minus (ii) the Book Value Adjustment as of the last day of the month immediately preceding the Closing Date (plus for a Book Value Surplus and minus for a Book Value Deficit), and (iii) the resulting amount (the "Closing Payment"), together with reasonable supporting documentation with respect to the calculation of the amounts set forth on the Closing Statement, (b) an estimated balance sheet, income statement and statement of cash flows of the Company as of the last day of the calendar month immediately preceding the Closing, (c) a copy of the monthly portfolio report prepared by the Company in the ordinary course of its business, reflecting collections, balances, charge-offs, recovery and delinquency as of the month preceding the Closing, and (d) the Loan Tape. The calculation of the Book Value Adjustment shall be prepared in accordance with the Accounting Principles. If requested by Buyer within two Business Days after delivery of the Closing Statement, Sellers' Representative shall provide Buyer and its Representatives with reasonable access, during normal business hours, to the books and records

20

relating to the Company Entities to the extent reasonably necessary to assist Buyer and its Representatives in their review of the Closing Statement. Prior to Closing, the Sellers' Representative shall cooperate in good faith to answer any questions raised by Buyer in its review of the Closing Statement, <u>provided</u> that if Buyer and the Sellers' Representative do not agree upon any or all of the adjustments set forth in the Closing Statement (1) there shall be no delay in Closing as a result thereof and (2) the amounts used to calculate the Closing Payment shall be the amounts set forth in the Closing Statement. For the avoidance of doubt, the Base Purchase Price is a fixed amount and is not subject to adjustment under this <u>Section 2.5</u>.

Section 2.6    <u>Transfer Taxes</u>.  Notwithstanding anything herein to the contrary, Buyer shall be responsible for the payment of all Transfer Taxes imposed as a result of the transactions contemplated hereby.  The Parties will reasonably cooperate in the preparation and filing of any Tax Returns or other documentation in connection with any Transfer Taxes subject to this <u>Section 2.6</u>, including joining in the execution of any such Tax Returns and other documentation to the extent required by Law.

ARTICLE III

<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY REGARDING THE<br>COMPANY ENTITIES</u>

On the date hereof and as of the Closing Date, the Company represents and warrants to Buyer, except as set forth in the corresponding sections of the Seller Disclosure Schedule, as follows:

Section 3.1    <u>Organization; Authority; Enforceability</u>.

(a)    Each Company Entity is a corporation, limited liability company or other entity duly incorporated or formed, validly existing and in good standing (or the equivalent thereof) under the Laws of its jurisdiction of organization. Each Company Entity has all requisite power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.  The Company has made available to Buyer prior to the date hereof accurate and complete copies of the Governing Documents of each of the Company Entities in effect as of the date hereof.  Each such Governing Document is in full force and effect, and each of the Company Entities is in compliance with its respective Governing Documents.  <u>Section 3.1(a)</u> of the Seller Disclosure Schedule sets forth an accurate and complete list of (i) any other Person that has merged or consolidated with or into any Company Entity since January 1, 2015 or (ii) any other Person all or substantially all of whose assets have been acquired by any Company Entity (whether by purchase, upon liquidation or otherwise) since January 1, 2015.  The Company has made available to the Buyer the minute books of each member of the Company Entity, if any.

(b)    Except as set forth in <u>Section 3.1(b)</u> of the Seller Disclosure Schedule, each Company Entity is duly qualified or licensed to do business and in good standing (or the equivalent thereof) in each jurisdiction in which the character or location of the properties it owns, leases or operates or the nature of the business it conducts makes such qualification, license or good standing (or the equivalent thereof) necessary, except where the failure to be so qualified or licensed and in

21

good standing (or the equivalent thereof) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    The Company has all organizational power and authority to execute and deliver this Agreement and the Transaction Documents to which the Company is a party, to perform its obligations under this Agreement and the Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the Transaction Documents to which it is a party.  The execution, delivery and performance of this Agreement by the Company and each of the Transaction Documents to which it is a party and the consummation the transactions contemplated by this Agreement and the Transaction Documents to which it is a party have been duly and validly authorized by the Company.  This Agreement has been duly executed by the Company, and each Transaction Document executed or to be executed by the Company is (if executed on the date of this Agreement) or will be (if to be executed at or prior to the Closing) duly executed and delivered by the Company and, assuming the due execution by Buyer or any other party(ies) thereto, this Agreement and the Transaction Documents to which the Company is (or will be) a party are (or will be) a valid and binding obligation of such Company Entities, enforceable against such Company Entities in accordance with their terms, except to the extent that its enforceability may be subject to the Remedies Exception.

Section 3.2    <u>Non-contravention</u>.  Except as set forth on <u>Section 3.2</u> of the Seller Disclosure Schedule, assuming the accuracy of the representations and warranties of Buyer set forth in <u>Article V</u>, neither the execution and delivery by the Company of this Agreement and the other Transaction Documents to which it is or will be a party, nor the consummation by the Company of the transactions contemplated by this Agreement and the Transaction Documents (a) violates, conflicts with or results in the breach of any provision of the respective Governing Documents of the Company Entities, (b) violates or constitutes a default under, gives rise to any right of termination, cancellation, payment or acceleration under or results in a breach of or imposition of any Lien (other than a Permitted Lien) on any of the material properties or assets of the Company Entities or under any Material Contract of any Company Entity, or (c) assuming receipt of the Consents of Governmental Authorities described in <u>Section 3.5</u>, and the accuracy of <u>Section 5.4</u>, violates, conflicts with or results in the breach of, requires any Consent or other action by any Person under, constitutes a default under or gives rise to any right of notice, payment, termination, amendment, modification, cancellation or acceleration of any right or obligation of any Company Entity or to a loss of any benefit to which any Company Entity is entitled to, under any Material Permit, Governmental Order or Law to which any Company Entity is subject, except in the case of clause (b), as would not, individually or in the aggregate, result in a material Liability to the Company Entities, taken as a whole.  As of the date of this Agreement, the Company Entities are not involved in any Action that challenges or seeks to prevent, restrain or otherwise delay the transactions contemplated by this Agreement or the Transaction Documents.

Section 3.3    <u>Capitalization</u>.

(a)    <u>Section 3.3</u> of the Seller Disclosure Schedule sets forth, as of the date hereof, a true, accurate and complete list of the Company Entities, and with respect to each Company Entity, (a) its name and jurisdiction of organization, (b) its form of organization, and (c) the issued and outstanding Interests thereof and the owners thereof.  No Company Entity holds

any Interests other than Interests in another Company Entity as set forth on <u>Section 3.3</u> of the Seller Disclosure Schedule.

(b)    Except for this Agreement, or as set forth on <u>Section 3.3</u> of the Seller Disclosure Schedule, neither Parent, CRUSA Inc., Seagrave nor any Company Entity is a party to any Contract that would require Parent, CRUSA Inc., Seagraves or such Company Entity to sell, transfer, issue or otherwise dispose of any Interests of the Company Entities.

(c)    Except as set forth on <u>Section 3.3</u> of the Seller Disclosure Schedules, there are no issued or outstanding (i) Interests of the Company Entities, (ii) securities of the Company Entities convertible into or exchangeable for Interests of such Company Entity, (iii) options or other rights to acquire from any Company Entity or obligations of any Company Entity to issue, any Interests or securities convertible into or exchangeable for Interests of such Company Entity, (iv) Contracts requiring the repurchase, redemption or other acquisition of any Company Entity or other Interests of any Company Entity (other than this Agreement), (v) Liens or other restrictions on transfer (including preemptive rights or rights of first refusal) of any Acquired Interests or other Interests of the Company Entities other than under this Agreement or applicable securities Laws (and none of the foregoing shall arise by virtue of or in connection with the Transaction), or (vi) equityholder agreements, voting trusts, proxies or other Contracts to which any Company Entity is a party with respect to or concerning the purchase, sale, transfer or voting of the Acquired Interest or other Interests of any Company Entity, other than this Agreement.

Section 3.4    <u>Ownership</u>.  Sellers own or will own as of the Closing, all of the issued and outstanding Interests in the Company, being only the Acquired Interests, as set forth in <u>Section 3.3</u> of the Seller Disclosure Schedule.  All outstanding Interests of each Company Entity (except to the extent such concepts are not applicable under the Law of such Company Entity's jurisdiction of formation or other Law) have been duly authorized and validly issued, are fully paid and nonassessable, are free and clear of any preemptive rights, restrictions on transfer or other Liens (other than restrictions under applicable federal and state securities Laws). Subject to the entry of the Sale Order and the conditions set forth herein, at the Closing, Buyer will be vested with direct legal ownership of the Acquired Interests.

Section 3.5    <u>Government Authorizations</u>.  Subject to entry of the Sale Order, no Consent of or by any Governmental Authority is required to be obtained or made by the Sellers or any Company Entity in connection with the execution and delivery of this Agreement and the other Transaction Documents by the Sellers or the consummation by the Sellers of the Transaction or the other transactions contemplated by this Agreement or the Transaction Documents, other than (a) the Consents set forth on <u>Section 3.5(a)</u> of the Seller Disclosure Schedule, (b) Regulatory Approvals set forth on <u>Section 3.5(b)</u> of the Seller Disclosure Schedule, (c) the Consents set forth on <u>Section 3.5(c)</u> of the Seller Disclosure Schedule that are not required to be made or given until after the Closing or (d) Consents which, if not made or obtained, would not reasonably be expected to be, individually or in the aggregate, material to the Company Entities, taken as a whole.

Section 3.6    <u>Financial Statements</u>.

(a)    Set forth on <u>Section 3.6(a)</u> of the Seller Disclosure Schedule are accurate and complete copies of (a) the audited consolidated balance sheets of the Company as of December

23

31, 2021 and December 31, 2020, and the related statements of operations for the respective periods covered thereby, together with the notes thereto (collectively, the "Audited Financial Statements"), and (b) the unaudited consolidated balance sheets of the Company as of December 31, 2022 (the "Balance Sheet Date") and the related unaudited statements of income and of cash flows of the Company for the period ending on the Balance Sheet Date (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). Except as set forth on Section 3.6(a) of the Seller Disclosure Schedule, the Financial Statements, as applicable, present fairly in all material respects, respectively, the financial position and statements of operations of the Company, at the respective dates set forth therein and for the respective periods covered thereby, and were prepared from the books and records of the Company in accordance with the Accounting Standards and Accounting Principles in all material respects (except, in the case of the Unaudited Financial Statements, for the absence of footnotes and any year-end adjustments), consistently applied, except as otherwise noted therein.

(b)     None of the Sellers or the Company Entities, and none of their respective Affiliates or Representatives, have received any written or oral complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods or internal accounting controls of the Company Entities or any Seller (with respect to the business of the Company Entities), including any complaint, allegation, assertion or claim that any of the Company Entities or any Seller (with respect to the business of the Company Entities) has engaged in improper accounting or auditing practices.

(c)     The Finance Net Receivables reflected on the Financial Statements and Finance Net Receivables arising after the Balance Sheet Date and reflected on the books and records of the Company Entities (i) arose in the Ordinary Course of Business from bona fide arm's-length transactions for the sale of goods or performance of services, (ii) are valid and (iii) are collectible in the Ordinary Course of Business (subject to reserves reflected in the Financial Statements) and, to the Sellers' Knowledge, are not subject to counterclaims or setoffs. Since the Balance Sheet Date, no Company Entity has cancelled, or agreed to cancel, in whole or in part, any accounts receivable except in the Ordinary Course of Business.

(d)     Section 3.6(d) of the Seller Disclosure Schedule sets forth a correct and complete list of (i) the outstanding principal balance of all Retail Installment Sale Contracts held by each of the Company Entities as of December 31, 2022, and (ii) since January 1, 2022 through December 31, 2022, all charge-offs recorded by the Company Entities on their respective books in respect thereof as of such date.

Section 3.7     Undisclosed Liabilities. The Company Entities have no material Liabilities that would be required under the Accounting Standards to be reflected on a consolidated balance sheet of the Company Entities, except for Liabilities (a) set forth, reflected in, reserved against or disclosed in the Financial Statements, (b) incurred in connection with the transactions contemplated by this Agreement, (c) incurred in the Ordinary Course of Business since the Balance Sheet Date, (d) set forth on Section 3.7 of the Seller Disclosure Schedule or (e) which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.8     Absence of Certain Changes. Except as set forth on Section 3.8 of the Seller Disclosure Schedule, from January 1, 2022 to the date hereof, (a) each Company Entity

24

has conducted its respective business in all material respects in the Ordinary Course of Business, (b) there has not been any change in accounting methods, principles or practices affecting the Company Entities, except as was required or permitted by Accounting Standards or Laws as set forth on Section 3.8 of the Seller Disclosure Schedule, (c) no Company Entity has acquired or divested any business or Person, by merger or consolidation, purchase of substantial assets or equity interests, or sale, or by any other manner, in a single transaction or series of related transactions, or entered into any Contract, letter of intent or similar arrangement with respect to the foregoing and (d) there has not been a Material Adverse Effect.

Section 3.9        Tax Matters.

(a)        Each Company Entity has (i) timely filed, or caused to be filed, all income and other material Tax Returns that it was required to file on or prior to the date hereof, taking into account all permitted extensions, and (ii) timely paid or caused to be paid all material Taxes owed by it, whether or not shown to be due and payable on its Tax Returns.  All such Tax Returns were correct and complete in all material respects as of the date hereof.  There are no Liens for Taxes on any of the assets of any Company Entity other than Permitted Liens.

(b)        None of the Company Entities currently is the beneficiary of any extension of time within which to file any Tax Return with respect to material Taxes. No claim has ever been made by any Governmental Authority in a jurisdiction where such Company Entity does not file Tax Returns that any Company Entity is or may be subject to taxation by that jurisdiction.

(c)        Each Company Entity has withheld and paid all material Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, partner, stockholder, beneficial owner, or other third party.

(d)        (i) There are no outstanding or unsettled written claims, asserted deficiencies or assessments against any Company Entity for the assessment or collection of any material Taxes, (ii) there are no ongoing or scheduled audits, examinations or other administrative or judicial proceedings with respect to any material Taxes of any Company Entity, and (iii) none of the Company Entities is a party to any Tax indemnification, Tax allocation, Tax sharing or similar agreement with respect to material Taxes, other than Contracts entered into in the Ordinary Course of Business that are not primarily related to Taxes.

(e)        No Company Entity has (A) waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency, or (B) sought or received any Tax ruling from any Governmental Authority.

(f)        For U.S. federal tax purposes, each Company Entity's classification and treatment is set forth below.

(i)        The Company is a partnership within the meaning of Treasury Regulations Section 301.7701-3(b).

(ii)        Each of the following is a business entity that is a disregarded entity pursuant to Treasury Regulations Sections 301.7701-2(c)(2) and 301.7701-3(b):

25

(1)    Auto Funding Services, LLC ("Services LLC");

(2)    Credito Real USA Receivables, LLC ("Depositor LLC");

(3)    Credito Real USA Auto Receivables Trust 2021-1 ("Issuer Trust"); and

(4)    CRUSAFIN Holding LP ("Holding LP").

(iii)    The Company is the owner for income tax purposes of all of the assets held by Services LLC, Depositor LLC, Issuer Trust (or by its trustee for the benefit of Issuer Trust) and Holding LP.

(iv)    The Company is the obligor for income tax purposes of all of the liabilities of Services LLC, Depositor LLC, Issuer Trust (or of its trust on behalf of Issuer Trust) and Holding LP.

(v)    CRUSAFIN Costa Rica, S.A. ("CRSA") is a controlled foreign corporation as defined in Section 957 of the Code.

(g)    No Company Entity (A) is liable for Taxes of any predecessor, (B) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was another Company Entity) or (C) has any Liability for Taxes of any Person (other than a Company Entity) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(h)    Neither Buyer nor any Company Entity will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (A) any method of accounting for a taxable period (or portion thereof) ending on or before the Closing Date; (B) any "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or non-U.S. law); (C) prepaid amount received on or before the Closing Date outside the ordinary course of business; or (D) Section 951 or Section 951A of the Code with respect to any income, asset or activity of a Company Entity in a taxable period (or portion thereof) ending on or before the Closing Date.

(i)    No Company Entity is or has been a party to any listed transaction as defined in Section 6707A(c)(2) of the Code or Treasury Regulations Section 1.6011-4(b).

(j)    No Company Entity claimed the employee retention credit under the Coronavirus Aid, Relief and Economic Security Act (or any similar program or provisions in any jurisdiction).

(k)    The representations and warranties set forth in this Section 3.9 (i) are the sole representations and warranties regarding Taxes and (ii) are made only with respect to Tax periods ending on or prior to the Closing Date and shall not be construed as a representations and

26

warranties with respect to any Taxes attributable to any Tax period (or portion thereof) beginning after the Closing Date or any Tax positions taken by the Company Entities in any Tax period (or portion thereof) beginning after the Closing Date.

Section 3.10    Real Property.

(a)    The Company Entities do not and have not owned any real property or any interest in real property.  Except for the Leased Real Property subject to the Lease Agreements, there is no material real property used by any Company Entity in, or otherwise related or necessary to, the operation of the Company Entities.  The Sellers have made available to Buyer correct and complete copies of the Lease Agreements (including any amendments, extensions or renewals with respect thereto).

(b)    The Leased Real Property is in good working order, operating condition and state of repair (ordinary wear and tear excepted) and has been maintained in the manner and to the standard required under the applicable Lease Agreement, except as would not, individually or in the aggregate, result in a material Liability to the Company Entities, taken as a whole.

(c)    The Lease Agreements are legal, valid, binding, enforceable and in full force and effect, and neither the Company Entity party thereto, nor, to the Sellers' Knowledge, any other party thereto, is in breach or default under such Lease Agreement.  Except as would not, individually or in the aggregate, result in a material Liability to the Company Entities, taken as a whole, (i) each Company Entity has exclusive and peaceful possession of all Leased Real Property, (ii) no Person, other than a Company Entity, leases, subleases, licenses, possesses, uses or occupies all or any portion of the Leased Real Property, and (iii) there are no outstanding options, rights of first refusals, rights of first offer or other third-party rights to purchase, use, occupy, sell, assign or dispose of the Leased Real Property or any interest therein.  Except as would not, individually or in the aggregate, result in a material Liability to the Company Entities, taken as a whole, there are no pending or, to the Sellers' Knowledge, threatened (in writing) proceedings to take all or any portion of the Leased Real Property or any interest therein by eminent domain or any condemnation proceeding (or the jurisdictional equivalent thereof) or any sale or disposition in lieu thereof.

Section 3.11    [Reserved].

Section 3.12    Contracts.

(a)    Section 3.12(a) of the Seller Disclosure Schedule sets forth a correct and complete list (which list is arranged in subsections to correspond to the subsections of this Section 3.12(a)), as of the date hereof, of the following Contracts to which a Company Entity is a party or under which a Company Entity has any benefits, rights or Liabilities or is otherwise bound, other than the Retail Installment Sale Contracts (each, a "Material Contract"):

(i)    each Contract (or group of Contracts with the same party or its Affiliates) (A) pursuant to which the Company Entities received or made payments in excess of $250,000 in the aggregate during the 12 month period ended December 31, 2022 or (B) which provides for or contemplates aggregate future payments in excess of $250,000

27

to or from the Company Entities during calendar year 2023, in each case excluding any Contracts disclosed under Section 3.12(a)(viii) of the Seller Disclosure Schedule;

(ii)    each Contract (A) which contains any covenant which materially restricts any of the Company Entities from competing or engaging in any geographical area, activity or business or from soliciting or hiring any Person for employment or to provide services or (B) pursuant to which any Company Entity grants to any Person the exclusive right to market, distribute or resell any product or service, or to exclusively represent any Company Entity with respect to any such product or service, act as exclusive agent for any Company Entity in connection with the marketing, distribution or sale of any product or service, or similar exclusive rights; or (C) that is a sales, commission, agency, marketing, representative or similar Contract under which the Company Entities made payments exceeding $100,000 in the aggregate during the 12 month period ending December 31, 2022 or which provides for or contemplates aggregate future payments in excess of $100,000 during calendar year 2023;

(iii)    each Contract (A) under which any Company Entity has created, incurred, assumed or guaranteed any material outstanding Indebtedness for borrowed money or granted a Lien on its assets, whether tangible or intangible, to secure such Indebtedness or (B) is a swap, exchange, commodity option, hedging or other derivative Contract;

(iv)    each (A) joint venture, partnership or other Contract involving a sharing of profits or losses with any other Person or (B) Contract or letter of intent for the disposition or acquisition of any business, capital stock or assets by any Company Entity;

(v)    each Contract or settlement with any Governmental Authority or any other Governmental Order to which any Company Entity is subject to;

(vi)    each Contract for the sale of products or services that provides terms materially and adversely different from the standard terms of the Company Entities' standards/form Contracts with dealers, customers, suppliers or vendors;

(vii)    each Affiliate Arrangement;

(viii)    each Lease Agreement;

(ix)    each Contract providing for employment or engagement of any person on a full-time, part-time, independent contractor or other basis or otherwise providing compensation to any director, employee or individual independent contractor with an annual base salary or wage rate of $100,000 or more; and

(x)    Other than (i) "shrink-wrap", "click-wrap", "web-wrap" or other licenses for commercially available software with annual aggregate license and maintenance fees of less than $250,000, (ii) licenses for Open Source Material, (iii) licenses granted to a Company Entity in employee, independent contractor and consulting agreements on such Company Entity's standard form(s) therefor, which have been provided to Buyer prior to the date hereof, (iv) licenses for the use of a Trademark, name,

28

logo, or other identifier where the grant of the license is not material to the purpose of such Contract, (v) licenses granted by a Company Entity to customers or end users in the ordinary course of business, (vi) incidental licenses granted by a Company Entity to vendors and service providers for the purpose of providing the applicable services to Company Entity, and (vii) confidentiality agreements, each Contract that (A) grants a Company Entity any right to use any material Intellectual Property (B) permits any third-party to use, enforce or register any material Company Owned IP, including any license agreements, coexistence agreements and covenants not to use; or (C) materially restricts the right of any Company Entity to use or register any material Intellectual Property, including settlement agreements, coexistence agreements and covenants not to sue.

(b)    Each Material Contract is in full force and effect, enforceable in accordance with its terms and is the legal, valid and binding obligation of the Company Entity, which is a party to such Material Contract, subject to the Remedies Exception and, to the Sellers' Knowledge, the other parties thereto.  Except as set forth in <u>Section 3.12</u> of the Seller Disclosure Schedule, no Company Entity, nor to the Sellers' Knowledge, any of the other parties thereto is in breach, violation or default, and, to the Sellers' Knowledge, no event has occurred which with notice or lapse of time or both would constitute any such breach, violation or default, or permit termination, modification, or acceleration by such other parties, under such Material Contract.  The Sellers have made available to Buyer an accurate and complete copy of each Material Contract, including all amendments, modifications and supplements thereto.

Section 3.13    <u>Insurance</u>. <u>Section 3.13</u> of the Seller Disclosure Schedule contains a true, accurate and complete list of all current insurance policies maintained by or insuring any Company Entity (collectively, the "<u>Company Insurance Policies</u>"), including with respect to each such policy, the policy type, first named insured, policy number, carrier, term, type and amount of coverage and annual premium, and the Sellers have made available accurate and complete copies of such Company Insurance Policies to the Buyer.  Sellers have provided Buyer with actual copies of run loss reports for each Company Insurance Policy since January 1, 2020.  The Company Insurance Policies provide the Company Entities with insurance coverage that is customarily maintained by comparable companies in their industries. Except as set forth on <u>Section 3.13</u> of the Seller Disclosure Schedule, no Company Entity has received any notice from the insurer under any such Company Insurance Policy disclaiming coverage, reserving rights with respect to a particular claim or such policy in general or canceling or materially amending any such policy, and there is no material claim by any Company Entity pending under any of the Company Insurance Policies.  All premiums due and payable for such Company Insurance Policies have been duly paid.

Section 3.14    <u>Litigation</u>.  Other than the Mexican Liquidation Proceeding, the Chapter 11 Case, the Chapter 15 Case and any adversary proceedings and contested matters commenced therein, there are (a) no outstanding Governmental Orders and (b) no Actions pending or, to the Sellers' Knowledge, threatened in writing, in each case against or involving any Company Entity that would, individually or in the aggregate, reasonably be expected to result in a material Liability to the Company Entities, taken as a whole.  <u>Section 3.14</u> of the Seller Disclosure Schedule sets forth a true, accurate and complete list of any Action pending or, to the Sellers' Knowledge, threatened in writing by or against each Company Entity since January 1, 2020.  To the Sellers' Knowledge, there is no investigation by any Governmental Authority involving any

29

Company Entity or any of their respective properties, operations, assets, officers, directors, managers, agents or employees (in their respective capacities as such).

Section 3.15    Labor Matters.

(a)    Section 3.15(a) of the Seller Disclosure Schedule contains a list of all persons who are employees, independent contractors or consultants of the Company Entities as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (A) name; (B) title or position (including whether full-time or part-time); (C) hire or retention date; (D) current annual base compensation rate or contract fee; (E) commission, bonus or other incentive-based compensation; and (F) a description of the fringe benefits provided to each such individual as of the date hereof.

(b)    Each Company Entity is in material compliance with all Laws respecting labor, employment and employment practices, including, without limitation, all laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.

(c)    No Company Entity is a party to nor bound by any labor agreement, collective bargaining agreement or any other labor-related agreements or arrangements with any labor union, labor organization or works council.  No employees of any Company Entity are represented by any labor union, labor organization or works council and there are no labor agreements, collective bargaining agreements or any other labor-related agreements or arrangements that pertain to any of the employees of any Company Entity.  There are no pending strikes, lockouts, work stoppages or slowdowns, pickets, boycotts, unfair labor practice charges, labor disputes, or grievances involving employees of the Company Entities.

(d)    To the Sellers' Knowledge, no employee of any Company Entity is in material violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation: (i) to any Company Entity or (ii) to a former employer of any such employee relating (A) that would impair the ability of, or prohibit, any such employee to be employed by any Company Entity or (B) to the knowledge or use of trade secrets or proprietary information.

(e)    There are no Actions by or against any Company Entity pending, or to the Sellers' Knowledge, threatened in writing to be brought or filed, by or with any Governmental Authority in connection with the employment or termination of employment of any employee or applicant to become an employee, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment-related matter arising under Laws.  No Company Entity is party to a settlement agreement executed on or since January 1, 2020, with a current or former director, officer, employee or independent contractor of any Company Entity that involves allegations relating to sexual harassment, sexual misconduct or discrimination by either (i) an officer of any Company Entity or (ii) an employee of any Company Entity whose base compensation is or was in excess of

30

$110,000 per year, in each case, where such alleged conduct occurred in connection with such employee's employment with the Company Entities. To the Sellers' Knowledge, no allegations of sexual harassment or sexual misconduct have been made in the last three (3) years against (i) any officer of any Company Entity or (ii) an employee of any Company Entity whose base compensation is or was in excess of $110,000 per year, in each case, where such alleged conduct occurred in connection with such employee's employment with the Company Entities.

(f)    All compensation, including wages, commissions and bonuses payable to any employees or independent contractors of the Company Entities for services performed on or prior to December 31, 2022 have been paid in full or accrued in the Company's financial records. The Company Entities have withheld all amounts required by Law or agreement to be withheld from the wages or salaries of employees and the Company Entities are not liable for any arrears of any Tax or penalties for failure to comply with the foregoing.

Section 3.16    Employee Benefits.

(a)    Set forth on Section 3.16(a) of the Seller Disclosure Schedule is a true, complete and correct list of all Benefit Plans. Neither any Company Entity, nor, to the Sellers' Knowledge, any other Person has announced any plan or made any commitment to create or enter into any additional plan, arrangement, agreement or policy which would constitute a Benefit Plan if in existence on the date hereof or to amend or modify any existing Benefit Plan.

(b)    Each Benefit Plan has been established, maintained and administered in all material respects in accordance with its terms and is in material compliance with all Laws, including ERISA and the Code. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS as to its qualified status, or is maintained pursuant to a volume submitter or prototype document for which a favorable IRS opinion or advisory letter has been issued which may be properly relied upon by the respective Benefit Plan. All contributions to, and payments from, each Benefit Plan that are required to be made in accordance with the terms and conditions thereof and Laws (including ERISA and the Code) have been, in all material respects, timely made or properly accrued.

(c)    Neither the Company Entities nor any ERISA Affiliate thereof maintains, contributes to, is required to contribute to, or has any liability with respect to (A) any defined benefit pension plan or any plan, program or arrangement subject to Title IV of ERISA, Section 302 or 303 of ERISA or Sections 412 or 436 of the Code, (B) any Multiemployer Plan (as defined in Section 3(37) of ERISA), (C) any Multiple Employer Plan (as defined in Section 413(c) of the Code), or (D) any Multiple Employer Welfare Arrangement (as defined in Section 3(40) of ERISA) and neither the Company Entities nor any ERISA Affiliate thereof has maintained, contributed to, been required to contribute to, or had any liability with respect to any plan described in clauses (A), (B), (C) or (D) above within the last six (6) years prior to the date of this Agreement.

(d)    No Benefit Plan provides or has an obligation to provide post-employment medical, life insurance or other welfare benefits to any individual (other than as required under Section 4980B of the Code or any similar Law). Each "group health plan" (within the meaning of Code section 5000(b)(1)) maintained by the Company Entities is in compliance in all material respects with the applicable requirements of the Affordable Care Act all documents are in

31

compliance in all material respects with current Affordable Care Act requirements, to the Sellers' Knowledge, and there exists no basis upon which the Company Entities would reasonably be expected to be subject to any fine or penalty under the Affordable Care Act. The Company Entities do not sponsor any welfare plan as defined in Section 3(1) of ERISA that is a group health plan, where the benefits under which are not provided exclusively from the assets of the Company Entities or any ERISA Affiliate of the Company Entities or through insurance contracts.

(e)     The Company Entities have made available to Buyer with respect to each Benefit Plan, where applicable, complete and correct copies of (A) the current plan document and amendments thereto (including all insurance contracts, evidences of coverage and other related documents); (B) the current trust agreement or other funding arrangements (including insurance policies) and amendments thereto; (C) the most recent Form 5500 annual reports; (D) the most recent summary plan description and summaries of any material modification thereto; (E) all material correspondence with the IRS, Department of Labor and Pension Benefit Guaranty Corporation regarding any Benefit Plan; (F) all discrimination testing for each Benefit Plan for the three (3) most recent plan years; (G) the most recent determination or opinion letter received from the IRS regarding the Benefit Plans; (H) the latest financial statements for the Benefit Plans; and (I) the most recent actuarial valuations, if applicable, and latest financial statement for each of the Benefits Plans.

(f)     Except as set forth on Section 3.16(f) of the Seller Disclosure Schedule, there is no pending or, to the Knowledge of the Sellers, threatened, Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan or, to the Sellers' Knowledge, fiduciary of a Benefit Plan, is presently the subject of an examination, investigation or audit by any Governmental Authority or the subject of an application or filing under voluntary compliance, self-correction or similar program sponsored by any Governmental Authority (including the Employee Plans Compliance Resolution System, the Voluntary Fiduciary Correction Program or the Delinquent Filers Voluntary Correction Program). For purposes of the Benefit Plans, the Company Entities have, in all material respects, properly classified individuals providing services as independent contractors or employees, as the case may be.

(g)     Except as set forth on Section 3.16(g) of the Seller Disclosure Schedule, none of the execution and delivery of this Agreement, the performance by any Party of its obligations hereunder or the consummation of the transactions (alone or in conjunction with any other event, including any termination of employment on or following the Closing Date) will (i) entitle any employee, director or other individual providing services to the Company Entities to any compensation or benefit under any Benefit Plan, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefit under any Benefit Plan, or (iii) result in any breach or violation of, or default under, or limit the Company Entities' rights to amend, modify or terminate any Benefit Plan.

(h)     No Benefit Plan has engaged in any non-exempt "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) that would be expected to result in a material liability to the Company Entities. The Company Entities have not, nor to the Knowledge of the Sellers, has any other Person, engaged in any transaction with respect to any Benefit Plan that would be reasonably likely to subject the Company Entities to any material Tax or material penalty (civil or otherwise) imposed by ERISA, the Code or other Law.

(i)      Each Benefit Plan that constitutes in any part a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and that is subject to Section 409A of the Code has been operated and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder during the respective time periods in which such operational or documentary compliance has been required. No Benefit Plan or individual agreement with any employee or service provider of the Company Entities provides for any actual or potential obligation to reimburse or otherwise "gross up" any Person for the interest or additional tax set forth under Section 409A(a)(1)(B) of the Code or otherwise.

(j)      No Company Entity is a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local, or non-U.S. Tax law) in connection with the transactions contemplated by this Agreement or (ii) any amount that will not be fully deductible as a result of Section 162(m) of the Code (or any corresponding provision of state, local, or non-U.S. Tax law.

Section 3.17      Legal Compliance.

(a)      Except for Laws relating to Taxes (which are addressed exclusively in Section 3.9), Laws regarding employees and related matters (which are addressed exclusively in Section 3.15), Permits (which are addressed exclusively in Section 3.19), Laws relating to intellectual property, information technology and data privacy (which are addressed exclusively in Section 3.20), the operations of the Company Entities are not being, and have not since January 1, 2020 been, conducted in violation in any material respect of any Law applicable to any relevant Company Entity, and no Company Entity (nor any Seller on behalf of any Company Entity) is in receipt of, nor has it received since January 1, 2020, any written notice with respect to any actual, alleged or potential failure to comply with any provision of Law, the Material Permits or Governmental Order.  Since January 1, 2020, no Company Entity, or any of the Sellers with respect to the Company Entities, has conducted any internal investigation with respect to any potential or alleged material conflict with, defaulted under or violation of, or noncompliance with, any Law, the Material Permits or Governmental Order.  To the Seller's Knowledge, as of the date of this Agreement, there is no unresolved violation with respect to any report, form, schedule, registration, statement or other document filed by, or relating to any examinations by, any Governmental Authority of any Company Entity.

(b)      Since January 1, 2020, each Company Entity has complied in all material respects with all applicable Consumer Protection Laws.  Since January 1, 2020, each Company Entity has conducted its operations in compliance in all material respects with applicable financial recordkeeping and reporting requirements of all Anti-Money Laundering Laws, anti-terrorist financing Laws and know-your-customer Laws administered or enforced by any Governmental Authority in jurisdictions where the applicable Company Entity conducts business.

(c)      Since January 1, 2020, (i) each Company Entity and, to the Sellers' Knowledge, their respective officers, directors, agents and employees, in each case, in their capacity as such, have complied in all material respects with (A) all Anti-Bribery Laws and (B) all economic sanctions Laws including those administered by the Office of Foreign Assets Control

(collectively, "Sanctions"), in each case, solely to the extent such laws are applicable to the applicable Company Entity's business and (ii) the Company Entities have not engaged in any transactions or dealings with any Person or jurisdiction that, to the Sellers' Knowledge, is the subject or target of Sanctions.  Each Company Entity has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Company Entities with Anti-Bribery Laws and Sanctions in all material respects, if applicable.

Section 3.18    Brokers' Fees.  Except as set forth on Section 3.18 of the Seller Disclosure Schedule, no Company Entity has entered into any contract or other arrangement or understanding (written or oral, express or implied) with any Person which may result in the obligation of any Company Entity or Buyer or any of its Affiliates to pay any fees or commissions to any broker or finder as a result of the execution and delivery of this Agreement or the Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

Section 3.19    Permits.  Section 3.19 of the Seller Disclosure Schedule sets forth a true, accurate and complete list of the material Permits held by the Company Entities, which Permits constitute all Permits required to conduct the businesses of the Company Entities as currently conducted (the "Material Permits").  Each Company Entity is not, and has not since January 1, 2020, been, in material violation of the terms of any such Material Permits.  No Company Entity has received, since January 1, 2020, any written notice of any suspension, revocation, cancellation, non-renewal or material modification, in whole or in part, of any such Material Permit, or any threat thereof.  There is no Action pending that would reasonably be expected to result in the revocation or termination of any such Material Permit.  There are no outstanding or unsatisfied Governmental Orders by any Governmental Authority against any Company Entity with respect to such Material Permits.

Section 3.20    Intellectual Property; Data Privacy.

(a)    Section 3.20(a) of the Seller Disclosure Schedule sets forth a true, accurate and complete list of all (i) domain names, (ii) material proprietary computer software, and (iii) registered and material unregistered Trademarks or pending applications for Trademarks, in each case that are included in the Company Owned IP. The Company does not own any (x) patents or pending applications for patents, or (y) registered copyrights.  Except as disclosed in Section 3.20(a) of the Seller Disclosure Schedule, all Company Owned IP that is the subject of a registration or pending application is valid and enforceable, in good standing, and all required filings and fees related to such Company Owned IP have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars.  No Governmental Order has been rendered in any Action denying the validity of a Company Entity's right to register, or a Company Entity's rights to own or use, any Company Owned IP.  The Company Entities own, free and clear of all Liens (except for Permitted Liens), all right, title and interest in and to the Company Owned IP. Company has not granted any material right, license or interest in or to the Company Owned IP to any third party.

(b)    To the Sellers' Knowledge, no third party is infringing upon, misappropriating or otherwise violating any Company Owned IP, and since January 1, 2020, until the date of this Agreement, the Company Entities have not sent any notice to or asserted or threatened in writing any action or claim against any Person involving or relating to any Company

34

Owned IP.  Except as would not, individually or in the aggregate, impose a material Liability on the Company Entities, the conduct of the business of the Company Entities in the manner formerly conducted, currently conducted and as currently contemplated by Sellers or the Company Entities to be conducted, did not and does not infringe upon, misappropriate, dilute or otherwise violate any Intellectual Property owned by a third party.  The Company Entities have not received any written communication since January 1, 2020, alleging that any Company Entity has infringed or, misappropriated, diluted or otherwise violated any material Intellectual Property of any Person. Except as set forth in Section 3.20(b) of the Seller Disclosure Schedule, on the Closing Date, the Company Entities will have the right and license to use all in-bound Intellectual Property licenses, in the same manner and subject to the same limitations and scope as the applicable Company Entity had immediately prior to the Closing, except, in each case, as would not, individually or in the aggregate, impose a material Liability on the Company Entities.

(c)    The Company Entities are in material compliance with all applicable Data Protection Laws. To the Knowledge of the Sellers, there have been no failures, unauthorized disclosures or uses of Personal Data, security breaches or other material adverse events affecting the software, computer hardware, firmware, networks, interfaces and related systems used by and under the control of the Company Entities or the Sellers (collectively, "IT Systems"). The Company Entities provide for the back-up and recovery of material data and have implemented commercially reasonable disaster recovery plans and procedures. The Company Entities and the Sellers have taken commercially reasonable steps for a business engaged in the industries in which they are engaged (including implementing and monitoring compliance with adequate measures with respect to technical and physical security) designed to protect the integrity and security of the IT Systems and the information stored therein (including all Personal Data, trade secrets and other confidential information owned, collected, protected or maintained by the Company Entities and the Sellers) from misuse or unauthorized use, access, disclosure or modification by third parties. The IT Systems (a) are adequate for the operation of the business of the Company Entities and the Sellers as currently conducted, (b) to Sellers' Knowledge, perform in material conformance with their documentation and (c) are to Sellers' Knowledge free from any virus, Trojan horse, or "back door" material defect, other than for manufacturers' design defects. To the Knowledge of the Sellers, the Company Entities have not experienced any loss, damage, or unauthorized access, disclosure, use, or breach of security of any Personal Data in any Company Entity's possession, custody, or control, or otherwise held or processed on its behalf.

(d)    The representations and warranties in this Section 3.20 are the sole and exclusive representations and warranties relating to intellectual property and data privacy matters.

Section 3.21    Affiliate Transactions.  None of the Sellers, nor any directors or officers of the Company, nor any of their respective Affiliates (a) is party to any Contract with any Company Entity (other than (x) employment arrangements entered into in the Ordinary Course of Business and (y) any agreement or transaction which is not substantially less favorable to the applicable Company Entity as would reasonably be expected to be obtained by such Company Entity at the time in a comparable arm's length transaction with a Person not affiliated with such

Company Entity), or (b) owns any material property or right, tangible or intangible, that is used by any Company Entity.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES REGARDING EACH SELLER

On the date hereof and as of the Closing Date, each Seller represents and warrants, severally and not jointly (and only as to itself or himself and not as to the other Seller), to Buyer, except as set forth in the corresponding sections of the Seller Disclosure Schedule, as follows:

Section 4.1     Organization; Legal Capacity.  Parent is an entity duly organized, validly existing, and in good standing under the Laws of Mexico.  CRUSA Inc. is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware. Seagrave is an individual domiciled in the State of Florida.  Subject to the necessary authority from the Bankruptcy Court, the Mexican Liquidation Court and/or the Mexican Liquidator, as applicable, Parent and CRUSA, Inc. have all requisite corporate power and authority to carry on their business as currently conducted, and to own, lease and operate their properties where such properties are now owned, leased or operated, except in such jurisdictions where the failure to be so qualified or licensed and in good standing (or the equivalent thereof) would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 4.2     Authorization; Enforceability.  Parent and CRUSA Inc. have, subject to the Bankruptcy Court's entry of the Sale Order and any necessary approvals from the Mexican Liquidation Court, all requisite corporate power and authority, and Seagrave has all legal capacity, power and authority, in each case, to execute and deliver this Agreement and the other Transaction Documents to which such Seller is or will be a party, to perform its obligations hereunder and thereunder and to consummate the Transaction and the transactions contemplated hereby and by the Transaction Documents.  The execution, delivery and performance by Parent and CRUSA Inc. of this Agreement and such other Transaction Documents and the consummation of the Transaction have been duly authorized by all necessary company or other action on the part of Parent and CRUSA Inc., as applicable.  This Agreement has been, and each Transaction Document to which such Seller, and with respect to Parent, subject to the Bankruptcy Court's entry of the Sale Order and any necessary approvals from the Mexican Liquidation Court, is or will be a party has been or will be, duly executed and delivered by such Seller and constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the Remedies Exception.

Section 4.3     Title.

(a)     Upon the terms and subject to the conditions contained in this Agreement and, with respect to Parent and CRUSA Inc., subject to requisite Bankruptcy Court approvals and the terms of the Sale Order and any necessary approvals from the Mexican Liquidation Court, such Seller is (or, in the case of Parent, will be after the consummation of the Reorganization) the record, legal and beneficial owner of the Acquired Interests set forth opposite such Seller's name on Section 3.3 of the Seller Disclosure Schedule (and other than as otherwise set forth on Section 3.3 of the Seller Disclosure Schedule, owns (or, in the case of Parent, will own after the consummation

36

of the Reorganization), of record or beneficially, no other Interests in the Company or any Company Entity), and such Seller has good and marketable title to such Acquired Interests, free and clear of all Liens.  Such Seller has (or, in the case of Parent, will have after the consummation of the Reorganization) full right, power and authority to transfer and deliver to the Buyer valid title to the Acquired Interests held by such Seller, free and clear of all Liens.  Subject to entry of the Sale Order, the assignments, endorsements, membership interest powers and other instruments of transfer delivered by the Sellers to the Buyer at the Closing are sufficient to transfer such Seller's entire interest, legal and beneficial, in the Acquired Interests and, immediately following the Closing, the Buyer will be the record and beneficial owner of the Acquired Interests and have good and marketable title to the Acquired Interests, free and clear of all Liens.  Except pursuant to this Agreement, there is no contractual obligation pursuant to which any Seller has, directly or indirectly, granted any option, warrant or other right to any Person to acquire any equity interests in any Company Entity.

(b)    Except as set forth on <u>Section 4.3(b)</u> of the Seller Disclosure Schedule and this Agreement, there is no Contract pursuant to which any Seller has, directly or indirectly, granted any option, warrant or other right to any Person to acquire any Interests in the Company Entities.  There are no equityholder agreements, voting trusts, proxies or other Contracts to which any Seller is a party with respect to or concerning the purchase, sale, transfer or voting of the Acquired Interests or other Interests of any Company Entity, other than this Agreement.

Section 4.4    <u>Brokers' Fees</u>.  With the exception of Riveron Consulting, LLC, neither Seller nor any of its or his Affiliates has entered into any contract or other arrangement or understanding (written or oral, express or implied) with any Person which may result in the obligation of any Company Entity or Buyer or any of its Affiliates to pay any fees or commissions to any broker or finder as a result of the execution and delivery of this Agreement or the other Transaction Documents to which such either Seller is or will be a party or the consummation of the Transaction. Each Seller acknowledges and agrees that it is solely liable for payment of any broker's fees owed to any brokers retained by such Seller relating to or arising from this Agreement, including any broker's fees owed by the CR Sellers to Riveron Consulting LLC.

Section 4.5    <u>Litigation</u>.  Except for the Mexican Liquidation Proceeding and any adversary proceedings or contested matters pending in connection therewith, there are (a) no outstanding Governmental Orders and (b) no Actions pending or, to such Seller's Knowledge, threatened in writing, before any Governmental Authority, in each case against any such Seller that would, individually or in the aggregate, that would reasonably be expected to materially interfere with, prevent or materially delay the ability of such Seller to enter into and perform its obligations under this Agreement or consummate the Transaction.

Section 4.6    <u>No Additional Representations and Warranties</u>.  Except for the express representations and warranties provided in <u>Article III</u> and this <u>Article IV</u> and any certificate delivered pursuant to this Agreement, neither of the Sellers nor any of their respective Affiliates, nor any of their respective Representatives or equity holders or any other Person acting on either Seller's behalf has made, or is making, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to the Sellers or any of the Company Entities (including any representation or warranty relating to financial condition, results of operations, assets or liabilities of any of the Company Entities) to Buyer, Buyer Parent or any of

37

their Affiliates or their respective Representatives or equity holders or any other Person, and the Sellers, on behalf of themselves and their respective Affiliates and Representatives, hereby disclaim any such other representations or warranties and no such party shall be liable in respect of the accuracy or completeness of any information provided to Buyer, Buyer Parent or any of their Affiliates or their respective Representatives or equity holders other than the express representations and warranties provided in Article III and this Article IV and any certificate delivered pursuant to this Agreement. Except for the representations and warranties contained in Article III and this Article IV (as modified by the Disclosure Schedules), Sellers are selling the Acquired Interests "as is-where is" and disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer, Buyer Parent or their Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or Buyer Parent by any Representative of Seller).  Neither of the Sellers nor any of their respective Affiliates, nor any of their respective Representatives or equity holders or any other Person acting on either Seller's behalf is, directly or indirectly, orally or in writing, making any representations or warranties regarding any pro-forma financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company Entities to Buyer, Buyer Parent or their Affiliates (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided to Buyer or Buyer Parent), and the Sellers, on behalf of themselves and their respective Affiliates and Representatives, hereby disclaim all Liability and responsibility for any such information and statements.  It is understood that any due diligence materials made available to Buyer, Buyer Parent or their Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of the Sellers or their respective Affiliates or their respective Representatives.

ARTICLE V

REPRESENTATIONS AND WARRANTIES REGARDING BUYER AND BUYER PARENT

On the date hereof and as of the Closing Date, each of Buyer and Buyer Parent represents and warrants to the Sellers, except as set forth in the corresponding sections of the Buyer Disclosure Schedule, as follows:

Section 5.1    Organization; Legal Capacity.  Buyer is a corporation, duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the State of Florida.  Buyer has all requisite organizational power and authority to carry on its business as currently conducted by it and to own, lease and operate its properties where such properties are now owned, leased or operated.  Buyer is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the property owned, leased by it or in which the conduct of its business requires it to be so qualified or licensed, except in such jurisdictions where the failure to be so qualified or licensed and in good standing (or the equivalent thereof) would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.  Buyer Parent is a *sociedad anónima de capital variable* duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of Mexico.  Buyer Parent has all requisite organizational power and authority to carry on its business as currently conducted by it and to own, lease and operate its properties where such properties are

38

now owned, leased or operated.  Buyer Parent is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the property owned, leased by it or in which the conduct of its business requires it to be so qualified or licensed, except in such jurisdictions where the failure to be so qualified or licensed and in good standing (or the equivalent thereof) would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.2    Authorization.  Each of Buyer and Buyer Parent has all requisite organizational power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the Transaction and the transactions contemplated hereby and by the Transaction Documents.  The execution, delivery and performance by each of Buyer and Buyer Parent of this Agreement and such other Transaction Documents and the consummation of the Transaction have been duly authorized by all necessary corporate and other organizational action on the part of Buyer and Buyer Parent, as applicable.   This Agreement has been, and each Transaction Document to which Buyer and Buyer Parent is or will be a party has been or will be, duly executed and delivered by Buyer and Buyer Parent and constitutes a legal, valid and binding obligation of Buyer and Buyer Parent, enforceable against each of them in accordance with its terms, subject to the Remedies Exception.

Section 5.3    Non-contravention.  Neither the execution and delivery of this Agreement or the other Transaction Documents to which Buyer or Buyer Parent is or will be a party, nor the consummation by Buyer or Buyer Parent of the Transaction or the other transactions contemplated by this Agreement and the Transaction Documents (a) violates, conflicts with or results in the breach of any provision of the Governing Documents of Buyer, (b) violates or results in a breach of any material agreement, contract, lease, license, instrument or other arrangement to which Buyer or any of its Affiliates is a party or by which any of their respective properties are bound, or (c) assuming the accuracy of Section 3.5 and Section 4.4, and the receipt of the Consents described in Section 5.4, violates, conflicts with or results in the breach of, requires any consent or other action by any Person under, constitutes a default under or gives right to any right of notice, payment, termination, amendment, modification, cancellation or acceleration of any right or obligation of any benefit to which Buyer or Buyer Parent is entitled to, under any Permit, Governmental Order or any Law to which Buyer or Buyer Parent is subject.  As of the date of this Agreement, neither Buyer or Buyer Parent is involved in any legal, administrative or arbitration Action that challenges or seeks to prevent or otherwise delay the Transaction.

Section 5.4    Government Authorizations.  Assuming the accuracy of Section 3.5 and Section 4.4, and the receipt of the Consents and Regulatory Approvals described in Section 3.5, no other Consent or Regulatory Approval of, with or to any Governmental Authority is required to be obtained or made by or with respect to Buyer, Buyer Parent or any of their Affiliates in connection with the execution and delivery of this Agreement and the other Transaction Documents by Buyer and Buyer Parent or the consummation by Buyer and Buyer Parent of the Transaction.

Section 5.5    Financial Capacity.  Each of Buyer and Buyer Parent has, and will have prior to the Closing, sufficient cash or other sources of immediately available funds to pay in cash the Purchase Price in accordance with the terms of Article II and for all other actions

39

necessary for each of them to consummate the Transaction and perform its obligations hereunder, including in respect of their obligations pursuant to Section 6.16(a)(ii). Each of Buyer and Buyer Parent acknowledges that receipt or availability of funds or financing by Buyer, Buyer Parent or any of their Affiliates shall not be a condition to their obligations hereunder.  No funds to be paid to the Sellers have derived from or will have been derived from, or constitute, either directly or indirectly, the proceeds of any criminal activity or otherwise in violation of any Laws, including any Anti-Money Laundering Laws.

Section 5.6    Investment.  Buyer is aware that the Acquired Interests being acquired by Buyer pursuant to the Transaction have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or under any state securities Laws.  Buyer is not an underwriter, as such term is defined under the Securities Act, and Buyer is purchasing the Acquired Interests for its own account solely for investment and not with a view toward, or for sale in connection with, any distribution thereof within the meaning of the Securities Act, nor with any present intention of distributing or selling any of the Acquired Interests.  Buyer and its Affiliates acknowledge that none of them may sell or otherwise dispose of the Acquired Interests except in compliance with the registration requirements or exemption provisions under the Securities Act and the rules and regulations promulgated thereunder, or any other applicable securities Laws.  Buyer is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.

Section 5.7    Litigation.  There are (a) no outstanding Governmental Orders and (b) no Actions pending or, to Buyer's Knowledge, threatened in writing, before any Governmental Authority, in each case against Buyer or Buyer Parent that would, individually or in the aggregate, reasonably be expected to materially interfere with, prevent or materially delay the ability of Buyer and Buyer Parent to enter into and perform their obligations under this Agreement or consummate the Transaction.

Section 5.8    Brokers' Fees.  None of Buyer, Buyer Parent or any of their Affiliates has any contract or other arrangement or understanding (written or oral, express or implied) with any Person which may result in the obligation of the Sellers, the Company Entities or any of their Affiliates to pay any fees or commissions to any broker or finder as a result of the execution and delivery of this Agreement or the other Transaction Documents to which each of Buyer and Buyer Parent is or will be a party or the consummation of the Transaction. Each of Buyer and Buyer Parent acknowledges and agrees it is solely liable for the payment of any broker's fees owed to any brokers retained by any of them relating to or arising from this Agreement or the Transaction, including any broker's fees owed to Broadspan Capital.

Section 5.9    Information.

(a)    Except with respect to the representations and warranties given in Articles III and IV and any certificate delivered pursuant to this Agreement, Buyer has relied solely on its own legal, tax and financial advisers for its evaluation of its investment decision to purchase the Acquired Interests and to enter into this Agreement and not on the advice of the Sellers or its legal, tax or financial advisers.  Buyer acknowledges that any financial projections that may have been provided to it are based on assumptions of future operating results based on assumptions about certain events (many of which are beyond the control of the Sellers).  Buyer understands that no assurances or representations can be given that the actual results of the operations of any Company

40

Entity will conform to the projected results for any period.  Buyer specifically acknowledges that no representation or warranty has been made, and that Buyer has not relied on any representation or warranty, as to the accuracy of any projections, estimates or budgets, future revenues, future results from operations, future cash flows, the future condition (whether financial or other) of any Company Entity, or the businesses or assets thereof, or, except as expressly set forth in this Agreement, any other information or documents made available to Buyer, its Affiliates or its or their respective Representatives or equity holders.

(b)    Buyer and its Representatives and equity holders, acknowledge and agree that neither of the Sellers nor any of their respective Affiliates, nor any of its or their respective Representatives or equity holders, is making any representation or warranty whatsoever, express or implied, beyond those expressly given in <u>Article III</u> and <u>Article IV</u> and the Transaction Documents, including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of any of the Company Entities.

(c)    The Sellers and the Company Entities have provided Buyer with such access to the facilities, books, records and personnel of the Company Entities as Buyer has deemed necessary and appropriate in order for Buyer to investigate the businesses and properties of the Company Entities to make an informed investment decision to purchase the Acquired Interests and to enter into this Agreement.  Buyer (either alone or together with its advisors) has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its purchase of the Acquired Interests and is capable of bearing the economic risks of such purchase.  Buyer's acceptance of the Acquired Interests on the Closing Date shall be based upon its own investigation, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement and any certificate delivered pursuant to this Agreement or any Transaction Document.

Section 5.10    <u>Sufficiency of Funds</u>.  Each of Buyer and Buyer Parent has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.11    <u>No Outside Reliance</u>.  Except as otherwise expressly provided in this Agreement, neither Buyer nor Buyer Parent has relied and will not rely on, and Sellers are not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Acquired Interests or relating thereto made or furnished by Sellers. BUYER AND BUYER PARENT FURTHER ACKNOWLEDGE THAT SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED INTERESTS IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR

41

WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH OR SAFETY MATTERS).

ARTICLE VI
COVENANTS

Section 6.1    Conduct of the Company.

(a)    From the date hereof until the earlier to occur of the Closing and the termination of this Agreement in accordance with Article IX (the "Interim Period"), except as (i) set forth in Section 6.1(a) of the Seller Disclosure Schedule, (ii) may be required or not otherwise prohibited by this Agreement (including in order to consummate the Reorganization), (iii) required by Law or any Governmental Order to which Sellers or any Company Entity is bound, or (iv) otherwise consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed, provided, that such consent shall be deemed to have been given if Buyer does not object within five Business Days after the date on which Sellers and the Company request such consent in compliance with Section 10.3 (Notices)), (x) each Seller shall cause the Company to and (y) the Company shall, and shall cause the other Company Entities to:

(i)    conduct the Company Entities' respective businesses and operations in all respects in the Ordinary Course of Business; and

(ii)    use commercially reasonable efforts to (A) preserve and maintain the assets and properties of the Company Entities in reasonably good operating condition, ordinary wear and tear excepted for physical assets; and (B) preserve and maintain the material business relationships with customers, suppliers, distributors and others with whom the Company Entities deal in the Ordinary Course of Business.

(b)    Without limiting the generality of the foregoing, during the Interim Period, except as (i) set forth in Section 6.1(b) of the Seller Disclosure Schedule, (ii) may be required or not otherwise prohibited by this Agreement (including in order to consummate the Reorganization), (iii) required by Law or any Governmental Order to which Sellers or any Company Entity is bound or (iv) otherwise consented in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed, provided, that such consent shall be deemed to have been given if Buyer does not object within five Business Days after the date on which Sellers and the Company request such consent in compliance with Section 10.3 (Notices)), (x) each Seller shall cause the Company not to and (y) the Company shall not, and shall cause the other Company Entities not to:

(i)    amend the Governing Documents of any Company Entity;

(ii)    (1) (x) purchase, repurchase, redeem or otherwise acquire or (y) issue, transfer, authorize, deliver, sell, grant, pledge, encumber or otherwise dispose of, any (A) Interests of any Company Entity or any other security in lieu of, linked to or in substitution of Interests of any Company Entity or (B) warrants, calls, options or other rights to acquire any Interests of any Company Entity or any other security in lieu of, linked to or in substitution of Interests of any Company Entity; or (2) split, combine, subdivide, reclassify

42

or otherwise alter the terms of any Interests of any Company Entity or any other security in lieu of, linked to or in substitution of Interests of any Company Entity;

(iii)    declare, set aside or pay any dividend or distribution;

(iv)    except as required by a change in the Accounting Standards, change any accounting methods, principles, policies or practices (including with respect to amortization, loan loss reserves, discounts, charge-offs and recoveries) of any Company Entity;

(v)    sell, lease (as lessor), license, mortgage or otherwise subject to any Lien (other than Permitted Liens), allow to lapse or expire, or otherwise dispose of any properties, rights, assets or interests of any Company Entity, other than (1) in the Ordinary Course of Business pursuant to Contracts in force on the date hereof and made available to Buyer on or prior to the date hereof and, to the extent not otherwise included on the Seller Disclosure Schedule, as set forth on Section 6.1(b)(v) of the Seller Disclosure Schedule, (2) dispositions of immaterial or obsolete physical assets in the Ordinary Course of Business, (3) dispositions of delinquent or charged-off Retail Installment Sale Contracts (or the vehicle thereunder) in the Ordinary Course of Business and (4) sales of Retail Installment Sale Contracts pursuant to transactions between the Company, on the one hand, and any other Company Entity, on the other hand;

(vi)    make any loans (other than with respect to Retail Installment Sale Contracts), advances or capital contributions to or investments in any Person or otherwise form, create or otherwise acquire any Interests;

(vii)    merge or consolidate with, or purchase substantially all of the assets or business of, or effect or enter into any partnership or joint venture transaction (or any other corporate transaction or combination having similar effects to any of the foregoing in this clause (vii)) with, any Person;

(viii)    incur any indebtedness for borrowed money or guarantee such indebtedness of another Person, or issue or sell any debt securities or other rights to acquire any debt securities, other than indebtedness incurred in the Ordinary Course of Business, including under the Existing Credit Facility;

(ix)    (1) settle or compromise any Action or threatened Action, or release, dismiss or otherwise dispose of any claim, other than settlements or compromises of Actions or releases, dismissals or dispositions of claims that (A) involve the payment by the Company Entities of monetary damages in an amount not in excess of $50,000 individually or $250,000 in the aggregate (measured in the aggregate among all Company Entities, taken as a whole) and (B) do not impose restrictions on the business or operations of any Company Entity; provided, that no Company Entity shall settle or compromise any Action brought by a Governmental Authority without the Buyer's consent; or (2) enter into any Contract or arrangement with any Person (including arrangements that are not legally binding) or make any payment (regardless of form or amount) to any Person or at the

direction of any Person, in each case in respect of, arising out of or relating to any Cybersecurity Incident;

(x)    enter into or modify, amend, extend or terminate, or waive, release or assign any rights or claims under, (1) any Material Contract (or Contract that would have been a Material Contract if entered into prior to the entry of this Agreement) other than in the Ordinary Course of Business and so long as such modification, amendment, extension, termination, waiver, release or assignment is not adverse in any material respect to the applicable Company Entity, other than any extensions to the Existing Credit Facility, or (2) any Affiliate Arrangement (or a Contract, arrangement, understanding, practice or other transaction that would have been an Affiliate Arrangement if entered into prior to the entry of this Agreement);

(xi)    (1) make, change or revoke any material tax election or settle or compromise any material Tax Contest for a material amount of Tax; or (2) change any material Tax accounting method or annual accounting period, file any amended Tax Return, enter into a Tax sharing, allocation or indemnity agreement, enter into a "closing agreement" within the meaning of Section 7121 (or any similar provision of state, local, or foreign law), apply for or request a Tax ruling, or surrender any right to claim a Tax refund, in each case, with respect to material Taxes;

(xii)    other than as required by Section 6.4, assign, transfer, cancel, let lapse or fail to use commercially reasonable efforts to obtain, maintain, extend or renew any Permit that is required for any Company Entity to operate its business as of the date of this Agreement or, if such business is changed in compliance with this Agreement, as of such time;

(xiii)    assign, transfer, cancel, let lapse or fail to use commercially reasonable efforts to obtain, maintain, extend or renew any Company Insurance Policies;

(xiv)    other than in the Ordinary Course of Business, (1) change, in any material respect, any underwriting, credit, collection, recovery, repossession, charge-off, score card, privacy or other similar policies, practices or procedures of any of the Company Entities as in effect on the date of this Agreement (collectively, the "Company Policies") or (2) modify, settle, waive, collect or enforce any Retail Installment Sale Contract in any manner other than in the Ordinary Course of Business in accordance with the applicable Company Policies (or fail to modify, settle, waive, collect or enforce any Retail Installment Sale Contract in the Ordinary Course of Business as required or provided by the applicable Company Policies);

(xv)    other than as required by the existing terms of any Benefit Plan or Contract in effect on the date hereof: (1) grant or increase any severance or termination pay to any current or former employee or natural independent contractor of any Company Entity; (2) enter into or amend any employment, severance or termination agreement with any current or former employee or natural independent contractor of any Company Entity who has an annual base pay or fees greater than $110,000, except as set forth in Schedule 6.1(b)(xv); (3) establish, adopt, terminate or amend any Benefit Plan (including any plan,

44

agreement or arrangement that would be a Benefit Plan if in effect on the date hereof) other than for immaterial amendments or amendments in the Ordinary Course of Business; (4) take any action to accelerate the vesting or payment, or fund or secure the payment, of compensation or benefits under a Benefit Plan; (5) grant or increase any change-in-control or retention bonus to any current or former employee or natural independent contractor of any Company Entity; (6) amend the funding policy or contribution rate of any Benefit Plan or change any underlying assumptions to calculate benefits payable under any Benefit Plan, except as may be required by the Accounting Standards; or (7) grant any other increase in compensation, bonus or other payments or benefits payable to any current or former employee or natural independent contractor of any Company Entity who has an annual base pay or fees greater than $110,000;

(xvi)    (1) modify, renew, extend, or enter into any labor agreement, collective bargaining agreement or any other labor-related agreements or arrangements with any labor union, labor organization or works council, or (2) recognize or certify any labor union, labor organization, works council, or group of employees of any Company Entity as the bargaining representative for any employees of any Company Entity, in the case of (1) and (2), except as required by the terms of any such labor agreement, collective bargaining agreement or any other labor-related agreements or arrangements with any labor union, labor organization or works council;

(xvii)    (1) except as set forth in Schedule 6.1(b)(xv), hire or engage any person to be an officer or employee of, or a service provider to, any Company Entity, other than the hiring or engagement of employees or service providers with annual base pay or fees not in excess of $110,000 and in the Ordinary Course of Business; or (2) terminate the employment of any current officer or employee of any Company Entity with annual base pay in excess of $110,000 other than for cause (as determined in accordance with past practice); or (3) waive, release (in whole or in part), or knowingly fail to enforce the restrictive covenant obligations of any current or former employee, independent contractor, officer or director of any Company Entity;

(xviii)    grant any Person any right to register or exclusive right to use any Company Owned IP or dispose of or transfer, or permit to lapse, any Company Owned IP;

(xix)    (w) purchase or acquire any real property or transfer, convey, sell or dispose of any Leased Real Property, (x) enter into any new real property agreement, (y) amend in any material respect, renew or waive any material provision of any Lease Agreement, or (z) rescind, allow to expire or terminate any Lease Agreement; or

(xx)    agree, commit or Contract, whether in writing or otherwise, to do any of the foregoing.

(c)    Other than the Buyer's right to consent or to withhold consent with respect to the foregoing matters, nothing contained in this Agreement shall be construed to give Buyer or any of its Affiliates, directly or indirectly, any right to control or direct the businesses of the Company Entities prior to the Closing or any other businesses or operations of the Sellers or their respective Affiliates.  Subject to the terms and conditions of this Agreement, during the Interim

45

Period the Sellers, unless otherwise ordered by the Bankruptcy Court or the Mexican Liquidation Court (<u>provided</u> that Sellers have not directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or the Mexican Liquidation Court or authorized, supported or directed any other Person to petition, seek, request or move for such order of the Bankruptcy Court or the Mexican Liquidation Court) shall exercise such control and supervision of the Company Entities and of their respective businesses and operations as is consistent with the terms and conditions of this Agreement and their respective Governing Documents.

Section 6.2    Exceptions (to Conduct of the Company).    Notwithstanding anything to the contrary in Section 6.1 and unless otherwise ordered by the Bankruptcy Court or the Mexican Liquidation Court, the Sellers and the Company Entities shall not be (i) prevented from undertaking or (ii) required to obtain the Buyer's consent in relation to:

(a)    any matter contemplated pursuant to the express terms of this Agreement;

(b)    any matter set forth in the applicable subsections of Section 6.1(b) of the Seller Disclosure Schedule;

(c)    the hirings set forth in Schedule 6.1(b)(xv); and

(d)    any matter required by Law, any Governmental Order or any Contract to which Sellers or any Company Entity is bound.

Section 6.3    Access to Information; Confidentiality.

(a)    During the Interim Period, the Sellers and the Company shall, and the Company shall cause the other Company Entities to, upon reasonable prior notice from Buyer, permit Buyer and its Representatives, including its independent accountants, to have reasonable access to the properties, books, Contracts, personnel and other records of the Company Entities during normal business hours to the extent reasonably necessary for Buyer to familiarize itself with such matters and consummate the transactions contemplated by this Agreement; provided, that (i) such investigation shall not unreasonably disrupt personnel and operations of the Company Entities and (ii) Buyer shall use its commercially reasonable efforts to minimize any such disruption.  All such requests for access to the properties, books, Contracts, personnel and other records of the Company Entities shall be made to such Representatives of the Sellers and the Company as the Sellers and the Company, as applicable, shall designate, who shall be solely responsible for coordinating all such requests.  Notwithstanding anything herein to the contrary, neither the Sellers nor any Company Entity shall be required to: (i) provide access or information to Buyer or any of its Representatives, whether during the Interim Period or after the Closing, that would reasonably be expected to violate Law or cause the forfeiture of attorney-client privilege (provided that in the event that the restrictions in this clause (i) apply, the Company shall provide, or cause to be provided, to Buyer a reasonably detailed description of the information not provided and the Company shall cooperate in good faith to design and implement alternative disclosure arrangements to enable Buyer to evaluate any such information without resulting in any violation of Law or forfeiture of privilege) and (ii) provide any information relating to the sale process, bids received from other Persons in connection with the transactions contemplated by this Agreement and information and analysis (including financial analysis) relating to such bids.  Buyer

46

acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, all documents, materials, communications, analyses and other information relating to the sale process, and bids received from Buyer and other Persons in connection with the transactions contemplated by this Agreement that are in the possession of the Company or any of its Subsidiaries as of the date hereof and through the Closing will be transferred to Sellers prior to or as of the Closing and Sellers shall not be required to grant access to such documents, materials and other information to Buyer or any of their respective Affiliates at any time. Buyer shall indemnify and hold harmless Sellers, their Affiliates and their respective Representatives for any and all losses incurred by Sellers, their Affiliates or their respective Representatives, directly arising out of actions specifically requested by Buyer pursuant to this <u>Section 6.3</u>.

(b)      Buyer's right of access and any information obtained by Buyer, its Affiliates and Representatives in connection with the transactions contemplated by this Agreement shall be subject to the provisions of the Confidentiality Agreement. The terms of the Confidentiality Agreement are hereby incorporated by reference and shall survive the termination of this Agreement and continue in full force and effect thereafter pursuant to the terms thereof.  From and as of the Closing Date, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto as it related to Confidential Information (as defined in the Confidentiality Agreement) that relates solely to the Company Entities and shall no longer be binding with respect thereto.

(c)      For a period of 24 months following the Closing, each Seller shall, and shall cause its Affiliates and Representatives to, treat as confidential, non-public and proprietary, not use, not disclose to any other Person and safeguard any confidential or proprietary information to the extent relating to the Company Entities by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information as each Seller or its Affiliates and Representatives used with respect thereto prior to the execution of this Agreement, <u>provided</u>, that each Seller may disclose or may permit disclosure of, such information (i) to its Representatives who have a need to know such information to the extent that they are informed of their obligation to hold such information confidential to the same extent as is applicable to such Seller, (ii) to the extent that such Seller, its Subsidiaries or its or their Representatives are required to disclose any such information pursuant to applicable Law or pursuant to the applicable rules and regulations of any securities exchange applicable to listed companies, (iii) in connection with the enforcement of any right or remedy relating to this Agreement or any other Transaction Documents or the transactions contemplated hereby and thereby, (iv) in connection with any dispute or claim or any tax matter relating to such Seller's prior ownership of the applicable Acquired Interest, (v) any information that is publicly available other than in contravention of this <u>Section 6.3</u>, or (vi) to the extent required to be disclosed by any Governmental Authority or Governmental Order or otherwise by applicable Law or regulation.  If following the Closing, a Seller or any of its respective Affiliates or Representatives are requested or required to disclose (after such Seller has used commercially reasonable efforts to avoid such disclosure and after promptly advising and consulting with Buyer about such Person's intention to make, and the proposed contents of, such disclosure) any such confidential or proprietary information pursuant to a Governmental Order, such Seller shall, or shall direct such Seller's Affiliate or Representative to, to the extent reasonably possible, provide Buyer with prompt written notice of such request so that Buyer may seek an appropriate protective order or other appropriate remedy at Buyer's sole cost.  At any time that such protective order or remedy has not been

obtained, such Seller, or such Seller's Affiliate or Representative, may disclose only that portion of the confidential or proprietary information which such Person is legally required to disclose or of which disclosure is required to avoid sanction for contempt or any similar sanction, and such Seller shall use commercially reasonable efforts to obtain assurance that confidential treatment will be accorded to such confidential or proprietary information so disclosed.

Section 6.4    Consents and Approvals.

(a)    Subject to the terms and conditions hereof, during the Interim Period, each Party shall use commercially reasonable efforts to, as applicable to such Party (i) promptly take, or cause to be taken, any and all actions, and to promptly do, or cause to be done, any and all things that, in each case, may be necessary, proper or advisable under this Agreement or Law to consummate and make effective, as promptly as reasonably practicable after the date of this Agreement, the Transaction and the other transactions contemplated by this Agreement or the Transaction Documents, (ii) prepare and make, as soon as is practical following the date when Buyer is selected as Successful Bidder, all necessary, proper or advisable filings, notices or other communications in connection with the Transaction or the other transactions contemplated by this Agreement or by any of the Transaction Documents that may be required to obtain any necessary Consent or Regulatory Approvals prior to the Closing Date and (iii) with respect to the Consents set forth in Section 3.5(a) of the Seller Disclosure Schedule and Regulatory Approvals in Section 3.5(b) of the Seller Disclosure Schedule, as soon as is practical following the date when Buyer is selected as Successful Bidder, submit such necessary, proper or advisable filings or notices. During the Interim Period, each Party shall use commercially reasonable efforts to submit the subsequent or supplemental filings, information or documents reasonably required or requested by any Governmental Authority (or needed for any other Party to make the applicable filings or notifications such Party is required to make hereunder) as soon as practicable after getting the other Party's approval of the relevant action, and cooperate with one another in the preparation of such filings and any subsequent procedure in such manner as is reasonably necessary and appropriate. Buyer shall be responsible for the payment of all filing fees to Governmental Authorities in connection with all filings or notices to Governmental Authorities required under this Section 6.4 (including any Consents and Regulatory Approvals). No Party shall, at any time during or prior to the performance of its obligations hereunder, secure any Consent or Regulatory Approvals from any Governmental Authority in violation of Anti-Bribery Laws.

(b)    Each Party shall use commercially reasonable efforts to notify the other Party(ies) promptly upon the receipt by such Party or its Affiliates or Representatives of (i) any written comments or questions from any officials of any Governmental Authority in connection with any filings or notices made pursuant to Section 6.4(a) and (ii) any written request by any Governmental Authority for amendments or supplements to any filings made with such Governmental Authority or answers to any questions, or the production of any documents, relating to an investigation of the Transaction by any Governmental Authority.  Whenever any event occurs that is required by a Governmental Authority to be set forth in an amendment or supplement to any filing or notice made pursuant to Section 6.4(a), each Party shall promptly inform the other Party of such occurrence and use reasonable best efforts to cooperate in filing promptly with the applicable Governmental Authority such amendment or supplement. Without limiting the generality of the foregoing, each Party shall provide to the other Party(ies), upon request, copies

48

of all written correspondence between such Party and any Governmental Authority relating to Section 6.4(a).

(c)     Each Party may, as they deem advisable and necessary, designate any competitively sensitive materials provided to the other Party(ies) under this Section 6.4 as "outside counsel only." Such materials and the information contained therein shall be given only to outside counsel of the recipient and shall not be disclosed by such outside counsel to any other Representatives of the recipient without the advance written consent of the Party providing such materials. In addition, to the extent reasonably practicable, and if and to the extent permitted under Law, all meetings with any Governmental Authority under this Section 6.4 shall include representatives of both Buyer and Sellers. Each Party shall use commercially reasonable efforts to consult and cooperate with each other in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, and proposals made or submitted to any Governmental Authority under Section 6.4(a).

(d)     Subject to the terms and conditions hereof, in order to consummate the Transaction or the other transactions contemplated by this Agreement or by any of the Transaction Documents, as soon as is practical following the date when Buyer is selected as Successful Bidder but in any event during the Interim Period, each Party shall use commercially reasonable efforts to, as applicable to such Party, (i) obtain, as soon as practicable all Consents (including the Regulatory Approvals) of, or other permission or action by any Governmental Authority (including, subject to Section 10.18, any applicable regulatory authority or bankruptcy court) as are necessary for consummation of the Transaction or the other transactions contemplated by this Agreement or by any of the Transaction Documents, (ii) secure the expiration or termination of any applicable waiting period from a Governmental Authority, and (iii) resolve any objections asserted with respect to the Transaction or the other transactions contemplated by this Agreement or the Transaction Documents raised by any Governmental Authority or other Person.

(e)     Buyer acknowledges that certain Consents and Regulatory Approvals to the Transactions may be required from Governmental Authorities and third parties to Contracts to which the Company or any of its Subsidiaries is a party, and that such Consents and Regulatory Approvals have not been obtained and may not be obtained prior to the Closing. Notwithstanding anything to the contrary herein, Buyer agrees that none of the Company Entities nor Sellers shall have any Liability whatsoever to Buyer or any of its Affiliates (and Buyer and its Affiliates shall not be entitled to assert any claims) arising out of or relating to the failure to obtain any Consents or Regulatory Approvals that may have been or may be required in connection with the Transactions or because of the default, acceleration or termination of or loss of right under any Contract or other agreement as a result thereof. Buyer further agrees that no representation, warranty or covenant of the Company Entities contained herein shall be breached or deemed breached as a result of the failure to obtain any Consent or Regulatory Approval or as a result of any such default, acceleration or termination or loss of right or any action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any Consent or Regulatory Approval or any such default, acceleration or termination or loss of right.

(f)     Notwithstanding anything in this Section 6.4 to the contrary, each Party's obligations under this Section 6.4 to share information with, cooperate or otherwise communicate with the other Party is subject to compliance with, and shall be limited by, Law.

49

Section 6.5    <u>Public Announcements</u>.    Unless otherwise required by or reasonably necessary to comply with Law (including (a) the Bankruptcy Code, bankruptcy rules, and applicable local rules of the Bankruptcy Court to the extent reasonably necessary to obtain entry of the Bidding Protections Order, or , if Buyer is selected as the Successful Bidder, the Sale Order and (b) in any filing made by Sellers or their Affiliates with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of Sellers or their Representatives to obtain court approval of the Transactions or in connection with conducting the Auction), orders of the Bankruptcy Court or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Mexican Liquidation Proceeding, Chapter 11 Case, or Chapter 15 Case and any filings or notices related thereto, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before either such party or their respective Affiliates or Representatives issue any other press release or otherwise makes any public statement with respect to this Agreement, the Transactions or the activities and operations of the other party with respect to this Agreement and the Transactions and shall not, and shall cause their respective Affiliates and Representatives not to, issue any such release or make any such statement without the prior written consent of Sellers or Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed), except that no such consent shall be necessary to the extent disclosure is made on the record at a hearing in connection with this Agreement, the Mexican Liquidation Proceeding, the Chapter 11 Case, or Chapter 15 Case; <u>provided</u>, that nothing in this Agreement shall restrict or prohibit Sellers, Buyer or their respective Affiliates from making any announcement to their respective employees, customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any party in accordance with this Agreement, including in investor conference calls, Q&As or other publicly disclosed statements or documents, in each case to the extent such disclosure is still accurate in all material respects (and not misleading).

Section 6.6    <u>Post-Closing Further Assurances</u>.    The Sellers and Buyer each agree that from time to time after the Closing Date, they shall execute and deliver or cause their respective Affiliates (including, with respect to Buyer, causing the Company Entities) to execute and deliver such further instruments, and take (or cause their respective Affiliates, including, with respect to Buyer, causing the Company Entities to take) such other action, as may be reasonably necessary to carry out the purposes and intents of this Agreement and the other Transaction Documents, in each instance as consistent with the Sale Order.

Section 6.7    <u>Directors' and Officers' Indemnity</u> .    For a period of 6 years following the Closing, the Governing Documents of the Company shall contain provisions providing indemnification rights (including any rights to advancement of expenses and exculpation) with respect to the pre-Closing period that are at least as favorable to the beneficiaries of such provisions (the "<u>Indemnified Persons</u>") as those provisions set forth as of the date of this Agreement in the Governing Documents of the Company as of the date of this Agreement (which for the avoidance of doubt, excludes indemnification coverage as a result of the gross negligence, fraud, willful or wanton misconduct or material breach of the Governing Documents by such Indemnified Person), which provisions shall not be amended, repealed or otherwise modified in any manner that would adversely affect the rights of such Persons thereunder, unless such modification is required by Law. The Parties agree that the obligations under this <u>Section 6.7</u> shall

be limited to those Indemnified Persons holding said positions within the 30 days immediately prior to the Closing, and only for their respective acts and omissions in the United States.

Section 6.8     <u>Tax Matters</u>.

(a)     The Parties agree, for U.S. federal income (and applicable state and local) Tax purposes, that (i) the Buyer be treated as a continuation of the Company under Section 708 of the Code and (ii) the transfer of Acquired Interests by Sellers to Buyer for consideration be treated as a sale or exchange of partnership interests between the Sellers and Buyer (clauses (i) through (ii), the "<u>Intended Tax Treatment</u>"). The Parties will, and will cause each of their respective Affiliates to, prepare and file all Tax Returns in a manner consistent with the Intended Tax Treatment, and none of the Parties or their respective Affiliates will take any position with any Governmental Authority or otherwise that is inconsistent with the Intended Tax Treatment, except as required by Law. Sellers and Buyer agree that, with respect to the transaction described in clause (ii) above, the Purchase Price and all other amounts constituting consideration for U.S. federal income Tax purposes shall be allocated among the assets of the Company for U.S. federal income Tax purposes in a manner consistent with Section 755 of the Code and the Treasury Regulations thereunder. Within 120 days of the Closing Date, Parent will provide Buyer with a schedule (the "<u>Allocation Schedule</u>") reflecting such allocation and shall reasonably consider the implementation of any comments provided by Buyer upon Parent's finalization of the Allocation Schedule. Upon Parent's finalization, the Parties will, and will cause each of their respective Affiliates to, prepare and file all Tax Returns (including any statements required under Treasury Regulation Section 1.751-1(a)(3) and any allocation required under Section 755 of the Code) in a manner consistent with the Allocation Schedule, and none of the Parties will take any position with any Governmental Authority or otherwise that is inconsistent with the Allocation Schedule, except as required by Law.

(b)     Parent shall prepare and file (or cause to be prepared and filed) all Tax Returns of the Company Entities for Flow-Through Income Taxes for any Pre-Closing Tax Period ("<u>Flow-Through Tax Returns</u>"). The distributive shares of items of income, gain, loss, deduction and credit of the Company for the taxable year that includes the Closing Date will be determined for U.S. federal and applicable state and local income Tax purposes based on the "closing of the books" method as described in Section 706(d)(1) of the Code and Treasury Regulations Section 1.706-4 (and corresponding provisions of state or local income Tax Law where applicable) as of the end of the Closing Date. To the extent a Flow-Through Tax Return also covers tax periods after the Closing Date, Parent shall deliver to Buyer a draft of such Flow-Through Tax Return for review at least 30 days prior to the due date for such Flow-Through Tax Return and shall consider in good faith any reasonable comments made by Buyers with respect to such Flow-Through Tax Return.  A Section 754 election shall be made (or otherwise be in effect) with respect to any Flow-Through Tax Return for a taxable period that includes the Closing Date.

(c)     Sellers shall have no liability or responsibility for, and shall in no way bear the burden of, any unpaid Taxes of any Company Entity for any Tax period. From and after the Closing Date, neither Buyer, nor any of its Affiliates (including any Company Entity), nor any Representatives thereof, shall (without the prior written consent of Parent) (i) file, or cause to be filed, any restatement or amendment of, modification to or claim for refund relating to, any Tax Return for any Pre-Closing Tax Period (including, for the avoidance of doubt, any Flow-Through

51

Tax Return), (ii) make, or cause or permit to be made, any Tax election that has retroactive effect to any Pre-Closing Tax Period; (iii) make the election under Section 6226 of the Code or any similar state or local income Tax Law with respect to any Pre-Closing Tax Period of any Company Entity; (iv) extend or waive, or cause to be extended or waived, any statute of limitations or other period for the assessment of any Tax or deficiency with respect to any Pre-Closing Tax Period; (v) adopt or change any Tax accounting method or practice with respect to, or that has retroactive effect to, a Pre-Closing Tax Period; (vi) make or initiate discussions or examinations with any Taxing Authority with respect to a Pre-Closing Tax Period; (vii) make any voluntary disclosures with respect to Taxes respect to a Pre-Closing Tax Period; or (viii) take or fail to take any action with respect to any Company Entity, in each case, to the extent any Seller could have a liability or bear any Taxes as a result of such actions or inactions.

(d)     Buyer and the Sellers shall, and shall cause their respective Affiliates to, provide to the other Party such cooperation and information, as and to the extent reasonably requested and reasonably necessary, in connection with (i) preparing, reviewing or filing any Tax Return, amended Tax Return or claim for refund of or with respect to the Company Entities, (ii) determining Liabilities for Taxes or a right to refund of Taxes of or with respect to the Company Entities or (iii) conducting any Tax Contest of or with respect to the Company Entities.

Section 6.9     <u>Use of Names and Marks</u>.  From and after the Closing:

(a)     To the extent the Seller Marks are used by the Company Entities on stationery, signage, invoices, receipts, forms, advertising and promotional materials, product, training and service literature and materials, computer programs, websites or other materials ("<u>Marked Materials</u>"), at the Closing, Buyer may use such Marked Materials for a period of up to nine months after the Closing Date.  To the extent Seller Marks have not been removed from the corporate name of any applicable Company Entities as of the Closing Date, Buyer will use commercially reasonable efforts to cause each such Company Entity to change its corporate name to remove any Seller Marks as soon as practicable after the Closing Date.

(b)     Buyer shall refrain from using any printed materials which include a statement setting forth the affiliation between a Company Entity, on the one hand, and Seller or any of its Affiliates, on the other hand ("<u>Affiliation Statement Materials</u>"), following the Closing Date; <u>provided</u>, that, so long as Buyer continues to use its commercially reasonable efforts to discontinue the use of the Affiliation Statement Materials, Buyer may continue to use the Affiliation Statement Materials existing at the Closing Date, subject to Law, for up to six months after the Closing Date.

(c)     For the avoidance of doubt, nothing in this Agreement shall be deemed to prohibit Buyer or its Affiliates from using the Seller Marks (i) as required by Law, (ii) for non-marketing, historical reference purposes in relation to the Company Entities, or (iii) in archival documents existing as of the Closing.

(d)     Within four months following the Closing Date, Buyer shall make the filings required, including in each Company Entity's jurisdiction of organization, to (i) eliminate the name "Credito Real", "Crusafin" and any variants thereof from the name of each Company

Entity; and (ii) reflect the change of name of such Company Entities in all applicable records of Governmental Authorities.

Section 6.10    Release.

(a)    From and after the Closing, each Seller, for and on behalf of such Seller and each of such Seller's respective Affiliates (other than the Company Entities) and each of such Seller's respective Representatives, predecessors, successors, assigns and heirs (collectively with respect to each such Seller, the "Seller Releasors"), for good and valuable consideration, hereby irrevocably, unconditionally and completely waive and release and forever discharge the Company Entities and each of their respective Representatives, predecessors, successors, assigns, (such released Persons, the "Company Releasees"), of and from all Affiliate Arrangements, debts, demands, actions, causes of action, suits, accounts, covenants, Contracts, agreements, claims and other Liabilities whatsoever of every name and nature, both in Law and in equity, whether known or unknown, suspected or unsuspected, anticipated or unanticipated, that any of the Seller Releasors has now or hereafter may have, arising out of or related to facts, events, circumstances or actions taken by any of the Company Releasees occurring or failing to occur, in each case, at or prior to the Closing (collectively with respect to each such Seller, the "Seller Released Claims"). Each Seller shall not, and shall cause its other Seller Releasors not to, make, assert or threaten any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any of the Company Releasees with respect to any Seller Released Claims.  Notwithstanding the foregoing, this Section 6.10 shall not constitute a release from, waiver of, or otherwise apply to the terms of this Agreement or any other Transaction Document.

(b)    From and after the Closing, Buyer, for and on behalf of itself and each of its Affiliates (including the Company Entities) and each of Buyer's respective Representatives, predecessors, successors, assigns and heirs (collectively, the "Buyer Releasors"), for good and valuable consideration, hereby irrevocably, unconditionally and completely waive and release and forever discharge the Sellers and each of their respective Representatives, predecessors, successors, assigns, (such released Persons, the "Seller Releasees"), of and from all Affiliate Arrangements, debts, demands, actions, causes of action, suits, accounts, covenants, Contracts, agreements, claims and other Liabilities whatsoever of every name and nature, both in Law and in equity, whether known or unknown, suspected or unsuspected, anticipated or unanticipated, that any of the Buyer Releasors has now or hereafter may have, arising out of or related to facts, events, circumstances or actions taken by any of the Seller Releasees occurring or failing to occur, in each case, at or prior to the Closing (collectively, the "Buyer Released Claims").  Buyer shall not, and shall cause its other Buyer Releasors not to, make, assert or threaten any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any of the Seller Releasees with respect to any Buyer Released Claims. Notwithstanding the foregoing, this Section 6.10 shall not constitute a release from, waiver of, or otherwise apply to the terms of this Agreement or any other Transaction Document.

Section 6.11    Termination of Affiliate Arrangements.  At or prior to the Closing, each Seller shall, and shall cause its Affiliates to, deliver such releases, termination agreements and discharges as are necessary to terminate and release all Affiliate Arrangements without further

payment or performance by any Company Entity such that no Company Entity shall have any further obligations or Liabilities therefor or thereunder.

Section 6.12     <u>Bankruptcy Court Matters</u>.

(a)    Buyer and Sellers acknowledge that this Agreement and the Transaction contemplated hereby are subject to the Bidding Procedures and approval by the Bankruptcy Court and, as applicable, entry of the Bidding Protections Order and Sale Order.  In the event of any discrepancy between this Agreement and the Bidding Procedures Order, Bidding Protections Order, and the Sale Order, the Bidding Procedures Order, Bidding Protections Order, and Sale Order shall govern, as applicable. The Buyer and Sellers further agree that:

(i)    the Bidding Protections Order shall approve: (1) Buyer as Stalking Horse Bidder (as defined in the Bidding Procedures), (2) Parent's entry and performance of certain obligations under this Agreement as Stalking Horse SPA (as defined in the Bidding Procedures), (3) Buyer's right to the Expense Reimbursement payable upon the terms set forth in <u>Section 6.12(h)</u>, (4) Buyer's right to the Break-Up Fee payable upon the terms set forth in <u>Section 6.12(h)</u>, and (5) Buyer's right to a dollar-for-dollar credit equal to the sum of the Break-Up Fee and Expense Reimbursement deemed to be included in any subsequent overbid submitted by the Buyer at the Auction.

(ii)    The Sale Order shall include, *inter alia*: (1) findings that Buyer has acted in good faith and is a "good faith" purchaser for purposes of section 363(m) of the Bankruptcy Code and entitled to all of the protections afforded thereby; (2) approval of the Transaction under sections 105, 363, 365 and 1519 (or 1520, as applicable) of the Bankruptcy Code, free and clear of all Liens (other than Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code on or against the Credito Real Interest after giving effect to the Reorganization; (3) a finding that Buyer is not a mere continuation of Parent and shall have no obligations with respect to any liabilities of or claims against Parent, except as may be expressly set forth in this Agreement; (4) a provision directing Parent to cause publication of a Notice of Entry of Sale Order promptly, but within two Business Days, after entry thereof in *The New York Times* and the Mexican *El Financiero* and (5) such other provisions as agreed upon between Parent and Buyer.

(b)    This Agreement and the Transaction are subject to Sellers' right and ability to consider higher and better competing bids with respect to the Acquired Interests pursuant to the Bidding Procedures, Bidding Procedures Order, and Bidding Protections Order.  If Sellers receive additional bids for the Acquired Interests, Sellers shall conduct an auction process for the Acquired Interests (the "<u>Auction</u>") in accordance with the Bidding Procedures and Bidding Protections Order and shall not amend, waive, modify or supplement the Bidding Procedures in any material respect except as provided in the Bidding Procedures, Bidding Procedures Order, the Bidding Protections Order, or any other order of the Bankruptcy Court.  Following completion of any Auction, if Buyer is the Successful Bidder, neither Sellers nor their agents shall initiate contact with, solicit, encourage submission of, or respond to any inquiries, proposals or offers by any Person (except for any Back-Up Bidder) in connection with the sale or disposition of the Acquired Interests.

54

(c)     Subject to the other terms of this Agreement and Sellers' obligations to comply with any order of the Bankruptcy Court, Sellers and Buyer shall cooperate to make all filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the Transaction. Sellers' Representative shall promptly provide Buyer with drafts of the Bidding Protections Motion, Bidding Protections Order and the Sale Order that Sellers' Representative proposes to file with the Bankruptcy Court and any revisions or amendments to such documents, and will provide Buyer with reasonable opportunity to review such filings. Sellers' Representative will also promptly provide Buyer with drafts of any other or further notice of appeal, motion, or application filed in connection with any appeal from or application for reconsideration of, any of such orders and any related briefs.

(d)     Sellers shall comply with the following timeline:

(i)     No later than January 19, 2023, Parent shall cause the Bidding Protections Motion to be filed;

(ii)     No later than 15 days after filing the Bidding Protections Motion, the Bankruptcy Court shall have entered the Bidding Protections Order;

(iii)     No later than March 3, 2023, the Bankruptcy Court shall have entered the Sale Order; and

(iv)     Within two Business Days of entry of the Sale Order, Parent shall have caused the publication of a Notice of Entry of Sale Order as set forth in subsection (a) above and in the Sale Order; and

(v)     Not sooner than 15 days after the entry of the Sale Order and no later than the Outside Date, the Closing shall have occurred.

(e)     From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, or staying of, or failure of the Bankruptcy Court to enter (as applicable) the Bidding Procedures Order, the Bidding Protections Order, or, if Buyer is the Successful Bidder at the Auction, the Sale Order or consummation of the Transaction. Buyer has not colluded in connection with its offer or negotiation of this Agreement. From and after the date hereof, Buyer shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order, the Bidding Protections Order, or if Buyer is the Successful Bidder at the Auction, the Sale Order or consummation of the Transaction.

(f)     Buyer agrees that it will promptly take such actions as are reasonably requested by the Parent or Sellers' Representative to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(g)     If an Auction is conducted, and Buyer is not the Successful Bidder for the Acquired Interests, Buyer shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Buyer is the next highest or otherwise best bidder for the Acquired Interests at the Auction (the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder, the "Back-Up Bidder") and, if Buyer is the Back-Up Bidder, Buyer shall, notwithstanding Section 9.1(b)(ii) or Section 9.1(g), be required to keep its bid to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) open and irrevocable until the earlier of (i) the date of consummation of a transaction with the Successful Bidder, (ii) 60 days after entry of the Sale Order or (iii) the date this Agreement is otherwise terminated pursuant to ARTICLE IX.  The Sale Order shall provide that, following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Buyer, if Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Parent may consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) with the Back-Up Bidder.

(h)     In consideration for Buyer having expended considerable time and expense in connection with this Agreement, the Transaction and the negotiation of this Agreement, upon the consummation of any Alternative Transaction following valid termination of this Agreement under either Section 9.1(b)(ii) (*Written Agreement for Alternative Transaction*), Section 9.1(f)(i) (*Alternative Transaction Consummated*), or Section 9.1(i) (*Fiduciary Out*), provided, that Buyer is not then in breach of any provision of this Agreement, Buyer shall be deemed to have earned the Break-Up Fee and Expense Reimbursement, which shall be paid in cash, by wire transfer of immediately available funds following consummation of such Alternative Transaction out of the proceeds of such Alternative Transaction to an account designated by Buyer to Sellers' Representative, without further order of the Bankruptcy Court.  Sellers hereby acknowledge that the obligation to pay the Break-Up Fee and Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.  The Parties acknowledge and agree that (1) the Parties have expressly negotiated the provisions of this Section 6.12(h), (2) the payment of the Break-Up Fee and Expense Reimbursement are integral parts of this Agreement, and (3) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement.

Section 6.13     Employee Matters.

(a)     Sellers shall, or shall cause one of their Affiliates to, make any matching contributions owed to any employee who is employed by a Company Entity immediately prior to the Closing ("Company Continuing Employee") under the Credito Real USA 401(k) Profit Sharing Plan (the "Seller 401(k) Plan"), and shall cause all Company Continuing Employees who participate in the Seller 401(k) Plan as of immediately prior to the Closing to become fully vested in any unvested portion of their Seller 401(k) Plan accounts as of the Closing Date.  Buyer shall, as of the Closing Date, make available a tax-qualified defined contribution retirement plan with a cash or deferred arrangement that is sponsored by the Buyer or one of its Affiliates (the "Buyer 401(k) Plan") that will cover Company Continuing Employees on and after the Closing Date. Buyer shall cause the Buyer 401(k) Plan to accept from each Seller 401(k) Plan the "direct rollover" of the account balance (including the in-kind rollover of notes evidencing outstanding

participant loans) of each Company Continuing Employee who participated in the Seller 401(k) Plan as of the Closing Date and who elects such direct rollover in accordance with the terms of the Seller 401(k) Plan and the Code. Sellers, Buyer and their respective Affiliates, as applicable, shall cooperate to take any and all commercially reasonable actions needed to permit each Company Continuing Employee with an outstanding loan balance under a Seller 401(k) Plan as of the Closing Date to continue to make scheduled loan payments to the Seller 401(k) Plan after the Closing Date, pending the distribution and in-kind rollover of the notes evidencing such loans from the Seller 401(k) Plan to the Buyer 401(k) Plan, as provided in the preceding sentence, so as to prevent, to the extent reasonably possible, a deemed distribution or loan offset with respect to such outstanding loans.

(b)     With respect to any employee benefit plan maintained by Buyer or its Affiliates, including the Buyer 401(k) Plan and the Benefit Plans (together, the "Buyer Plans"), in which any Company Continuing Employees may participate immediately after the Closing, Buyer shall, or shall cause the Company Entities to, recognize all service of the Company Continuing Employees with the Company Entities and any of their predecessors, as the case may be as if such service were with the Company Entities or such predecessors, for vesting and eligibility purposes in any Buyer Plan in which such Company Continuing Employees may be eligible to participate after the Closing Date and benefits determination for vacation and severance benefits; provided, that such service shall not (i) be recognized to the extent that such recognition would result in a duplication of benefits, (ii) apply for purposes of any retiree medical plans or for purposes of benefit accrual under any defined benefit pension plan or for purposes of retirement treatment under any long-term incentive plan, or (iii) apply for purposes of any plan, program or arrangement (A) under which similarly situated employees of Buyer and its Affiliates do not receive credit for prior service or (B) that is grandfathered or frozen either with respect to level of benefits or participation.

(c)     The provisions of this Section 6.13 are solely for the benefit of the Parties, and no current or former employee or any other individual associated with any of the Company Entities shall be regarded for any purpose as a third-party beneficiary of this Section 6.13. In no event shall the terms of this Agreement be deemed to (i) establish, amend or modify any Benefit Plan or any "employee benefit plan" as defined in Section 3(3) of ERISA, or any other benefit plan, program, agreement or arrangement maintained or sponsored by any Party or its respective Affiliates; (ii) alter or limit the ability of Buyer or its Affiliates to amend, modify or terminate any plan, employment agreement or any other benefit or employment plan, program, agreement or arrangement; or (iii) confer upon any current or former employee, officer, director or consultant any right to employment or continued employment or continued service with any Person, or constitute or create an employment agreement with any employee.

Section 6.14     Advise of Changes. Prior to the Closing, each Party shall promptly advise the other Parties of any change, development, circumstance, fact, effect, condition or event (i) that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on it, or (ii) that is, or would or would reasonably be expected to cause or constitute, a breach, nonfulfillment or failure to perform of any of such Party's representations, warranties, obligations, covenants or agreements contained in this Agreement or any Transaction Document entered into prior to the Closing; provided, that any failure to give such prompt notice in accordance with the foregoing with respect to any breach shall not be deemed to constitute a

violation of this <u>Section 6.14</u> or the failure of any condition set forth in <u>Section 7.2</u> or <u>Section 7.3</u> to be satisfied, or otherwise constitute a breach of this Agreement by the Party failing to give such prompt notice, in each case, so long as (A) the failure to give such prompt notice was not knowing, intentional or willful and (B) the underlying breach would not independently result in a failure of the conditions set forth in <u>Section 7.2</u> or <u>Section 7.3</u> to be satisfied; and <u>provided</u>, <u>further</u>, that the delivery of any notice pursuant to this <u>Section 6.14</u> shall not cure any breach of, or noncompliance with, any other provision of this Agreement or any Transaction Document or limit the remedies available to the Party receiving such notice.

Section 6.15    <u>RWI Insurance Policy</u>.  The Parties acknowledge that, at Closing, Buyer may, at its sole election, obtain a buyer-side representations and warranties insurance policy with respect to the representations and warranties set forth in <u>Article III</u> and <u>Article IV</u> and certain other terms of this Agreement (the "<u>R&W Policy</u>"), with Buyer paying 100% of the costs of obtaining such Policy.  Buyer and Buyer Parent acknowledge and agree that the R&W Policy, if obtained, shall at all times provide that the insurer shall have no, and shall waive and not pursue any and all, subrogation rights against the Sellers or any of their Representatives (except in the case of Fraud with respect to the representations and warranties set forth in <u>Article III</u> and <u>Article IV</u>), and the Sellers shall be a third-party beneficiary of such waiver.

Section 6.16    <u>Existing Credit Facility Amendment</u>.

(a)    At or prior to Closing, Buyer shall:

(i)    Obtain (1) an amendment, restatement, amendment and restatement or other modification of the Existing Credit Facility, on such terms and conditions as may be specified by Buyer such that the Existing Credit Facility is revised to provide terms and conditions which give due regard to (a) the organizational structure of Buyer and its Affiliates (including the Company Entities after the Closing) after giving effect to the transactions contemplated by this Agreement and (b) the operational needs of the Company Entities after giving effect to transactions contemplated by this Agreement (the "<u>Loan Amendment</u>"), (2) Wells Fargo Consent, and (3) termination and release of the Guaranty; <u>provided</u>, that in no event shall any such actions result in any monetary obligation or other Liability being imposed upon the Company prior to Closing, or the Sellers prior to, at, or after Closing, cause any adverse effect with respect to Company prior to Closing, or the Sellers prior to, at, or after Closing, or cause any decrease to the Purchase Price; or

(ii)    Make all payments and satisfy any other obligations required by the Payoff Letter, including any prepayment, termination or breakage fees or penalties paid or payable related to the Existing Credit Facility.

(b)    Upon Buyer's written request to the Company no later than 10 Business Days prior to Closing, the Company shall use reasonable best efforts to provide the Payoff Letter to Buyer no later than three Business Days prior to Closing at the sole cost and expense of the Buyer (including with respect to any amounts payable under the Existing Credit Facility or thereunder).

(c)     Buyer shall use reasonable best efforts to obtain the Loan Amendment including using reasonable best efforts to do the following: (i) provide reasonably available customary financial, business and other information regarding the Buyer and its Affiliates as may be reasonably requested by Parent or the lenders under the Existing Credit Facility and (ii) cause members of senior management of the Buyer to participate in a reasonable number of lender meetings, presentations, diligence sessions or conference calls and to meet with representatives of Wells Fargo Bank, N.A.

(d)     Notwithstanding anything to the contrary, the obligation of Buyer to consummate the Transactions is not conditioned upon or subject to the obtainment of the Wells Fargo Consent or any matter arising therefrom.

Section 6.17     Reorganization.  CRUSA Inc. shall, prior to the Closing, dividend the Credito Real Interest to Parent, such that following such dividend, the Company will become a direct subsidiary of Parent.

Section 6.18     Preservation of Records.

(a)     For a period of seven years after the Closing Date or such other longer period as required by Law, Buyer shall preserve and retain all corporate, accounting, legal, auditing, human resources and other books and records of the Company and its Subsidiaries (including (i) any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations and (ii) all Tax Returns, schedules, work papers and other material records or other documents relating to Taxes of the Company Entities), in each case, to the extent in the possession of Buyer and relating to the conduct of the business and operations of the Company and its Subsidiaries prior to the Closing Date (the "Books and Records"). If at any time after such seven-year period Buyer intends to dispose of any such Books and Records, Buyer shall not do so without first offering such Books and Records to Sellers and, in the event that Sellers elect to receive any such Books and Records, Buyer shall provide copies of such Books and Records, at Sellers' sole cost and expense. The provisions of this Section 6.18 shall cease to apply in the event of a sale or disposition of the Company or its Subsidiaries by Buyer; provided, that Buyer shall cause the subsequent owner(s) of such entity to assume the obligations of Buyer set forth in this Section 6.18.

(b)     To the extent reasonably required in connection with any insurance claims by, Actions against, governmental investigations or Tax audits of, compliance with legal requirements by, or the preparation of financial statements of Sellers or any of their Affiliates or otherwise in connection with any other matter relating to or resulting from this Agreement, Buyer shall, and shall cause the Company and its Subsidiaries to, cooperate with Sellers and their counsel in the defense or contest, make available their personnel, and provide such reasonable access to the Books and Records as shall be necessary or reasonably requested in connection therewith, all at the sole cost and expense of Sellers; provided, that such requested cooperation shall not (A) unreasonably interfere with the ongoing operations of the Company or its Subsidiaries or (B) extend to any information that is subject to attorney-client, work product or other privilege or the sharing of which would violate Law or confidentiality restrictions (it being agreed that, in the event that any of the restrictions of this clause (B) apply, Buyer shall provide each Seller and its counsel with a reasonably detailed description of the information not provided and Buyer shall cooperate

59

in good faith to design and implement alternative disclosure arrangements to enable such Person to evaluate any such information without resulting in any waiver of such privilege or violation of any confidentiality restriction).

Section 6.19    Conflicts; Privileges. It is acknowledged by each of the parties hereto that Sellers, the Company and certain of its Affiliates have retained White & Case LLP ("W&C") and Richards, Layton and Finger P.A. ("RLF") to act as their counsel in connection with the transactions contemplated hereby and that W&C and RLF has not acted as counsel for any other Person in connection with the transactions contemplated hereby and that no other party to this Agreement or Person has the status of a client of W&C or RLF for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its Affiliates (including, after the Closing, the Company and its Subsidiaries) and Sellers, or any of their Affiliates (including, prior to the Closing, the Company or any of its Subsidiaries), W&C and RLF may represent Sellers or any such Affiliate in such dispute even though the interests of Sellers or such Affiliate may be directly adverse to Buyer or any of its Affiliates (including, after the Closing, the Company or its Subsidiaries), and even though W&C and RLF may have represented the Company or its Subsidiaries in a matter substantially related to such dispute, or may be handling ongoing matters for Buyer, the Company or its Subsidiaries, Buyer and the Company hereby waive, on behalf of themselves and each of their Affiliates, (a) any claim they have or may have that W&C or RLF has a conflict of interest in connection with or is otherwise prohibited from engaging in such representation, (b) agree that, in the event that a dispute arises after the Closing between Buyer or any of its Affiliates (including, after the Closing, the Company or its Subsidiaries) and Sellers, W&C and RLF may represent any such party in such dispute even though the interest of any such party may be directly adverse to Buyer or any of its Affiliates (including after the Closing, the Company or its Subsidiaries), and even though W&C and RLF may have represented the Company or its Subsidiaries in a matter substantially related to such dispute, or may be handling ongoing matters for Buyer the Company or its Subsidiaries. Buyer further agrees that, (i) as to all communications between W&C and RLF, on the one hand, and Sellers, on the other hand, that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Sellers and may be controlled by Sellers and shall not pass to or be claimed by Buyer, the Company or its Subsidiaries, and (ii) as to all communications between W&C and RLF, on the one hand, and the Company or its Subsidiaries, on the other hand, or among W&C, RLF, the Company, the Company's Subsidiaries or Sellers, that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to evidentiary privilege belong to Sellers and may be controlled by Sellers and shall not pass to or be claimed by Buyer, the Company or its Subsidiaries. Buyer agrees to take, and to cause its Affiliates to take, all steps necessary to implement the intent of this Section 6.19. The parties hereto further agree that W&C and RLF and their respective partners and employees are third party beneficiaries of this Section 6.19.

60

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions Precedent to Obligations of the Parties</u>.  The respective obligations of each Party to consummate the Transaction and other transactions contemplated by this Agreement are subject to the satisfaction (or, where legally permissible, waiver by such Party in such Party's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    <u>No Adverse Order</u>.  There shall be no Law or Governmental Order that is in effect that prohibits, makes illegal, restrains or otherwise prevents the consummation of the Transaction or the other transactions contemplated by this Agreement.

(b)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, and prior to the Closing, such Sale Order shall have become a Final Order, without any Governmental Order staying, reversing, modifying or amending such Sale Order in effect on the Closing Date.

(c)    <u>Reorganization</u>.  The Reorganization shall have been duly completed.

Section 7.2    <u>Conditions Precedent to Obligations of the Sellers and the Company</u>.  The obligation of the Sellers and the Company to consummate the Transaction is subject to the satisfaction (or waiver by the Sellers, in the Sellers' sole discretion) at or prior to the Closing Date, of each of the following additional conditions:

(a)    <u>Accuracy of Buyer's Representations and Warranties</u>.

(i)    The representations and warranties of Buyer contained in this Agreement other than the Buyer Fundamental Representations, disregarding all qualifications contained herein relating to materiality or Material Adverse Effect, are true and correct as of the date hereof and shall be true and correct on and as of the Closing Date (except for such representations and warranties which by their express provisions are made as of an earlier date, in which case, as of such earlier date) with the same force and effect as though such representations and warranties had been made on the Closing Date, except to the extent that the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect with respect to Buyer.

(ii)    The Buyer Fundamental Representations contained in this Agreement are true and correct in all respects as of the date hereof and shall be true and correct in all respects (other than de minimis inaccuracies) on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on the Closing Date (except for such representations and warranties which by their express provisions are made as of an earlier date, in which case, as of such earlier date).

(b)    <u>Covenants and Agreements of Buyer</u>.  Buyer shall have performed and complied in all material respects with all of the obligations, covenants and agreements hereunder required to be performed and complied with by it at or prior to the Closing.

(c)    <u>Certificate of Buyer</u>.  Sellers shall have received a certificate signed by a duly authorized officer of Buyer confirming the matters set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> as of the Closing.

(d)    <u>Guaranty</u>. The Guaranty shall have been terminated in its entirety with no liability imposed upon Parent or any of its Affiliates as a result of such termination.

(e)    <u>Existing Credit Facility</u>. Either (i) the Wells Fargo Consent shall have been obtained, or (ii) Buyer shall have made or caused to be made all payments and satisfied any other obligations required by the Payoff Letter, including any prepayment, termination or breakage fees or penalties paid or payable related to the Existing Credit Facility.

Section 7.3    <u>Conditions Precedent to Obligations of Buyer</u>.  The obligation of Buyer to consummate the Transaction is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following additional conditions:

(a)    <u>Accuracy of Sellers' and the Company's Representations and Warranties</u>.

(i)    The representations and warranties of the Sellers and Company contained in this Agreement other than the Sellers Fundamental Representations, disregarding all qualifications contained herein relating to materiality or Material Adverse Effect (other than with respect to <u>Section 3.8(d)</u>), are true and correct as of the date hereof and shall be true and correct, on and as of the Closing Date (except for such representations and warranties which by their express provisions are made as of an earlier date, in which case, as of such earlier date) with the same force and effect as though such representations and warranties had been made on the Closing Date, except to the extent that the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect with respect to Sellers or the Company Entities; <u>provided</u>, that the representations and warranties set forth in <u>Section 3.8(d)</u> shall be true and correct in all respects.

(ii)    The Sellers Fundamental Representations are true and correct in all respects as of the date hereof and shall be true and correct in all respects (other than de minimis inaccuracies) on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on the Closing Date (except for such representations and warranties which by their express provisions are made as of an earlier date, in which case, as of such earlier date).

(b)    <u>Covenants and Agreements of the Sellers and the Company</u>. The Sellers and the Company shall have performed and complied in all material respects with all of the obligations, covenants and agreements hereunder required to be performed and complied with by the Sellers or the Company (or any of them) at or prior to the Closing.

(c)    <u>Publication of Notice of Entry of Sale Order</u>. The Sellers shall have caused a Notice of Entry of Sale Order to be published as required under <u>Section 6.12(a)(ii)</u> hereof and the Sale Order within two Business Days of the entry of the Sale Order by the Bankruptcy Court.

(d)     <u>Required Regulatory Approvals</u>.  Sellers shall have obtained the Required Regulatory Approvals.

(e)     <u>Certificate of the Sellers</u>.  Buyer shall have received a certificate signed by a duly authorized legal representative of Sellers' Representative confirming the matters set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> as of the Closing.

Section 7.4     <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in this <u>Article VII</u> to be satisfied if such failure was caused by such Party's breach of or failure to comply with such applicable provision(s) of this Agreement.

ARTICLE VIII

<u>INDEMNIFICATION AND REMEDIES</u>

Section 8.1     <u>Survival</u>.  None of the representations or warranties contained in this Agreement or the other Transaction Documents or any schedule, instrument or other document delivered pursuant to this Agreement or the other Transaction Documents, certificates delivered pursuant to this Agreement or the other Transaction Documents, or covenants or agreements contained in this Agreement or the other Transaction Documents (other than the covenants and agreements which by their terms contemplate performance after the Closing (each, a "<u>Post-Closing Covenant</u>") shall survive, and each shall terminate and be of no further force or effect as of, the Closing Date or the termination of this Agreement, and none of the Seller Group Parties shall have any liability whatsoever with respect to any such representations, warranties, covenants, agreements or certificates and no claim for breach of any such representation, warranty, covenant, agreement or certificate or any claim for detrimental reliance or other right or remedy (whether in contract, in tort or at Law or in equity) may be brought after the Closing with respect thereto against any of the Seller Group Parties. None of the covenants or other agreements contained in this Agreement or the other Transaction Documents shall survive the Closing, other than the Post-Closing Covenants, and each such Post-Closing Covenant shall survive the Closing in accordance with their respective terms and if no timeframe is specified, such Post-Closing Covenant shall survive for one (1) year following the Closing Date.

Section 8.2     <u>No Consequential Damages</u>.  Notwithstanding anything to the contrary elsewhere in this Agreement, no Party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

Section 8.3     <u>R&W Policy; Exclusive Remedy</u>.  Other than in respect of Fraud, the Parties agree that the sole and exclusive remedy for Buyer and Buyer Parent following the Closing for any claim arising out of (a) a breach of any representation or warranty set forth in this Agreement or the other Transaction Documents or any schedule, instrument or other document delivered pursuant to this Agreement or the other Transaction Documents or (b) any covenants, agreement or certificate delivered pursuant to this Agreement or the other Transaction Documents, shall be limited to a claim for indemnification pursuant to the terms, and subject to the limitations, of the R&W Policy (whether or not a R&W Policy is obtained at or prior to Closing).  The Parties

63

shall not be entitled to a rescission of this Agreement, to any indemnification rights or other claims of any nature whatsoever in respect thereof (whether by contract, common law, statute, Law, regulation or otherwise).

ARTICLE IX

TERMINATION

Section 9.1    Termination Events.  Without prejudice to other remedies which may be available to the Parties by Law or this Agreement, this Agreement may be terminated, and the Transaction may be abandoned at any time prior to the Closing solely in the following cases:

(a)    by mutual written consent of the Parties;

(b)    by either Sellers' Representative or Buyer:

(i)    if there shall be any Law that makes consummation of the Transaction illegal or otherwise prohibited, or if any Governmental Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transaction is entered and such Governmental Order shall become final; provided, however, that no termination may be made by a Party under this Section 9.1(b)(i) if the issuance of such Governmental Order was caused by the material breach of any representations, warranties, covenants or agreements contained in this Agreement by such Party; or

(ii)    upon Sellers' written agreement to enter into an Alternative Transaction.

(c)    by Buyer, by giving written notice to Sellers' Representative if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that would prevent the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.3(a) and Section 7.3(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured prior to the earlier to occur of (A) 20 days after receipt of Buyer's notice of such breach, and (B) the Outside Date; provided, that Buyer shall not have a right of termination pursuant to this Section 9.1(c) if Sellers' Representative could, at such time, terminate this Agreement pursuant to Section 9.1(h);

(d)    by Buyer, if the Sale Order shall not have been entered by March 3, 2023, or at any time after entry of the Sale Order, such Governmental Order is reversed, stayed for more than 14 days, vacated or modified to the extent such modifications are reasonably expected to have a Material Adverse Effect;

(e)    by Buyer, upon occurrence of any Material Adverse Effect;

(f)    by Buyer, if (i) Sellers consummate an Alternative Transaction, or (ii) Buyer is neither the Successful Bidder nor the Back-Up Bidder following the Auction;

(g)    by Buyer or Sellers' Representative, if the Closing shall not have occurred on or before the Outside Date, provided, however, that no termination may be made by a Party

64

under this Section 9.1(g) if the failure to close on or before the Outside Date was caused by the material breach of any representations, warranties, covenants or agreements contained in this Agreement by such Party;

(h)     by Sellers' Representative, by giving written notice to Buyer if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that would prevent the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by Sellers' Representative, or, if such breach is curable, cured by such Buyer prior to the earlier to occur of (A) 20 days after receipt of Sellers' Representative's notice of such breach, and (B) the Outside Date; provided, that Sellers' Representative shall not have a right of termination pursuant to this Section 9.1(h) if Buyer could, at such time, terminate this Agreement pursuant to Section 9.1(c); or

(i)     by Parent, if the court-appointed provisional liquidator or other governing body of Parent determines, upon advice from outside legal counsel, that not proceeding with the Transaction or terminating this Agreement is in the best interests of Parent's estates and creditors, and is necessary for such governing body to fulfill its fiduciary obligations under Law (the "Fiduciary Duty"), including to pursue an Alternative Transaction.  For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Section 9.1), Parent retains the right to pursue any transaction or restructuring strategy that, in Parent's business judgment, will maximize the value of its estate.

Each condition set forth in this Section 9.1 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this Section 9.1 is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

Section 9.2     Effect of Termination.  In the event of any termination of this Agreement pursuant to Section 9.1, the Party(ies) so terminating this Agreement shall provide written notice to the other Party(ies) specifying the provisions hereof pursuant to which such termination is made, and, except as otherwise set forth in this Section 9.2, this Agreement shall forthwith become null and void and of no effect and all rights and obligations of the Parties hereunder shall terminate without any Liability on the part of any Party in respect thereof, except that (a) provisions of, and the obligations of the Parties under Section 2.3 (*Deposit*), Section 6.3 (*Access to Information; Confidentiality*), Section 6.5 (*Public Announcements*), Section 6.12(h) (*Break-Up Fee and Expense Reimbursement*), this Section 9.2 and Article X, and to the extent applicable in respect of such Sections and Article, ARTICLE I (*Definitions*), of this Agreement shall remain in full force and effect in accordance with their terms, and (b) such termination shall not relieve any Party of any Liability for any Fraud or breach of this Agreement prior to such termination; provided that, notwithstanding anything to the contrary herein, (i) the sole and exclusive remedies of Buyer and Buyer Parent for any breach of this Agreement by Sellers shall be, if applicable, to terminate this Agreement pursuant to Section 9.1(c), and (ii) in no event shall Sellers or the Company Entities be liable for monetary damages in connection with this Agreement and the Transactions except for payment of the Break-Up Fee and Expense Reimbursement to the extent payable.  In the event of any termination of this Agreement pursuant to Section 9.1, the

Company shall cause all filings, applications and other submissions made pursuant to this Agreement to be withdrawn from the Governmental Authorities to which they were made.

ARTICLE X

MISCELLANEOUS

Section 10.1    Parties in Interest.  Nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than (a) the Parties and their respective permitted successors and assigns, (b) the Indemnified Persons with respect to Section 6.7, and (c) the Sellers' Counsel with respect to Section 10.13, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

Section 10.2    Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.  No Party may assign (by contract, stock sale, merger, other business combination, any other transaction involving a Party or any Affiliate thereof that would have the same or substantially similar economic or substantive effect to any of the foregoing (including by way of any derivative arrangement), operation of Law or otherwise) either this Agreement or any of its rights, interests, or obligations hereunder without the express prior written consent of the other Parties, and any attempted assignment, without such consent, shall be null and void.  Notwithstanding the foregoing, from and after the Closing, the Buyer may assign this Agreement or any of its rights, interests, or obligations hereunder to an Affiliate; provided that (x) no such assignment shall relieve Buyer of any liability hereunder and (y) Buyer may not assign this Agreement or any of its rights, interests or obligations hereunder after the date which is two Business Days after entry of the Sale Order. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' bankruptcy estates appointed in connection with the Mexican Liquidation Proceeding.

Section 10.3    Notices.  All notices and other communications required or permitted to be given by any provision of this Agreement shall be in writing and mailed (certified or registered mail, postage prepaid, return receipt requested) or sent by hand or overnight courier, or by electronic mail, charges prepaid and addressed to the intended recipient as follows, or to such other addresses or numbers as may be specified by a Party from time to time by like notice to the other Parties:

(a)    If to Parent or CRUSA Inc.:

Credito Real USA, Inc.
Av. Insurgentes Sur 730, Piso 20
Col. del Valle, Alcaldía Benito Juárez

03103, Ciudad de México, México
Email: fguelfi@creditoreal.com.mx
Attention: Felipe Guelfi Regules

(b)    If to Seagrave:

66

1475 W Cypress Creek Road, Suite 300
Fort Lauderdale, Florida 33309
Email: scot@crealusa.com
Attention: Scot Seagrave

(c)     If to the Company prior to the Closing, to the Sellers.

Av. Insurgentes Sur 730, Piso 20
Col. del Valle, Alcaldía Benito Juárez
03103, Ciudad de México, México
Email: fguelfi@creditoreal.com.mx
Attention: Felipe Guelfi Regules

(d)     If to Sellers' Representative:

Av. Insurgentes Sur 730, Piso 20
Col. del Valle, Alcaldía Benito Juárez
03103, Ciudad de México, México
Email: fguelfi@creditoreal.com.mx
Attention: Felipe Guelfi Regules

(e)     In each case of (a), (b), (c) and (d), with a copy to:

White & Case LLP
609 Main St., 29th Floor
Houston, TX 77002
Attention:     Bill Parish
Email:         bill.parish@whitecase.com

(f)     If to the Buyer or Buyer Parent or, after the Closing, the Company:

Bepensa Capital Inc.
7227 N.W. 74 Avenue
Miami, Florida 33166
Attention: Jose Juan Vazquez Basaldúa
Email: jvasquezb@benepsa.com

(g)     In the case of (f), with a copy to:

Lic. Pablo E. Romero Gonzalez
Director Jurídico
Bepensa
Calle 60 Diagonal No. 496
Entre 59 y 61
Fracc. Parque Industrial
Mérida Yucatán 97300
Mexico

67

Tel.  011 52 (999) 176 9100
Email: promerog@bepensa.com

and

Stephen P. Walroth-Sadurní, Esq.
Walroth-Sadurní Law
Columbus Center
1 Alhambra Plaza
Penthouse
Coral Gables, Florida 33134
Tel.            305.330.6401
Email:        walroth.s@walsadlaw.com


and

Tracy L. Klestadt, Esq.
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street
17th Floor
New York, NY 10036-7203
Tel.    212.972.3000
Email: TKlestadt@Klestadt.com

All notices and other communications given in accordance with the provisions of this Agreement shall be deemed to have been given and received (i) when delivered by hand or transmitted by email (underlined provided) that the sender does not receive an automatic message of non-delivery), (ii) three Business Days after the same are sent by certified or registered mail, postage prepaid, return receipt requested or (iii) one Business Day after the same are sent by a reliable overnight courier service, with confirmation of delivery from the service.

Section 10.4    Amendments and Waivers.  This Agreement may not be amended, supplemented, superseded, canceled, extended or otherwise modified except in a written instrument executed by each of the Parties.  No waiver by any of the Parties of any default, misrepresentation, or breach of any representation, warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No waiver by any of the Parties of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party sought to be charged with such waiver.  No waiver by any party shall operate or be construed as a waiver in respect of any inaccuracy, failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after the waiver.  The failure or delay of any party to assert any of its rights, remedies, powers or privileges hereunder will not constitute a waiver of such rights, nor shall any waiver on the party of any party of any such rights, remedy, power or privilege, nor any single or partial exercise of any such rights,

68

remedy, power or privilege, preclude, any further exercise thereof or the exercise of any other rights, remedy, power or privilege.

Section 10.5    Exhibits and Schedules.   All Exhibits and Schedules and the Disclosure Schedules attached hereto are hereby incorporated herein by reference and made a part hereof as further provided herein.

Section 10.6    Headings.  The table of contents and section headings contained in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement or affect in any way the meaning or interpretation of this Agreement.

Section 10.7    Construction.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.8    Entire Agreement.  This Agreement (including the Schedules and the Exhibits hereto), the Sale Order, and the other Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede any prior understandings, negotiations, agreements or representations among the Parties of any nature, whether written or oral, to the extent they relate in any way to the subject matter hereof or thereof.

Section 10.9    Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared by any court of competent jurisdiction to be invalid, illegal, void or unenforceable in any respect, all other provisions of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, illegal, void or unenforceable, shall nevertheless remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.  Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by Law in an acceptable manner to the end that the Transaction is fulfilled to the greatest extent possible. Notwithstanding anything contained herein, under no circumstance shall the obligation of the Sellers to deliver the Acquired Interests be enforceable absent enforceability of the obligation of Buyer to pay the Purchase Price, and vice versa.

Section 10.10    Expenses.

(a)    Buyer shall be obligated to pay any and all filing fees to the applicable Governmental Authority(ies) with respect to any filings required by Law in connection with this Agreement and the Transaction.

(b)    Unless otherwise provided in this Agreement or any Transaction Document, each Party agrees to pay, without right of reimbursement from the other, all costs and expenses incurred by it incident to the negotiation, execution or performance of its obligations hereunder, including the fees and disbursements of counsel, accountants, financial advisors, experts and

consultants employed by the respective Parties in connection with the Transaction, whether or not the Transaction is consummated.

Section 10.11    No Recourse Against Non-Recourse Persons.  All proceedings, claims, disputes, obligations, Liabilities, or causes of action (whether in contract or in tort, in equity or at Law, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), shall be made only against (and are those solely of) the Persons that are expressly identified as Parties in the preamble to this Agreement (the "Contracting Parties").  No Person who is not a Contracting Party, including any past, present or future Representative, incorporator, equity holder or Affiliate of such Contracting Party or any past, present or future Representative, incorporator, equity holder or Affiliate of any of the foregoing (the "Non-Recourse Persons"), shall have any Liability (whether in contract or in tort, in equity or at Law, or granted by statute) for any claims, causes of action, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or in its negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action and obligations against any such Non-Recourse Persons.  Each Contracting Party disclaims any reliance upon any Non-Recourse Persons, in each case with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement. Notwithstanding anything to the contrary in this Section 10.11, nothing in this Section 10.11 shall preclude or limit a claim by any Person for Fraud.

Section 10.12    Specific Performance. Subject to the limitations set forth in Section 9.2, (a) each Party recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement shall cause the other Party or Parties to sustain irreparable harm for which it would not have an adequate remedy at Law, and therefore in the event of any such breach the aggrieved Party shall, without the posting of bond or other security (any requirement for which the Parties hereby waive), be entitled to seek the remedy of specific performance of such covenants and agreements, including injunctive and other equitable relief, in addition to any other remedy to which it might be entitled, (b) a Party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement, and (c) in the event that any action is brought in equity to enforce the provisions of this Agreement, no Party shall allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law.  The Parties further agree that (i) by seeking the remedies provided for in this Section 10.12, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement, including monetary damages or in the event that the remedies provided for in this Section 10.12 are not available or otherwise are not granted, and (ii) nothing contained in this Section 10.12 shall require any Party to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 10.12 before exercising any termination right under Section 9.1 (and pursuing damages after such termination) nor shall the commencement of any Action pursuant to this Section 10.12 or anything contained in this Section 10.12 restrict or limit any Party's right to terminate this Agreement in accordance

70

with the terms of <u>Section 9.1</u> or pursue any other remedies under or in connection with this Agreement that may be available then or thereafter.

Section 10.13    <u>Governing Law; Exclusive Jurisdiction</u>.

(a)    EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, UNITED STATES OF AMERICA.

(b)    Subject to <u>Section 10.13(c)</u>, without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transaction, and (ii) any and all claims or proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in <u>Section 10.3</u>.  For the avoidance of doubt, this <u>Section 10.13</u> shall not apply to any claims that Buyer or its Affiliates may have against any third party following the Closing.

(c)    Notwithstanding anything herein to the contrary, in the event the Chapter 15 Case or the Mexican Liquidation Proceeding are closed or dismissed, the Parties hereby agree that all claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transaction, shall be heard and determined exclusively in any federal court sitting in Delaware or, if that court does not have subject matter jurisdiction, in any state court located in Wilmington County, Delaware (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

Section 10.14    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.15    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Signed counterparts of this Agreement may be delivered by scanned image, DocuSign or other electronic means including files in .pdf or .jpeg.

Section 10.16    <u>Currency Matters</u>.   All payments hereunder shall be made in Dollars.

Section 10.17    <u>Disclosure Schedules</u>.   There may be included in the Seller Disclosure Schedule and Buyer Disclosure Schedule, as applicable, items and information, the disclosure of which is not required either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in <u>Article III</u> or <u>Article IV</u>, with respect to the Seller Disclosure Schedule, or <u>Article V</u>,

71

with respect to the Buyer Disclosure Schedule. Inclusion of any such items or information shall not, in any case, be deemed to be an acknowledgment or agreement that any such item or information (or any non-disclosed item or information of comparable or greater significance) is "material" or is reasonably likely to result in a Material Adverse Effect or to affect the interpretation of such term for purposes of this Agreement. The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the items or information in such Disclosure Schedules relates; provided, that any information set forth in one section or subsection pertaining to the representations and warranties of the Seller Disclosure Schedule or the Buyer Disclosure Schedule, as the case may be, shall be deemed to apply to each other section or subsection thereof pertaining to representations and warranties to the extent that it is reasonably apparent based on a plain reading of such disclosure that it is applicable to such other sections or subsections of the Seller Disclosure Schedule or the Buyer Disclosure Schedule, as the case may be. Nothing in the Seller Disclosure Schedule or Buyer Disclosure Schedule, as the case may be, shall constitute an admission of any liability or obligation of any Party to any third party, nor an admission to any third party against the interests of any or all of the Parties.

Section 10.18    Fiduciary Obligations.    Nothing in this Agreement, or any document related to the Transaction contemplated hereby, without limiting in any way Buyer's rights and remedies set forth in this Agreement, will require the CR Sellers or any of their governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

Section 10.19    Several Liability.    The Liability of any Seller hereunder (if any) is several and not joint. Notwithstanding any other provision of this Agreement, in no event will any Seller be liable for any other Seller's breach of such other Seller's obligations under this Agreement or the other Transaction Documents.

Section 10.20    Sellers' Representative

(a)    Sellers hereby irrevocably authorize, direct and appoint Sellers' Representative to act, and Sellers' Representative hereby accepts such appointment to act, as sole and exclusive agent, attorney-in-fact and representative of Sellers, and authorize and direct Sellers' Representative to (i) take any and all actions (including executing and delivering any documents, giving and receiving notices, incurring any costs and expenses on behalf of Sellers and making any and all determinations) which may be required or permitted by this Agreement to be taken by any of them, (ii) exercise such other rights, power and authority, as are authorized, delegated and granted to Sellers' Representative pursuant to this Agreement, (iii) receive and disburse to Sellers any funds received on behalf of Sellers contemplated by this Agreement and (iv) exercise such rights, power and authority as are incidental to the foregoing. Notwithstanding the foregoing, Sellers' Representative shall have no obligation to act on behalf of Sellers except as provided herein and in any certificate, instrument or document delivered pursuant hereto. Any such actions taken, exercises of rights, power or authority, and any decision or determination made by Sellers' Representative consistent therewith, shall be absolutely and irrevocably binding on each Seller and its respective successors, as if such party personally had taken such action, exercised such rights, power or authority or made such decision or determination in such party's capacity and all defenses

72

which may be available to any Seller to contest, negate or disaffirm the action of Sellers' Representative taken in good faith under this Agreement are waived. The powers, immunities and rights to indemnification granted to Sellers' Representative Group (as defined below) hereunder are coupled with an interest and shall be irrevocable and survive the death, incompetence, bankruptcy or liquidation of any Seller and shall be binding on any successor thereto.

(b)    Each Seller agrees that (i) Sellers' Representative shall not be a fiduciary when serving as "Sellers' Representative" under this Agreement and (ii) neither Sellers' Representative, its Affiliates nor their respective contractors, agents or advisors (collectively, the "Sellers' Representative Group") shall be liable for any actions taken or omitted to be taken under or in connection with this Agreement, any certificate, instrument or document delivered pursuant hereto, or the transactions contemplated hereby or thereby, except for such actions taken or omitted to be taken resulting from Sellers' Representative's Fraud or willful misconduct. Furthermore, each Seller shall indemnify, defend and hold harmless, severally and not jointly, *pro rata* based upon such Seller's share of the sale proceeds hereunder from and against any and all losses, claims, damages, liabilities, fees, costs, expenses (including reasonable attorneys' fees and expenses of other skilled professionals and in connection with seeking recovery from insurers), judgments, fines or amounts paid in settlement paid or incurred by Sellers' Representative in connection with the performance of its obligations as Sellers' Representative.

(c)    The parties agree that Buyer and its Affiliates shall be entitled to conclusively rely, without independent investigation or verification, on and shall be fully protected in relying on the appointment and authority of Sellers' Representative and on any action taken, decisions made or instructions given by Sellers' Representative, on behalf of each Seller. Payments made to or as directed by Sellers' Representative pursuant to this Agreement are sufficient and binding to the same extent as though such payments were made directly to the appropriate Seller. Buyer shall not have any responsibility or Liability for any further delivery or application of any such payment, it being agreed by Sellers that, on the terms set forth herein, (i) any payment Buyer is required to make hereunder to any Seller may be made to or as directed by Sellers' Representative on behalf of such Seller, as the case may be, (ii) Sellers shall determine among themselves the amount due to each Seller from each payment made to or as directed by Sellers' Representative hereunder, and (iii) each Seller shall look solely to Sellers' Representative for such Seller's respective share of any payment made to or as directed by Sellers' Representative hereunder.

(d)    Sellers' Representative shall be entitled to, and shall not have any liability to Sellers for action in accordance with the following: (i) relying upon any signature believed by Sellers' Representative to be genuine, (ii) reasonably assuming that a signatory has proper authorization to sign on behalf of the applicable party, and (iii) requesting and relying upon the written consent or written instructions of a party; provided, that Sellers' Representative shall not have any obligation to request such consent or instructions with respect to any matter. Sellers' Representative may resign at any time following the Closing Date, upon at least 30-days' prior written notice to Buyer; provided, that for so long as Sellers' Representative or Sellers have any outstanding duties or obligations hereunder, a replacement reasonably believed to be capable of carrying out the duties and performing the obligations of Sellers' Representative hereunder shall be appointed as the "Sellers' Representative" hereunder prior to the effectiveness of any such

resignation and Sellers' Representative shall notify Buyer of such replacement at least 30-days prior to the effectiveness of such replacement.

(e)     Neither Buyer nor any of its Affiliates (including, after the Closing, the Company Entities), shall have any Liability whatsoever or be held liable or accountable in any manner to any Person for any act or omission of Sellers' Representative in such capacity, including in connection with any actions or inactions of the Buyer or any of its Affiliates (including, after the Closing, the Company Entities), in reliance on any act, decision, consent, approval or instruction of Sellers' Representative.

Section 10.21   Guarantee. Buyer Parent, in order to induce the Sellers to enter into this Agreement and the other Transaction Documents, and in recognition of substantial direct and indirect benefits to Buyer Parent therefrom, hereby absolutely, unconditionally and irrevocably guarantees the due and punctual payment and performance of all of Buyer's obligations contemplated by this Agreement, including the payment (a) of the Purchase Price and (b) if applicable under Section 6.16, all obligations required by the Payoff Letter, including any prepayment, termination or breakage fees or penalties paid or payable related to the Existing Credit Facility, in each case, pursuant to and in accordance with the terms and conditions of this Agreement (the "Guarantee" and such obligations, the "Guaranteed Obligations").  The Guarantee is valid and in full force and effect and constitutes the valid and binding obligation of Buyer Parent, enforceable in accordance with its terms. The Guarantee is an irrevocable guarantee of payment and performance (and not just of collection) and shall continue in effect notwithstanding any extension or modification of the terms of this Agreement or any assumption without the consent of the Sellers' Representative of any such guaranteed obligation by any other Person until such time as the Guaranteed Obligations have been performed in full.  The obligations of Buyer Parent hereunder shall not be released or discharged, in whole or in part, or otherwise affected by or contingent upon (i) the liquidation or dissolution of, or the merger or consolidation of Buyer with or into, any Person or any sale or transfer by Buyer of all or any part of its property or assets, (ii) the bankruptcy, receivership, insolvency, reorganization or similar proceedings involving or affecting Buyer, (iii) any modification, alteration, amendment or addition of or to this Agreement or any of the other Transaction Documents (except to the extent such modification, alteration, amendment or addition affects the Buyer's obligations hereunder or thereunder and then only to such extent), (iv) any disability or any other defense of Buyer or any other Person (with or without notice) which might otherwise constitute a legal or equitable discharge of a surety or a guarantor or otherwise, (v) the failure or delay on the part of any Seller or the Sellers' Representative to assert any claim or demand or to enforce any right or remedy against Buyer or Buyer Parent or (vi) any change in the name or ownership of a Seller or the Company or any other person referred to herein. In connection with the foregoing, Buyer Parent waives, to the fullest extent permitted by Law, all defenses, benefits and discharges it may have or otherwise be entitled to as a guarantor or surety and further waives presentment for payment or performance, notice of nonpayment or nonperformance, demand, diligence or protest.  Buyer Parent acknowledges that it will receive substantial direct and indirect benefits from the Transactions and that the waivers and agreements

by Buyer Parent set forth in this <u>Section 10.21</u> are knowingly made in contemplation of such benefits.

[<i>Signature Pages Follow</i>]

RLF1 28498915v.1

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

**SELLERS:**

**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.**

By: _____
Name: Fernando Alonso-de-Florida Rivero
Title:   Authorized Representative

**CREDITO REAL USA, INC.**

By: _____
Name: Arturo Rosas Barrientos
Title:   President and Secretary

**SCOT SEAGRAVE**

_____

**COMPANY:**

**CREDITO REAL USA FINANCE, LLC**

By: _____
Name: Scot Seagrave
Title:   CEO

*[Signature Page to Purchase Agreement]*

**SELLERS' REPRESENTATIVE:**


**CRÉDITO REAL, S.A.B. DE C.V., SOFOM, E.N.R.**


By: _____
Name: Fernando Alonso-de-Florida Rivero
Title:   Authorized Representative

[*Signature Page to Purchase Agreement*]

**BUYER:**

**BEPENSA CAPITAL, INC.**

By: _____
Name:    Juan Manuel Ponce Diaz
Title:     President

By: _____
Name:    Alberto Ponce Gutiérrez
Title:     Vice President

By: _____
Name:    Jose Luis Ponce Manzanilla
Title:     Vice President

[*Signature Page to Purchase Agreement*]

**BUYER PARENT:**

**BEPENSA CAPITAL S.A. DE C.V.**

By: _____
Name:    Juan Manuel Ponce Diaz
Title:    Board Member


By: _____
Name:    Alberto Ponce Gutiérrez
Title:    Board Member


By: _____
Name:    Jose Luis Ponce Manzanilla
Title:    Board Member

[*Signature Page to Purchase Agreement*]

Schedule A

Buyer Disclosure Schedule

(To be attached)

Schedule B

Seller Disclosure Schedule

(To be attached)

<u>Schedule C</u>

<u>Book Value Calculation Schedule</u>

(To be attached)

1

Schedule D

Required Regulatory Approvals

(To be attached)

<u>Exhibit A</u>

**Directors' List and Company Entities' List**

1.  <u>Company</u>: Arturo Rosas Barrientos.

<u>Exhibit B</u>

**Form of Directors' Resignation Letter**

(To be attached)